**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **ORG GC MIDCO, LLC** | § | **Case No. 21-90015 (MI)** |
| | § | |
| Debtor.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**DECLARATION OF ROBERT WAGSTAFF IN SUPPORT OF**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

I, Robert Wagstaff, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the Chief Restructuring Officer ("**CRO**") of ORG GC Midco, LLC (the "**Debtor**" or "**Midco**" and, collectively, with its direct and indirect subsidiaries, the "**Company**" or the "**GCS Parties**") and a Managing Director at Riveron Management Services LLC, f/k/a Conway MacKenzie Management Services, LLC ("**Riveron**").  I have more than 30 years of financial and operational experience, spanning a wide range of industries, including business services.  I specialize in assisting distressed and underperforming companies in all areas of operational and financial restructuring, and have advised debtors, creditors, investors, and court-appointed officers in multiple chapter 11 bankruptcy cases and out-of-court matters. I have previously held senior positions with Berkeley Research Group LLC, Frontera Capital Advisors, FTI Consulting and Sitel Group. I began my career with PricewaterhouseCoopers LLP.  I have a Bachelor of Commerce degree in Accounting from Concordia University.

---

[1]    The last four digits of the Debtor's federal tax identification number are 1740.  The Debtor's mailing address is 6330 Gulfton Street, Houston, Texas 77081.

2.       I have overseen the Debtor's operations and preparations for chapter 11 since November 2019, when the Company engaged Riveron and I was appointed as CRO.  As CRO, I am familiar and knowledgeable with the Company's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the Debtor's filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Case**").  I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Debtor's Chapter 11 Case and in support of certain motions and applications that the Debtor has filed with the Court, including the "first day" pleadings filed concurrently herewith (the "**First Day Motions**").  I am authorized to submit this Declaration on behalf of the Debtor.

3.       Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's employees, my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial condition, or from my discussions with the Debtor's advisors.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

### I. Preliminary Overview

4.       GC Services Limited Partnership ("**GC Services**" or "**GCS LP**"), an indirect subsidiary of the Debtor, is one of North America's oldest and largest privately held providers of Accounts Receivable Management ("**ARM**") and Business Process Outsourcing ("**BPO**") solutions, providing a full scope of solution offerings, including 24x7x365 programs, multi-channel and multi-lingual customer service programs (e.g. voice, email, chat, social media

and more), from numerous locations in the continental United States and the Philippines, to Fortune 500 companies, premier global financial institutions, and large governmental entities.

5.     GC Services' intermediate holding company, Midco, has commenced this Chapter 11 Case to implement a pre-packaged, comprehensive consensual restructuring (the "**Restructuring**") of the Company's funded indebtedness through a prepackaged plan of reorganization that will substantially de-lever the Company by reducing its funded indebtedness from approximately \$210.3[2] million to approximately \$130.0[3] million upon emergence.

6.     A corporate structure chart of the Debtor and Non-Debtor GCS Parties (as defined below) is as follows:



---

[2]   Amount excludes accrued interest of approximately \$32 million as of the Petition Date and is based on notional size \$25 million Existing ABL Facility.

[3]   Amount includes notional size \$30 million Exit ABL Facility, which may be increased to \$40 million subject to ongoing negotiations.

7.     As noted above, Midco—the only debtor in the Chapter 11 Case—is the intermediate holding company of GC Services and the direct or indirect parent of five non-Debtor subsidiaries (the "**Non-Debtor GCS Parties**").   None of Midco's subsidiaries, including the Company's primary operating entity, GC Services, are expected to file for chapter 11 protection. After careful and extensive evaluation, the Company, in consultation with, and with the support of the Consenting Lenders (as defined herein), determined not to file the Non-Debtor GCS Parties for chapter 11 along with the Debtor because they determined doing so may deplete the value of the Company to the detriment of all parties in interest.   Moreover, due to the fully consensual nature of the Restructuring, a chapter 11 filing by the Non-Debtor GCS Parties is not necessary to effectuate the Restructuring.[4]   Business at the Non-Debtor GCS Parties is expected to continue as usual and GC Services anticipates no impact on its operations.

8.     As set forth in greater detail in the *Prepackaged Chapter 11 Plan of ORG GC Midco, LLC* (as amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof and the Restructuring Support Agreement, the "**Plan**"),[5] dated October 16, 2021 and filed contemporaneously herewith, the Restructuring provides that:

i.   the Existing Term Loans of approximately $185.3 million will be cancelled and discharged in exchange for (a) takeback first lien term loans in an aggregate amount of approximately $71 million, (b) takeback second lien term loans in an aggregate amount of approximately $29 million, and (c) preferred and common equity of the Reorganized Company.  More specifically:

a.   each holder of an Allowed Existing Term Loan Claim affiliated with BSP will receive its (i) *pro rata* share of (A) Initial New 1L Loans, (B) New 2L Loans, and (C)  New Holdco Junior Preferred Equity, and (ii) 100% of the New Holdco Common Equity; and

---

[4]   The Consenting Lenders will enter into contractual agreements with the Non-Debtor GCS Parties to implement the Restructuring contemplated by the Plan.

[5]   Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

Case 21-90015   Document 3   Filed in TXSB on 11/08/21   Page 5 of 750

    b.   each holder of an Allowed Existing Term Loan Claim affiliated with GS will receive its (i) *pro rata* share of Initial New 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans), (ii) *pro rata* share of New 2L Loans, (iii) 100% of the New Midco Equity, and (iv) as a result of receiving 100% of the New Midco Equity, GS will acquire an indirect interest in (A) 100% of the New Holdco Senior Preferred Equity and (B) its *pro rata* share of New Holdco Junior Preferred Equity, both of which shall be issued to the Reorganized Debtor; *provided that* prior to the Effective Date, GS may elect to have its *pro rata* share of the Initial 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans) and/or its *pro rata* share of the New 2L Loans issued to the Reorganized Debtor.

ii.   holders of Existing ABL Facility Claims are unimpaired and, on the Effective Date, will be either (a) paid in full and refinanced out with a third party lender or (b) provided such other treatment so as to render the Existing ABL Claims unimpaired;

iii.   General Unsecured Claims are unimpaired and will receive payment of their claims in full in cash in the ordinary course of business; and

iv.   existing equity interests (i.e., Midco Equity Interests) in the Debtor will be cancelled on the Effective Date.

    9.    One of the Company's Existing Term Lenders, GS, has agreed to provide up to $6 million in senior secured debtor-in-possession financing (the "**Term DIP Facility**") to fund the costs of implementing the Restructuring.  The Company's Existing ABL Lenders have also agreed to allow GC Services to continue to access the Existing ABL Facility during the pendency of the Debtor's Chapter 11 Case.[6]

    10.    The effects of the Restructuring can be summarized as follows:

---

[6]   The Debtor has agreed (i) not to borrow under the Existing ABL Facility and (ii) that no borrowings by GC Services under the facility will be made available for the Debtor's use during the Chapter 11 Case.

*Reorganized Funded Comparison ($ in millions)*

| Current Funded Debt (Principal Only) | | Reorganized Funded Debt (Principal Only) | |
|---|---|---|---|
| Existing Term Loan Facility | $  185.3 | New 1L Facility | $   71.0 |
| Existing ABL Facility | 25.0[7] | New 2L Facility | 29.0 |
| | | Exit ABL Facility | 30.0[8] |
| *Total Funded Debt* | *$  210.3[9]* | *Total Reorganized Debt* | *$ 130.0* |

11.     The resulting corporate and capital structure following the Restructuring are

as follows:



---

7    Amount outstanding under Existing ABL Facility fluctuates monthly. Amount herein is based on a notional size
     $25 million facility. As of the Petition Date, the amount outstanding under the Existing ABL Facility is
     approximately $13.1 million (including approximately $5.2 million in drawn letters of credit).

8    Amount reflects $30.0 million notional Exit ABL Facility, inclusive of $10 million L/C sublimit size of the Exit
     ABL. Facility contemplated to be upsized to $40.0 million, inclusive of $15 million L/C sublimit, at exit, subject
     to ongoing negotiations.

9    Total current funded indebtedness consists of principal amount outstanding as of the Petition Date.

12.     The Restructuring is supported by the Debtor's entire capital structure. Pursuant to that certain *Restructuring Support Agreement*, dated as of October 16, 2021, annexed hereto as **Exhibit A** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all exhibits thereto, the "**Restructuring Support Agreement**"), 100% of the holders of Existing Term Loan Claims have already voted in accordance with the terms and conditions of the Restructuring Support Agreement, to accept the Plan (such lenders, the "**Consenting Lenders**").  All other claims of third parties against the Debtor, including holders of General Unsecured Claims, are unimpaired under the Plan, and third-party creditors, if any, are accordingly presumed to accept the Plan.

13.     Furthermore, the GCS Parties and the Consenting Lenders entered into that certain *Settlement and Release Agreement*, dated as of November 8, 2021, annexed hereto as **Exhibit B** (the "**Settlement and Release Agreement**"), with the Company's Sponsor (as defined herein) and minority equity holder – the Katz Parties (as defined in the Settlement and Release Agreement) – pursuant to which the Sponsor and the Katz Parties have agreed to support and not object to the Plan.  Under the Settlement and Release Agreement, the Sponsor and the Katz Parties have agreed to take all actions reasonably requested by the GCS Parties to support and facilitate implementation and consummation of the Plan and Restructuring, and to not take any action that is inconsistent with the Restructuring, the Restructuring Support Agreement, the Plan, or the Chapter 11 Case.  In exchange, the GCS Parties have agreed to pay the Sponsors' professional fees up to $100,000.  GCS LP and ORG (as defined below) have also agreed to terminate that certain Consulting Agreement, dated July 31, 2017, by and between ORG and GCS LP, whereby GCS LP retained ORG to provide certain management consulting services, and ORG has agreed to waive any claims thereunder.

14.     Finally, as noted above, pursuant to that certain *Amended and Restated Forbearance Agreement and Ninth Amendment* to Credit Agreement, dated as of November 7, 2021 (as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**ABL Forbearance Agreement**"), the Company's Existing ABL Facility Lenders have agreed to support the Company's Restructuring process by continuing to provide the Debtor's operating subsidiary, GC Services, with access to the Existing ABL Facility during the Debtor's Chapter 11 Case.  Pursuant to the ABL Forbearance Agreement, the Debtor has agreed (i) not to borrow under the Existing ABL Facility and (ii) that no funds made available to GC Services under the facility will be made available to, or otherwise used by, the Debtor during the Chapter 11 Case.

15.     The Company, the Consenting Lenders, and the Existing ABL Facility Lenders have agreed to implement the Restructuring with as little disruption to the business as possible.  In accordance with this goal, and to reap the full benefits of the Restructuring, the Debtor must exit chapter 11 quickly.

16.     Accordingly, pursuant to the Restructuring Support Agreement and the Term DIP Facility Agreement, the Debtor has agreed to use commercially reasonable efforts to meet certain milestones (the "**RSA Milestones**") for the Restructuring process, including (i) confirmation of the Plan by no later than 24 days after the Petition Date (i.e., December 2, 2021), and (ii) the Plan becoming effective no later than 38 days after the Petition Date (i.e., December 16, 2021).  Furthermore, the ABL Forbearance Agreement also provides for certain

milestones (the "**ABL Milestones**") for the Debtor's Chapter 11 Case.   The full list of RSA Milestones and ABL Milestones are set forth in the table below:

| Milestone | RSA Deadline | ABL Deadline |
|---|---|---|
| Commence Solicitation of Votes on the Plan | October 20, 2021 | |
| Petition Date ("**T**") | November 8, 2021 | November 15, 2021 |
| Filing of First Day Motions, the Plan, the Disclosure Statement, Scheduling Motion, and DIP Motion | T (i.e. November 8, 2021) | |
| Execution of Settlement and Release Agreement | T (i.e. November 8, 2021) | |
| Completion of Solicitation of Votes on the Plan | November 9, 2021 | |
| Entry of Cash Management Order (as defined herein) | | T + 5 days (i.e., November 20, 2021) |
| Hearing to Consider Approval of the Disclosure Statement and Confirmation of the Plan | T + 21 days (i.e., November 29, 2021) | |
| Obtain Entry of Final DIP Order | T + 24 days (i.e., December 2, 2021) | |
| Obtain Entry of an Order Approving the Disclosure Statement and Confirming the Plan | T + 24 days (i.e., December 2, 2021) | T + 30 days (i.e., December 15, 2021) |
| Occurrence of Effective Date | T + 38 days (i.e., December 16, 2021) | December 23, 2021 |

17.     Failure to meet an RSA Milestone or an ABL Milestone could lead to termination of the Restructuring Support Agreement and/or the ABL Forbearance Agreement. Thus, in accordance with the RSA Milestones and the ABL Milestones, the Debtor has requested that the Court schedule a combined hearing to approve the Disclosure Statement and confirm the Plan (the "**Combined Hearing**") on November 22, 2021 at 2:00 p.m. (Prevailing Central Time), or as soon thereafter as the Court's schedule permits.

18.     The below table highlights the Debtor's proposed key dates for this Chapter 11 Case:

| Event | Date |
|---|---|
| Voting Record Date | October 15, 2021 |
| Mailing of Combined Notice (as defined in the Scheduling Motion) | October 16, 2021 |
| Plan Voting Deadline | November 1, 2021 at 4:00 p.m. |
| Petition Date | November 8, 2021 |
| First Day Hearing (subject to Court availability) | November 9, 2021 |
| Plan/Disclosure Statement Objection Deadline | November 16, 2021 at 4:00 p.m. |
| Combined Hearing (subject to Court availability) | November 22, 2021 at 2:00 p.m. |

19.     On October 16, 2021, immediately following the execution of the Restructuring Support Agreement, the Debtor began soliciting votes on the Plan.  On October 16, 2021, the Debtor served the Disclosure Statement for Prepackaged Chapter 11 Plan of ORG GC Midco, LLC (the "**Disclosure Statement**") on all holders of Class 3 (Existing Term Loan Claims), the only class entitled to vote, and requested such holders return their ballots with respect to the Plan no later than 4:00 p.m. (Prevailing Central Time) on November 1, 2021 (the "**Voting Deadline**").

20.     As of the Voting Deadline, and consistent with the commitments set forth in the Restructuring Support Agreement, 100% of holders of Existing Term Loan Claims have voted to accept the Plan.

## II. The Company's Business

21.     Founded by Jerold B. Katz, GC Services opened its doors for business in October 1957 as a small, one-man BPO agency with one client and one employee (the founder) providing third party accounts receivable management services.  It was during these early formative years that GC Services pioneered the use of automated systems that maximize the efficiency, productivity, and cost-effectiveness of the accounts receivable management process.

Through a dedicated approach to providing quality service and excellent results, GC Services moved into the forefront of the BPO industry.

22.     As client needs changed, GC Services evolved and expanded in the 1980s to offer first party accounts receivable collection services.  GC Services later expanded its service offerings by creating a separate teleservices division that could meet a full range of customer care needs, eventually becoming the nation's oldest and one of the largest privately owned business process outsourcing providers with approximately 6,000 employees and numerous call centers located across the United States and in Manila, Philippines.

23.     In late 2015, investment funds managed by the Austin-based private equity firm, Owner Resource Group, LLC ("**ORG**" and collectively with its affiliates that own Interests, directly or indirectly, in the Debtor, including Holdings (as defined below) the "**Sponsor**"), acquired a controlling interest in the Company from the Katz family.

### III. Corporate and Capital Structure

24.     As depicted on the comprehensive corporate organizational chart above, the Company is indirectly owned by the Sponsor through ORG GC Holdings, LLC ("**Holdings**"), which owns 100% of the equity interests of Midco.  Midco, in turn, directly or indirectly owns each of the Non-Debtor GCS Parties.

25.     As of the Petition Date, the Company's capital structure consists of approximately $210.3[10] million in funded debt, with respect to which the Debtor is obligated as a borrower.  The Debtor's obligations are summarized below:

---

[10]   Amount excludes accrued interest of approximately $32 million as of the Petition Date and is based on notional size $25 million Existing ABL Facility.

| Debt Instrument | Principal Funded Debt ($ millions) |
|---|---|
| Existing Term Loan Facility | $          185.3 |
| Existing ABL Facility[11] | $           25.0 |
| **Total Funded Debt** | **$          210.3** |

### A.    Existing Term Loan Facility

26.    The Debtor has outstanding senior secured debt obligations under that certain *Financing Agreement*, dated July 31, 2017, by and among Midco and certain of its affiliates, as borrowers, each of the guarantors party thereto, BSP Agency, LLC, as administrative agent and collateral agent (the "**Existing Term Loan Facility Agent**"), and the lenders party thereto (the "**Existing Term Lenders**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing Term Loan Credit Agreement**" and the facility provided thereunder, the "**Existing Term Loan Facility**").

27.    As of the Petition Date, the aggregate principal amount outstanding under the Existing Term Loan Facility was approximately $185.3 million.  Obligations under the Existing Term Loan Facility are secured by a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral (each, as defined in the Existing Intercreditor Agreement (defined below)).

### B.    Existing ABL Facility

28.    GC Services maintains a revolving line of credit under that certain *Credit Agreement* dated July 31, 2017, by and among the Debtor and certain of its affiliates, as borrowers, each of the guarantors party thereto, JPMorgan Chase Bank N.A. ("**JPMorgan**"), as administrative

---

[11]   Amount outstanding under Existing ABL Facility fluctuates monthly. Amount herein is based on a notional size $25 million facility. As of the Petition Date, the amount outstanding under the Existing ABL Facility is approximately $13.1 million (including approximately $5.2 million in drawn letters of credit).

agent (in such capacity, the "**Existing ABL Facility Agent**"), and the lenders party thereto (the "**Existing ABL Lenders**") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Existing ABL Facility Agreement**" and the facility provided thereunder, the "**Existing ABL Facility**").

29.     As of the Petition Date, the aggregate amount outstanding under the Existing ABL Facility is approximately $13.1 million,[12] which, as described in further detail in the Plan, will be converted into outstanding principal amounts under the Exit ABL Facility with the Existing ABL Lenders or paid in full in connection with refinancing the Existing ABL Facility with a new lender upon consummation of the Restructuring.  The Company's obligations under the Existing ABL Facility are secured by a first priority lien on the ABL Priority Collateral and a second priority lien on the Term Priority Collateral.

### C.     Existing Intercreditor Agreement

30.     The relative contractual rights of the Existing Term Lenders and the Existing ABL Lenders are governed by that certain Intercreditor Agreement, dated as of July 31, 2017 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time, the "**Existing Intercreditor Agreement**").  The Existing Intercreditor Agreement governs the rights and obligations of the Existing Term Lenders and the Existing ABL Lenders with respect to, among other things, collateral priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

### IV. Events Leading to the Restructuring

31.     Although the business is operationally sound, the Company is significantly over-levered.  For Fiscal 2020, the Company reported approximately $15 million of adjusted

---

[12]     Amount includes approximately $5.2 million in drawn letters of credit.

EBITDA (on a consolidated 52-week basis) versus approximately $217 million of total funded debt, including accrued and unpaid interest—implying leverage of approximately 14.5x EBITDA.[13]  The Company's precarious financial position compared to its competitors, many of which have already undergone their own balance sheet restructurings in the past 12-18 months, has begun to negatively impact the Company's ability to attract and retain customers.

32.     In the fall of 2019, the Company began struggling to comply with certain of its financial covenants under the Existing Term Loan Credit Agreement.  In November 2019, the Company retained Riveron and appointed me as Chief Restructuring Officer ("**CRO**") to assist the Company in evaluating strategic options to right-size its balance sheet and provide financial and operational leadership to the Company as it embarked on a potential restructuring process.

33.     In January 2020, the Company failed to make a regularly scheduled interest payment due under the Existing Term Loan Credit Agreement, triggering an event of default with respect to the Existing Term Loan Credit Agreement and a cross-default with respect to the Existing ABL Facility Agreement.  On April 24, 2020, the Debtor, certain of the Non-Debtor GCS Parties, and Holdings, entered into forbearance agreements with the Existing Term Loan Facility Agent, each of the Existing Term Lenders, and the Existing ABL Facility Agent, which forbearance agreements expired on July 14, 2020.

34.     On September 16, 2020, the Existing Term Loan Facility Agent delivered to the Debtor, among others, a *Notice of Exercise of Rights and Remedies After Default*, which, among other things, notified the Debtor, among other parties, of the Existing Term Loan Facility

---

[13]    As of December 31, 2020, there was approximately $13.9 million drawn on the Existing ABL Facility and approximately $203.3 million in par plus accrued interest outstanding on the Existing Term Loan Facility. Calculation does not include $5.5 million in letters of credit outstanding as of December 31, 2020.

Agent's decision to exercise rights under the Proxy and Power of Attorney (as defined in the Pledge and Security Agreement).[14]

35.    On September 18, 2020, the Existing Term Loan Facility Agent executed and delivered a written consent (the "**September 18 Written Consent**"), in the name of and on behalf of Holdings, pursuant to the Proxy and Power of Attorney and the Existing Term Loan Facility Agent's exercise of rights thereunder, pursuant to which, in accordance with Section 3.9 of the former Limited Liability Company Agreement of Midco (the "**Former ORG GC Midco Operating Agreement**"), and Section 18-302(d) of the Delaware Limited Liability Company Act, each person that was formerly serving as a manager of Midco was removed as a manager and the current three person Board of independent Managers was appointed.  Pursuant to the September 18 Written Consent, the Former ORG GC Midco Operating Agreement was also amended and restated in its entirety and the Amended and Restated Limited Liability Company Agreement of ORG GC Midco, LLC, effective as of September 18, 2020 (the "**A&R ORG GC Midco Operating Agreement**"),  was adopted.

36.    In October 2020, the Company retained Weil, Gotshal & Manges LLP as counsel ("**Weil**") to assist the Company in negotiating and implementing a deleveraging transaction.  With Weil and Riveron's assistance, the Company began to engage with its Existing Term Lenders, the Existing ABL Lenders, and the Sponsor regarding the terms of a potential restructuring transaction.

---

[14]    Pursuant to that certain Pledge and Security Agreement (the "**Pledge and Security Agreement**") entered into in connection with the Existing Term Loan Credit Agreement, 100% of the equity in the Debtor and certain of the other GCS Parties (each a "**Pledged Company**" and, collectively, the "**Pledged Companies**" and such equity, the "**Pledged Equity**") was pledged by the holders of such Pledged Equity (the "**Pledgors**") in favor of the Existing Term Loan Facility Agent, in its capacity as agent for the Existing Term Lenders, to secure the obligations under the Existing Term Loan Credit Agreement.

37.     After several months of good faith, arm's length negotiations with the Consenting Lenders, on October 16, 2021, the Debtor, the Non-Debtor GCS Parties, and the Consenting Lenders entered into the Restructuring Support Agreement.

38.     The terms of the Restructuring are reflected in the Plan.  Upon its full implementation, the Plan will effectuate a significant de-leveraging of the Company's capital structure by eliminating approximately $117 million[15] in principal amount of funded debt and accrued interest and reducing the Company's ongoing cash debt service requirements.  The reduced debt burden and cash debt service requirements will provide the Company with sufficient liquidity to continue funding the Company's operations and to make the necessary capital expenditures and investments to ensure that GC Services remains an industry leader in the ARM and BPO sector.

### V. Term DIP Facility

39.     As an intermediate holding company, the Debtor does not generate its own revenue.  Accordingly, the Debtor requires financing to help fund the costs of implementing the Restructuring.

40.     One of the Consenting Lenders, GS, has agreed to provide incremental liquidity to help fund the costs of implementing the Restructuring in the form of a superpriority senior secured term loan facility in an aggregate principal amount up to $6 million.  Pursuant to the *Emergency Motion of Debtor for Entry of Final Order (I) Authorizing the Debtor to Obtain Senior Secured Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties; and (V) Granting Related Relief* (the "**Term DIP Financing**

---

[15]    Inclusive of $32 million of accrued interest on the Existing Term Loan Facility.

**Motion**"), the Debtor is requesting authority to enter into the Term DIP Facility. The Term DIP Financing Motion will be scheduled to be heard at the Combined Hearing to consider approval of the Disclosure Statement and confirmation of the Plan, and the Term DIP Facility will be funded and closed immediately prior to the Debtor's emergence from this Chapter 11 Case. Upon consummation of the Restructuring, the Term DIP Facility will be converted on a dollar-for-dollar basis into Initial New 1L Loans.

41.     Incurrence of the Term DIP Facility is fully consensual as the Existing Term Lenders would not consent to being primed by a third party lender. Riveron contacted multiple third party lenders to inquire whether any would be interested in an opportunity to provide the Debtor with unsecured financing. All parties contacted declined the opportunity. The Company has no unencumbered collateral, and in light of the Debtor's precarious financial position as well as my inquiries with potential third party lenders, I do not believe the Debtor would be able to obtain financing on an unsecured basis. The Debtor negotiated the terms of the Term DIP Facility at arm's length, in good faith, and I believe the terms are the best available to the Debtor in light of the circumstances. Accordingly, it is my business judgement that incurrence of the Term DIP Facility is necessary and in the best interests of the Debtor's estate.

## VI. First Day Motions

42.     As discussed above, the Company and the Consenting Lenders have agreed to implement the Restructuring to minimize any disruption to the business. Accordingly, Midco is the only Debtor in this Chapter 11 Case. As a holding company, Midco has no operations or employees. Accordingly, the Debtor does not require extensive "first day" relief; however, in addition to the Term DIP Financing Motion, the Debtor has filed the "first day" pleadings described below to minimize the adverse effects of the commencement of this Chapter 11 Case

and ensure the Debtor's swift exit from chapter 11.  Copies of the First Day Motions were shared with the Office of the United States Trustee for the Southern District of Texas (the " **U.S. Trustee**") prior to the Petition Date and the U.S. Trustee's comments have been incorporated.  Notably, all of the Company's employees are employed and paid by the Debtor's non-Debtor operating subsidiary, GCS LP, which will continue to pay such employees their wages and benefits in the ordinary course.  Similarly, virtually all of the Company's vendors and customers have legal and contractual relationships with non-Debtor GCS Parties.  The Company will continue to honor its obligations to all such parties in the ordinary course.  I am familiar with the contents of each First Day Motion, and believe that the relief requested in the First Day Motions will preserve and maximize the value of the Debtor's estate.

## A.     Administrative Motions and Applications

### 1.     Claims Agent Retention Application

43.     Pursuant to the *Emergency Ex Parte Application of Debtor for Entry of an Order (I) Authorizing Retention and Appointment of Stretto as Claims, Noticing, and Solicitation Agent; and (II) Granting Related Relief* (the "**Claims Agent Retention Application**"), the Debtor requests entry of an order appointing Bankruptcy Management Solutions, Inc. d/b/a Stretto ("**Stretto**") as claims, noticing, and solicitation agent for the Debtor and its Chapter 11 Case. Stretto's responsibilities will include, among other things: (i) serving as the noticing agent to mail notices to the estate's creditors and other parties in interest; (ii) providing computerized claims, objection, solicitation, and balloting related services; and (iii) providing expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to this Chapter 11 Case.   The terms of Stretto's retention are set forth in that certain engagement agreement by and between the Debtor and Stretto.

44.     I understand that Stretto is a chapter 11 administrator comprised of leading industry professionals with significant experience in the administrative aspects of large, complex chapter 11 cases and that Stretto's professionals have experience in noticing, claims administration, solicitation, balloting, and facilitation of other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  I have been made aware that Stretto has served as an official claims, noticing, and solicitation agent in many large bankruptcy cases in this district and other districts nationwide.  I have been further advised that the appointment of a claims, noticing, and solicitation agent will relieve the Debtor and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtor's estate and its creditors.  Based on the foregoing, I believe that the relief requested in the Claims Agent Retention Application should be approved.

**2.     Scheduling Motion**

45.     Pursuant to the *Emergency Motion of Debtor for Entry of an Order (I) Scheduling Combined Hearing to Consider (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Approving Solicitation Procedures and Form and Manner of Notice of Anticipated Commencement of Chapter 11 Case, Combined Hearing, and Objection Deadline; (III) Fixing Deadline to Object to Disclosure Statement and Plan; (IV) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting and (B) Waiving Requirement of Filing Statement of Financial Affairs and Schedule of Assets and Liabilities; and (V) Granting Related Relief* (the "**Scheduling Motion**"), the Debtor requests entry of an order:

     i.     scheduling a combined hearing (the "**Combined Hearing**") on November 22, 2021 at 2:00 p.m. (Prevailing Central Time) to consider (i) approval of the Disclosure Statement and (ii) confirmation of the Plan;

ii.    establishing November 16, 2021 at 4:00 p.m. (Prevailing Central Time) as the deadline to object to the adequacy of the Disclosure Statement and/or confirmation of the Plan (the "**Objection Deadline**");

iii.    approving the Solicitation Procedures (as defined in the Scheduling Motion) with respect to the Plan, including the form of Ballot and Notice of Non-Voting Status (each as defined in the Scheduling Motion);

iv.    approving the form and manner of the notice of anticipated commencement of the Debtor's Chapter 11 Case, the Combined Hearing, and the Objection Deadline;

v.    approving the form of Supplemental Notice (as defined herein);

vi.    so long as the Plan is confirmed on or before January 7, 2022 (the "**SOFA/Schedule Deadline**"), (a) directing the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") not to convene an initial meeting of creditors under section 341(a) of the Bankruptcy Code (the "**341 Meeting**"), and (b) waiving the requirement that the Debtor file its statement of financial affairs ("**SOFA**") and schedules of assets and liabilities ("**Schedules**"); and

vii.    granting related relief.

46.    As set forth in more detail in the Scheduling Motion, the holders of Class 3 (Existing Term Loan Claims) are the only class of claims entitled to vote on the Plan. Accordingly, on October 16, 2021, following execution of the Restructuring Support Agreement, Stretto transmitted a Solicitation Package (defined below) to the holders of Class 3 (Existing Term Loan Claims). The Solicitation Package included: (i) a cover e-mail from the Debtor; (ii) the Combined Notice; (iii) the Disclosure Statement and all exhibits thereto, including the Plan; and (iv) a customized Ballot containing instructions on how to vote on the Plan (the "**Solicitation Package**"). Stretto transmitted the Solicitation Package to the holders of holders of Class 3 (Existing Term Loan Claims) electronically. The Solicitation Packages established a voting deadline of November 1, 2021 at 4:00 p.m. (Prevailing Central Time).

47.    I understand from counsel that the Debtor's prepetition solicitation of the Plan was in compliance with the Bankruptcy Code and the Bankruptcy Rules. Based on

discussions with the Debtor's counsel, the Combined Notice and the proposed service of the Supplemental Notice was or will be provided to all parties in interest of the commencement of the Chapter 11 Case, including the holders of Claims and Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (Existing Term Loan Claims), Class 4 (Existing ABL Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), and Class 7 (Midco Equity Interests), as well as the Debtor's insurers, taxing authorities, and other interested governmental parties.

48.     The Combined Notice notified parties that, among other things, the Debtor expected to commence this Chapter 11 Case on or shortly after November 8, 2021, included the date, time, and place of the Combined Hearing, and the procedures for objecting to the adequacy of the Disclosure Statement and/or confirmation of the Plan (including the releases contained therein).   In addition to distributing the Combined Notice to all known parties in interest on October 16, 2021, out of abundance of caution, the Debtor also caused a copy of the Combined Notice to be published in the *Wall Street Journal* (national) and the *Houston Chronicle* on October 21, 2021.   In addition, on October 16, 2021, holders of Claims in the non-voting Classes were served with Opt-Out Forms (as defined in the Scheduling Motion) detailing how they could elect to opt out of the Plan's third party release provisions.

49.     Finally, I believe that setting a combined hearing on the Plan and Disclosure Statement, in combination with the aforementioned noticing and solicitation procedures, is necessary to allow the Debtor to prosecute the Chapter 11 Case in an expeditious manner, thereby minimizing administrative costs and delays and avoiding operational disruption to the Company's business for the benefit of all parties in interest, including the Debtor and its stakeholders.

**B.      Operational Motions**

    **1.      Cash Management Motion**

        50.      Pursuant to the *Emergency Motion of Debtor for Interim and Final Orders (I) Authorizing Debtor to (A) Continue Participating in Existing Cash Management System and Using Bank Account and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, (III) To the Extent Applicable, Extending Time for Debtor to Comply with Section 345(b) of the Bankruptcy Code, (IV) Authorizing Debtor to Continue Serving as Obligor on Existing ABL Facility, and (V) Granting Related Relief* (the "**Cash Management Motion**"), the Debtor requests entry of an order (the "**Cash Management Order**") authorizing the Debtor to:

        i.     continue participating in the Company's existing cash management system (the "**Cash Management System**"), including, without limitation, to continue to maintain the Debtor's existing bank account and business forms;

        ii.    implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtor's participation in or control of the Cash Management System, including, without limitation, opening a new or closing the existing bank account owned by the Debtor;

        iii.   continue to perform under and honor Intercompany Transactions (as defined in the Cash Management Motion) in the ordinary course of business;

        iv.   continue to serve as an obligor under the Existing ABL Facility;

        v.    provide administrative expense priority for postpetition Intercompany Claims (as defined in the Cash Management Motion) against the Debtor; and

        vi.   honor and pay all prepetition and postpetition Bank Fees (as defined in the Cash Management Motion) payable by the Debtor.

        51.      To facilitate the efficient operation of its business, the Company utilizes an integrated, centralized cash management system used to collect, transfer, and disburse funds generated by their operations (the "**Cash Management System**").  The Cash Management System

is an ordinary course, customary, and essential business system which allows for the flow of cash between bank accounts and between Company affiliates, including the Debtor, as required or needed, in accordance with the Company's historical cash management practices. The Company relies on the Cash Management System in the course of its day-to-day business operations. The Cash Management System provides for seamless banking and accounting functions across and among all of the Company's entities in a single location, thereby reducing banking expenses, permitting prompt and accurate liquidity tracking, and allowing simple and accurate intercompany allocations and transfers.

52.     The Company's Cash Management System is comprised of approximately 56 bank accounts at multiple banks, of which approximately (i) 26 are operating accounts, (ii) 28 are custodial accounts maintained in the name of GCS LP, whereby GCS LP merely holds the account (and the funds in it) in trust or as custodian for a third party, (iii) one account relates to the Company's ABL credit facility; and (iv) one account relates to a securities portfolio containing certain foreign regulatory investments.

53.     Of these 56 bank accounts, only one is owned by the Debtor: the Debtor's operating account (the "**Debtor Operating Account**"). The Debtor Operating Account is subject to a Blocked Account Control Agreement, dated September 29, 2017. The Debtor Operating Account is held at JPMorgan,[16] which is designated as an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee's Guidelines for Debtors-In-Possession. The Debtor does not maintain any other bank accounts. The Debtor Operating Account typically maintains a small balance and most funds—generally in the form of equity distributions or intercompany

---

[16]     The last four digits of the Debtor Operating Account at JPMorgan are x2599.

loans—that come into the Debtor Operating Account are transferred from the GP Operating Account and the LP Operating Account on an as-needed basis.

54. Although the Debtor Operating Account is used less frequently than other accounts in the Company's Cash Management System, it is periodically used to make certain external disbursements relating to, among other things, debt service payments, Texas state franchise, other federal and state tax payments, and certain professional fee payments.

55. In my view, the Cash Management System constitutes an ordinary course and essential business practice of the Debtor. The Cash Management System provides significant benefits to the Company and, in turn, the Debtor, including the ability to (i) control corporate funds, (ii) ensure the optimal availability of funds when and where necessary, (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information, and (iv) allow the Company to operate at maximum efficiency. Therefore, the Debtor's continued participation in the Cash Management System without interruption is vital to the Debtor's business operations and the success of this Chapter 11 Case.

56. Pursuant to the Cash Management Motion, the Debtor also seeks authority to continue to serve as an obligor with respect to the Existing ABL Facility, although the Debtor has agreed not to make borrowing requests under the facility. It is critical the Debtor be permitted to continue to serve as an obligor to ensure the Debtor's operating subsidiary, GC Services, continues to benefit from access to the Existing ABL Facility and the funding thereunder. Such funding is critical to the Company's business operations and the Existing ABL Facility Lender has only agreed to continue to provide GC Services with access to the facility subject to the Debtor continuing to serve as an obligor.

2.   **NOL Motion**

57.     Pursuant to the *Emergency Motion of Debtor for Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in ORG GC Midco, LLC; and (II) Granting Related Relief* (the "**NOL Motion**"), the Debtor requests entry of interim and final orders (i) authorizing the Debtor to establish certain procedures (the "**Procedures**") to protect the potential value of the Debtor's consolidated net operating loss carryforwards ("**NOLs**") for use in connection with the Debtor's Chapter 11 Case and any post-emergence business and transactions of the Debtor; and (ii) granting related relief.

58.     The Debtor is taxed as a corporation for federal income tax purposes.  The Debtor directly and indirectly owns limited liability company subsidiaries, most of which are disregarded for income tax purposes.  The Debtor has certain tax attributes which include, as of the Petition Date, estimated NOLs in excess of $69 million, deferred interest under section 163(j) of approximately $16 million, and certain other tax attributes.  Additionally, the Debtor currently has adjusted tax basis in its assets well in excess of the value of such assets, reflecting a "built-in" loss for federal income tax purposes.  It is my belief that the NOLs (and the built-in tax losses, if and as ultimately realized, in which case the realized loss generally would add to Debtor's NOL assuming it is not applied to offset current year income of Debtor) are valuable assets of the Debtor's estate.

59.     I understand that the title 26 of the United States Code (the "**Tax Code**") generally permits a corporation to carry forward its NOLs and disallowed business interest to reduce future taxable income, thereby reducing, along with available tax credits, such corporation's tax liability in future periods. Accordingly, absent any intervening limitations, and depending on future operating results, I understand and am advised that the NOLs would be

available to offset the income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.

60.     I believe and am advised that the Debtor's NOLs would be adversely affected (and could be effectively eliminated) by an Ownership Change (as defined in the NOL Motion) during the pendency of this Chapter 11 Case.  Accordingly, I believe that it is in the best interests of the Debtor and its stakeholders to restrict trading that could result in an Ownership Change before the effective date of a chapter 11 plan or other applicable bankruptcy court order, in order to protect the Debtor's ability to use the NOLs during the pendency of this Chapter 11 Case and post-emergence.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: November 8, 2021
      Houston, Texas

                     */s/  Robert Wagstaff*
                     Name: Robert Wagstaff
                     Title: Chief Restructuring Officer
                     ORG GC Midco, LLC

**<u>Certificate of Service</u>**

I hereby certify that on November 8, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's proposed claims, noticing, and solicitation agent.


     */s/ Alfredo R. Pérez*          
Alfredo R. Pérez

**EXHIBIT A**

**RESTRUCTURING SUPPORT AGREEMENT**

EXECUTION VERSION

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE DEFINITIVE DOCUMENTS, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including all annexes, exhibits and schedules attached hereto, in each case, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of October 16, 2021, is entered into by and among:

(i)     ORG GC Midco, LLC ("**Midco**"), ORG GC GP Buyer, LLC, ORG GC LP Buyer, LLC, GC Services International, LLC, GC Services Limited Partnership ("**GCS LP**"), and GC Services (Barbados) SRL (the foregoing, collectively, the "**Company**" or the "**GCS Parties**"), each of which are signatories hereto;

(ii)    the undersigned Existing Term Lenders (as defined herein) that as of the date hereof beneficially own (or otherwise have voting discretion with respect to) 100% of the Existing Term Loans (as defined herein) outstanding as of the date hereof, and/or, as the case may be, any of the nominees, investment managers, advisors or subadvisors for such Existing Term Lenders (as applicable), in each case, that have executed and delivered counterpart signature pages to this Agreement on the date hereof (collectively, the "**Initial Consenting Lenders**", and, each individually, an "**Initial Consenting Lender****);

(iii)   any Person (if any) that, at any time after the Support Effective Date and in accordance with Section 4(c) of this Agreement, executes and delivers a Joinder Agreement (as defined below) and becomes a party to this Agreement as a Consenting Lender in accordance with the terms hereof (the foregoing, together with the Initial Consenting Lenders, as of any date of determination  the "**Consenting Lenders**"); and

(iv)    solely with respect to Section 6 of this Agreement and following the Subordination Period Start Date (as defined herein), the Existing Term Loan Facility Agent, the Term DIP Agent and the Term DIP Lenders (each as defined herein).

The Consenting Lenders, each of the GCS Parties, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**" and each individually as a "**Party**."  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Definitive Documents (defined below), as applicable.

## RECITALS

**WHEREAS** the Company has outstanding obligations under that certain Financing Agreement, dated July 31, 2017, by and among certain of the GCS Parties, variously, as a borrower and/or as a guarantor thereunder (collectively in such capacities, the "**Existing Term Loan Obligors**"), BSP Agency, LLC, as administrative agent and collateral agent (the "**Existing Term Loan Facility Agent**"), and the lenders party thereto (the "**Existing Term Lenders**"; together with the Existing Term Loan Facility Agent, the "**Existing Term Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing Term Loan Credit Agreement**"; the other "Loan Documents" (as such term is defined in the Existing Term Loan Credit Agreement) thereunder, the "**Existing Term Loan Documents**"; the "Obligations" (as such term is defined in the Existing Term Loan Credit Agreement) thereunder (the "**Existing Term Obligations**"); the Liens on the "Collateral" (as such term is defined in the Existing Term Loan Credit Agreement) (the "**Existing Term Collateral**") securing the Existing Term Obligations thereunder, the "**Existing Term Liens**"; and the principal amount of "Loans" (as such term is defined in the Existing Term Loan Credit Agreement) outstanding thereunder, the "**Existing Term Loans**");

**WHEREAS**, as of the date hereof, the Initial Consenting Lenders collectively hold 100% of the aggregate principal amount of the Existing Term Loans outstanding as of the date hereof; and

**WHEREAS**, the Parties have negotiated in good faith at arm's length and agreed to enter into certain transactions in furtherance of a restructuring of the Company's capital structure and financial obligations (the "**Restructuring**") on the terms and conditions set forth in this Agreement and the Definitive Documents attached hereto, which is anticipated to be implemented pursuant to the terms of the plan of reorganization attached hereto as <u>Exhibit A</u>   (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with <u>Section 12</u>, the "**Plan**") and any supplement(s) thereto as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, in accordance with <u>Section 12</u>, the "**Plan Supplement**"), a corresponding disclosure statement in respect of the Plan attached hereto as <u>Exhibit B</u> (as may be amended, restated, amended and restated, supplemented, or modified from time to time, in accordance with <u>Section 12</u>, the "**Disclosure Statement**"), a solicitation of votes thereon (the "**Solicitation**" and the materials with respect thereto, in each case, to the extent that the same comply with applicable Law and are consistent with the terms and conditions of this Agreement, collectively, the "**Solicitation Materials**"), and the commencement by Midco of a voluntary case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and

2

sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Certain Definitions**.

As used in this Agreement, the following terms have the following meanings:

(a)    "**Affiliate**" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person and shall also include (i) any related fund of such Person and (ii) in the case of a specified Person who is an individual, any family member or personal representative of such Person.  The term "**control**" (including, with its correlative meanings, "**controlling**," "**controlled by**" and "**under common control with**") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

(b)    "**Agreement**" shall have the meaning ascribed to such term in the Preamble.

(c)    "**Alternative Transaction**" means any plan, dissolution, winding up, liquidation, sale or disposition of a material portion of assets, reorganization, merger, consolidation, financing (including any DIP or exit financing), tender offer, exchange offer, business combination, acquisition, amalgamation, debt or equity investment, joint venture, partnership, recapitalization, restructuring or similar transaction involving any of the GCS Parties, a material portion of their assets or the debt, equity or other interests of any of the GCS Parties, other than the Restructuring contemplated by this Agreement and the Definitive Documents.

(d)    "**Bankruptcy Code**" shall have the meaning ascribed to such term in the Recitals.

(e)    "**Bankruptcy Court**" shall have the meaning ascribed to such term in the Recitals.

(f)    "**Bankruptcy Laws**" shall mean the Bankruptcy Code and any similar federal or state or non-U.S. law or statute providing for the supervision, administration, or relief of debtors, including bankruptcy or insolvency laws.

(g)    "**BSP**" means Benefit Street Partners LLC, together with its Affiliates and related and/or managed funds, accounts and/or entities directly or indirectly owned by such Affiliates, managed funds or accounts.

3

(h)    "**Cash Proceeds**" shall mean all Proceeds of any DIP Existing Term Collateral received by any Grantor, Existing Term Secured Party, or DIP Secured Party consisting of cash, cash equivalents and checks.

(i)    "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).   Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

(j)    "**Chapter 11 Case**" shall have the meaning ascribed to such term in the Recitals.

(k)    "**Claims**" means any and all claims (as defined in section 101(5) of the Bankruptcy Code) against any of the GCS Parties, including the Existing Term Loan Claims.

(l)    "**Company**" shall have the meaning ascribed to such term in the Preamble.

(m)    "**Confirmation Order**" means an order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Company and the Consenting Lenders.

(n)    "**Consenting Lenders**" shall have the meaning ascribed to such term in the Preamble.

(o)    "**Debtor**" means Midco.

(p)    "**Definitive Documents**" means any document effectuating, implementing or otherwise relating to the Restructuring, including this Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Solicitation Materials, the Term DIP Facility Agreement, the Exit Term Loan Facility Agreements, the Exit ABL Facility Agreement, the New Organizational Documents, the Settlement and Release Agreement, and all other agreements,

4

instruments, pleadings, orders (including the DIP Order), forms, questionnaires and other documents (including all related orders, agreements, instruments, exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto), which shall be consistent in all material respects with this Agreement and in form and substance reasonably acceptable to the Company and the Consenting Lenders.

(q)   "**DIP Collateral**" means the "Collateral" (as such term is defined in the Term DIP Facility Agreement) thereunder.

(r)   "**DIP Commitments**" means the "Commitments" (as such term is defined in the Term DIP Facility Agreement) thereunder.

(s)   "**DIP Documents**" means the "Loan Documents" (as such term is defined in the Term DIP Facility Agreement) thereunder.

(t)   "**DIP Existing Term Collateral**" has the meaning set forth in Section 6(a).

(u)   "**DIP Loans**" means the "Loans" (as such term is defined in the Term DIP Facility Agreement) made under the Term DIP Facility Agreement in accordance with the terms thereof, and subject to prior approval by the Bankruptcy Court of the DIP Order in accordance herewith.

(v)   "**DIP Obligations**" means, as of any time, the "Obligations" (as such term is defined in the Term DIP Facility Agreement) outstanding at such time under the Term DIP Facility Agreement.

(w)   "**DIP Order**" means the order of the Bankruptcy Court approving the terms of the Term DIP Facility and the use of cash collateral, which shall be in a form and substance reasonably acceptable to the Consenting Lenders.

(x)   "**DIP Secured Parties**" means the Term DIP Agent and the Term DIP Lenders.

(y)   "**Discharge of DIP Obligations**", with respect to the DIP Obligations, shall be deemed to occur immediately and automatically upon the earlier of (such earlier time, the "**DIP Discharge Time**") (x) the payment in full in cash of all DIP Obligations, and the termination, cancellation or expiry of all DIP Commitments, on or before the Effective Date, in each case, in accordance with the Term DIP Facility Agreement or as otherwise consented to by the Company, the DIP Secured Parties, and the Consenting Lenders, or (y) the satisfaction of all DIP Obligations in accordance with the Plan or as otherwise consented to by the Company, the DIP Secured Parties and the Consenting Lenders in accordance with Section 12.

5

(z)      "**Disclosure Statement**" shall have the meaning ascribed to such term in the Recitals.

(aa)     "**Effective Date**" means the date upon which (i) all conditions to the effectiveness of the Restructuring set forth in <u>Section 9</u> of this Agreement and (ii) all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of this Agreement and the Plan and the Plan becomes effective.

(bb)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(cc)     "**Existing ABL Facility**" means that asset-based lending facility provided pursuant to the Existing ABL Facility Agreement.

(dd)     "**Existing ABL Facility Agent**" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent under the Existing ABL Facility Agreement.

(ee)     "**Existing ABL Facility Agreement**" means that certain Credit Agreement, dated July 31, 2017, by and among GCS LP, Midco, and certain of the Non-Debtor GCS Parties, as borrower, each of the guarantors party thereto, the Existing ABL Lenders, and the Existing ABL Facility Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

(ff)     "**Existing ABL Facility Loan Documents**" means, collectively, the Existing ABL Facility Agreement and the other "Loan Documents" (as defined in the Existing ABL Facility Agreement)

(gg)     "**Existing ABL Forbearance Agreement**" means that certain Forbearance Agreement and Sixth Amendment to Credit Agreement, dated as of November 30, 2020, among certain of the GCS Parties, the Existing ABL Lenders, and the Existing ABL Facility Agent, as amended, restated, amended and restated, supplemented or otherwise modified as of the date hereof and any additional amendment, restatement, amendment and restatement, supplement or other modification on terms and conditions reasonably acceptable to the GCS Parties and the Consenting Lenders.

(hh)     "**Existing ABL Lenders**" means the Persons party to the Existing ABL Facility Agreement as "Lenders" from time to time thereunder, and each of their respective successors and permitted assigns.

(ii)     "**Existing ABL Obligations**" means the ABL Obligations (as defined in the Existing Intercreditor Agreement).

(jj)     "**Existing ABL Secured Parties**" means the ABL Secured Parties (as defined in the Existing Intercreditor Agreement).

(kk)     "**Existing Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of July 31, 2017, by and among the Existing ABL Facility Agent and the Existing Term Loan Facility Agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

(ll)     "**Existing Term Collateral**" shall have the meaning ascribed to such term in the Recitals.

(mm)    "**Existing Term Lenders**" shall have the meaning ascribed to such term in the Recitals.

(nn)     "**Existing Term Liens**" shall have the meaning ascribed to such term in the Recitals.

(oo)     "**Existing Term Loans**" shall have the meaning ascribed to such term in the Recitals.

(pp)     "**Existing Term Loan Claims**" means all Claims arising under, in connection with, or related to the Existing Term Loan Credit Agreement, including any accrued and unpaid interest, fees, and/or deficiency Claims.

(qq)     "**Existing Term Loan Credit Agreement**" shall have the meaning ascribed to such term in the Recitals.

(rr)     "**Existing Term Loan Documents**" shall have the meaning ascribed to such term in the Recitals.

(ss)     "**Existing Term Loan Facility Agent**" shall have the meaning ascribed to such term in the Recitals.

(tt)     "**Existing Term Obligations**" shall have the meaning ascribed to such term in the Recitals.

(uu)     "**Existing Term Loan Obligors**" shall have the meaning ascribed to such term in the Recitals.

(vv)     "**Existing Term Secured Parties**" shall have the meaning ascribed to such term in the Recitals.

7

(ww)   "**Exit ABL Facility**" means that asset-based lending facility provided pursuant to the Exit ABL Facility Agreement.

(xx)   "**Exit ABL Facility Agreement**" means (i) the Existing ABL Facility Agreement, as amended on terms and conditions reasonably acceptable to the GCS Parties and the Consenting Lenders or (ii) a credit agreement evidencing an asset-based lending facility on terms and conditions reasonably acceptable to the GCS Parties and the Consenting Lenders.

(yy)   "**Exit ABL Facility Lenders**" means any Person that becomes a lender under the Exit ABL Facility Agreement.

(zz)   "**Exit Term Loan Facilities**" means, collectively, the New 1L Facility and the New 2L Facility.

(aaa)   "**Exit Term Loan Facility Agreements**" means, collectively, the New 1L Facility Agreement and the New 2L Facility Agreement.

(bbb)   "**First Day Motions**" means those motions and related orders filed by the Debtor on the Petition Date and which are to be heard by the Bankruptcy Court at the "first day" hearing.

(ccc)   "**GCS LP**" shall have the meaning ascribed to such term in the Preamble.

(ddd)   "**GCS Parties**" shall have the meaning ascribed to such term in the Preamble.

(eee)   "**Governmental Entity**" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.

(fff)   "**Grantors**" means the GCS Parties party to the Term DIP Facility Agreement and the other DIP Documents.

(ggg)   "**GS**" means Goldman Sachs Bank USA, together with its Affiliates and related and/or managed funds, accounts and/or entities directly or indirectly owned by such Affiliates, managed funds or accounts.

(hhh)   "**Initial Consenting Lenders**" shall have the meaning ascribed to such term in the Preamble.

(iii)   "**Initial Consenting Lenders' Advisors**" means, collectively, (i) Stroock, as counsel to certain of the Consenting Lenders affiliated with BSP and the Existing Term Loan

8

Facility Agent, (ii) K&S, as counsel to certain of the Initial Consenting Lenders affiliated with GS, the Term DIP Agent and the Term DIP Facility Lenders, (iii) Vinson & Elkins LLP, as corporate counsel to certain of the Initial Consenting Lenders affiliated with GS, (iv) Ernst & Young Global Limited, as tax consultant to certain of the Initial Consenting Lenders affiliated with GS, (v) Mayer Brown LLP, as regulatory counsel to the Initial Consenting Lenders, (vi) Jim Eckstaedt, as consultant to the Initial Consenting Lenders, (vii) David Zwick and Garry Herdler, as consultants to the Existing Term Loan Facility Agent, and (viii) Haynes & Boone LLP, as local Texas counsel to the Existing Term Loan Facility Agent and the Term DIP Agent.

(jjj)    "**Interests**" means with respect to any GCS Party, (i) any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such GCS Party, and (ii) any options, warrants, securities, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights or other agreements, arrangements or rights of any kind that are convertible into, exercisable or exchangeable for, or otherwise permit any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such GCS Party.

(kkk)   "**Insolvency or Liquidation Proceeding**" means any of the following: (a) the filing by any Grantor of a voluntary petition in bankruptcy under any provision of any Bankruptcy Law or a petition to take advantage of any receivership or insolvency laws, including any petition seeking the dissolution, winding up, total or partial liquidation, reorganization, composition, arrangement, adjustment or readjustment, or other relief of such Grantor, such Grantor's debts, or such Grantor's assets or the appointment of a trustee, receiver, liquidator, custodian, or similar official for such Grantor or a material part of such Grantor's property; (b) the admission in writing by such Grantor of its inability to pay its debts generally as they become due; (c) the appointment of a receiver, liquidator, trustee, custodian, or other similar official for such Grantor or all or a material part of such Grantor's assets; (d) the filing of any petition against such Grantor under any Bankruptcy Law or other receivership or insolvency law, including any petition seeking the dissolution, winding up, total or partial liquidation, reorganization, composition, arrangement, adjustment, or readjustment or other relief of such Grantor, such Grantor's debts, or such Grantor's assets or the appointment of a trustee, receiver, liquidator, custodian, or similar official for such Grantor or a material part of such Grantor's property; (e) the general assignment by such Grantor for the benefit of creditors or any other marshalling of the assets and liabilities of such Grantor; or (f) a corporate (or similar) action taken by such Grantor to authorize any of the foregoing.  For the avoidance of doubt, any Chapter 11 Case shall constitute an Insolvency or Liquidation Proceeding.

(lll)    "**K&S**" means King & Spalding LLP.

9

(mmm) "**Law**" means any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation, treaty, decree, injunction, order, ruling, assessment, writ or other legal requirement or judgment, in each case, that is validly adopted, promulgated, issued or entered by a Governmental Entity of competent jurisdiction (including the Bankruptcy Court).

(nnn)   "**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, charge, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement).

(ooo)   "**LLC Agreement**" means the limited liability company agreement for New Holdco to be entered into on the Effective Date substantially in the form attached hereto as Exhibit C.

(ppp)   "**Material Adverse Effect**" means, other than the filing of the Chapter 11 Case, any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact, or the worsening of any of the foregoing (each, an "**Event**"), that, individually or together with all other Events, has had, or would reasonably be expected to have, a material adverse effect on either (a) the business, operations, finances, properties, interests, reserves, condition (financial or otherwise), assets or liabilities of the GCS Parties, taken as a whole or (b) the ability of the GCS Parties, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement.

(qqq)   "**Material Contract**" means any of the following contracts or agreements (or group of related contracts or agreements) to which any of the GCS Parties is a party or by which any of the GCS Parties or any of their respective assets or properties are bound:  (a) any contract or agreement that is a "material contract," or "plans of acquisition, reorganization, arrangement, liquidation or succession" (as each such term is defined in Item 601(b)(2) or Item 601(b)(10) of Regulation S-K under the Exchange Act), (b) any contract or agreement that may reasonably be expected to result in (i) aggregate payments from the applicable contracting GCS Party to a third party are reasonably expected to exceed $250,000 or (ii) aggregate payments from a third party to the applicable GCS Party contract party are reasonably expected to exceed $500,000, in each case during the current or any subsequent calendar year or (c) any contract or agreement that is related to the GCS Parties' third party business.

(rrr)   "**Midco**" shall have the meaning ascribed to such term in the Preamble.

(sss)   "**New 1L Facility**" means that certain first lien senior secured term loan facility to be provided to New Holdco Sub on the Effective Date pursuant to the New 1L Facility Agreement.

10

(ttt)    "**New 1L Facility Agreement**" means that certain Financing Agreement, dated as of the Effective Date, governing the New 1L Facility (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof) in form and substance reasonably acceptable to BSP, GS, New Holdco Sub, and each of the Non-Debtor GCS Parties party thereto, substantially in the form attached hereto as Exhibit D.

(uuu)    "**New 2L Facility**" means that certain second lien secured term loan facility to be provided to New Holdco Sub on the Effective Date pursuant to the New 2L Facility Agreement.

(vvv)    "**New 2L Facility Agreement**" means that certain Financing Agreement, dated as of the Effective Date, governing the New 2L Facility (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof) in form and substance reasonably acceptable to BSP, GS, New Holdco Sub and each of the Non-Debtor GCS Parties, substantially in the form attached hereto as Exhibit E.

(www)    "**New Holdco**" means a new entity formed on the Effective Date, which will own 100% of the equity interests in New Holdco Sub.

(xxx)    "**New Holdco Sub**" means a new entity formed on the Effective Date, which will own 100% of the equity interests in each of ORG GC GP Buyer, LLC and ORG GC LP Buyer, LLC.

(yyy)    "**New Organizational Documents**" means the Company's (excluding Midco) new organizational documents after giving effect to the Restructuring, including, but not limited to, the LLC Agreement and the documents  necessary to be executed and/or filed for the formation of New Holdco and New Holdco Sub, each of which shall be in form and substance reasonably acceptable to BSP, GS, and the Company.

(zzz)    "**Non-Debtor GCS Parties**" means the GCS Parties excluding Midco.

(aaaa)    "**ORG**" means Owner Resource Group, LLC.

(bbbb)    "**Outside Petition Date**" shall have the meaning set forth in Section 3(b) hereto.

(cccc)    "**Party**" shall have the meaning ascribed to such term in the Preamble.

(dddd)    "**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

11

(eeee)   "**Petition Date**" shall have the meaning set forth in <u>Section 3(b)</u> hereto.

(ffff)   "**Plan**" shall have the meaning ascribed to such term in the Recitals.

(gggg) "**Plan Supplement**" shall have the meaning ascribed to such term in the Recitals.

(hhhh) "**Proceeds**" shall mean, with respect to any DIP Existing Term Collateral, (x) all "proceeds" thereof, as such term is defined in Article 9 of the UCC as in effect in the state of New York on the date hereof, and (y) without duplication, (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to either the Term DIP Agent or the Existing Term Loan Facility Agent or any Grantor from time to time with respect to any of the DIP Existing Term Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the DIP Existing Term Collateral by any governmental authority, and (c) any and all other amounts from time to time paid or payable to either the Term DIP Agent or the Existing Term Loan Facility Agent or any Grantor from time to time with respect to any of the DIP Existing Term Collateral under or in connection with any of the DIP Existing Term Collateral.

(iiii)   "**Releases**" shall have the meaning set forth in the Plan.

(jjjj)   "**Restructuring**" shall have the meaning ascribed to such term in the Recitals.

(kkkk) "**SEC**" means the United States Securities and Exchange Commission.

(llll)   "**Settlement and Release Agreement**" means an agreement by and between the (i) Debtor; (ii) the Non-Debtor GCS Parties; (iii) ORG GC Holdings, LLC; (iv) ORG and certain of its affiliates; (v) the Existing Term Loan Facility Agent; and (vi) the Consenting Lenders setting forth a settlement among the parties thereto in form and substance reasonably acceptable to the Consenting Lenders, the Existing Term Loan Facility Agent, the Debtor and each of the Non-Debtor GCS Parties.

(mmmm)      "**Solicitation**" shall have the meaning ascribed to such term in the Recitals.

(nnnn) "**Solicitation Materials**" shall have the meaning ascribed to such term in the Recitals.

(oooo) "**Stroock**" means Stroock & Stroock & Lavan LLP.

12

(pppp) "**Subordination Period**" means and refers to the time period (a) commencing as of the date (the "**Subordination Period Start Date**") when the DIP Loans are first borrowed in accordance with the Term DIP Facility Agreement and the DIP Order, so long as such borrowing occurs after approval of the Term DIP Facility by the Bankruptcy Court pursuant to the DIP Order, and (b) ending at, and expiring as of, the DIP Discharge Time (the date on which such end or expiry occurs, the "**Subordination Period Expiry Date**").

(qqqq) "**Support Period**" means, with reference to any Party, the period commencing on the Support Effective Date (or, in the case of any Person that becomes a party hereto after the Support Effective Date, the date such Person becomes a party hereto) and ending on the earlier of (i) the Effective Date and (ii) the Termination Date.

(rrrr)　"**Term DIP Agent**" means Goldman Sachs Specialty Lending Group, L.P., solely in its capacity as administrative agent and collateral agent under the Term DIP Facility, or its successors, permitted assigns, or any replacement agent appointed pursuant to the terms of the Term DIP Facility Agreement.

(ssss)　"**Term DIP Facility**" means that debtor-in-possession financing facility to be provided to the Debtor pursuant to the Term DIP Facility Agreement and the DIP Order.

(tttt)　"**Term DIP Facility Agreement**" means that certain Superpriority Secured Debtor-in-Possession Financing Agreement, to be dated after the Petition Date, by and among the Debtor, as borrower, certain Non-Debtor GCS Parties, as guarantors, the Term DIP Lenders, and the Term DIP Agent (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), on terms and conditions satisfactory to the Debtor, the Non-Debtor GCS Parties thereto, the Term DIP Lenders and the Consenting Lenders, substantially in the form attached hereto as <u>Exhibit F</u>.

(uuuu) "**Term DIP Lenders**" means the Persons party to the Term DIP Facility Agreement as "Lender" from time to time thereunder.

(vvvv) "**Termination Event**" means a Lender Termination Event, a Company Termination Event, or an Other Termination Event.

(wwww)　"**Transaction Expenses**" means all reasonable fees, costs and expenses of each of the Consenting Lenders' Advisors, in each case, (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, (ii)(A) consistent with any engagement letters or fee reimbursement letters entered into between the applicable GCS Parties, on the one hand, and the applicable Consenting Lenders' Advisors, on

13

the other hand, (as supplemented and/or modified by this Agreement) or (B) as provided in the DIP Order and/or the Confirmation Order.

(xxxx) "**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

**2.**     **Exhibits**.   The Definitive Documents attached as exhibits hereto are expressly incorporated herein by reference and made a part of this Agreement as if fully set forth herein.  The terms and conditions of the Restructuring are set forth in the Definitive Documents; *provided, however*, that the Definitive Documents are supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Definitive Documents, the relevant Definitive Document shall govern.

**3.**     **Bankruptcy Process; Plan of Reorganization**.

(a)     Solicitation of the Plan.  As soon as reasonably practicable after the Support Effective Date has occurred, Midco will commence solicitation of the Plan through the Disclosure Statement and other Solicitation Materials and take all reasonably practicable steps to secure acceptance of the Plan prior to the Petition Date (as defined below).

(b)     Commencement of the Chapter 11 Case.   Provided that the Support Effective Date has occurred and Midco has received sufficient votes to accept the Plan from the class of Existing Term Loan Claims, as soon as reasonably practicable, but in any event no later than 11:59 p.m. prevailing Central Time on November 8, 2021 (the "**Outside Petition Date**") (the date on which such filing actually occurs, the "**Petition Date**"), Midco shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case.

(c)     Filing of the Plan.  On the Petition Date, Midco shall file the Plan and the Disclosure Statement with the Bankruptcy Court.

(d)     Confirmation of the Plan.  Midco shall use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each of the other GCS Parties and each Consenting Lender shall use commercially reasonable efforts to cooperate fully in connection therewith.

**4.**     **Agreements of the Consenting Lenders**.

(a)     Agreement to Support.  During the Support Period, each Consenting Lender agrees that, subject to the receipt by such Consenting Lender of a Disclosure Statement and other

14

Solicitation Materials in respect of the Plan that comply with applicable Law and are consistent with the terms and conditions of this Agreement, it shall:

(i)      (A) consent to Midco's use of cash collateral, to the extent there is any cash collateral, and incurrence of the Term DIP Facility to support the Chapter 11 Case, including deeming the Existing Term Loan Credit Agreement to be amended as necessary to permit the incurrence of the Term DIP Facility, and (B) to the extent applicable, fund the loans under the Term DIP Facility;

(ii)      vote, or cause to be voted, all of its Claims and Interests against Midco to accept the Plan and issue the releases of its Claims against each other Released Party (as defined in the Plan) by delivering its duly executed and completed ballots accepting the Plan on a timely basis following the commencement of the Solicitation, and not withdraw, opt-out, or object to the Releases in the Plan;

(iii)      give any notice, order, instruction, or direction to the Existing Term Loan Facility Agent necessary to give effect to the Restructuring in accordance with this Agreement and as otherwise determined by the Consenting Lenders in their reasonable discretion and in consultation with the GCS Parties; *provided* that such Consenting Lender shall not be required to provide the Existing Term Loan Facility Agent or any other person or entity with any indemnities or similar undertakings in connection with taking any such action;

(iv)      not change, revoke or withdraw (or cause to be changed, revoked or withdrawn) any such vote or release in clause (ii) above; *provided that* such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement prior to the confirmation of the Plan pursuant to the terms hereof (it being understood that any termination of the Support Period with respect to a Consenting Lender shall entitle such Consenting Lender to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation Materials with respect to the Plan shall be consistent with this proviso);

(v)      not (A) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan, (B) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for any Alternative Transaction or (C) otherwise take any action that could in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(vi)      not direct the Existing Term Loan Facility Agent or any other Person acting as agent for, or otherwise on behalf of, such Consenting Lender under the Existing Term Loan Documents to take any action inconsistent with, or that would constitute a violation of, such Consenting Lender's obligations under this Agreement, and, if,

15

notwithstanding the foregoing, any such Person takes any such action, such Consenting Lender shall direct such Person to cease and refrain from taking any such action; *provided*, *however*, that nothing in this clause (vi) shall require the Consenting Lenders to (A) waive any Default or Event of Default (each as defined in the Existing Term Loan Credit Agreement) or any of the Existing Term Loan Claims or release or terminate any liens on any of the collateral securing the Existing Term Loan Claims or (B) forbear with respect to any Event of Default (as defined in the Existing Term Loan Credit Agreement) other than as set forth in Section 4(e);

(vii)    support and take all actions necessary or reasonably requested in writing by the GCS Parties to facilitate the consummation of the Restructuring in a timely manner as contemplated by this Agreement and the Definitive Documents; *provided* that no Consenting Lender shall be obligated to waive or consent to any modification of any condition to the consummation of any part of the Restructuring set forth in any Definitive Document;

(viii)    negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, and effectuated in accordance with the terms of, the applicable Definitive Documents to which it is (or will be) a party; *provided*, *however*, that no Consenting Lender shall be obligated to waive or consent to any modification of any condition to the consummation of any part of the Restructuring set forth in any applicable Definitive Document;

(ix)    other than in respect of any such rights preserved under Section 4(b) below, not, directly or indirectly, through any person or entity, take any action, including initiating (or encouraging any other person or entity to initiate) any legal proceeding, that is inconsistent with this Agreement or that would reasonably be expected to prevent, interfere with, delay, or impede the consummation of the Restructuring; and

(x)    to the extent any legal or structural impediments arise that are reasonably expected to prevent, hinder, or delay the consummation of, the Restructuring, negotiate in good faith with the other Consenting Lenders and the GCS Parties appropriate additional or alternative provisions to address any such impediment;

Notwithstanding anything in this Agreement to the contrary, (a) no Consenting Lender shall be required to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Consenting Lender (other than, in the case of any Consenting Lender that is also a Term DIP Lender, any commitments in respect of the Term DIP Facility) and (b) nothing in this Agreement shall limit any of the rights or remedies of the Term DIP Agent or the Term DIP Lenders under or with respect to the Term DIP Facility Agreement and related loan documents and the DIP Order.

16

(b)      Rights of Consenting Lenders Unaffected. Nothing contained herein shall: (i) limit (A) the rights of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Case so long as the exercise of any such right is not inconsistent with such Consenting Lender's obligations under this Agreement, (B) the ability of a Consenting Lender to purchase, sell or enter into any transactions regarding any Claims or Interests, subject to the terms hereof, (C) except as set forth in this Agreement, any right or remedy of any Consenting Lender under, as applicable, (x) the Existing Term Loan Credit Agreement or any related loan documents and (y) any other applicable agreement, instrument or document that gives rise to a Consenting Lender's Claims or Interests, (D) the ability of a Consenting Lender to consult with any of the other Parties or any other party in interest in the Chapter 11 Case (including any official committee and the United States Trustee), (E) the rights of any Consenting Lender to engage in any discussions, enter into any agreements or take any other action regarding matters to be effectuated after the expiration or termination of the Support Period, (F) the ability of a Consenting Lender to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Definitive Documents, (G) the ability of a Consenting Lender to file a proof of claim, if required, or (H) the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring, (ii) constitute a waiver or amendment of any term or provision of (A) the Existing Term Loan Credit Agreement or any of the other related loan documents or (B) any other agreement, instrument or document that gives rise to a Consenting Lender's Claims or Interests, or (iii) constitute a termination or release of any liens on the collateral securing the Existing Term Loan Claims. Without limiting the foregoing in any way, if this Agreement is terminated (by one or all of the Parties hereto) in accordance with its terms for any reason, each Consenting Lender fully reserves any and all of its respective rights, remedies and interests.

(c)      Transfers.  Each Consenting Lender agrees that, for the duration of the Support Period, such Consenting Lender shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "**Transfer**"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or Interests (including grant any proxies, deposit any Claims into a voting trust or entry into a voting agreement with respect to any such Claims), unless the transferee thereof (each, a "**Transferee**") (i) is, at the time of the Transfer, a Consenting Lender or (ii) is, at the time of the Transfer, an Affiliate of a Consenting Lender, and, prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Lender and to be bound by all of the terms of this Agreement applicable to Consenting Lenders (including with respect to any and all Claims or Interests it already may hold against or in the Company or any other of the GCS Parties prior to such Transfer and funding of the Term DIP Facility unless the transferor Consenting Lender agrees to remain obligated to fund its portion of the Term DIP Facility) by executing a joinder agreement substantially in the form attached hereto as Exhibit G (a "**Joinder Agreement**"), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Weil, Gotshal & Manges LLP ("**Weil**"), counsel to

17

the GCS Parties, (ii) Stroock, and (iii) K&S, in which event (A) the Transferee shall be deemed to be a Consenting Lender hereunder to the extent of such transferred rights and obligations (and all Claims and Interests it already may own or hold prior to such Transfer) and (B) the transferor Consenting Lender shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred rights and obligations. Notwithstanding the foregoing or any other provision in this Agreement, each transferor Consenting Lender and each Transferee agrees that if the Transferee ceases to be an Affiliate of the transferor Consenting Lender, then, promptly (but in any event within three (3) business days) after such cessation, such Transferee shall Transfer back to such transferor Consenting Lender any Claims (or any options thereon or any right or interest therein) or Interests transferred to it by such transferor Consenting Lender.  Notwithstanding the foregoing, the restrictions on Transfer set forth in this Section 4(c) shall not apply to the grant of any liens or encumbrances on any Claims or Interests in favor of a bank or broker-dealer holding custody of such Claims or Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims or Interests.  Each Consenting Lender agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the applicable GCS Parties and each other Consenting Lender shall have the right to enforce the voiding of such Transfer.

(d)     Additional Claims and Interests.  This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Claims or Interests; *provided*, *however*, that any such additional Claims or Interests shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement.

(e)     Forbearance. During the Support Period, the Consenting Lenders each hereby agree to forbear from the exercise of any rights or remedies they may have under the Existing Term Loan Credit Agreement or any other Loan Documents (as defined in the Existing Term Loan Credit Agreement) and under applicable United States or foreign Law or otherwise, in each case, with respect to any Defaults or Events of Default (in each case, as such term is defined in the Existing Term Loan Credit Agreement) listed on Schedule A attached hereto (the "**Specified Defaults**").  For the avoidance of doubt, the forbearance set forth in this Section 4(e) shall not constitute a waiver with respect to any of the Specified Defaults, or any other Defaults or Events of Default under the Existing Term Loan Credit Agreement or any other Loan Document and shall not bar any Consenting Lender from filing a proof of claim or taking action to establish the amount of its Claims.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Lender or the Existing Term Loan Facility Agent or the ability of each of the Consenting Lenders or the Existing Term Loan Facility Agent to protect and preserve its rights, remedies and interests, including any Claims it may have against the GCS Parties.  If the transactions contemplated hereby are not

18

consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

(f)     The covenants and agreements of the Consenting Lenders in this <u>Section 4</u> are several and not joint.

## 5.     <u>Agreements of the GCS Parties</u>.

(a)     <u>Good Faith and Commercially Reasonable Efforts</u>.  The GCS Parties agree to (i) act in good faith, support and use commercially reasonable efforts to complete successfully the Restructuring and (ii) do all things reasonably necessary and appropriate, or reasonably requested by the Consenting Lenders, in furtherance of implementing and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement, including, without limitation, (1) complete and file, within the timeframes contemplated herein and set forth in <u>Section 7</u>, the Plan, the Disclosure Statement, and the other Definitive Documents, (2) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving the DIP Order, the Disclosure Statement, and confirming the Plan, and any other Definitive Document requiring the approval of the Bankruptcy Court within the timeframes contemplated by this Agreement and set forth in <u>Section 7</u> (or, if this Agreement is silent, as soon as reasonably practicable); (3) prosecute and defend any objections or appeals relating to the DIP Order, any orders approving the Disclosure Statement, the Plan, and/or the Restructuring or any Definitive Document filed or entered into by the Company in connection therewith; and (4) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of the motions for approval of the Term DIP Facility, the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring or any Definitive Document filed or entered into by the Company, in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of managers, members or partners, as applicable, of each of the GCS Parties; *provided that* none of the GCS Parties shall be obligated to agree to any modification of any document that is inconsistent with the Restructuring.  To the extent any legal or structural impediments arise that would prevent, hinder or delay the consummation of the Restructuring, the GCS Parties agree to negotiate in good faith with the Consenting Lenders appropriate additional or alternative provisions to address any such impediment.

(b)     <u>Definitive Documents</u>.  Each of the GCS Parties agrees to (i) provide the applicable Definitive Documents to, and afford reasonable opportunity for comment and review of such Definitive Documents by, each of the Consenting Lenders' Advisors no less than three (3) business days in advance of any filing, execution, distribution or use (as applicable) thereof, except (in the case of any applicable Definitive Document other than the Plan, the Disclosure Statement, the motion to approve the Disclosure Statement and Solicitation, the Plan Supplement and any other material Definitive Document) if the applicable Definitive Document cannot be so provided to the Consenting Lenders' Advisors due to exigent circumstances, in which case such documents will be provided as soon as reasonably practicable prior to filing, execution, distribution or use (as

19

applicable) thereof, (ii) consult in good faith with each of the Consenting Lenders' Advisors regarding the form and substance of the applicable Definitive Documents in advance of the filing, execution, distribution or use (as applicable) thereof, (iii) not modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement in all material respects, (iv) not amend, supplement or otherwise modify any of the Existing ABL Facility Loan Documents in any material respect, and not enter into any new agreement with any of the Existing ABL Secured Parties, in each case, without the prior written consent of the Consenting Lenders (not to be unreasonably withheld, conditioned, or delayed) or as expressly permitted in accordance herewith and (v) negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the applicable Definitive Documents to which it is (or will be) a party; *provided*, *however*, that the obligations under this <u>Section 5(b)</u> shall in no way alter or diminish any right expressly provided to any applicable Consenting Lender under this Agreement to review, comment on, and/or consent to the form and/or substance of any document.

(c)    <u>Continued Business Operations</u>. The GCS Parties agree, subject to applicable Laws, to use commercially reasonable efforts, consistent with the pursuit and consummation of the Restructuring, to preserve intact in all material respects the current business operations of the GCS Parties (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than as contemplated by the GCS Parties' current business plan provided to the Consenting Lenders, voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the GCS Parties (other than terminations for cause or consistent with applicable fiduciary duties).  Each of the GCS Parties further agrees to (i) conduct, and cause its respective subsidiaries to conduct, its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, (ii) maintain its physical assets, properties and facilities in their proper working order, condition and repair as of the Support Effective Date, ordinary wear and tear excepted, (iii) maintain its respective books and records on a basis consistent with prior practice, (iv) maintain all insurance policies, or suitable replacements therefor reasonably acceptable to the Consenting Lenders, in full force and effect, (v) maintain its good standing and legal existence under the laws of the state in which it is incorporated, organized or formed, except to the extent that any failure to maintain its good standing arises solely as a result of the filing of the Chapter 11 Case, (vi) maintain all of its material permits in full force and effect (including by filing all reports, notifications and filings with, and paying all fees to, the applicable Governmental Entities necessary to maintain all such permits in full force and effect), (vii) use commercially reasonable efforts to comply in all material respects with, perform all of its obligations under, and maintain in full force and effect, each Material Contract (other than any Material Contract that has expired after the Support Effective Date in accordance with its terms) and (viii) not, without first obtaining the consent (email being sufficient) of the Consenting Lenders, directly or indirectly, through any Person (A) enter into any contract which, if existing as

20

of the Support Effective Date, would constitute a Material Contract had it been entered into prior to the Support Effective Date, (B) amend, supplement or modify or terminate any Material Contract (other than any Material Contract that has terminated after the Support Effective Date in accordance with its terms), (C) incur or commit to incur any capital expenditures, other than capital expenditures that are included in any applicable budget approved pursuant to the DIP Order or (D) amend or propose to amend any of its organizational documents.

(d)     Employee Matters.  Each GCS Party agrees that it shall (i) maintain all existing compensation and benefit plans and other employee arrangements in the ordinary course of business unless otherwise required by Law or the terms of the benefit plans or arrangements and (ii) without first obtaining the consent of the Consenting Lenders, not, directly or indirectly, through any Person, (A) grant or agree to grant any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance or other compensation or benefits (including in the form of any vested or unvested equity interests of any kind or nature), or enter into, adopt or establish any new plan or arrangement that provides for the foregoing, (1) to any insider (as defined in section 101(a)(31) of the Bankruptcy Code) or executive-level employee of any of the GCS Parties or (2) pursuant to any plan, practice, program or arrangement applicable to more than one person, (B) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), except as required by Law or the terms of the benefit plan or arrangement or (C) enter into, adopt or establish any key employee retention or incentive plan or other similar agreement or arrangement.

(e)     Legal Challenges.  The GCS Parties agree not to, directly or indirectly, through any person or entity, commence or support or encourage any other person or entity to (i) seek discovery in connection with, prepare or commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability or priority of any Claims or Interests held by any of the Consenting Lenders, or (B) the validity, enforceability or perfection of any lien or other encumbrance securing any Claims or Interests held by any of the Consenting Lenders or (ii) otherwise seek to restrict any rights of any of the Consenting Lenders.  The GCS Parties further agree to timely object to or oppose any motion or objection filed by any Person or Entity that would in any respect prevent, hinder or delay the consummation of the Restructuring.

(f)     Inconsistent Actions.  The GCS Parties agree that, for the duration of this Agreement, the GCS Parties shall not, directly or indirectly, through any person or entity, take, or encourage any other person or entity to take, any action inconsistent with, or omit to take any action required by, this Agreement or take any action that would reasonably be expected to prevent, interfere with, frustrate, delay or impede implementation, solicitation, confirmation or the consummation of the Restructuring.  For the avoidance of doubt, none of the GCS Parties shall, directly or indirectly, through any Person, (i) seek, solicit, support, encourage, propose, assist, consent to, vote for, enter or participate in any discussions or any agreement with any person or entity regarding, pursue or consummate any Alternative Transaction; *provided*, *however*, that the

GCS Parties may participate in discussions with any third party that has made (and not withdrawn) a *bona fide*, unsolicited proposal in writing as to which the boards of directors or similar governing bodies of the GCS Parties determine, in good faith and based upon advice of legal counsel, that the failure to participate in such discussions would be inconsistent with such board's or governing body's fiduciary duties under applicable Law; *provided*, that the GCS Parties may solicit proposals from, provide diligence to, engage in discussions with, encourage, or otherwise negotiate with third party lenders in connection with refinancing the Existing ABL Facility; *provided*, *further*, that the GCS Parties shall (A) comply with their obligations under <u>Section 5(f)</u> hereunder and (B) provide such information to the Consenting Lenders' Advisors regarding (x) any discussions and/or negotiations relating to any such proposal and/or (y) any amendments, modifications or other changes to, or any further developments of, any such proposal, in any such case as is necessary to keep the Consenting Lenders' Advisors contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes and/or developments, (ii) announce publicly, or announce to any of the Parties or other holders of Claims or Equity Interests, its intention not to support the Restructuring or (iii) execute, deliver and/or file any applicable Definitive Document (including any amendment, supplement or modification of, or any waiver to, any Definitive Document) that, in whole or in part, is not consistent in all material respects with this Agreement or is not otherwise reasonably acceptable to the Consenting Lenders or file any pleading seeking authorization to accomplish or effect any of the foregoing.

(g)    <u>Notifications</u>.  Subject to prohibition under applicable Law, each GCS Party agrees that it shall promptly notify the Consenting Lenders' Advisors (and in any event within two (2) business days after obtaining actual knowledge thereof) of (i) any pending, existing, instituted or threatened direct or derivative Proceeding by (A) any person or entity (other than a Governmental Entity) involving any of the GCS Parties or any of their respective current or former officers, employees or directors (in their  capacities as such) that is material to the GCS Parties, or (B) any Governmental Entity (or any person or entity on behalf of a Governmental Entity) involving any of the GCS Parties or any of their respective current or former officers, employees or directors (in their capacities as such), except (in any such case) to the extent any of the same are disclosed on the docket maintained in the Chapter 11 Case, (ii) any breach by any GCS Party in any respect of any of its obligations, representations, warranties or covenants set forth in this Agreement, the Term DIP Facility or the DIP Order, (iii) any Material Adverse Effect, (iv) the happening or existence of any event that shall have made any of the conditions precedent set forth in (or to be set forth in) any of the Definitive Documents incapable of being satisfied prior to the Outside Date, (v) the occurrence of any Termination Event (as defined below), (vi) the receipt of notice from any Governmental Entity or other third party alleging that the consent of such person or entity is or may be required in connection with the consummation of any part of the Restructuring, unless such notice is disclosed on the docket maintained in the Chapter 11 Case, and (vii) any unsolicited proposal or expression of interest with respect to an Alternative Transaction received by it, with such notice to include the material terms thereof.  Each GCS Party also agrees that if such GCS Party receives an unsolicited proposal or expression of interest with

respect to an Alternative Transaction, it shall promptly notify the Consenting Lenders' Advisors of the receipt thereof, with such notice to include the material terms thereof.

(h)     Other.  Each GCS Party agrees that it shall (i) unless it obtains the prior written consent of a Consenting Lender otherwise, use the information regarding any Claims held at any time by such Consenting Lender solely in furtherance of this Agreement and the Restructuring and keep such information (as well as the names and identities of the Consenting Lenders) strictly confidential and not disclose it to any other person or entity, except where disclosure is required by Law, subject to Section 11 hereof, (ii) use reasonable best efforts to obtain, file, submit or register any and all required Governmental Entity and/or third party approvals, filings, registrations or notices that are necessary or advisable for the implementation or consummation of the Restructuring or the approval by the Bankruptcy Court of the applicable Definitive Documents, (iii) use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent, and (iv) not, directly or indirectly, through any Person, (A) move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of any executory contract (including any employment agreement or employee benefit plan) or unexpired lease, other than any assumption or rejection that is expressly contemplated by the Restructuring, (B) unless it obtains the prior written consent of each of the Consenting Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangements, other than the Term DIP Facility, the Exit ABL Facility, and the Exit Term Loan Facilities or as contemplated by the DIP Order, (C) assert, or support any assertion by any Person, that, in order to act on the provisions of Section 7, the Consenting Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and each of the GCS Parties hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of any notice of termination in accordance with Section 7), (D) authorize, create or issue any additional equity interests in any of the GCS Parties, or redeem, purchase, acquire, declare any distribution on or make any distribution on any equity interests in any of the GCS Parties or (E) solely with respect to Midco, pay, or agree to pay, any indebtedness, liabilities or other obligations (including any accounts payable or trade payable) that existed prior to the Petition Date or that arose from any matter, occurrence, action, omission or circumstance that occurred prior to the Petition Date, unless the Bankruptcy Court authorizes Midco to pay such indebtedness, liabilities or other obligations (including any accounts payable or trade payable) pursuant to the relief granted in connection with the First Day Motions.

**6.     Subordination of Existing Term Loan Facility to Term DIP Facility**.

Each of the Consenting Lenders, in their collective capacity as all Consenting Lenders and all Existing Term Lenders on the date hereof (in each case, for and on behalf of themselves and the Consenting Lenders who are their respective assignees in accordance herewith), hereby agree (and hereby direct the Existing Term Loan Facility Agent, in accordance with the Existing Term Loan

23

Credit Agreement, to agree), in accordance with Section 12.02 of the Existing Term Loan Credit Agreement, but solely subject to, and effective only as of the Subordination Period Start Date, and only until the Subordination Period Expiry Date, that:

(a)     <u>Payment Priority</u>: The  Existing Term Obligations shall become subordinate in right of payment to the DIP Obligations in all respects as of the Subordination Period Start Date, and shall remain so subordinate until the Subordination Period Expiry Date; <u>provided</u>, that, notwithstanding anything herein or elsewhere to the contrary, in no event shall any Existing Term Obligations become, or at any time be (or be deemed to be), subordinate to any Existing ABL Obligations (except if, but solely to the extent, and only in the limited manner and circumstances as, expressly provided in the Existing Intercreditor Agreement).  Any Existing Term Collateral, and any Cash Proceeds or non-Cash Proceeds thereof, as the case may be, received during the Subordination Period by the Existing Term Loan Facility Agent or any other Existing Term Secured Party, whether received as a voluntary payment, received under any plan of reorganization or liquidation or otherwise in any Insolvency or Liquidation Proceeding, or in connection with the exercise of any right or remedy (including set-off) relating to DIP Collateral constituting Existing Term Collateral (the "**DIP Existing Term Collateral**") in contravention of this <u>Section 6</u>, in each case, shall be segregated by the Existing Term Secured Party that is the recipient thereof, and held in trust, and shall as soon as is practicable be paid by such recipient over to the Term DIP Agent for the benefit of the DIP Secured Parties in accordance with the Term DIP Facility Agreement, in each case, in the same form as received, with any necessary endorsements in form and substance reasonably satisfactory to the Term DIP Agent and the Existing Term Loan Facility Agent (but without recourse or warranty as to the Exiting Term Agent or any other Existing Term Secured Party) or as a court of competent jurisdiction may otherwise direct, in each case, to the extent that the Liens of the Existing Term Loan Facility Agent in the DIP Existing Term Collateral are valid, enforceable and perfected.  The Term DIP Agent is hereby authorized to make any such endorsements that comply with the terms hereof as agent for the Existing Term Loan Facility Agent or any other Existing Term Secured Party, as applicable, and such authorization is coupled with an interest, and is irrevocable during the Subordination Period; <u>provided</u>, that the same shall be deemed revoked for all purposes immediately and automatically upon occurrence of, and as of, the Subordination Period Expiry Date.

(b)     <u>Lien Priorities</u>: Subject to the terms of this Agreement, but otherwise notwithstanding (i) the time, manner, order or method of grant, creation, attachment, validity, enforceability or perfection of any Liens securing the DIP Obligations granted on the DIP Existing Term Collateral, (ii) the date on which any DIP Loans are extended, (iii) any provision of the UCC or any other applicable law, including any rule for determining priority thereunder or under any other law or rule governing the relative priorities of secured creditors, including with respect to real property or fixtures, (iv) any provision set forth in any DIP Document or any Existing Term Loan Document (other than this <u>Section 6</u>), or (v) the possession or control by the Existing Term Loan Facility Agent or any Existing Term Secured Party or any bailee of all or any part of any

24

Existing Term Collateral as of the date hereof or otherwise, the Existing Term Secured Parties shall hereby be deemed to agree that, during the Subordination Period, (I) any Lien on the DIP Existing Term Collateral securing any Existing Term Obligations now or hereafter held by or on behalf of the Existing Term Loan Facility Agent or any other Existing Term Secured Party or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens thereon hereafter held by or on behalf of the Term DIP Agent or any other DIP Secured Parties or any agent or trustee therefor on the DIP Existing Term Collateral securing any DIP Obligations and (II) any Lien on the DIP Existing Term Collateral securing any DIP Obligations held by or on behalf of the Term DIP Agent or any other DIP Secured Party or any agent or trustee therefor after approval of the Term DIP Facility by the Bankruptcy Court pursuant to the DIP Order, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects to all Liens thereon hereafter held by or on behalf of the Existing Term Loan Facility Agent or any other Existing Term Secured Party or any agent or trustee therefor on the DIP Existing Term Collateral securing any Existing Term Obligations. For the avoidance of doubt, notwithstanding anything herein or elsewhere to the contrary, in no event shall any Lien on any DIP Existing Term Collateral securing any Existing Term Obligations now or hereafter held by or on behalf of the Existing Term Loan Facility Agent or any other Existing Term Secured Party (or any agent or trustee therefor), regardless of how acquired, become, or at any time be (or be deemed to be), subordinate to any Lien securing any Existing ABL Obligations now or hereafter held by or on behalf of the Existing ABL Facility Agent or any other Existing ABL Secured Party (or any agent or trustee therefor), regardless of how acquired (except if, but solely to the extent, and only in the limited manner and circumstances as, expressly provided in the Existing Intercreditor Agreement).

(c)     Bailee for Perfection. The Existing Term Loan Facility Agent shall at all times hold the DIP Existing Term Collateral as collateral agent for the Existing Term Secured Parties in accordance with the Existing Term Loan Documents (including to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC or any other applicable law); provided, that, without limiting the foregoing, and solely during the Subordination Period, the Existing Term Loan Facility Agent shall hold that part of the DIP Existing Term Collateral that is in its possession or control (or in the possession or control of its agents or bailees), including, without limitation, any accounts subject to a Control Agreement (as defined in the Existing Term Loan Credit Agreement), in each case, to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC or any other applicable law (i) as collateral agent for the Existing Term Secured Parties, and (ii) as gratuitous bailee for, and, solely with respect to any collateral that cannot be perfected under the UCC in such manner, as agent for, the Term DIP Agent (on behalf of the DIP Secured Parties) and any assignee thereof, in each case, solely for the purpose of perfecting the security interest granted under DIP Documents under the UCC (such bailment and agency as provided herein being intended to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104 and 9-313(c) of the UCC). Notwithstanding the

foregoing or anything else in this Agreement or otherwise, the Existing Term Loan Facility Agent shall not (and shall not be deemed to), whether by reason of this <u>Section 6</u> or any other provision of this Agreement or any other document, or otherwise, as the case may be, at any time (including during the Subordination Period) (A) have any fiduciary or other relationship, duty or obligation (as applicable), in respect of, or owing to, the Term DIP Agent or any other DIP Secured Parties, or (B) have any obligation whatsoever to the Term DIP Agent or any other DIP Secured Parties to (x) ensure that any DIP Existing Term Collateral is genuine or owned by any of the Grantors or (y) except as expressly set forth in this <u>Section 6(c),</u> preserve rights or benefits of any such Person; <u>provided</u>, further, that, for the avoidance of doubt, the duties or responsibilities of the Existing Term Loan Facility Agent expressly set forth in this <u>Section 6(c)</u> shall be limited to solely holding the DIP Existing Term Collateral as gratuitous bailee or agent (as applicable hereunder) in accordance with this <u>Section 6(c)</u>.

(d)     <u>Exercise of Remedies</u>.  Upon the occurrence of an Event of Default under and as defined in the Term DIP Facility Agreement, remedies may be exercised by Term DIP Agent (acting at the direction of the "Required Lenders" under (and as defined in) the Term DIP Facility Agreement) with the consent of the Consenting Lenders and in accordance with the DIP Order.

(e)     <u>Prohibition on Contesting DIP Claims and DIP Liens</u>.   During the Subordination Period, the Consenting Lenders and the Existing Term Loan Facility Agent, for itself and on behalf of each Existing Term Secured Party, shall not (and hereby waives any right to) contest, or support any other Person in contesting, in any proceeding (including, the Chapter 11 Case or any other Insolvency or Liquidation Proceeding), (i) the priority, validity, perfection or enforceability of a Lien held by or on behalf of any of the DIP Secured Parties in the DIP Collateral or (ii) the validity or enforceability of any DIP Document (or any DIP Obligations thereunder).

(f)     <u>Post-Petition Interest Fees and Expenses; Adequate Protection Payments</u>: No Existing Term Secured Party may retain payment of post-petition interest, fees, and expenses, or any cash payments on account of adequate protection in any Insolvency or Liquidation Proceeding, pursuant to Sections 361, 362, 363 or 364 of the Bankruptcy Code during the Subordination Period except as provided herein or as otherwise consented to by the Existing Term Loan Facility Agent and the Term DIP Agent.  If any Existing Term Secured Party receives any payment of post-petition interest, fees, and expenses, or any cash payments on account of adequate protection in any Insolvency or Liquidation Proceeding pursuant to Sections 361, 362, 363 or 364 of the Bankruptcy Code during the Subordination Period in contravention of this Agreement, such Existing Term Secured Party shall hold the same in trust for the Term DIP Agent, and shall as soon as is practicable pay (or cause the same to be paid) over to the Term DIP Agent for the benefit of the DIP Secured Parties in the same form as received, in each case, consistent with the manner provided in clause (a) of this <u>Section 6</u>.

26

(g)      Plan of Reorganization.  During the Subordination Period, no Existing Term Secured Party may vote in favor of, or otherwise support or enter into, a plan of reorganization or liquidation, or other agreement governing the distribution of a Grantor's assets, in any Insolvency or Liquidation Proceeding (an "**Insolvency or Liquidation Plan**") that provides for the distribution of Cash Proceeds or non-Cash Proceeds or any other property of a Grantor to the Existing Term Secured Party unless (i) such Insolvency or Liquidation Plan provides for the Discharge of the DIP Obligations or (ii) the Term DIP Agent (acting at the direction of the "Required Lenders" under (and as defined in) the Term DIP Facility Agreement) has consented in writing to such Insolvency or Liquidation Plan.  Notwithstanding the foregoing, the Existing Term Secured Parties may vote in favor of the Plan at any time (including during the Subordination Period), and the provisions hereof shall cease to be in effect (including as applicable to any Insolvency or Liquidation Plan) immediately and automatically upon expiry of the Subordination Period.

(h)      Other Chapter 11 Issues**.**  During the Subordination Period, if any Grantor shall become subject to any Insolvency or Liquidation Proceeding, no Existing Term Secured Party shall (A) offer to provide, or support a third-party in providing, debtor-in-possession financing to any Grantor, (B) consent to any Grantor's use of cash collateral constituting DIP Existing Term Collateral, or (C) participate in any sale of substantially all of the assets of any Grantor pursuant to Section 363 of the Bankruptcy Code or under an Insolvency or Liquidation Plan, in each case unless the Term DIP Agent (acting at the direction of the "Required Lenders" under the Term DIP Facility Agreement) has consented in writing to such action.

(i)      Purchase Option.  The Existing Term Secured Parties shall have the right to purchase by way of assignment (and shall thereby also assume all commitments and duties of the Term DIP Agent and DIP Lenders), all, but not less than all, of the DIP Obligations at any time during the DIP Purchase Option Period (as defined below); *provided that* the purchase price shall be equal to the sum of (A) 100% of the principal amount of all outstanding DIP Loans, and all accrued unpaid interest thereon (including, without limitation, default interest), (B) all accrued and unpaid costs, premiums, fees and expenses payable under the DIP Documents (including reasonable and documented out-of-pocket attorneys' fees and legal expenses subject to reimbursement under the DIP Documents, and (C) the amount required to be paid by any Grantors to Term DIP Agent or any other DIP Secured Party as of the date of the proposed purchase pursuant to any indemnity provision contained in the DIP Documents.  The right to purchase the DIP Obligations may be exercised by giving irrevocable notice to the Term DIP Agent at any time during the period that begins on the date of the occurrence of any of the following (such date, the "**DIP Purchase Option Period**"): (1) an Event of Default has occurred under the DIP Documents and has not been cured by the Grantors or waived by the DIP Lenders within thirty (30) days of the occurrence thereof, (2) the maturity of the DIP Obligations has been accelerated, (3) the Term DIP Agent or any other DIP Secured Party has commenced, or has notified the Existing Term Loan Facility Agent that it intends to commence, the exercise of any rights and remedies with respect to

27

any Collateral, (4) a payment Event of Default has occurred and is continuing under the DIP Documents, or (5) any Grantor (other than Midco) has commenced a Chapter 11 Case. Notwithstanding anything in <u>Section 13</u> to the contrary, only the consent of the Consenting Lenders, the Existing Term Loan Facility Agent, the Term DIP Agent and Term DIP Lenders shall be required for any amendment, supplement or other modification of, or any waiver or consent or other agreement under, this <u>Section 6(i)</u>.

(j)     <u>Acknowledgment and Agreement of the GCS Parties and the Existing Term Loan Facility Agent</u>.

(i)     The Existing Term Loan Facility Agent hereby acknowledges the direction given to it above by the Consenting Lenders in their capacity as Existing Term Lenders, and, in reliance thereon, hereby provides, effective as of the start of the Subordination Period, each of the agreements required to be provided by it pursuant to the express terms of clauses (a) through (i) of this <u>Section 6</u>, and agrees to comply, during (but only until expiry of) the Subordination Period, with its express obligations thereunder, in each case, to the extent required hereby.

(ii)     The GCS Parties hereby acknowledge, consent to and confirm the terms and provisions of this <u>Section 6</u>, and hereby covenant and agree to, at all times during the Subordination Period, (x) comply with each of their respective obligations hereunder to the fullest extent required hereunder, and (y) not take any action that is inconsistent with, contrary to, or could reasonably be expected to result in any default or breach by any Person of, any provision of this Agreement.

(k)     <u>Enforceability and Continuing Priority</u>.     This <u>Section 6</u> (including the relative rights of the DIP Secured Parties and the Existing Term Secured Parties in respect of any DIP Existing Term Collateral or Proceeds of DIP Existing Term Collateral) shall become effective solely as of the start of the Subordination Period, and shall only be in effect during the Subordination Period, and shall cease to be in effect immediately and automatically upon expiry of Subordination Period, without requirement for any action or consent by any Party hereto or any other Person.  The provisions of this <u>Section 6</u> are intended to be and shall be enforceable during the Subordination Period as a subordination agreement within the meaning of Section 510 of the Bankruptcy Code (or similar Bankruptcy Law).

**7.     Termination of Agreement**.

This Agreement shall automatically terminate three (3) business days following the delivery of written notice from the Consenting Lenders to the other Parties (in accordance with <u>Section 22</u>) at any time after and during the continuance of any Lender Termination Event.  In addition, this Agreement shall automatically terminate three (3) business days following the delivery of written notice from the GCS Parties to the Consenting Lenders (in accordance with

28

Section 22) at any time after the occurrence and during the continuance of any GCS Party Termination Event.  This Agreement shall terminate automatically on the Effective Date without any further required action or notice.

       (a)    A "**Lender Termination Event**" shall mean any of the following:

          (i)    The breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by any GCS Party of any of the undertakings, representations, warranties or covenants of the GCS Parties set forth herein which remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Consenting Lenders pursuant to this Section 7 and in accordance with Section 22 (as applicable); *provided that* the GCS Parties reserve all rights they may have to challenge the exercise by the Consenting Lenders of their ability to terminate this Agreement pursuant to this Section 7(a)(i);

          (ii)    On October 20, 2021, unless Midco has commenced the Solicitation (the "**Outside Solicitation Date**").

          (iii)    On the Outside Petition Date, unless Midco has commenced the Chapter 11 Case.

          (iv)    On November 9, 2021, unless Midco has completed the Solicitation on such date or commenced the Chapter 11 Case and requested authority to complete the Solicitation postpetition.

          (v)    On the Petition Date, unless Midco has filed the First Day Motions, the Plan, the Disclosure Statement, a motion to schedule a joint hearing for approval of the Plan and the Disclosure Statement, and a motion for approval of the Term DIP Facility in form and substance satisfactory to the Consenting Lenders.

          (vi)    On the Petition Date, unless the parties to the Settlement and Release Agreement have executed and exchanged signature pages thereto.

          (vii)    On the date that is 21 days after the Petition Date, if the Bankruptcy Court shall not have held a joint hearing for approval of the Plan and the Disclosure Statement.

          (viii)    On the date that is 24 days after the Petition Date, if the Bankruptcy Court shall not have entered the DIP Order in form and substance reasonably satisfactory to the Consenting Lenders.

(ix)     On the date that is 24 days after the Petition Date, if the Bankruptcy Court shall not have entered the Confirmation Order in form and substance reasonably satisfactory to the GCS Parties and the Consenting Lenders.

(x)     Midco (A) withdraws the Plan or Disclosure Statement or files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Definitive Documents in all material respects and such motion or pleading has not been withdrawn prior to the earlier of (i) two (2) business days after the Midco receives written notice from the Consenting Lenders (in accordance with Section 22) that such motion or pleading is materially inconsistent with this Agreement or the Definitive Documents and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading,  (B) publicly announces, or announces in writing to any other Party, its intention to withdraw the Plan or not support the Plan, (C) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction, (D) moves to voluntarily dismiss the Chapter 11 Case, (E) moves for conversion of the Chapter 11 Case to a case under chapter 7 under the Bankruptcy Code, (F) moves for court authority to sell any material asset or assets without the written consent of the Consenting Lenders, or (G) moves for the appointment of an examiner with expanded powers or a chapter 11 trustee and, in any such case, such withdrawal, announcement or motion, as applicable, has not been withdrawn or retracted by the Debtor within three (3) business days after the date such withdrawal, announcement or motion was made.

(xi)     A chapter 11 trustee or examiner with expanded powers shall have been appointed in the Chapter 11 Case.

(xii)     If either (A) any GCS Party (or any person or entity on behalf of any GCS Party or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of any of the obligations or Existing Term Loan Claims under the Existing Term Loan Credit Agreement, or (B) an order is entered by the Bankruptcy Court invalidating, subordinating, recharacterizing, limiting or disallowing, as applicable, the enforceability, priority or validity of the liens securing the obligations owed under the Existing Term Loan Credit Agreement or the claims in respect thereof.

(xiii)     The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Definitive Documents in any respect or would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, which event remains uncured for three (3) business

days after such terminating Consenting Lenders transmit a written notice in accordance with <u>Section 22</u> hereof detailing any such event.

(xiv)   The Bankruptcy Court enters an order terminating Midco's exclusive right to file and/or solicit acceptances of a plan of reorganization.

(xv)   After entry by the Bankruptcy Court of the DIP Order or the Confirmation Order, any such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the written consent of the Consenting Lenders.

(xvi)   Midco files, propounds or otherwise supports any chapter 11 plan other than the Plan.

(xvii)   The occurrence of any Event of Default under (and as defined in) the Definitive Documents relating to the Term DIP Facility or the DIP Order.

(xviii)  The occurrence of a Material Adverse Effect.

(xix)   The occurrence of an Other Termination Event (as defined below).

(b)     A "**GCS Party Termination Event**" shall mean any of the following:

(i)     The breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by a Consenting Lender of any of the undertakings, representations, warranties or covenants of the Consenting Lenders set forth herein, which remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the GCS Parties pursuant to this <u>Section 7</u> and in accordance with <u>Section 22</u> (as applicable); *provided that* the Consenting Lenders reserve all rights they may have to challenge the exercise by the GCS Parties of their ability to terminate this Agreement pursuant to this Section 7(b)(i).

(ii)     The board of managers, members, or partners, as applicable, of any GCS Party reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable Law; *provided that* in the event that the GCS Parties desire to terminate this Agreement pursuant to this <u>Section 7(b)(ii)</u>, the GCS Parties shall provide written notice to counsel to the Consenting Lenders three (3) business days prior to delivering a notice of termination advising such counsel that the GCS Parties intend to terminate this Agreement pursuant to this <u>Section 7(b)(ii)</u>; *provided further* that the Consenting Lenders reserve all rights they may have to challenge the exercise by the GCS Parties of their ability to terminate this Agreement pursuant to this <u>Section 7(b)(ii)</u>;

31

   (iii) One or more of the Consenting Lenders seeks approval of or supports (or fails to object in a timely manner to) another party in filing or seeking approval of an Alternative Transaction.

   (iv) The occurrence of an Other Termination Event.

  (c) <u>Other Termination Events</u>.  An "**Other Termination Event**" shall mean any of the following:

   (i) The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order declaring this Agreement to be unenforceable, enjoining the consummation of, rendering illegal or otherwise preventing or prohibiting the consummation of a material portion of the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of a GCS Party, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within twenty (20) business days after such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling, judgment or order in contravention of any obligation set out in this Agreement.

   (ii) On the date that the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such case shall have been dismissed by order of the Bankruptcy Court (unless caused by a default by any Consenting Lender of its obligations hereunder, in which event the Consenting Lenders shall not have the right to terminate under this clause (ii)).

   (iii) Upon the entry of an order by the Bankruptcy Court (without the prior written consent of the Consenting Lenders) (A) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in the Chapter 11 Case or (B) rejecting this Agreement.

   (iv) Upon entry of any order by the Bankruptcy Court or a Court of competent jurisdiction denying confirmation of the Plan, denying consummation of the Restructuring (unless caused by a default by any Consenting Lender of its obligations hereunder, in which event the Consenting Lenders shall not have the right to terminate under this subsection) or refusing to approve the Disclosure Statement; *provided that* neither the GCS Parties nor the Consenting Lenders shall have the right to terminate this Agreement pursuant to this clause (c)(iv) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or the Disclosure Statement that would not have an adverse effect on the recovery or treatment that the Consenting Lenders would receive as compared to the recovery they would have otherwise received pursuant to the Plan;

(v)     The Existing ABL Forbearance Agreement is terminated prior to the Petition Date;

(vi)     38 days after the Petition Date (the "**Outside Date**"), if the Effective Date has not occurred.

Notwithstanding the foregoing, any of the dates set forth in this Section 7(c) may be extended by agreement among the GCS Parties and the Consenting Lenders.

(d)     Mutual Termination.   This Agreement may be terminated by mutual agreement of the Company and the Consenting Lenders upon the receipt of written notice delivered in accordance with Section 22.

(e)     Effect of Termination.   Subject to the provisions contained in Section 16, upon the termination of this Agreement in accordance with this Section 7 (the date of such termination, the "Termination Date"), this Agreement shall become void and of no further force or effect and each Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; *provided that* in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.   Upon the termination of this Agreement prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before such Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, this Agreement or otherwise.   Nothing in this Agreement shall be construed as prohibiting a GCS Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.   Notwithstanding any provision to the contrary in this Section 7, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of a Lender Termination Event or Company Termination Event specified herein, except a termination pursuant to Section 7(b)(b)(ii).   If this Agreement has been terminated in accordance with this Section 7 with respect to any Consenting Lender at a time when permission of the Bankruptcy Court shall be required for such Consenting Lender to change or withdraw (or cause to change or withdraw) its

33

vote to accept the Plan, the GCS Parties shall consent to any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote at such time.

## 8. **Definitive Documents; Good Faith Cooperation; Further Assurances**.

(a)     Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

(b)     Each of the Parties agrees to negotiate in good faith any amendments and modifications to the Definitive Documents as reasonably necessary and appropriate to effectuate the Restructuring and obtain confirmation of the Plan pursuant to an order of the Bankruptcy Court; *provided that* each Party shall have no obligation to agree to any modification that (i) is inconsistent with this Agreement, (ii) creates any new obligations on any Party, or (iii) adversely changes or otherwise adversely affects the economic treatment of such Party whether such change is made directly to the treatment of the Consenting Lenders or otherwise.

## 9. **Certain Conditions Precedent to Effective Date**.

The following shall be conditions precedent to the Effective Date:

(a)     The GCS Parties shall have committed to implementing any items necessary to satisfy all matters requiring attention received by the Company in connection with the Company's 2020-2021 examination by the Consumer Financial Protection Bureau ("**CFPB**"), in each case in accordance with any deadlines established by the CFPB.

(b)     The GCS Parties shall have shared the CFPB examination report with the Consenting Lenders or shall have requested approval from the CFPB to do so.

(c)     The GCS Parties shall have provided evidence to the Consenting Lenders of the relevant GCS Parties' collection agency registration in Louisiana.

(d)     The GCS Parties shall have provided the Consenting Lenders with an update on the status of any material litigation against any of the GCS Parties, including the GCS Parties' assessment of the likelihood of success of such litigation.

(e)    The GCS Parties shall have delivered an action plan (the "**Action Plan**") to the Consenting Lenders regarding implementation of the following (collectively, the "**Action Items**"):

(i)    in consultation with the GCS Parties' customers, potential revisions to the GCS Parties' settlement offer letters, scripts, and communications to include clear disclosure that accepting a settlement offer may have tax implications;

(ii)    in consultation with the GCS Parties customers, potential revisions to the GCS Parties' settlement offer letters, scripts, and communications to disclose an exact dollar figure that a debtor must tender to accept a settlement offer;

(iii)    revisions to the GCS Parties' form of collection letter to debtors with respect to out-of-statute debt to include clear and conspicuous disclosures that making a voluntary payment on an out-of-statute debt could have the effect of restarting the statute of limitations;

(iv)    revisions to validation of debt letters sent by the GCS Parties to include (a) disclosures that the consumer's balance may increase after the date of the letter due to fees, interest, and other charges (if the underlying obligation is interest bearing, carries fees or other charges, or the balance will otherwise increase over time), (b) if available based on information provided by the GCS Parties' clients, itemized amounts of the debt that the debtor owes, including fees, charges, or other items, and (c) validation of debt information and disclosures on the front side of the letter;

(v)    upon the effective date of the CFPB's Regulation F, use of the CFPB's model form validation of debt letter;

(vi)    within thirty (30) days of the Effective Date, remediation of any open items identified as "high priority" on the GCS Parties' "issues log" related to credit reporting and do-not-call numbers;

(vii)    revisions to the GCS Parties' skip tracing training materials to reflect the Fair Debt Collection Practices Act definition of "location information" as (a) the consumer's residence, (b) the consumer's residential telephone number, and (c) the consumer's place of employment;

(viii)    adoption of a credit reporting policy and procedure incorporating the guidelines contained in CFPB's Regulation V ("**Furnisher Rule**") applicable to the GCS Parties' credit reporting activities, specifically addressing the GCS Parties' controls to ensure accuracy and integrity of reported information;

(ix)     revisions to the GCS Parties' credit reporting policies and procedures to clarify the GCS Parties' obligation to report the results of all direct credit reporting dispute investigations to the debtor within thirty (30) days of receipt; and

(x)     system controls to prevent the GCS Parties' representatives from leaving voicemail messages for debtors who reside in jurisdictions where applicable laws prohibit leaving voicemail messages for a debtor.

The Action Plan shall provide an anticipated timeline for completion of each of the Action Items. Except for those Action Items where a deadline is explicitly contemplated by this Agreement, the GCS Parties shall use commercially reasonable efforts to complete each Action Item within sixty (60) days of the Effective Date. For any Action Item not completed within sixty (60) days after the Effective Date, the GCS Parties shall provide regular updates to the Consenting Lenders regarding the status of completion of such Action Item.

## 10.     **Representations and Warranties**.

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Lender that becomes a party hereto after the date hereof, as of the date such Consenting Lender becomes a party hereto):

(i)     Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder. The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(ii)     The execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of Law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of Midco, the filing of the Chapter 11 Case.

(iii)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(iv)     Except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by such Party in order for it to effectuate the Restructuring and perform its respective obligations under this Agreement; *provided that* certain of the GCS Parties may be required to seek regulatory or licensing approvals in certain jurisdictions in which the GCS Parties conduct business in order to implement the Restructuring.

(v)     Such Party (A) is a sophisticated party with respect to the subject matter of this Agreement and the transactions contemplated hereby, (B) has adequate information concerning the matters that are the subject of this Agreement and the transactions contemplated hereby, (C) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has independently and without reliance upon any warranty or representation by, or information from, any other Party or any officer, employee, agent or representative thereof, of any sort, oral or written, except the warranties and representations expressly set forth in this Agreement, and based on such information as such Party has deemed appropriate, made its own analysis and decision to enter into this Agreement and the transactions contemplated hereby, and (D) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(vi)     Such Party is not aware of the occurrence of any event that, due to any fiduciary or similar duty to any other Person, would prevent it from taking any action required of it under this Agreement.

(vii)     Such Party is not currently engaged in any discussions, negotiations or other arrangements with respect to any Alternative Transaction.

(b)     Each Consenting Lender severally (and not jointly) represents and warrants to the GCS Parties that, as of the date hereof (or as of the date such Consenting Lender becomes a party hereto), such Consenting Lender (i) is the sole beneficial owner, or is the nominee, investment manager or advisor for beneficial owner(s), of the aggregate principal amount of loans under the Existing Term Loan Credit Agreement (the "**Loans**") set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owner(s) of such Loans, (A) sole investment or voting discretion with respect to such Loans, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign and Transfer such Loans, and (C) full power and authority to bind or act on the behalf of, such beneficial owner(s).

It is understood and agreed that the representations and warranties made by a Consenting Lender that is an investment manager, advisor or subadvisor of a beneficial owner of

Claims are made with respect to, and on behalf of, such beneficial owner and not such investment manager, advisor or subadvisor, and, if applicable, are made severally (and not jointly) with respect to the investment funds, accounts and other investment vehicles managed by such investment manager, advisor or subadvisor.

11. **Disclosure; Publicity**. The Company shall submit drafts to the Consenting Lenders' Advisors of any press releases, public documents and any and all filings with the SEC or any other applicable regulatory or licensing authority with jurisdiction over the GCS Parties' operations that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) business days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. Except as required by applicable Law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Lender, no Party or its advisors shall (a) use the name of any Consenting Lender in any public manner (including in any press release) with respect to this Agreement, the Restructuring or any of the Definitive Documents or (b) disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Lender), other than advisors to the Company, the principal amount or percentage of Loans held by any Consenting Lender, in each case, without such Consenting Lender's prior written consent; *provided* that (x) if such disclosure is required by Law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, (y) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by all the Consenting Lenders collectively and (z) any Party may disclose information requested by a regulatory or licensing authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person. Notwithstanding the provisions in this Section 11, (a) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof and (b) except as permitted by clause (a) immediately above, any Party may disclose, to the extent expressly consented to in writing by a Consenting Lender, such Consenting Lender's identity and individual holdings. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Lender (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

12. **Amendments and Waivers**. Except as otherwise expressly set forth herein, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except in a writing signed by each of the GCS Parties and each of the Consenting Lenders. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*. The waiver by any Party of a

breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

   **13.**   **Effectiveness**. This Agreement shall become effective and binding upon and enforceable against, the Parties as of the date first written above, subject to, and only upon and as of the date when, Midco, the Initial Consenting Lenders and the Existing Term Loan Facility Agent shall have received counterpart signature pages to this Agreement, duly executed and delivered by the GCS Parties, the Initial Consenting Lenders and the Existing Term Loan Facility Agent (such date, the "**Support Effective Date**"); *provided* that Section 6 shall not be binding on, or enforceable against, any of the Parties until each of the Term DIP Lenders and the Term DIP Agent have delivered to each of the other Parties a duly executed joinder to this Agreement, which joinder shall be in form and substance reasonably acceptable to the Company, the Consenting Lenders, and the Existing Term Loan Facility Agent.

**14.**   **Governing Law; Jurisdiction; WAIVER OF JURY TRIAL**.

   (a)  This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York without giving effect to the conflict of laws principles thereof. Each of the Parties irrevocably agrees that any legal action, suit or proceeding (each, a "**Proceeding**") arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the City of New York (the "**New York Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Proceeding arising out of or relating to this Agreement and the Restructuring. Each of the Parties agrees not to commence any Proceeding relating hereto or thereto except in the New York Courts, other than Proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court. Each of the Parties further agrees that notice as provided in Section 22 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that a Proceeding in any New York Court is brought in an inconvenient forum, the venue of such Proceeding is improper, or the Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Case, all Proceedings contemplated by this Section 14(a) shall be brought in the Bankruptcy Court.

39

(b)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

15.      **Specific Performance/Remedies**.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

16.      **Survival**.  Notwithstanding the termination of this Agreement pursuant to Section 6, Sections 7, 11–12, 14–22, 24–25, 28–29, and 30 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *that* any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

17.      **Headings**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

18.      **Successors and Assigns; Severability**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives (subject to Section 4(d)); *provided* that nothing contained in this Section 18, shall be deemed to permit Transfers of the Loans or any Claims or Interests other than in accordance with the express terms Section 4 of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

19.      **Relationship Among Parties**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  It is understood and agreed that no Consenting Lender owes any

duty of trust or confidence of any kind or form to any other Party. In this regard, it is understood and agreed that any Consenting Lender may trade in Claims or Interests to any other Consenting Lender or any Affiliate of any Consenting Lender without the consent of any other Consenting Lender, subject to, and in compliance with, applicable securities Laws and the terms of this Agreement; *provided, however*, that no Party shall have any responsibility for any trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

20.    **Prior Negotiations; Entire Agreement; Conflicts**.

(a)    This Agreement, including the exhibits and schedules hereto (including the Definitive Documents), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations with respect to the express subject matter hereof and thereof, subject to anything contained in the Existing Intercreditor Agreement and any other documents agreed to with the Existing ABL Lenders in connection with the Restructuring.

(b)    In the event of any conflict between the express provisions of this Agreement and the express provisions of the Existing Intercreditor Agreement, the express provisions of this Agreement shall govern and control as between the Existing Term Loan Facility Agent and the other Existing Term Secured Parties, on the one hand, and the Term DIP Agent and Term DIP Lenders, on the other hand; *provided* that the Existing Intercreditor Agreement shall continue to apply in accordance with its terms at all times, and shall govern any matter not expressly provided for in this Agreement (including with respect to any matter set forth in Section 6).

21.    **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement delivered by PDF shall be deemed to be an original for the purposes of this paragraph.

22.    **Notices**. All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested), to the following addresses:

41

(a)      If to any of the GCS Parties, to:

ORG GC Midco, LLC
6330 Gulfton Street
Houston, Texas 77081
Attention:  Mark Schordock, Chief Executive Officer; Michael Jones, Chief
Financial Officer; and Brad Batig, Chief Compliance Officer and General
Counsel
Email:  mark.schordock@gcserv.com, michael.jones@gcserv.com,
and brad.batig@gcserv.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Sunny Singh, Esq. and Katherine T. Lewis, Esq.
Email: sunny.singh@weil.com and katherine.lewis@weil.com

(b)      If to BSP, as a Consenting Lender, or a transferee thereof, to the addresses
or email addresses set forth below such Consenting Lender's signature hereto (or
as directed by any transferee thereof), as the case may be, with copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
Attention: Jayme T. Goldstein, Esq., Daniel P. Ginsberg, Esq., and Joanne Lau,
Esq.
Email:  jgoldstein@stroock.com, dginsberg@stroock.com, and jlau@stroock.com

(c)      If to GS, as a Consenting Lender, or a transferee thereof, to the addresses
or email addresses set forth below such Consenting Lender's signature hereto (or
as directed by any transferee thereof), as the case may be, with copies to:

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Attention: W. Austin Jowers, Esq. and Michael R. Handler, Esq.
Email:  ajowers@kslaw.com and mhandler@kslaw.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral or electronic mail (as applicable) confirmation of transmission.

23.    **Reservation of Rights; Settlement Discussions; No Admission**.  Nothing contained herein shall limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Case, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective Affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the GCS Parties.  This Agreement and the Definitive Documents are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable Law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

24.    **No Solicitation; Adequate Information**.  This Agreement is not and shall not be a solicitation for consents of the Plan.  The votes of the holders of Claims against Midco will not be solicited until such holders who are entitled to vote have received the Plan, the Disclosure Statement, and the related Solicitation Materials, including the ballots.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.  Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Lender acknowledges, agrees and represents (severally and not jointly) to the other Parties that it (i) is a Qualified Institutional Buyer (as defined in Rule 144A of the Securities Act of 1933 (the "**Securities Act**")), an "institutional accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a non-"U.S. Person" (as defined in Regulation S of the Securities Act), (ii) understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Lender's representations contained in

43

this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iii) has such knowledge and experience in financial and business matters that such Consenting Lender is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

25. **Interpretation; Rules of Construction; Representation by Counsel**. When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless otherwise specified, any reference in this Agreement to an existing agreement, document, schedule or exhibit shall, in each case, mean such agreement, document, schedule or exhibit, as applicable, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; *provided that* no such amendment, amendment and restatement, supplement or other modification (as applicable) entered into or purported to be effective at any time after the date hereof shall be deemed effective for purposes hereof unless (and solely to the extent that) the Consenting Lenders have consented thereto in writing or the same is otherwise effectuated in accordance with the express terms hereof; *provided*, *further* that any capitalized terms in this Agreement which, for purposes of this Agreement, are expressed to be defined with reference to the definition thereof contained in another agreement, shall be defined with reference to such other agreement as in effect on the date of this Agreement, without giving effect to any termination of such other agreement, or any amendment or other modification to such capitalized terms in any such other agreement following the date of this Agreement (except to the extent that the same is in accordance with the preceding proviso). Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," whether stated or not, and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." References to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws. The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

26. **Independent Due Diligence and Decision Making.** Each Consenting Lender hereby confirms that its decision to execute this Agreement has been based upon its

independent investigation of the operations, businesses, financial and other conditions, and prospects of the GCS Parties.

27.     **Enforceability of Agreement.**  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

28.     **Email Consents.**  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Consenting Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel (identified in Section 22) to the applicable Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

29.     **Transaction Expenses.**

(a)     Whether or not the transactions contemplated by this Agreement are consummated and, in each case, if applicable, subject to the terms of the applicable engagement letter or fee reimbursement letter, the GCS Parties hereby agree, on a joint and several basis, to pay in cash the Transaction Expenses as follows: (i) all accrued and unpaid reasonable and documented Transaction Expenses incurred up to (and including) the Support Effective Date shall be paid in full in cash on the Support Effective Date, *provided that* the GCS Parties have received invoices with respect to such Transaction Expenses at least two (2) business days prior to the Support Effective Date, (ii) prior to the Petition Date and after the Support Effective Date, all accrued and unpaid reasonable and documented Transaction Expenses shall be paid in full in cash by the GCS Parties on a regular and continuing basis promptly (but in any event within five (5) business days of receipt of an invoice by the GCS Parties) and no later than the business day prior to the Petition Date against receipt of reasonably detailed invoices, and (iii) all accrued and unpaid reasonable and documented Transaction Expenses incurred up to (and including) the Effective Date shall be paid in full in cash on or prior to the Effective Date  against receipt of reasonably detailed invoices, in each case without any requirement for Bankruptcy Court review or further Bankruptcy Court order.

(b)     The terms set forth in this Section 29 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  The GCS Parties hereby acknowledge and agree that the Consenting Lenders have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the Restructuring, and

45

that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the GCS Parties, and that the Consenting Lenders have made a substantial contribution to the GCS Parties and the Restructuring. If and to the extent not previously reimbursed or paid in connection with the foregoing, subject to the approval of the Bankruptcy Court, the GCS Parties shall reimburse or pay (as the case may be) all reasonable and documented Transaction Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. The GCS Parties hereby acknowledge and agree that the Transaction Expenses are of the type that should be entitled to treatment as, and the GCS Parties shall seek treatment of such Transaction Expenses as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

30.    **No Recourse.**  This Agreement may only be enforced against the named Parties hereto (and then only to the extent of the specific obligations undertaken by such Parties in this Agreement). All claims or causes of action (whether in contract, tort, equity or any other theory) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the Persons that are expressly identified as Parties hereto (and then only to the extent of the specific obligations undertaken by such Parties herein). No past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney or other representative of any Party hereto (including any person negotiating or executing this Agreement on behalf of a Party hereto), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney or other representative of any of the foregoing (other than any of the foregoing that is a Party hereto), shall have any liability with respect to this Agreement or with respect to any Proceeding (whether in contract, tort, equity or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or Affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**[SIGNATURE PAGES ON FILE WITH THE DEBTOR]**

## Exhibit A

**Plan**

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE COMMENCEMENT OF THE DEBTOR'S CHAPTER 11 CASE.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **ORG GC MIDCO, LLC** | § | **Case No. 21-** |
| | § | |
| Debtor.[1] | § | |
| | § | |

**PREPACKAGED CHAPTER 11 PLAN OF ORG GC MIDCO, LLC**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Sunny Singh (*pro hac vice* pending)
Katherine T. Lewis (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for the Debtor*
*and Debtor in Possession*

Dated:   October 16, 2021
              Houston, Texas

---

[1]   The last four digits of the Debtor's federal tax identification number are 1740.  The Debtor's mailing address is 6330 Gulfton Street, Houston, Texas 77081.

Table of Contents

Page

**ARTICLE I**    DEFINITIONS AND INTERPRETATION. .......................................................... 1

   A.     Definitions. ....................................................................................................... 1

   B.     Interpretation; Application of Definitions and Rules of Construction. .................................... 14

   C.     Reference to Monetary Figures. ...................................................................... 14

   D.     Controlling Document. ....................................................................................... 14

   E.     Consultation, Information, Notice and Consent Rights. ...................................................... 15

**ARTICLE II**    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS. ............................. 15

   2.1.     Administrative Expense Claims. .................................................................... 15

   2.2.     Fee Claims. ...................................................................................................... 16

   2.3.     Priority Tax Claims. ........................................................................................ 16

   2.4.     Term DIP Claims ............................................................................................. 17

   2.5.     Transaction Expenses. ..................................................................................... 17

**ARTICLE III**    CLASSIFICATION OF CLAIMS AND INTERESTS. ...................................... 17

   3.1.     Classification in General. ................................................................................ 17

   3.2.     Summary of Classification. ............................................................................. 18

   3.3.     Special Provision Governing Unimpaired Claims. ......................................... 18

   3.4.     Elimination of Vacant Classes. ...................................................................... 18

**ARTICLE IV**    TREATMENT OF CLAIMS AND INTERESTS. ............................................. 18

   4.1.     Priority Non-Tax Claims (Class 1). ................................................................ 18

i

Table of Contents
(continued)

4.2.     Other Secured Claims (Class 2)..................................................................19

4.3.     Existing Term Loan Claims (Class 3) ..........................................................19

4.4.     Existing ABL Facility Claims (Class 4) .......................................................20

4.5.     General Unsecured Claims (Class 5)............................................................20

4.6.     Intercompany Claims (Class 6). ...................................................................21

4.7.     Midco Equity Interests (Class 7). .................................................................21

4.8.     Subordinated Claims and Interests. ..............................................................21

**ARTICLE V**     MEANS FOR IMPLEMENTATION. .................................................22

5.1.     Compromise and Settlement of Claims, Interests, and Controversies..........22

5.2.     Continued Corporate Existence. ...................................................................22

5.3.     Exit ABL Facility. .........................................................................................22

5.4.     Exit Term Loan Facilities. .............................................................................23

5.5.     New Intercreditor Agreements. .....................................................................24

5.6.     New Organizational Documents.....................................................................25

5.7.     Authorization and Issuance of the New Equity. ............................................25

5.8.     Section 1145 Exemption................................................................................25

5.9.     Cancellation of Existing Securities and Agreements.....................................26

5.10.    Officers and Board of Managers....................................................................27

5.11.    Effectuating Documents; Further Transactions..............................................28

5.12.    Cancellation of Liens.....................................................................................29

ii

Table of Contents
(continued)

5.13.    Management Incentive Plan. ..................................................................... 29

5.14.    Nonconsensual Confirmation. ................................................................... 29

5.15.    Closing of Chapter 11 Case. ..................................................................... 29

5.16.    Notice of Effective Date. .......................................................................... 30

5.17.    Sources for Plan Distributions. ................................................................. 30

**ARTICLE VI**   DISTRIBUTIONS. ............................................................................. 30

6.1.     Distributions Generally. ............................................................................ 30

6.2.     Distribution Record Date. ......................................................................... 30

6.3.     Date of Distributions. ............................................................................... 30

6.4.     Disbursing Agent. ..................................................................................... 31

6.5.     Rights and Powers of Disbursing Agent. .................................................. 31

6.6.     Expenses of Disbursing Agent. ................................................................. 31

6.7.     No Postpetition Interest on Claims. .......................................................... 32

6.8.     Delivery of Distributions. ......................................................................... 32

6.9.     Distributions after Effective Date. ............................................................ 32

6.10.    Unclaimed Property. ................................................................................. 32

6.11.    Time Bar to Cash Payments. ..................................................................... 33

6.12.    Manner of Payment under Plan. ................................................................ 33

6.13.    Satisfaction of Claims. .............................................................................. 33

6.14.    Fractional Stock. ....................................................................................... 33

iii

Table of Contents
(continued)

Page

6.15.   Minimum Cash Distributions. ........................................................................ 33

6.16.   Setoffs and Recoupments. ............................................................................. 33

6.17.   Allocation of Distributions between Principal and Interest.............................. 34

6.18.   No Distribution in Excess of Amount of Allowed Claim................................. 34

6.19.   Surrender of Cancelled Instruments or Securities. ......................................... 34

6.20.   Accrual of Dividends and Other Rights........................................................... 34

6.21.   Withholding and Reporting Requirements. ..................................................... 34

6.22.   Hart-Scott-Rodino Antitrust Improvements Act. ............................................ 35

**ARTICLE VII** PROCEDURES FOR DISPUTED CLAIMS. ......................................... 35

7.1.   Disputed Claims. ........................................................................................... 35

7.2.   Claims Administration Responsibilities. ......................................................... 36

7.3.   Estimation of Claims. .................................................................................... 36

7.4.   No Distributions Pending Allowance. ............................................................. 37

7.5.   Distributions after Allowance........................................................................ 37

7.6.   Claim Resolution Procedures Cumulative....................................................... 37

7.7.   Claims Paid by Third Parties. ......................................................................... 37

7.8.   Insured Claims................................................................................................ 37

**ARTICLE VIII**                   EXECUTORY CONTRACTS AND UNEXPIRED LEASES............... 38

8.1.   General Treatment. ........................................................................................ 38

8.2.   Determination of Cure Disputes and Deemed Consent .................................... 39

iv

Table of Contents
(continued)

8.3.     Rejection Claims...................................................................................... 40

8.4.     Survival of the Debtor's Indemnification Obligations. ................................. 40

8.5.     Insurance Policies. .................................................................................. 41

8.6.     Intellectual Property Licenses and Agreements........................................... 41

8.7.     Modifications, Amendments, Supplements, Restatements, or Other
         Agreements.............................................................................................. 41

8.8.     Reservation of Rights. ............................................................................. 41

8.9.     Contracts and Leases Entered into after the Effective Date. ........................ 42

**ARTICLE IX**   CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
                EFFECTIVE DATE.................................................................................. 42

9.1.     Conditions Precedent to Confirmation of Plan............................................ 42

9.2.     Conditions Precedent to Effective Date...................................................... 43

9.3.     Waiver of Conditions Precedent................................................................ 44

9.4.     Effect of Failure of a Condition................................................................ 44

**ARTICLE X**   EFFECT OF CONFIRMATION OF PLAN. ................................................ 45

10.1.    Vesting of Assets. .................................................................................... 45

10.2.    Binding Effect......................................................................................... 45

10.3.    Discharge of Claims and Termination of Interests. ...................................... 45

10.4.    Term of Injunctions or Stays. ................................................................... 46

10.5.    Injunction............................................................................................... 46

10.6.    Releases. ................................................................................................. 47

v

Table of Contents
(continued)

Page

10.7.    Exculpation...................................................................................................... 49

10.8.    Retention of Causes of Action/Reservation of Rights................................. 49

10.9.    Solicitation of Plan. ....................................................................................... 50

10.10.   Corporate and Limited Liability Company Action........................................ 51

10.11.   Protections Against Discriminatory Treatment. ........................................... 51

10.12.   Reimbursement or Contribution. ................................................................... 52

**ARTICLE XI**  RETENTION OF JURISDICTION........................................................... 52

11.1.    Retention of Jurisdiction................................................................................ 52

11.2.    Courts of Competent Jurisdiction. ................................................................ 54

**ARTICLE XII** MISCELLANEOUS PROVISIONS.......................................................... 54

12.1.    Payment of Sponsor Fees. ............................................................................. 54

12.2.    Payment of Statutory Fees. ........................................................................... 54

12.3.    Substantial Consummation of the Plan.......................................................... 54

12.4.    Plan Supplement. ........................................................................................... 54

12.5.    Request for Expedited Determination of Taxes............................................. 55

12.6.    Exemption from Certain Transfer Taxes. ...................................................... 55

12.7.    Amendments................................................................................................... 55

12.8.    Effectuating Documents and Further Transactions. ...................................... 56

12.9.    Revocation or Withdrawal of Plan. ............................................................... 56

12.10.   Severability of Plan Provisions...................................................................... 56

vi

Table of Contents
(continued)

Page

12.11.   Governing Law. ............................................................................................... 57

12.12.   Time. ................................................................................................................. 57

12.13.   Dates of Actions to Implement the Plan. ......................................................... 57

12.14.   Immediate Binding Effect. ............................................................................... 57

12.15.   Deemed Acts. .................................................................................................... 57

12.16.   Reservation of Rights. ...................................................................................... 58

12.17.   Successor and Assigns. ..................................................................................... 58

12.18.   Entire Agreement. ............................................................................................. 58

12.19.   Exhibits to Plan. ............................................................................................... 58

12.20.   Waiver or Estoppel. .......................................................................................... 58

12.21.   Notices. ............................................................................................................. 58

ORG GC Midco, LLC (the "**Debtor**" and, collectively, with its direct and indirect subsidiaries, the "**Company**" or the "**GCS Parties**") proposes the following chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.

## ARTICLE I        DEFINITIONS AND INTERPRETATION.

### A.    **Definitions.**

The following terms shall have the respective meanings specified below:

1.1    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Case of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (ii) the Fee Claims; and (iii) the Term DIP Claims.

1.2    *Affiliates* means, with respect to any Person (except with respect to ORG GC Holdings, LLC), any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person and shall also include (i) any related fund of such Person and (ii) in the case of a specified Person who is an individual, any family member or personal representative of such Person. The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

1.3    *Allowed* means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor or New Holdco; (c) as to which the liability of the Debtor or New Holdco, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; *provided*, *however*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) New Holdco (as successor to the Debtor) shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.4    *Bankruptcy Code* means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Case.

1.5     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Case.

1.6     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Case.

1.7     ***BSP*** means Benefit Street Partners LLC, together with its Affiliates and related and/or managed funds, accounts, and/or entities directly or indirectly owned by such Affiliates, managed funds, or accounts, in their respective capacities as Existing Term Lenders and the Existing Term Loan Facility Agent.

1.8     ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.9     ***Cash*** means legal tender of the United States of America.

1.10    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.11    ***Certificate*** means any instrument evidencing a Claim or an Interest.

1.12    ***Chapter 11 Case*** means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court.

1.13    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against the Debtor.

1.14    ***Class*** means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

2

1.15    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.16    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.17    ***Confirmation Order*** means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably satisfactory to the Company and the Consenting Lenders.

1.18    ***Consenting Lenders*** has the meaning ascribed to such term in the Restructuring Support Agreement.

1.19    ***Cure*** means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtor in accordance with the terms of an executory contract or unexpired lease of the Debtor and (b) permit the Debtor to assume and assign such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.20    ***Cure Dispute*** means a pending objection relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.21    ***Debtor*** has the meaning set forth in the introductory paragraph of the Plan.

1.22    ***Debtor in Possession*** means the Debtor in its capacity as a debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.23    ***Definitive Documents*** has the meaning set forth in the Restructuring Support Agreement.

1.24    ***DIP Budget***  means "Budget" as defined in the Term DIP Facility Agreement.

1.25    ***DIP Order*** means the order of the Bankruptcy Court approving the terms of the Term DIP Facility and the use of cash collateral, to the extent applicable, which shall be in form and substance reasonably acceptable to the Consenting Lenders.

1.26    ***Disallowed*** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.27    ***Disbursing Agent*** means any Entity (including the Debtor or New Holdco if either acts in such capacity) in its capacity as a disbursing agent under Article VI of the Plan.

1.28    ***Disclosure Statement*** means the disclosure statement for the Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules and other applicable law, and all exhibits, schedules,

supplements, modifications and amendments thereto, all of which shall be consistent in all material respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Debtors and the Consenting Lenders (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof).

1.29    ***Disputed*** means a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code or (b) with respect to which the Debtor or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtor disputes only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtor does not dispute, and Disputed as to the balance of such Claim.

1.30    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.31    ***Entity*** means an individual, corporation, partnership, limited  partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.32    ***Estate*** means the Debtor's estate created under section 541 of the Bankruptcy Code.

1.33    ***Exchange Act*** means the Securities Exchange Act of 1934, as amended.

1.34    ***Exculpated Parties*** means, collectively: (a) the Debtor, (b) the Reorganized Debtor, (c) the Non-Debtor GCS Parties, (d) the Consenting Lenders, (e) the Existing ABL Lenders, (f) the Existing Agents, (g) the Term DIP Agent, (h) the Term DIP Lenders, (i) the Exit Agents and (j) with respect to each of the foregoing Entities in clauses (a) through (i), all Persons and Entities who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.35    ***Existing ABL Claims*** means all Claims arising under, in connection with, or related to the Existing ABL Facility Agreement, including any accrued and unpaid interest and fees.

1.36    ***Existing ABL Facility*** means that asset-based lending facility provided pursuant to the Existing ABL Facility Agreement.

1.37    ***Existing ABL Facility Agreement*** means that certain Credit Agreement, dated July 31, 2017, by and among GCS LP, as borrower, each of the guarantors party thereto, including the Debtor, the Existing ABL Lenders, and the Existing ABL Facility Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

1.38    ***Existing ABL Facility Agent*** means JPMorgan Chase Bank N.A. in its capacity as administrative agent under the Existing ABL Facility Agreement.

4

1.39    ***Existing ABL Lenders*** means the Persons party to the Existing ABL Facility Agreement as "Lenders" from time to time thereunder, and each of their respective successors and permitted assigns.

1.40    ***Existing Agents*** means, collectively, the Existing Term Loan Facility Agent and the Existing ABL Facility Agent.

1.41    ***Existing Indemnity Agreements*** means, collectively, the indemnification agreements entered into by the Non-Debtor GCS Parties, and guaranteed by the Debtor, with certain of the Sureties with respect to the Existing Surety Bonds.

1.42    ***Existing Intercreditor Agreement*** means that certain Intercreditor Agreement, dated as of July 31, 2017, by and among the Existing ABL Facility Agent, the Existing Term Loan Facility Agent, and acknowledged by the GCS Parties (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof).

1.43    ***Existing Surety Bonds*** means the commercial surety bonds issued by the Sureties on behalf of certain of the Non-Debtor GCS Parties, and guaranteed by the Debtor, in connection with certain statutory, contractual, or other regulatory bonding requirements applicable to such Non-Debtor GCS Parties in jurisdictions where the GCS Parties operate.

1.44    ***Existing Term Lenders*** means the Persons party to the Existing Term Loan Credit Agreement as "Lenders" from time to time thereunder, and each of their respective successors and permitted assigns.

1.45    ***Existing Term Loan Claims*** means all Claims arising under, in connection with, or related to the Existing Term Loan Credit Agreement, including any accrued and unpaid interest, fees, and/or deficiency Claims.

1.46    ***Existing Term Loan Credit Agreement*** means that certain Financing Agreement, dated July 31, 2017, by and among Midco and certain of its affiliates, as borrowers, each of the guarantors party thereto, the Existing Term Loan Facility Agent, and the Existing Term Lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof).

1.47    ***Existing Term Loan Facility*** means that certain term loan facility provided pursuant to the Existing Term Loan Credit Agreement.

1.48    ***Existing Term Loan Facility Agent*** means BSP Agency, LLC in its capacity as administrative agent and collateral agent under that certain Existing Term Loan Credit Agreement.

1.49    ***Exit ABL Facility*** means that asset-based lending facility provided pursuant to the Exit ABL Facility Agreement.

1.50  ***Exit ABL Facility Agent*** means the administrative agent and collateral agent under the Exit ABL Facility Agreement.

1.51  ***Exit ABL Facility Agreement*** means (i) the Existing ABL Facility Agreement, as amended on terms and conditions reasonably acceptable to the GCS Parties and the Consenting Lenders or (ii) a credit agreement evidencing an asset-based lending facility on terms and conditions reasonably acceptable to the GCS Parties and the Consenting Lenders.

1.52  ***Exit ABL Facility Documents*** means, collectively, the Exit ABL Facility Agreement and all other "Loan Documents" (as defined therein) required to be delivered to the Exit ABL Facility Agent.

1.53  ***Exit ABL Facility Lenders*** means any Person that becomes a lender under the Exit ABL Facility Agreement.

1.54  ***Exit ABL Facility Obligations*** means all debts, liabilities, guarantees and other obligations of the Reorganized Company arising under, in connection with, or related to the Exit ABL Facility.

1.55  ***Exit Agents*** means, collectively, the Exit ABL Facility Agent, the New 1L Facility Agent, and the New 2L Facility Agent,

1.56  ***Exit Term Loan Facilities*** means, collectively, the New 1L Facility and the New 2L Facility.

1.57  ***Exit Term Loan Facility Agreements*** means, collectively, the New 1L Facility Agreement and the New 2L Facility Agreement.

1.58  ***Exit Term Loan Facility Documents*** means, collectively, the New 1L Facility Documents and the New 2L Facility Documents.

1.59  ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained by the Debtor or official committee (if any) by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case.

1.60  ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility

6

that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.61    *General Unsecured Claim* means any unsecured Claim against the Debtor as of the Petition Date that is not an Existing Term Loan Claim, an Existing ABL Claim, an Other Secured Claim, an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Fee Claim, a Term DIP Claim, or an Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

1.62    *GCS Parties* means, collectively, the Debtor and each of (i) GP Buyer, (ii) LP Buyer, (iii) GCS LP, (iv) GC Services International, LLC, and (v) GC Services (Barbados) SRL.

1.63    *GCS LP* means GC Services Limited Partnership.

1.64    *GP Buyer* means ORG GC GP Buyer, LLC.

1.65    *GS* means Goldman Sachs Bank USA, together with its Affiliates and related and/or managed funds, accounts and/or entities directly or indirectly owned by such Affiliates, managed funds or accounts, in its capacity as an Existing Term Lender.

1.66    *Impaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.67    *Initial New 1L Loans* means the term loans to be issued under the Initial New 1L Facility.

1.68    *Initial New 1L Facility* means the new term loan facility under the New 1L Facility Agreement pursuant to which, as of the Effective Date, the Initial New 1L Loans will be borrowed in an aggregate principal amount equal to $71 million (inclusive of the Term DIP Claims exchanged for Initial New 1L Loans on a dollar-for-dollar basis on the Effective Date).

1.69    *Insured Claims* means any Claim or portion of a Claim that is, or may be, insured under any of the Debtor's insurance policies.

1.70    *Intercompany Claim* means any Claim against the Debtor held by a non-Debtor affiliate.

1.71    *Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor, and including all common stock, preferred stock, limited partnership interests, general partnership interests, limited liability company interests and any other equity, ownership, beneficial or profits interests in the Debtor, whether or not transferable and whether fully vested or vesting in the future, and any option, warrant, right, or any other security, agreement or interest that is exercisable, convertible or exchangeable into or for any common stock, preferred stock, limited partnership interests, general partnership interests, limited liability company interests, or any other equity, ownership, beneficial or profits interests in or of the Debtor, contractual or otherwise, including, without limitation, equity or equity-

7

based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtor, to acquire any such interests in the Debtor that existed immediately before the Effective Date.

1.72     *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.73     *LLC Agreement* means the limited liability company agreement for New Holdco to be entered into on the Effective Date.

1.74     *LP Buyer* means ORG GC LP Buyer, LLC.

1.75     *Management Incentive Plan* means a post-Effective Date management incentive plan, which may be formulated and approved by the New Board in its sole discretion; *provided* that the terms must be acceptable to BSP and GS.

1.76     *Midco* means ORG GC Midco, LLC, the Debtor in the Chapter 11 Case.

1.77     *Midco Equity Interests* means any outstanding Interests in the Debtor that existed immediately prior to the Effective Date.

1.78     *New 1L Facility* means that certain first-lien senior secured term loan facility to be provided to New Holdco Sub, GP Buyer, and LP Buyer on the Effective Date pursuant to the New 1L Facility Agreement.

1.79     *New 1L Facility Agent* means BSP Agency, LLC, in its capacity as administrative agent and collateral agent under the New 1L Facility Agreement.

1.80     *New 1L Facility Agreement* means that certain First Lien Financing Agreement, dated as of the Effective Date, governing the New 1L Facility (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof) in form and substance reasonably acceptable to BSP, GS, New Holdco Sub, and each of the Non-Debtor GCS Parties party thereto.

1.81     *New 1L Facility Documents* means, collectively, the New 1L Facility Agreement and all other "Loan Documents" (as defined therein) required to be delivered to the New 1L Facility Agent.

1.82     *New 1L Facility Lender* means any Person that becomes a lender under the New 1L Facility from time to time in accordance with the New 1L Facility Agreement.

1.83     *New 1L Facility Obligations* means all debts, liabilities, guarantees and other obligations of the Reorganized Company arising under, in connection with, or related to the New 1L Facility.

1.84    ***New 2L Facility*** means that certain second lien secured term loan facility to be provided to New Holdco Sub, GP Buyer and LP Buyer on the Effective Date pursuant to the New 2L Facility Agreement.

1.85    ***New 2L Facility Agent*** means BSP Agency, LLC in its capacity as administrative agent and collateral agent under the New 2L Facility Agreement.

1.86    ***New 2L Facility Agreement*** means that certain Second Lien Financing Agreement, dated as of the Effective Date, governing the New 2L Facility (as may be amended, restated, amended and restated, supplemented, or modified from time to time, solely in accordance with the terms thereof) in form and substance reasonably acceptable to BSP, GS, New Holdco Sub and each of the Non-Debtor GCS Parties party thereto.

1.87    ***New 2L Facility Documents*** means, collectively, the New 2L Facility Agreement and all other "Loan Documents" (as defined therein) required to be delivered to the New 2L Facility Agent.

1.88    ***New 2L Facility Lender*** means any Person that becomes a lender under the New 2L Facility from time to time in accordance with the New 2L Facility Agreement.

1.89    ***New 2L Facility Obligations*** means all debts, liabilities, guarantees and other obligations of the Reorganized Company arising under, in connection with, or related to the New 2L Facility.

1.90    ***New 2L Loans*** means the term loans to be issued under the New 2L Facility.

1.91    ***New Board*** means the board of managers of New Holdco as of the Effective Date.

1.92    ***New Equity*** means, collectively, the New Holdco Common Equity, the New Holdco Preferred Equity, and the New Midco Equity.

1.93    ***New Holdco*** means a new entity formed on the Effective Date, which will hold 100% of the equity interests in New Holdco Sub, and which shall be the successor to the Debtor.

1.94    ***New Holdco Common Equity*** means the common equity interests of New Holdco that will be issued by New Holdco on the Effective Date in connection with implementation of the Plan.

1.95    ***New Holdco Equity*** means, collectively, the New Holdco Common Equity and the New Holdco Preferred Equity.

1.96    ***New Holdco Junior Preferred Equity*** means the junior preferred equity interests of New Holdco that will be issued by New Holdco on the Effective Date in connection with implementation of the Plan.

1.97    ***New Holdco Preferred Equity*** means, collectively, the New Holdco Senior Preferred Equity and the New Holdco Junior Preferred Equity.

9

1.98     *New Holdco Senior Preferred Equity* means the senior preferred equity interests of New Holdco that will be issued by New Holdco on the Effective Date in connection with implementation of the Plan.

1.99     *New Holdco Sub* means a new entity to be wholly owned by New Holdco that is formed on the Effective Date, which will own 100% of the equity interests in each of GP Buyer and LP Buyer.

1.100     *New 1L/2L Intercreditor Agreement* means the Intercreditor Agreement, to be entered into on the Effective Date, by and between the New 1L Facility Agent and the New 2L Facility Agent, the form and substance of which shall be reasonably acceptable to the New 1L Facility Lenders, the New 2L Facility Lenders, and New Holdco Sub.

1.101     *New 1L/2L/ABL Intercreditor Agreement* means the Intercreditor Agreement, to be entered into on the Effective Date, by and between the Exit ABL Facility Agent, the New 1L Facility Agent, and the New 2L Facility Agent, the form and substance of which shall be reasonably acceptable to the Exit ABL Facility Lenders, the New 1L Facility Lenders, the New 2L Facility Lenders, and New Holdco Sub.

1.102     *New Intercreditor Agreements* means, collectively, the New 1L/2L Intercreditor Agreement and the New 1L/2L/ABL Intercreditor Agreement.

1.103     *New Midco Equity* means the common equity interests of the Reorganized Debtor that will be issued by the Reorganized Debtor to GS on the Effective Date in connection with implementation of the Plan.

1.104     *New Organizational Documents* means the new organizational documents of each of the Non-Debtor GCS Parties, New Holdco and New Holdco Sub after giving effect to the Restructuring and the documents necessary to be executed and/or filed for the formation of New Holdco and New Holdco Sub, including the LLC Agreement, each of which shall be in form and substance reasonably acceptable to BSP, GS, and the Company.

1.105     *Non-Debtor GCS Parties* means the GCS Parties excluding the Debtor.

1.106     *Non-Released Parties* means (i) any indirect holder of Interests in the Debtor that is not (x) a current employee of the GCS Parties or (y) a party to the Settlement and Release Agreement; and (ii) the former Chief Executive Officer of the GCS Parties whose employment with the GCS Parties was terminated by GCS LP effective as of November 29, 2020.

1.107     *Other Secured Claim* means a Secured Claim, other than a Priority Tax Claim, an Existing Term Loan Claim, an Existing ABL Claim, a Term DIP Claim, or an Administrative Expense Claim.

1.108     *Person* means any individual, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other Entity.

1.109   ***Petition Date*** means the date on which the Debtor commenced the Chapter 11 Case.

1.110   ***Plan*** means this prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

1.111   ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, draft forms of documents, schedules, and exhibits to the Plan to be filed with the Court, including, but not limited to, the following, each of which must be in form and substance reasonably acceptable to the GCS Parties and the Consenting Lenders: (a) the New Organizational Documents, including the LLC Agreement; (b) the Exit Term Loan Facility Agreements; (c) the Exit ABL Facility Agreement or a term sheet detailing the material terms thereof, (d) the identity of the managers to be appointed to the New Board; (e) the Schedule of Rejected Contracts, if applicable; (f) the Restructuring Transaction Steps; and, (g) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided* that through the Effective Date, the Debtor shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement.

1.112   ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.113   ***Priority Tax Claim*** means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.114   ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.115   ***Reinstate, Reinstated, or Reinstatement*** means leaving a Claim Unimpaired under the Plan.

1.116   ***Released Parties*** means (a) the Debtor; (b) the Consenting Lenders; (c) the Existing Agents; (d) the Existing ABL Lenders; (e) the Term DIP Lenders; (f) the Term DIP Agent; (g) with respect to the foregoing (a) through (f), each of their respective current affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in each case, in their respective capacities as such); and (h) with respect to the foregoing (b) through (f), each of their respective former affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in

11

each case, in their respective capacities as such); *provided, however,* that "Released Parties" shall not include a Non-Released Party.

1.117   **Releases** means the releases set forth in <u>Section 10.6</u> hereof.

1.118   **Releasing Parties** means (a) the Debtor; (b) the Consenting Lenders; (c) the Existing Agents; (d) the Existing ABL Lenders; (e) the Term DIP Lenders; (f) the Term DIP Agent; (g) with respect to the foregoing (a) through (f), each of their respective current affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in each case, in their respective capacities as such); and (h) the holders of Claims that are Unimpaired and presumed to accept the Plan; *provided that* in each case, an Entity shall not be a Releasing Party if it (x) elects to timely opt out of the third party releases contained in <u>Section 10.6</u> of the Plan or (y) is a Non-Released Party.

1.119   **Reorganized Company** means the Company, as reorganized on the Effective Date in accordance with the Plan.

1.120   **Reorganized Debtor** means the Debtor as reorganized on the Effective Date in accordance with the Plan.

1.121   **Restructuring** means, collectively, the transactions necessary or, in the judgment of the Consenting Lenders, reasonably desirable to effectuate the financial restructuring of the Debtor, the principal terms of which are set forth in the Plan, the Restructuring Support Agreement, and the Plan Supplement.

1.122   **Restructuring Support Agreement** means that certain Restructuring Support Agreement, dated as of October 16, 2021, by and among the GCS Parties and the Consenting Lenders (as may be amended, restated, amended and restated, supplemented, or modified from time to time in accordance with the terms thereof) annexed to the Plan as **Exhibit A**.

1.123   **Restructuring Transaction Steps** means the summary of transaction steps to complete the Restructuring contemplated by the Plan, which shall be in the Plan Supplement.

1.124   **Schedule of Rejected Contracts** means, to the extent applicable, the schedule of executory contracts and unexpired leases to be rejected by the Debtor pursuant to this Plan, if any, in the form filed with the Bankruptcy Court as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement.

1.125   **Secured Claim** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtor (with the consent of the Consenting Lenders), or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.126 **Security** has the meaning set forth in in section 101(49) of the Bankruptcy Code.

1.127 **Settlement and Release Agreement** means an agreement by and between the (i) Debtor; (ii) the Non-Debtor GCS Parties; (iii) ORG GC Holdings, LLC; (iv) Owner Resource Group, LLC and certain of its affiliates; (v) the Existing Term Loan Facility Agent; and (vi) the Consenting Lenders setting forth a settlement among the parties thereto in form and substance reasonably acceptable to each of the parties thereto.

1.128 **Sureties** means, collectively, those certain commercial surety companies that have issued commercial surety bonds on behalf of certain of the Non-Debtor GCS Parties in connection with certain statutory, contractual, or other regulatory bonding requirements applicable to such GCS Parties in jurisdictions where such GCS Parties operate.

1.129 **Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.130 **Term DIP Agent** means Goldman Sachs Specialty Lending Group, L.P., solely in its capacity as administrative agent and collateral agent under the Term DIP Facility, or its successors, permitted assigns, or any replacement agent appointed pursuant to the terms of the Term DIP Facility Agreement.

1.131 **Term DIP Claims** means all Claims arising under, in connection with, or related to the Term DIP Facility.

1.132 **Term DIP Facility** means that debtor-in-possession financing facility to be provided to the Debtor pursuant to the Term DIP Facility Agreement and the DIP Orders.

1.133 **Term DIP Facility Agreement** means that certain Superpriority Secured Debtor-in-Possession Financing Agreement, to be dated after the Petition Date, by and among the Debtor, as borrower, certain Non-Debtor GCS Parties, as guarantors, the Term DIP Lenders, and the Term DIP Agent (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), on terms and conditions satisfactory to the Debtor, the Non-Debtor GCS Parties thereto, the Term DIP Lenders, and the Consenting Lenders.

1.134 **Term DIP Lenders** means the Persons party to the Term DIP Facility Agreement as "Lender" from time to time thereunder.

1.135 **Transaction Expenses** has the meaning set forth in the Restructuring Support Agreement.

1.136 **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.137 **U.S. Trustee** means the United States Trustee for Region 7.

1.138    ***Voting Deadline*** means the date by which all Persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan, which is November 1, 2021 at 4:00 p.m. (Prevailing Central Time), or such other date set by the Bankruptcy Court.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  The headings in the Plan are for convenience of reference only and are not intended to be a part of the Plan and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (6) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (7) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (8) references to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (9) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail; (10) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (11) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented.

C.    **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.    **Controlling Document.**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a

14

manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

E.      **Consultation, Information, Notice and Consent Rights.**

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the Consenting Lenders' consent rights), with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A of the Plan) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

**ARTICLE II      ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.    *Administrative Expense Claims.*

(a)      Except as otherwise provided in this <u>Section 2.1</u> of the Plan, requests for payment of Administrative Expense Claims (other than a Fee Claim, Transaction Expenses, or a Term DIP Claim) must be filed and served on the Debtor or New Holdco, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the first Business Day that is thirty (30) calendar days after the Effective Date.  Holders of Administrative Expense Claims that are required to, but do not, timely file and serve a request for payment of such Administrative Expense Claims shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor, the Reorganized Debtor, New Holdco or their respective property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be filed with respect to an Administrative Expense Claim previously Allowed.

(b)      Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, or has been paid prior to the Effective Date, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or a Term DIP Claim) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*,

15

*however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as a debtor in possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions and otherwise in accordance with the DIP Budget.

2.2.    ***Fee Claims***.

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to New Holdco, the U.S. Trustee, counsel to the Consenting Lenders, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to New Holdco, counsel to the Consenting Lenders, and the Entity requesting payment no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Fee Claim).

(b)    Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which a Final Order relating to any such Allowed Fee Claim is entered, in each case, as soon as reasonably practicable, or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or New Holdco, as applicable.

(c)    New Holdco is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.  On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of such post-Effective Date Fee Claims to the Debtor or New Holdco and the Debtor or New Holdco shall separately reserve for such estimated amounts for the benefit of the holders of the Fee Claims.  If a holder of a Fee Claim does not provide an estimate, the Debtor or New Holdco may estimate the unpaid and unbilled fees and expenses of such holder of a Fee Claim.

2.3.    ***Priority Tax Claims***.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, at the sole option of the Debtor or New Holdco (with the consent of the Consenting Lenders) (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

16

2.4.    ***Term DIP Claims***

(a)    The amount outstanding under the Term DIP Facility shall be deemed Allowed in the full amount due and owing under the Term DIP Facility Agreement, including, for the avoidance of doubt, (i) the principal amount outstanding under the Term DIP Facility; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued fees, expenses, and indemnification obligations payable under the Term DIP Facility Agreement.

(b)    On the Effective Date, or as soon as reasonably practicable thereafter, the outstanding Term DIP Claims shall be converted, on a dollar-for-dollar basis, into Initial New 1L Loans in full and final satisfaction, settlement, release, and discharge of such Term DIP Claims.  Upon satisfaction of the Allowed Term DIP Claims, all Liens and security interests granted to secure the Term DIP Facility shall be deemed cancelled, released and terminated and shall be of no further force and effect.

2.5.    ***Transaction Expenses.***

During the period commencing on the Petition Date through the Effective Date, the Debtor will promptly pay, or cause a Non-Debtor GCS Party to promptly pay, in full any Transaction Expenses in accordance with the terms of the Restructuring Support Agreement. Without limiting the foregoing, to the extent that any Transaction Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Debtor or New Holdco shall pay, or cause a Non-Debtor GCS Party to pay, in full in Cash any outstanding Transaction Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Case, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, Transaction Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days, following receipt of an invoice.

**ARTICLE III       CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    ***Classification in General.***

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Expense Claims, Priority Tax Claims, and Term DIP Claims, as described in Article II.

A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest, or any portion thereof, is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is

17

an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.     *Summary of Classification.*

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, including Fee Claims, Term DIP Claims, and Priority Tax Claims, have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| 3 | Existing Term Loan Claims | Impaired | Yes |
| 4 | Existing ABL Claims | Unimpaired | No (Deemed to accept) |
| 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| 7 | Midco Equity Interests | Impaired | No (Deemed to reject) |

3.3.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor or New Holdco, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

3.4.     *Elimination of Vacant Classes.*

Any Class of Claims against or Interests in the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of the Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether the Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

**ARTICLE IV     TREATMENT OF CLAIMS AND INTERESTS.**

4.1.     *Priority Non-Tax Claims (Class 1).*

(a)     *Classification*:  Class 1 consists of Priority Non-Tax Claims.

18

(b)      *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release and discharge of such Allowed Priority Non-Tax Claim, at the sole option of the Debtor or New Holdco, as applicable (with the consent of the Consenting Lenders) (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Priority Non-Tax Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.      ***Other Secured Claims (Class 2).***

(a)      *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)      *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim against the Debtor agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release and discharge of such Allowed Other Secured Claim, at the option of the Debtor or New Holdco, as applicable (with the consent of the Consenting Lenders)  (i) each such holder shall receive payment in Cash in an amount equal to the Allowed Amount of such Other Secured Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) the collateral securing its Allowed Other Secured Claim, (iii) such holder's Allowed Other Secured Claim shall be Reinstated, or (iv) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.      ***Existing Term Loan Claims (Class 3)***

(a)      *Classification*:  Class 3 consists of the Existing Term Loan Claims.

(b)      *Treatment*:  On the Effective Date, or as soon as practicable thereafter, (x) each holder of an Allowed Existing Term Loan Claim affiliated with BSP shall receive, in full and final satisfaction, settlement, release, and discharge of such Existing Term Loan Claim, (i) its *Pro Rata* share of Initial New 1L Loans, (ii) its *Pro Rata* share of New 2L Loans, (iii) its *Pro Rata* share of New Holdco Junior Preferred Equity, and (iv) 100% of the New Holdco Common Equity; and (y) each holder of an Allowed Existing Term Loan Claim affiliated with GS shall receive, in full and final satisfaction, settlement, release, and discharge of such Existing Term Loan Claim, (i) its *Pro Rata* share of Initial New 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans), (ii) its *Pro Rata* share of New 2L Loans, (iii) 100% of the New Midco Equity, and (iv) as a result of receiving 100% of the New Midco Equity, GS will acquire an indirect interest in (A) 100% of the New Holdco Senior Preferred Equity and (B) its *Pro Rata* share of New Holdco Junior Preferred Equity, both of which shall be issued to the Reorganized Debtor; *provided that* prior to the Effective Date, GS may elect to have its *Pro Rata* share of the Initial New 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans) and/or its *Pro Rata* share of the New 2L Loans issued to the Reorganized Debtor.

(c)      *Voting*:  Class 3 is Impaired.  Holders of Existing Term Loan Claims are entitled to vote on the Plan.

### 4.4.      *Existing ABL Facility Claims (Class 4)*

(a)      *Classification*:  Class 4 consists of Existing ABL Facility Claims.

(b)      *Treatment*:  On the Effective Date, or as soon as practicable thereafter, (i) all outstanding amounts under the Existing ABL Facility shall be converted, on a dollar for dollar basis, into amounts outstanding under the Exit ABL Facility and all of the Debtor's obligations under the Existing ABL Facility shall be assumed by New Holdco or (ii) holders of Existing ABL Facility Claims shall receive such other treatment so as to render such holder's Allowed Existing ABL Facility Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 4 in Unimpaired, and the holders of Existing ABL Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Existing ABL Facility Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing ABL Facility Claims.

### 4.5.      *General Unsecured Claims (Class 5).*

(a)      *Classification*:  Class 5 consists of General Unsecured Claims.

(b)      *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim against the Debtor agrees to a less favorable treatment of such Claim or has been paid before the Effective Date, at the sole option of the Debtor or New Holdco, as applicable (with the consent of the Consenting Lenders), on and after the Effective Date, (i) New Holdco shall continue to pay or treat each Allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and

20

conditions of the particular transaction giving rise to such Allowed General Unsecured Claim or (ii) such holder shall receive such other treatment so as to render such holder's Allowed General Unsecured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, in each case, subject to all defenses or disputes the Debtor and/or New Holdco may assert as to the validity or amount of such Claims, including as provided in Section 10.8 of the Plan.

(c)    *Voting*:  Class 5 is Unimpaired, and the holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

### 4.6.    *Intercompany Claims (Class 6).*

(a)    *Classification*:  Class 6 consists of Intercompany Claims.

(b)    *Treatment*:  On the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged to the extent determined to be appropriate by the Company with the consent of Consenting Lenders, but shall not be paid in Cash; *provided however*, for the avoidance of doubt, any Intercompany Claims held by ORG GC Holdings, LLC or Owner Resource Group, LLC and its affiliates shall be released on the Effective Date.

(c)    *Voting*:  Class 6 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

### 4.7.    *Midco Equity Interests (Class 7).*

(a)    *Classification*:  Class 7 consists of Midco Equity Interests.

(b)    *Treatment*:  On the Effective Date the Midco Equity Interests shall be deemed cancelled, released, extinguished and shall be of no further force and effect without further action by any party or order of the Bankruptcy Court.

(c)    *Voting*:  Class 7 is Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Midco Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Midco Equity Interests.

### 4.8.    *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and

21

equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor or New Holdco, as applicable, reserves the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE V       MEANS FOR IMPLEMENTATION.

5.1.    *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan (including the Restructuring Support Agreement) shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

5.2.    *Continued Corporate Existence.*

(a)      Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, the Debtor shall continue to exist after the Effective Date as a limited liability company, with all the powers of a limited liability company, in accordance with the applicable laws of the jurisdiction in which it is organized and pursuant to its organizational documents and the New Organizational Documents, as applicable, and such documents are deemed to be amended or amended and restated pursuant to the Plan and require no further action or approval (other than any requisite filing required under applicable state, provincial, or federal law).

(b)      On or after the Effective Date, the Reorganized Debtor, New Holdco, and New Holdco Sub may take such action that may be necessary or appropriate as permitted by applicable law and the New Organizational Documents, as the Reorganized Debtor, New Holdco, and New Holdco Sub, as applicable, may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation, causing: (i) the legal name of the Reorganized Debtor to be changed; or (ii) the closure of the Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

5.3.    *Exit ABL Facility.*

(a)      On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit ABL Facility Documents, New Holdco and New Holdco Sub will act as guarantors under the Exit ABL Facility Agreement without the need for any further corporate action and without further action

22

by the holders of Claims or Interests.  On and after the Effective Date, the applicable Exit ABL Facility Documents shall constitute legal, valid and bind obligations of New Holdco and New Holdco Sub and be enforceable in accordance with their respective terms.

(b)      All Liens, mortgages, and security interests securing the obligations arising under the Existing ABL Facility that were collateral securing the Existing ABL Claims as of the Petition Date are unaltered by the Plan, and all such Liens, mortgages, and security interests are created and perfected with respect to the Exit ABL Facility to the same extent, in the same manner, and on the same terms and priorities as they were with respect to the Existing ABL Claims, except as the foregoing may be altered pursuant to the Exit ABL Facility Documents and the New 1L/2L/ABL Intercreditor Agreement.  On the Effective Date, the Exit ABL Facility Documents shall be executed and delivered substantially on terms and conditions which New Holdco, New Holdco Sub, the Non-Debtor GCS Parties thereto, and the Exit ABL Facility Lenders (with the consent of the Consenting Lenders) may agree and such documents shall become effective in accordance with their terms.  All Liens and security interests granted and continuing pursuant to the Exit ABL Facility Documents shall be (i) valid, binding, perfected (to the extent provided in the security documents), and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under the New Intercreditor Agreement and/or applicable nonbankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law. New Holdco, New Holdco Sub, and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

(c)      New Holdco and New Holdco Sub shall be authorized to execute, deliver, and enter into and perform under the Exit ABL Facility Documents, including the payment of all fees, indemnities, and expenses provided for therein, without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

5.4.      ***Exit Term Loan Facilities.***

(a)      On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit Term Loan Facility Documents, the Exit Term Loan Facility Documents shall be executed and delivered, and New Holdco and New Holdco Sub shall be authorized to execute, deliver and enter into the Exit Term Loan Facility Documents, in each case, without (i) further notice to the Bankruptcy Court or (ii) further act or action under applicable, law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (including, without limitation, the  holders of Claims or Interests), except in each case, to the extent set forth in the Exit Term Loan Facility Documents.  The Exit Term Loan Facility Agreements shall be executed and delivered in substantially the same form as the Exit Term Loan Facility Agreements annexed to the Restructuring Support Agreement as Exhibit D and Exhibit E, with such modifications to which New Holdco, New Holdco Sub, and the Consenting Lenders may agree.

23

(b)     Confirmation of the Plan shall be deemed approval of the Exit Term Loan Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Holdco or New Holdco Sub in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, authorization of New Holdco and New Holdco Sub to enter into and execute the Exit Term Loan Facility Documents, and authorization to create or perfect the Liens in connection therewith.

(c)     On the Effective Date, all Liens, mortgages and security interests granted pursuant to the Exit Term Loan Facility Documents shall be (i) deemed to be granted, (ii) shall be valid, binding, automatically perfected (to the extent provided in the security documents), and enforceable Liens and mortgages on, and security interests in, the personal and real property described in and subject to the Exit Term Loan Facility Documents, with the priorities established in respect thereof under the Exit Term Loan Facility Documents, the New Intercreditor Agreement and/or applicable non-bankruptcy law, as applicable and (ii) not subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or under any applicable law. New Holdco and New Holdco Sub and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law or that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

(d)     New Holdco and New Holdco Sub shall be authorized to execute, deliver, and enter into and perform under the Exit Term Loan Facility Documents, including the payment of all fees, indemnities, and expenses provided for therein, without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

5.5.     *New Intercreditor Agreements.*

(a)     On the Effective Date, the Exit ABL Facility Agent, the New 1L Facility Agent, and the New 2L Facility Agent shall enter into the New 1L/2L/ABL Intercreditor Agreement. Each Exit ABL Facility Lender, New 1L Facility Lender, and New 2L Facility Lender shall be deemed to have directed the Exit ABL Facility Agent, the New 1L Facility Agent, and the New 2L Facility Agent, as applicable, to execute the New 1L/2L/ABL Intercreditor Agreement and shall be bound by the terms of the New 1L/2L/ABL Intercreditor Agreement from and after the Effective Date as if it were a signatory thereto.

(b)     On the Effective Date, the New 1L Facility Agent and the New 2L Facility Agent shall enter into the New 1L/2L Intercreditor Agreement. Each New 1L Facility Lender and New 2L Facility Lender shall be deemed to have directed the the New 1L Facility Agent and the New 2L Facility Agent, as applicable, to execute the New 1L/2L Intercreditor Agreement and shall be bound by the terms of the New 1L/2L Intercreditor Agreement from and after the Effective Date as if it were a signatory thereto.

24

5.6.    ***New Organizational Documents.***

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by New Holdco and New Holdco Sub, as applicable.  To the extent required under the Plan or applicable non-bankruptcy law, New Holdco and New Holdco Sub, as applicable, will file the applicable New Organizational Documents with the Delaware Secretary of State if and to the extent required in accordance with the applicable laws of the state of Delaware.  The New Organizational Documents will (a) authorize the issuance of the New Holdco Equity and (b) include a provision pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code prohibiting the issuance of non-voting equity Securities.

After the Effective Date, New Holdco and New Holdco Sub, as applicable, may amend and restate its New Organizational Documents in accordance with the terms thereof, and New Holdco and New Holdco Sub, as applicable, may file amended certificates of formation or such other applicable formation documents, and other constituent documents as permitted by the laws of the state of Delaware and the New Organizational Documents.

On the Effective Date, New Holdco and all of the holders of the New Holdco Equity shall execute the LLC Agreement.  The LLC Agreement shall be binding on New Holdco and all parties receiving, and all holders of, New Holdco Equity.

5.7.    ***Authorization and Issuance of the New Equity.***

(a)     On the Effective Date, the Debtor, the Reorganized Debtor, New Holdco, and New Holdco Sub, as applicable, are authorized to issue or cause to be issued and shall issue the New Equity, in accordance with the terms of the Plan, the New Organizational Documents, and the Restructuring Transaction Steps without the need for any further corporate, limited liability company, or shareholder action, vote, consent, authorization or approval of any Person or without further notice to or order of the Bankruptcy Court. All of the New Equity, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  Any such issuance would be part of the exchange or other transfer or transaction as contemplated and required hereunder.

(b)     Upon the Effective Date, (i) the New Equity shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange and (ii) neither the Reorganized Debtor nor New Holdco shall be a reporting company under the Exchange Act.  The distribution of New Equity pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Equity or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtor and the Consenting Lenders in accordance with the customary practices of such agent, as and to the extent practicable.

5.8.    ***Section 1145 Exemption.***

(a)     The offer, issuance, sale and distribution of the New Equity under the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity,

from the registration and prospectus delivery requirements under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any federal, state or local law requiring registration and/or delivery of a prospectus for the offer, issuance, sale or distribution of Securities.

(b)       The New Equity will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) the restrictions, if any, on the transferability of the New Equity contained in the New Organizational Documents; and (iv) applicable regulatory approval.

5.9.    ***Cancellation of Existing Securities and Agreements.***

(a)       Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or the Confirmation Order, on the Effective Date, all agreements, instruments, and other documents evidencing an Existing Term Loan Claim or Midco Equity Interest and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtor thereunder shall be deemed fully satisfied, released, and discharged. Notwithstanding such cancellation and discharge, the Existing Term Loan Credit Agreement shall continue in effect, except as otherwise provided herein, solely to (i) the extent necessary to allow the holders of Allowed Existing Term Loan Claims to seek allowance and receive distributions under the Plan, (ii) the extent necessary to allow the Debtor, Reorganized Debtor, New Holdco, and New Holdco Sub, as applicable, the Existing Term Loan Facility Agent, and the Disbursing Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of the Allowed Existing Term Loan Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims, (iii) allow the holders of Allowed Existing Term Loan Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents, (iv) allowing the Existing Term Loan Facility Agent to enforce its rights, claims, and interests vis-à-vis any party other than the Debtor (including the maintenance, exercise and enforcement of any charging lien or distribution waterfall), (v) preserve all rights, including rights of enforcement, of the Existing Term Loan Facility Agent to indemnification, reimbursement, or contribution pursuant to and subject to the terms of the Existing Term Loan Credit Agreement, (vi) appear and be heard in the Chapter 11 Case or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Existing Term Loan Facility Agent or Existing Term Lenders and (vii) permit the Existing Term Loan Facility Agent to perform any functions that are necessary to effectuate the foregoing; *provided*, *however*, that nothing in this Section 5.9 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtor, New Holdco or New Holdco Sub.  Except as provided in the Plan or as may be necessary to effectuate the terms of the Plan, on the Effective Date, the Existing Term Loan Facility Agent, and its agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the Existing Term Loan Credit Agreement.  To the extent cancelled in accordance with this paragraph, the commitments and obligations (if any) of the Existing Term Lenders to extend any further or future credit or financial accommodations to the Debtor, any of its subsidiaries or any of its successors or assigns under the Existing Term Loan Credit Agreement shall fully terminate and be of no further force or effect on the Effective Date.

26

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, loss, waiver, or other forfeiture of, or by, the Debtor or its interests, or any increase or acceleration of any of their obligations, in any such case as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for herein shall be deemed null and void and shall be of no force and effect. For the avoidance of doubt, nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of its counterparties under any executory contract or unexpired lease to the extent such executory contract or lease has been assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court or hereunder.

(b)      On the Effective Date, any registration rights or similar agreements with respect to the Midco Equity Interests will also be cancelled and any obligations of the Debtor thereunder will be discharged.

5.10.   ***Officers and Board of Managers***

(a)      On the Effective Date, the terms of the current members of the board of managers of the Debtor shall expire, and commencing on the Effective Date, each of the managers of New Holdco shall be elected and serve pursuant to the terms of the New Organizational Documents pertaining to New Holdco, including the LLC Agreement, and may be replaced or removed in accordance with such New Organizational Documents.

(b)      The New Board shall consist of five board members to be appointed by the holders of a majority of the New Holdco Common Equity; *provided* that at least two of the five board members shall be independent; and *provided further that* (i) for so long as a holder of New Holdco Junior Preferred Equity holds at least 32% of the New Holdco Junior Preferred Equity, the appointment of two independent board members shall require the consent of such holder; and (ii) for so long as a holder of New Holdco Junior Preferred Equity holds less than 32% of the New Holdco Junior Preferred Equity but not less than 16% of the New Holdco Junior Preferred Equity, the appointment of one independent board member shall require the consent of such holder; *provided further* that, unless otherwise agreed by BSP and GS, on the Effective Date, the New Board as of the Effective Date shall initially consist of three board members, one of which shall be an independent director. The remaining two board seats shall be filled following the Effective Date. Any direct and indirect subsidiaries of New Holdco shall continue to be member managed, except GCS LP which shall continue to be managed by GP Buyer, its general partner.

(c)      Except to the extent that a member of the board of managers of the Debtor is appointed to serve as a manager of New Holdco on and after the Effective Date, the managers of the Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtor or to New Holdco on or after the Effective Date and each manager will be deemed to have resigned or shall otherwise cease to be a manager of the Debtor on the Effective Date.

(d)      The officers of the Debtor immediately before the Effective Date shall serve as the initial officers of New Holdco on and after the Effective Date and in accordance with the Plan and applicable non-bankruptcy law.

(e)     In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Board and any Person proposed to serve as an officer of New Holdco and New Holdco Sub shall be disclosed at or before the Confirmation Hearing, in each case to the extent the identity of such proposed manager or officer is known at such time.  To the extent any such manager or officer of New Holdco is an insider, the Debtor will disclose the nature of any compensation to be paid to such manager or officer.  Each such manager and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of New Holdco and New Holdco Sub.

5.11.   ***Effectuating Documents; Further Transactions.***

(a)     After the Confirmation Date, but prior to the Effective Date, the Debtor, the Reorganized Debtor, New Holdco and New Holdco Sub, as applicable, shall take such actions as may be or become necessary or appropriate to effect the Restructuring Transaction Steps.

(b)     On or as soon as practicable after the Effective Date, the Reorganized Debtor, New Holdco, or New Holdco Sub, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, or contemplated by, or necessary to effectuate, the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having other terms to which the applicable parties agree, (iii) the execution, delivery and, if applicable, filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, or dissolution and the New Organizational Documents pursuant to applicable state law, (iv) the issuance of securities, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, subject, in each case, to the New Organizational Documents.

(c)     Each officer and member of the board of managers of the Debtor is (and each officer and member of the New Board shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, New Holdco, or New Holdco Sub, as applicable, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtor, the Reorganized Debtor, New Holdco, or New Holdco Sub) except for those expressly required pursuant to the Plan.

28

(d)    All matters provided for herein involving the corporate structure of the Debtor or Reorganized Debtor, New Holdco, New Holdco Sub, or any other Non-Debtor GCS Party, or any corporate, limited liability company, or related action required by any of the foregoing in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or managers of such Entities, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of such Entities.

5.12.    *Cancellation of Liens.*

(a)    Except as otherwise specifically provided herein, in the Confirmation Order or in any contract, instrument, release, or other agreement or document created or entered into pursuant to the Plan, upon the Effective Date, any Lien securing a Secured Claim shall be deemed fully released and discharged, and all of the right, title, and interest of any Holder of such Liens shall revert to New Holdco and its successors and assigns.  Any holder of such Secured Claim (or any agent for such holder) shall be authorized and directed, at the sole cost and expense of the Debtor or New Holdco, as applicable, to release any Collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such holder (and any agent for such holder), and to take such actions as may be reasonably requested by the Debtor, the Reorganized Debtor or New Holdco to cancel, extinguish, and evidence the release of such Liens (including the execution, delivery and filing or recording of such release), if they have been or will be satisfied or discharged in full pursuant to the Plan.

(b)    Upon the payment or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall deliver to New Holdco any Collateral or other property of the Debtor held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

5.13.    *Management Incentive Plan.*

Following the Effective Date, New Holdco may choose to implement the Management Incentive Plan.

5.14.    *Nonconsensual Confirmation.*

The Debtor intends to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

5.15.    *Closing of Chapter 11 Case.*

After the Estate has been fully administered, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

29

5.16.    *Notice of Effective Date.*

On the Effective Date, the Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.17.    *Sources for Plan Distributions.*

The Debtor shall fund distributions under the Plan with (a) Cash on hand, (b) the proceeds of the Term DIP Facility, (c) the Exit ABL Facility, (d) the Exit Term Loan Facilities; and (e) the New Equity in accordance with the Plan and the Restructuring Support Agreement.  Cash payments to be made pursuant to the Plan will be made by the Disbursing Agent, which may be New Holdco.  From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the Exit ABL Facility, the Exit Term Loan Facilities and the LLC Agreement), New Holdco shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the New Board deems appropriate.

## ARTICLE VI       DISTRIBUTIONS.

6.1.    *Distributions Generally.*

The Disbursing Agent shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2.    *Distribution Record Date.*

As of the close of business on the Effective Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Effective Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtor nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

6.3.    *Date of Distributions.*

Except as otherwise provided in the Plan, in a Final Order, or as otherwise agreed to by the Debtor or New Holdco, as the case may be, and the holder of the applicable Allowed Claim, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; *provided* that the Disbursing Agent may implement periodic distribution dates to the extent it determines appropriate.

6.4.    ***Disbursing Agent.***

All distributions under the Plan shall be made by New Holdco (or such other Entity designated by New Holdco), as Disbursing Agent, on or after the Effective Date or as otherwise provided herein. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and out-of-pocket expenses incurred by such Disbursing Agents directly related to distributions hereunder shall be reimbursed by New Holdco. New Holdco shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than New Holdco) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtor's or New Holdco's books and records. New Holdco shall cooperate in good faith with the applicable Disbursing Agent (if other than New Holdco) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

6.5.    ***Rights and Powers of Disbursing Agent.***

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and out-of-pocket expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and out-of-pocket expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Company in the ordinary course of business.

31

6.7.    ***No Postpetition Interest on Claims.***

Except to the extent that payments to Allowed General Unsecured Claims are not timely made pursuant to Section 4.3 of the Plan or as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Petition Date, *provided*, *however*, if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment; *provided, however*, the Existing ABL Facility Claims shall accrue and be paid interest in accordance with the terms set forth in the Existing ABL Facility Agreement.

6.8.    ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made by the Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims at the address for each such holder on the Debtor's records as of the date of any such distribution. In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 6.19 of the Plan.

6.9.    ***Distributions after Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.10.   ***Unclaimed Property.***

Undeliverable distributions or unclaimed distributions shall remain in the possession of New Holdco until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts to New Holdco, as applicable, in accordance with this provision, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to New Holdco.  Upon such revesting, the Claim of the holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an unclaimed distribution, to the contrary.

6.11.    ***Time Bar to Cash Payments.***

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to New Holdco, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    ***Manner of Payment under Plan.***

Except as otherwise specifically provided in the Plan, at the option of the Debtor or New Holdco, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

6.13.    ***Satisfaction of Claims.***

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14.    ***Fractional Stock.***

If any distributions of New Equity pursuant to the Plan would result in the issuance of a fractional share or unit of New Equity, then the number of shares or units of New Equity to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share or unit (with a half share or unit or greater rounded up and less than a half share or unit rounded down).  The total number of shares or units of New Equity to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14.  No consideration shall be provided in lieu of fractional shares or units that are rounded down.  Neither New Holdco nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share or unit of New Equity.

6.15.    ***Minimum Cash Distributions.***

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, *however*, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.16.    ***Setoffs and Recoupments.***

The Debtor, the Reorganized Debtor and New Holdco, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or

33

recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtor, the Reorganized Debtor or New Holdco, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, New Holdco or their respective successors of any claims, rights, or Causes of Action that the Debtor, the Reorganized Debtor, New Holdco or their respective successors or assigns may possess against the holder of such Claim.

### 6.17. *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by New Holdco), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 6.18. *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything in the Plan to the contrary, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 6.19. *Surrender of Cancelled Instruments or Securities.*

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent. Notwithstanding the immediately preceding sentence, this Section 6.19 shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

### 6.20. *Accrual of Dividends and Other Rights.*

For purposes of determining the accrual of distributions or other rights after the Effective Date, the New Equity shall be deemed distributed as of the Effective Date regardless of the date on which the New Equity is actually distributed; *provided, however*, the Reorganized Debtor or New Holdco shall not pay any such distributions or distribute such other rights, if any, until after distribution of the applicable New Equity actually takes place.

### 6.21. *Withholding and Reporting Requirements.*

(a)    *Withholding Rights*. In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

34

Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)     *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by New Holdco (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by New Holdco, the Disbursing Agent, or such other Entity designated by New Holdco or the Disbursing Agent and the holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

6.22.   ***Hart-Scott-Rodino Antitrust Improvements Act.***

Any New Equity to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

### ARTICLE VII     PROCEDURES FOR DISPUTED CLAIMS.

7.1.   ***Disputed Claims.***

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Claims (other than Existing Term Loan Claims) under the Plan, holders of Claims need not file proofs of Claim, and the Debtor or New Holdco, as applicable, and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Case had not been commenced except that the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All proofs of Claim filed in the Chapter 11 Case shall be considered objected to and Disputed without further action by the Debtor.  Upon the Effective Date, all proofs of Claim filed against the Debtor, regardless of the time of filing, and including proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below, without the need for any objection by the Debtor or New Holdco or any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that

35

the Debtor seeks to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, unless agreed to by New Holdco, any other Non-Debtor GCS Party that is party thereto, and the applicable executory contract or unexpired lease counterparty.

7.2.    ***Claims Administration Responsibilities.***

(a)      Except as otherwise specifically provided in the Plan, the Debtor or New Holdco, as applicable, shall have sole authority: (1) to file, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor and New Holdco, as applicable, shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim.

(b)      Notwithstanding the foregoing, the Debtor, the Reorganized Debtor, or New Holdco, as applicable, shall be entitled to dispute and/or otherwise object to any Claim in accordance with applicable nonbankruptcy law.  If the Debtor, the Reorganized Debtor or New Holdco, as applicable, disputes any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Case had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any Claim, any and all claims or defenses that could have been asserted by the Debtor or the Entity holding such Claim are preserved as if the Chapter 11 Case had not been commenced.

(c)      Any duplicate Claim or any Claim that has been paid, amended, or superseded may be adjusted or expunged on the claims register by New Holdco without New Holdco having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without further notice to or action, order, or approval of the Bankruptcy Court.

7.3.    ***Estimation of Claims.***

The Debtor or New Holdco, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether the Debtor or any other party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or New Holdco may pursue supplementary proceedings to object to the allowance of, or to any ultimate distribution on, such Claim.

36

7.4.    ***No Distributions Pending Allowance.***

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.5.    ***Distributions after Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan. Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.6.    ***Claim Resolution Procedures Cumulative.***

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.7.    ***Claims Paid by Third Parties.***

The Debtor or New Holdco, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or New Holdco. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or New Holdco on account of such Claim, such holder shall, within fourteen calendar days of receipt thereof, repay the distribution to New Holdco, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing New Holdco annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

7.8.    ***Insured Claims.***

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

37

## ARTICLE VIII   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    *General Treatment.*

(a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed assumed and assigned to New Holdco without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless, with the consent of the Consenting Lenders, such contract or lease (i) was previously assumed or rejected by the Debtor pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date; (iv) is identified in Sections 8.4 and 8.5 of the Plan; or (v) is identified for rejection on the Schedule of Rejected Contracts included in the Plan Supplement, if applicable.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and assignments or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that New Holdco has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Any executory contract and unexpired lease assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by New Holdco, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto and any consent or advance notice required under such executory contract or unexpired lease shall be deemed satisfied by entry of the Confirmation Order.

(d)     The Debtor reserves the right, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtor and the applicable counterparty, to amend the Schedule of Rejected Contracts to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this provision shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing.

38

8.2.    ***Determination of Cure Disputes and Deemed Consent***

(a)    Any monetary amounts by which any executory contract or unexpired lease to be assumed and assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by New Holdco upon the assumption and assignment thereof in the ordinary course.

(b)    If the Debtor intends to assume and assign to New Holdco any executory contract or lease in connection with the Plan, the Debtor shall serve a notice on the counterparty to such executory contract or unexpired lease at least ten (10) days before the Confirmation Hearing (i) reflecting the Debtor's intention to potentially assume and assign the contract or lease to New Holdco in connection with the Plan and (ii) where applicable, setting forth a proposed Cure amount (if any).  Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption and assignment, or related Cure amount, must be filed, served, and actually received by the Debtor within ten (10) days of service of the applicable notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption and assignment to New Holdco of such executory contract or unexpired lease shall be deemed to have assented to assumption and assignment of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of the Debtor or New Holdco under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or asset of the Debtor or New Holdco, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms herein shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an assumption dispute pertaining to the assumption and assignment of an executory contract or unexpired lease (other than a dispute pertaining to a Cure amount), such dispute shall be heard by the Bankruptcy Court before such assumption and assignment becomes effective; *provided* that, the Debtor or New Holdco, as applicable, may settle any assumption dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an assumption dispute relates solely to the Cure amount, the Debtor may assume and assign the applicable executory contract or unexpired lease before the resolution of the assumption dispute; *provided* that New Holdco, as assignee, shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  New Holdco is authorized to settle any dispute regarding the Cure amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

39

(e)     The assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or New Holdco (as assignee) or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtor assumes and assigns such executory contract or unexpired lease to New Holdco.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, upon the assumption of such executory contract or unexpired lease.

8.3.     ***Rejection Claims.***

Any party wishing to assert a Claim arising from the rejection of its executory contract or unexpired lease shall provide written notice of such asserted Claim to New Holdco no later than the date that is thirty (30) days after the Effective Date and file such notice on the Bankruptcy Court's docket.  Any Claims arising from the rejection of an executory contract or unexpired lease that have not been asserted and filed by such date will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, New Holdco, the Estate, or their respective property without the need for any objection by the Debtor or New Holdco or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged.  All Allowed Claims arising from the rejection of the Debtor's executory contracts or unexpired leases shall be classified and treated in Class 5 (General Unsecured Claims).

8.4.     ***Survival of the Debtor's Indemnification Obligations.***

(a)     Any obligations of the Debtor pursuant to its corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current officers, managers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtor or such directors, managers, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtor, shall not be discharged or impaired by confirmation of the Plan; *provided, however*, that New Holdco shall not indemnify directors, managers, officers, agents and/or employees of the Debtor for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes intentional fraud, gross negligence, or willful misconduct.  All such obligations shall be deemed and treated as executory contracts to be assumed and assigned by the Debtor under the Plan and shall become obligations of New Holdco.  Any claim based on the Debtor's obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(b)     In addition, after the Effective Date, New Holdco shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy

for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies; *provided however*, notwithstanding the foregoing, the Debtor and New Holdco shall be under no obligation to maintain or renew such directors' and officers' insurance policies as such policies relate to ORG GC Holdings, LLC and its directors and officers.

8.5.    ***Insurance Policies.***

All insurance policies pursuant to which the Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed and assigned to New Holdco and shall continue in full force and effect thereafter in accordance with their respective terms.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any insurance policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.  All insurance policies shall vest in New Holdco.

8.6.    ***Intellectual Property Licenses and Agreements.***

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed and assigned to New Holdco and shall continue in full force and effect.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements, to the extent applicable, shall vest in the New Holdco and New Holdco may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.7.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed and assigned to New Holdco shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease.

8.8.    ***Reservation of Rights.***

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor or New Holdco or their respective affiliates have any liability thereunder.

41

(b)      Except as otherwise provided in the Plan, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor or New Holdco under any executory or non-executory contract or any unexpired or expired lease.

(c)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or New Holdco (to the extent any executory contracts or unexpired lease is assumed and assigned) under any executory or non-executory contract or any unexpired or expired lease.  Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor or New Holdco (as successor to the Debtor), as applicable, under such executory contracts or unexpired leases.

(d)      If there is a Cure Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtor or New Holdco, as applicable, shall have sixty (60) days following entry of a Final Order resolving such Cure Dispute to alter its treatment of such contract or lease by filing a notice indicating such altered treatment.

### 8.9.   *Contracts and Leases Entered into after the Effective Date.*

Contracts and leases entered into after the Petition Date by the Debtor, including any executory contracts and unexpired leases assumed by the Debtor, will be performed by the Debtor or New Holdco (to the extent any executory contract or unexpired lease is assumed and assigned) in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed executory contracts and unexpired leases) will survive and remain unaffected by entry of the Confirmation Order.

### ARTICLE IX      CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

### 9.1.   *Conditions Precedent to Confirmation of Plan.*

The following are conditions precedent to confirmation of the Plan:

(a)      the Plan and the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed, and shall be in form and substance reasonably acceptable to the Debtor and the Consenting Lenders;

(b)      the Bankruptcy Court shall have entered the DIP Order;

(c)      the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect; and

(d)      the Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall not have been stayed or modified.

9.2.     ***Conditions Precedent to Effective Date.***

The following are conditions precedent to the Effective Date of the Plan:

(a)     the Definitive Documents shall (i) contain terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement  and otherwise acceptable to the Debtor and the Consenting Lenders and (ii) have been executed and delivered, and any conditions precedent contained to effectiveness therein shall have been satisfied or waived in accordance therewith and the foregoing documents shall be in full force and effect and binding upon the relevant parties;

(b)     all actions, documents, and agreements, including the Definitive Documents, necessary to implement and consummate the Plan shall have been effected or executed;

(c)     the New Organizational Documents shall have been filed with the appropriate governmental authority, as applicable;

(d)     the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been stayed, modified, or vacated;

(e)     the Exit Term Loan Facilities, including all documentation related thereto, shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the effectiveness thereof (other than any conditions relating to the occurrence of the Effective Date) shall have been satisfied or duly waived in accordance with their respective terms and the closing thereof shall have occurred;

(f)     the Exit ABL Facility, including all documentation related thereto, shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the effectiveness thereof (other than any conditions relating to the occurrence of the Effective Date) shall have been satisfied or duly waived in accordance with their respective terms and the closing thereof shall have occurred;

(g)     the New Holdco Equity shall have been issued, and all actions, documents, and agreements related thereto shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the effectiveness thereof (other than any conditions relating to the occurrence of the Effective Date) shall have been satisfied or duly waived in accordance with their respective terms;

(h)     the New Midco Equity shall have been issued, and all actions, documents, and agreements related thereto shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the effectiveness thereof (other than any conditions relating to the occurrence of the Effective Date) shall have been satisfied or duly waived in accordance with their respective terms and the closing thereof shall have occurred;

(i)      all governmental, regulatory, licensing, other and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, as determined by the Debtor in consultation with the Consenting Lenders, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or been terminated without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(j)      the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect;

(k)      each of the requirements set forth in Section 9 of the Restructuring Support Agreement shall each have been satisfied; and

(l)      all unpaid Transaction Expenses shall have been paid in Cash, to the extent invoiced at least three (3) Business Days prior to the Effective Date and, if applicable, to the extent approved by the Bankruptcy Court, pursuant to the applicable fee arrangements of such professionals.

9.3.    ***Waiver of Conditions Precedent.***

Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtor, with the prior written consent of the Consenting Lenders, without any notice to any other parties in interest and without any further notice to or action, leave of or order or approval of the Bankruptcy Court.  The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4.    ***Effect of Failure of a Condition.***

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than ninety (90) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtor (with the consent of the Consenting Lenders) in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Restructuring Support Agreement, the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of the Debtor, any holder of a Claim or Interest or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, any of the Consenting Lenders or any other Entity.

## ARTICLE X          EFFECT OF CONFIRMATION OF PLAN.

10.1.    ***Vesting of Assets.***

(a)      On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor's Estate shall vest in New Holdco free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the Exit ABL Facility Agreement, the Exit Term Loan Facility Documents, or the Restructuring Transaction Steps.

(b)      For the avoidance of doubt, on the Effective Date, the Debtor's obligations under each of the Existing Indemnity Agreements shall be assumed by the Debtor and assigned to New Holdco and shall automatically become obligations of New Holdco.  Upon request of any of the Sureties, New Holdco shall execute a new indemnity agreement in a form substantially similar to the applicable Existing Indemnity Agreement with such Surety or otherwise on terms acceptable to the applicable Surety and New Holdco.

10.2.    ***Binding Effect.***

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

10.3.    ***Discharge of Claims and Termination of Interests.***

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, each holder (as well as any representatives, affiliates, trustees, or agents on behalf of each holder) of an Existing Term Loan Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtor or any of its assets and properties, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, Causes of Action, rights, and liabilities that arose prior to the Effective Date, whether known or unknown.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor against the Debtor (or New Holdco, as successor to the Debtor) or any of its assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Unimpaired Claims) and Interests subject to the occurrence of the Effective Date.  For the avoidance of doubt, Unimpaired Claims shall not be discharged under the Plan.  On the Effective Date, all Unimpaired Claims shall be assumed by and become obligations of New Holdco and receive the treatment ascribed to such Claims set forth in this Plan.

45

10.4.   ***Term of Injunctions or Stays.***

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

10.5.   ***Injunction.***

(a)   **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

(b)   **Except as expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, or as agreed to by the Debtor and a holder of a Claim against or Interest in the Debtor, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, subrogation or recoupment of any kind, directly or indirectly, against any obligation due from the Released Parties or against the property of any of the Released Parties, except as contemplated or allowed by the Plan or unless such holder has filed a motion requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff, subrogation or recoupment pursuant to applicable law or otherwise and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)     The injunctions in this Section 10.5 shall extend to any successors of the Debtor and its respective property and interests in property, including New Holdco and New Holdco Sub.

10.6.   *Releases.*

(a)     <u>Estate Releases</u>

Subject to the occurrence of and effective as of the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect or becomes effective after the Effective Date, for good and valuable consideration, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtor, New Holdco (as the successor to the Debtor) and the Debtor's Estate, in each case on behalf of themselves and their respective successors, assigns and representatives, and any all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the Debtor, New Holdco (as the successor to the Debtor) and the Debtor's Estate, from any and all Claims or Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that the Debtor, New Holdco (as the successor to the Debtor) and the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership or operation thereof), the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the Non-Debtor GCS Parties, the Term DIP Facility, the Exit Term Loan Facilities, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or New Holdco (as the successor to the Debtor), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor, the Non-Debtor GCS Parties, and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of the Definitive Documents or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, any settlement or agreement in the Chapter 11 Case, the offer, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the distribution of property under the Plan, whether or not such distribution occurs following the Effective Date, the negotiations regarding or concerning any of the foregoing, or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that* nothing herein shall be construed to release any party or entity from willful misconduct or intentional fraud as determined by a Final Order; *provided*

47

*further* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to applicable law.

        (b)       <u>Releases by Holders of Claims</u>

        Subject to the occurrence of and effective as of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect or becomes effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties (other than the Debtor) shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each Releasing Party, <u>including holders of Unimpaired Claims that have not (i) checked the box on the applicable notice (the "Opt-Out Form") indicating they opt out of granting the Releases provided in the Plan and (ii) returned such Opt-Out Form to the Voting Agent by the deadline specified in the Opt-Out Form</u>, in each case, on behalf of themselves and their respective successors, assigns and representatives, and any all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, interests or Causes of Action, including any derivative claims, asserted or assertable on their behalf, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership or operation thereof), the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the Non-Debtor GCS Parties, the Term DIP Facility, the Exit Term Loan Facilities, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or New Holdco (as the successor to the Debtor), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor, the Non-Debtor GCS Parties, and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of the Definitive Documents or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, any settlement or agreement in the Chapter 11 Case, the offer, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the distribution of property under the Plan, whether or not such distribution occurs following the Effective Date, the negotiations regarding or concerning any of the foregoing, or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that* nothing herein shall be construed to release any party or entity from willful misconduct or intentional fraud as determined by a Final Order; *provided further* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to

applicable law.

10.7.   *Exculpation.*

**Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, the Exculpated Parties shall neither have nor incur any liability to any holder of a Claim or Interest or any other party in interest, or any of their respective predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entity's respective heirs, executors, estates, servants or nominees for any act or omission (both prior to and subsequent to the Petition Date) in connection with, related to, or arising out of, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any Security of the Debtor or New Holdco, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Exculpated Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, filing, dissemination, or consummation of the Plan (including the Plan Supplement), the Restructuring Support Agreement, the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, any settlement or agreement in the Chapter 11 Case, the offer, issuance, and distribution of any Securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date, negotiations regarding or concerning any of the foregoing, the administration and implementation of the Plan or property to be distributed hereunder or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for actions determined by Final Order to constitute gross negligence, willful misconduct, or intentional fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan or any other related document, instrument or agreement; *provided that* nothing in the Plan shall limit the liability of professionals to their clients pursuant to applicable law.**

10.8.   *Retention of Causes of Action/Reservation of Rights.*

(a)     Except as otherwise provided herein, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of the Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor.  In accordance with section 1123(b) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest in New Holdco, except as otherwise expressly provided in the Plan.

49

(b)      New Holdco, through its authorized agents or representatives, shall have, retain, reserve, and be entitled to assert and enforce all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's and New Holdco's (as successor to the Debtor) legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.   New Holdco shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.   Notwithstanding the foregoing, the Debtor and New Holdco shall not retain any Claims or Causes of Action released pursuant to Sections 10.5, 10.6, and 10.7 of the Plan against the Released Parties or arising under chapter 5 of the Bankruptcy Code (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures pursuant to section 502(d) of the Bankruptcy Code or otherwise).

**(c)      New Holdco may pursue such retained Causes of Action, as appropriate, in accordance with its best interests and the best interests of the Reorganized Company. No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that New Holdco will not pursue any and all available Causes of Action of the Debtor (or New Holdco, as successor to the Debtor) against it. New Holdco expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action of the Debtor against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, New Holdco expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan.

10.9.    *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtor, the Consenting Lenders, and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

50

10.10.    *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in 5.12(a) of the Plan; (b) the selection of the managers and officers for New Holdco, New Holdco Sub, and each of the other GCS Parties, as applicable, pursuant to the New Organizational Documents; (c) the issuance and distribution, or other transfer, of the New Equity; (d) the entry into the Exit Term Loan Facilities and Exit ABL Facility and the corresponding Exit Term Loan Facility Documents and Exit ABL Facility Documents, as applicable; (e) the adoption and/or filing of or entry into the LLC Agreement and other New Organizational Documents; and (f) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated, by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtor or the Reorganized Debtor, and any corporate or limited liability company action required by the Debtor, the Reorganized Debtor, New Holdco or New Holdco Sub in connection with the Plan, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by holders of Claims, the security holders, directors, managers, authorized persons, or officers of the Debtor, the Reorganized Debtor, New Holdco or New Holdco Sub.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtor, the Reorganized Debtor, New Holdco and New Holdco Sub, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments, certificates of merger, certificates of conversion, certificates of incorporation, or comparable documents, or franchise tax reports contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, New Holdco, New Holdco Sub, and each of the other GCS Parties, as applicable, including, but not limited to, (i) the New Organizational Documents, including the LLC Agreement; (ii) the Exit ABL Facility Agreement; (iii) the Exit ABL Facility Documents; (iv) the Exit Term Loan Facilities, (v) the Exit Term Loan Facility Documents; and (vi) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.10 shall be effective notwithstanding any requirements under non-bankruptcy law.

10.11.    *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against New Holdco or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, New Holdco or another Entity with whom New Holdco has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

10.12. ***Reimbursement or Contribution.***

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to entry of the Confirmation Order a Final Order has been entered determining such Claim is no longer contingent.

## ARTICLE XI        RETENTION OF JURISDICTION.

11.1. ***Retention of Jurisdiction.***

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)        to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Cure Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)        to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)        to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)        to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim;

(e)        to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)        to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(g)        to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      to hear and determine all Fee Claims;

(j)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan, the Confirmation Order or the Disclosure Statement, including the Restructuring Support Agreement;

(l)      determine any other matters and for such other purposes that may arise in connection with or relate to or be provided in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement

(m)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)      to hear and determine matters concerning exemptions from federal, state and local registration and prospectus delivery requirements in accordance with section 1145 of the Bankruptcy Code;

(o)      to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

(p)      to resolve disputes concerning Disputed Claims or the administration thereof;

(q)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)      to enter a final decree closing the Chapter 11 Case;

(s)      to recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

(t)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(u)      to enforce all orders previously entered by the Bankruptcy Court; and

(v)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

11.2.   ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII      MISCELLANEOUS PROVISIONS.

12.1.   ***Payment of Sponsor Fees.***

Provided the Settlement and Release Agreement has been executed and has not been terminated prior to the Effective Date, the Debtor shall pay, or shall cause a Non-Debtor GCS Party to pay, reasonable and documented out-of-pocket professional fees and expenses of ORG GC Holdings, LLC and/or Owner Resource Group, LLC and certain of its affiliates incurred through and including the Effective Date in an amount not to exceed $100,000.

12.2.   ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, New Holdco shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code until such time as a final decree is entered closing the Debtor's Chapter 11 Case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtor's case is entered.

12.3.   ***Substantial Consummation of the Plan.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.4.   ***Plan Supplement.***

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the

Bankruptcy Court during normal court hours. Documents included in the Plan Supplement will be posted at the website of the Debtor's notice, claims, and solicitation agent.

12.5.     *Request for Expedited Determination of Taxes.*

The Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

12.6.     *Exemption from Certain Transfer Taxes.*

To the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any Lien, mortgage, deed of trust, or other security interest or the securing of additional indebtedness by such or other means, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtor pursuant to, in implementation of or as contemplated in the Plan (whether to the Reorganized Debtor, New Holdco or otherwise), (d) the grant of collateral under the Exit ABL Facility Documents and the Exit Term Loan Facility Documents, and (e) the issuance, renewal, modification, or securing of indebtedness  by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

12.7.     *Amendments.*

(a)      *Plan Modifications.* Subject to the terms of the Restructuring Support Agreement, (i) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtor may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.

(b)     *Other Amendments*.  Subject to the Restructuring Support Agreement, before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

(c)     *Approval of Amendments.*  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 12.8.   *Effectuating Documents and Further Transactions.*

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  Each of the officers of New Holdco, New Holdco Sub, and the Reorganized Debtor is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12.9.   *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor, any of the Consenting Lenders, or any other Entity; *provided, however*, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect. This provision shall have no impact on the rights of the Consenting Lenders or the Debtor, as set forth in the Restructuring Support Agreement, in respect of any such revocation or withdrawal.

### 12.10.   *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be

invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtor or New Holdco (to the extent any executory contracts or unexpired lease is assumed and assigned) (as the case may be) and the Consenting Lenders, and (c) nonseverable and mutually dependent.

### 12.11.   *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; *provided* that corporate or limited liability company governance matters relating to the Debtor, the Reorganized Debtor, New Holdco and New Holdco Sub, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of such entity, as applicable.

### 12.12.   *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.13.   *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 12.14.   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor, New Holdco and New Holdco Sub.

### 12.15.   *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have

been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.16.   ***Reservation of Rights.***

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

12.17.   ***Successor and Assigns.***

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.  For the avoidance of doubt, New Holdco shall be the successor to the Debtor as of the Effective Date.

12.18.   ***Entire Agreement.***

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.19.   ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.20.   ***Waiver or Estoppel.***

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to entry of the Confirmation Order.

12.21.   ***Notices.***

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall

be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)     if to the Debtor:

ORG GC Midco, LLC
6330 Gulfton Street
Houston, Texas 77081
Attn:   Mark Schordock, Chief Executive Officer
        Michael Jones, Chief Financial Officer
        Brad Batig, Chief Compliance Officer and General Counsel
Email:  mark.schordock@gcserv.com
        michael.jones@gcserv.com
        brad.batig@gcserv.com

        -and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Sunny Singh, Esq.
        Katherine T. Lewis, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  sunny.singh@weil.com
        katherine.lewis@weil.com

(b)     if to the Consenting Lenders:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn:   Jayme T. Goldstein, Esq.
        Daniel P. Ginsberg, Esq.
        Joanne Lau, Esq.
Telephone:  (212) 806-5400
Facsimile:  (212) 806-6006
Email:  jgoldstein@stroock.com
        dginsberg@stroock.com
        jlau@stroock.com

        -and-

59

King & Spalding
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Attn:    W. Austin Jowers, Esq.
            Michael R. Handler, Esq.
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Email:  ajowers@kslaw.com
            mhandler@kslaw.com

After the Effective Date, the Debtor has authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, New Holdco is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 solely to those Entities who have filed such renewed requests.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

60

Dated:  October 16, 2021

Respectfully submitted,

ORG GC MIDCO, LLC

By:

Name:  Michael Jones
Title:  Chief Financial Officer

## Exhibit B

**Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **ORG GC MIDCO, LLC** | § | **Case No. 21-** |
| | § | |
| Debtor.[1] | § | |
| | § | |

**DISCLOSURE STATEMENT FOR**
**PREPACKAGED CHAPTER 11 PLAN OF ORG GC MIDCO, LLC**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

*Proposed Attorneys for Debtor*
*and Debtor in Possession*

**WEIL GOTSHAL, & MANGES LLP**
Sunny Singh (*pro hac vice* pending)
Katherine T. Lewis (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Dated:   October 16, 2021
Houston, Texas

---

[1] The last four digits of the Debtor's federal tax identification number are 1740.  The Debtor's mailing address is 6330 Gulfton Street, Houston, Texas 77081.

**THIS SOLICITATION OF VOTES (THE "<u>SOLICITATION</u>") IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN (AS DEFINED HEREIN) IN CONNECTION WITH THE FILING OF A VOLUNTARY CASE UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>") BY ORG GC MIDCO, LLC.  BECAUSE THE CHAPTER 11 CASE HAS NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.   FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE, THE DEBTOR (AS DEFINED HEREIN) EXPECTS TO PROMPTLY SEEK (I) BANKRUPTCY COURT APPROVAL OF (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND (B) THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (II) CONFIRMATION OF THE PLAN.**

**DISCLOSURE STATEMENT, DATED OCTOBER 16, 2021**

**Solicitation of Votes on the
Prepackaged Chapter 11 Plan of**

**ORG GC MIDCO, LLC**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING CENTRAL TIME, ON NOVEMBER 1, 2021, UNLESS EXTENDED BY THE COURT OR THE DEBTOR.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS OCTOBER 15, 2021 (THE "<u>VOTING RECORD DATE</u>").**

---

**RECOMMENDATION BY THE DEBTOR**

**The Board of Managers of ORG GC Midco, LLC have unanimously approved the transactions contemplated by the Solicitation and the Plan. Holders of the Existing Term Loan Claims (as defined herein), the only impaired Class entitled to vote on the Plan, have already unanimously agreed to vote in favor of the Plan.**

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF (I) THE NEW HOLDCO COMMON EQUITY, (II) THE NEW HOLDCO SENIOR PREFERRED EQUITY, (III) NEW HOLDCO JUNIOR PREFERRED EQUITY, AND (IV) THE NEW MIDCO EQUITY SHALL, IN EACH CASE, BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.  THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE EXISTING TERM LOAN CLAIMS IS BEING MADE PURSUANT TO SECTION 4(A)(2) AND/OR REGULATION D OF THE SECURITIES ACT AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE ELIGIBLE EXISTING TERM LENDERS (I.E., ACCREDITED INVESTORS AS DEFINED IN RULE 501 OF THE SECURITIES ACT); PROVIDED, HOWEVER, THAT ALL HOLDERS OF ALLOWED EXISTING TERM LOAN CLAIMS WILL BE ENTITLED TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.

THE NEW HOLDCO COMMON EQUITY, NEW HOLDCO SENIOR PREFERRED EQUITY, NEW HOLDCO JUNIOR PREFERRED EQUITY, AND NEW MIDCO EQUITY TO BE ISSUED ON THE EFFECTIVE DATE HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

**FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.**

**ALL PARTIES ENTITLED TO VOTE ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL NOT BE IMPAIRED BY THE PLAN AND, AS A RESULT, THEIR RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF VALID OBLIGATIONS IS NOT ALTERED BY THE PLAN.**

**THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN AND IN CONNECTION WITH CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**PLEASE BE ADVISED THAT SECTIONS 10.5, 10.6, AND 10.7 OF THE PLAN CONTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.**

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................... 1

II. OVERVIEW OF COMPANY ................................................................................................... 3
    A.     Company's Business ............................................................................................... 3
    B.     Company's Organizational Structure ..................................................................... 3
    C.     Debtor's Board of Managers and Officers ............................................................ 4
    D.     Capital Structure .................................................................................................... 5

III. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE ................... 6

IV. ANTICIPATED EVENTS DURING CHAPTER 11 CASE ..................................................... 8
    A.     Commencement of Chapter 11 Case and First-Day Motions ................................ 8
    B.     Procedural Motions and Retention of Professionals ............................................. 9
    C.     Solicitation Procedures .......................................................................................... 9
    D.     Timetable for Chapter 11 Case .............................................................................. 9

V. SUMMARY OF PLAN .......................................................................................................... 10
    A.     Treatment and Voting .......................................................................................... 10
    B.     Injunctions, Releases, and Exculpations .............................................................. 11

VI. FINANCIAL INFORMATION AND PROJECTIONS .......................................................... 16
    A.     Consolidated Condensed Projected Financial Information ................................... 16

VII. VALUATION ....................................................................................................................... 19

VIII.    TRANSFER RESTRICTIONS AND  CONSEQUENCES UNDER FEDERAL SECURITIES
        LAWS ................................................................................................................... 23

IX. CERTAIN U.S. TAX CONSEQUENCES OF PLAN ........................................................... 24
    A.     Background .......................................................................................................... 25
    B.     Consequences to the Debtor ................................................................................. 26

X. CERTAIN RISK FACTORS TO BE CONSIDERED ............................................................ 28
    A.     Certain Bankruptcy Law Considerations ............................................................. 28
    B.     Additional Factors Affecting Value of New Holdco ........................................... 29
    C.     Risks Relating to Company's Business and Financial Condition ........................ 30
    D.     Factors Relating to Securities to Be Issued Under Plan, Generally .................... 34
    E.     Risks Related to Investment in Exit Term Loan Facilities ................................... 34
    F.     Risks Related to an Investment in (i) New Holdco Common Equity, (ii) New Holdco
        Senior Preferred Equity, and (iii) New Holdco Junior Preferred Equity ............. 36
    G.     Additional Factors ............................................................................................... 37

XI. VOTING PROCEDURES AND REQUIREMENTS ............................................................. 38
    A.     Parties Entitled to Vote ........................................................................................ 38

B.      Voting Deadline ...................................................................................... 39
C.      Voting Procedures .................................................................................. 39
D.      Waivers of Defects, Irregularities, etc. .................................................. 41
E.      Notice of Non-Voting Status ................................................................. 41
F.      Opt-Out Form ........................................................................................ 41

XII. CONFIRMATION OF PLAN ............................................................................ 41
A.      Confirmation Hearing ............................................................................ 41
A.      Objections to Confirmation ................................................................... 42
B.      Requirements for Confirmation of Plan ................................................ 44

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ........... 48
A.      Alternative Plan of Reorganization ....................................................... 48
B.      Sale Under Section 363 of Bankruptcy Code ........................................ 48
C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ....... 48

XIV.    CONCLUSION AND RECOMMENDATION ...................................................... 50


EXHIBIT A:  Plan
EXHIBIT B:  Liquidation Analysis

# I.

# INTRODUCTION

ORG GC Midco, LLC (the "**Debtor**" or "**Midco**" and, collectively, with its direct and indirect subsidiaries, the "**Company**") submits this Disclosure Statement (this "**Disclosure Statement**") in connection with the Solicitation of votes on the *Prepackaged Chapter 11 Plan of ORG GC Midco, LLC*, dated October 16, 2021 (as amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof and the Restructuring Support Agreement, the "**Plan**")[2], annexed hereto as **Exhibit A**.  Capitalized terms used in this Disclosure Statement, but not herein defined, have the meanings ascribed to such terms in the Plan.  The Debtor anticipates filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on or about November 8, 2021 (the "**Petition Date**").  The Debtor intends to seek confirmation of the Plan on an expedited basis consistent with the timeline set forth herein.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.

GC Services Limited Partnership ("**GC Services**"), a second-tier subsidiary of the Debtor, is one of North America's oldest and largest privately held providers of Accounts Receivable Management ("**ARM**") and Business Process Outsourcing ("**BPO**") solutions, providing a full scope of solution offerings, including 24x7x365 programs, multi-channel and multi-lingual customer service programs (e.g. voice, email, chat, social media and more), from numerous locations in the continental United States and the Philippines, to Fortune 500 companies, premier global financial institutions, and large governmental entities.

GC Services' intermediate holding company, Midco, has commenced this Chapter 11 Case to implement a pre-negotiated, comprehensive consensual restructuring (the "**Restructuring**") of the Company's funded indebtedness through a prepackaged plan of reorganization that will substantially de-lever the Company by reducing its funded indebtedness from approximately \$210.3[3] million to approximately \$130.5[4] million upon emergence.

Midco is the only anticipated debtor in the Chapter 11 Case.  None of Midco's subsidiaries (collectively, the "**Non-Debtor GCS Parties**"), including the Company's primary operating entity, GC Services, contemplate filing for chapter 11 protection.  After careful and extensive evaluation, the Company, in consultation with, and with the support of the Consenting Lenders (as defined herein), determined not to file the Non-Debtor GCS Parties for chapter 11 along with the Debtor because they determined doing so may deplete the value of the Company to the detriment of all parties in interest.  Moreover, due to the fully consensual nature of the Restructuring, a chapter 11 filing by the Non-Debtor GCS Parties is simply not necessary to

---

[2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

[3] Amount excludes accrued interest of approximately \$33 million as of the anticipated Petition Date and is based on notional size \$25 million Existing ABL Facility.

[4] Amount includes notional size \$30 million Exit ABL Facility, which may be increased to \$40 million subject to ongoing negotiations.

effectuate the Restructuring.[5]    Accordingly, business at the Non-Debtor GCS Parties will continue as usual and GC Services anticipates no impact on its operations.

 As set forth in greater detail in the Plan, the Restructuring provides that:

    i.    the Existing Term Loans of approximately $210.3 million will be cancelled and discharged in exchange for (a) takeback first lien term loans in an aggregate amount of approximately $71 million, (b) takeback second lien term loans in an aggregate amount of approximately $29 million, and (c) preferred and common equity of the Reorganized Company.  More specifically:

        a.    each holder of an Allowed Existing Term Loan Claim affiliated with BSP will receive (i) its *pro rata* share of Initial New 1L Loans, (ii) its *pro rata* share of New 2L Loans, (iii) its *pro rata* share of New Holdco Junior Preferred Equity, and (iv) 100% of the New Holdco Common Equity; and

        b.    each holder of an Allowed Existing Term Loan Claim affiliated with GS will receive (i) its *pro rata* share of Initial New 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans), (ii) its *pro rata* share of New 2L Loans, (iii) 100% of the New Midco Equity, and (iv) as a result of receiving 100% of the New Midco Equity, GS will acquire an indirect interest in (A) 100% of the New Holdco Senior Preferred Equity and (B) its *pro rata* share of New Holdco Junior Preferred Equity, both of which shall be issued to the Reorganized Debtor; *provided that* prior to the Effective Date, GS may elect to have its *pro rata* share of the Initial 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans) and/or its *pro rata* share of the New 2L Loans issued to the Reorganized Debtor.

    ii.    holders of Existing ABL Facility Claims are unimpaired and, on the Effective Date, will be either (a) paid in full or (b) converted on a dollar-for-dollar basis into the Exit ABL Facility;

    iii.    General Unsecured Claims are unimpaired and will receive payment of their claims in full in the ordinary course of business; and

    iv.    existing equity interests in the Debtor will be cancelled on the Effective Date.

One of the Company's Existing Term Lenders, GS, has agreed to provide up to $6 million in senior secured debtor-in-possession financing (the "**Term DIP Facility**") to fund the costs of implementing the Restructuring.  The Company's Existing ABL Lenders have agreed to allow GC Services to continue to access the Existing ABL Facility during the pendency of the Chapter 11 Case.

---

[5] The Consenting Lenders will enter into contractual agreements with the Non-Debtor GCS Parties to implement the Restructuring contemplated by the Plan.

## II.
## OVERVIEW OF COMPANY

### A.    Company's Business

Midco is a non-operating intermediate holding company. Its primary source of revenue is derived through its second-tier subsidiary and operating company, GC Services.

Founded by Jerold B. Katz, GC Services opened its doors for business in October 1957 as a small, one-man business process outsourcing ("**BPO**") agency with one client and one employee (the founder) providing third party accounts receivable management services.  It was during these early formative years that GC Services pioneered the use of automated systems that maximize the efficiency, productivity and cost-effectiveness of the accounts receivable management process.  Through a dedicated approach to providing quality service and excellent results, GC Services moved into the forefront of the BPO industry.

As client needs changed, GC Services evolved and expanded in the 1980s to offer first party accounts receivable collection services.  Soon after, GC Services further expanded its service offerings by creating a separate teleservices division that could meet a full range of customer care needs, eventually becoming the nation's oldest and one of the largest privately owned business process outsourcing providers with approximately 6,000 employees and numerous call centers located across the United States and in Manila, Philippines.

In late 2015, investment funds managed by the Austin-based private equity firm, Owner Resource Group, LLC ("**ORG**" and collectively with its affiliates that own Interests, directly or indirectly, in the Debtor, including Holdings (as defined below) the "**Sponsor**"), acquired a controlling interest in the Company from the Katz family.

### B.    Company's Organizational Structure

As depicted below, the Company is indirectly controlled by the Sponsor through ORG GC Holdings, LLC ("**Holdings**"), which owns 100% of the equity interests of Midco.  Midco, in turn, directly or indirectly owns each of the other GCS Parties.



### C. Debtor's Board of Managers and Officers

| Board of Managers | Officers |
|---|---|
| James Decker | Mark Schordock, Chief Executive Officer, Chief Operating Officer, and President |
| John Haas | Michael Jones, Chief Financial Officer |
| Steven Panagos | Brad Batig, General Counsel |

D.    **Capital Structure**

As of the date of this Disclosure Statement, the Company's capital structure consists of approximately $210.3 million in funded debt, with respect to which the Debtor is obligated as a borrower. The Debtor's obligations are summarized below:

| Debt Instrument | Principal Funded Debt ($ millions) |
|---|---|
| Existing Term Loan Facility | $              185.3 |
| Existing ABL Facility[6] | $                 25 |
| **Total Funded Debt** | **$              210.3** |

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

1.    **Existing Term Loan Facility**

The Debtor has outstanding senior secured debt obligations under that certain Financing Agreement, dated July 31, 2017, by and among Midco and certain of its affiliates, as borrowers, each of the guarantors party thereto, BSP Agency, LLC, as administrative agent and collateral agent (the "**Existing Term Loan Facility Agent**"), and the lenders party thereto (the "**Existing Term Lenders"**) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing Term Loan Credit Agreement**" and the facility provided thereunder, the "**Existing Term Loan Facility**").

As of the date of this Disclosure Statement, the aggregate principal amount outstanding under the Existing Term Loan Facility is approximately $185.3 million. Obligations under the Existing Term Loan Facility are secured by a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral (each, as defined in the Existing Intercreditor Agreement (defined below)).

2.    **Existing ABL Facility**

GC Services maintains a revolving line of credit under that certain Credit Agreement dated July 31, 2017, by and among the Debtor and certain of its affiliates, as borrowers, each of the guarantors party thereto, JPMorgan Chase Bank N.A., as administrative agent (in such capacity, the "**Existing ABL Facility Agent**"), and the lenders party thereto (the "**Existing ABL Lenders**") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Existing ABL Facility Agreement**" and the facility provided thereunder, the "**Existing ABL Facility**").

---

[6] Amount outstanding under Existing ABL Facility fluctuates monthly.  Amount herein is based on a notional size $25 million facility. As of the date of this Disclosure Statement, the principal amount outstanding under the Existing ABL Facility is approximately $2 million (not including $5.5 million in drawn letters of credit).

As of the date of this Disclosure Statement, the aggregate principal amount outstanding under the Existing ABL Facility is approximately $2 million[7], which, as described in further detail in the Plan, will be converted into outstanding principal amounts under the Exit ABL Facility or paid in full in connection with refinancing the Existing ABL Facility with a new lender upon consummation of the Restructuring. The Company's obligations under the Existing ABL Facility are secured by a first priority lien on the ABL Priority Collateral and a second priority lien on the Term Priority Collateral.

### 3.  Existing Intercreditor Agreement

The relative contractual rights of the Existing Term Lenders, on the one hand, and the Existing ABL Lenders, on the other hand, are governed by that certain Intercreditor Agreement, dated as of July 31, 2017 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time, the "**Existing Intercreditor Agreement**"). The Existing Intercreditor Agreement controls the rights and obligations of the Existing Term Lenders and the Existing ABL Lenders with respect to, among other things, collateral priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

### III.
### KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE

Although the business is operationally sound, the Company is significantly over-levered. For Fiscal 2020, the Company reported approximately $15 million of adjusted EBITDA (on a consolidated 52-week basis) versus approximately $218 million of total funded debt, including accrued and unpaid interest—implying leverage of approximately 14.5x EBITDA.[8]

In the fall of 2019, the Company began struggling to comply with certain of its financial covenants under the Existing Term Loan Credit Agreement. In November 2019, the Company retained Robert Wagstaff of Riveron Management Services LLC, f/k/a Conway MacKenzie Management Services, LLC ("**Riveron**") and appointed him as Chief Restructuring Officer ("**CRO**") to assist the Company in evaluating strategic options to right-size its balance sheet and provide financial and operational leadership to the Company as it embarked on a potential restructuring process.

In January 2020, the Company failed to make a regularly scheduled interest payment due under the Existing Term Loan Credit Agreement, triggering an event of default with respect to the Existing Term Loan Credit Agreement and a cross-default with respect to the Existing ABL Facility Agreement.

On April 24, 2020, the Debtor, certain of the Non-Debtor GCS Parties, and Holdings, entered into forbearance agreements with the Existing Term Loan Facility Agent, each of the Existing

---

[7] Amount excludes $5.5 million in drawn letters of credit.

[8] As of December 31, 2020, there was approximately $13.9 million drawn on the Existing ABL Facility and approximately $204.6 million in par plus accrued interest outstanding on the Existing Term Loan Facility. Calculation does not include $5.5 million in letters of credit outstanding as of December 31, 2020.

Term Lenders, and the Existing ABL Facility Agent, which forbearance agreements expired on July 14, 2020.

On September 16, 2020, the Existing Term Loan Facility Agent delivered to the Debtor, among others, a *Notice of Exercise of Rights and Remedies After Default*, which, among other things, notified the Debtor, among other parties, of the Existing Term Loan Facility Agent's decision to exercise rights under the Proxy and Power of Attorney (as defined in the Pledge and Security Agreement).[9]

On September 18, 2020, the Existing Term Loan Facility Agent executed and delivered a written consent (the "**September 18 Written Consent**"), in the name of and on behalf of Holdings, pursuant to the Proxy and Power of Attorney and the Existing Term Loan Facility Agent's exercise of rights thereunder, pursuant to which, in accordance with Section 3.9 of the former Limited Liability Company Agreement of Midco (the "**Former ORG GC Midco Operating Agreement**"), and Section 18-302(d) of the Delaware Limited Liability Company Act, each person that was formerly serving as a manager of Midco was removed as a manager and the current three (3) person Board of independent Managers was appointed.  Pursuant to the September 18 Written Consent, the Former ORG GC Midco Operating Agreement was also amended and restated in its entirety and the Amended and Restated Limited Liability Company Agreement of ORG GC Midco, LLC, effective as of September 18, 2020 (the "**A&R ORG GC Midco Operating Agreement**"), was adopted.

In October 2020, the Company retained Weil, Gotshal & Manges LLP as counsel ("**Weil**") to assist the Company in negotiating and implementing a deleveraging transaction.  With Weil and Riveron's assistance, the Company began to meaningfully engage with its Existing Term Lenders, the Existing ABL Lenders, and the Sponsor regarding the terms of a potential restructuring transaction.

On November 30, 2020, the Debtor and certain of the other Non-Debtor GCS Parties entered into forbearance agreements with the Existing Term Lenders and the Existing ABL Facility Agent. Since that time, the Company has been operating under a series of extensions to those forbearance agreements as the Company assessed its strategic options and attempted to negotiate a consensual resolution of its capital structure concerns.

The Company's precarious financial position compared to its competitors, many of which have already undergone their own balance sheet restructurings in the past 12-18 months, has begun to negatively impact the Company's ability to attract and retain customers, as well as prevent the Company from making certain technology and/or system upgrades necessary to ensure the Company is in compliance with requirements imposed by certain regulatory and licensing authorities.

---

[9] Pursuant to that certain Pledge and Security Agreement (the "**Pledge and Security Agreement**") entered into in connection with the Existing Term Loan Credit Agreement, 100% of the equity in the Debtor and certain of the other GCS Parties (each a "**Pledged Company**" and, collectively, the "**Pledged Companies**" and such equity, the "**Pledged Equity**") was pledged by the holders of such Pledged Equity (the "**Pledgors**") in favor of the Existing Term Loan Facility Agent, in its capacity as agent for the Existing Term Lenders, to secure the obligations under the Existing Term Loan Credit Agreement.

After several months of good faith, arm's length negotiations with the Consenting Lenders, on October 16, 2021, the Debtor, the Non-Debtor GCS Parties, and the Consenting Lenders entered into the Restructuring Support Agreement, annexed to the Plan as **Exhibit A**.

The Company's Existing ABL Lenders have agreed to allow GC Services to continue to access the Existing ABL Facility through the consummation of the Restructuring through the Debtor's Chapter 11 Case, at which point the Existing ABL Facility will either be refinanced or converted into the Exit ABL Facility.

The terms of the Restructuring are reflected in the Plan. Upon its full implementation, the Plan will effectuate a significant de-leveraging of the Company's capital structure by eliminating approximately $110 million in principal amount of funded debt and reducing the Company's ongoing cash debt service requirements. The reduced debt burden and cash debt service requirements, coupled with the exit financing anticipated under the Plan, will provide the Company with sufficient liquidity, not only to continue funding the Company's operations, but to make the necessary capital expenditures and investments to ensure that GC Services remains an industry leader in the Accounts Receivable Management and BPO sector.

IV.
**ANTICIPATED EVENTS DURING CHAPTER 11 CASE**

Pursuant to the Restructuring Support Agreement, the Debtor agreed to file a voluntary petition (the "**Petition**") for relief under chapter 11 of the Bankruptcy Code on or before November 8, 2021 (the date the Chapter 11 Case is actually commenced, the "**Petition Date**") and file the Plan and this Disclosure Statement on the Petition Date. The filing of the Petition will commence the Chapter 11 Case, at which time the Debtor will be afforded the benefits, and become subject to the limitations, of the Bankruptcy Code.

A.   **Commencement of Chapter 11 Case and First-Day Motions**

The Company and the Consenting Lenders have agreed to implement the Restructuring with as little disruption to the business as possible. Accordingly, Midco is the only Debtor in this Chapter 11 Case. As a holding company, Midco has no operations. Accordingly, the Debtor does not anticipate needing extensive "first day" relief; however, the Debtor has filed the "first day" pleadings described below to minimize the adverse effects of the commencement of this Chapter 11 Case and ensure the Debtor's swift exit from chapter 11 (the "**First Day Motions**").
GC Services will continue to operate its business in the ordinary course during the pendency of the Debtor's Chapter 11 Case as it had prior to the Petition Date.
The following is a brief overview of the substantive relief the Debtor intends to seek on the Petition Date.

1.   **Cash Management System**

In the ordinary course of business, the Company utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by its operations (the "**Cash Management System**"). The Debtor intends to request authority to continue participating in the Company's Cash Management System, including its sole prepetition bank account and incurrence of Intercompany Claims.

### 2.  DIP Financing

As a holding company, the Debtor does not generate its own revenue.  Accordingly, the Debtor requires financing to help fund the costs of implementing the Restructuring.

One of the Consenting Lenders, GS, has agreed to provide such incremental liquidity in the form of a superpriority senior secured term loan facility in an aggregate principal amount up to $6 million to cover such costs.  Incurrence of the Term DIP Facility is anticipated to be fully consensual.  Upon consummation of the Restructuring, the Term DIP Facility will be converted on a dollar-for-dollar basis into Initial New 1L Loans.

### 3.  Net Operating Losses

The Debtor intends to request entry of interim and final orders authorizing the Debtor to establish certain procedures to protect the potential value of the Debtor's consolidated net operating loss carryforwards ("**NOLs**") for use in connection with the Debtor's Chapter 11 Case.

### B.  <u>Procedural Motions and Retention of Professionals</u>

The Debtor intends to file several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Case, including applications to retain various professionals to assist the Debtor in the Chapter 11 Case.

### C.  <u>Solicitation Procedures</u>

Contemporaneously with the filing of the Petition, the Debtor will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (i) the adequacy of the Disclosure Statement and the Solicitation in connection therewith and (ii) confirmation of the Plan.  Notice of this hearing will be published and mailed to all known and potential holders of Claims and Interests prior to the filing of the Chapter 11 Case.

### D.  <u>Timetable for Chapter 11 Case</u>

In accordance with the Restructuring Support Agreement and the Term DIP Facility Agreement, the Debtor is seeking to implement the restructuring on an expedited basis.  Accordingly, the Consenting Lenders have established the following milestones:

| Milestone | Deadline |
|---|---|
| Commence Solicitation of Votes on the Plan | October 20, 2021 |
| Commence Chapter 11 Case | November 8, 2021 |
| Hearing to Consider Approval of the Disclosure Statement and Confirmation of the Plan | 21 days after the Petition Date |

| Milestone | Deadline |
|---|---|
| Obtain Entry of Final DIP Order | 24 days after the Petition Date |
| Obtain Entry of an Order Approving the Disclosure Statement and Confirming the Plan | 24 days after the Petition Date |
| Occurrence of Effective Date | 38 days after the Petition Date |

## V.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes certain terms of the Plan, a copy of which is annexed hereto as **Exhibit A**.

### A.   Treatment and Voting

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, including Fee Claims, Term DIP Claims, and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| 3 | Existing Term Loan Claims | Impaired | Yes |
| 4 | Existing ABL Claims | Unimpaired | No (Deemed to accept) |
| 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| 7 | Midco Equity Interests | Impaired | No (Deemed to reject) |

As set forth in greater detail in the Plan, filed contemporaneously herewith, the Restructuring provides that:

i. each holder of an Allowed Existing Term Loan Claim affiliated with BSP will receive (a) its *pro rata* share of Initial New 1L Loans, (b) its *pro rata* share of New 2L Loans, (c) its *pro rata* share of New Holdco Junior Preferred Equity, and (d) 100% of the New Holdco Common Equity;

ii. each holder of an Allowed Existing Term Loan Claim affiliated with GS shall receive (a) its *pro rata* share of Initial New 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans), (b) its *pro rata* share of New 2L Loans, (c) 100% of the New Midco Equity, and (d)

as a result of receiving 100% of the New Midco Equity, GS will acquire an indirect interest in (i) 100% of the New Holdco Senior Preferred Equity and (ii) its *pro rata* share of New Holdco Junior Preferred Equity, both of which shall be issued to the Reorganized Debtor; *provided* that prior to the Effective Date, GS may elect to have its *pro rata* share of the Initial 1L Loans (less the amount of Term DIP Claims outstanding immediately prior to the Effective Date rolled into Initial New 1L Loans) and/or its *pro rata* share of the New 2L Loans issued to the Reorganized Debtor;

iii.    holders of Existing ABL Facility Claims are unimpaired and on the Effective Date or as soon as practicable thereafter, (i) all outstanding amounts under the Existing ABL Facility shall be converted, on a dollar for dollar basis, into amounts outstanding under the Exit ABL Facility and all of the Debtor's obligations under the Existing ABL Facility shall be assumed by New Holdco or (ii) holders of Existing ABL Facility Claims shall receive such other treatment so as to render such holder's Allowed Existing ABL Facility Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code;

iv.    holders of General Unsecured Claims are unimpaired and will receive payment of their Claims in full in the ordinary course of business; and

v.    existing equity interests in the Debtor will be cancelled on the Effective Date.

Holders of Existing Term Loan Claims (Class 3) and Midco Equity Interests (Class 7) are the only holders of Claims and Interests that are impaired by the Plan.  Each of the holders of Claims in Class 3 have already agreed, pursuant to the Restructuring Support Agreement, to support and not object to the Plan or the treatment provided for their Class therein. All other holders of Claims against the Debtor are unimpaired by the Plan.

   B.    <u>**Injunctions, Releases, and Exculpations**</u>

**THE PLAN CONTAINS CERTAIN INJUNCTION, RELEASE, AND EXCULPATORY PROVISIONS DETAILED BELOW. YOU ARE ADVISED TO READ THESE PROVISIONS CAREFULLY, AS YOUR RIGHTS MAY BE AFFECTED.**

**IN PARTICULAR, THE PLAN PROVIDES FOR THIRD PARTY RELEASES. EACH HOLDER OF AN UNIMPAIRED CLAIM WILL BE DEEMED TO HAVE GRANTED THE THIRD PARTY RELEASES UNLESS SUCH HOLDER AFFIRMATIVELY OPTS OUT OF SUCH RELEASE BY RETURNING THE OPT-OUT NOTICE TO THE DEBTOR'S VOTING AGENT BY 4:00 PM PREVAILING CENTRAL TIME ON NOVEMBER 16, 2021.**

   1.    **Injunctions**

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, or as agreed to by the Debtor and a holder of a Claim against or Interest in the Debtor, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, subrogation or recoupment of any kind, directly or indirectly, against any obligation due from the Released Parties or against the property of any of the Released Parties, except as contemplated or allowed by the Plan or unless such holder has filed a motion requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff, subrogation or recoupment pursuant to applicable law or otherwise and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtor and its respective property and interests in property, including New Holdco and New Holdco Sub.

## 2. Estate Releases

Subject to the occurrence of and effective as of the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect or becomes effective after the Effective Date, for good and valuable consideration, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtor, New Holdco (as the successor to the Debtor) and the Debtor's Estate, in each case on behalf of themselves and their respective successors, assigns and representatives, and any all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the Debtor, New Holdco (as the successor to the Debtor) and the Debtor's Estate, from any and all Claims or Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtor, whether known or

unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that the Debtor, New Holdco (as the successor to the Debtor) and the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership or operation thereof), the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the Non-Debtor GCS Parties, the Term DIP Facility, the Exit Term Loan Facilities, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or New Holdco (as the successor to the Debtor), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor, the Non-Debtor GCS Parties, and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of the Definitive Documents or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, any settlement or agreement in the Chapter 11 Case, the offer, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the distribution of property under the Plan, whether or not such distribution occurs following the Effective Date, the negotiations regarding or concerning any of the foregoing, or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that* nothing in the Plan shall be construed to release any party or entity from willful misconduct or intentional fraud as determined by a Final Order; *provided further* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to applicable law.

### 3.   Releases by Holders of Claims

Subject to the occurrence of and effective as of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect or becomes effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties[10] to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties (other than the Debtor) shall be deemed conclusively, absolutely, unconditionally, irrevocably

---

[10] "**Released Parties**" means (a) the Debtor; (b) the Consenting Lenders; (c) the Existing Agents; (d) the Existing ABL Lenders; (e) the Term DIP Lenders; (f) the Term DIP Agent; (g) with respect to the foregoing (a) through (f), each of their respective current affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in each case, in their respective capacities as such); and (h) with respect to the foregoing (b) through (f), each of their respective former affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in each case, in their respective capacities as such); *provided, however,* that "Released Parties" shall not include a Non-Released Party.

and forever released and discharged by each Releasing Party[11], <u>including holders of Unimpaired Claims that have not (i) checked the box on the applicable notice (the "Opt-Out Form") indicating they opt out of granting the Releases provided in the Plan and (ii) returned such Opt-Out Form to the Voting Agent by the deadline specified in the Opt-Out Form</u>, in each case, on behalf of themselves and their respective successors, assigns and representatives, and any all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, interests or Causes of Action, including any derivative claims, asserted or assertable on their behalf, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership or operation thereof), the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the Non-Debtor GCS Parties, the Term DIP Facility, the Exit Term Loan Facilities, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or New Holdco (as the successor to the Debtor), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor, the Non-Debtor GCS Parties and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of the Definitive Documents or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, any settlement or agreement in the Chapter 11 Case, the offer, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the distribution of property under the Plan, whether or not such distribution occurs following the Effective Date, the negotiations regarding or concerning any of the foregoing, or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that* nothing in Section 10.6(b) of the Plan shall be construed to release any party or entity from willful misconduct or intentional fraud as determined by a Final Order; *provided further* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to applicable law.

---

[11] "**Releasing Parties**" means (a) the Debtor; (b) the Consenting Lenders; (c) the Existing Agents; (d) the Existing ABL Lenders; (e) the Term DIP Lenders; (f) the Term DIP Agent; (g) with respect to the foregoing (a) through (f), each of their respective current affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in each case, in their respective capacities as such); and (h) the holders of Claims that are Unimpaired and presumed to accept the Plan; *provided that* in each case, an Entity shall not be a Releasing Party if it (x) elects to timely opt out of the third party releases contained in <u>Section 10.6</u> of the Plan or (y) is a Non-Released Party.

### 4.  Exculpation

Notwithstanding anything in the Plan to the contrary, and to the maximum extent permitted by applicable law, the Exculpated Parties[12] shall neither have nor incur any liability to any holder of a Claim or Interest or any other party in interest, or any of their respective predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entity's respective heirs, executors, estates, servants or nominees for any act or omission (both prior to and subsequent to the Petition Date) in connection with, related to, or arising out of, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any Security of the Debtor or New Holdco, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Exculpated Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, filing, dissemination, or consummation of the Plan (including the Plan Supplement), the Restructuring Support Agreement, the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, any settlement or agreement in the Chapter 11 Case, the offer, issuance, and distribution of any Securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date, negotiations regarding or concerning any of the foregoing, the administration and implementation of the Plan or property to be distributed hereunder or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for actions determined by Final Order to constitute gross negligence, willful misconduct, or intentional fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan or any other related document, instrument or agreement; *provided that* nothing in the Plan shall limit the liability of professionals to their clients pursuant to applicable law.

---

[12] "**Exculpated Parties**" means, collectively: (a) the Debtor, (b) the Reorganized Debtor, (c) the Non-Debtor GCS Parties, (d) the Consenting Lenders, (e) the Existing ABL Lenders, (f) the Existing Agents, (g) the Term DIP Agent, (h) the Term DIP Lenders, (i) the Exit Agents and (j) with respect to each of the foregoing Entities in clauses (a) through (i), all Persons and Entities who acted on their behalf in connection with the matters as to which exculpation is provided in the Plan.

# VI.
# FINANCIAL INFORMATION AND PROJECTIONS

### A.   Consolidated Condensed Projected Financial Information

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (*See* Article XIV hereof), as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Company analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.  The Company prepared financial projections (the "**Projections**") for the years 2021 through 2025, as set forth below.

The Debtor does not, as a matter of course, publish its business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtor does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or Projections to holders of Claims, Interests, or other parties in interest after the Confirmation Date.  In connection with the planning and development of the Plan, the Projections were prepared by the Company, with the assistance of its professionals, to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in demand for the Company's services, further competition within the Company's current markets, changes in interest rates and inflation, changes in terms with material customers, suppliers, and/or a variety of other factors.  Consequently, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Projections included herein were last updated on August 10, 2021.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTOR PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF ITS ADVISERS.  THE DEBTOR DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTOR DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE

IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.   ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL.  THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTOR PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTOR, REORGANIZED DEBTOR, AND NEW HOLDCO AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

The Projections herein include:

1. Pro forma projected consolidated income statement and Adjusted EBITDA of the Company, including non-Debtor affiliates, for fiscal years 2021 through 2025; and

2. Pro forma projected consolidated cash flows of the Company, including non-Debtor affiliates, for fiscal years 2021 through 2025.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the Debtor's historical consolidated financial statements (including the notes and schedules thereto).

### PRO FORMA PROJECTED INCOME STATEMENT AND ADJUSTED EBITDA[13]

| | Q42021 | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|---|
| ($ in 000's) | | | | | |
| **Revenues, Net** | $ 61,890 | $ 252,436 | $ 274,501 | $ 302,510 | $ 328,178 |
| Operating Expenses: | | | | | |
| Salaries & Employee Benefits | 49,072 | 198,720 | 212,804 | 231,385 | 250,731 |
| Operating Expenses | 13,501 | 45,659 | 46,317 | 48,522 | 50,860 |
| Depreciation & Amortization | 1,245 | 4,812 | 4,812 | 4,812 | 4,812 |
| **Total Operating Expenses** | 63,818 | 249,190 | 263,933 | 284,719 | 306,403 |
| Operating Income | $ (1,928) | $ 3,246 | $ 10,568 | $ 17,791 | $ 21,774 |
| Interest Expense | 2,795 | 12,178 | 13,846 | 15,346 | 16,810 |
| Other Expense (Income) | (117) | 0 | 0 | 0 | (0) |
| **Pre-tax Income (Loss)** | (4,606) | (8,932) | (3,278) | 2,446 | 4,964 |
| Income Taxes (Benefit) | 195 | 600 | 600 | 600 | 600 |
| **Net Income (Loss)** | $ (4,801) | $ (9,532) | $ (3,878) | $ 1,846 | $ 4,364 |
| | | | | | |
| **Supplemental Information** | | | | | |
| Depreciation & Amortization | $ 1,245 | $ 4,812 | $ 4,812 | $ 4,812 | $ 4,812 |
| Adjustments | 2,870 | 1,500 | 1,500 | 1,500 | 1,500 |
| | | | | | |
| **EBITDA** | $ (683) | $ 8,058 | $ 15,380 | $ 22,603 | $ 26,586 |
| **Adjusted EBITDA** | $ 2,187 | $ 9,558 | $ 16,880 | $ 24,103 | $ 28,086 |

---

[13] Adjustments include addbacks of Board of Manager Fees, Non-Recurring Expenses, Certain Severance and other gains/losses.

**PRO FORMA CONSOLIDATED CASH FLOW PROJECTIONS[14]**

| ($ in 000's) | Q42021 | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|---|
| Adjusted EBITDA | $ 2,187 | $ 9,558 | $ 16,880 | $ 24,103 | $ 28,086 |
| | | | | | |
| Cash Taxes | (195) | (600) | (600) | (600) | (600) |
| Capital Expenditures | (1,484) | (6,360) | (8,560) | (8,560) | (8,560) |
| Net Working Capital | 3,610 | (4,298) | (2,304) | (5,185) | (4,606) |
| Other | (2,705) | (1,500) | (1,500) | (1,500) | (1,500) |
| Unlevered Free Cash Flow | $ 1,413 | $ (3,200) | $ 3,916 | $ 8,258 | $ 12,820 |
| Cash Interest Expense | (131) | (630) | (2,258) | (6,866) | (6,671) |
| **Leveraged Free Cash Flow** | **$ 1,282** | **$ (3,830)** | **$ 1,659** | **$ 1,393** | **$ 6,149** |
| Debt (Repay) / Draw | (1,282) | 3,830 | (1,659) | (1,393) | (6,149) |
| **Change in Cash** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| | | | | | |
| Beginning Cash | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 |
| Change in Cash | - | - | - | - | - |
| **Ending Cash** | **$ 2,500** | **$ 2,500** | **$ 2,500** | **$ 2,500** | **$ 2,500** |

## VII.
## VALUATION

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTOR OR ANY OF ITS AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, Riveron estimated a range of total enterprise value ("**Enterprise Value**") for the Reorganized Company *pro forma* for the transactions contemplated by the Plan and the Restructuring Support Agreement (the "**Valuation Analysis**"). As discussed throughout the Disclosure Statement, the Debtor is an intermediate holding company and does not have any of its own operations. Its primary assets are its Interests in its direct and indirect operating subsidiaries, the Non-Debtor GCS Parties.

---

[14] Q4 Beginning Cash balance based on preliminary estimate as of October 1, 2021.

The Valuation Analysis is based on financial and other information provided by the Debtor's management team, as well as the Projections included herein in Article VII, and information provided by other sources. The Valuation Analysis is as of September 30, 2021, with an assumed Effective Date of November 26, 2021. The Valuation Analysis utilizes market data as of September 13, 2021. The valuation estimates set forth herein represent valuation analyses of the Reorganized Company generally based on the application of customary valuation techniques to the extent deemed appropriate.

In preparing its valuation, Riveron considered a variety of factors and evaluated a variety of financial analyses, including (a) a comparable companies analysis; (b) a discounted cash flow analysis; and (c) a precedent transactions analysis. In performing the Valuation Analysis, Riveron primarily relied upon a comparable companies analysis and a discounted cash flow analysis. While Riveron considered a precedent transactions analysis, Riveron deemed it to be of limited relevance because of a lack of recent transactions for companies that are comparable in certain respects to the Reorganized Company. The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.

    i. Comparable Companies Analysis: The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value) and minority interest. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, most commonly EBITDA. The total enterprise value of the Reorganized Company was calculated by applying such multiples to the Reorganized Company's relevant statistics. The selection of public comparable companies for this purpose was based on various parameters that were deemed relevant.

    ii. *Discounted Cash Flow Analysis*: The discounted cash flow ("**DCF**") analysis is a forward-looking enterprise valuation methodology that estimates the value of a business by calculating the present value of expected future cash flows to be generated by the business, combined with the present value of the terminal value of the business at the end of the forecast period. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "**Discount Rate**"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The terminal value is calculated by applying a forward EBITDA multiple from the comparable company analysis to the EBITDA in the final year of the Projections (i.e., 2025).

    iii. *Precedent Transactions Analysis*: The precedent transactions methodology

estimates the value of a company by identifying and examining public transactions. Under this methodology, transaction values are commonly expressed as multiples of various measures of financial and operating statistics. Riveron identified and examined public merger and acquisition transactions that involved companies whose business and operating characteristics are generally similar to that of the Reorganized Company. No selected company is either identical or directly comparable to Reorganized Company's business. From a review of the transaction-derived valuation multiples for the selected transactions, Riveron then developed a range of valuation multiples to apply to the Projections to derive a range of implied enterprise values for the Reorganized Company's operations.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Company, as of September 30, 2021, is approximately $104 million to approximately $120 million (with the midpoint of such range being approximately $112 million).

For purposes of the Valuation Analysis, Riveron assumed that no material changes that would affect estimated value occur between the date of this Disclosure Statement and the Effective Date. Riveron's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY RIVERON ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTOR AVAILABLE TO RIVERON AS OF SEPTEMBER 13, 2021. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT RIVERON'S CONCLUSIONS, RIVERON DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES AND/OR FUNDED DEBT TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL

OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTOR, RIVERON, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED FUNDED DEBT AND SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH FUNDED DEBT AND SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, SPLIT OF INTEREST PAID IN CASH OR IN KIND, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL FUNDED DEBT AND SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF FUNDED DEBT AND SECURITIES.

The Projections were prepared in good faith and on a basis reflecting the best estimates and judgments as to the future operating and financial performance of the Reorganized Company. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the valuation of the Reorganized Company and the Enterprise Value thereof.

In preparing the Valuation Analysis, Riveron: (a) reviewed certain historical financial information of the Debtor and the Non-Debtor GCS Parties for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtor and the Non-Debtor GCS Parties, including the Projections; (c) reviewed certain publicly available financial data for, and considered the market value of, public companies that Riveron deemed generally relevant in analyzing the value of the Reorganized Company; (d) reviewed certain publicly available data for, and considered the market values implied therefrom, recent transactions in the business process outsourcing and debt collection sectors involving companies comparable in certain respects to the Reorganized Company; and (e) considered certain economic and industry information that Riveron deemed generally relevant to the Reorganized Company. Riveron assumed and relied on the accuracy and completeness of all financial and other information furnished to it by management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any holder of Allowed Claims, or any other person as to how such person should vote or otherwise act with respect to the Plan. Riveron has not been requested to, and does not express any view as to, the potential trading value of New Holdco's funded debt and securities on issuance or at any other time.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY RIVERON. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS

OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY RIVERON IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

RIVERON HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTOR OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTOR'S CHAPTER 11 CASE, THE PLAN OR OTHERWISE.

## VIII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The Solicitation is being made prior to the Petition Date pursuant to Section 4(a)(2) and/or Regulation D of the Securities Act and only from holders of Existing Term Loan Claims who are Accredited Investors (as defined in Rule 501 of the Securities Act).

The issuance of and the distribution under the Plan of (i) the New Holdco Common Equity, (ii) the New Holdco Senior Preferred Equity, (iii) the New Holdco Junior Preferred Equity, and (iv) the New Midco Equity, to holders of Allowed Existing Term Loan Claims, as applicable, shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, (i) the New Holdco Common Equity, (ii) the New Holdco Senior Preferred Equity, (iii) the New Holdco Junior Preferred Equity, and (iv) the New Midco Equity issued to holders of Allowed Existing Term Loan Claims, as applicable, will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to

distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of the (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, (iii) New Holdco Junior Preferred Equity, or (iv) New Midco Equity issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

To the extent certificated, certificates evidencing the (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, (iii) New Holdco Junior Preferred Equity, or (iv) New Midco Equity held by holders of 10% or more of the outstanding (i) New Holdco Common Equity (ii) New Holdco Senior Preferred Equity, (iii) New Holdco Junior Preferred Equity, or (iv) New Midco Equity, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE NEW HOLDCO COMMON EQUITY, NEW HOLDCO SENIOR PREFERRED EQUITY, NEW HOLDCO JUNIOR PREFERRED EQUITY, AND THE NEW MIDCO EQUITY REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE ISSUER RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## IX.
## CERTAIN U.S. TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor. This summary is based on the Tax Code, existing and proposed U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**"), and other applicable authorities, as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor has not requested an opinion of counsel or a ruling from the IRS with

respect to any of the tax aspects of the Plan. This summary does not address state, local, or foreign income or other tax consequences of the Plan. Importantly, this summary does not purport to address the U.S. federal income tax consequences of the Plan to *any* holder of Claims or *any* holder of Midco Equity Interests. Finally, this discussion does not address U.S. federal taxes other than income taxes, nor does it discuss the consequences of the Plan to any person that acquires any of the New Equity or other securities or property issued or transferred in and pursuant to the Plan or in the secondary market.

This discussion assumes that the New Equity Interests and, except as otherwise indicated below, the various debt and other arrangements to which the Debtor is a party, will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE CIRCUMSTANCES PERTAINING TO A PARTICULAR TAXPAYER. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

### A.    Background

The Debtor is taxed as a corporation for federal income tax purposes. The Debtor directly and indirectly owns limited liability company subsidiaries, most of which are disregarded for income tax purposes. The Debtor has certain tax attributes which include, as of the anticipated Petition Date, estimated NOLs in excess of $69 million, deferred interest under section 163(j) of approximately $16 million, and certain other tax attributes. Additionally, the Debtor currently has adjusted tax basis in its assets well in excess of the value of such assets, reflecting a "built-in" loss.

As described in the Plan, the Debtor is the borrower under existing debt instruments, including the Existing Term Loan Facility. In accordance with Article IV the Plan, and as discussed below, the Debtor will undergo a restructuring in which all of the Debtor's assets will be transferred to a newly formed limited liability company ("**New Holdco Sub**"), in connection with which the Debtor will receive all the equity in New Holdco Sub's direct parent, New Holdco; both New Holdco and New Holdco Sub will be, at the time of such asset transfer, disregarded for federal income tax purposes. Immediately thereafter, pursuant to the Plan (1) the Debtor's existing equity (i.e., the Midco Equity Interests) will be cancelled, (2) the Allowed Existing Term Loan Claims will be exchanged for a combination of newly issued equity of the Debtor, the New Holdco Equity, and New Holdco Sub debt securities, and otherwise discharged, and (3) all other Claims will remain unimpaired.

This restructuring and the U.S. federal income tax consequences thereof to the Debtor are discussed below.

### B.   Consequences to the Debtor

**1.   The Debtor's transfer to BSP of New Holdco Equity is expected to result in loss recognition by the Debtor.**

Pursuant to the Plan, the consideration for the satisfaction, settlement, release, and discharge of the Allowed Existing Term Loan Claim held by BSP (and its affiliates) will include a transfer by the Debtor of approximately 66% of the New Holdco Junior Preferred Equity and 100% of the New Holdco Common Equity, which is expected to represent approximately 66% of the value of all New Holdco's equity (excluding the New Holdco Senior Preferred Equity) at the Effective Date. Because, at the time of such transfer, New Holdco will be disregarded for federal income tax purposes, the transfer by the Debtor of these equity interests is expected to be treated as a transfer by the Debtor of a proportionate undivided interest in the underlying assets owned by New Holdco (and New Holdco Sub). Generally, a transfer by a debtor of property—like interests in its assets—in satisfaction of debt is taxable for federal income tax purposes. Thus, given that New Holdco and New Holdco Sub, immediately prior to the transfer described above, will be disregarded entities for income tax purposes, it is expected that the transfer of the New Holdco Equity in partial satisfaction of such Allowed Existing Term Loan Claims will be treated as a taxable sale of the underlying assets of New Holdco and New Holdco Sub.

Because the transfer to BSP (and its affiliates) of the New Holdco Equity will be treated as a taxable asset sale, the Debtor anticipates recognizing a loss under applicable tax principles in an amount proportionate to the percentage of the underlying assets of New Holdco and New Holdco Sub deemed transferred to BSP (and its affiliates).   The amount of the loss described in the foregoing sentence is expected to be significant; the precise amount of such loss cannot be determined at this time, as such amount will be dependent in large part on the value of the underlying assets of New Holdco and New Holdco Sub as of the Effective Date.

**2.   The Restructuring will result in income from the cancellation of debt ("COD"), the amount of which will depend in significant part on the value of the Reorganized Debtor. Because the COD will be realized in the context of a chapter 11 plan, such COD will be excluded from income.**

Pursuant to the Plan, on the Effective Date, except as otherwise expressly provided for by the Plan, all notes, instruments and certificates evidencing debt of, or equity interests in the Debtor shall be cancelled and obligations of the Debtor thereunder shall be discharged. It is expected that such implementation of the Plan may result in the recognition of COD. Generally, if an issuer discharges its debt in exchange for consideration having a value less than the adjusted issue price of such debt, the issuer will recognize COD. Under the Plan, the Existing Term Loan Facility (as noted above) will be satisfied in part and otherwise discharged, and all other Claims (except as otherwise provided in the Plan) will remain unimpaired.

The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. In the case of the Debtor, such amount of COD is projected to be significant; the amount of COD cannot be determined at this time, as such amount will be dependent in large part on the value of the underlying assets of New Holdco and New Holdco Sub as of the Effective Date.

The COD recognized by the Debtor as a result of the Restructuring will be excluded from income because the restructuring will be effected pursuant to a confirmed chapter 11 plan, and, consequently, will qualify for exclusion under section 108 of the Tax Code.

> ### 3. To the extent COD is excluded, it will result in tax attribute reduction, specifically a reduction in the amount of the Debtor's NOLs.

Although COD is excluded from income as discussed above, section 108 of the Tax Code requires a debtor in a chapter 11 bankruptcy case to reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, certain tax credits, and tax basis in assets—by the amount of any COD incurred pursuant to a confirmed chapter 11 plan and excluded under section 108.

As noted above, while the amount of COD that the Debtor will recognize and exclude under section 108 will depend in large part on the fair market value of the New Equity Interests (and cannot at this point be determined), the Debtor expects to incur and exclude a significant amount of COD as a result of the implementation of the Plan. Accordingly, the Debtor expects that its NOLs available to be carried forward and utilized in taxable years following the taxable year of the Restructuring (which would include NOLs generated as a result of the Restructuring) will be significantly reduced. Even so, the Debtor projects that an amount of its NOLs will remain even after such section 108 attribute reduction.

> ### 4. The Restructuring is expected to qualify under section 382(l)(5) of the Tax Code.

Under the Tax Code, any NOLs and certain other tax attributes of a corporation may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. Such limitation would apply in addition to (and after application of), and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan.

However, section 382(l)(5) of the Tax Code provides a special rule that the usual section 382 annual limitation does not apply if the "ownership change" resulted from the consummation of a chapter 11 plan. In the case where a corporation qualifies for and does not elect out of section 382(l)(5) treatment, the Tax Code generally requires reduction of NOLs that correspond to interest deductions claimed in respect of debt that is exchanged for debtor equity. It is currently expected that the implementation of the Plan will qualify for the special rule in section 382(l)(5).

Following the Restructuring, the pre-Restructuring business of the Debtor will be operated in a pass-through structure.

After emergence from its chapter 11 proceeding, the Debtor's business and assets will be owned and operated indirectly by New Holdco; all of New Holdco's U.S. subsidiaries will be disregarded limited liability companies. New Holdco is expected to be taxed for federal income tax purposes as a partnership. As such, it will not itself be a taxpayer, but its income, gain, loss, deductions and other tax results will "pass through" to its members, which, upon emergence from chapter 11, will be Midco and BSP (and its affiliates).

The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.

**X.**
**CERTAIN RISK FACTORS TO BE CONSIDERED**

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

## A.   **Certain Bankruptcy Law Considerations**

### 1.  **General**

While the Debtor believes that the Chapter 11 Case will be of short duration and will not be materially disruptive to GC Services' business, the Debtor cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on GC Services' business.  Among other things, it is possible that bankruptcy proceedings by its affiliates could adversely affect GC Services' relationships with its key customers, vendors, suppliers, and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from business operations at GC Services.

### 2.  **Risk of Non-Confirmation of Plan**

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtor can make no assurances that it will receive the requisite acceptances to confirm the Plan, and even if the Voting Class (as defined herein) voted in favor of the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3.  **Risk of Non-Occurrence of Effective Date**

Although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which

28

event no distributions would be made under the Plan, the Debtor and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

### 4. Risk of Termination of Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied or certain milestones are not met. Termination of the Restructuring Support Agreement could result in a protracted Chapter 11 Case. Moreover, termination of the Restructuring Support Agreement may result in the Debtor's subsidiary operating company, GC Services, or other affiliates needing to seek chapter 11 protection. A chapter 11 filing by GC Services could significantly and detrimentally impact GC Services' relationships with vendors, suppliers, employees, and major customers.

### 5. Conversion to Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Article XIII hereof, as well as the Liquidation Analysis attached hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would likely have on the recoveries of holders of Claims and Interests.

### B. Additional Factors Affecting Value of New Holdco

### 1. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Projections and feasibility analysis, and the variation may be material.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### C.    Risks Relating to Company's Business and Financial Condition

#### 1.    The Reorganized Company May Not Be Able to Generate Sufficient Cash to Service All of Its Indebtedness

The Reorganized Company's ability to make scheduled payments on, or refinance its debt obligations, depends on the Reorganized Company's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Company's control.  The Reorganized Company may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Company to pay the principal, premium, if any, and interest on its indebtedness, including, without limitation, potential borrowings under the Exit ABL Facility upon emergence.

#### 2.    The Company Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Case

For the duration of the Chapter 11 Case, the Company's ability to operate, develop, and execute a business plan, and continue as a going concern, may be subject to the risks and uncertainties associated with the Debtor's status as a chapter 11 debtor.  These risks include the following: (a) ability of the Debtor to confirm and consummate the restructuring transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Case from time to time; (c) ability of GC Services to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability of GC Services to maintain contracts that are critical to operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Case  to a chapter 7 proceeding; and (f) the actions and decisions of the Debtor's creditors and other third parties who have interests in the Chapter 11 Case that may be inconsistent with the Debtor's plans.

These risks and uncertainties with the Debtor's Chapter 11 Case could affect GC Services' business and operations in various ways.  For example, negative events associated with the Chapter 11 Case could adversely affect GC Services' relationships with suppliers, vendors, service providers, customers, employees, and other third parties, which in turn could adversely affect GC Services' operations and financial condition, which effects would be felt by the Debtor.  Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

#### 3.    The Debtor's Operating in Bankruptcy for a Long Period of Time May Harm GC Services' Business

The Debtor's future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period under Bankruptcy Court protection could have a material adverse effect on GC Services' business, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Case continue,

senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on the business operations at GC Services. A prolonged period in chapter 11 also may make it more difficult to retain management and other key personnel necessary to the success and growth of the business. In addition, the longer the proceedings related to the Chapter 11 Case continue, the more likely it is that customers and suppliers will lose confidence in the Company's ability to reorganize successfully and will seek to establish alternative commercial relationships.

Furthermore, the Debtor cannot predict the ultimate outcome for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Company's operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company whose affiliate recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

The Projections referenced in Section VI are based on assumptions that are an integral part of the projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Company, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Company and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Company's operations. These variations may be material and may adversely affect the value of the Reorganized Company and the ability of New Holdco to make payments with respect to its indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

If the Debtor emerges from the Chapter 11 Case, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization. The Debtor also may be required to adopt fresh start accounting, in which case its assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Company's consolidated balance sheets. The Company's financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Company with the assistance of its advisors. There can be no assurances that the business plan will not change, perhaps materially, as a result of decisions that the board of managers may make after fully evaluating the strategic direction of the Company and its business plan.

### 5. The Company's Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Company's operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws and certain regulatory and licensing requirements. The Company may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Company to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Company.

### 6. The Reorganized Debtor May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Case

It is possible that New Holdco, as the successor to the Debtor, may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Company's financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that New Holdco, New Holdco Sub, or any other Non-Debtor GCS Party, may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Company's business and financial stability could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Company's Operations

As detailed herein, the Debtor is a holding company and does not have any operations, nor does the Debtor employ any employees. However, the Debtor's subsidiary operating company, GC Services, is dependent on a relatively small group of key management personnel and a skilled employee base. GC Services has experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel can be significant, GC Services may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect GC Services' ability to operate the business. A loss of key personnel or material erosion of employee morale could have a material adverse effect on GC Services' ability to meet expectations, thereby adversely affecting GC Services' business and the results of operations.

### 8. Operations May be Impacted by the Continuing COVID-19 Pandemic

The continued spread of COVID-19 could have a significant impact on GC Services' business, including in the context of consumer demand for the GC Services' services. On a macro level, this pandemic could dampen global growth and ultimately lead to an economic recession. Such a scenario would negatively impact the financial performance. In addition, government lockdowns and employee infections could both negatively affect financial performance.

The volume and quality of consumer debt, student loan and unpaid government tax fee delinquencies may decline as a result of COVID-19, which would significantly impact GC Services' Accounts Receivable Management segment. In particular, government restrictions on

consumer and student loan debt collection activity may negatively impact the Company's operating environment and projected financial performance.

A COVID-19 or COVID-19 variant outbreak at a site may lead to a temporary site shut down, and as a result, disruption to operations.

### 9. Government Stimulus Measures May Impact Ability to Hire

If there are new government stimulus measures, either through direct transfers of payments or further extensions or increases in enhanced unemployment benefits, this may lead to increased impediments to hiring or higher attrition rates due to disincentives to work.

### 10. DIP Facility

The Term DIP Facility is intended to provide liquidity to the Debtor during the pendency of the Chapter 11 Case. There can be no assurance that the Bankruptcy Court will approve the Term DIP Facility on the terms requested by the Debtor, which could endanger the funding of the Chapter 11 Case and the ability of the Plan to go effective. Moreover, if the Chapter 11 Case takes longer than expected to conclude, the Debtor may exhaust or lose access to its financing. There is no assurance that they will be able to obtain additional financing from their existing lenders or otherwise. In either such case, the liquidity necessary to administer the Chapter 11 Case may be materially impaired. Moreover, in the event the Debtor's operating subsidiaries are required to file their own chapter 11 cases, additional liquidity may be necessary to ensure the orderly functioning of the Company's business. There is no assurance the Company will be able to obtain such liquidity.

### 11. Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Company expects to have outstanding principal indebtedness of approximately $130 million, which includes amounts expected to be outstanding under the Exit Term Loan Facilities and a $30 million notional Exit ABL Facility.[15]

The Reorganized Company's ability to service its debt obligations will depend on, among other things, the Debtor's compliance with affirmative and negative covenants, and the Company's future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Company's control. The Reorganized Company may not be able to generate sufficient cash from operations to meet its debt service obligations as well as fund necessary capital expenditures. In addition, if the Reorganized Company needs to refinance its debt, obtain additional financing, or sell assets or equity, it may not be able to do so on commercially reasonable terms, if at all.

---

[15] The size and terms of the Exit ABL Facility remain subject to ongoing negotiations.

### D. Factors Relating to Securities to Be Issued Under Plan, Generally

#### 1. No Current Public Market for Securities

There is currently no market for the New Holdco Common Equity, New Holdco Senior Preferred Equity, New Holdco Junior Preferred Equity, or New Midco Equity, and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Company is under no obligation to list any securities on any national securities exchange. The New Holdco Common Equity, New Holdco Senior Preferred Equity, New Holdco Junior Preferred Equity, and New Midco Equity will not be issued through the Depository Trust Company. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Company. In addition, holders of the New Holdco Equity will be subject to certain restrictions in the LLC Agreement, which may include restrictions on the ability of a holder to transfer its shares, as well as other limitations associated with such securities. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2. Potential Dilution

The ownership percentage represented by the New Holdco Common Equity, New Holdco Senior Preferred Equity, New Holdco Junior Preferred Equity, and New Midco Equity distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including the potential for conversion of the New Holdco Preferred Equity.

In the future, similar to all companies, additional equity financings or other share issuances by New Holdco could adversely affect the value of the issuable securities upon such conversion. The amount and dilutive effect of any of the foregoing could be material.

### E. Risks Related to Investment in Exit Term Loan Facilities

#### 1. Insufficient Cash Flow to Meet Debt Obligations

As discussed above, the Reorganized Company's earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Company's future cash flow may be insufficient to meet the Reorganized Company's debt obligations and commitments. Any insufficiency could negatively impact the Reorganized Company's business. A range of economic, competitive, business, and industry factors will affect the Reorganized Company's future financial performance and, as a result, its ability to generate cash flow from operations and to pay its debt. Many of these factors are beyond the Reorganized Company's control.

If the Reorganized Company does not generate enough cash flow from operations to satisfy its debt obligations, it may have to undertake alternative financing plans, such as:

- Refinancing or restructuring debt;

- Selling assets;

- Reducing or delaying capital investments; or

- Seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Company to meet its debt obligations. An inability to generate sufficient cash flow to satisfy its debt obligations or to obtain alternative financing could materially and adversely affect (i) the Reorganized Company's ability to make payments on the Exit Term Loan Facilities and (ii) its business, financial condition, results of operations, and prospects. Moreover, to the extent that the Reorganized Company's cash flow only minimally exceeds its debt service obligations under the Exit Term Loan Facilities and Exit ABL Facility and other post-Restructuring debt, the value of the equity of New Holdco may be diminished.

### 2. Defects in Collateral Securing Exit Term Loan Facilities

The indebtedness under the Exit Term Loan Facilities will be secured on a first-priority basis by security interests in the collateral. Such collateral securing the Exit Term Loan Facilities may be subject to exceptions, permitted encumbrances, and liens. Further, neither the Debtor nor the Non-Debtor GCS Parties have conducted appraisals of any of the assets constituting the collateral to determine if the value of the collateral upon foreclosure or liquidation equals or exceeds the amount of the Exit Term Loan Facilities or such other obligation secured by the collateral. Accordingly, it cannot be assured that the remaining proceeds from a sale of the collateral would be sufficient to repay holders of the debt under the Exit Term Loan Facilities all amounts owed under them. The fair market value of the collateral is subject to fluctuations based on factors that include, among others, the ability to sell collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Company's failure to implement its business strategy, and similar factors. The amount received upon a sale of collateral would be dependent on numerous factors, including, but not limited to, the actual fair market value of the collateral at such time, and the timing and manner of the sale. By its nature, portions of the collateral may be illiquid and may have no readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the collateral will be sufficient to pay the Reorganized Company's obligations under the Exit Term Loan Facilities, in full or at all. There can also be no assurance that the collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain. Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Exit Term Loan Facilities.

### 3.   Failure to Perfect Security Interests in Collateral

The failure to properly perfect liens on the collateral could adversely affect the collateral agent's ability to enforce its rights with respect to the collateral for the benefit of the holders of the Exit Term Loan Facilities and the Exit ABL Facility.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the collateral agent will monitor, or that New Holdco will inform the trustee or the collateral agent of, the future acquisition of such property and rights that constitute collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired collateral.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the loans against third parties.

### 4.   Casualty Risk of Collateral

The Reorganized Company will be obligated by the Exit Term Loan Facilities and the Exit ABL Facility to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities.  There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part.  As a result, it is possible that the insurance proceeds will not compensate the Reorganized Company fully for its losses.  If there is a total or partial loss of any of the pledged collateral or significant disruption to business operations, any insurance proceeds received may be insufficient to satisfy the secured obligations of the Reorganized Company, including the Exit Term Loan Facilities.

### F.   Risks Related to an Investment in (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, and (iii) New Holdco Junior Preferred Equity

### 1.   Significant Holders

Certain holders of Allowed Existing Term Loan Claims are expected to acquire a significant ownership interest in the (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, and (iii) New Holdco Junior Preferred Equity (in each case with respect to GS, through GS' 100% ownership of the New Midco Equity) pursuant to the Plan.  Such ownership concentration will result in certain holders being in a position to influence the outcome of certain actions requiring member approval, including the election of managers, without the approval of other members.  This concentration of ownership could also facilitate or hinder a negotiated change of control of New Holdco and, consequently, have an impact upon the value of the (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, and the (iii) the New Holdco Junior Preferred Equity.

In any subsequent liquidation, dissolution, or winding up of New Holdco, (i) the New Holdco Common Equity, unless converted into unsecured debt in accordance with their terms, the (ii) New Holdco Senior Preferred Equity, and the (iii) New Holdco Junior Preferred Equity would rank below all debt claims against New Holdco.  As a result, holders of the (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, and (iii) New Holdco Junior Preferred Equity will not be entitled to receive any payment or other distribution of assets upon

the liquidation, dissolution, or winding up of New Holdco until after all New Holdco's obligations to its debt holders have been satisfied.

### 2. No Intention to Pay Dividends

Following the Effective Date, except for permitted tax distributions, New Holdco does not anticipate paying any dividends on the (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, or (iii) New Holdco Junior Preferred Equity as it expects to retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in (i) New Holdco Common Equity, (ii) New Holdco Senior Preferred Equity, or the (iii) New Holdco Junior Preferred Equity could depend upon, among other things, the future appreciation in the value of the Reorganized Company.

### G. Additional Factors

### 1. Debtor Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

### 2. Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.  No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor, or the Company more generally, or holders of Claims or Interests.

### 6.  Certain Tax Consequences

For a discussion of certain tax considerations to the Company and certain holders of Claims in connection with the implementation of the Plan, see Article IX hereof.

## XI.
## VOTING PROCEDURES AND REQUIREMENTS

### A.  Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

**THE ONLY CLASS OF CLAIMS THAT IS IMPAIRED AND ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN IS CLASS 3—EXISTING TERM LOAN CLAIMS (THE "VOTING CLASS" OR "VOTING CLAIMS").**

The solicitation of votes on the Plan with respect to the Existing Term Loan Claims prior to the Petition Date is being made pursuant to Section 4(a)(2) and/or Regulation D of the Securities Act

and only from holders of such Claims who are eligible Existing Term Lenders (*i.e.*, Accredited Investors as defined in Rule 501 of the Securities Act) (collectively, "**Eligible Holders**").

## B.   <u>Voting Deadline</u>

Before voting to accept or reject the Plan, each Eligible Holder of an Allowed Existing Term Loan Claim as of the Voting Record Date should carefully review the Plan attached hereto as <u>**Exhibit A**</u>.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots will be provided for holders of Voting Claims as of the Voting Record Date (i.e., October 15, 2021) to vote to accept or reject the Plan (a "**Ballot**").  Because Classes 1, 2, 4, 5, and 6 are unimpaired and deemed to accept, and Class 7 is impaired but deemed to reject, only Class 3 is entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

The Debtor has engaged Bankruptcy Management Solutions, Inc. (d/b/a Stretto) as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

THE VOTING DEADLINE IS 4:00 P.M., PREVAILING CENTRAL TIME, ON NOVEMBER 1, 2021, UNLESS EXTENDED BY THE DEBTOR (THE "**VOTING DEADLINE**").

<u>CLASS 3</u>:  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT THROUGH SUBMISSION ON THE E-VOTING PLATFORM ON OR BEFORE THE VOTING DEADLINE.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTOR, IN ITS SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS.  THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.  AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

## C.   <u>Voting Procedures</u>

The Debtor is providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record

holders of the Existing Term Loan Claims.  Any Eligible Holder of Existing Term Loan Claims who has not received a Ballot should contact the Voting Agent.  The Existing Term Loan Facility Agent will not vote on behalf of its respective holders.  Each Eligible Holder of the Existing Term Loan Claims must submit its own Ballot.

Holders of Existing Term Loan Claims should provide all of the information requested by the Ballot.  Holders of Existing Term Loan Claims should complete and return all Ballots received to the Voting Agent using the online ballot submission platform, which can be accessed at https://cases.stretto.com/GCS.

### 1.  Miscellaneous

All Ballots must be signed by the holder of record of the Existing Term Loan Claims, as applicable, or any person who has obtained a properly completed Ballot proxy from the record holder of the Existing Term Loan Claims, as applicable, on such date.  For purposes of voting to accept or reject the Plan, the Eligible Holders of the Existing Term Loan Claims will be deemed to be the "holders" of the claims represented by such Existing Term Loan Claims.  If you return more than one Ballot voting different Existing Term Loan Claims, the Ballots for a particular class are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.  If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot.  If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtor may, in its sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 2.  Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, and 10.7 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

### 3.  Change of Vote

Subject in all respects to the commitments set forth in the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent

prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

### D.   Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtor, as applicable, in their sole discretion, which determination will be final and binding.  The Debtor reserves the right to reject any and all Ballots submitted by any of its creditors not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, as applicable, be unlawful.  The Debtor further reserves its respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of its creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines.  Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.   Notice of Non-Voting Status

Holders in Classes 1, 2, 4, 5, and 6 are Unimpaired and deemed to accept the Plan.  Holders of Midco Equity Interests in Class 7 are impaired and deemed to reject the Plan.  Accordingly, as noted above, holders of Claims and Interests in Classes 1, 2, 4, 5, 6, and 7 will not receive a Ballot.  Holders of Claims and Interests in Classes 1, 2, 4, 5, 6, and 7 will receive a notice informing them of their non-voting status (the "**Notice of Non-Voting Status**").

### F.   Opt-Out Form

In addition to receiving a Notice of Non-Voting Status, holders of Unimpaired Claims will receive an Opt-Out Form.  To the extent a holder of an Unimpaired Claim wishes to elect to opt-out of the releases contemplated by the Plan, such holder must return the Opt-Out Form, with the box checked indicating such holder is electing to opt-out of the releases, to the Voting Agent **before 4:00 p.m. (Prevailing Central Time) on November 16, 2021**.

### XII.
### CONFIRMATION OF PLAN

### A.   Confirmation Hearing

On the Petition Date, the Debtor intends to file a motion requesting, among other things, that the Bankruptcy Court (i) approve this Disclosure Statement, (ii) schedule a hearing (the "**Confirmation Hearing**") to consider the adequacy of this Disclosure Statement and confirmation of the Plan and (iii) approve of the solicitation procedures with respect to the Plan.

The Debtor intends to request that the Bankruptcy Court schedule the Confirmation Hearing for November 22, 2021 at 2:00 p.m. (Prevailing Central Time) or as soon as practicable thereafter as the Bankruptcy Court's schedule permits.

A notice of the Confirmation Hearing will be published and mailed to all known or potential holders of Claims and Interests at least twenty-eight (28) days before the date by which objections must be filed with the Bankruptcy Court.

### B. <u>Objections to Confirmation</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor's estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Case, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)    The Debtor at:

       ORG GC Midco, LLC
       6330 Gulfton Street
       Houston, Texas 77081
       Attn:   Mark Schordock, Chief Executive Officer;
                 Michael Jones, Chief Financial Officer; and
                 Brad Batig, Chief Compliance Officer and General Counsel
       Email: mark.schordock@gcserv.com
              michael.jones@gcserv.com
              brad.batig@gcserv.com

(b)    Office of the U.S. Trustee at:

       Office of the U.S. Trustee for the Southern District of Texas
       515 Rusk Street, Suite 3516
       Houston, Texas 77002
       Attn:   [•]

(c)    Counsel to the Debtor at:

       Weil, Gotshal & Manges LLP
       700 Louisiana Street, Suite 1700
       Houston, Texas 77002
       Attn:   Alfredo R. Pérez, Esq.
       Email: alfredo.perez@weil.com

            - and-

       Weil, Gotshal & Manges LLP
       767 Fifth Avenue
       New York, New York 10153
       Attn:   Sunny Singh, Esq.
                 Katherine Lewis, Esq.
       Email: sunny.singh@weil.com
              Katherine.lewis@weil.com

(d)    Counsel to BSP at:

       Stroock & Stroock & Lavan LLP
       180 Maiden Lane
       New York, NY 10038-4982
       Attn:   Jayme T. Goldstein, Esq.
                 Daniel P. Ginsberg, Esq.
                 Joanne Lau, Esq.
       Email: jgoldstein@stroock.com

dginsberg@stroock.com
jlau@stroock.com

(e)   Counsel to GS at:

King & Spalding LLP
1185 Avenue of Americas, 34th Floor
New York, NY 10036
Attn:   W. Austin Jowers, Esq.
        Michael R. Handler, Esq.
Email: ajowers@kslaw.com
        mhandler@kslaw.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**C.**   **Requirements for Confirmation of Plan**

**1.   Requirements of Section 1129(a) of Bankruptcy Code**

(a)   General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)   the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)   the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(iii)   the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)   any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)   the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of New Holdco, and the appointment to, or

continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtor has disclosed the identity of any insider who will be employed or retained by the Reorganized Company, and the nature of any compensation for such insider;

(vi) with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii) except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan; and

(xi) all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b) Best Interests Test

As noted above, with respect to each impaired class of claims and interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such

holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and interests under the plan.

The Debtor believes that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit B**.

The Debtor believes that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor. The Liquidation Analysis provided in **Exhibit B** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)     Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared the Projections provided in Section VII hereof. Based upon such Projections, the Debtor believes it will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Section X hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)     Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtor will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of

non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

**2.    Additional Requirements for Non-Consensual Confirmation**

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

(a)    Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtor believes the Plan satisfies the "unfair discrimination" test.  Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtor believes that the Plan satisfies the "fair and equitable" test with respect to Midco Equity Interests, the only impaired class that is deemed to reject the Plan.

With respect to a class of equity interests, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to any dissenting class of equity interests will not receive any property under the plan of reorganization.

Pursuant to the Plan, all Midco Equity Interests will be cancelled without further action by any party or order of the Bankruptcy Court, released, extinguished and shall be of no further force and effect.  As detailed in the Liquidation Analysis, holders of Midco Equity Interests would not receive any recovery in a liquidation scenario.  There is no junior interest holder receiving property under the Plan.

Accordingly, the Plan meets the "fair and equitable" test with respect to the holders of Midco Equity Interests.

The Debtor does not intend to proceed with non-consensual confirmation of the Plan in the event Class 3 (Existing Term Loan Claims) votes to reject the Plan. As discussed above, pursuant to the Restructuring Support Agreement, 100% of holders of Existing Term Loan Claims are required, subject to the terms and conditions of the Restructuring Support Agreement, to vote in favor of the Plan.

**XIII.**
**ALTERNATIVES TO CONFIRMATION AND**
**CONSUMMATION OF PLAN**

The Debtor has evaluated several alternatives to the Plan. After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.     Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of its assets. The Debtor, however, submits that the Plan, as described herein, enables its creditors to realize the most value under the circumstances.

### B.     Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtor could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell its assets under section 363 of the Bankruptcy Code. Holders of Claims in Classes 2, 3, and 4 would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtor's assets held by holders of Claims in Classes 2, 3 and 4 would attach to the proceeds of any sale of the Debtor's assets. After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Classes 1, 5, 6, and 7. Upon analysis and consideration of this alternative, the Debtor does not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan.

### C.     Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of

48

Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **<u>Exhibit B.</u>**

The Debtor believes that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other reasons, the delay resulting from the conversion of the case and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtor's Chapter 11 Case.

## XIV.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtor believes the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 to vote in favor thereof.

Dated: October 16, 2021
       Houston, Texas


**ORG GC MIDCO, LLC**


By:_____
    Name:  Michael Jones
    Title:   Chief Financial Officer

*Signature Page for Disclosure Statement for Prepackaged Plan of Reorganization of ORG GC Midco, LLC*

## EXHIBIT A

PLAN

[**OMITTED**]

**EXHIBIT B**

LIQUIDATION ANALYSIS

NOTHING CONTAINED IN THE FOLLOWING LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION OR ALLOWANCE OF THE DEBTOR (OR ANY OTHER PARTY). THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS OR ALLOWED INTERESTS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

Under the "best interests" of creditors test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds that a chapter 7 trustee would generate if the Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution that each non-accepting holder of a Claim or Interest would receive from the net estimated liquidation proceeds under the priority scheme dictated in chapter 7; and (3) compare each holder's estimated recovery under liquidation to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated. To demonstrate that the Plan satisfies the best interests test, the Debtor has conducted a hypothetical liquidation analysis (the "**Liquidation Analysis**").

The Debtor believes that the assumptions and conclusions set forth herein are fair and represent management's best judgment regarding the results of a liquidation of the Debtor under chapter 7 of the Bankruptcy Code taking into account various factors including the negative impact on values arising from a liquidation sale of the Debtor's assets. This Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and holders of Impaired Claims or Interests in making this determination and should not be used for any other purpose. Pursuant to the Plan and as set out in the Disclosure Statement, only ORG GC Midco, LLC – the intermediate holding company for the enterprise – has commenced a Chapter 11 Case. The Debtor has no operations and its primary assets are its Interests in its direct and indirect subsidiaries, the Non-Debtor GCS Parties (such Interests, the "**Subsidiary Equity Interests**"). Accordingly, in a chapter 7 liquidation scenario, the only distributable value available to holders of Claims against or Interests in the Debtor would be the value, if any, of the Subsidiary Equity Interests.

In the event the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code, the Debtor assumes that the Existing Term Lenders and the Existing ABL Lenders, will

exercise remedies and foreclose upon the assets and property of the Non-Debtor GCS Parties, substantially all of which assets and property are subject to prepetition liens in favor of the Existing Term Lenders and the Existing ABL Lenders. The Debtor believes that following such foreclosure on the Non-Debtor GCS Parties' assets and property, there would be no value available for distribution to holders of Subsidiary Equity Interests (i.e., the Debtor). Accordingly, there would be no distributable value available to any holders of Claims against or Interests in the Debtor.

Based on the foregoing, the Debtor believes that the value of any distributions to each Class of Allowed Claims and Interests in a chapter 7 liquidation scenario would be equal to, or less than, the value of distributions provided to each Class under the Plan, and, therefore, that the Plan satisfies the "best interests" test.

THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. NEITHER THE DEBTOR NOR ITS ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTOR WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS

## Exhibit C

**Form of LLC Agreement**

*Draft 10/16/21*

**[NEWCO]**

**LIMITED LIABILITY COMPANY AGREEMENT**

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION ............................................ 6

    1.1    Certain Definitions ................................................................................... 6
    1.2    Rules of Construction .............................................................................. 22

ARTICLE 2 GENERAL ....................................................................................................... 23

    2.1    Limited Liability Company Agreement .................................................. 23
    2.2    Name ....................................................................................................... 23
    2.3    Term ....................................................................................................... 23
    2.4    Business Offices ..................................................................................... 23
    2.5    Registered Office and Agent .................................................................. 23
    2.6    Qualification in Other Jurisdictions ...................................................... 23
    2.7    No State-Law Partnership ...................................................................... 24

ARTICLE 3 PURPOSE OF THE BUSINESS ...................................................................... 24

ARTICLE 4 MEMBERS; MEETINGS ................................................................................. 24

    4.1    Members ................................................................................................. 24
    4.2    Substituted Members and Additional Members ..................................... 24
    4.3    Member Meetings ................................................................................... 25
    4.4    Authority of the Members ...................................................................... 28
    4.5    Limitation on Liability .......................................................................... 28

ARTICLE 5 CAPITAL STRUCTURE ................................................................................. 29

    5.1    Units ....................................................................................................... 29
    5.2    Issuance of Units ................................................................................... 29
    5.3    Certificated Units ................................................................................... 30
    5.4    Voting Rights ......................................................................................... 30
    5.5    Record ................................................................................................... 31
    5.6    No Appraisal Rights ............................................................................. 31
    5.7    Lost, Destroyed or Mutilated Certificates ............................................ 31
    5.8    Series A Preferred Units ....................................................................... 31
    5.9    Series B Preferred Units ....................................................................... 32
    5.10   Preferred Unit Consent Rights .............................................................. 33
    5.11   Redemption of Preferred Units ............................................................. 35

ARTICLE 6 MANAGEMENT; OPERATION OF THE COMPANY BUSINESS ................... 39

    6.1    Management of the Company ................................................................ 39
    6.2    Board ..................................................................................................... 40
    6.3    Regular Meetings ................................................................................... 42
    6.4    Special Meetings ................................................................................... 42
    6.5    Place of Meetings .................................................................................. 42

i

| | | |
|---|---|---|
| 6.6 | Notice of Meetings | 42 |
| 6.7 | Meetings by Remote Communication | 42 |
| 6.8 | Quorum; Acts of Managers | 43 |
| 6.9 | Organization, Agenda and Procedures | 43 |
| 6.10 | Waiver of Notice | 43 |
| 6.11 | Managers' Action By Written Consent | 43 |
| 6.12 | Removal | 44 |
| 6.13 | Resignation | 44 |
| 6.14 | Vacancies | 44 |
| 6.15 | Committees | 44 |
| 6.16 | Compensation of Managers | 44 |
| 6.17 | Subsidiary Governing Bodies | 45 |

ARTICLE 7 OFFICERS; POWERS OF OFFICERS. ................................................. 45

| | | |
|---|---|---|
| 7.1 | Election and Tenure | 45 |
| 7.2 | Resignation, Removal and Vacancies | 45 |
| 7.3 | Chairman | 46 |
| 7.4 | Chief Executive Officer | 46 |
| 7.5 | Chief Financial Officer | 46 |
| 7.6 | Vice Presidents | 46 |
| 7.7 | Secretary | 46 |
| 7.8 | Treasurer | 46 |
| 7.9 | Assistant Secretaries and Assistant Treasurers | 47 |
| 7.10 | Salaries | 47 |
| 7.11 | Borrowing | 47 |
| 7.12 | Checks and Endorsements | 47 |
| 7.13 | Deposits | 47 |
| 7.14 | Proxies | 47 |

ARTICLE 8 EXCULPATION AND INDEMNIFICATION ...................................... 48

| | | |
|---|---|---|
| 8.1 | Exculpation | 48 |
| 8.2 | Indemnification | 49 |
| 8.3 | No Member Liability | 50 |
| 8.4 | Settlements | 50 |
| 8.5 | Business Opportunities; Fiduciary Duties | 50 |
| 8.6 | Subrogation | 53 |
| 8.7 | Insurance | 53 |
| 8.8 | Amendments | 53 |

ARTICLE 9 TRANSFERS ............................................................................ 54

| | | |
|---|---|---|
| 9.1 | Restrictions on Transfers | 54 |
| 9.2 | Transfer Agents and Registrars; Regulations | 58 |
| 9.3 | Drag-Along Transactions | 59 |
| 9.4 | Appointment of Purchaser Representative | 65 |
| 9.5 | [Intentionally Deleted] | 65 |
| 9.6 | Preemptive Rights | 65 |

9.7     [Intentionally Deleted] ..................................................................................... 67
9.8     Termination of Article 9 ................................................................................... 67
9.9     Certain GS Investor Transfers .......................................................................... 67

ARTICLE 10 FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS ..................................... 68

10.1    Fiscal Year ........................................................................................................ 68
10.2    Books and Records ............................................................................................ 68
10.3    Tax Information ................................................................................................. 68
10.4    Tax Elections and Accounting .......................................................................... 69
10.5    Company Representative ................................................................................... 69
10.6    Required Records .............................................................................................. 70
10.7    Audits of Books and Accounts ......................................................................... 70
10.8    Tax Matters ....................................................................................................... 71
10.9    ORG GC Midco Tax Matters ............................................................................ 71

ARTICLE 11 CAPITAL ........................................................................................................ 72

11.1    Capital Contributions ....................................................................................... 72
11.2    No Right to Return of Contribution .................................................................. 72
11.3    Additional Capital Contributions ..................................................................... 72
11.4    Loans to the Company; No Interest on Capital ................................................. 72
11.5    Creditor's Interest in the Company ................................................................... 73
11.6    Capital Accounts .............................................................................................. 73
11.7    Return of Capital .............................................................................................. 74

ARTICLE 12 ALLOCATION OF PROFITS AND LOSSES .................................................. 74

12.1    Profits and Losses ............................................................................................ 74
12.2    Special Allocations .......................................................................................... 74
12.3    Curative Allocations ........................................................................................ 76
12.4    Limitation on Allocation of Losses .................................................................. 76
12.5    Other Allocation Rules .................................................................................... 76
12.6    Tax Allocations: Code Section 704(c) ............................................................. 77

ARTICLE 13 DISTRIBUTIONS ........................................................................................... 77

13.1    Tax Distributions ............................................................................................. 77
13.2    Other Distributions .......................................................................................... 78
13.3    Limitations on Distributions ............................................................................ 79
13.4    No Other Distributions ..................................................................................... 79
13.5    Withholding Tax ............................................................................................... 80

ARTICLE 14 WITHDRAWALS; ACTION FOR PARTITION ............................................. 81

14.1    Waiver of Partition ........................................................................................... 81
14.2    Covenant Not to Withdraw or Dissolve ........................................................... 81

ARTICLE 15 DISSOLUTION AND LIQUIDATION ........................................................... 81

15.1    Events Causing Dissolution ............................................................................. 81

15.2    Liquidation and Winding Up ................................................................ 82
15.3    No Deficit Restoration Obligation ......................................................... 82

ARTICLE 16 AMENDMENTS ............................................................................ 82

16.1    Amendments ........................................................................................ 82

ARTICLE 17 INFORMATION RIGHTS ............................................................. 84

17.1    Information Rights ............................................................................... 84
17.2    Delivery of Information ....................................................................... 85
17.3    Termination of Information Rights ...................................................... 85
17.4    Consumer Compliance Reporting ........................................................ 85

ARTICLE 18 REPRESENTATIONS AND WARRANTIES OF THE MEMBERS ............... 86

18.1    Representations and Warranties of the Members ................................. 86

ARTICLE 19 MISCELLANEOUS ...................................................................... 88

19.1    Entire Agreement ................................................................................ 88
19.2    Counterparts ........................................................................................ 88
19.3    Severability ......................................................................................... 88
19.4    Successors and Assigns........................................................................ 89
19.5    Notices ................................................................................................ 89
19.6    Headings .............................................................................................. 89
19.7    GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE
          OF PROCESS; WAIVER OF JURY TRIAL .................................... 89
19.8    No Third Party Beneficiaries ............................................................... 90
19.9    Deemed Execution; Effective Date....................................................... 90
19.10   Additional Actions and Documents ..................................................... 90
19.11   Injunctive Relief ................................................................................. 90
19.12   Assignment ......................................................................................... 90
19.13   Spousal Consent .................................................................................. 91
19.14   Regulatory Disclosure ......................................................................... 91
19.15   FCPA Matters ...................................................................................... 91
19.16   Regulatory Matters.............................................................................. 92
19.17   Certain Limitations; Investment Banking Services ............................. 92
19.18   Use of Logos ....................................................................................... 93
19.19   Non-Promotion .................................................................................... 93
19.20   Non-Impairment .................................................................................. 93
19.21   Reduction of Rights ............................................................................ 94

ARTICLE 20 CONFIDENTIALITY .................................................................... 94

20.1    Confidentiality .................................................................................... 94
20.2    Permitted Disclosure of Confidential Information ............................... 94
20.3    United States Tax Confidentiality Waiver ........................................... 96

ARTICLE 21 IPO; CORPORATE CONVERSION; SALE COVENANT ................. 96

iv

21.1    IPO Approval ................................................................................................ 96
21.2    Required Actions ........................................................................................... 97
21.3    Registration Rights Agreement ..................................................................... 97
21.4    Sale Covenant ............................................................................................... 97
21.5    Deemed Underwriter ..................................................................................... 97

SCHEDULES AND EXHIBITS

| Schedule A | Members |
|------------|---------|
| Schedule B | Initial Officers |
| Schedule C | Initial Board |

| Exhibit A | Form of Joinder Agreement |
|-----------|---------------------------|
| Exhibit B | Transferee Confidentiality Agreement |

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## [NEWCO]

This LIMITED LIABILITY COMPANY AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, together with all schedules, exhibits and annexes hereto, this "**Agreement**") of [NEWCO], LLC (the "**Company**"), is made as of [●], 2021, by and among (a) the Company and (b) the Persons listed on Schedule A attached hereto and any other Person who may become a party hereto by executing a Joinder Agreement (a "**Joinder Agreement**") in the form of Exhibit A attached hereto (each, a "**Member**" and, collectively, the "**Members**").

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, *et seq.* (as amended from time to time, the "**Act**") by the filing of a Certificate of Formation of the Company (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Certificate of Formation**") with the Secretary of State of the State of Delaware pursuant to Section 18-201 of the Act on [●], 2021; and

WHEREAS, the Members desire to enter into this Agreement in order to provide for the conduct of the business and affairs of the Company and the rights and obligations of the Members with respect thereto.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and other obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Certain Definitions.  As used herein:

"**Accredited Investor**" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

"**Adjusted Capital Account**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the adjustments set forth herein and the following adjustments:

(a)    credit to such Capital Account any amounts which such Member is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or pursuant to the penultimate sentence of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    debit to such Capital Account the items described in paragraphs (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

6

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations to the extent relevant thereto and shall be interpreted consistently therewith.

"**Affiliate**" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "**control**" (including, with its correlative meanings, "**controlling**", "**controlled by**" and "**under common control with**") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

"**Affiliate Transaction**" means any transaction between (a) the Company or any of its Subsidiaries, on the one hand, and (b)(i) any Member or Manager, (ii) any Affiliate of a Member or Manager (other than (x) the Company or its Subsidiaries, (y) any Person that is an Affiliate of any Member or Manager as a result of such Member or Manager, any Affiliate of such Member or Manager, or any employee, officer, manager or director of such Member, Manager or Affiliate, serving on the board of directors (or comparable governing body) of such Person and (z) any portfolio companies of any Related Fund of any of the Members, (with respect to transactions described in this clause (z)), on terms no less favorable to the Company or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof) or (iii) any general partner, managing member, manager, officer or director of any of the Persons described in <u>clause (b)(i)</u> or <u>clause (b)(ii)</u> of this definition (an "**Interested Investor**"), on the other hand.

"**Allocation Year**" means the Fiscal Year or any portion of the Fiscal Year for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss, or deduction pursuant to <u>Article 12</u>.

"**Applicable Tax Rate**" means, for any calendar year, the sum of the highest marginal federal, state and local tax rates (including employment, net investment income and related taxes) applicable to income of the Company allocated to an individual or a corporation (whichever rate is higher) resident in [New York, New York].

"**BSP Members**" means, collectively, (a) [Benefit Street Partners, L.P.], so long as [Benefit Street Partners, L.P.] owns or holds Units, and (b) any Affiliates of [Benefit Street Partners, L.P.] that own or hold Units, so long as any such Affiliate remains an Affiliate of [Benefit Street Partners, L.P.]  Any consent, approval, decision (including any decision as to whether a Person, action or thing is acceptable), determination, designation, identification, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the BSP Members pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the BSP Members that own or hold a majority of the Series B Preferred Units or Class A Common Units, in each case as the context requires, owned or held by all of the BSP Members at such time.  For the avoidance of doubt, a Person that does not own or hold Units as of any time of determination shall not constitute a BSP Member as of such time.

"**Business Day**" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

"**Capital Account**" means the capital account maintained for each Member pursuant to Section 11.6, as the same may be credited or debited in accordance with the terms hereof.

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed, or deemed contributed, by such Member to the Company (net of any liabilities secured by such property that the Company is considered to assume or take subject to under Code Section 752), including any initial capital contribution and additional capital contribution of such Member under Section 11.1.

"**Chairman**" means, as of any time of determination, the Chairman of the Board as of such time.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company Minimum Gain**" means "partnership minimum gain" as set forth in Treasury Regulations Section 1.704-2(d).

"**Competitor**" means any Person that is engaged in a business or any other activity that is competitive with any business or other activity of the Company or any of its Subsidiaries, as reasonably determined by the Board; provided, that, notwithstanding the foregoing, in no event shall a private equity fund or other financial investor be deemed to be a Competitor if such private equity fund or other financial investor establishes and maintains with reasonable diligence and in good faith an Ethical Wall between such private equity fund or other financial investor, on the one hand, and any Competitor of which such private equity fund or other financial investor is an Affiliate or Related Fund, on the other hand.

"**Covered Person**" means (a) each current and former Member, (b) each Affiliate of any current or former Member, (c) each current and former Company Representative and each Affiliate of any current or former Company Representative, (d) each Person serving or having served as a Manager or a member of any committee of the Board, (e) each Person serving or having served as an officer of the Company or any of its Subsidiaries, and (f) each Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling Person, employee, consultant, counsel, representative or agent of a current or former Member, a current or former Company Representative, or any Affiliate of a current or former Member or Company Representative (other than the Company or any of its Subsidiaries), in each of the foregoing cases, in any such Person's capacity as such.

"**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, (i) where such difference is being eliminated by use of the "remedial method" pursuant to Treasury Regulation Section 1.704-3(d), Depreciation shall be the amount of book basis recovered for such Allocation Year under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2) and (ii) where such difference is being eliminated by use of any other method, Depreciation shall be an amount which bears the

same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis.  If any asset shall have a zero adjusted basis for federal income tax purposes, Depreciation shall be determined utilizing any reasonable method determined by the Board.

"**DIP Obligations**" means the Obligations (as defined in the DIP Credit Agreement) outstanding under that certain [Credit Agreement, dated [•], 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**"), by and among ORG GC Midco, LLC, as borrower, each of the guarantors party thereto, Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent thereunder, and the lenders party thereto from time to time].

"**Distribution**" means any distribution by the Company to any Member (in its capacity as such), including distributions payable in cash, property or securities and including by means of distribution, redemption, repurchase or liquidation, except that none of the following shall be a Distribution: (a) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of all outstanding Units of any class, and (b) any repurchases by the Company of Units from a Management Holder following termination of his or her employment with the Company or any of its Subsidiaries or termination of his or her service as a Manager or any member of any Subsidiary Governing Body.

"**Drag-Along Transaction**" means a bona fide Sale Transaction (whether or not a Member vote is required) to or with any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) other than the Selling Members or any Affiliates thereof (a "**Third Party Purchaser**") that satisfies each of the applicable Drag-Along Requirements set forth in Section 9.3(a).

"**Emergence**" means [●].[1]

"**Entity**" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"**Equity Interests**" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such Person (however designated).

"**Ethical Wall**" means reasonably effective procedures established and maintained by a Person (the "First Party") to ensure that employees or other agents (other than any third party advisor that has a professional obligation of confidentiality with respect to the First Party (provided that such First Party shall enforce such professional obligations against such third party advisor in the event of any breach thereof)) of another Person (the "Second Party"), or any Affiliate or Related Fund of the Second Party (other than the First Party), do not gain access to, or are not furnished with, confidential information of, or competitively sensitive information relating to, Holdings and its Subsidiaries that is in the possession of the First Party.

---

[1] NTD: Appropriate definition to be added.

"**Excepted Transaction**" means (a) any transaction or agreement entered into, consummated or effected on the Effective Date (including the Management Consulting Agreement) and (b) any transaction expressly permitted or required by this Agreement, including (i) any Distributions pursuant to Article 13 or Article 15, and (ii) issuances of Additional Securities in accordance with Section 9.6.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" means, with respect to any property or asset, the amount at which a willing buyer would pay to a willing seller for such property or asset in an arms' length transaction, where neither party is under any compulsion to buy or sell, and both such parties are ready, willing and able to engage in such transaction and well informed about such property or asset.  Subject to Section 9.3, the Fair Market Value shall be determined by the Board in its reasonable discretion.

"**Family Member**" means, with respect to any individual, (a) any Related Person of such individual or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

"**Fiscal Quarter**" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board or as required by the Code.

"**FMV Sale Process**" means a commercially reasonable sale process run by an Independent Financial Advisor.

"**GAAP**" means generally accepted accounting principles in effect in the United States from time to time consistently applied.

"**Goldman Members**" means, collectively, (a) ORG GC Midco, so long as ORG GC Midco owns or holds Units, and (b) any Affiliates of ORG GC Midco that own or hold Units, including Special Situations Investing Group II, LLC, so long as any such Affiliate remains an Affiliate of ORG GC Midco.  Any consent, approval, decision (including any decision as to whether a Person, action or thing is acceptable), determination, designation, identification, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the Goldman Members pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the Goldman Members that own or hold a majority of the Series A Preferred Units, Series B Preferred Units or Class A Common Units, in each case as the context requires, owned or held by all of the Goldman Members at such time.  For the avoidance of doubt, a Person that does not own or hold Units as of any time of determination shall not constitute a Goldman Member as of such time.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or

any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset;

(b)     the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross Fair Market Values as of the following times: (i) the acquisition of an interest (or additional interest) in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution to the Company or in exchange for the performance of more than a de minimis amount of services to or for the benefit of the Company; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)(1), (iv) the acquisition of an interest in the Company by any new or existing Member upon the exercise of a noncompensatory option in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(s); or (v) any other event to the extent determined by the Board to be permitted and necessary or appropriate to properly reflect Gross Asset Values in accordance with the standards set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(q); provided, however, that adjustments pursuant to clauses (i), (ii) and (iv) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     the Gross Asset Value of any Company asset distributed to a Member shall be the gross Fair Market Value of such asset on the date of distribution;

(d)     the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) (including any such adjustments pursuant to Treasury Regulation Section 1.734-2(b)(1)), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and clause (f) of the definition of Profit and Loss or Section 12.2(g); provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph (d) to the extent the adjustment pursuant to paragraph (b) hereof is made in connection with the transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraphs (a), (b), or (d), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Independent Financial Advisor**" means any financial advisor that is not an Affiliate of any Member or the Company that is acceptable to the BSP Members and the Goldman Members.

"**Independent Manager**" means any Manager who is neither (a) an employee of the Company or any of its Subsidiaries, nor (b) an employee of any of the Members or any Affiliate of any Member.

"**Initial Drag-Along Date**" means [•].[2]

"**Initial Member Group**" means either (a) the Goldman Members, or (b) the BSP Members, in each case as the context requires.

"**Insolvency Event**" means (a) the commencement by the Company or any of its Subsidiaries of any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent entity, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its indebtedness or assets, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (b) there being commenced against the Company or any of its Subsidiaries any case, proceeding or other action of a nature referred to in clause (a) above; (c) the Company or any of its Subsidiaries shall be generally unable to, or shall admit in writing its general inability to, pay its debts or obligations when due; (d) the Company or any of its Subsidiaries makes a general assignment for the benefit of its creditors or any other marshalling of assets and liabilities of the Company or any of its Subsidiaries; or (e) any liquidation, dissolution or winding up of the Company or any of its Subsidiaries, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy.

"**Interest**" means all or any part of a Member's equity, ownership, profit or other right, title and interest in the Company in such Member's capacity as a Member, including all of such Member's rights in Profits, Losses and Distributions and all of such Member's rights under this Agreement.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended.

"**IPO**" means the first underwritten public offering of the common equity securities of the Company (or any successor or Subsidiary of the Company) following the Effective Date pursuant to an effective registration statement under the Securities Act filed with the SEC.

"**Lien**" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

---

[2]NTD:  This should be the date that is 18 months after the Effective Date.

"**Liquidation Event**" means the consummation, effectiveness or occurrence of any of the following:  (a) a Sale Transaction, (b) an IPO, or (c) an Insolvency Event.

"**Management Consulting Agreement**" means that certain management consulting agreement entered into as of the Effective Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) between the Company and [BSP Entity].

"**Management Holder**" means (a) members of the Board or any of the Subsidiary Governing Bodies and (b) employees of or consultants to the Company or any of its Subsidiaries, in any such case who are selected by the Board (or any applicable committee thereof) to participate in any Management Incentive Plan.

"**Management Incentive Plan**" means any management incentive plan established by the Board to provide incentives to Management Holders in the form of equity or equity-based awards determined by the Board, as may be amended, supplemented, amended and restated or otherwise modified from time to time.

"**Manager**" means a manager serving on the Board at any given time.

"**Manager Consent Right**" means the right of a Qualified Preferred Holder Group to consent to the appointment of one (1) or more Independent Managers pursuant to Section 6.2(b).

"**Material Adverse Effect**" means (a) any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact, or the worsening of any of the foregoing (each, an "**Event**") with respect to a significant portion of the industry or business segment in which the Company operates or relies upon if such Event has or is reasonably likely to have a material adverse effect on the Company and its Subsidiaries taken as a whole, (b) any material adverse Event with respect to the United States or global financial, banking or capital markets generally or (c) any epidemic, pandemic, disease, outbreak, public health crisis or act of God or natural disaster or man-made disaster or combination of any of the foregoing, in each case, that has or is reasonably likely to have a material adverse effect on the Company and its Subsidiaries taken as a whole.

"**Material Contract**" means any material agreement, contract or instrument pursuant to which the Company, its properties or assets are bound or to which they may be subject that involves, on an annual basis, payments to or by the Company in excess of $[•].

"**Member Group**" means either (a) the Goldman Members, (b) the BSP Members or (c) a Preferred Holder Group, in each case as the context requires.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as set forth in Treasury Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Sections 1.704-2(i)(2) and (3).

13

"**Member Nonrecourse Deductions**" means "partner nonrecourse deductions" as set forth in Treasury Regulations Sections 1.704-2(i)(1) and (2).

"**Minimum Purchase Price**" means an amount equal to the sum of (a) the aggregate principal amount of outstanding Prepetition Term Loans as of the Petition Date, (b) the aggregate principal amount of outstanding DIP Obligations immediately prior to the Effective Date, and (c) the aggregate principal amount of new capital or other amounts advanced or funded by the Goldman Members, the BSP Members and/or any of their respective Affiliates (or any of their successors and assigns under the Prepetition Term Loans) to the Company or any of its Subsidiaries after the Effective Date.

"**New Credit Documents**" means the loan documents governing the New First Lien Term Loans and the New Second Lien Term Loans.

"**New First Lien Term Loans**" means [•].

"**New Second Lien Term Loans**" means [•].

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**ORG GC Midco**" means ORG GC Midco, LLC, a Delaware limited liability company.

"**Permitted Liens**" means Liens that are imposed (a) by this Agreement or (b) under applicable securities laws.

"**Person**" means an individual, an Entity, or a Governmental Authority.

"**Personal Representative**" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Member that is an individual.

"**Petition Date**" means [•], 2021.

"**Plan of Reorganization**" means [●].

"**Preferred Holder Group**" means, collectively, (a) a holder of Series B Preferred Units and (b) any Affiliates of such holder that own or hold Series B Preferred Units, so long as any such Affiliate remains an Affiliate of such holder. Any consent, approval, decision (including any decision as to whether a Person, action or thing is acceptable), determination, designation, identification, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the Preferred Holder Group pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the members of such Preferred Holder Group that own or hold a majority of the Series B Preferred Units owned or held by all of the members of such Preferred Holder Group at such time.

14

"**Preferred Units**" means, collectively, the Series A Preferred Units and the Series B Preferred Units.

"**Prepetition Term Loans**" means the term loans outstanding under that certain Financing Agreement, dated July 31, 2017, by and among ORG GC Midco and certain of its affiliates, as borrowers, each of the guarantors party thereto, BSP Agency, LLC, as administrative agent and collateral agent thereunder, and the lenders party thereto from time to time, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Profits**" and "**Losses**" means, for each Allocation Year, an amount equal to the Company's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses," shall be subtracted from such taxable income or loss;

(c)     in the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (b) or paragraph (c) in the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Company asset for purposes of computing Profits or Losses;

(d)     gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition thereof;

(f)     to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(g)     notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated under this Agreement shall not be taken into account in computing Profits or Losses.

"**Purchase Price**" means the total consideration received on the closing date of the Sale Transaction by the Company and the Members on account of their interests in the Company or assets of the Company.  In no event shall the Purchase Price include (i) any consideration received by a Member that is not directly attributable to its Units or assets of the Company, including, but not limited to, payments made by the counterparty to a Sale Transaction in respect of agreements not to compete or other restrictive arrangements or (ii) any consideration payable to the Company or the Members after the closing date of a Sale Transaction as consideration for the limited liability company interests or assets of the Company that is either (A) placed in escrow or otherwise held back to support indemnification obligations, purchase price adjustments, or other similar obligations, (B) contingent consideration to be paid in the future (including, without limitation, any installment payments, milestone payments and "**earn-outs**"), or (C) set aside in a separate account for use by a representative of the Company or the Members to manage, address, monitor or otherwise deal with post-closing matters relating to such Sale Transaction.  The Purchase Price shall be determined by the Board in its reasonable discretion and any determination of Purchase Price by the Board shall be solely for purposes of determining whether the requirements of Section 9.3 are satisfied and is not intended to be reflective of value for any other purpose.

"**Qualified Preferred Holder Group**" means, as of any time of determination, any Preferred Holder Group which holds at least the Threshold Amount of Series B Preferred Units. For the avoidance of doubt, as of the Effective Date, each of (a) the BSP Members and (b) the Goldman Members constitute a Qualified Preferred Holder Group.

"**Qualified Public Offering**" means the first underwritten public offering pursuant to an effective registration statement covering a sale of the Company's (or any successor's or any Subsidiary of the Company's) common equity to the public that results in (a) such common equity being listed on a national securities exchange or quoted on the Nasdaq Stock Market, and (b) at least one-third (1/3) of the issued and outstanding shares or units of such common equity (calculated on a fully diluted basis, and for purposes of such calculation treating such common equity that is issued in the public offering as issued and outstanding shares or units of such common equity) being issued or sold to the public in connection with such public offering.

"**Redemption Date**" means a Mandatory Redemption Date or an Optional Redemption Date.

"**Regulations**" or "**Treasury Regulations**" means the income tax regulations promulgated under the Code as such regulations may be amended from time to time (including Temporary Regulations).

"**Related Fund**" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Related Person**" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"**Requisite Members**" means, at any time of determination, Members that own or hold at least 50% of the issued and outstanding Class A Common Units of the Company at such time.

"**Sale Transaction**" means the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (a) all or substantially all of the consolidated assets of the Company and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share or unit exchange, consolidation or other business combination) of at least a majority of the aggregate voting power of the Voting Securities of any direct and/or indirect Subsidiary or Subsidiaries of the Company if substantially all of the consolidated assets of the Company and its Subsidiaries are held by such Subsidiary or Subsidiaries) or (b) at least a majority of the then-issued and outstanding Class A Common Units (whether directly or indirectly or by way of any merger, share or unit exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership).

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Selling Member**" means, as of any time of determination, an Initial Member Group which (a) holds at least the Threshold Amount of Series B Preferred Units as of such time, and (b) delivers a Drag-Along Notice pursuant to Section 9.3.

"**Series A Preference Amount**" means, with respect to each Series A Preferred Unit, $100.00, subject to appropriate proportionate adjustment in the event of any distribution, split, combination or other similar adjustment in the number of Series A Preferred Units.

"**Series A Preferred Return**" means, with respect to each Series A Preferred Unit, an amount accruing on such Series A Preferred Unit on a daily basis during each Fiscal Quarter at the rate of 20.00% per annum (or, during a Specified Period, at the Series A Specified Rate) and compounded quarterly on the sum of (a) the Unpaid Series A Preference Amount of such Series A Preferred Unit and (b) the Unpaid Series A Preferred Return on such Series A Preferred Unit at the commencement of such Fiscal Quarter.  In calculating the Series A Preferred Return with respect to any Series A Preferred Unit for purposes of Distributions, the Series A Preferred Return shall include amounts accrued through the date of such Distribution.  Series A Preferred Return shall be calculated on the basis of a 365/366-day year based on the actual number of days elapsed. For the avoidance of doubt, the Series A Preferred Return on a Series A Preferred Unit will accrue from and including the Effective Date to and including the date on which the Series A Preference Amount on such Series A Preferred Unit has been reduced to zero dollars ($0.00), whether or not such Series A Preferred Return shall have been declared and whether or not there are profits, surplus or other funds of the Company legally available for the payment of such Series A Preferred Return.

"**Series A Redemption Price**" means with respect to any Series A Preferred Unit as of any Redemption Date, the sum of (a) an amount equal to the Unpaid Series A Preferred Return on such

Series A Preferred Unit as of such Redemption Date and (b) an amount equal to the Unpaid Series A Preference Amount of such Series A Preferred Unit as of such Redemption Date.

"**Series A Specified Rate**" means, during any Specified Period, a rate equal to twenty-two percent (22.0%) per annum.

"**Series B Preference Amount**" means, with respect to each Series B Preferred Unit, $100.00, subject to appropriate proportionate adjustment in the event of any distribution, split, combination or other similar adjustment in the number of Series B Preferred Units.

"**Series B Preferred Return**" means, with respect to each Series B Preferred Unit, an amount accruing on such Series B Preferred Unit on a daily basis during each Fiscal Quarter at the rate of 15.00% per annum (or, during a Specified Period, at the Series B Specified Rate) and compounded quarterly on the sum of (a) the Unpaid Series B Preference Amount (ignoring, for purposes of this definition, clause (y) of the definition of "Unpaid Series B Preference Amount") of such Series B Preferred Unit and (b) the Unpaid Series B Preferred Return on such Series B Preferred Unit at the commencement of such Fiscal Quarter. In calculating the Series B Preferred Return with respect to any Series B Preferred Unit for purposes of Distributions, the Series B Preferred Return shall include amounts accrued through the date of such Distribution. Series B Preferred Return shall be calculated on the basis of a 365/366-day year based on the actual number of days elapsed. For the avoidance of doubt, the Series B Preferred Return on a Series B Preferred Unit will accrue from and including the Effective Date to and including the date on which the Unpaid Series B Preference Amount (ignoring, for purposes of this definition, clause (y) of the definition of Unpaid Series B Preference Amount) on such Series B Preferred Unit has been reduced to zero dollars ($0.00), whether or not such Series B Preferred Return shall have been declared and whether or not there are profits, surplus or other funds of the Company legally available for the payment of such Series B Preferred Return.

"**Series B Redemption Price**" means with respect to any Series B Preferred Unit as of any Redemption Date, the greater of (x) the sum of (a) an amount equal to the Unpaid Series B Preferred Return on such Series B Preferred Unit as of such Redemption Date and (b) an amount equal to the Unpaid Series B Preference Amount (ignoring, for purposes of this clause (x) of this definition, clause (y) of the definition of "Unpaid Series B Preference Amount") of such Series B Preferred Unit as of such Redemption Date and (y) an amount equal to the Unpaid Series B Preference Amount (ignoring, for purposes of this clause (y) of this definition, clause (x) of the definition of "Unpaid Series B Preference Amount") of such Series B Preferred Unit as of such Redemption Date.

"**Series B Specified Rate**" means, during any Specified Period, a rate equal to seventeen percent (17.0%) per annum.

"**Specified Breach**" means the breach of any Preferred Unit Consent Right that is either not capable of cure or, if capable of cure, remains uncured for a period of thirty (30) days.

"**Specified Manager**" means any Manager that is an employee of any Member or any Affiliate of a Member (other than the Company or any of its Subsidiaries).

"**Specified Material Breach**" means the breach of any of the Preferred Unit Consent Rights set forth in Sections 5.10(a)(i), (ii), (v), (vi), (vii), (viii), (ix), (xiii), or (xvi) that is either not capable of cure or, if capable of cure, remains uncured for a period of thirty (30) days.

"**Specified Period**" means, as the case may be, the period (a) beginning on the day of the occurrence of a Specified Breach and (b) ending on the day on which such Specified Breach has been cured in full.

"**Subsequent Drag-Along Date**" means [•].[3]

"**Subsidiary**" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

"**Subsidiary Governing Body**" means the board of directors, the board of managers or other governing body (including any committee of any such governing body) of each Subsidiary of the Company.

"**Third Party**" means, with respect to any Member, any Person who is not an Affiliate of such Member.

"**Threshold Amount**" means, at any time of measurement with respect to any Member Group (or any assignee, purchaser or other transferee referred to in Section 5.10(b)) and the Series A Preferred Units or the Series B Preferred Units, as applicable, fifty percent (50%) of the number of Series A Preferred Units or the Series B Preferred Units, as applicable, held by the Goldman Members as of the Effective Date, subject to appropriate proportionate adjustment in the event of any distribution, split, combination or other similar adjustment in the number of Series A Preferred Units or Series B Preferred Units, as applicable.

"**Transfer**" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Units (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Units), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Member lends or borrows any Units to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers Units in connection with such Member's financing arrangements, in any case in the ordinary course of business, shall not, in and of itself, constitute a Transfer of Units for purposes of this Agreement; provided, however, that any foreclosure (including the retention of Units in satisfaction of any obligations) on Units by any such broker, bank or other financial institution shall be deemed a Transfer of Units for purposes

---

[3]NTD:  This should be the date that is 4 years after the Effective Date.

of this Agreement.  The terms "**Transferee**," "**Transferring**," "**Transferor**," "**Transferred**," and other forms of the word "**Transfer**" shall have the correlative meanings.

"**Unpaid Series A Preference Amount**" means, with respect to any Series A Preferred Unit as of any time of determination, an amount equal to the excess, if any, of (a) the Series A Preference Amount, <u>over</u> (b) the aggregate amount of Distributions made by the Company with respect to such Series A Preferred Unit pursuant to <u>Section 13.2(b)</u> prior to such time.

"**Unpaid Series A Preferred Return**" means, with respect to any Series A Preferred Unit as of any time of determination, an amount equal to the excess, if any, of (a) the aggregate Series A Preferred Return accrued on such Series A Preferred Unit through such time, over (b) the aggregate amount of Distributions made by the Company with respect to such Series A Preferred Unit pursuant to <u>Section 13.2(a)</u> prior to such time.

"**Unpaid Series B Preference Amount**" means, with respect to any Series B Preferred Unit as of any time of determination, an amount equal to the excess, if any, of the greater of (x) (a) the Series B Preference Amount, <u>over</u> (b) the aggregate amount of Distributions made by the Company with respect to such Series B Preferred Unit pursuant to <u>Section 13.2(d)</u> prior to such time, and (y)(a) 175% of the Series B Preference Amount <u>over</u> (b) the aggregate amount of Distributions made by the Company with respect to such Series B Preferred Unit pursuant to <u>Section 13.2(c)</u> and <u>Section 13.2(d)</u> prior to such time.

"**Unpaid Series B Preferred Return**" means, with respect to any Series B Preferred Unit as of any time of determination, an amount equal to the excess, if any, of (a) the aggregate Series B Preferred Return accrued on such Series B Preferred Unit through such time, <u>over</u> (b) the aggregate amount of Distributions made by the Company with respect to such Series B Preferred Unit pursuant to <u>Section 13.2(c)</u> prior to such time.

"**Voting Securities**" means, with respect to any Person, the Equity Interests of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of managers or directors (or persons performing similar functions) of such Person.

<u>Additional Definitions</u>.  The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| "Act" | Recitals |
| "Additional Securities" | 9.6(a) |
| "Agreement" | Preamble |
| "Assistant Secretaries" | 7.9 |
| "Assistant Treasurers" | 7.9 |
| "BB Act" | 10.5(a) |
| "Board" | 6.1(a) |
| "BSP Board Observer" | 6.2(f) |
| "Certificate of Formation" | Recitals |
| "Chief Executive Officer" | 7.4 |
| "Chief Financial Officer" | 7.5 |

| Defined Term | Location |
|---|---|
| "Class A Common Units" | 5.1 |
| "Company" | Preamble |
| "Company Income Amount" | 13.1(b) |
| "Company Representative" | 10.5(a) |
| "Confidential Information" | 20.1 |
| "Confidentiality Period" | 20.1 |
| "control" | Definition of "Affiliate" |
| "Conversion Units" | 9.1(a)(ii) |
| "Corporate Conversion" | 21.2 |
| "Damages" | 8.2(a) |
| "DIP Credit Agreement" | Definition of "DIP Obligations" |
| "Dissolution Event" | 15.2 |
| "Drag-Along Notice" | 9.3(a) |
| "Drag-Along Requirements" | 9.3(a) |
| "Drag-Along Transaction Documents" | 9.3(b)(iv) |
| "Dragged Members" | 9.3(a) |
| "e-mail" | 19.5 |
| "Effective Date" | 2.1 |
| "Event" | Definition of "Material Adverse Effect" |
| "FCPA" | 19.15 |
| "Fiscal Year" | 10.1 |
| "flow-through entity" | 18.1(g) |
| "Goldman Board Observer" | 6.2(f) |
| "Goldman Entity" | 21.5 |
| "Goldman Underwriter Registration Statement" | 21.5 |
| "GS" | 19.14(a) |
| "Identified Person" | 8.5(a) |
| "Interested Investor" | Definition of "Affiliate Transaction" |
| "Investment Documents" | 9.3(b)(v) |
| "Joinder Agreement" | Preamble |
| "Mandatory Redemption Date" | 5.11(a)(ii) |
| "Mandatory Redemption Right" | 5.11(a)(i) |
| "Member" | Preamble |
| "Opportunity" | 8.5(a) |
| "Pre-Emergence Tax Period" | 10.9(a) |
| "Preemptive Members" | 9.6 |
| "Preemptive Rights Notice" | 9.6(a) |
| "Preferred Unit Consent Rights" | 5.10(a) |
| "Principal Office" | 2.4 |
| "Pro Rata Portion" | 9.6(a) |
| "Proceeding" | 8.2(a) |
| "Redemption Prohibition" | 5.11(a)(iii) |
| "Redemption Response Notice" | 5.11(a)(iii) |
| "Regulatory Allocations" | 12.3 |

21

| Defined Term | Location |
|---|---|
| "Related Companies" | 8.5(c) |
| "Reorganized Issuer" | 21.2 |
| "Representatives" | 20.2(a)(i) |
| "ROFO Acceptance Notice" | 9.9(b) |
| "ROFO Acceptance Period" | 9.9(b) |
| "ROFO Notice Period" | 9.9(b) |
| "ROFO Offer" | 9.9(b) |
| "ROFO Units" | 9.9(b) |
| "Secretary" | 7.7 |
| "Section 13(r)" | 19.14(a) |
| "Series A Note" | 5.8(a) |
| "Series A Preferred Units" | 5.1 |
| "Series B Note" | 5.9(a) |
| "Series B Preferred Units" | 5.1 |
| "Specified Insurance" | 8.7 |
| "Surviving Entity" | 9.3(b)(v) |
| "Tax Distribution" | 13.1(a) |
| "Taxing Authority" | 13.5 |
| "Tax Proceeding" | 10.9(a) |
| "Third Party Purchaser" | Definition of "Drag-Along Transaction" |
| "Transfer Notice" | 9.1(c) |
| "Treasurer" | 7.8 |
| "Units" | 5.1 |
| "Vice Presidents" | 7.6 |

1.2     <u>Rules of Construction</u>.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)     All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits to, or contained in, this Agreement.

(b)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     The words "**include**," "**includes**" and "**including**," when used herein shall be deemed in each case to be followed by the words "**without limitation**" (regardless of whether such words or similar words actually appear).

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to "**$**" or "**dollars**" shall mean United States dollars.

(f)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(g)    The words "**herein**," "**hereinafter**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

## ARTICLE 2
## GENERAL

2.1    <u>Limited Liability Company Agreement</u>.  The Members agree that this Agreement (a) constitutes the "limited liability company agreement" of the Company within the meaning of Section 18-101(7) of the Act, (b) shall be effective as of the date hereof (the "**Effective Date**") and (c) shall govern the rights, duties and obligations of the Members, except as otherwise expressly required by the Act.

2.2    <u>Name</u>.  The name of the Company shall be, and the business of the Company shall be conducted under the name of, "[NEWCO, LLC]" or under such other name or names as the Board may determine from time to time.

2.3    <u>Term</u>.  The term of the Company commenced on [•], 2021 and shall continue perpetually until a certificate of cancellation with respect to the Certificate of Formation shall be filed with the Secretary of State of the State of Delaware and become effective, and the Company is dissolved in accordance with <u>Article 15</u>.

2.4    <u>Business Offices</u>.  The location of the principal place of business of the Company shall be [6330 Gulfton Street, Houston, TX 77801] or such other place as the Board may from time to time determine (the "**Principal Office**").  The Company may have one or more offices at such place or places, either within or outside the State of Delaware, as the Board may from time to time determine or as the business of the Company may require.

2.5    <u>Registered Office and Agent</u>.  The Company's registered agent and registered office in the State of Delaware is [Corporation Service Company], located at [251 Little Falls Drive, in the City of Wilmington, County of New Castle, 19808].  At any time and from time to time, the Board may change the Company's registered agent and registered office in the State of Delaware.

2.6    <u>Qualification in Other Jurisdictions</u>.  The Board shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business and in which such qualification, formation or registration is required or as the Board determines to be desirable.  Any officer or other authorized person of the Company, each as duly authorized by the Board, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.7     No State-Law Partnership.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement (except for tax purposes as set forth in the next sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.  The Members intend that, to the extent an election described in the next sentence is not made, the Company shall be treated as a partnership for United States federal and, if applicable, state and local income tax purposes, and that each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment, except as otherwise required by law.  Without the prior written consent of the Requisite Members, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Treasury Regulations Section 301.7701-3 (or any successor regulation or provision) or, to the extent applicable, state or local income tax purposes.

# ARTICLE 3
## PURPOSE OF THE BUSINESS

The purpose and character of the business of the Company shall be to undertake and carry on any lawful business, purpose or activity for which limited liability companies may be formed under the Act, and engaging in any and all activities necessary, advisable, convenient or incidental thereto.

# ARTICLE 4
## MEMBERS; MEETINGS

4.1     Members.  The name of each Member, its address, contact information, Capital Contributions, and class or series and number of Units held are listed on Schedule A attached hereto.  Notwithstanding the provisions of Article 16, Schedule A shall be amended from time to time by the Company, without requiring the consent of any Member, to reflect the change in any of the information contained therein (including the withdrawal of one or more Members, the admission of one or more additional Members, additional Capital Contributions, forfeitures of Units, Transfers and the issuance of additional Units) only to the extent that the actions resulting in such changes were taken pursuant to, and in accordance with, the terms and conditions of this Agreement, and that any consents of the Members to such actions required hereunder, if any, were obtained.  The Company will, upon written request of any Member, provide such Member with a copy of such amended Schedule A.  Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A, as amended, supplemented or otherwise modified and in effect from time to time.

4.2     Substituted Members and Additional Members.

(a)     In connection with a Transfer of Units that is permitted pursuant to, and is effected in compliance with, the applicable terms of this Agreement, the Transferee of the Units subject to such Transfer shall become a substitute Member, effective on the date of such Transfer (which effective date shall not be earlier than the date of compliance with or waiver of the conditions to such Transfer set forth herein), entitled to all of the rights,

subject to Section 5.10 (to the extent applicable), and subject to all of the obligations and restrictions, of the transferor Member to the extent of the Units so Transferred.  Upon the substitution of a transferee Member, Schedule A shall be amended by the Company to reflect the substitution of such transferee Member.  Any duly substituted Member shall be considered a "Member" for all purposes of this Agreement and the Act.  Notwithstanding the requirement that substituted Members execute a Joinder Agreement pursuant to Section 9.1(c), this Agreement shall bind all holders of Units, regardless of whether any such holder executes this Agreement or a Joinder Agreement and by acceptance of Units each holder agrees to be so bound.

(b)    Subject to the provisions of this Agreement, the Board may, from time to time in its sole discretion (and without the requirement of any consent or approval of any Member), admit additional Persons as Members and issue to such Person's Units on such terms and conditions (including the Capital Contributions required, the series and class of Units to be issued, the number of Units to be issued and, if applicable, the vesting schedule of such Units and any forfeiture provisions applicable thereto) as the Board shall determine in its sole discretion.  The admission of an additional Member to the Company, and the issuance to such Person by the Company of Units in connection with such admission as a Member, shall be subject to the satisfaction of the following conditions: (i) such additional Member shall have become a party to this Agreement by executing and delivering to the Company a Joinder Agreement (duly completed) and such other written documentation as the Board may require in connection with such admission and issuance, (ii) such issuance of Units shall not require the Company to register any Units under the Exchange Act (as a result of the number of holders of Units or otherwise), unless, at the time of such issuance, the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act, (iii) the compliance with all applicable laws and regulations (including securities laws) relating to such admission and issuance, (iv) such issuance of Units shall not cause the Company to be treated as an association taxable as a corporation or as a "publicly traded partnership" for federal income tax purposes and (v) such issuance of Units shall not cause the Company to be required to register as an "investment company" under the Investment Company Act.  Upon the admission of a new Member, Schedule A shall be amended by the Company to reflect the addition of such new Member.  Any duly admitted new Member shall be considered a "**Member**" for all purposes of this Agreement and the Act. Notwithstanding the requirement that additional Members execute a Joinder Agreement, this Agreement shall bind all holders of Units, regardless of whether any such holder executes this Agreement or a Joinder Agreement, and by acceptance of Units each holder agrees to be so bound.

4.3    Member Meetings.

(a)    *Meetings*.  Meetings of the Members may be called for any purpose at any time by the Board or the Requisite Members (determined as of the time that such meeting is called).  Anything in this Agreement to the contrary notwithstanding, no regular, special or other meetings of the Members are required to be held.

(b)    *Place of Meetings*.  Member meetings may be held (i) at any place within or outside the State of Delaware designated by the Board or the Members calling any such

meeting, and/or (ii) if the Board or the Members calling any such meeting so determine, by means of remote communication in accordance with Section 4.3(k).  In the absence of any other designation by the Board or the Members calling any such meeting, Member meetings shall be held at the Principal Office.

(c)     *Notice of Meetings*.  Not less than five (5) Business Days prior to any Member meeting, notice of the place, if any, the purpose and the date and time of such meeting shall be delivered by the Secretary to each Member entitled to vote at such meeting in accordance with Section 19.5.  Presence of a Member (in person, or by duly authorized proxy) at a meeting shall constitute waiver of notice by such Member, except where a Member (in person, or by duly authorized proxy) participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened and does not at such meeting vote for or assent to action taken at such meeting.

(d)     *Quorum*.  The holders of at least a majority of the aggregate voting power of the then-issued and outstanding Units entitled to vote on a matter to be presented at a Member meeting, either present in person or represented by proxy, shall constitute a quorum with respect to action on such matter, and action may be taken with respect to any matter presented at the meeting only if a quorum exists with respect to such matter.

(e)     *Voting*.  Every Member entitled to vote its Units on any matter to be presented at a Member meeting shall be entitled, with respect to such matter, to one (1) vote for each such Unit held of record by such Member on the record date designated for such meeting.  Whenever any action is to be taken with respect to any matter by vote of the Members, such action shall be authorized by the affirmative vote of holders of at least a majority of the aggregate voting power of the then-issued and outstanding Units entitled to vote on such matter, unless the express provisions of this Agreement require a different vote, in which case such express provisions shall govern and control.

(f)     *Adjournment*.  Notwithstanding any other provision of this Agreement, if a quorum is not present at any Member meeting, such meeting may be adjourned by announcement of the chairman of the meeting or by affirmative vote of the holders of a majority of the voting power of the Units that are present in person or represented by proxy at such meeting and are entitled to vote on one or more matters to be presented at such meeting.  Notice of an adjournment need not be given to the Members of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting.  However, if the adjournment is for more than thirty (30) days from the date of the original meeting, or if after the adjournment a new record date is fixed for the adjourned meeting, a new notice of the adjourned meeting shall be given in accordance with Section 4.3(c) to each Member of record entitled to vote at such adjourned meeting.

(g)     *Record Date*.  Unless otherwise determined by the Board, the date on which notice of a Member meeting is first sent shall be the record date for the determination of Members entitled to notice of or to vote at such meeting (including any adjournment

thereof). The record date for determining Members entitled to express consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.

(h)     *Proxies*.  Each Member may authorize another Person or Persons to act for him, her or it by proxy by an instrument executed in writing and delivered to the Company in accordance with Section 19.5 before or at the time of the meeting or execution of a written consent, as the case may be.  Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one such Person is present, then such powers may be exercised by that Person; or if an even number of such Persons attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.  The appointment of a proxy shall be effective for eleven (11) months from the date of such appointment unless a different period is expressly specified in the appointment form.  A proxy may only be voted or acted upon by its holder in accordance with written instructions of the Member granting such proxy.  Except as otherwise limited therein, proxies shall entitle the individuals authorized to vote at a meeting thereby to vote at any adjournment of such meeting.  A proxy purporting to be executed by or on behalf of a Member shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger.  Subject to the above, any proxy may be revoked if an instrument revoking it or a proxy bearing a later date is delivered to the Company in accordance with Section 19.5.

(i)     *Conduct of Member Meetings*.  The Chairman or, in the Chairman's absence, the Chief Executive Officer (or, in the Chief Executive Officer's absence, any Vice President) shall call meetings of the Members to order and act as chairman of such meetings.  In the absence of said officers, any Member entitled to vote at the meeting, or any proxy of any such Member, may call the meeting to order and a chairman shall be elected by the affirmative vote of holders of a majority of the voting power of the Units present in person or represented by proxy and entitled to vote on any matter to be presented at such meeting.  The Secretary or any Assistant Secretary or any person appointed as secretary of a meeting of the Members by the chairman at any meeting of the Members may act as secretary of such meeting.  The chairman of any Member meeting shall determine the order of business and the procedure at such meeting, including such regulation of the manner of voting and the conduct of discussion.

(j)     *Action by Written Consent*.  Notwithstanding anything contained in this Agreement to the contrary, any action required or permitted by applicable law to be taken at any Member meeting may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members that own or hold Units representing not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all the Members entitled to vote thereon were present and voted and shall be delivered to the Company in accordance with Section 19.5.  An action by written consent of the Members

shall become effective as of the time the last written consent necessary to effect the contemplated action is received by the Company, unless all consents necessary to effect the contemplated action specify a later time, in which case the later time shall be the effective time of such action.  Prompt notice (and in any event within ten (10) Business Days after receipt of the written consent by the Company) of the taking of Member action without a meeting by less than unanimous written consent shall be given by the Company to those Members who have not consented in writing and were entitled to vote on the matters that were the subject of such action.

(k)    *Meetings by Remote Communication*.  One or more, or all, Members may participate in any meeting of the Members through the use of any means of remote communication by which all persons participating can hear each other at the same time.  Any Member participating in a meeting by any such means of remote communication is deemed to be present in person at such meeting, except as set forth in Section 4.3(c).

4.4    Authority of the Members.

(a)    Notwithstanding Section 18-402 of the Act, except as expressly authorized in writing by the Board or this Agreement (including Article 7 hereof), no Member, nor any officer, employee or agent of any Member, as such, shall have the authority or power to manage the Company or to act for the Company for any purpose, or to engage in any transaction, make any commitment, enter into any contract or incur any obligation or responsibility (whether as principal, surety or agent) on behalf of, or in the name of, the Company, or bind the Company, or hold itself out to any third party as acting for or on behalf of the Company, all such powers being vested in the Board.  To the fullest extent permitted by applicable law, any attempted action in contravention of this Section 4.4 shall be null and void *ab initio* and not binding upon the Company.  The Company shall not be responsible or liable for any indebtedness or obligation of any Member incurred or arising either before or, except as provided in Article 8, after the Effective Date.

(b)    Except (i) for the Company Representative acting, subject to the terms hereof, in its capacity as such, (ii) pursuant to a duly authorized proxy in accordance with Section 4.3(h), and (iii) as set forth in Section 9.3, no Member shall have any authority to bind, to act for, to execute any document or instrument on behalf of or to assume any obligation or responsibility on behalf of, any other Member.  No Member shall, by virtue of being a Member, be responsible or liable for any indebtedness or obligation of any other Member incurred or arising either before or after the Effective Date.

4.5    Limitation on Liability.  Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising under contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.  The immediately preceding sentence shall constitute a compromise to which all the Members have consented within the meaning of the Act.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on a Covered Person.

28

**ARTICLE 5**
**CAPITAL STRUCTURE**

5.1     Units.  All of the issued and outstanding Interests shall be issued in unit increments (each, a "**Unit**" and, collectively, the "**Units**").  The Units shall initially be divided into the following:  (a) Class A Voting Common Units (the "**Class A Common Units**"), (b) Series A Preferred Units (the "**Series A Preferred Units**") and (c) Series B Preferred Units (the "**Series B Preferred Units**"). References herein to the Units shall apply to units or other interests of the Company issued to Members in exchange for or in respect of the Units, including by unit split, unit dividend, distribution, exercise of options or warrants or equivalent transactions, or otherwise, whether by merger, consolidation or similar transaction (including shares or interests of a surviving corporation or other entity or successor into which units or interests of the Company are exchanged).

5.2     Issuance of Units.

(a)     On the Effective Date, the Company is authorized, empowered and directed to issue Units of the class or series, the amount, and to the applicable Members as set forth on Schedule A hereto.  No other Units or Interests, or options, warrants or other securities that are convertible into, or exchangeable or exercisable for, Units or Interests shall be issued or outstanding on, or immediately after, the Effective Date.

(b)     Subject to the provisions of this Agreement, the Board may from time to time cause the Company to issue and/or create and issue additional Units (of existing or new classes or series) or other equity or equity-based securities of the Company (including creating additional classes or series thereof having such powers, designations, preferences, rights and obligations as may be determined by the Board in its sole discretion, including powers, preferences, rights and obligations different from, senior or junior to or more or less favorable than existing classes or series of Units or other equity or equity-based securities of the Company).  Such Units or other equity or equity-based securities may be issued for any amount and form of consideration as the Board may determine, including cash or other property, tangible or intangible, received or to be received by the Company or any of its Subsidiaries, or services rendered or to be rendered to the Company or any of its Subsidiaries.  In connection with the foregoing, the Board shall have the power to make such amendments or modifications to this Agreement (including any amendment and restatement of this Agreement) in order to provide for such other additional Units or equity or equity-based securities, and such powers, designations, preferences, rights and obligations as the Board in its discretion deems necessary or appropriate to give effect to such authorization, creation and/or issuance (including amending this Agreement to incorporate the terms of such class or series of Units or other equity or equity-based securities of the Company, including economic and governance rights which may be different from, senior or junior to or more or less favorable than the other existing classes or series of Units or other equity or equity-based securities of the Company), all without further vote or action of the Members; provided, however, that if any such amendments or modifications would otherwise require any vote or consent pursuant to any of clauses (i)-(vii) of Section 16.1(a) (other than immaterial amendments or modifications), then such vote or consent shall be obtained as a condition to any such amendment or modification.

29

5.3     <u>Certificated Units</u>.  If the Board so elects, the Units shall be certificated in such form as the Board may from time to time determine.  Such certificates shall be signed by any two (2) authorized officers of the Company, and may, but need not, be sealed with the seal of the Company; <u>provided</u>, <u>however</u>, that where any such certificate is signed or countersigned by a transfer agent or registrar, the signatures of such officers of the Company may be in facsimile form.  In case any officer of the Company who shall have signed, or whose facsimile signature shall have been placed on, any certificate evidencing Units shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Company, such certificate may nevertheless be issued and delivered by the Company as though the person who signed such certificate, or whose facsimile signature shall have been placed thereon, had not ceased to be such officer of the Company.

5.4     <u>Voting Rights</u>.

(a)     Except as otherwise provided by non-waivable provisions of applicable law or this Agreement and subject to <u>Section 5.10</u>, the holders of Class A Common Units (in their capacity as such) shall have the right to elect the Managers to serve on the Board and shall have full voting rights and powers to vote on all matters submitted to the Members for vote, consent or approval, and each holder of Class A Common Units shall be entitled to one (1) vote for each Class A Common Unit held of record by such holder on any matter submitted to the Members for approval.

(b)     Except as otherwise provided by non-waivable provisions of applicable law or this Agreement, the holders of Series A Preferred Units (in their capacity as such) shall have no right to vote on any matter submitted to the Members for vote, consent or approval, and the Series A Preferred Units shall not be included in determining the number of Units voting or entitled to vote on matters for which the holders of Series A Preferred Units (in their capacity as such) shall have no right to vote (including for purposes of determining whether a quorum is present at any meeting of the Members or whether the requisite number of Member consents have been received for purposes of determining whether an action has been properly authorized by written consent of the Members with respect to such matters).  With respect to any matter for which holders of Series A Preferred Units (in their capacity as such) are entitled to vote by non-waivable provisions of applicable law or this Agreement, the holders of Series A Preferred Units (in their capacity as such) shall vote as a separate class and not as a single class with holders of other Units entitled to vote on such matter.

(c)     Except as otherwise provided by non-waivable provisions of applicable law or this Agreement, the holders of Series B Preferred Units (in their capacity as such) shall have no right to vote on any matter submitted to the Members for vote, consent or approval, and the Series B Preferred Units shall not be included in determining the number of Units voting or entitled to vote on matters for which the holders of Series B Preferred Units (in their capacity as such) shall have no right to vote (including for purposes of determining whether a quorum is present at any meeting of the Members or whether the requisite number of Member consents have been received for purposes of determining whether an action has been properly authorized by written consent of the Members with respect to such matters).  With respect to any matter for which holders of Series B Preferred Units (in their

capacity as such) are entitled to vote by non-waivable provisions of applicable law or this Agreement, the holders of Series B Preferred Units (in their capacity as such) shall vote as a separate class and not as a single class with holders of other Units entitled to vote on such matter.

(d)     Except as this Agreement expressly provides otherwise or as otherwise expressly provided by non-waivable provisions of applicable law, no holders of Units shall be entitled to any voting rights, and any action which would otherwise be subject to the vote or consent of Members under the Act may be taken by the Company by approval of the Board.

5.5     Record.  The Company shall keep and maintain a record of the name of each Person holding Units, the class or series and number of Units held by each such Person, any Transfer thereof and, in case any Unit is represented by a certificate and such certificate is cancelled, the date of cancellation thereof.  Unless otherwise determined by the Board, Schedule A shall serve as such record.  The Person in whose name Units are registered on Schedule A or such other record as determined by the Board shall be deemed the owner thereof, and thus a holder of record of such Units, for all purposes as regards the Company.

5.6     No Appraisal Rights.  The Members agree that no appraisal rights, dissenter's rights or other similar rights shall be available with respect to the Units, and waive all such rights in connection with any amendment of this Agreement or the Certificate of Formation, any merger or consolidation in which the Company is a constituent party, any conversion of the Company to another business form, any division of the Company into two or more other Entities, any transfer to or domestication in any jurisdiction by the Company, the sale of all or substantially all of the Company's assets or otherwise.

5.7     Lost, Destroyed or Mutilated Certificates.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the registered holder in customary form will be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing Units, and in the case of any such loss, theft or destruction upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company will (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of Units represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

5.8     Series A Preferred Units.

(a)     Exchange.  The Series A Preferred Units shall not be convertible into Class A Common Units (or any other Units); provided, however, that if the Series A Preferred Units have not been redeemed or repurchased within two (2) years after the Effective Date, any Member that holds or owns Series A Preferred Units shall be entitled to exchange its Series A Preferred Units for debt in the form of unsecured senior subordinated loans or notes to be issued by the Company at such time ("**Series A Note**"), which Series A Note shall (A) be in an original principal amount equal to the Series A Redemption Price (determined as if the date of such exchange is the Redemption Date), (B) have the same

31

economic terms as the Series A Preferred Units (e.g., the interest rate will be the same rate as the Series A Preferred Return and the maturity date shall be the date that is six years from the Effective Date), (C) have the same consent, information rights and (to the extent reasonably requested by an Initial Member Group) covenants as applicable to Series A Preferred Units pursuant to this Agreement, (D) be subject to such other terms and issued pursuant to documentation that is reasonably satisfactory to each Initial Member Group, including terms and conditions that would permit the parties to treat such debt instrument as equity for U.S. federal income tax purposes, and (E) rank senior to any Series B Note in the same manner as the Series A Preferred Units are senior in right of payment to the Series B Preferred Units as set forth in this Agreement (but applied to indebtedness rather than equity).

(b)     *Liquidation.* The Series A Preferred Units shall, with respect to rights upon liquidation, dissolution or winding up of the affairs of the Company, rank senior and prior to the Class A Common Units and the Series B Preferred Units.

5.9     Series B Preferred Units.

(a)     *Exchange.* The Series B Preferred Units shall not be convertible into Class A Common Units (or any other Units); provided, however, that if the Series B Preferred Units have not been redeemed or repurchased within two (2) years after the Effective Date, any Member that holds or owns Series B Preferred Units shall be entitled to exchange its Series B Preferred Units for debt in the form of unsecured junior subordinated loans or notes to be issued by the Company at such time ("**Series B Note**"), which Series B Note shall (A) be in an original principal amount equal to the sum of the Unpaid Series B Preference Amount (ignoring, for purposes of this Section 5.9(a)(A), clause (y) of the definition of "Unpaid Series B Preference Amount") and Unpaid Series B Preferred Return with respect to such Series B Preferred Units, (B) be entitled to a liquidation preference (or equivalent) that is determined in the same manner as the determination of the Series B Redemption Price for such Series B Preferred Units (*mutatis mutandis*), (C) have the same economic terms as the Series B Preferred Units  (e.g., the interest rate will be the same rate as the Series B Preferred Return and the maturity date shall be the date that is ten years from the Effective Date), (D) have the same consent, information rights and (to the extent reasonably requested by an Initial Member) covenants as applicable to Series B Preferred Units pursuant to this Agreement, (E) be subject to such other terms and issued pursuant to documentation that is reasonably satisfactory to each Initial Member Group, including terms and conditions that would permit the parties to treat such debt instrument as equity for U.S. federal income tax purposes, and (F) rank junior in right of payment to any Series A Note on the same terms as the Series B Preferred Units are junior in right of payment to the Series A Preferred Units as set forth in this Agreement.  If, at any time while a Series B Note is outstanding, any Series A Note is also outstanding, the holder(s) of the Series B Note(s) shall execute and deliver a subordination agreement in form and substance reasonably requested by the holder(s) of any Series A Note(s) and the holder(s) of any Series A Note(s) shall be express third party beneficiaries of this sentence.

32

(b)     *Liquidation.* The Series B Preferred Units shall, with respect to rights upon liquidation, dissolution or winding up of the affairs of the Company, rank senior and prior to the Class A Common Units and junior to the Series A Preferred Units.

5.10    <u>Preferred Unit Consent Rights</u>.

(a)     *Qualified Preferred Holder Consent Rights.* So long as any Series A Preferred Units or Series B Preferred Units remain outstanding, neither the Officers, nor the Company Representative nor the Board shall, directly or indirectly, take any of the following actions on behalf of the Company, including causing the Company (or, to the extent applicable, its Subsidiaries) to take or permit such actions without the prior written consent of each holder of Series A Preferred Units or Series B Preferred Units (the "**<u>Preferred Unit Consent Rights</u>**"):

(i)     amend, modify, or waive any provisions of this Agreement which would have an adverse effect on the rights, preferences, privileges or other powers of the Series A Preferred Units or the Series B Preferred Units, as applicable; <u>provided</u>, that neither the increase of the number of any existing or new class or series of Units or other Equity Interests of the Company, nor the issuance by the Company of any such series or class of Units or other Equity Interests of the Company (in compliance with, and not in limitation of, the terms of this <u>Section 5.10</u>), shall, on its own, be deemed to adversely affect the Series A Preferred Units or the Series B Preferred Units, as applicable;

(ii)     (A) create, authorize, issue or increase the authorized number of any Equity Interests of the Company, or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests of the Company, that have rights, preferences (including with respect to Distributions and upon liquidation) or privileges which are senior to or on parity with any of the rights, preferences or privileges of the Series A Preferred Units or the Series B Preferred Units, as applicable, as set forth in this Agreement; (B) create, authorize or issue any Equity Interests of any Subsidiary other than issuances to the Company or its wholly-owned Subsidiaries (other than issuances to other Persons that are required by applicable law or regulation); or (C) Transfer any Equity Interests of any Subsidiary, other than Transfers to the Company or its wholly-owned Subsidiaries, Transfers that are required by applicable law or regulation, or Transfers in connection with a Liquidation Event (in compliance with, and not in limitation of, the terms of this <u>Section 5.10</u>);

(iii)     change the size of the Board or the number of independent Managers on the Board or modify any consent rights with respect to the Board;

(iv)     reclassify any Equity Interests of the Company;

(v)     incur any indebtedness, pledge or grant Liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person, in any such case that is prohibited under the New Credit

33

Documents or, in the event all obligations under the New Credit Documents have been discharged, the New Credit Documents as in effect immediately prior to such discharge;

(vi)    declare or pay any dividend or distribution on, or convert, redeem, purchase, or otherwise acquire, any Equity Interests of the Company which are (A) for so long as any Series A Preferred Units remain outstanding, junior to the Series A Preferred Units and Series B Preferred Units or (B) if there are no longer any Series A Preferred Units outstanding and for so long as any Series B Preferred Units remain outstanding, junior to the Series B Preferred Units;

(vii)   cause or permit a Liquidation Event, except (A) in the event of a Drag-Along Transaction which results in a Liquidation Event or (B) any Insolvency Event;

(viii)  enter into or effect any transaction or series of related transactions involving the acquisition (including by merger, consolidation, acquisition of stock, acquisition of assets or otherwise) by the Company or any of its Subsidiaries of any assets or Equity Interests of any Person that is prohibited under the New Credit Documents or, in the event all obligations under the New Credit Documents have been discharged, the New Credit Documents as in effect immediately prior to such discharge; provided that the amount of such transactions shall not exceed $20 million in the aggregate;

(ix)    initiate or consummate an initial public offering, qualified public offering, or any other public offering and sale of the Company's or any Subsidiary's Equity Interests or any other securities;

(x)     approve the Company's annual budget;

(xi)    enter into or materially change any Material Contract that is prohibited under the New Credit Documents or, in the event all obligations under the New Credit Documents have been discharged, the New Credit Documents as in effect immediately prior to such discharge;

(xii)   settle any material lawsuit, action, dispute, or other proceeding that is prohibited under the New Credit Documents or, in the event all obligations under the New Credit Documents have been discharged, the New Credit Documents as in effect immediately prior to such discharge;

(xiii)  cause or permit the Company or its Subsidiaries to make any material changes to the Company's principal line of business; provided that neither (x) restructuring or exiting the Company's third-party business segment nor (y) changing the Company's line of business to any business reasonably associated with the business process outsourcing industry shall constitute a material change to the Company's principal line of business;

(xiv)   enter into, amend in any material respect, waive, or terminate any Affiliate Transaction other than an Excepted Transaction or the expiration of any such Affiliate Transaction in accordance with its terms;

(xv)   (A) change the tax classification of the Company or any of its Subsidiaries, (B) designate or change the Fiscal Year or taxable year of the Company or any of its Subsidiaries, (C) require any holder of Series A Preferred Units or Series B Preferred Units to file an amended tax return or information statement for a prior taxable period pursuant to Section 6225(c)(2) of the Code (or any similar provision of state or local law) or (D) participate in any reportable transaction (within the meaning of Treasury Regulations Section 1.6011-4(b)); or

(xvi)   the entry into any Material Contract that would include a Redemption Prohibition;

provided, upon the Goldman Members holding less than the Threshold Amount of the Series B Preferred Units, the Preferred Unit Consent Rights set forth in clauses (ii)(A) (solely with respect to (x) increasing the authorized number of Class A Common Units, (y) creating new classes of Units having preference over or on parity with the Series B Preferred Units and (z) issuing any Units senior to or pari passu with the Series B Preferred Units), (v), (vii), (viii), (ix), (x), (xi), (xii) or (xiii) of this Section 5.10(a) shall no longer be applicable; provided, further, that, if the Goldman Members hold less than the Threshold Amount of the Series B Preferred Units, the Goldman Members shall additionally have consent rights over the following:

(xvii)   (A) refinance the New First Lien Term Loans or the New Second Lien Term Loans to the extent the terms of any such refinancing are less favorable to the Company than the New First Lien Term Loans or the New Second Lien Term Loans, as applicable, or (B) incur any incremental debt resulting in [net leverage][4] exceeding 4.0:1.0 on a pro forma basis.

(b)   *Assignment of Preferred Unit Consent Rights*.  Notwithstanding anything herein to the contrary, if the Goldman Members Transfer all (and not less than all) of the Series B Preferred Units held by them as of the Effective Date to a single assignee, purchaser or other transferee pursuant to the terms of this Agreement, the Preferred Unit Consent Rights set forth in clauses (v), (vii), (viii) and (ix) of Section 5.10(a) shall be applicable to such assignee, purchaser or other transferee for so long as such assignee, purchaser or transferee holds at least the Threshold Amount of Series B Preferred Units.

5.11   Redemption of Preferred Units.

(a)   *Mandatory Redemption*.

(i)   (A) On the sixth (6th) anniversary of the Effective Date (with respect to the Series A Preferred Units), (B) on the tenth (10th) anniversary of the Effective Date (with respect to the Series B Preferred Units) or (C) in the event of a Specified

---

[4]NTD:  To the extent applicable, conform to defined term in New Credit Documents.

Material Breach or any Liquidation Event described in clauses (a)(i) or (b) (solely in connection with any case, proceeding or other action of a nature referred to in clause (a)(i) of the definition of "Insolvency Event") of the definition of "Insolvency Event", each holder of Series A Preferred Units or Series B Preferred Units, as applicable, shall have the right (a "**Mandatory Redemption Right**") to require the Company to redeem all or any portion of the Series A Preferred Units or Series B Preferred Units, as applicable, owned or held by such holder of Series A Preferred Units or Series B Preferred Units, as applicable, for an amount in cash per Series A Preferred Unit or Series B Preferred Unit, as applicable, equal to the Series A Redemption Price for such Series A Preferred Unit or the Series B Redemption Price for such Series B Preferred Unit, as applicable.  Notwithstanding anything in this Section 5.11 to the contrary, the Company may not redeem any of the Series B Preferred Units until such time as all Series A Preferred Units have been redeemed.

(ii)     The redemption of the applicable Preferred Units pursuant to a Mandatory Redemption Right shall be consummated on a date (the "**Mandatory Redemption Date**") selected by the Company, which shall be no less than seven (7) Business Days, and no more than ten (10) Business Days, after (x) the applicable anniversary of the Effective Date (in the event of a Mandatory Redemption Right pursuant to Section 5.11(a)(i)(A) or 5.11(a)(i)(B)) or (y) the date on which (I) the Goldman Members or the BSP Members notify the Company in writing of the occurrence of a Specified Material Breach or (II) any Liquidation Event described in clauses (a)(i) or (b) (solely in connection with any case, proceeding or other action of a nature referred to in clause (a)(i) of the definition of "Insolvency Event") of the definition of "Insolvency Event" occurs (in either case, in the event of a Mandatory Redemption Right pursuant to Section 5.11(a)(i)(C)), and the Company shall deliver a written notice to all holders of the applicable Preferred Units advising them of such Mandatory Redemption Date; provided, that if the Company fails to select a Mandatory Redemption Date, then the Mandatory Redemption Date shall be deemed to be the thirteenth (13th) Business Day after such anniversary date, delivery of notice of Specified Material Breach or occurrence of any Liquidation Event described in clauses (a)(i) or (b) (solely in connection with any case, proceeding or other action of a nature referred to in clause (a)(i) of the definition of "Insolvency Event") of the definition of "Insolvency Event", as applicable.  Subject to Section 13.2, on the Mandatory Redemption Date, the Company shall pay to each holder of the applicable Preferred Units the aggregate Series A Redemption Price or the aggregate Series B Redemption Price, as applicable, for the outstanding Series A Preferred Units or the outstanding Series B Preferred Units, as applicable. Payment of the Series A Redemption Price or the Series B Redemption Price, as applicable, for the outstanding Series A Preferred Units or the outstanding Series B Preferred Units, as applicable, shall be made by wire transfer of immediately available funds to the account of the applicable holder as provided by such holder to the Company in writing at any time prior to the Mandatory Redemption Date.

(iii)    If the Company is prohibited from redeeming all outstanding Series A Preferred Units or all outstanding Series B Preferred Units because (A) of the

existence of a contractual prohibition as in effect on the applicable Mandatory Redemption Date contained in any agreement or instrument governing or evidencing indebtedness or other *bona fide* third party financing arrangements of the Company or any of its Subsidiaries or (B) the Company does not have sufficient funds legally available therefor under applicable law (either, a "**Redemption Prohibition**"), then the Company shall give written notice (a "**Redemption Response Notice**") to each holder of Series A Preferred Units and/or Series B Preferred Units, as applicable, of (x) a reasonably detailed description of the reason that the Company is unable to redeem all such Series A Preferred Units and/or Series B Preferred Units and (y) the aggregate amount of such Series A Preferred Units and/or Series B Preferred Units, if any, which the Company will be able to redeem on the Mandatory Redemption Date, which Redemption Response Notice shall be delivered to such holders by the Company as soon as possible after the Company becomes aware of the applicable Redemption Prohibition. If the Company is prohibited from redeeming all outstanding Series A Preferred Units or all outstanding Series B Preferred Units, as applicable, because of a Redemption Prohibition, then the Company shall use its reasonable best efforts to increase its legally available funds under applicable law to an amount sufficient to enable it to purchase legally all such Series A Preferred Units and Series B Preferred Units and/or to obtain relief from any contractual restriction in order to enable it to make the required payments, including, through effecting a financing transaction, obtaining the consent of a requisite number of holders of indebtedness or otherwise, in each case, as soon as practicable.

(iv)     If the Company is prohibited from redeeming all outstanding Series A Preferred Units or all outstanding Series B Preferred Units, as applicable, because of a Redemption Prohibition, then, on the applicable Mandatory Redemption Date, subject to Section 13.2, the Company shall redeem the maximum possible number of Series A Preferred Units or Series B Preferred Units, as applicable, ratably among such holders based upon the aggregate Series A Redemption Price or Series B Redemption Price, as applicable, of such Preferred Units owned or held by each such holder, without violating the Redemption Prohibition. At any time thereafter when such Redemption Prohibition shall not prevent the Company from redeeming additional Series A Preferred Units or Series B Preferred Units, as applicable, the Company shall immediately redeem additional Series A Preferred Units or Series B Preferred Units, as applicable, after giving written notice to the holders of such Preferred Units, ratably in the same manner as set forth in the preceding sentence, to the maximum extent it is able to do so without violating the Redemption Prohibition. Anything in this Agreement to the contrary notwithstanding, if any of the Preferred Units that the Company is required to redeem is not redeemed by the Company on the applicable Mandatory Redemption Date, including as a result of a Redemption Prohibition, then (i) such Series A Preferred Units or Series B Preferred Units shall remain outstanding until so redeemed and (ii) without prejudice to any other rights that any such holder may have under this Agreement, at law or in equity, the Series A Preferred Return or Series B Preferred Return, as applicable, on any such Series A Preferred Unit or Series B Preferred Unit, as applicable, shall continue to accrue and accumulate and shall be added to the Series

A Redemption Price or Series B Redemption Price, as applicable, for such Series A Preferred Unit or Series B Preferred Unit, as applicable.

(b)        *Optional Redemption*.

(i)        Subject to <u>Section 13.2</u>, the Company shall have the right (an "**Optional Redemption Right**") to redeem all or any portion of the outstanding Preferred Units for an amount in cash per Series A Preferred Unit or Series B Preferred Unit, as applicable, to be redeemed equal to the Series A Redemption Price or the Series B Redemption Price, as applicable for such Series A Preferred Unit or Series B Preferred Unit, as applicable.

(ii)        The Company may exercise its Optional Redemption Right by delivering an irrevocable written notice to each of the holders of Series A Preferred Unit and Series B Preferred Unit, stating that the Company is exercising its Optional Redemption Right (an "**Optional Redemption Notice**").  The Optional Redemption Notice delivered by the Company to each holder of Series A Preferred Unit and Series B Preferred Unit, pursuant to this Section 5.11(b)(ii) shall specify (i) the number of, and series of, the Series A Preferred Unit or Series B Preferred Unit, as applicable, to be redeemed from such holders and the Series A Redemption Price or the Series B Redemption Price, as applicable, therefor, and (ii) the date on which such redemption shall occur (the "**Optional Redemption Date**"), which shall be no less than fifteen (15) Business Days and no more than thirty (30) Business Days after the date on which the Optional Redemption Notice is delivered to such holder.

(iii)        Subject to <u>Section 5.10(a)(vi)</u> and the last sentence of <u>Section 5.11(a)(i)</u>, in the case of a redemption of a portion of the outstanding Series A Preferred Units, such redemption shall be made among the holders of Series A Preferred Units on a ratable basis based upon the aggregate Series A Redemption Price of all Series A Preferred Units owned or held by each holders of Series A Preferred Units.  Subject to <u>Section 13.2</u>, in the case of a redemption of a portion of the outstanding Series B Preferred Units, such redemption shall be made among the holders of Series B Preferred Units on a ratable basis based upon the aggregate Series B Redemption Price of all Series B Preferred Units owned or held by each holders of Series B Preferred Units.

(iv)        On the Optional Redemption Date, the Company shall pay to each holder of Series A Preferred Units or Series B Preferred Units, as applicable, the aggregate Series A Redemption Price or the Series B Redemption Price, as applicable, for the Series A Preferred Units or Series B Preferred Units, as applicable, owned or held by such holders that were called for redemption pursuant to the Company's exercise of its Optional Redemption Right. Payment of the Series A Redemption Price or the Series B Redemption Price for each of the Series A Preferred Units or Series B Preferred Units, as applicable, so redeemed by the Company shall be made by wire transfer of immediately available funds to the

account of the applicable holder as provided by such holder to the Company in writing at any time prior to the Optional Redemption Date.

(v)     Anything in this Agreement to the contrary notwithstanding, if any of the Series A Preferred Units or Series B Preferred Units, as applicable, that the Company calls for redemption pursuant to the exercise of its Optional Redemption Right is not redeemed by the Company on the applicable Optional Redemption Date, then (i) such Series A Preferred Units or Series B Preferred Units, as applicable, shall remain outstanding until so redeemed and (ii) without prejudice to any other rights that the applicable holder of Series A Preferred Units or Series B Preferred Units, as applicable, may have under this Agreement, at law or in equity, the Series A Preferred Return or Series B Preferred Return, as applicable, on any such Series A Preferred Units or Series B Preferred Units, as applicable, shall continue to accrue and accumulate and shall be added to the Series A Redemption Price or Series B Redemption Price, as applicable, for such Series A Preferred Units or Series B Preferred Units, as applicable.

(c)     Any Series A Preferred Units and Series B Preferred Units redeemed, purchased or otherwise acquired by the Company (including in any exchange referred to in Sections 5.8(a) or 5.9(a)) in any manner whatsoever shall be retired and canceled promptly after the acquisition thereof, shall no longer be deemed to be outstanding and shall no longer be Transferable on the books of the Company.  The holder(s) of such Series A Preferred Units and Series B Preferred Units shall have no interest in or claim against the Company with respect to such Series A Preferred Units and Series B Preferred Units.

## ARTICLE 6
## MANAGEMENT; OPERATION OF THE COMPANY BUSINESS

6.1     Management of the Company.

(a)     Subject to the terms and conditions of this Agreement, the business and affairs of the Company shall be managed by the board of managers of the Company (the "**Board**"), which shall direct, manage and control the business of the Company.  Except where the approval of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law, the Board shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The enumeration of powers in this Agreement shall not limit the general or implied powers of the Board or any additional powers provided by applicable law.  Each Manager shall possess and may enjoy and exercise all of the rights and powers of a "manager" as provided in the Act, and each Manager shall be a "manager" as provided in the Act; provided, however, that (i) no individual Manager shall have the authority to act for or bind the Company without the requisite consent of the Board and (ii) each Manager will be subject only to the rights, obligations, limitations and duties expressly set forth in this Agreement.  Except (x) for the Company Representative acting, subject to the terms hereof, in its capacity as such (if the Company Representative is a Member), and (y) pursuant to a duly

authorized delegation of authority by the Board, no Member shall have any right, power or authority to act (as agent or otherwise) for, or to bind, the Company in any manner.

(b)     Except as expressly provided for in this Agreement or expressly required by non-waivable provisions of applicable law, the Members shall not have voting rights with respect to the management of the Company and shall not be entitled to vote on or consent to or approve or disapprove actions or decisions regarding the Company.

6.2     Board.

(a)     The Board shall consist of up to five (5) Managers (at least two (2) of which must be Independent Managers); provided that, as of the Effective Date, each Initial Member Group agrees that the Managers shall be the Persons listed on Schedule C attached hereto and nothing herein shall obligate any Member to appoint any additional Managers. The Board may be increased or decreased as set forth in this Section 6.2 (and subject to Section 5.10).  Managers must be natural persons at least eighteen (18) years of age but need not be Members, residents of the State of Delaware or citizens of the United States.

(b)     Members of the Board shall be appointed by vote of Members of a plurality of the votes of the Class A Common Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancies (or by the Requisite Members acting by written consent); provided, that (i) for so long as a Preferred Holder Group continues to own or hold thirty-two percent (32.0%) or more of the outstanding Series B Preferred Units, such Preferred Holder Group shall have the right to consent to two (2) Independent Managers appointed by the holders of the Class A Common Units, and (ii) for so long as a Preferred Holder Group continues to own or hold at least the Threshold Amount (but less than thirty-two percent (32.0%)) of the outstanding Series B Preferred Units, such Preferred Holder Group shall have the right to consent to one (1) Independent Manager appointed by the holders of the Class A Common Units.

(c)     The Manager Consent Right of any Qualified Preferred Holder Group shall not be transferable to any Person other than to any Person that is another member of such Qualified Preferred Holder Group.

(d)     The Chairman shall be appointed by the holders of a majority of the Class A Common Units.  The Chairman must be a Manager.

(e)     None of the Members, and no officer, director, manager, stockholder, partner, member, employee or agent of any Member, makes any representation or warranty as to the fitness or competence of any appointee that serves as a member on the Board (or any committee thereof) or any Subsidiary Governing Body by virtue of being a party to this Agreement.

(f)     For so long as the Goldman Members continue to own or hold at least the Threshold Amount of all outstanding Series B Preferred Units, the Goldman Members shall be entitled to appoint one Person (the "**Goldman Board Observer**") to attend, as a non-voting observer, each meeting of the Board, or any committee thereof, whether such meeting is conducted in person or by telephone.  For so long as the BSP Members continue

to own or hold at least the Threshold Amount of all outstanding Series B Preferred Units, the BSP Members shall be entitled to appoint one Person (the "**BSP Board Observer**") to attend, as a non-voting observer, each meeting of the Board, or any committee thereof, whether such meeting is conducted in person or by telephone.  The Goldman Board Observer and the BSP Board Observer shall each be entitled to receive, with respect to each meeting of the Board or any committee thereof: (i) written notice of each regular meeting and special meeting delivered no later than the date on which the members of the Board or the committee, as applicable, are notified of such meeting pursuant to Section 6.6, and (ii) any and all information provided in connection with each such meeting to all members of the Board or the applicable committee, in each case at the time and in the same manner as provided to such other attendees.  Additionally, the Goldman Board Observer and the BSP Board Observer shall each receive copies of all other notices, minutes, consents and other material items that the Company provides to the members of the Board at the same time and in the same manner as provided to such members.  Notwithstanding the foregoing, the Goldman Board Observer and the BSP Board Observer shall not be entitled to observe any portion of a meeting of the Board or any committee thereof (or receive notice of such portion of such meeting) or to receive any materials or other information that the Board or the applicable committee, as the case may be, reasonably determines on advice of counsel (A) would jeopardize or impair the ability of the Company or any of its Subsidiaries to take advantage of the attorney-client, work product or similar privilege if such portion of such meeting of the Board or any committee thereof were observed or if such portion of such materials or such other information was received by such Goldman Board Observer or the BSP Board Observer, as applicable, (B) would violate any *bona fide* contracts or other agreements to which the Company or any of its Subsidiaries are a party or bound, or violate any applicable law to which the Company or any of its Subsidiaries are subject, in either such case if such portion of such meeting of the Board or any committee thereof were observed or if such portion of such materials or such other information was received by such Goldman Board Observer or BSP Board Observer, as applicable, or (C) such Goldman Board Observer or BSP Board Observer, any of the Goldman Members, the BSP Members or of their respective Affiliates has/have a conflict of interest with respect to the subject matter of such portion of the meeting of the Board or any committee thereof or such materials or other information; provided that no conflict of interest with respect to the Goldman Board Observer or the BSP Board Observer shall be deemed to exist solely by virtue of the Goldman Members or the BSP Members or any of their Affiliates being lenders to the Company or its Subsidiaries.  The failure of the Goldman Board Observer or the BSP Board Observer to attend any meeting of the Board or any committee thereof (or to receive any portion of a notice of a meeting of the Board or any committee thereof) or to receive any materials or other information shall not prevent any such meeting of the Board or any committee thereof from proceeding or otherwise affect the validity of such meeting of the Board or any committee thereof (or any written consent in lieu of a meeting of the Board or any committee thereof) or any actions taken at such meeting of the Board or any committee thereof (or any written consent in lieu of such meeting of the Board or any committee thereof).  The Goldman Board Observer and the BSP Board Observer shall not be entitled to any fees or other compensation for acting as an observer, but shall receive reimbursement from the Company for any and all reasonable and documented out-of-pocket expenses incurred by the Goldman Board Observer or the

BSP Board Observer, as applicable, in connection with attending any and all meetings of the Board or any committee thereof to the extent that such expenses would be reimbursed by the Company to Managers in accordance with the Company's reimbursement policies if such expenses were incurred by Managers.  For so long as the Goldman Members continue to own or hold at least the Threshold Amount of all outstanding Series B Preferred Units, the Goldman Members shall be entitled to fill any vacancy caused by the resignation, death or removal of a prior Goldman Board Observer.  The right of the Goldman Members to appoint the Goldman Board Observer, and to remove and replace the individual serving as the Goldman Board Observer with a new individual appointed by the Goldman Members, shall be subject to the execution and delivery by such Goldman Board Observer of a confidentiality agreement that is reasonably acceptable to the Board.  For so long as the BSP Members continue to own or hold at least the Threshold Amount of all outstanding Series B Preferred Units, the BSP Members shall be entitled to fill any vacancy caused by the resignation, death or removal of a prior BSP Board Observer.  The right of the BSP Members to appoint the BSP Board Observer, and to remove and replace the individual serving as the BSP Board Observer with a new individual appointed by the BSP Members, shall be subject to the execution and delivery by such BSP Board Observer of a confidentiality agreement that is reasonably acceptable to the Board.

6.3     <u>Regular Meetings</u>.  Regular meetings of the Board shall be held at such time or times as may be determined by the Board and specified in the notice of such meetings.

6.4     <u>Special Meetings</u>.  Special meetings of the Board may be called by any two (2) Managers.

6.5     <u>Place of Meetings</u>.  Any meeting of the Board may be held at such place or places as shall from time to time be determined by the Board and as shall be designated in the notice of the meeting.  If no other place is designated in the notice of the meeting, such meeting shall be held at the Principal Office.

6.6     <u>Notice of Meetings</u>.  Notwithstanding <u>Section 19.5</u>, notice of each meeting of the Board, whether regular or special, shall be given to each Manager (unless such notice is waived by such Manager as provided in <u>Section 6.10</u>) (a) if such notice is sent by overnight delivery, at least two (2) Business Days prior to such meeting or, (b) if such notice is sent by electronic mail, at least one (1) day prior to such meeting; <u>provided</u>, <u>however</u>, if a special meeting of the Board is being called due to exigent circumstances, as reasonably determined by the Managers calling such meeting, then notice of such meeting may be provided to each Manager (unless such notice is waived by such Manager as provided in <u>Section 6.10</u>) by electronic mail at least twelve (12) hours prior to such meeting.  Any such notice shall be sent to each Manager at such Manager's usual or last known business or residence address or electronic mail address, as applicable.  The notice shall state the date, time and location (if such location is not the Principal Office) of the meeting, but need not state the purposes of such meeting.

6.7     <u>Meetings by Remote Communication</u>.  One or more, or all, members of the Board or any committee designated by the Board may participate in a meeting of the Board or such committee through the use of any means of remote communication by which all persons participating can hear each other at the same time.  Any Manager or committee member

participating in a meeting by any such means of remote communication is deemed to be present in person at such meeting, except as set forth in Section 6.10.

6.8    Quorum; Acts of Managers.  A quorum for any meeting of the Board will require the attendance of at least a majority of the Managers then in office.  The vote of a majority of the votes of the Managers present and entitled to vote at a meeting of the Board at which a quorum is present shall be the act of the Board, unless the express provisions of this Agreement or applicable non-waivable law require a different vote, in which case such express provisions shall govern and control.  In the case of a deadlocked Board, the Chairman shall have the tie-breaking vote.  In the absence of a quorum at any such meeting, a majority of the votes of the Managers present and entitled to vote may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.  Each Manager shall have one (1) vote on all matters submitted to the Board for the vote, consent or approval of the Board (other than matters for which such Manager is not entitled to vote, as expressly set forth in this Agreement).  Decisions of the Board shall be decisions of the "manager" for all purposes of the Act.  For the avoidance of doubt, but not in limitation of the obligations set forth in Section 6.2(f), the attendance of the Goldman Board Observer and/or the BSP Board Observer shall not be required for a quorum or for any vote or action by the Board.

6.9    Organization, Agenda and Procedures.  The Chairman shall preside over the meetings of the Board; provided, however, if the Chairman shall not be present at a meeting of the Board or shall refuse to preside over a meeting of the Board, then the Managers that are present at such meeting shall choose a chairman to preside over such meeting.  The Secretary, any Assistant Secretary, or any other person appointed as secretary of a meeting of the Board by the Chairman shall act as secretary of each meeting of the Board.  The agenda of and procedure for such meetings shall be as determined by the Board.

6.10    Waiver of Notice.  A Manager may waive any notice of a meeting of the Board, whether before or after the date or time stated in the notice as the date or time when any action will occur or has occurred.  Any such waiver shall be in writing, be signed by the Manager entitled to the notice, and be delivered to the Company in accordance with Section 19.5, but such delivery shall not be a condition of the effectiveness of the waiver.  Attendance or participation by a Manager at a meeting of the Board, (a) shall be deemed a waiver of objection to lack of required notice or defective notice of the meeting, unless the Manager, at the beginning of the meeting or promptly upon his or her later arrival, expressly objects to holding the meeting or transacting business at the meeting because of lack of notice or defective notice, and does not thereafter vote for or assent to action taken at the meeting, and (b) shall be deemed a waiver of objection to consideration of a particular matter at the meeting, unless the Manager expressly objects to considering the matter when it is presented and does not thereafter vote for or assent to action taken at the meeting with respect to such matter.

6.11    Managers' Action By Written Consent.  Any action required or permitted to be taken at any meeting of the Board, or any committee thereof, may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing is/are signed by the Managers or committee members (as applicable) holding not less than the total number of votes that would be necessary to authorize such action at a meeting of the Board or such committee (as applicable) at which all Managers or committee members (as applicable) were present and voted,

and the writing or writings are filed with the minutes of proceedings of the Board or any such committee. A written consent of the Board or any committee thereof, with respect to an action of the Board or such committee, shall become effective when the written consent or consents to such action has/have been signed (and not revoked) by the requisite Managers or committee members (as the case may be) and delivered to the Company in accordance with Section 19.5, and any action taken by written consent shall be effective as of the time such written consent is effective, unless the Managers or committee members (as the case may be) that execute such written consent specify a different effective time in such written consent. Prompt notice of the taking of action by the Board or any committee thereof without a meeting by less than unanimous written consent shall be given to those Managers or committee members who have not consented in writing.

6.12    Removal. Any Manager may be removed, with or without cause, by the Requisite Members at the time of such removal. Subject to Section 6.2(b), any vacancy on the Board created by the resignation or removal of a Manager shall be filled by vote of Members of a plurality of the votes of the Class A Common Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Requisite Members acting by written consent).

6.13    Resignation. Any Manager may resign at any time by giving written notice of such Manager's resignation to the Company in accordance with Section 19.5. Such resignation shall take effect at the date of delivery of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation by the Company shall not be necessary to make it effective.

6.14    Vacancies. Except as set forth in Section 6.2(b) or Section 6.12, any vacancy on the Board resulting from a Manager's death, incapacity, resignation, retirement, disqualification, removal from office, or other cause, shall be filled by vote of Members of a plurality of the votes of the Class A Common Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Requisite Members acting by written consent).

6.15    Committees. The Board, by resolution, may from time to time designate from among the Managers one or more committees. The Board may (and if the Board does not, a majority of the votes of the committee members may) designate a chairman of each such committee from among its members. Each such committee, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board in the management of the Company. Any or all members of any such committee may be removed, with or without cause, by a duly adopted resolution of the Board. Rules governing the procedures for meetings of each committee designated by the Board shall be as established by the Board from time to time (or, if the Board does not establish such procedures, as established by a majority of the votes of the committee members).

6.16    Compensation of Managers. Each Independent Manager, if any, shall be paid compensation from the Company, in such form (which may be in the form of cash fees and/or other incentives granted under any management incentive plan) as approved by the Requisite Members, for the performance of such Independent Manager's duties as a Manager or a member of any committee of the Board. Managers who are not Independent Managers shall not receive compensation from the Company for the performance of such Manager's duties as a Manager or a

44

member of any committee of the Board.  Each Manager and committee member who is not employed by the Company or any of its Subsidiaries shall be reimbursed for the reasonable expenses incurred by such Manager or committee member in connection with the performance of such Manager's or committee member's duties as a Manager or a member of any committee of the Board (including expenses incurred in attending meetings of the Board or any committee thereof). Nothing herein contained shall be construed to preclude any Manager or committee member from serving the Company or any of its Subsidiaries in any other capacity and receiving proper compensation therefor.

6.17    Subsidiary Governing Bodies.  Each Subsidiary Governing Body of any wholly-owned Subsidiary of the Company (other than any such Subsidiary which is either (a) a limited liability company that is managed by its member(s), or (b) a limited partnership that is managed by its general partner) shall be comprised of one or more executive employees of the Company or any of its Subsidiaries, as determined by the Board in its sole discretion.  The Company agrees to take all necessary and desirable actions to ensure that any such Subsidiary Governing Body does not adopt any resolutions, execute any consents, grant any approvals or take any other action, or otherwise cause or permit any such Subsidiary to do anything, that would be inconsistent with, or contrary to, any resolution, consent, approval or other action adopted, executed, granted or taken by the Board, or that would be in subversion of the rights of the Members under this Agreement or that would otherwise be a breach of this Agreement if the Company did the same.

## ARTICLE 7
## OFFICERS; POWERS OF OFFICERS.

7.1    Election and Tenure.  The officers of the Company shall consist of the Chairman, the Chief Executive Officer, the Chief Financial Officer, a Secretary and a Treasurer, each of whom (other than the Chairman) shall be appointed by the Board.  The persons initially holding these positions are listed on Schedule B attached hereto.  The Board may also designate and appoint such other officers and assistant officers as the Board may deem necessary or advisable. The Board may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees.  Any two or more offices may be held by the same person.  Each officer so appointed shall continue in office until a successor shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal.  Each officer shall be a natural person who is eighteen (18) years of age or older.

7.2    Resignation, Removal and Vacancies.  Any officer may resign at any time by giving written notice of resignation to the Company, to the attention of the Board or the Chief Executive Officer.  Such resignation shall take effect when the notice is delivered in accordance with Section 19.5 unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states.  Any officer may at any time be removed by the Board.  If any office becomes vacant for any reason, the vacancy may be filled by the Board.  An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office (if any) and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal.  The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal of an officer shall not affect the officer's contract rights, if any,

with the Company, and the resignation of an officer does not affect the Company's contract rights, if any, with the officer.

7.3     Chairman.  The Chairman shall preside over the meetings of the Board and have such powers and responsibilities as are incident thereto.  However, the Chairman shall not have responsibility for the day-to-day business operations of the Company.  The Chairman shall be a Manager.

7.4     Chief Executive Officer.  The chief executive officer of the Company (the "**Chief Executive Officer**") shall (a) preside over meetings of the Members, if any, (b) have general and active management of the business of the Company, and preside over the day-to-day business operations of the Company, (c) see that all orders and resolutions of the Board are carried into effect, and (d) perform all duties as may from time to time be assigned to him or her by the Board.

7.5     Chief Financial Officer.  The chief financial officer of the Company (the "**Chief Financial Officer**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer.  In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, responsibility for the day-to-day business operations of the Company.

7.6     Vice Presidents.  The vice presidents of the Company (the "**Vice Presidents**"), if any, shall perform such duties and possess such powers as from time to time may be assigned to them by the Board or the Chief Executive Officer.  In the absence of the Chief Executive Officer or in the event of the inability or refusal of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

7.7     Secretary.  The secretary of the Company (the "**Secretary**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including the duty and power to give notice of all meetings of Members (if any), the Board and any committee of the Board, to prepare and maintain minutes of the meetings of the Members (if any) or the Board (or any committee thereof), to maintain other records and information of the Company, to authenticate records of the Company, to be custodian of the Company seal and to affix and attest to the Company seal on documents.

7.8     Treasurer.  The treasurer of the Company (the "**Treasurer**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the

Board, making proper accounts thereof, and to render as required by the Board statements of all such transactions and of the financial condition of the Company.

7.9     <u>Assistant Secretaries and Assistant Treasurers</u>.   The assistant secretaries and assistant treasurers of the Company (the "**Assistant Secretaries**" and the "**Assistant Treasurers**"), if any, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer or the Board.   In the absence, inability or refusal to act of the Secretary or the Treasurer, the Assistant Secretaries or the Assistant Treasurers, respectively, in the order designated by the Board, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

7.10     <u>Salaries</u>.  Officers of the Company shall be entitled to such salaries, emoluments, compensation or reimbursement as shall be fixed or allowed from time to time by the Board or in such manner as the Board shall provide.

7.11     <u>Borrowing</u>.  No loan shall be contracted on behalf of the Company, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Board or a committee designated by the Board to so act.  Such authority may be general or confined to specific instances.   When so authorized, an officer may (a) effect loans at any time for the Company from any bank or other Entity and for such loans may execute and deliver promissory notes or other evidences of indebtedness of the Company, and (b) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by the Company as security for the payment of any loans or obligations (including any guarantees) of the Company, and to that end may execute and deliver for the Company such instruments as may be necessary or proper in connection with such transaction.

7.12     <u>Checks and Endorsements</u>.  All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Company by such officers or agents of the Company as shall from time to time be determined by resolution of the Board, which resolution may provide for the use of facsimile or electronic signatures.

7.13     <u>Deposits</u>.  All funds of the Company not otherwise employed shall be deposited from time to time to the Company's credit in such banks or other depositories as shall from time to time be determined by resolution of the Board, which resolution may specify the officers or agents of the Company who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Company or its order.

7.14     <u>Proxies</u>.  Unless otherwise provided by resolution adopted by the Board, the Chief Executive Officer, the Chief Financial Officer or any Vice President: (a) may from time to time appoint one (1) or more agents of the Company, in the name and on behalf of the Company, (i) to cast the votes which the Company may be entitled to cast as the holder of Equity Interests or other securities in any other Entity whose Equity Interests or other securities may be held by the Company, at meetings of the holders of the Equity Interests or other securities of such other Entity, or (ii) to consent in writing to any action by such other Entity; (b) may instruct the person so

47

appointed as to the manner of casting such votes or giving such consent; and (c) may execute or cause to be executed in the name and on behalf of the Company and under its Company seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper in connection with the foregoing clauses (a) and (b).

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1     Exculpation.

(a)     Notwithstanding any other provisions of this Agreement (whether express or implied) or obligation or duty at law or in equity, to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Member, the Company or any other Person (including any creditor or claimant of the Company or any of its Subsidiaries) for any losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by a Covered Person in connection with the Company or any of its Subsidiaries, nor shall any Covered Person be liable to any Member, the Company or any other Person for any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by any employee or other agent of the Company or any of its Subsidiaries, except to the extent that any such losses, expenses, claims, damages or liabilities, (i) in each case, are attributable to such Covered Person's material breach of this Agreement, (ii) in the case of any Manager (but expressly excluding any Specified Manager), are attributable to such Manager's breach of the duty of loyalty to the Company or the Members as a result of usurping or misappropriating a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries, and (iii) in the case of any officer of the Company (other than the Chairman) or any Manager that is also an employee of the Company or any of its Subsidiaries (but, for the avoidance of doubt, expressly excluding any Specified Manager and any Independent Manager), (A) are attributable to such officer's or Manager's acts or omissions not in good faith, (B) are attributable to such officer's or Manager's breach of the duty of loyalty to the Company or the Members, (C) arise from a transaction in which such officer or Manager derived an improper personal benefit or (D) are attributable to acts or omissions of such officer or Manager that constitute a knowing violation of law.  No amendment to or repeal of this Section 8.1 shall apply to or have any effect on the liability or alleged liability of the Covered Persons for or with respect to their acts or omissions occurring prior to such amendment or repeal.

(b)     In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member.  It is the intent of the Members that no distribution to any Member pursuant to Section 5.11 or Articles 13 or 15 shall be deemed a return of money or other property paid or distributed in violation of the Act or other applicable law.  The return of such money or distribution of any such property to a Member shall be deemed to be a compromise within the meaning of the Act, and the Member receiving any such money or property shall not be required to return to any Person any such money or property.  However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make such

payment, such obligation shall be the obligation of such Member and not of any other Member.

8.2     Indemnification.

(a)     The Company shall, to the fullest extent permitted by applicable law (as now or hereafter in effect), indemnify, defend and hold harmless each Covered Person from and against any losses, claims, expenses, damages, judgments, fines and liabilities (collectively, "**Damages**") suffered or incurred by, imposed on, or to which such Covered Person may become subject (i) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, or (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "**Covered Person**"; provided, that no right of indemnification shall be available to a Covered Person under this Article 8 to the extent that it shall have been determined by a final, non-appealable decision by a court of competent jurisdiction that any such Damages are attributable to (x) such Covered Person's material breach of this Agreement, (y) in the case of any Manager (but expressly excluding any Specified Manager), such Manager's breach of the duty of loyalty to the Company or the Members as a result of usurping or misappropriating a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries and (z) in the case of any officer of the Company (other than the Chairman) or any Manager that is also an employee of the Company or any of its Subsidiaries (but, for the avoidance of doubt, expressly excluding any Specified Manager and any Independent Manager), (A) such officer's or Manager's acts or omissions not in good faith, (B) such officer's or Manager's breach of the duty of loyalty to the Company or the Members, (C) a transaction in which such officer or Manager derived an improper personal benefit or (D) are attributable to acts or omissions of such officer or Manager that constitute a knowing violation of law.  If a Covered Person is or was made, or threatened to be made, a party to any threatened, pending or completed action, proceeding or investigation (a "**Proceeding**"), whether civil, criminal, administrative or investigative, including an action by or in the right of the Company to procure a judgment in its favor, (1) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, or (2) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "**Covered Person**", the Company shall pay, within a reasonable period of time following the Company's receipt of reasonably detailed supporting documentation, to such Covered Person for such Covered Person's legal and other expenses (including legal and other professional fees and disbursements, and the cost of any investigation and preparation) incurred in connection therewith in advance of the final disposition of such Proceeding; provided, that such Covered Person shall promptly repay to the Company the amount of any such expenses paid to it if it shall be determined that such Covered Person is not entitled to be indemnified by the Company in connection with such Proceeding as provided in the proviso contained in the immediately preceding sentence.  If for any reason the foregoing indemnification is unavailable to a Covered Person, or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Covered Person as a result of the applicable Damages in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect

not only the relative benefits referred to above but also any other relevant equitable considerations.  No amendment or repeal of any part of this <u>Section 8.2</u> shall apply to or have any effect on any right to indemnification, reimbursement and advancement of expenses, and contribution provided hereunder with respect to any acts or omissions occurring prior to such amendment or repeal.

(b)     The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this <u>Section 8.2</u> shall not be deemed exclusive of any other rights to which a Covered Person seeking indemnification, reimbursement or advancement of expenses, or contribution may have or hereafter be entitled under any statute, this Agreement, any other agreement (including any policy of insurance purchased or provided by the Company under which any Covered Person is covered), any vote of the Members or Managers or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

(c)     The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this <u>Section 8.2</u> shall inure to the benefit of the successors, heirs, executors and administrators of a Covered Person.

(d)     The Company shall have the power to purchase and maintain insurance on behalf of any Covered Person to protect such Covered Person against any Damages, whether or not the Company would have the power to indemnify such Covered Person against any such Damages under the provisions of this <u>Section 8.2</u> or under any provision of law.

8.3     <u>No Member Liability</u>.  Any indemnification, reimbursement and advancement of expenses, or contribution provided under this <u>Article 8</u> shall be satisfied solely out of assets of the Company, as an expense of the Company.  No Member shall be subject to personal liability by reason of the indemnification, reimbursement and advancement of expenses, or contribution provisions set forth in this <u>Article 8</u>.

8.4     <u>Settlements</u>.  The Company shall not be liable for any settlement by a Covered Person of any Proceeding effected without its written consent, but if settled with such written consent, or if there is a final judgment against such Covered Person in any such Proceeding, the Company agrees to indemnify and hold harmless such Covered Person to the extent provided above from and against any Damages by reason of such settlement or judgment.

8.5     <u>Business Opportunities; Fiduciary Duties</u>.

(a)     The Company and each Member acknowledge that each Member (other than a Member who is also an employee or officer of the Company or any of its Subsidiaries (other than the Chairman) or any Affiliate of any such employee or officer), each Specified Manager (whether the Specified Manager is serving as a member of the Board, a member of a committee of the Board or a member of any Subsidiary Governing Body), and each Affiliate, manager, director, principal, officer, employee and other representative of each such Member or Specified Manager (other than any such Person who is also an employee or officer of the Company or any of its Subsidiaries (other than the Chairman)) (the

foregoing Persons being referred to, collectively, as "**Identified Persons**" and, each individually, as an "**Identified Person**") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Company or any of its Subsidiaries, directly or indirectly, now engage or may engage and/or other business activities that overlap with, are complementary to, or compete with those in which the Company or any of its Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "**Opportunity**"). No Identified Person shall have any duty to refrain, directly or indirectly, from (i) pursuing or engaging in any Opportunity or (ii) otherwise competing with the Company or any of its Subsidiaries. No Identified Person shall have any duty or obligation to refer or offer to the Company or any of its Subsidiaries any Opportunity, and the Company hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Company or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity engaged in by any Identified Person which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries.

(b)     In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Company or any of its Subsidiaries and shall not be liable to the Company, any of its Subsidiaries or any of the Members for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

(c)     The Company, on behalf of itself and each of its Subsidiaries, and each Member (i) acknowledge that the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Entities (each such Entity, a "**Related Company**" and all such Entities, collectively, "**Related Companies**") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates, and (ii) agree that (A) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates, (C) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates as if the Identified Persons were not a party to this Agreement and (D) the Identified Persons are not and shall not be obligated to

51

disclose to the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates in any such business or as to any such opportunities.

(d)     To the fullest extent permitted by law, this Agreement is not intended to, and does not, create or impose any fiduciary or other duty on any Identified Person. Further, to the fullest extent permitted by law, the Company and each Member hereby waives any and all fiduciary duties owed to the Company or such Member by any Identified Person (including those fiduciary duties that, absent such waiver, may be implied by law), and in doing so, the Company and each Member recognizes, acknowledges and agrees that the duties and obligations of the Identified Persons to the Company, each other Member and each other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement are only as expressly set forth in this Agreement. To the fullest extent permitted by law, no Identified Person shall owe any duty (including any fiduciary duty) to the Company or to any Member or to any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement other than a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.   The parties acknowledge and agree that any Identified Person acting in accordance with this Agreement shall (i) be deemed to be acting in compliance with such implied contractual covenant, and (ii) not be liable to the Company, to any Member or to any other Person that is a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement for its reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Identified Person otherwise existing at law or in equity in respect of the Company or any of the Members, are agreed by all parties hereto to replace fully and completely such other duties and liabilities.

(e)     Each Manager (but expressly excluding any Specified Manager and any Independent Manager), in its capacity as such, shall have the same fiduciary duties as those of a member of a board of directors of a corporation organized under the laws of the State of Delaware.  Each employee and officer (other than the Chairman) of the Company, in its capacity as such, shall have the same fiduciary duties as an employee or officer (as applicable) of a corporation organized under the laws of the State of Delaware; provided, that, in recognition of the fact that the Managers do not owe the same fiduciary duties as the officers and employees, the parties acknowledge and agree that any action taken or omitted to be taken by any officer or employee of the Company in accordance with his or her good faith execution of a duly authorized direction of the Board shall not be deemed a breach of such officer's or employee's duty of loyalty to the Company or the Members. Each Independent Manager, in its capacity as such, shall have the same fiduciary duties as those of a member of a board of directors of a corporation organized under the laws of the State of Delaware to refrain from usurping or misappropriating any corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries, including any Opportunity, but shall have no other fiduciary duties.

(f)     Nothing in this Section 8.5 shall be deemed to limit any Member's obligations under Section 20.1.

8.6     Subrogation.  In the event that any Covered Person who is or was a Member, or who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of a Member, and (in any such case) is entitled to indemnification under Section 8.2 for which such Covered Person is also entitled to indemnification from such Member or any of its Affiliates (other than the Company or any of its Subsidiaries), the Company hereby agrees that its duties to indemnify such Covered Person, whether pursuant to this Agreement or otherwise, shall be primary to those of such Member or such Affiliate, and to the extent that such Member or such Affiliate actually indemnifies any such Covered Person, such Member or such Affiliate shall be subrogated to the rights of such Covered Person against the Company for indemnification hereunder.  The Company hereby acknowledges the subrogation rights of each Member and its Affiliates under such circumstances and agrees to execute and deliver such further documents and/or instruments as such Member or its Affiliates may reasonably request in order to evidence any such subrogation rights, whether before or after such Member or its Affiliates make any such indemnification payment.  The Company shall pay any amounts due under this Section 8.6, in cash, promptly, and in any event within fifteen (15) days, upon written demand therefor (accompanied by reasonably detailed supporting documentation) from a Member.  The Company hereby waives any right against each of the Members and their respective Affiliates to indemnification, subrogation, or contribution.  Furthermore, the Company expressly agrees that each Member and its Affiliates is an intended third party beneficiary as to the indemnification provisions of this Agreement and shall be entitled to bring suit against the Company to enforce said provisions.

8.7     Insurance.  The Company shall purchase and maintain, at the Company's expense, insurance (the "**Specified Insurance**") on behalf of all Managers, directors and officers of the Company and its Subsidiaries to protect any such Person against any expense, liability or loss suffered or incurred by, imposed on, or to which such Person may become subject (a) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (b) by reason of the fact that such Person is serving or has served as an officer, manager or director of the Company or any of its Subsidiaries or (c) by reason of the fact that such Person is or was serving as a manager, officer, member, employee or agent or in any other capacity at the request of the Company for any other Entity, in any such case based on acts, omissions, facts, circumstances or matters occurring or arising on or after the Effective Date; provided, however, that the Specified Insurance shall be subject to (i) exclusions and exceptions that are customary for such insurance, and (ii) retentions and limitations as the Board determines to be reasonable in light of the premiums to be paid for the Specified Insurance.  Any Specified Insurance shall be satisfactory to the Board.  If there are any material changes to the terms of the Specified Insurance (other than such changes specifically approved in advance by the Board), including terms relating to scope, retention or amounts, then the Company shall notify the Managers in writing of such changes promptly after the Company becomes aware thereof.

8.8     Amendments.  Notwithstanding anything herein to the contrary, no amendment, repeal or modification of this Article 8 shall affect any rights or obligations with respect to any

state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

## ARTICLE 9
## TRANSFERS

9.1     Restrictions on Transfers.

(a)     *Prohibited Transfers.*  Without limiting any other provisions, restrictions or conditions of this Article 9, but subject to Section 9.9, unless otherwise waived by the Board in its sole discretion, no Units shall be Transferred by any Member (regardless of the manner in which the Transferor initially acquired such Units), if:

(i)     such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or any of its Subsidiaries;

(ii)     such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Board, but not yet consummated), result in the Company having, in the aggregate, 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of either (x) the class of Units proposed to be Transferred (assuming, for purposes of this clause (x), that all issued and outstanding securities of the Company that are exercisable or exchangeable for, or convertible into, directly or indirectly, the class of Units proposed to be Transferred were exercised, exchanged or converted at the time of such Transfer) or (y) any class of Units into which the Units proposed to be Transferred are convertible (such Units, "**Conversion Units**") (assuming, for purposes of this clause (y), that all issued and outstanding securities of the Company that are exercisable or exchangeable for, or convertible into, directly or indirectly, Conversion Units were exercised, exchanged or converted at the time of such Transfer), unless at the time of such Transfer the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; provided, that the number 400 as used in this Section 9.1(a)(ii) shall be increased by the number of such holders that acquire from the Company, after the Effective Date, Units of the class proposed to be Transferred, Conversion Units, or securities of the Company that are exercisable or exchangeable for, or convertible into, Units of the class proposed to be Transferred or Conversion Units, in any such case other than any such acquisition that was made by a holder who held any such Units, Conversion Units or securities prior to such acquisition (including in connection with a distribution to all holders of any such Units, Conversion Units or securities);

(iii)     such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice of any thereof has been previously delivered to the Board, but not yet consummated), require the Company to register any class of Units or other equity securities of the Company

54

under the Exchange Act (as a result of the number of holders of such Units or equity securities or otherwise), unless, at the time of such Transfer, the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act;

(iv)    such Transfer would, in the reasonable judgment of the Board, cause the Company to be treated as an association taxable as a corporation or as a "publicly traded partnership" for federal income tax purposes;

(v)    such Transfer would, in the reasonable judgment of the Board, cause the Company to be required to register as an "investment company" under the Investment Company Act; or

(vi)    such Transfer is to a Competitor or any of its Affiliates.

(b)    *Certificates; Legal Opinion.*  In addition to the restrictions set forth in Section 9.1(a), no Units shall be Transferred by any Member unless (i) the certificates (if any) representing such Units bear legends as provided in Section 9.1(e) (and, with respect to uncertificated Units, notice of such legends is provided in accordance with applicable law), for so long as such legends are applicable, and (ii) either (A) the Transferee is an Affiliate of the Transferor or (B) prior to such Transfer (1) the Transferee and the Transferor shall have delivered to the Company representation letters in such form as may be approved from time to time by the Company and (2) the Transferor shall have delivered to the Company a legal opinion, reasonably acceptable to the Company, stating that the registration of the Units that are the subject of such proposed Transfer is not required under the Securities Act or any applicable state securities or "**blue sky**" laws.  Any of the requirements set forth in clause (B) of the immediately preceding sentence may be waived by the Company in its sole discretion.

(c)    *Notice of Transfer*.  Subject to Sections 9.3 and 9.9, and unless otherwise provided by the Company, any Member proposing to effect a Transfer of Units must submit to the Company, not less than five (5) Business Days prior to such Transfer, a written notice (a "**Transfer Notice**") of such Transfer.  A Transfer Notice shall be delivered to the Company, to the attention of (i) the Secretary or Chief Financial Officer, or any of their designees, and (ii) the Chairman, in each case in accordance with Section 19.5.  A Transfer Notice shall include or be accompanied by (A) the name, address, e-mail address and telephone number of the Transferor and the Transferee, (B) a certification from the Transferee whether the Transferee is an Affiliate of the Transferor and whether the Transferee is an Accredited Investor, (C) the number and class of Units proposed to be Transferred to, and acquired by, the Transferee, (D) the date on which the Transfer is proposed to take place, (E) the percentage of the Transferor's total number of Units of the same class to be Transferred, (F) a Joinder Agreement, duly completed and executed by the Transferee to the extent such Transferee has not already signed a counterpart of this Agreement or executed a Joinder Agreement and (G) a request that the Company register the Transfer on the books of the Company and inform the Company's transfer agent (if any) of the Transfer.  So long as the other provisions of this Section 9.1 are satisfied and complied with, the Company shall, within five (5) Business Days after a Transfer Notice

is delivered to the Company (but in no event earlier than the proposed date of Transfer specified in the Transfer Notice), cause the Transfer to be registered on the books of the Company and inform the Company's transfer agent (if any) of such Transfer unless, (I) prior to the expiration of such five (5) Business Day period, the Company requests information demonstrating that the Transfer complies with this <u>Section 9.1</u> (including information demonstrating that the Transferee or any of its Affiliates is not a Competitor) or (II) the Transferor by written notice to the Company withdraws the related Transfer Notice prior to registration of the Transfer.  If any such request for information is made, the Transfer shall be registered on the books of the Company no later than five (5) Business Days after the Company receives such information (but in no event earlier than the proposed date of Transfer specified in the Transfer Notice), unless the Company determines during any such 5-Business Day period that the Transfer is not permitted pursuant to the terms of this <u>Section 9.1</u>, in which case the Company shall promptly inform the Transferor of such determination.  Upon the closing of each Transfer that is permitted by this Agreement and the Transferee becoming a party to this Agreement, (x) such Transferee shall be admitted as, and deemed to be, a Member for purposes of this Agreement, (y) such Transferee shall be entitled to the rights (excluding Manager Consent Rights and any other rights of a Member that are not assignable or otherwise transferable pursuant to the terms of this Agreement), and subject to the obligations, of a Member with respect to the Transferred Units and (z) <u>Schedule A</u> shall be amended by the Company accordingly.

(d)      *Prohibited Transfers Void.*  Subject to <u>Section 9.9</u>, the Company shall not record upon its books any Transfer of any Units except in accordance with the terms and provisions of this Agreement.  Any purported Transfer of Units in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Company.

(e)      *Legends*.

(i)      All certificates (if any) or statements related to book-entry accounts representing or otherwise evidencing any Units that were issued in connection with the Plan of Reorganization shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to <u>Section 9.1(e)(iv)</u> below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WERE ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.   THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH LIMITED LIABILITY COMPANY INTERESTS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD, PLEDGED OR

OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(ii)     All certificates (if any) or statements related to book-entry accounts representing or otherwise evidencing any Units (other than Class A Common Units that were issued under the Plan of Reorganization) shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 9.1(e)(iv) below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(iii)     All certificates (if any) or statements related to book-entry accounts representing or otherwise evidencing any Units shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend:

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF [NEWCO, LLC] (THE "**COMPANY**") DATED AS OF [●], 2021 (AS AMENDED, RESTATED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**LLC AGREEMENT**") BY AND AMONG THE COMPANY AND THE MEMBERS OF THE COMPANY.  NO REGISTRATION OR TRANSFER OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WILL BE MADE ON THE BOOKS OF THE COMPANY OR ITS TRANSFER AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.  THE COMPANY OR ITS TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] A COPY OF THE LLC AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF LIMITED

LIABILITY COMPANY INTERESTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(iv)     In the event that any Units shall be registered for Transfer under the Securities Act, the Company shall, upon the written request of the holder of such Units, issue to such holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Units without the legend required by Section 9.1(e)(i).  In the event that any Units shall cease to be subject to the restrictions on Transfer set forth in this Section 9.1, the Company shall, upon the written request of the holder of such Units, issue to such holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Units without the legend required by Sections 9.1(e)(ii) and 9.1(e)(iii).

(v)     In the case of uncertificated Units, the Company shall provide notice to the Members of the applicable legends required by Sections 9.1(e)(i), 9.1(e)(ii) and 9.1(e)(iii) above in accordance with applicable law.

(vi)     Each Member shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including the restrictions on Transfer set forth in this Section 9.1) for all purposes of this Agreement and applicable law (including the Act and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate or statement of book-entry position, as applicable, representing or otherwise evidencing any Units owned or held by such Member bears the applicable legends set forth in Sections 9.1(e)(i), 9.1(e)(ii) and 9.1(e)(iii) and whether or not any such Member received a separate notice of such terms, provisions, restrictions and conditions.

(f)     *Member Consent*.     Anything in this Agreement to the contrary notwithstanding, except as provided in Section 9.3 or Section 9.9, no Series A Preferred Units or Series B Preferred Units may be Transferred by any Member to any Person (other than an Affiliate of such Member) without the prior written consent (not to be unreasonably withheld) of each Initial Member Group; provided, however, that such consent of an Initial Member Group shall only be required for so long as, at the time of such proposed Transfer, such Initial Member Group holds at least the Threshold Amount of the applicable series of Preferred Units.

(g)     *Certain Members*.     If any Member is an Entity that was formed for the primary purpose of acquiring indebtedness of, or securities in, the Company, or that has no substantial assets other than Units and indebtedness of, or securities in, the Company, then such Member agrees that no Equity Interests in such Member may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this Section 9.1 as if such Equity Interests were Units.

9.2     Transfer Agents and Registrars; Regulations.  The Company, by resolution of the Board, may from time to time appoint a transfer agent and a registrar, under such arrangements

and upon such terms and conditions as the Board deems advisable.  Until and unless the Board appoints some other Person as its transfer agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary shall be the transfer agent of the Company without the necessity of any formal action of the Board, and the Secretary, or any Person designated by the Secretary, shall perform all of the duties of such transfer agent.  The Board may make such rules and regulations as it may deem expedient and as are not inconsistent with this Agreement, concerning the issue, registration and Transfer of certificates for Units.

9.3     Drag-Along Transactions.

(a)     At any time after the Initial Drag-Along Date, if a Selling Member (or Selling Members) determines to effect, approve or otherwise take an action that would cause the occurrence of, or desire to consummate, a Drag-Along Transaction, the Company or such Selling Members (or a designated representative acting on behalf of such Selling Members) shall deliver written notice thereof (a "**Drag-Along Notice**") to all other Members (each, a "**Dragged Member**" and, collectively, the "**Dragged Members**"), including any holders of Class A Common Units, Series A Preferred Units or Series B Preferred Units, in their capacities as such.  Such written notice shall be delivered to the Dragged Members in accordance with Section 19.5 at least twenty (20) Business Days prior to the proposed closing date of the Drag-Along Transaction, and shall contain a description, in reasonable detail, of the material terms and conditions of the Drag-Along Transaction, including the identity of the Third Party Purchaser, the amount and form of consideration to be paid by the Third Party Purchaser, copies of any Drag-Along Transaction Documents or Investment Documents that the Dragged Members will be required to execute and deliver in connection with such Drag-Along Transaction (to the extent such documents exist at the time such Drag-Along Notice is delivered to the Dragged Members) and the proposed date (which may be an estimated date or range of dates) for the closing of the Drag-Along Transaction.  Notwithstanding the foregoing, a Drag-Along Transaction shall satisfy one of the following requirements (collectively, the "**Drag-Along Requirements**"):

(i)     (A) the Selling Members hold at least the Threshold Amount of Series B Preferred Units at the time the Drag-Along Notice is delivered and at all times after the time the Drag-Along Notice is delivered through immediately prior to the closing of such Drag-Along Transaction (except in connection with the exercise by the Company of its Optional Redemption Right after the Drag-Along Notice is delivered), (B) the Drag-Along Transaction is to be consummated after the Initial Drag-Along Date (but before the Subsequent Drag-Along Date), and (C) the Purchase Price is equal to (or greater than) the greater of (1) the Fair Market Value of the Company, which Fair Market Value shall be obtained through a FMV Sale Process, and (2) the Minimum Purchase Price;

(ii)     (A) the Selling Members hold at least the Threshold Amount of Series B Preferred Units at the time the Drag-Along Notice is delivered and at all times after the time the Drag-Along Notice is delivered through immediately prior to the closing of such Drag-Along Transaction (except in connection with the exercise by the Company of its Optional Redemption Right after the Drag-Along

Notice is delivered), (B) the Drag-Along Notice is delivered after the Subsequent Drag-Along Date, (C) the Purchase Price is equal to (or greater than) the Fair Market Value of the Company, which Fair Market Value shall be obtained through a FMV Sale Process, and (D) no Material Adverse Effect shall have occurred and be continuing; or

      (iii)    (A) the Goldman Members hold less than the Threshold Amount of the Series B Preferred Units at the time the Drag-Along Notice is delivered, (B) the BSP Members hold at least fifty percent (50%) of the number of Class A Common Units held by the BSP Members as of the Effective Date (subject to appropriate proportionate adjustment in the event of any distribution, split, combination or other similar adjustment in the number of Class A Common Units) at the time the Drag-Along Notice is delivered and at all times after the time the Drag-Along Notice is delivered through immediately prior to the closing of such Drag-Along Transaction (except in connection with the exercise by the Company of its Optional Redemption Right after the Drag-Along Notice is delivered), and (C) the terms of such proposed Drag-Along Transaction were approved by the Board, and obtained through a FMV Sale Process.

For the purposes of this Section 9.3, "**Fair Market Value**" shall mean the fair market value of the applicable property and/or assets included in a proposed Drag-Along Transaction as determined by (x) the Board or (y) in the event that there is an FMV Sale Process, an Independent Financial Advisor.  Such Independent Financial Advisor's determination of such Fair Market Value shall be final, binding and conclusive on the Company and the Members for the purposes of this Section 9.3.  Any and all costs and fees of such Independent Financial Advisor shall be paid pursuant to Section 9.3(e).

      (b)    If a Drag-Along Notice is delivered by the Company or by or on behalf of the Selling Members to the Dragged Members, each of the Dragged Members shall:

      (i)    if such Drag-Along Transaction is structured as a Transfer of Units, be obligated to Transfer to the Third Party Purchaser (subject to the other terms of this Section 9.3(b)), at the closing of such Drag-Along Transaction, all Units held by such Dragged Member (or the applicable portion of such Dragged Member's Units that are required to be Transferred in connection with such Drag-Along Transaction, as determined in accordance with Section 9.3(c)) on purchase terms and conditions that are substantially the same as those purchase terms and conditions applicable to the Units of the Selling Members of the same class (excluding any investment or reinvestment opportunity given to management of the Company or any of its Subsidiaries), free and clear of any Liens (other than Permitted Liens); provided, that each Dragged Member will receive, in respect of such Dragged Member's Units that are Transferred in such Drag-Along Transaction, no less than the same portion of the aggregate net consideration paid in such Drag-Along Transaction that such Dragged Member would have received if such aggregate net consideration had been distributed by the Company pursuant to Section 13.2;

(ii)      if such Drag-Along Transaction is structured as a sale or transfer of assets (including by or through the sale, issuance or other disposition of the Equity Interests of, or reorganization, merger, unit or share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Company), approve any subsequent dissolution and liquidation of the Company or any of its Subsidiaries in connection therewith and execute and/or deliver any applicable documents, instruments or agreements related thereto;

(iii)      (A) be required to vote (including by written consent) such Dragged Member's Units (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction, and (B) not raise any objection against such Drag-Along Transaction (including objections relating to consideration being paid in connection therewith) or the process pursuant to which it was arranged, negotiated or consummated (other than any objection based on a claim of non-compliance with the terms of this Agreement);

(iv)      execute and deliver any applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Drag-Along Transaction that the Company, the Selling Members or the Third Party Purchaser may request and which are executed and delivered by the Selling Members (other than any agreements or documents that relate to any investment or reinvestment opportunity given to management of the Company or any of its Subsidiaries) (the "**Drag-Along Transaction Documents**"); provided, however, that (A) no Dragged Member shall be required to provide any (I) non-competition, non-solicitation or other restrictive covenant other than reasonable and customary confidentiality covenants, (II) representations or warranties other than customary representations and warranties, on a several and not joint basis, regarding organization, existence and good standing of such Dragged Member, the power and authority of such Dragged Member to enter into the Drag-Along Transaction, due authorization, execution and delivery by such Dragged Member of the Drag-Along Transaction Documents and the Investment Documents, enforceability against such Dragged Member of the Drag-Along Transaction Documents and the Investment Documents, good and marketable title (free and clear of all Liens) of the Units of such Dragged Member, the consents and notices required to be obtained or made by such Dragged Member in connection with such Drag-Along Transaction, no conflicts with organizational documents, contracts or law applicable to such Dragged Member, no legal proceedings against such Dragged Member, and no brokers' fees owed by such Dragged Member in connection with such Drag-Along Transaction, and other matters reasonably requested by the Third Party Purchaser with respect to such Dragged Member and directly related to such Drag-Along Transaction (for the avoidance of doubt, no Dragged Member shall be required to provide any representations or warranties with respect to the Company or any of its Subsidiaries), or (III) indemnity relating to such Drag-Along Transaction that is in excess of the amount of net proceeds payable to such Dragged Member in connection with such Drag-Along Transaction (other than on account of such Dragged Member's own fraud) and (B) no Dragged Member shall be required to

accept, in exchange for such Dragged Member's Units, consideration payable in any form other than cash (unless such Dragged Member consents to such consideration);

(v)     if the Members will receive any Equity Interests in the continuing, acquiring, resulting or surviving entity in the Drag-Along Transaction, or the parent thereof (the "**Surviving Entity**"), execute and deliver any applicable limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of the Surviving Entity and/or the rights or obligations of the owners of the Equity Interests in the Surviving Entity that the Company, the Selling Members or the Third Party Purchaser may request and which are executed and delivered by the Selling Members (the "**Investment Documents**"); provided, however, that if the Equity Interests to be received by the Dragged Members are not marketable securities, the Selling Members shall reasonably cooperate with each such Dragged Member with respect to the inclusion of proper provisions in the relevant Investment Documents to account for any *bona fide* regulatory requirements reasonably requested by each such Dragged Member;

(vi)     use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Member to effectuate such Drag-Along Transaction;

(vii)     without limiting the provisions of Section 5.6, waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Drag-Along Transaction;

(viii)     not (A) take any action that would reasonably be expected to impede or be prejudicial to such Drag-Along Transaction, (B) assert, at any time, any claim (other than a claim based on non-compliance with the terms of this Agreement) against the Company, any member of the Board (or any committee thereof), any member of any Subsidiary Governing Body or any other Member or any of its Affiliates (including any Selling Member and any of its Affiliates) in connection with such Drag-Along Transaction, or (C) except as required by a Governmental Authority or as otherwise permitted under and pursuant to Article 20, disclose to any Person any information related to such Drag-Along Transaction (including the identity of the Third Party Purchaser, the fact that discussions or negotiations are taking place concerning such Drag-Along Transaction, or any of the terms, conditions or other information with respect to such Drag-Along Transaction); and

(ix)     subject to the limitations set forth in the proviso in Section 9.3(b)(iv), take all necessary or desirable actions reasonably requested by the Selling Members, the Third Party Purchaser and/or the Company in connection with the consummation of such Drag-Along Transaction, including voting such Dragged Member's Units (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction and, if

applicable, in favor of a Corporate Conversion in connection with such Drag-Along Transaction.

(c)     In the case of a Drag-Along Transaction pursuant to which the Selling Members are collectively Transferring less than one hundred percent (100%) of all of the Units owned or held by the Selling Members in the aggregate, then each Dragged Member shall be required to Transfer a percentage of the applicable class of Units owned or held by such Dragged Member equal to the quotient obtained by dividing (i) the total number of the applicable class of Units owned or held by the Selling Members that are proposed to be Transferred in such Drag-Along Transaction by (ii) the total number of the applicable class of Units owned or held by the Selling Members in the aggregate.

(d)     At the closing of any Drag-Along Transaction that is structured as a sale or other Transfer of Units in which the Selling Members have exercised their rights under this Section 9.3, each Dragged Member shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Drag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Third Party Purchaser) representing such Dragged Member's Units to be sold, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by any one or more of the Selling Members, the Third Party Purchaser and/or the Company for the proper transfer of such Units on the books of the Company, free and clear of any Liens (other than Permitted Liens).

(e)     Each Selling Member and each Dragged Member will bear its *pro rata* share (based upon the allocation among each such Member of the consideration payable in respect of Units in the Drag-Along Transaction) of the costs and expenses of any Drag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all Members or the Company and are not otherwise paid by the Company or the Third Party Purchaser.  Costs and expenses incurred by any Member on its own behalf will not be considered costs and expenses of the Drag-Along Transaction and will be borne solely by such Member.

(f)     The Company shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Drag-Along Transaction and not take any action which would reasonably be expected to impede or be prejudicial to any such Drag-Along Transaction. Pending the completion of any proposed Drag-Along Transaction, the Company shall use commercially reasonable efforts to operate the Company and its Subsidiaries in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Drag-Along Transaction Documents) and otherwise comply with the terms of the Drag-Along Transaction Documents to which it is a party.

(g)     The Company shall cooperate with the Selling Members to enter into a Drag-Along Transaction and to take any and all such further action in connection therewith as the Selling Members may deem reasonably necessary or reasonably appropriate in order

to consummate (or, if directed by the Selling Members, abandon) any such Drag-Along Transaction. Neither the Company, any of its Subsidiaries nor any of the Selling Members shall have any liability if any Drag-Along Transaction is not consummated for any reason (including if the Selling Members elect to abandon such Drag-Along Transaction for any reason or for no reason). Subject to the provisions of this Section 9.3, the Selling Members, in exercising their rights under this Section 9.3, shall have complete discretion over the terms and conditions of any Drag-Along Transaction effected hereby, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows; provided that the Selling Members shall consult with, and consider in good faith reasonable comments and requests from, the other Members. At the request of the Selling Members, the Board shall authorize and direct the Company and/or any now or hereafter created Subsidiary of the Company to execute such agreements, documents, applications, authorizations, registration statements and instruments as they may deem reasonably necessary or reasonably appropriate in connection with any Drag-Along Transaction.

(h)     IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED MEMBER TO VOTE SUCH DRAGGED MEMBER'S UNITS IN FAVOR OF A DRAG-ALONG TRANSACTION AND (WITHOUT LIMITING THE PROVISIONS OF SECTION 5.6) TO WAIVE ANY APPRAISAL, DISSENTERS OR SIMILAR RIGHTS THAT SUCH DRAGGED MEMBER HAS (OR MAY HAVE) WITH RESPECT TO ANY DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 9.3(b), EACH DRAGGED MEMBER HEREBY IRREVOCABLY APPOINTS THE SELLING MEMBERS (AND EACH OF THEM) AS SUCH DRAGGED MEMBER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL UNITS OWNED OR HELD BY SUCH DRAGGED MEMBER OR OVER WHICH SUCH DRAGGED MEMBER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES AND WAIVERS FOR THE DURATION OF THE EXISTENCE OF THE COMPANY. IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED MEMBER TO EXECUTE AND DELIVER THE DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, THE INVESTMENT DOCUMENTS, AND TO TAKE ACTIONS IN CONNECTION WITH THE CONSUMMATION OF A DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 9.3(b), EACH DRAGGED MEMBER HEREBY IRREVOCABLY GRANTS TO THE SELLING MEMBERS (AND EACH OF THEM) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH DRAG-ALONG TRANSACTION DOCUMENTS (PROVIDED SUCH DOCUMENTS ARE IN COMPLIANCE WITH THE TERMS OF SECTION 9.3(b)) AND, IF APPLICABLE, INVESTMENT DOCUMENTS, AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH DRAGGED MEMBER. THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH DRAGGED MEMBER PURSUANT TO THIS SECTION 9.3(h) ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, BANKRUPTCY OR INSOLVENCY OF ANY DRAGGED MEMBER WHO IS AN INDIVIDUAL AND THE MERGER, CONSOLIDATION, LIQUIDATION, BANKRUPTCY, INSOLVENCY OR DISSOLUTION OF ANY DRAGGED MEMBER THAT IS NOT AN INDIVIDUAL.

ANY SELLING MEMBER MAY EXERCISE THE PROXIES AND POWERS OF ATTORNEY GRANTED BY ANY DRAGGED MEMBER HEREUNDER AT ANY TIME SUCH DRAGGED MEMBER FAILS TO COMPLY WITH THE PROVISIONS OF THIS <u>SECTION 9.3</u> WITHIN THREE (3) BUSINESS DAYS AFTER BEING GIVEN WRITTEN NOTICE THEREOF.

(i)     A Transfer of Units in a Drag-Along Transaction by a Selling Member or a Dragged Member pursuant to this <u>Section 9.3</u> shall not be subject to the requirements of <u>Section 9.1</u> other than <u>Section 9.1(a)(i)</u>.

(j)     For the avoidance of doubt, (i) a Drag-Along Transaction shall be deemed to constitute a Liquidation Event but shall not constitute a Dissolution Event pursuant to <u>Section 15.2</u>, (ii) the proceeds of a Drag-Along Transaction shall be distributed in accordance with <u>Section 13.2</u> (<u>provided</u>, that, to the extent applicable, the Company will be entitled to retain a portion of the proceeds of such Drag-Along Transaction reasonably necessary to satisfy debts and liabilities of the Company with respect to a subsequent Dissolution Event pursuant to <u>Section 15.2</u>, as described in <u>Section 15.2(a))</u>, and (iii) the obligations of the Company and the Dragged Members pursuant to this <u>Section 9.3</u> shall apply irrespective of the amount of consideration (if any) to be paid to each Dragged Member pursuant to the Drag-Along Transaction (<u>provided</u> the proposed Drag-Along Transaction otherwise meets any applicable Drag-Along Requirements).

(k)     The Selling Members who desire to pursue a potential Drag-Along Transaction shall be entitled to require that the Company retain an Independent Financial Advisor and run a FMV Sale Process by delivering a written notice (a "**Sale Process Notice**") to the Company to such effect; <u>provided</u> that, the Goldman Members shall not be entitled to deliver a Sale Process Notice (i) prior to the Initial Drag-Along Date (except for instances in which the Company has failed to timely redeem any Units held by the Goldman Members as required or permitted under <u>Section 5.11</u>) or (ii) more than once in any twelve (12)-month period.

9.4     <u>Appointment of Purchaser Representative</u>.  If the Selling Members enter into any negotiation or transaction for which Rule 506 of Regulation D (or any similar rule then in effect) promulgated by the SEC may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Dragged Member who is not an Accredited Investor shall, at the request of the Company or the Selling Members appoint a "purchaser representative" (as such term is defined in Rule 501 of Regulation D) reasonably acceptable to the Company and the Selling Members in connection with such negotiation or transaction.

9.5     [Intentionally Deleted].

9.6     <u>Preemptive Rights</u>.  If the Goldman Members no longer hold the Threshold Amount of Series B Preferred Units, each holder of Series B Preferred Units shall be treated as a "**Preemptive Member**" and, collectively, the "**Preemptive Members**") and granted the preemptive rights set forth in this <u>Section 9.6</u>.

(a)      The Company shall not, after the Effective Date, sell or issue to any Person (including any then-current Member) any additional Units or other Equity Interests of the Company, or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Units or other Equity Interests of the Company, or reclassify any Units or Equity Interests of the Company, in any such case that are senior to or *pari passu* with the Series B Preferred Units (collectively, the "**Additional Securities**"), unless the Company first submits written notice (a "**Preemptive Rights Notice**") to each Preemptive Member identifying the material terms of the Additional Securities (including the price, number or amount and type of Additional Securities, and all other material terms thereof) and offers to each such Preemptive Member (provided such Preemptive Member demonstrates to the Company's reasonable satisfaction that such Preemptive Member is an Accredited Investor) the opportunity to purchase up to a portion of the Additional Securities (a "**Pro Rata Portion**") on such terms and conditions set forth in the Preemptive Rights Notice.  A Preemptive Member's Pro Rata Portion shall be equal to the product of (x) the total number or amount of Additional Securities subject to the sale or issuance and (y) a fraction, (A) the numerator of which is the aggregate Series B Preference Amount of the Series B Preferred Units then owned or held by such Preemptive Member, and (B) the denominator of which is the aggregate Series B Preference Amount of all of the issued and outstanding Series B Preferred Units.

(b)      The Company's offer to each Preemptive Member shall remain open for a period of thirty (30) days after the Preemptive Rights Notice is delivered to such Preemptive Member in accordance with Section 19.5.  A Preemptive Member may accept such offer by delivering written notice of such acceptance to the Company prior to the expiration of such thirty (30) day period, which notice shall set forth the number or amount of such Additional Securities to be purchased by such Preemptive Member (which, in any event, shall not exceed the number or amount equal to such Preemptive Member's Pro Rata Portion).  If not all Preemptive Members subscribe for their full Pro Rata Portion of Additional Securities, then the Company shall notify in writing the fully-subscribing Preemptive Members of such fact and shall offer such fully-subscribing Preemptive Members the right to acquire such unsubscribed Additional Securities on the terms set forth in the Preemptive Rights Notice.  Each fully-subscribing Preemptive Member shall have the right to elect to purchase up to its *pro rata* share of such unsubscribed Additional Securities (in proportion to the Pro Rata Portions of all fully-subscribing Preemptive Members), by delivering written notice to the Company within two (2) Business Days from the date such offer from the Company is delivered to such Preemptive Member.  To the extent the procedure described in the preceding sentence does not result in the subscription of all unsubscribed Additional Securities, such procedure shall be repeated until there are no unsubscribed Additional Securities or until no Preemptive Member has elected to purchase additional unsubscribed Additional Securities.

(c)      In the event that any Additional Securities are not subscribed for by the Preemptive Members in accordance with this Section 9.6, the Company or its applicable Subsidiary will have sixty (60) days after the expiration of the last period in which Preemptive Members are entitled to subscribe for Additional Securities to sell the unsubscribed Additional Securities, at a price and upon other terms no more favorable to a purchaser of Additional Securities, in the aggregate, than those specified in the Preemptive

Rights Notice delivered to the Preemptive Members pursuant to Section 9.6(a). Following the earlier to occur of (i) the date the Company sells all such unsubscribed Additional Securities and (ii) the date of the expiration of the sixty (60) day period referred to in the immediately preceding sentence, the Company will not issue or sell any Additional Securities without first offering such Additional Securities to each of the Preemptive Members in the manner provided in this Section 9.6 (it being understood, however, that prior to such earlier date the Company shall not be permitted to sell or issue any Additional Securities (other than such unsubscribed Additional Securities) without first offering such Additional Securities to each of the Preemptive Members in the manner provided in this Section 9.6).

9.7     [Intentionally Deleted].

9.8     Termination of Article 9.    Notwithstanding anything to the contrary in this Article 9, the provisions of this Article 9 (other than the legend requirements set forth in Section 9.1(e) (to the extent still applicable)) shall automatically terminate and be of no further force or effect upon the earlier of: (a) the consummation of a Qualified Public Offering and (b) the consummation of a Sale Transaction; provided that for purposes of this Section 9.8, the term "Sale Transaction" shall not include any consolidation, merger or other business combination of the Company with or into an Affiliate of the Company for the purpose of changing the legal domicile of the Company or any other transaction for the purpose of domesticating the Company in another jurisdiction or changing the legal form of the Company; provided, however, that (A) any claims or rights of a Selling Member or the Company against any Dragged Member arising under or relating to Section 9.3 hereof and (B) any authorizations, obligations, covenants or liabilities of a Dragged Member arising under or relating to Section 9.3 hereof shall, in either such case, survive the termination of this Article 9.

9.9     Certain GS Investor Transfers.

(a)     Subject to Section 9.9(b), notwithstanding anything to the contrary in this Agreement, in the event that it becomes unlawful for the Goldman Members to continue to hold their Units, in whole or in part, or some or all of the Units held by them, or restrictions are imposed on the Goldman Members by any statute, regulation or governmental authority which, in the good faith judgment of the Goldman Members, make it unduly burdensome (based upon the written advice of outside counsel) to continue to hold the Units, the Goldman Members may sell or otherwise dispose of their Units without the consent of the Board, the Company or any other Member (provided, that the consent of the Board shall be required if the transferee is an operating company that is a direct Competitor of the Company) and without compliance with Section 9.1(c), and the Company agrees, at the request of the Goldman Members, to provide (and authorize the Goldman Members to provide) customary and reasonable financial and other information concerning the Company to any prospective purchaser of the Units owned by the Goldman Members.

(b)     In the event the Goldman Members propose to Transfer their Units pursuant to Section 9.9(a) (the "ROFO Units"), the Goldman Members agree to first comply with the provisions of this Section 9.9(b). The Goldman Members shall give written notice to the Company and the BSP Members stating its bona fide intention to

Transfer the Units pursuant to <u>Section 9.9(a)</u> and specifying the number of ROFO Units. Upon receipt of such notice, the Company and the BSP Members shall have a period of thirty (30) days (the "<u>ROFO Notice Period</u>") to submit an offer to the Goldman Members (a "<u>ROFO Offer</u>") for all (but not less than all) of the ROFO Units, including the cash purchase price and material terms of such offer. The delivery of a ROFO Offer shall constitute an irrevocable offer (during the ROFO Acceptance Period) by the Company and/or the BSP Members to purchase the ROFO Units at the price and on the terms specified in the ROFO Offer.  Upon the receipt of the ROFO Offer, the Goldman Members shall have a period of thirty (30) days (the "<u>ROFO Acceptance Period</u>") to accept the ROFO Offer (a "<u>ROFO Acceptance Notice</u>").  If the Goldman Members timely deliver a ROFO Acceptance Notice, then each party shall take such actions and execute such documents as are customary for transactions of this type and may otherwise be reasonably requested by the other party in order to promptly give effect to the transactions contemplated hereby.  If the Company and/or the BSP Members fail to deliver a ROFO Offer during the ROFO Notice Period or the Goldman Members do not deliver a ROFO Acceptance Notice by the end of the ROFO Acceptance Period, the Goldman Members may, during the 90-day period following the expiration of the ROFO Notice Period (and subject to extension for any regulatory filings or requirements), Transfer all (but not less than all) of the ROFO Units to a third party at a price not less than the price included in the ROFO Offer (if any).  If the Goldman Members do not Transfer all of the ROFO Units, or if such Transfer is not consummated, within the period in the preceding sentence, the right of first offer provided in this <u>Section 9.9(b)</u> shall be deemed to be revived, and the ROFO Units shall not be offered to any Person unless first re-offered to the Company and the BSP Members in accordance with this <u>Section 9.9(b)</u>.

## ARTICLE 10
## FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS

10.1    <u>Fiscal Year</u>.  The fiscal year of the Company (the "**Fiscal Year**") shall be the year ending on December 31, unless another fiscal year is established by the Board.

10.2    <u>Books and Records</u>.  The books and records of the Company may be kept at such place or places as may be from time to time designated by the Board.  The Company shall keep correct and complete books and records of account, including the amount of its assets and liabilities, minutes of its proceedings of its Members and the Board (and any committee of the Board) and the names and places of residence of its officers.

10.3    <u>Tax Information</u>.  The Company shall, as a Company expense, as soon as reasonably practicable after the end of each Fiscal Year, but no later than 120 days after the end of each Fiscal Year, furnish the Members with all necessary tax reporting information required, or reasonably requested, by the Members (including, without limitation, state and local apportionment information) for the preparation of their respective federal, state and local income tax returns, including each Member's Schedule K-1 or analogous schedule.  Estimates of the same will be provided to each Member within 90 days after the end of each Fiscal Year.  The Company shall use reasonable efforts to cause all federal, state and local income and other tax returns to be timely filed by the Company, and shall supervise the Company's independent nationally or regionally recognized accountant (which shall be designated and/or changed by the Board) in the

preparation of the Company's tax returns, which returns shall be signed by an authorized Member or representative on behalf of the Company and co-signed by the Company's accountant as preparer.

10.4   <u>Tax Elections and Accounting</u>.  Except as otherwise provided in this Agreement, all decisions as to accounting principles, whether for the Company's books or for income tax purposes (and such decisions may be different for each such purpose), all elections available to the Company under applicable tax law and the treatment of all transactions on the Company's tax returns, shall be made by the Board, in consultation with the Company's tax advisors.  The Board (i) shall, at the request of a holder of Series A Preferred Units or Series B Preferred Units, in the manner provided in Treasury Regulations Section 1.754-1(b), cause the Company to elect pursuant to Code Section 754 to adjust the basis of the assets of the Company in the manner provided in Code Sections 734 and 743, (ii) may make comparable elections under comparable provisions of state, local, or foreign tax law, and (iii) shall allocate Profits and Losses under <u>Article 12</u>.

10.5   <u>Company Representative</u>.

(a)   Unless otherwise agreed by the Board, and subject to the terms of this Agreement, an officer of the Company or a Manager designated by the Board shall have full power and authority to act for the Company and the Members as the "partnership representative" (the "<u>Company Representative</u>") under Section 6223 of the Code (as modified by the Bipartisan Budget Act of 2015, as amended (and any comparable provisions of state or local tax law), the "<u>BB Act</u>"), with all the rights and responsibilities of that position described in Code Sections 6222-32 and to act in any similar capacity under applicable state or local law.  The Company Representative shall keep the Members reasonably informed of the progress of any tax audits or examinations.  The Company shall reimburse the Company Representative for all third party costs and expenses, and any other costs and expenses, incurred by it in the exercise of the rights and/or the performance of the responsibilities referred to in this <u>Section 10.5</u>.  The Company Representative shall, to the extent permissible and with the consent of the Requisite Members, make the election contemplated by Code Section 6226 (as modified by the BB Act). Each Member shall provide to the Company Representative all information reasonably necessary to allow the Company Representative to make an election under Section 6226 of the Code (as modified by the BB Act) or to utilize the so-called "pull in" procedure to reduce the tax payable by the Company if the reviewed-year partners pay any additional tax that would be owed on their share of the imputed underpayment amount.  Each Member agrees that, upon request of the Company Representative, such Member shall take such reasonable actions as may be necessary or desirable (as reasonably determined by the Company Representative) to allow the Company to comply with the provisions of Section 6226 of the Code so that any "partnership adjustments" are taken into account by the Members rather than the Company.

(b)   In the event the Company incurs any liability for taxes, interest or penalties pursuant to the BB Act:

(i)   then any "**imputed underpayment**" (as determined in accordance with Section 6225 of the Code) or "**partnership adjustment**" that does not give rise to an "**imputed underpayment**" shall be apportioned among the Members for

the taxable year in which the adjustment is finalized in such manner as may be necessary (as determined by the Board) so that, to the maximum extent possible, the tax and economic consequences of the partnership adjustment and any associated interest and penalties are borne by the Members based upon their interests in the Company for the "**reviewed year**";

(ii)     the Company Representative shall request the Members (including any former Member) to whom such liability relates, as determined by the Company Representative in its reasonable discretion, to pay, and each such Member hereby agrees to pay, such amount to the Company and such amount shall not be treated as a Capital Contribution for purposes of any provision herein that affects Distributions to the Members;

(iii)    without reduction in any Member's (or former Member's) obligation under the foregoing clause (ii), any amount paid by the Company that is attributable to a Member (or former Member), as determined by the Company Representative in its reasonable discretion, and that is not paid by such Member pursuant to clause (ii) shall be withheld from current or future Distributions otherwise distributable to the Member but treated for purposes of Article 13 as a Distribution made to such Member (or former Member); and

(iv)    the obligations of each Member (or former Member) under this Section 10.5 shall survive the Transfer by such Member of its Units and the dissolution of the Company.

10.6   Required Records.   To the fullest extent permitted under applicable law, each Member hereby waives its rights under Section 18-305(a) of the Act to obtain the information specified therein; provided, however, that to the extent that, notwithstanding such waiver, any such Member is entitled to receive such information, the receipt thereof shall be subject to all of the limitations set forth in Section 18-305 of the Act (including the right of the Managers to keep certain information confidential from the Members pursuant to Section 18-305(c) of the Act), and shall be limited to review of the Company's general ledger and those financial statements derived from it; provided, further, that the review of such information shall be at the sole cost and expense of such Member, during regular business hours, upon reasonable advance notice, in a manner as would not be unreasonably disruptive to the business or operations of the Company or any of its Subsidiaries, and subject to such other standards as may be established by the Board from time to time.   Except as expressly required by non-waivable provisions of applicable law and except as expressly set forth in Section 4.1, Section 10.3 and Section 17.1, the Members shall have no rights to obtain, examine or inspect, or make copies or extracts of, any documents, materials or information relating to the Company or any of its Subsidiaries or any of their respective businesses, assets, operations, properties, financial and other conditions, prospects, or members, partners or shareholders.

10.7   Audits of Books and Accounts.   The Company's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by vote or written consent of the Board.

10.8    <u>Tax Matters</u>.    Notwithstanding anything to the contrary contained in this Agreement, the following provisions shall apply with respect to all Tax matters relating to the Company and its Subsidiaries:

(a)    Tax Return Filing.  No later than thirty (30) days prior to the filing of any income or other material Tax return (including, for the avoidance of any doubt, any amended income or other material Tax return), the holders of the Series A Preferred Units and the Series B Preferred Units shall receive a draft of any such Tax return for their review, and shall have ten (10) days after receipt of such Tax return to provide comments thereto. The Board and/or Company Representative shall act reasonably and in good faith to consider such comments and consult with the respective holder and Tax return preparer to address such comments fairly and appropriately.

(b)    Tax Controversies.  Upon receipt of a written notice of audit, examination or other tax proceeding from any taxing authority, the Company Representative shall promptly notify each holder of Series A Preferred Units and the Series B Preferred Units, and shall keep each such holder reasonably informed with respect to the amount, status and nature of each tax item or issue that is the subject of such audit, examination or other tax proceeding.  Upon request, the Company Representative shall provide such holder with copies of any communications with the relevant taxing authorities and, to the extent permitted by applicable law, allow such holder to participate in meetings or conferences related thereto.  Neither the Company Representative nor the Board (nor any person acting on their behalves) shall enter into any settlement or compromise that could reasonably be expected to have a material and disproportionate adverse impact on the Tax position of any holder of Series A Preferred Units or Series B Preferred Units without the consent of such holder, which consent shall not be unreasonably delayed, withheld or conditioned.

(c)    Tax Return Preparers/Company Representative.  Any decision to appoint or replace a tax return preparer or Company Representative shall be made by the Board in good faith and for the collective benefit of the Members; <u>provided</u>, the initial tax return preparer shall be approved by the holders of the Series A Preferred Units and Series B Preferred Units.  Prior to making any such decision, the Board shall notify and consult with each holder of Series A Preferred Units or Series B Preferred Units, and provide each such holder with the opportunity to comment on such appointment or replacement.

(d)    "Imputed Underpayments".  The Board and/or the Company Representative shall act reasonably and in good faith and consult with each holder of Series A Preferred Units and Series B Preferred Units with respect to the calculation and allocation among Members of the amount, if any, of any imputed underpayments under <u>Section 10.5(b)</u>.

10.9    <u>ORG GC Midco Tax Matters</u>.

(a)    The Company shall cooperate with ORG GC Midco and any of its Affiliates fully, as and to the extent reasonably requested by either of them, in connection with the filing of tax returns and any audit, litigation, proposed adjustment or deficiency, assessment, claim, suit or other tax proceeding ("**Tax Proceeding**") imposed on or with respect to the assets, operations or activities of ORG GC Midco for any taxable period (in

71

whole or in part) ending on or before the date of Emergence (the "**Pre-Emergence Tax Period**"). Such cooperation shall include using commercially reasonable efforts to (i) furnish or cause to be furnished to ORG GC Midco and any of its Affiliates, upon request, as promptly as practicable, such information and assistance as is reasonably necessary for (A) the filing of any such tax returns and (B) the preparation, prosecution or defense of any Tax Proceeding in respect any Pre-Emergence Tax Period, and (ii) preserve and keep, or cause to be preserved and kept, all original books and records related to ORG GC Midco in respect of Pre-Emergence Tax Periods until the seventh anniversary of the date hereof or such longer period as may be required by applicable law or necessitated by applicable statues of limitations.

(b)        [The Company shall cooperate with ORG GC Midco in the preparation of any U.S. federal and applicable state tax return of ORG GC Midco for any Pre-Emergence Tax Period.]

## ARTICLE 11
## CAPITAL

11.1    <u>Capital Contributions</u>.   The Capital Contributions made and the value of other consideration provided by the Members prior to or on the Effective Date are set forth on <u>Schedule A</u>. The Company and each of the Members agree to file all tax returns consistent with the values set forth on <u>Schedule A</u>.  To the extent that any Member shall make any additional Capital Contributions to the Company in accordance with the terms hereof, <u>Schedule A</u> shall be amended by the Company to reflect such additional Capital Contributions.

11.2    <u>No Right to Return of Contribution</u>.   No Member shall have the right to the withdrawal or to the return of such Member's Capital Contributions, except upon the dissolution and liquidation of the Company pursuant to, and subject to the terms and conditions of, <u>Section 5.8</u>, <u>5.9</u> or <u>5.11</u> or <u>Article 15</u>.

11.3    <u>Additional Capital Contributions</u>.  From and after the Effective Date, no Member will be obligated to make any further Capital Contributions to the Company.

11.4    <u>Loans to the Company; No Interest on Capital</u>.  The Members may, but are not obligated to, make loans or provide other extensions of credit to the Company from time to time (including by the purchase of debt securities issued by the Company), as authorized by the Board. Any such loans or extensions of credit shall not be treated as Capital Contributions to the Company for any purpose under this Agreement nor entitle such Member to any increase in its share of the Profits and Losses and Distributions, but the Company shall be obligated to such Member for the amount of any such loans or extensions of credit pursuant to the terms thereof, as the same are determined by the Board and such Member.  Interest with respect to the outstanding amount of any loans or other extensions of credit made or provided by a Member to the Company shall accrue and be payable at such times and at such rates as is determined by the Board and such Member. No interest shall be paid on any Capital Contribution to the Company or on any balance in any Capital Account.

11.5   <u>Creditor's Interest in the Company</u>.  No creditor who makes a loan or otherwise extends credit to the Company shall have or acquire at any time as a result of making the loan or providing the extension of credit any direct or indirect interest in the profits, capital or property of the Company, other than such interest as may be accorded to a secured creditor.  Notwithstanding the foregoing, and subject to other limitations expressly set forth in this Agreement, this provision shall not prohibit in any manner whatsoever a secured creditor from participating in the profits of operation or gross or net sales of the Company or in the gain on sale or refinancing of the Company, all as may be provided in its loan or security agreements.

11.6   <u>Capital Accounts</u>.

(a)   The Company shall establish and maintain a separate Capital Account for each Member in accordance with the following provisions:

(i)   To each Member's Capital Account there shall be credited such Member's Capital Contributions and such Member's allocable share of Profits, and any items in the nature of income or gain that are specially allocated to such Member under this Agreement.

(ii)   To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752) and such Member's allocable share of Losses, and any items in the nature of expenses or losses that are specially allocated to such Member under this Agreement.

(iii)   In the event any Unit is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Unit.  In the case of a sale or exchange of a Unit at a time when an election under Code Section 754 is in effect, the Capital Account of the Transferee Member shall not be adjusted to reflect the adjustments to the adjusted tax bases of Company property required under Code Sections 754 and 743, except as otherwise permitted by Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(iv)   In determining the amount of any liability for purposes of <u>paragraphs (i)</u> and <u>(ii)</u> above, there shall be taken into account Code Section 752(c) and the Treasury Regulations promulgated thereunder, and any other applicable provisions of the Code and Regulations.

(b)   This <u>Section 11.6</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Regulations.  The Board's determination of Capital Accounts shall be binding upon all Members, except as otherwise required by law.

11.7   <u>Return of Capital</u>.   No Member shall be liable for the return of the Capital Contributions (or any portion thereof) of any other Member, it being expressly understood that any such return shall be made solely from Company assets.   No Member shall be required to pay to the Company or to any other Member any deficit in its Capital Account upon dissolution of the Company or otherwise, and no Member shall be entitled to withdraw any part of its Capital Contributions or Capital Account, to receive interest on its Capital Contributions or Capital Account or to receive any Distributions from the Company, except as expressly provided for in this Agreement or under applicable law.

## ARTICLE 12
## ALLOCATION OF PROFITS AND LOSSES

12.1   <u>Profits and Losses</u>.   Except as otherwise stated in this <u>Article 12</u>, Profits and Losses for each Allocation Year shall be allocated among the Members in such a manner that, as of the end of such Allocation Year, the sum of (a) the Capital Account of each Member, (b) such Member's share of Company Minimum Gain (as determined according to Treasury Regulations Section 1.704-2(g)), and (c) such Member's Member Nonrecourse Debt Minimum Gain shall be equal to the respective net amounts, positive or negative, which would be distributed to them, determined as if the Company were to (x) liquidate the assets of the Company for an amount equal to their Gross Asset Value, (y) satisfy in cash all liabilities of the Company in accordance with their terms (limited, in the case of non-recourse liabilities, to the Gross Asset Value of the property securing such liabilities) and (y) distribute the proceeds of liquidation pursuant to <u>Section 15.2</u> (solely for this purpose,[ ignoring <u>clause (y)</u> of the definition of "Unpaid Series B Preference Amount" and] the proviso in <u>Section 15.2(b)</u>   for any Allocation Year ending prior to the occurrence of a Dissolution Event).   Notwithstanding anything to the contrary contained in this Agreement, except as otherwise required by applicable law, only "net" profits and items of "net" income or "net" gain (and not "gross" profits, income or gain ) shall be allocated with respect to the Series A Preferred Return or the Series B Preferred Return, and no portion of any payments and accruals on the Series A Preferred Return or Series B Preferred Return shall be treated as giving rise to a "guaranteed payment" under Section 707(c) of the Code or a capital shift.

12.2   <u>Special Allocations</u>.

(a)   *Minimum Gain Chargeback*.   Notwithstanding any other provision of this <u>Article 12</u>, if there is a net decrease in Company Minimum Gain during any Allocation Year, the Members shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.   The items so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).   This <u>Section 12.2(a)</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)   *Member Nonrecourse Debt Minimum Gain Chargeback*.   Notwithstanding any other provision of this <u>Article 12</u>, except <u>Section 12.2(a)</u>, if there is a net decrease in

74

Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).   This Section 12.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     *Qualified Income Offset*.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in paragraphs (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by such Regulations, the Adjusted Capital Account deficit of such Member as quickly as possible, provided, that an allocation pursuant to this Section 12.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account deficit after all other allocations provided for in this Article 12 have been tentatively made as if this Section 12.2(c) were not in this Agreement.

(d)     *Gross Income Allocation*.  In the event any Member has a deficit Capital Account at the end of any Allocation Year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Member is obligated to restore pursuant to the penultimate sentence of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided, that an allocation pursuant to this Section 12.2(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 12 have been made as if Section 12.2(c) and this Section 12.2(d) were not in this Agreement.

(e)     *Nonrecourse Deductions*.  Nonrecourse Deductions shall be allocated to holders of Class A Common Units in proportion to the number of Class A Common Units held by each such holder immediately prior to such allocation.

(f)     *Member Nonrecourse Deductions*.  Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     *Section 754 Adjustments*.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) (including any such adjustments pursuant to Treasury Regulation Section 1.734-2(b)(1)) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

12.3     Curative Allocations.  The allocations contained in each of Section 12.2 and Section 12.4 (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Code and Regulations.  The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either by other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 12.3.  Therefore, notwithstanding any other provisions of this Article 12 (other than the Regulatory Allocations), the Board shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it reasonably determines to be appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement.

12.4     Limitation on Allocation of Losses.  In no event shall Losses be allocated to a Member to the extent such allocation would result in such Member having an Adjusted Capital Account deficit at the end of any Allocation Year.  All such Losses shall be allocated to the other Members in accordance with the positive balances in such Members' Capital Accounts.

12.5     Other Allocation Rules.

(a)     Profits, Losses, and any other items of income, gain, loss, or deduction shall be allocated to the Members pursuant to this Article 12 as of the last day of each Fiscal Year, provided, that Profits, Losses, and such other items shall also be allocated at such times as the Gross Asset Values of Company assets are adjusted pursuant to paragraph (b) of the definition of "**Gross Asset Value**".

(b)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly or other basis, as reasonably determined by the Board, using any permissible method under Code Section 706 and the Regulations thereunder.

(c)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members for tax purposes in the same proportions as they share Profits or Losses, as the case may be, for the applicable Allocation Year.

(d)     For purposes of Code Section 752 and the Regulations thereunder, "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations

Section 1.752-3(a)(3), shall be allocated among the holders of Class A Common Units in proportion to the number of Class A Common Units held by each such holder immediately prior to such allocation.

(e)  To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Members shall treat any Distributions as not allocable to an increase in Company Minimum Gain to the extent the Distribution does not cause or increase a deficit balance in the Adjusted Capital Account of any Member.

(f)  For purposes of determining the nature (as ordinary or capital and, if capital, the applicable rate) of certain items of income and gain allocated among the Members for federal income tax purposes pursuant to this Section 12.5, any items of income and gain required to be recognized as ordinary income under Code Section 1245 or as "unrecaptured section 1250 gain," as defined in Code Section 1(h), shall be deemed to be allocated among the Members in the same proportion that the Members were allocated and claimed the tax depreciation deductions or basis deductions, directly or indirectly, giving rise to such treatment under Code Sections 1(h) and 1245.

12.6   Tax Allocations: Code Section 704(c).

(a)  Subject to Section 12.6(b), items of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner that such items are allocated to the Members' Capital Accounts.

(b)  In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, deduction and tax depreciation with respect to any property which has a Gross Asset Value different than its adjusted tax basis, will, solely for federal income tax purposes, be allocated among the Members in accordance with Code Section 704(c) and the Treasury Regulations thereunder to take into account such difference, using the "traditional method" under Section 1.704-3 of the Treasury Regulations.  Allocations pursuant to this Section 12.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

## ARTICLE 13
## DISTRIBUTIONS

13.1   Tax Distributions.

(a)  Subject to (x) the terms of Section 5.2 and Section 13.3, (y) the Company having available cash, as determined by the Board in its sole discretion, and (z) the then existing agreements of the Company or any of its Subsidiaries relating to indebtedness or debt securities of the Company or any of its Subsidiaries, the Company shall, with respect to each Fiscal Quarter, distribute to each Member an amount of cash (a "Tax Distribution") equal to (i) the product of (A) the amount of the Company Income Amount with respect to such Fiscal Quarter that is allocable to such Member pursuant to Section 12.6 and (B) the Applicable Tax Rate less (ii) the amount distributed to such Member pursuant to

Section 13.2 in respect of such Fiscal Quarter.  Unless and until the net taxable income of the Company exceeds the net taxable losses of the Company, Tax Distributions shall only be made by the Company to the extent that net taxable income cannot be offset with net operating losses under Section 172 of the Code.

(b)      The "**Company Income Amount**" for a Fiscal Quarter shall be an amount equal to the taxable income of the Company (excluding taxable income incurred in connection with a Liquidation Event but, for the avoidance of doubt, taking into account Section 163(j) and any other limitations on the deductibility of interest)) for such Fiscal Quarter calculated at the partnership level which, for the avoidance of doubt, shall exclude any adjustments under Code Section 743 (net of taxable losses and tax credits from prior Fiscal Quarters not previously taken into account under this clause).  Tax Distributions shall be made at least ten days in advance of the due date for a U.S. corporation's quarterly estimated U.S. federal income tax payment (and the Company shall provide to each Member that is receiving a Tax Distribution, at substantially the same time that any such Tax Distribution is made, a reasonably detailed calculation of the Company Income Amount).  Subsequent Tax Distributions shall be adjusted up or down to reflect any variation between the quarterly estimated Tax Distributions actually made and the Tax Distributions that would have been made based on subsequent tax information.  In the event that the funds available for any Tax Distribution to be made hereunder are insufficient to pay the full amount of the Tax Distribution that would otherwise be required under Section 13.1(a), the amount of funds that are then available shall be distributed at such time to the Members in proportion to the amounts that would otherwise have been distributed to such Members pursuant to Section 13.1(a).  At any time thereafter when additional funds of the Company are legally available for distribution, such funds shall be promptly distributed to the Members in proportion to the amounts that would otherwise have been distributed to such Members pursuant to Section 13.1(a) (without any interest thereon) until the full amount of Tax Distributions that were not previously paid are so paid in full.  If any Member Transfers any portion of its Units during a Fiscal Quarter, the Tax Distribution made with respect to the Transferor and the Transferee with respect to such Transferred Units shall be allocated between the Transferor and the Transferee in proportion to the taxable income allocated to each such Person during such Fiscal Quarter.  Tax Distributions shall be treated as advances of amounts Members are entitled to receive pursuant to Section 13.2, except that Tax Distributions that are made with respect to allocations of income with respect a Member's Class A Common Units will not count in determining the Unpaid Series B Preferred Return and Unpaid Series B Preference Amount with respect to such Member's Series B Preferred Units.

13.2      Other Distributions.  Other than Tax Distributions, subject to (x) the terms of Sections 5.2 and 13.3, and (y) the then existing agreements of the Company or its Subsidiaries relating to indebtedness or debt securities of the Company or any of its Subsidiaries, the Board may (but shall not be obligated to) cause the Company to make Distributions to the Members, at such times and in such amounts as the Board may determine in its sole discretion, as follows:

(a)      first, to the Members that own or hold Series A Preferred Units (ratably among such Members based on the aggregate Unpaid Series A Preferred Return with respect to all outstanding Series A Preferred Units held by each such Member immediately

prior to such Distribution) until the aggregate Unpaid Series A Preferred Return with respect to each such Member's Series A Preferred Units has been reduced to zero dollars ($0.00);

(b)     second, to the Members that own or hold Series A Preferred Units (ratably among such Members based on the aggregate Unpaid Series A Preference Amount with respect to all outstanding Series A Preferred Units held by each such Member immediately prior to such Distribution) until the aggregate Unpaid Series A Preference Amount with respect to each such Member's Series A Preferred Units has been reduced to zero dollars ($0.00);

(c)     third, to the Members that own or hold Series B Preferred Units (ratably among such Members based on the aggregate Unpaid Series B Preferred Return with respect to all outstanding Series B Preferred Units held by each such Member immediately prior to such Distribution) until the aggregate Unpaid Series B Preferred Return with respect to each such Member's Series B Preferred Units has been reduced to zero dollars ($0.00);

(d)     fourth, to the Members that own or hold Series B Preferred Units (ratably among such Members based on the aggregate Unpaid Series B Preference Amount with respect to all outstanding Series B Preferred Units held by each such Member immediately prior to such Distribution) until the aggregate Unpaid Series B Preference Amount with respect to each such Member's Series B Preferred Units has been reduced to zero dollars ($0.00); and

(e)     fifth, to the Members that own or hold Class A Common Units (ratably among such Members based on their respective ownership of the total number of issued and outstanding Class A Common Units immediately prior to such Distribution).

Unless a different record date is established by the Board, any Distribution pursuant to or in accordance with this Section 13.2 shall be made to the Persons shown on the Company's books and records as holders of Units entitled to such Distribution as of the date of such Distribution.

Distributions upon a Liquidation Event shall be made pursuant to this Section 13.2 (provided, that, the Company will be entitled to retain a portion of the proceeds of such Liquidation Event reasonably necessary to satisfy debts and liabilities of the Company with respect to a subsequent Dissolution Event pursuant to Section 15.2, as described in Section 15.2(a)).

13.3    Limitations on Distributions. Notwithstanding any provision to the contrary in this Article 13, no Distribution shall be made if such Distribution would violate the Act or any other applicable law.

13.4    No Other Distributions. Except as set forth in this Article 13 or upon the dissolution and liquidation of the Company pursuant to, and subject to the terms and conditions of, Article 15, no Member shall have the right to demand or receive any Distribution or other return on capital in respect of its Units or Capital Contributions.

13.5    <u>Withholding Tax</u>.  The Company will at all times be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation to such Member or otherwise with respect to such Member (including in connection with a distribution in kind or as a result of a failure to provide materials necessary to prevent withholding under this <u>Section 13.5</u>) and to withhold (or deduct) the same (together with interest as set forth below) from distributions or allocations to such Member, including in connection with an audit of the Company.  Any funds withheld by reason of this <u>Section 13.5</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement and, to the extent such withholding has not offset a current distribution, shall reduce future distributions to which such Member is otherwise entitled pursuant to this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to such Member (including in connection with a distribution in kind or as a result of a failure to provide materials necessary to prevent withholding under this <u>Section 13.5</u>), then such Member shall reimburse the Company for the amount of such payment (together with interest as set forth below), on demand or as otherwise provided hereunder.  The amount of a Member's reimbursement obligation under this <u>Section 13.5</u>, to the extent not paid, shall be deducted from the distributions to such Member; and any amounts so deducted shall constitute a repayment of such Member's obligation hereunder to the extent of such deduction.  In addition, if a Member has not satisfied its reimbursement obligation under this <u>Section 13.5</u> by the time of any Transfer of any of such Member's Units (including any Transfer in connection with a Sale Transaction), then the Company is authorized by the Members (including such Member) to take such steps and other actions to cause or require an amount of proceeds that would otherwise be paid or distributed to such Member (or its Affiliates) in connection with such Transfer to be paid to the Company to satisfy such reimbursement obligation in full (or to satisfy such reimbursement obligation to the maximum extent possible); and any amounts so paid to the Company shall constitute a repayment of such Member's obligation hereunder to the extent of such payment.  The amount of a Member's reimbursement obligation under this <u>Section 13.5</u> shall bear interest on such amount at a rate equal to 7.0% per annum, compounded quarterly, commencing from the date the Company makes the applicable payment to a Taxing Authority until such amount (together with such interest) is repaid to the Company (or deducted from a distribution to such Member).  Each Member's reimbursement obligation under this <u>Section 13.5</u> shall remain a personal liability of such Member and shall continue after such Member Transfers its Units or after a withdrawal by such Member from the Company.  Each Member agrees to furnish the Company with any representations, forms, certificates or other information as shall be reasonably requested by the Company to assist the Company in determining the extent of, or in fulfilling or complying with, any withholding, reporting or compliance obligations the Company may have, including any representations, forms, certificates and information required under Treasury Regulation Section 1.1445-2 or 1.1445-5 in order for the Company to satisfy any withholding, reporting or compliance obligations under Section 1445 of the Code with respect to such Member.  The Company shall be entitled to withhold distributions from any Member that fails to provide the representations, forms, certificates and information referred to in the preceding sentence and to use such withheld distributions in order to satisfy any withholding obligations with respect to such Member.  Each Member agrees to indemnify and hold harmless the Company, each officer, each Manager, the other Members, and any other Person who is or is deemed to be the responsible withholding agent for federal, state,

local or foreign income tax purposes, from and against any liability with respect to taxes, interest and penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable to such Member, other than to the extent any such person acted in bad faith or with gross negligence.  Any amount payable as indemnity hereunder by a Member will be paid promptly to the Company, and the Company will be entitled to retain any distributions due to such Member for all such amounts that have not been paid.

## ARTICLE 14
## WITHDRAWALS; ACTION FOR PARTITION

14.1    Waiver of Partition.  No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or, subject to the terms of Section 9.3, cause the sale of any Company property; and, notwithstanding any provisions of applicable law to the contrary, each Member (and each of such Member's legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to such Member's Units, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

14.2    Covenant Not to Withdraw or Dissolve.  Notwithstanding any provision of the Act, but except as otherwise provided in this Agreement, each Member hereby covenants and agrees that such Member has entered into this Agreement based on its mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) withdraw or attempt to withdraw from the Company (other than (x) upon the permitted Transfer of all of its Units, so long as such withdrawal does not result in a dissolution of the Company or (y) as permitted under Section 9.9), (b) exercise any power under the Act to dissolve the Company, (c) petition for judicial dissolution of the Company, or (d) demand a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits).  Anything herein to the contrary notwithstanding, no Member shall be entitled to abandon or surrender such Member's Units or other Interests.

## ARTICLE 15
## DISSOLUTION AND LIQUIDATION

15.1    Events Causing Dissolution.  Subject to Section 5.10(a), the Company shall be dissolved only upon the occurrence of any of the following events:

(a)    Notwithstanding anything in Section 18-801(a)(3) of the Act to the contrary, the affirmative vote or written consent of the Requisite Members (provided, that, the written consent of the Goldman Members will be required with respect to a Dissolution Event whereby proceeds are allocated pursuant to Section 15.2, including the limitation provided in Section 15.2(b); provided, further, that, the foregoing shall not limit the ability of the Requisite Members to approve a dissolution of the Company following the distribution of proceeds in connection with a Liquidation Event);

81

(b)     The entry of a final decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(c)     At any time there are no Members of the Company, unless the Company is continued in accordance with the Act.

Except as otherwise set forth in this Section 15.1, the Company is intended to have perpetual existence.  To the fullest extent permitted by law, any death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member (or the occurrence of any other event that terminates the continued membership of a Member in the Company) shall not, in and of itself, cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

15.2     Liquidation and Winding Up.  If the Company is dissolved pursuant to Section 15.1 (a "**Dissolution Event**"), the Company shall be liquidated and the Managers (or other Person or Persons designated by the Board or by a decree of court) shall wind up the affairs of the Company. The Managers or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and, in settling the accounts of the Company, the assets and the property of the Company shall be distributed in the following order of priority:

(a)     First, to the payment of (or establishing reserves to pay) all debts and liabilities of the Company (including any debts or liabilities owed to any Member) in the order of priority as provided by law; and

(b)     The balance, if any, to the Members in accordance with Section 13.2; provided, that, notwithstanding the foregoing, the Goldman Members shall not be entitled to receive more than 24.99% of the assets and property pursuant to this Section 15.2(b) unless (and to the extent that) the distributions of assets and property in excess of 24.99% to the Goldman Members would not trigger a disclosure obligation under applicable law (as determined in good faith by the Goldman Members in consultation with their advisors).

Any non-cash asset will first be written up or down to its gross Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with the provisions of Article 12.

15.3     No Deficit Restoration Obligation.  If any Member has a deficit balance in its Capital Account (after giving effect to all Capital Contributions, distributions and allocations for all fiscal periods including the fiscal period during which the liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

## ARTICLE 16
## AMENDMENTS

16.1     Amendments.

(a)     Without limiting Section 5.10, any term, condition or provision of this Agreement may be amended, modified or waived (whether by merger or otherwise) from

time to time if, and only if, such amendment, modification or waiver is in writing and signed, (x) in the case of an amendment or modification, by the Company and the Requisite Members at the time of such amendment or modification, or (y) in the case of a waiver, by the party against whom the waiver is to be effective.  Notwithstanding the foregoing sentence, without limiting Section 5.10, no amendment or modification (whether by merger or otherwise) of any term, condition or provision of this Agreement shall be made (whether by merger or otherwise, except in connection with a Sale Transaction) relating to:

(i)      Sections 5.10 and 5.11 (including any of the defined terms used in any such Section, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of each of the holders of Series A Preferred Units and Series B Preferred Units;

(ii)     Sections 9.1, 9.3, 9.6, 10.3, 10.4, 10.8, 11.6 and 16.1(b)(i) or Article 12 or Article 17 (including any of the defined terms used in any such Section or Article, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of holders, at any time of determination, that own or hold at least 70% of the issued and outstanding Series B Preferred Units at such time;

(iii)    Section 5.8 (including any of the defined terms used in such Section, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of each of the holders of Series A Preferred Units;

(iv)     Section 5.9 (including any of the defined terms used in such Section, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of each of the holders of Series B Preferred Units;

(v)      Section 6.2(b) (including any of the defined terms used in such Section, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of each Preferred Holder Group with a consent right over any Independent Manager;

(vi)     the definition of "BSP Members" or Sections 6.2(f), 19.15, 19.16, 19.17, 19.18, 19.19, 19.20 or 20.1 (including any of the defined terms used in such definition or any such Section, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of the BSP Members;

(vii)    the definition of "Goldman Members" or Sections 6.2(f), 9.9, 10.8, 19.15, 19.16, 19.17, 19.18, 19.19, 19.20, 19.21, 20.1 or 21.5 (including any of the defined terms used in such definition or any such Section, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of the Goldman Members;

(viii)   for so long as the Goldman Members continue to own or hold at least the Threshold Amount of all outstanding Series B Preferred Units, Section 19.14 (including any of the defined terms used in such Section, solely to

the extent such defined terms are used therein), without the affirmative vote or written consent of the Goldman Members; and

(ix)     any of clauses (i)-(viii) of this Section 16.1(a) without the prior written consent of the Company and the specific Member or Members, and/or the Member or Members that own or hold the requisite percentage of the Units, as applicable, that would be required to amend the underlying provision or definition of this Agreement to which such amendment or modification relates; provided, however, that no amendment or modification of this Section 16.1(a)(ix) shall be made without the affirmative vote or written consent of all of the Members that own Class A Common Units, Series A Preferred Units and Series B Preferred Units.

(b)     Anything in this Agreement to the contrary notwithstanding, but without limiting Section 5.10, (i) subject to clause (ii) of this Section 16.1(b), no amendment, modification or waiver of any provision of this Agreement (whether by merger or otherwise, except in connection with a Sale Transaction) that would materially and adversely affect the rights or materially increase the obligations of any Member that owns or holds Units of any particular series or class (in its capacity as a holder of Units of such series or class) set forth in this Agreement in a manner that is disproportionate in any material respect to the comparable rights and obligations of the Members that own or hold a majority of the issued and outstanding Units of such series or class (in their capacity as holders of Units of such series or class) (without regard to any effect resulting from (A) the individual circumstances of any such Member, or (B) the differences in the respective percentages of ownership of Units of the Members) shall be made without the affirmative vote or written consent of such affected Member; provided, however, that, for the avoidance of doubt, neither the authorization or creation of a new class or series of Units or other equity or equity-based securities of the Company, nor the issuance of any additional Units or any other equity or equity-based securities of the Company, in each case in accordance with Sections 5.10 and 9.6, shall be deemed to adversely affect the rights or obligations of any Member, and (ii) subject to Section 5.10, the Board is hereby authorized and empowered, without further vote or action of the Members, to amend or modify this Agreement as provided in Section 5.2(b) hereof, and each Member shall be deemed to have executed any such amendment to, or amendment and restatement of, this Agreement; provided, however, that if any such amendment or modification would otherwise require any vote or consent pursuant to any of clauses (i)-(ix) of Section 16.1(a) (other than immaterial amendments or modifications), then such vote or consent shall be obtained as a condition to any such amendment or modification.

## ARTICLE 17
## INFORMATION RIGHTS

17.1   Information Rights.  Subject to the obligations of the Members under Article 20, the Company shall make available to each Member the following information:

(a)     Within one hundred and twenty (120) days after the end of each Fiscal Year of the Company, copies of the audited consolidated financial statements of the Company and its Subsidiaries, including a consolidated balance sheet and consolidated statements of

operations, members' equity and cash flows, for such Fiscal Year, together with the auditors' report on such audited consolidated financial statements in accordance with GAAP;

(b)    within forty-five (45) days after the end of each Fiscal Quarter in each of the Company's first three (3) Fiscal Quarters in each Fiscal Year of the Company, copies of the unaudited consolidated financial statements of the Company and its Subsidiaries, including a consolidated balance sheet and consolidated statements of operations and cash flows, for such Fiscal Quarter, in accordance with GAAP, subject to the absence of footnotes and to year-end adjustments; and

(c)    any information required to be provided under the New Credit Documents, concurrently with the delivery of any such information to the lenders thereunder;

provided that the Company shall make available solely to the Initial Member Groups any other information reasonably requested by an Initial Member Group so long as such Initial Member Group continues to own or hold at least the Threshold Amount of all outstanding Series B Preferred Units; provided, that (i) the Company shall only be required to provide information that is in its possession or control at the time of such request and that can be provided without waiving any attorney-client or other privileges, violating or breaching any *bona fide* third party contracts or other agreements to which the Company or any of its Subsidiaries are a party or bound, or violating any applicable law to which the Company or any of its Subsidiaries are subject, (ii) the Company shall not be required to provide any such information to any Member that has a conflict of interest with respect to such information (provided that no conflict of interest with respect to the Goldman Members shall be deemed to exist solely by virtue of the Goldman Members or any of their Affiliates being lenders to the Company or its Subsidiaries) and (iii) the Company shall not be required to purchase or acquire any new information or materials.

17.2    <u>Delivery of Information</u>.  At the option of the Board, the Company may make available the information described in <u>Section 17.1</u> on a password-protected website that is only available to the Members.  As a condition to gaining access to the information posted on such website, a Member may be required to "click through" or take other affirmative action pursuant to which such Member shall (a) confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement, (b) acknowledge its confidentiality obligations in respect of such information and (c) certify its status as a Member hereunder.

17.3    <u>Termination of Information Rights</u>.  The requirements of this <u>Article 17</u> shall cease to apply at such time as the Company becomes obligated to file reports under Section 13 or Section 15(d) of the Exchange Act or as a voluntary filer pursuant to contractual obligations (so long as the Company makes such filings).

17.4    <u>Consumer Compliance Reporting</u>.  The Company shall be subject to the same consumer compliance reporting obligations as set forth in the loan documents governing the New First Lien Term Loans and shall deliver to each Member any reports or other information required to be provided thereunder concurrently with the delivery of any such information to the lenders thereunder.

## ARTICLE 18
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

18.1     <u>Representations and Warranties of the Members</u>.  Each Member (including each Member, if any, admitted after the Effective Date) hereby represents, warrants and acknowledges to the Company and to each other Member on the Effective Date (or the date on which such Member executes and delivers a Joinder Agreement) as follows:

(a)     Such Member (if such Member is an Entity) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has all requisite power and authority to conduct its business as it is now being conducted and as proposed to be conducted.

(b)     Such Member has the full power, authority and legal right to execute, deliver and perform this Agreement, and, if such Member is an Entity, the execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary action of such Member.  This Agreement constitutes such Member's legal, valid and binding obligation, enforceable against it in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

(c)     Such Member is not subject to, or obligated under, any provision of (i) its organizational documents (if such Member is an Entity), (ii) any agreement, contract, arrangement or understanding, (iii) any license, franchise or permit, or (iv) any law, regulation, order, judgment or decree, in any such case that would be breached or violated, or in respect of which a right of termination or acceleration or any Lien on any of such Member's assets (including its Units) would be created, by such Member's execution, delivery and/or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)     No authorization, consent or approval of, waiver or exemption by, or filing or registration with, any Governmental Authority or any other Person is necessary on such Member's part for the consummation of the transactions contemplated by this Agreement that has not previously been obtained by such Member.

(e)     No Person has or will have, as a result of any act or omission by such Member, any right, interest or valid claim against the Company or any other Member for any commission, fee or other compensation as a finder or broker, or in any similar capacity, in connection with any of the transactions contemplated by this Agreement.

(f)     Neither such Member nor any of its Affiliates (other than Related Funds) is, nor will the Company as a result of such Member holding an Interest be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act.

(g)     If such Member is a partnership, a limited liability company treated as a partnership for United States federal income tax purposes, a grantor trust (within the meaning of Sections 671-679 of the Code) or an S corporation (within the meaning of Code

86

Section 1361) (each, a "**flow-through entity**"), then either: (i) no Person will own, directly or indirectly through one or more flow-through entities, an interest in such Member such that more than fifty percent (50%) of the value of such Person's interest in such Member is attributable to the Member's investment in the Company; or (ii) if one or more Persons will own, directly or indirectly through one or more flow-through entities, an interest in such Member such that more than fifty percent (50%) of the value of any such Person's interest in such Member is attributable to such Member's investment in the Company, neither such Member nor any such Person has or had any intent or purpose to cause such Person to invest in the Company indirectly through such Member in order to enable the Company to qualify for the private placement safe harbor under Treasury Regulations Section 1.7704-1(h).

(h)     Except as expressly set forth in this Agreement (including in Article 17), neither the Company, any Manager nor any other Member shall have any duty or responsibility to provide such Member with any documents, materials or other information concerning the business, operations, assets, properties, financial and other conditions, or prospects of the Company or any of its Subsidiaries which may come into the possession of the Company, any Manager, any other Member or any of their respective officers, directors, employees, agents, other representatives or Affiliates.

(i)     Except as expressly set forth in this Section 18.1, neither the Company, any Manager, any other Member nor any of their respective officers, directors, employees, agents, other representatives or Affiliates has made any representations or warranties to such Member regarding the business, assets, operations, properties, financial and other conditions, or prospects of the Company or any of its Subsidiaries, or otherwise, and no act by the Company, any Manager or any other Member hereinafter taken, including any review of the affairs of the Company or any of its Subsidiaries shall be deemed to constitute any such representation or warranty by the Company or any other Member.

(j)     The Units acquired by such Member have been, or are being, acquired by such Member for its own account and not with a view to the sale or distribution of any part thereof (or any fractional or beneficial interest therein), and such Member has no present intention of selling, granting any participation in, or otherwise distributing any of the Units (or any fractional or beneficial interest therein).  Such Member does not have any contract, agreement or understanding with any Person to sell, Transfer or grant a participation to such Person with respect to any of the Units (or any fractional or beneficial interest therein). Such Member was not formed for the specific purpose of acquiring the Units acquired by such Member.

(k)     (i) Such Member must bear the economic risk of such Member's investment in the Company indefinitely unless such Member's Units are registered pursuant to the Securities Act or an exemption from such registration is available, and unless the disposition of such Units are registered or qualified under applicable state securities laws or an exemption from such registration or qualification is available, and that the Company has no obligation or intention of so registering or qualifying such Units, (ii) there is no assurance that any exemption from the Securities Act will be available, or, if available, that such exemption will allow such Member to dispose of or otherwise Transfer any or all of

such Member's Units, in the amounts or at the times such Member might desire and (iii) the Company is not presently under any obligation to register the Units under Section 12 of the Exchange Act or to make publicly available the information specified in Rule 144 under the Securities Act and that it may never be required to do so.

(l)     Such Member: (i) is an Accredited Investor, (ii) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Units acquired by such Member, (iii) has received all of the information about the Company and its Subsidiaries that it has requested and considers necessary or appropriate for deciding whether to acquire the Units acquired by such Member, (iv) is acquiring Units based upon such Member's own investigation, and the exercise by such Member of such Member's rights and the performance of such Member's obligations under this Agreement will be based upon such Member's own investigation, analysis and expertise, (v) has the ability to bear the economic risks inherent in its investment of the Units acquired by such Member, (vi) is able, without materially impairing its financial condition, to hold the Units acquired by such Member for an indefinite period of time and to suffer a complete loss of its investment, and (vii) understands and has fully considered for purposes of its investment in the Units acquired by such Member the risks of this investment and understands that: (A) the Units represent an extremely speculative investment that involves a high degree of risk of loss, (B) it may not be possible for such Member to liquidate its investment in any of the Units because of substantial restrictions on the transferability of the Units, (C) no public market exists for the Units, and no representation has been made to such Member that any such public market will exist in the future, and (D) there have been no representations as to the possible future value, if any, of any of the Units.

## ARTICLE 19
## MISCELLANEOUS

19.1     <u>Entire Agreement</u>.  This Agreement (including the exhibits, schedules and other documents referred to in this Agreement) contains the entire understanding among the Members and the Company with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement.

19.2     <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

19.3     <u>Severability</u>.  In the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

19.4    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

19.5    Notices.    All notices, requests, waivers, document deliveries and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("**e-mail**") to the party to be notified, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified, or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (i) in the case of any Member, to such Member at its address or e-mail address set forth on Schedule A and (ii) in the case of the Company, to the Company at the Principal Office, Attention: [•] (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement).  A party may change its address or e-mail address for purposes of notice hereunder by (x) in the case of the Company, giving notice of such change to all of the Members in the manner provided in this Section 19.5 and (y) in the case of any Member, giving notice of such change to the Company in the manner provided in this Section 19.5.

19.6    Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

19.7    GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE.  EACH OF THE COMPANY AND EACH MEMBER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR ANY MEMBER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.  EACH OF THE COMPANY AND EACH MEMBER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE COMPANY AND EACH MEMBER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN SECTION 19.5, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE COMPANY AND EACH MEMBER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY

WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.

19.8    No Third Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its legal representatives, heirs, administrators, executors, successors and permitted assigns, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than (x) the Covered Persons (solely with respect to Sections 8.1 and 8.2), (y) the Identified Persons (solely with respect to Section 8.5), and (z) to the extent not already a party hereto, each Affiliate of any of the Members for purposes of Section 8.6.

19.9    Deemed Execution; Effective Date.  On the Effective Date, the counterparts of this Agreement executed and delivered by each of the Members shall be deemed released and this Agreement shall become effective without any further action on the part of, or notice to, any Person.  This Agreement shall apply to, and be binding upon, all holders of Units and Interests, whether or not such holder has executed a counterpart of this Agreement or a Joinder Agreement, and shall also apply to all Units and Interests no matter when acquired, and by acceptance of Units or Interests each holder agrees to be so bound.

19.10    Additional Actions and Documents.  The parties agree to execute and deliver any further instruments or perform any additional acts that are or may become reasonably necessary to carry on the Company or to effectuate its purposes.

19.11    Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such non-breaching party shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity.  Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

19.12    Assignment.  Except as otherwise expressly set forth in this Agreement, no rights, interests or obligations of any Member herein may be assigned without the prior approval of the Board and the Requisite Members, except assignments to Transferees of Units in connection with Transfers of Units that strictly comply with Article 9; provided, however, that (a) no assignment of this Agreement or any rights or obligations hereunder shall be made without the assignee, as a condition to such assignment, assuming in writing its assignor's obligations under this Agreement, to the extent applicable to such assignment, (b) no assignment of the Manager Consent Right of any Preferred Holder Group shall be made other than to any Person included within the definition of such Preferred Holder Group, (c) no assignment of the right of the BSP Members to designate

90

the Chairman in accordance with the terms of <u>Section 6.2(d)</u> shall be made other than to any Person included within the definition of BSP Members, (d) no assignment of the right of any Preferred Holder Group under this Agreement, in its capacity as a Preferred Holder Group, shall be made other than to any Person included within the definition of any such Preferred Holder Group, (e) no assignment of the right of any Initial Member Group under this Agreement, in its capacity as an Initial Member Group, shall be made other than to any Person included within the definition of any such Initial Member Group.

19.13   <u>Spousal Consent</u>.  If requested by the Board, each married Member, and each Member who, subsequent to the date hereof, marries or remarries, will concurrently with his or her execution hereof, or the consummation of such marriage, as applicable, deliver to the Board the written consent of his or her spouse in a form that is acceptable to the Board in its sole discretion; <u>provided</u>, <u>however</u>, that the failure of any such Member to do so will not affect the validity or enforceability of this Agreement.

19.14   <u>Regulatory Disclosure</u>.

(a)      The Goldman Sachs Group, Inc. ("**<u>GS</u>**") is required to disclose under Section 13(r) of the Exchange Act ("**<u>Section 13(r)</u>**"), whether any of its Affiliates has engaged during each calendar quarter in certain Iran-related activities, including those targeted under the Iran Sanctions of Act of 1996 and other Iran-related laws. The Company represents and warrants that neither the Company nor any of its controlled Affiliates nor any of their respective officers or directors has engaged in any activity that would be reportable by the Company if the Company was required to make a disclosure under Section 13(r).

(b)      Neither the Company nor any of its controlled Affiliates nor any of their respective officers or directors will engage in any activity that would be reportable by the Company if the Company was required to make a disclosure under Section 13(r). To the extent that the Company or its controlled Affiliates, officers or directors are, or become, engaged in any activities that would be reportable by the Company if the Company was required to make a disclosure under Section 13(r), the Company shall, upon becoming aware of such information, timely disclose such information in writing to GS.

(c)      The Company shall timely provide GS with any information concerning the Company or its controlled Affiliates, officers or directors reasonably requested by GS to allow GS or its Affiliates to comply with any disclosure requested or required under any law applicable to any of them or by any governmental authority, including, without limitation, any Section 13(r) compliance questionnaire and any other disclosure requested or required by the Commission, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of the Comptroller of the Currency or Office of Foreign Assets Control.

19.15   <u>FCPA Matters</u>.  The Company shall not (and shall not knowingly permit any of its Subsidiaries or controlled Affiliates or any of its or their respective directors, officers, managers, employees, independent contractors, representatives or agents (and with respect to such independent contractors, representatives or agents, solely to the extent such Persons are acting on behalf of the Company) to) promise, authorize or make any payment to, or otherwise contribute

any item of value to, directly or indirectly, any third party, including any Foreign Official (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), in each case, in violation of the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law. To the extent necessary, the Company shall (and shall cause each of its Subsidiaries and controlled Affiliates to) cease all of its or their respective activities, as well as remediate any actions taken by the Company, its Subsidiaries or controlled Affiliates, or any of their respective directors, officers, managers, employees, independent contractors, representatives or agents (and with respect to such independent contractors, representatives or agents, solely to the extent such Persons are acting on behalf of the Company) in violation of the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law. The Company further represents that it shall (and shall cause each of its Subsidiaries and controlled Affiliates to) maintain systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) that are reasonably necessary to ensure compliance with the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law.  The Company shall timely notify each Member if the Company becomes aware of the Company or any of its officers, directors or employees being the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other anticorruption law. The Company shall (and shall use reasonable efforts to cause any direct or indirect Subsidiaries, whether now in existence or formed in the future, to) comply in all material respects with the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law.  Notwithstanding anything to the contrary set forth herein, the sole remedy with respect to any breach of this <u>Section 19.15</u> shall be specific performance.

19.16  <u>Regulatory Matters</u>.   The Company shall keep each Member informed, on a reasonably current basis, of any events, discussions, notices or changes of a material nature with respect to any tax (other than ordinary course communications which would not reasonably be expected to be material to the Company), criminal or regulatory investigation or action involving the Company or any of its Subsidiaries, in each case which may reasonably be expected to affect the Members, and shall reasonably cooperate with the Members and their Affiliates in an effort to avoid or mitigate any cost or regulatory consequences to them that might arise from such investigation or action (including by reviewing written submissions in advance, attending meetings with authorities and coordinating and providing assistance in meeting with regulators).  Prior to any securities offering by the Company pursuant to Regulation D of the Securities Act, the Company covenants and agrees to (a) give notice of such offering to the Members at least ten (10) days before a private placement memorandum or similar offering document is first sent to prospective investors and (b) cooperate with any reasonable requests of Members regarding disclosure in the offering documents which may be required or appropriate as a result of the Members' ownership interest in the Company.  Notwithstanding anything to the contrary set forth herein, the sole remedy with respect to any breach of this <u>Section 19.16</u> shall be specific performance.

19.17  <u>Certain Limitations; Investment Banking Services</u>.   Notwithstanding any other terms in this Agreement to the contrary, nothing contained in this Agreement shall in any way (a) limit any of the BSP Members, the Goldman Members or any of their respective Affiliates from engaging in any brokerage, investment advisory, financial advisory, anti-raid advisory, principaling, merger advisory, financing, asset management, trading, market making, arbitrage, investment activity and other similar activities conducted in the ordinary course of its business or

(b) apply to common stock or any securities convertible or exercisable or exchangeable for common stock acquired by any of the Goldman Members or any of their respective Affiliates following the effective date of any initial public offering of the Company or its successor.  The Company and each Member understands and acknowledges that, notwithstanding any actions or omissions by representatives of any of the BSP Members, the Goldman Members or any of their respective Affiliates in whatever capacity, it is understood that none of the BSP Members, the Goldman Members or any of their respective Affiliates is acting as a financial advisor, agent or underwriter to the Company or any of its Affiliates or otherwise on behalf of the Company or any of its Affiliates, unless retained to provide such services pursuant to a separate written agreement.

19.18    Use of Logos.  The Company grants the BSP Members and the Goldman Members permission to use the Company's name and logo in the BSP Members', the Goldman Members' or their respective Affiliates' marketing materials.  The BSP Members, the Goldman Members and their respective Affiliates, as applicable, shall include a trademark attribution notice giving notice of the Company's ownership of its trademarks in the marketing materials in which the Company's name and logo appear.

19.19    Non-Promotion.  Each of the Company and each Member agrees that it will not, without the prior written consent of the Goldman Members, (a) use in advertising, publicity, or otherwise the name of any of the Goldman Members or any of their Affiliates, or any partner or employee of any of the Goldman Members, or any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned by the Goldman Members, except in connection with any enforcement of rights and remedies, or as required by applicable law, or (b) represent, directly or indirectly, in writing that any product or any service provided by the Company has been approved or endorsed by any of the Goldman Members.  Each of the Company and each Member agrees that it will not, without the prior written consent of the BSP Members, (i) use in advertising, publicity, or otherwise the name of any of the BSP Members or any of their Affiliates, or any partner or employee of any of the BSP Members, or any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned by the BSP Members, except in connection with any enforcement of rights and remedies, or as required by applicable law, or (ii) represent, directly or indirectly, in writing that any product or any service provided by the Company has been approved or endorsed by any of the BSP Members.

19.20    Non-Impairment.  Notwithstanding any other terms in this Agreement or the New Credit Documents to the contrary, nothing contained in this Agreement or the New Credit Documents shall affect, limit or impair the rights and remedies of the BSP Members, the Goldman Members or any of their respective Affiliates (a) in its or their capacity as a lender or as agent for lenders to the Company or any of its Subsidiaries pursuant to any agreement under which the Company or any of its Subsidiaries has borrowed money, including, without limitation, the New Credit Documents, or (b) in its or their capacity as a lender or as agent for lenders to any other Person who has borrowed money.  Without limiting the generality of the foregoing, any such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (i) its or any of its Affiliates' status as a Member, (ii) the interests of the Company or its Subsidiaries or (iii) any duty it may have to any Member, except as may be required under the applicable loan documents or by commercial law applicable to creditors generally.  No consent, approval, vote or other action taken or required to

be taken by the BSP Members or the Goldman Members, as applicable, in such capacity shall in any way impact, affect or alter the rights and remedies of the BSP Members or the Goldman Members or any of their respective Affiliates as a lender or agent for lenders.

19.21   Reduction of Rights. The Goldman Members may, in their sole discretion, reduce or limit any of rights afforded to them in this Agreement so long as such reduction or limitation does not have, or is not reasonably expected to have, individually or in the aggregate, an adverse effect on any of the other Members.

**ARTICLE 20**
**CONFIDENTIALITY**

20.1   Confidentiality.  Each Member hereby agrees that, during the period commencing on the Effective Date (or, with respect to any Member that becomes a party hereto after the Effective Date, the date any such Member executes and delivers a Joinder Agreement) and ending on the first anniversary of the date on which such Member no longer beneficially owns or holds any Units (such period, the "**Confidentiality Period**"), such Member will keep confidential and will not disclose or divulge to any other Person (other than as permitted by Section 20.2) any (x) confidential, business, financial or proprietary information regarding the Company or any of its Subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any other Member in respect of the Company or any of its Subsidiaries (in any such case, whether in written, oral or electronic form), that is obtained by, or on behalf of, such Member from the Company or any of its Subsidiaries, from the Company's or any such Subsidiary's legal or financial advisors or any other agents or advisors engaged by the Company or any of its Subsidiaries, from any other Member, or through the ownership of Interests and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by such Member or any of its Representatives which contain, reflect or are based upon the information referred to in clause (x) above (collectively, "**Confidential Information**").   Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of this Section 20.1 by a Member or any of its Representatives), (B) is or becomes available to a Member on a non-confidential basis from a source other than the Company, any other Member or any of their respective Affiliates or Representatives (provided, that such Member is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to such Member by (or obtained from) the Company or any of its Subsidiaries, any other Member or any of their respective Affiliates or Representatives or (C) is independently developed or acquired by such Member or its Representatives without reference to the Confidential Information.

20.2   Permitted Disclosure of Confidential Information.

(a)   Notwithstanding Section 20.1, Confidential Information may be disclosed as follows:

(i)   Confidential Information may be provided by a Member, on a confidential basis, to such Member's Affiliates and its and their respective managers, officers, directors, employees, partners, investors, members, representatives, attorneys, agents, accountants, consultants, other professional

94

advisors and financing sources (collectively, "**Representatives**"), to the extent reasonably necessary in connection with such Member's investment in the Company; provided, however, that such Member shall instruct its Representatives to comply with the applicable restrictions in this Article 20 as if such Representatives were a party hereto and bound by such restrictions, and such Member shall be responsible for any breach of this provision by any such Representative (provided that such Representative has not otherwise entered into a confidentiality agreement directly with the Company).

(ii)     Confidential Information may be provided by a Member, on a confidential basis, to an actual or potential Transferee of all or a portion of the Units owned or held by such Member, to the extent reasonably necessary to consummate a sale or other Transfer of such Units permitted under this Agreement; provided, however, that (x) in the case that such actual or potential Transferee or any of its Affiliates is a Competitor, such disclosure shall be permitted only if such Transferee has been expressly authorized by the Board to receive Confidential Information, and (y) prior to such Member's delivery of Confidential Information to an actual or potential Transferee of Units pursuant to this clause (ii), such actual or potential Transferee shall have executed and delivered to such Member and the Company a Transferee confidentiality agreement substantially in the form attached hereto as Exhibit B.

(iii)     In the event that such Member or any of its Representatives determines, in good faith upon the advice of counsel (which may include internal counsel), that disclosure of Confidential Information is required under applicable law or regulation, or by regulatory authorities having jurisdiction over such Member or such Representative, such Member or such Representative will (x) use reasonable efforts to preserve the confidentiality of the Confidential Information sought to be disclosed; and (y) to the extent legally permitted and reasonably practicable, promptly provide the Company with written notice so that the Company may seek (at the Company's expense) an appropriate protective order or other remedy and/or waive compliance with this Agreement and, if requested by the Company, reasonably assist the Company (at the Company's expense) to seek such a protective order or other remedy.  Provided that such notice (to the extent legally permitted and reasonably practicable) is furnished, if, in the absence of a protective order or other remedy, such Member or any applicable Representative is, in the opinion of its counsel (which may include internal counsel), legally compelled to disclose Confidential Information, such Member or such Representative may disclose pursuant to this Section 20.2(a)(iii) only that portion of such Confidential Information, and only to those parties, that such counsel has advised is compelled or required to be disclosed, without liability under this Agreement.  In addition, any Member shall be entitled to share Confidential Information with Governmental Authorities in connection with routine regulatory audits and examinations that are conducted by such Governmental Authorities of such Member and no notice by such Member to the Company shall be required with respect to any such disclosure.

(iv)     With the prior consent of the Company, any Member may provide Confidential Information of the Company (but not Confidential Information of any other Member in respect of the Company or any of its Subsidiaries) to any Person in connection with a potential Sale Transaction with such Person; provided that such Person has an obligation to the Company (which obligation shall be customary in such transaction processes) to keep such Confidential Information confidential.

(v)     Any Member that is an employee, consultant or other service provider of the Company or any of its Subsidiaries may disclose Confidential Information in the performance of such employment duties or services to the extent authorized by the Company's policies in respect thereof.

(b)     Termination.  All the rights and obligations of a Member set forth in this Article 20 shall terminate automatically upon the expiration of the Confidentiality Period applicable to such Member; provided, however, that no such termination shall relieve any Member from any liability relating to any breach of this Article 20.

20.3     United States Tax Confidentiality Waiver.  Notwithstanding anything contained in this Agreement or any Transferee confidentiality agreement, the Company, each Manager, each officer of the Company, the Board and each committee thereof, and their respective advisors, authorize each Member and each of its employees, representatives or other agents, from and after the commencement of any discussions with any such party, to disclose to any and all Persons, without limitation of any kind, the United States income and franchise tax treatment and United States income and franchise tax structure of the Company and any transaction entered into by the Company and all materials of any kind (including tax opinions or other tax analyses) relating to such tax treatment or tax structure that are provided to such Member, insofar as such treatment and/or structure relates to a United States income or franchise tax strategy provided to such Member by the Company, by any Manager, by any officer of the Company, by the Board or any committee thereof, or by any of their respective advisors, except for any information identifying any Manager, any officer of the Company, or any other Member, or (except to the extent relevant to such tax structure or tax treatment) any non-public commercial or financial information.

## ARTICLE 21
## IPO; CORPORATE CONVERSION; SALE COVENANT

21.1     IPO Approval.  Subject to Section 5.10, the Board, with the consent of the Requisite Members, may at any time approve an IPO.  The parties hereto agree that any IPO relating to the Company or any of its Subsidiaries may be effected at the Company level or at a Subsidiary of the Company, and that in the event of a planned IPO, the Company shall convert all (or the appropriate portion) of the Units then held by any Members into an economically equivalent number of shares of the preferred stock and common stock of the Company or its applicable Subsidiary effecting such IPO.  If the Board approves an IPO of the Company or any of its Subsidiaries with the prior written consent of the Requisite Members, each Member hereby consents to such IPO and shall vote for (to the extent it has any voting right) and raise no objections against such IPO, and each Member shall take all reasonable actions in connection with the consummation of such IPO as requested by the Board.

21.2    <u>Required Actions</u>.  In connection with an IPO, the Board may, in its sole discretion, either (a) cause the Company to contribute all or substantially all of its assets to a corporation in a transaction qualified under Section 351(a) of the Code, and thereupon liquidate and dissolve the Company, (b) elect to have all Members contribute their Units to a corporation, in a transaction qualifying under Section 351(a) of the Code, as long as the Fair Market Value of the shares of the corporation received by all Members is equal to the Fair Market Value of the Units Transferred, (c) cause the Company to distribute some or all of the shares of capital stock of one or more Subsidiaries of the Company to the Members, (d) cause the Company to Transfer its assets, liabilities and operations to a corporation in exchange for any combination of cash, debt or capital stock in such corporation, (e) cause a corporation to be admitted as a Member of the Company, with such corporation purchasing interests in the Company from the Company or Members (as determined by the Board) with the proceeds of a public offering of the corporation's stock; or (f) otherwise cause the Company to convert into a corporation, by way of merger, consolidation or otherwise. Each Member hereby consents to such actions and shall vote for (to the extent it has any voting right) and raise no objections against such actions, and each Member shall, at the request of the Board, take all actions reasonably necessary or desirable to effect such actions (including whether by conversion to a subchapter C corporation, merger or consolidation into a corporation, recapitalization or reorganization, sale of securities, or otherwise), giving effect to the same economic (other than any tax effects resulting therefrom), voting and corporate governance provisions contained herein (any such transaction contemplated by this <u>Section 21.2</u>, a "**Corporate Conversion**"); <u>provided</u>, <u>however</u>, that the Company agrees to effect such Corporate Conversion in a mutually tax efficient manner.  In connection with such Corporate Conversion, each Member hereby agrees to enter into a shareholders agreement (or equivalent) with the corporate successor (the "**Reorganized Issuer**") and each other Member which contains restrictions on the Transfer of such capital stock and other provisions (including with respect to the governance and control of such Reorganized Issuer) in form and substance (including with respect to the termination thereof) similar to the provisions and restrictions set forth herein to the extent reasonably requested by the Board.

21.3    <u>Registration Rights Agreement</u>.  In connection with (but prior to the consummation of) a Qualified Public Offering, the Company or any Reorganized Issuer, as applicable, shall enter into a registration rights agreement with the Members that own or hold Class A Common Units, in form and substance reasonably satisfactory to the Requisite Members, with respect to the registration of its securities following the consummation of a Qualified Public Offering.

21.4    <u>Sale Covenant</u>.    Subject to the limitations set forth in the proviso in <u>Section 9.3(b)(iv)</u>, the Company shall run a FMV Sale Process with respect to all or substantially all of the assets of the Company or the equity of the Company (including the Series A Preferred Units, the Series B Preferred Units and the Class A Common Units) on terms and conditions acceptable to each Initial Member Group if the Company has not (a) satisfied in full the New First Lien Term Loans and the New Second Lien Term Loans prior to the date that is six (6) months before the applicable maturity or (b) redeemed the Series A Preferred Units in full on or prior to the sixth (6th) anniversary of the Effective Date or the Series B Preferred Units in full on or prior to the tenth (10th) anniversary of the Effective Date.

21.5    <u>Deemed Underwriter</u>. The Company agrees that, if the Goldman Members or any of their respective Affiliates (each a "**Goldman Entity**") could reasonably be deemed to be an

"**underwriter**," as defined in Section 2(a)(11) of the Securities Act, in connection with any registration of the Company's securities of any Goldman Entity pursuant to this Agreement, and any amendment or supplement thereof (a "**Goldman Underwriter Registration Statement**"), then the Company will reasonably cooperate with such Goldman Entity in allowing such Goldman Entity to conduct customary "underwriter's due diligence" with respect to the Company and satisfy its obligations in respect thereof.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the Effective Date.

**COMPANY**:

[NEWCO], LLC

By: _____
             Name:
             Title:

**MEMBERS**:

[•]

By: _____
             Name:
             Title:

[SIGNATURE PAGES TO COME]

**Schedule A**

| Member | Notice Information | Capital Contributions | Class A Common Units | Series A Preferred Units | Series B Preferred Units |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**Schedule B**

**Initial Officers**

| | |
|---|---|
| | |
| | |
| | |
| | |

## Schedule C

## Initial Board

| Jim Decker | |
|---|---|
| Garry Herdler | |
| David Zwick | |

## Exhibit A

Form of Joinder Agreement

This Joinder Agreement (this "**Joinder Agreement**"), dated as of [●], is executed by the undersigned pursuant to the terms of the Limited Liability Company Agreement of [NEWCO], LLC (the "**Company**"), dated as of [●], 2021 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**LLC Agreement**"), by and among the Company and the other parties from time to time party thereto.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the LLC Agreement.

The undersigned hereby acknowledges and agrees as follows:

(1)     Acknowledgements.  The undersigned hereby acknowledges that (a) it has received and reviewed a complete copy of the LLC Agreement, (b) by executing and delivering this Joinder Agreement, it is agreeing to become a party to the LLC Agreement as a "**Member**" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the LLC Agreement as a "**Member**" party thereto, (c) it has had sufficient time to consider the LLC Agreement and to consult with an attorney if it wished to do so, or to consult with any other Person of its choosing, before signing this Joinder Agreement and (d) it has willingly executed and delivered this Joinder Agreement with full understanding of the legal and financial consequences of this Joinder Agreement and the LLC Agreement.

(2)     Agreements.  The undersigned hereby agrees that, upon execution and delivery to the Company of this Joinder Agreement, the undersigned (i) shall become a party to the LLC Agreement as a "**Member**" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the LLC Agreement as a "**Member**" party thereto, and (ii) makes the representations, warranties and acknowledgments set forth in Section 18.1 of the LLC Agreement to the Company and to each other Member as of the date of this Joinder Agreement.

(3)     Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.

(4)     Counterparts. This Joinder Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.  Delivery of an executed counterpart of this Joinder Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Joinder Agreement.

(5)     Headings.  The headings of the various sections of this Joinder Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Joinder Agreement.

(6)     Schedule A to LLC Agreement.  For purposes of Schedule A to the LLC Agreement, the undersigned's address and e-mail address are as follows:

Address:
E-mail Address:

[_____]

Date: _____        _____
                               By:
                               Title:

Exhibit A

## Exhibit B

## FORM OF TRANSFEREE CONFIDENTIALITY AGREEMENT

[NAME OF POTENTIAL TRANSFEREE]
[ADDRESS]

Attention:

Re:     Confidentiality Agreement

Ladies and Gentlemen:

In connection with a possible transaction (the "**Transaction**") involving the sale or transfer of limited liability company interests of [NEWCO], LLC (the "**Company**") owned, held or controlled by [INSERT NAME OF TRANSFEROR] (the "**Transferor**") to [INSERT NAME OF POTENTIAL TRANSFEREE] (the "**Potential Transferee**"), the Transferor is prepared to make available to the Potential Transferee certain Confidential Information (as defined below).  As a condition to such Confidential Information being furnished to the Potential Transferee, the Potential Transferee hereby agrees that it will comply with the following terms of this letter agreement (this "**Confidentiality Agreement**"):

1.      Confidential Information.  "Confidential Information" means any (x) confidential, business, financial or proprietary information regarding the Company or any of its subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any member of the Company in respect of the Company or any of its subsidiaries (in any such case, whether in written, oral or electronic form), that has been obtained by the Transferee or any of its Representatives from the Company or any of its subsidiaries, from the Transferor, or from any of their respective Representatives and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by the Potential Transferee or any of its officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, other professional advisors and financing sources (collectively, "**Representatives**"), which contain, reflect or are based upon the information referred to in clause (x) above.  Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of the confidentiality obligations hereunder or otherwise by the Transferor, the Potential Transferee or any of their respective Representatives), (B) is or becomes available to the Potential Transferee on a non-confidential basis from a source other than the Transferor or any of its Representatives (provided, that the Potential Transferee is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to such Potential Transferee by or on behalf of (or obtained from) the Company, any of its subsidiaries, the Transferor or any of their respective Representatives or (C) is independently developed by the Potential Transferee or its Representatives without reference to the Confidential Information.

(a)      The Potential Transferee recognizes and acknowledges the competitive value and confidential nature of the Confidential Information and the damage that could result to the Company, the Transferor and any other member of the Company if any Confidential Information is disclosed to a third party, and hereby agrees that it will keep strictly confidential

and will not disclose, divulge or use for any purpose, other than to evaluate the Transaction, any of the Confidential Information; provided, however, that any of the Confidential Information may be disclosed, on a confidential basis, to any of the Potential Transferee's Representatives that need to know such information for the purpose of evaluating the Transaction.  The Potential Transferee shall cause its Representatives to comply, and the Potential Transferee shall be responsible for ensuring that its Representatives comply, with the restrictions set forth in this Confidentiality Agreement as if such Representatives were a party hereto and bound by such restrictions.

2.   Disclosure of Confidential Information.  In the event that the Potential Transferee (a) determines, in good faith upon the advice of counsel, that disclosure of Confidential Information is required under applicable law or regulation, or by regulatory authorities having jurisdiction over the Potential Transferee, the Potential Transferee, to the extent legally permitted, will promptly provide the Transferor and the Company with written notice so that they may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Confidentiality Agreement.  Provided that such foregoing notice (if legally permitted) is furnished, if, in the absence of a protective order or other remedy, the Potential Transferee is, in the opinion of its counsel, compelled to disclose Confidential Information or else be held liable for contempt or suffer other censure or penalty, the Potential Transferee may disclose pursuant to this paragraph only that portion of such Confidential Information, and only to those parties, that such counsel has advised is compelled or required to be disclosed, without liability under this Confidentiality Agreement.

3.   Return and Destruction of Confidential Information.  In the event that the Potential Transferee decides not to proceed with the Transaction, the Potential Transferee will promptly inform the Transferor of that decision.  In that case, or at any time upon the request of the Transferor for any reason, the Potential Transferee will, as directed by the Transferee, promptly deliver to the Transferor or the Company all Confidential Information (and any copies thereof) furnished to the Potential Transferee or any of its Representatives, by or on behalf of the Company or any of its subsidiaries, the Transferor, or any of their respective Representatives.  In the event of such a decision or request, all other Confidential Information prepared by the Potential Transferee or on the Potential Transferee's behalf, shall be returned or destroyed.  Upon the Transferor's request, the Potential Transferee shall provide the Transferor with prompt written confirmation of the Potential Transferee's compliance with this paragraph.  Notwithstanding the return or destruction of the Confidential Information, the Potential Transferee and its Representatives shall continue to be bound by the obligations of confidentiality and other obligations and agreements hereunder.

4.   No Representations or Warranties.   The Potential Transferee understands, acknowledges and agrees that neither the Company or any of its subsidiaries, nor the Transferor or any other member of the Company makes any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information furnished hereunder, and neither the Company or any of its subsidiaries, nor the Transferor or any other member of the Company shall have any liability to the Potential Transferee or to any of its Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom.  Only those representations or warranties which are made in a final definitive agreement regarding any Transaction, when, as and if executed and delivered, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

Exhibit B

5.      <u>Injunctive Relief</u>.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered by the Company and the Transferor if the Potential Transferee fails to comply with any of the obligations imposed on it by this Confidentiality Agreement and that in the event of any such failure, the Transferor and the Company will be irreparably damaged and will not have an adequate remedy at law.  The Transferor and the Company shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which either the Transferor or the Company is entitled at law or in equity.  The Potential Transferee hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  The Potential Transferee hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Confidentiality Agreement.

6.      <u>Governing Law</u>.   THIS CONFIDENTIALITY AGREEMENT AND ANY CONFLICTS ARISING HEREUNDER OR RELATED HERETO SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF DELAWARE, ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAWS, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS.    EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK, AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE TRANSFEROR OR THE POTENTIAL TRANSFEREE WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS CONFIDENTIALITY AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.    EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.    EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SPECIFIED BELOW, OR IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

7.      <u>Term</u>.  This Confidentiality Agreement will terminate on the earlier of (a) two (2) years from the date hereof and (b) the Potential Transferee executing a Joinder Agreement to the Limited Liability Company Agreement of [NEWCO], LLC, dated as of [●], 2021, among [NEWCO], LLC and its members, as amended, supplemented, amended and restated or otherwise modified from time to time; <u>provided</u>, <u>however</u>, that no such termination of this Confidentiality

Agreement shall relieve the Potential Transferee from any liability relating to any breach of this Confidentiality Agreement.

8.    <u>Notices</u>.  All notices, requests, waivers and other communications made pursuant to this Confidentiality Agreement shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by electronic mail ("**e-mail**") to the party to be notified; (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case as follows:

> to the Transferor, at:

> [          ]

> to the Potential Transferee, at:

> [          ]

A party may change its address or e-mail address for purposes of notice hereunder by giving notice of such change to the other party in the manner provided in this <u>Section 8</u>.

9.    <u>Miscellaneous</u>.  This Confidentiality Agreement contains the entire agreement between the Transferor and the Potential Transferee regarding its subject matter and supersedes all prior agreements, understandings, arrangements and discussions between the Transferor and the Potential Transferee regarding such subject matter.  It is understood and agreed that no failure or delay by the Transferor or the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  No provision in this Confidentiality Agreement can be waived or amended except by written consent of the Transferor, the Potential Transferee and the Company, which consent shall specifically refer to the provision to be waived or amended and shall explicitly make such waiver or amendment.  This Confidentiality Agreement may be signed by electronic transmission and in one or more counterparts, each of which shall be deemed an original but all of which shall be deemed to constitute a single instrument.  If any provision of this Confidentiality Agreement is found to violate any statute, regulation, rule, order or decree of any Governmental Authority, such invalidity shall not be deemed to affect any other provision hereof or the validity of the remainder of this Confidentiality Agreement, and such invalid provision shall be deemed deleted herefrom to the minimum extent necessary to cure such violation.  The provisions of this Confidentiality Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.  The Potential Transferee may not assign this Confidentiality Agreement without the prior written consent of the Transferor and the Company.  The Potential Transferee agrees and acknowledges that the Company shall be an express third party beneficiary hereof, having all rights to enforce this Confidentiality Agreement.

[Remainder of Page Intentionally Left Blank]

Exhibit B

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Confidentiality Agreement as of this __ day of _____, 20__.

Very truly yours,

TRANSFEROR

[                    ]

By: _____
     Name:
     Title:


CONFIRMED AND AGREED
as of the date written above:

POTENTIAL TRANSFEREE

[          ]

By: _____
     Name:
     Title:

Exhibit B

## __Exhibit D__

**Form of New 1L Facility Agreement**

*SSL Draft 10/16/2021*

**FIRST LIEN FINANCING AGREEMENT**

**DATED AS OF [  ], 2021**

**BY AND AMONG**

**[NEW HOLDCO SUB], ORG GC GP BUYER, LLC, AND ORG GC LP BUYER, LLC,**
**as Borrowers,**

**[NEW HOLDCO],**
**as Parent**

**PARENT AND EACH SUBSIDIARY OF PARENT LISTED**
**AS A GUARANTOR ON THE SIGNATURE PAGES HERETO**
**AND FROM TIME TO TIME PARTY HERETO,**
**as Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as Lenders,**

**BSP AGENCY, LLC,**

**as Collateral Agent,**

**and**

**BSP AGENCY, LLC,**
**as Administrative Agent**

# TABLE OF CONTENTS

Page

ARTICLE I          DEFINITIONS; CERTAIN TERMS ..........................................1
Section 1.01      Definitions ..................................................................1
Section 1.02      Terms Generally .........................................................57
Section 1.03      Certain Matters of Construction ..................................58
Section 1.04      Accounting and Other Terms ......................................58
Section 1.05      Time References .........................................................61
Section 1.06      Classification of Loans and Borrowings .....................61

ARTICLE II         THE LOANS ..............................................................61
Section 2.01      Commitments .............................................................61
Section 2.02      Making the Loans .......................................................63
Section 2.03      Repayment of Loans; Evidence of Debt ......................65
Section 2.04      Interest .......................................................................66
Section 2.05      Termination or Reduction of Total Commitments; Prepayment of
                  Loans .........................................................................68
Section 2.06      Fees ............................................................................72
Section 2.07      LIBOR Option ............................................................73
Section 2.08      Funding Losses ..........................................................75
Section 2.09      Taxes ..........................................................................75
Section 2.10      Increased Costs and Reduced Return ...........................78
Section 2.11      Changes in Law; Impracticability or Illegality ............80
Section 2.12      Incremental Facilities and Incremental Facility Loans ...80
Section 2.13      Benchmark Replacement Rate .....................................86

ARTICLE III        [INTENTIONALLY OMITTED] ..................................87

ARTICLE IV        APPLICATION OF PAYMENTS; DEFAULTING LENDERS ...................87
Section 4.01      Payments; Computations and Statements ......................87
Section 4.02      Sharing of Payments ..................................................88
Section 4.03      Apportionment of Payments .......................................89
Section 4.04      Defaulting Lenders .....................................................91
Section 4.05      Administrative Borrower; Joint and Several Liability of the
                  Borrowers ..................................................................92

ARTICLE V         CONDITIONS TO EFFECTIVE DATE AND LOANS ................................93
Section 5.01      Conditions Precedent to Effectiveness and Initial Term Loans ...................93
Section 5.02      [Conditions Subsequent to Effectiveness .....................97
Section 5.03      Conditions to Each Borrowing .....................................98

ARTICLE VI        REPRESENTATIONS AND WARRANTIES ...............................98
Section 6.01      Representations and Warranties ...................................98

i

ARTICLE VII     COVENANTS OF THE LOAN PARTIES ................................................105
    Section 7.01     Affirmative Covenants ..........................................................................105
    Section 7.02     Negative Covenants ..............................................................................113
    Section 7.03     Minimum EBITDA ...............................................................................118

ARTICLE VIII    CASH MANAGEMENT ARRANGEMENTS AND
                OTHER COLLATERAL MATTERS ....................................................118
    Section 8.01     Cash Management Arrangements..........................................................118

ARTICLE IX      EVENTS OF DEFAULT ......................................................................120
    Section 9.01     Events of Default ..................................................................................120
    Section 9.02     Cure Right ............................................................................................123

ARTICLE X       AGENTS ..............................................................................................124
    Section 10.01    Appointment ........................................................................................124
    Section 10.02    Nature of Duties; Delegation................................................................125
    Section 10.03    Rights, Exculpation, Etc ......................................................................125
    Section 10.04    Reliance ................................................................................................126
    Section 10.05    Indemnification.....................................................................................126
    Section 10.06    Agents Individually ..............................................................................127
    Section 10.07    Successor Agent ...................................................................................127
    Section 10.08    Collateral Matters ................................................................................127
    Section 10.09    Agency for Perfection...........................................................................129
    Section 10.10    No Reliance on any Agent's Customer Identification Program .................130
    Section 10.11    No Third-Party Beneficiaries ...............................................................130
    Section 10.12    No Fiduciary Relationship ....................................................................130
    Section 10.13    Reports; Confidentiality; Disclaimers ..................................................130
    Section 10.14    Collateral Custodian ............................................................................131
    Section 10.15    Intercreditor Agreements .....................................................................131
    Section 10.16    Collateral Agent May File Proofs of Claim ...........................................131

ARTICLE XI      GUARANTY ........................................................................................132
    Section 11.01    Guaranty ...............................................................................................132
    Section 11.02    Guaranty Absolute ...............................................................................132
    Section 11.03    Waiver ..................................................................................................133
    Section 11.04    Continuing Guaranty; Assignments ......................................................133
    Section 11.05    Subrogation...........................................................................................134
    Section 11.06    Contribution..........................................................................................134

ARTICLE XII     MISCELLANEOUS .............................................................................135
    Section 12.01    Notices, Etc...........................................................................................135
    Section 12.02    Amendments, Etc ..................................................................................137
    Section 12.03    No Waiver; Remedies, Etc ....................................................................139
    Section 12.04    Expenses; Taxes; Attorneys' Fees ........................................................139
    Section 12.05    Right of Set-off .....................................................................................140
    Section 12.06    Severability............................................................................................140
    Section 12.07    Assignments and Participations.............................................................140

Section 12.08     Counterparts ..............................................................................145
Section 12.09     GOVERNING LAW ...................................................................145
Section 12.10     CONSENT TO JURISDICTION; SERVICE OF PROCESS AND
                  VENUE......................................................................................146
Section 12.11     WAIVER OF JURY TRIAL, ETC..............................................146
Section 12.12     Consent by the Agents and Lenders ...........................................147
Section 12.13     No Party Deemed Drafter ...........................................................147
Section 12.14     Reinstatement; Certain Payments ...............................................147
Section 12.15     Indemnification; Limitation of Liability for Certain Damages ..................147
Section 12.16     Records .......................................................................................148
Section 12.17     Binding Effect ............................................................................148
Section 12.18     Highest Lawful Rate ...................................................................149
Section 12.19     Confidentiality............................................................................150
Section 12.20     Public Disclosure .......................................................................150
Section 12.21     Integration...................................................................................151
Section 12.22     USA PATRIOT Act ....................................................................151

## SCHEDULE AND EXHIBITS

Schedule 1.01(A)     Lenders and Lenders' Commitments
Schedule 1.01(B)     Facilities
Schedule 6.01(e)     Capitalization; Subsidiaries
Schedule 6.01(f)     Litigation
Schedule 6.01(l)     Nature of Business
Schedule 6.01(q)     Environmental Matters
Schedule 6.01(r)     Insurance
Schedule 6.01(u)     Intellectual Property
Schedule 7.02(a)     Existing Liens
Schedule 7.02(b)     Existing Indebtedness
Schedule 7.02(e)     Existing Investments
Schedule 7.02(k)     Limitations on Dividends and Other Payment Restrictions
Schedule 8.01        Cash Management Accounts

Exhibit A     Form of Joinder Agreement
Exhibit B     Form of Assignment and Acceptance
Exhibit C     Form of Notice of Borrowing
Exhibit D     Form of LIBOR Notice

## FIRST LIEN FINANCING AGREEMENT

This First Lien Financing Agreement, dated as of [  ], 2021, is made by and among [New Holdco], a [   ] (the "Parent"), as a guarantor, [New Holdco Sub], a Delaware limited liability company (the "Holdco Borrower"), as a borrower, ORG GC GP Buyer, LLC, a Delaware limited liability company ("GC GP Buyer"), as a borrower, and ORG GC LP Buyer, LLC, a Delaware limited liability company ("GC LP Buyer"), as a borrower (GC LP Buyer, together with [Holdco Borrower] and GC GP Buyer, collectively, the "Borrowers", and each a "Borrower"), Holdco Borrower, as the Administrative Borrower, each subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, as a guarantor (together with the Parent and each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder or otherwise guaranties all or any part of the Obligations (as hereinafter defined), each a "Guarantor" and collectively, the "Guarantors"), the Lenders (as hereinafter defined) from time to time party hereto, BSP Agency, LLC (in its individual capacity, "BSP Agency"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent"), and BSP Agency, LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agent" or "Agents").

## RECITALS

**WHEREAS**, the Loan Parties and the Lenders (and/or one or more of their respective Affiliates) have agreed to consummate certain Restructuring Transactions, as further set forth in the related Restructuring Documents;

**WHEREAS**, in connection with implementing the Restructuring Transactions, the Lenders have agreed to provide certain credit facilities to the Borrower hereunder, and shall be deemed to have extended certain term loans to the Borrower on the Chapter 11 Plan Effective Date, in each case, on the terms set forth herein, and subject to the applicable provisions of the other Loan Documents and the Restructuring Documents;

**WHEREAS**, the Agents have agreed to act as administrative and collateral agents in respect of the credit facilities provided hereunder; and

**WHEREAS**, the parties hereto are entering into this Agreement in furtherance of, and to document their agreement with respect to, the foregoing.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01  Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below:

"ABL/Term Intercreditor Agreement" means the [ABL/Term Intercreditor Agreement], dated as of the date hereof, by and among the Collateral Agent, the Second Lien Collateral Agent and the ABL Agent and acknowledged by the Loan Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"ABL Agent" means [   ], in its capacities as the administrative agent and the collateral agent under the ABL Credit Agreement, together with its successors and assigns in such capacities.

"ABL Credit Agreement" means the Credit Agreement, dated as of [  ], among [GCS, as the borrower, Parent, GC Midco, GC GP Buyer, GC LP Buyer and GC Services International, LLC, as loan parties], the ABL Agent and the lenders from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreement.

"ABL Credit Facility" means (a) any credit facility established pursuant to, or governed by, and any loans provided under, the ABL Credit Agreement, and (b) any domestic secured or unsecured revolving, cash-flow or asset-backed credit facility, any letter of credit facility, any receivables financing, and any other form of liquidity or working capital financing provided to, or for the benefit of, the Borrowers.

"ABL Indebtedness" means Indebtedness of the Loan Parties owing to the ABL Lenders and other secured parties under the ABL Credit Facility.

"ABL Lenders" means, collectively, the lenders party to the ABL Credit Agreement from time to time.

"ABL Loan Documents" means, collectively, the ABL Credit Agreement and the other [Loan Documents] (as defined in the ABL Credit Agreement), in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreements.

"ABL Loans" means any revolving loans made pursuant to the ABL Credit Agreement.

"ABL Priority Collateral" means "ABL Priority Collateral" as defined in the ABL/Term Intercreditor Agreement.

"Account Debtor" means, with respect to any Person, each debtor, customer or obligor in any way obligated on or in connection with any Account of such Person.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.09(a).

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all

payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"<u>Administrative Borrower</u>" has the meaning specified therefor in <u>Section 4.05(a)</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is in control of, is controlled by, or is under common control with, such Person (including such Person's Controlled Investment Affiliates).   For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.   Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"<u>Affiliated Lenders</u>" means, as used with respect to any group of Lenders, any Lenders within such group who are Affiliates or Related Funds of one another and, accordingly, are not Unaffiliated Lenders.

"<u>Agent</u>" has the meaning specified therefor in the preamble hereto.

"<u>Aggregate Payments</u>" has the meaning specified therefor in <u>Section 11.06</u>.

"<u>Agreement</u>" means this First Lien Financing Agreement, including all amendments, restatements, amendments and restatements, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"<u>Anti-Corruption Laws</u>" has the meaning specified therefor in <u>Section 6.01(aa)(i)</u>.

"<u>Anti-Money Laundering and Anti-Terrorism Laws</u>" means any Requirement of Law relating to terrorism, economic sanctions or money laundering, including, without limitation, (a) the Money Laundering Control Act of 1986 (*i.e.*, 18 U.S.C. §§ 1956 and 1957), (b) the Bank Secrecy Act of 1970 (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), and the implementing regulations promulgated thereunder, (c) the USA PATRIOT Act and the implementing regulations promulgated thereunder, (d) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("<u>OFAC</u>"), (e) any law prohibiting or directed against terrorist activities or the financing or support of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B), and (f) any similar laws enacted in the United States or any other jurisdictions in which the parties to this Agreement operate, as any of the foregoing laws have been, or shall hereafter be, amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"<u>Applicable ECF Percentage</u>" means, for any Fiscal Year of the Parent, (a) 50%, if the Total Senior Lien Leverage Ratio as of the last day of such Fiscal Year is greater than 4.50:1.00,

3

(b) 25% if the Total Senior Lien Leverage Ratio as of the last day of such Fiscal Year is less than or equal to 4.50:1.00 and (c) 0%, as of, and at all times after, the Suspension Date.

"Applicable Margin" means, in the case of (a) Initial Term Loans and Delayed Draw Term Loans, (i) 5.50% per annum, for Reference Rate Loans and (ii) 6.50% per annum, for LIBOR Rate Loans, and (b) any Incremental Facility Loan, the per annum rate specified in the Incremental Facility Amendment applicable thereto.

"Applicable Premium" means, in the case of any Initial Term Loan and Delayed Draw Term Loan, as of the date of the occurrence of an Applicable Premium Trigger Event:

        (a)      on or before the 12 month anniversary of the Effective Date, 103%;

        (b)      during the period of time from and after the 12 month anniversary of the Effective Date up to and including the date that is the 24 month anniversary of the Effective Date, 102%; and

        (c)      thereafter, zero.

"Applicable Premium Trigger Event" as to any Loan, means, and shall be deemed to occur upon:

        (a)      any payment by any Loan Party of all, or of any part, of the outstanding principal balance of any Initial Term Loan and Delayed Draw Term Loan for any reason (including, but not limited to, any optional prepayment, and any mandatory prepayment (other than any Excess Cash Flow mandatory prepayment required pursuant to Section 2.05(c)(i), or any Extraordinary Receipts mandatory prepayment required pursuant to Section 2.05(c)(iv))), and any voluntary permanent reduction or cancellation of all or any part of any undrawn Initial Term Loan Commitments and Delayed Draw Term Loan Commitments effectuated at the option or request of the Borrowers, in each case, whether before or after (i) the occurrence of an Event of Default, (ii) the Final Maturity Date, or (iii) the commencement of any Insolvency Proceeding, and, in each case, notwithstanding any acceleration (for any reason) of any of the Loans or Obligations;

        (b)      the acceleration of the Obligations for any reason, including, but not limited to, acceleration in accordance with Section 9.01, including as a result of the commencement of an Insolvency Proceeding;

        (c)      the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to the Collateral Agent, for the account of the Lenders in full or partial satisfaction of the Obligations; or

        (d)      the termination of this Agreement for any reason.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Administrative Agent (and the Collateral

Agent, if applicable), in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Collateral Agent.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, chief administrative officer, treasurer or other financial officer performing similar functions, president,  vice president, general counsel or chief compliance officer of such Person.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, in its capacity as the court having jurisdiction over the Chapter 11 Case.

"Barbados Account" means any deposit account or other bank account maintained by GC Services (Barbados) SRL that is located in Barbados.

"Benchmark" means, initially, LIBOR Rate; provided, that if a replacement of the Benchmark has occurred pursuant to this Section titled "Benchmark Replacement Setting", then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"Benchmark Replacement" means, for any Available Tenor:

(a)     For purposes of clause (a) of Section 2.12, the first alternative set forth below that can be determined by the Administrative Agent:

(i)     the sum of: (i) Term SOFR and (ii) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.18456% (18.456 basis points) for an Available Tenor of two-months' duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration[1], or

(ii)     the sum of: (i) Daily Simple SOFR and (ii) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the tenor of LIBOR Rate with a SOFR-based rate having approximately the same length as the interest payment period specified in clause (a) of this Section; and

---

[1] These values represent the ARRC/ISDA recommended spread adjustment values available here:
https://assets.bbhub.io/professional/sites/10/IBOR-Fallbacks-LIBOR-Cessation_Announcement_20210305.pdf.

(b)      For purposes of clause (b) of <u>Section 2.12</u>, the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Administrative Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time; <u>provided</u>, that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Conforming Changes</u>" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Reference Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of Borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides, in consultation with the Administrative Borrower, may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides, in consultation with the Administrative Borrower, is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"<u>Benchmark Transition Event</u>" means, with respect to any then-current Benchmark other than LIBOR Rate, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark or (b) all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"<u>Blocked Person</u>" means any Person:

(a)      that (i) is identified on the list of "Specially Designated Nationals and Blocked Persons" published by OFAC; (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of an OFAC Sanctions Program; or (iii) a

United States Person is prohibited from dealing or engaging in a transaction with under any of the Anti-Money Laundering and Anti-Terrorism Laws; and

(b)      that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in clause (a) above.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, manager or managers, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrowing" means Loans of the same Class and Type which are made, issued, converted or continued (as applicable) on the same Borrowing Date and, in the case of LIBOR Rate Loans, as to which a single Interest Period is in effect.

"Borrowing Date" means the date of any Borrowing hereunder (as set forth in the Notice of Borrowing delivered in connection with such Borrowing).  For the avoidance of doubt, the Effective Date shall be the Borrowing Date for Initial Term Loans.

"BSP/Goldman Buyout Right" has the meaning specified therefor in that certain Mutual Buyout Right and ROFO Agreement, dated as of the Effective Date, entered into by and among the BSP Lenders and the Goldman Lenders and acknowledged by the Agents.

"BSP/Goldman Right of First Offer" has the meaning specified therefor in that certain Mutual Buyout Right and ROFO Agreement, dated as of the Effective Date, entered into by and among the BSP Lenders and the Goldman Lenders and acknowledged by the Agents.

"BSP Agency" has the meaning specified therefor in the preamble hereto.

"BSP Group" means, at any time, BSP Lenders who are not Defaulting Lenders, taken as a whole.

"BSP Lenders" means, as of any time, the BSP Persons that are Lenders at such time (each of them individually, a "BSP Lender"); provided, that, upon any sale, assignment or other transfer (whether in a single or multiple transactions) by the BSP Lenders of all Effective Date Committed Debt held collectively by them since the Effective Date through and including the date of such sale, assignment or transfer to a BSP Successor, the term BSP Lenders shall, as of such time, be construed to instead refer to such BSP Successor.

"BSP Management Consulting Agreement" means that certain Management Consulting Agreement, dated as of [___], 2021, by and among [the Parent], and [the BSP Persons party thereto] as BSP Investors (as defined therein).

"BSP Management Fee" means that certain [___] (as defined in the BSP Management Consulting Agreement) owing and payable to BSP pursuant to the BSP Management Consulting Agreement in an amount and in accordance with the other terms set forth in the BSP Management Consulting Agreement.

"BSP Persons" means the following Persons, collectively, (a) Benefit Street Partners LLC, (b) the Persons listed as a '*BSP Lender*' on Schedule 1.01(A) hereto, (c) each of the Affiliates of any of the foregoing, and their and such Affiliates' respective Related Funds, investment advisors, managing members, and partners (and, each such Person, individually, a "BSP Person").

"BSP Successor" means (a) any Person (together with its Affiliates and Related Funds) that has become a Lender pursuant to an assignment, together with all other Affiliates and Related Funds that has become a Lender pursuant to an assignment, of all Effective Date Committed Debt held by the BSP Lenders subject to the terms of this Agreement, and (b) each subsequent assignee of the foregoing, or of any prior assignee therefrom, as applicable (in each case, together with each of their respective Affiliates and Related Funds).

"Budget" means the financial projections of Parent and its Subsidiaries for the next succeeding fiscal year, delivered pursuant to Section 7.01(a)(vii).

"Business Day" means (a) for all purposes other than as described in clause (b) below, any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close, and (b) with respect to any Borrowing, payment or continuation of, or determination of interest rate on, LIBOR Rate Loans, any day that is a Business Day described in clause (a) above and on which dealings in Dollars may be carried on in the interbank eurodollar markets in New York City and London.

"Capital Expenditures" means, with respect to any Person for any period, the result of the sum of (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed, including all Capitalized Lease Obligations and all capitalized software development costs that are paid or due and payable during such period, plus, (b) to the extent not covered by clause (a) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person. Notwithstanding the foregoing, for the avoidance of doubt, Capital Expenditures shall not include expenditures made with the Net Cash Proceeds of any Extraordinary Receipts solely to the extent such expenditures are used to purchase property that is the same as or substantially similar to any property the loss of which gave rise to a Loan Party's receipt of such Extraordinary Receipts.

"Capitalized Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within 270 days from the date of acquisition thereof.

"Cash Management Accounts" means the bank accounts of each Loan Party maintained at one or more Cash Management Banks.

"Cash Management Bank" has the meaning specified therefor in Section 8.01(a).

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means each occurrence of any of the following:

9

(a)        the Permitted Holders, taken as a whole, shall cease to beneficially and of record own and control, directly or indirectly, at least 50.1 % on a fully diluted basis of the Parent Common Equity (or the common equity of any successor to Parent);

(b)        the Parent shall cease to have "*beneficial ownership*" (as defined in Rule 13d-3 under the Exchange Act) of 100% of the aggregate voting or economic power of the Equity Interests of the Loan Parties (other than in connection with any transaction permitted pursuant to Section 7.02(c)(i)), free and clear of all Liens (other than Permitted Specified Liens);

(c)        a "Change of Control" (or any comparable term or provision) under or with respect to any documentation evidencing Subordinated Indebtedness if any Material Indebtedness is outstanding thereunder (but solely if the same shall cause the same to become, or to be declared, due and payable (or subject to any mandatory purchase or offer to purchase the same) prior to the scheduled maturity thereof; or

(d)        a "Change in Control" under, and as defined in, the ABL Credit Agreement or the Second Lien Financing Agreement if any Material Indebtedness is outstanding thereunder (but solely if the same shall cause the same to become, or to be declared, due and payable (or subject to any mandatory purchase or offer to purchase the same) prior to the scheduled maturity thereof,

provided, that, notwithstanding the above, a Change of Control shall not be deemed to occur, and shall not be triggered, as a result of (i) any sale, merger, consolidation or other transaction permitted for purposes of (x) the Loan Documents (including pursuant to a consent of the Required Lenders in accordance herewith), or (y) the Parent Common Equity or the Parent Preferred Equity (or under the corporate governance and other arrangements governing the same, and including pursuant to a consent of the applicable holders of Parent Common Equity or Parent Preferred Equity, as applicable), (ii) any (x) sale, merger or consolidation of any Loan Party to or with, or (y) sale, assignment, conveyance, transfer or other disposition of all or substantially all of any Loan Party's assets to, an Affiliate incorporated or organized solely for the purpose of reincorporating or reorganizing such Loan Party in another jurisdiction and/or for the sole purpose of forming or collapsing a holding company structure, (iii) any change in the identity of any officer or member of (or any other matter relating to the governance of) the board of the Parent or any of its Subsidiaries, (iv) anything consented to at the applicable time by BSP Persons and/or other Permitted Holders, and by Goldman Persons, in each case, who at such time hold Parent Common Equity or Parent Preferred Equity, as applicable, (v) the Restructuring Transactions or any other transactions relating thereto, or (vi) such other circumstances as shall be reasonably satisfactory to BSP Persons and/or other Permitted Holders and Goldman Persons.

"Chapter 11 Case" means the case under Chapter 11 of the Bankruptcy Code (Case No. [__]) arising from the voluntary petition filed with the Bankruptcy Court by the Prepetition Administrative Borrower, as a debtor and debtor-in-possession.

"Chapter 11 Case Documents" means the Chapter 11 Plan, the Chapter 11 Plan Confirmation Order, together with any and all other orders entered by the Bankruptcy Court in the Chapter 11 Case, and any and all agreements relating thereto.

10

"Chapter 11 Plan" means [____].

"Chapter 11 Plan Confirmation Order" means [an order of the Bankruptcy Court in the Chapter 11 Case (in form and substance acceptable to the Required Lenders) confirming the Chapter 11 Plan].

"Chapter 11 Plan Effective Date" means [____].

"CIP Regulations" has the meaning specified therefor in Section 10.10.

"Class" when used in reference to (a) any Loan or Borrowing of Loans, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Term Loans, Delayed Draw Term Loans (or, if any Incremental Facility Loans are outstanding at the time of determination, Incremental Facility Loans (and, if there is more than one issuance of Incremental Facility Loans, Incremental Facility Loans having the same designation hereunder, after giving effect to any amendment hereto entered into to effectuate the incurrence of such Incremental Facility Loans in accordance herewith, as the case may be)), (b) any Commitment, refers to whether such Commitment is an Initial Term Loan Commitment, Delayed Draw Facility Commitment or Incremental Facility Commitment (and, in the case of an Incremental Facility Commitment, the Class of Loans to which such commitment relates), and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments. For the avoidance of doubt, and for purposes hereof, Incremental Facility Commitments and Incremental Facility Loans that have different terms and conditions, shall be construed to be in different Classes, and each tranche of Incremental Facility Loans having the same terms and conditions shall be construed as belonging to the same Class and tranche of Loans.

"Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 10.08(a).

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commitment" means, as of any time, any Initial Term Loan Commitment, any Delayed Draw Facility Commitment and any Incremental Facility Commitment (collectively, the "Commitments").

"Competitor" means (a) each operating company in the same industry as the Loan Parties that is a direct competitor of any Loan Party or any of its Subsidiaries, and that has been identified as such by the Required Lenders or the Administrative Borrower with the consent of the Required Lenders prior to the Effective Date, (b) each Person that is identifiable as an Affiliate or Related Fund of any Person described in clause (a) on the basis of its name delivered in writing to the Administrative Agent prior to the Effective Date and (c) any other operating company (or Affiliate

11

or Related Fund of such operating company) in the same industry as the Loan Parties that is a direct competitor of any Loan Party or any of its Subsidiaries that is disclosed in writing to the Administrative Agent after the Effective Date and consented to by the Required Lenders, with such addition to become effective after three Business Days from the Required Lenders' consent thereto. The Administrative Agent shall, if requested by any Lender, disclose to such Lender the Persons (if any) that, at such time, constitute Competitors; provided, that, any Lender seeking to sell, assign or otherwise transfer, or pledge or grant any security interest in, or enter into any participation or other arrangements with respect to, any Obligations (or any interest therein, or claim or right thereto), or otherwise consummate any transaction in compliance with Section 12.07, shall request such disclosure, and shall not seek to consummate any such arrangements to the extent involving any Person that constitutes, or is reasonably believed to be, a Competitor at such time, in each case, without the Administrative Borrower's prior written consent. Notwithstanding anything to the contrary in the foregoing, any supplement to the list of Competitors pursuant to clause (c) shall not apply retroactively to disqualify any Person that previously acquired an assignment or participation in any Loans or Commitments, but shall prevent any such Person from acquiring further Loans or Commitments.

"<u>Compliance Certificate</u>" has the meaning assigned to such term in <u>Section 7.01(a)(iv)</u>.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consolidated EBITDA</u>" means, with respect to any Person for any period:

      (a)     the Consolidated Net Income of such Person for such period,

      <u>plus</u>

      (b)     without duplication, the sum of the following amounts for such period to the extent deducted in the calculation of Consolidated Net Income for such period:

            (i)     any provision for United States federal income taxes or other taxes measured by net income, gross margin or profits,

            (ii)     Consolidated Net Interest Expense,

            (iii)     any loss from extraordinary, unusual or non-recurring items approved by the Administrative Agent in writing,

            (iv)     any depreciation and amortization expense,

            (v)     fees and expenses paid in cash or accrued pursuant to any agreement referred to in, and to the extent such payment is permitted to be paid or accrued under, <u>Section 7.02(h)</u>,

(vi)    one-time, non-recurring, out-of-pocket fees and expenses incurred to consummate the transactions contemplated by the Loan Documents, the Second Lien Loan Documents and the ABL Loan Documents prior to or within 90 days following the Effective Date,

(vii)    [reserved],

(viii)    any aggregate net loss on the Disposition of property (other than accounts and Inventory) outside the ordinary course of business,

(ix)    any non-cash expense related to employee compensation,

(x)    any severance, recruiting expenses or signing bonuses for employees up to $500,000 (or such greater amount as the Administrative Agent may agree (at the direction of the Required Lenders)) in such Fiscal Year,

(xi)    any dividends relating to the Parent Preferred Equity, to the extent permitted to be paid under Section 7.02(h),

(xii)    the negative effects of non-cash adjustments from the adoption of fresh start accounting in connection with the consummation of the Plan of Reorganization and the Restructuring Transactions; provided that positive effects, if any, of non-cash adjustments from the adoption of fresh start accounting in connection with the consummation of the Plan of Reorganization and the Restructuring Transactions shall be deducted from Consolidated EBITDA,

(xiii)    fees and expenses paid to members of the Board of Directors of the Loan Parties in an aggregate amount not to exceed $30,000 in any fiscal quarter,

(xiv)    (A) fees and expenses paid to the Agents, the Lenders, the ABL Agent, the ABL Lenders and the lenders and other secured parties under the Second Lien Facility, in each case, pursuant to the terms of the Loan Documents, the ABL Loan Documents or the Second Lien Loan Documents, respectively and (B) fees and expenses paid to the agents and lenders, pursuant to the terms of the Prepetition Term Financing Agreement (to the extent relating to amounts incurred through to the Effective Date or within 60 days thereafter), and

(xv)    any other non-cash expenditure, charge or loss for such period (other than any non-cash expenditure, charge or loss relating to write-offs, write-downs or reserves, in each case, with respect to accounts and Inventory),

minus

(c)    without duplication, the sum of the following amounts for such period to the extent included in the calculation of such Consolidated Net Income for such period:

(i)    any credit for United States federal income taxes or other taxes measured by net income, gross margin or profits,

(ii)    any gain from extraordinary, unusual or non-recurring items,

(iii)    [Reserved], and

(iv)    any aggregate net gain (or plus any aggregate net loss) from the Disposition of property (other than accounts and Inventory) outside the ordinary course of business, any other non-cash gain, including any reversal of a charge referred to in clause (b)(xv) above by reason of a decrease in the value of any Equity Interest; in each case, determined on a consolidated basis in accordance with GAAP.

For purposes of the calculation of the covenants set forth in <u>Section 7.03</u> of this Agreement, the Consolidated EBTIDA of Parent and its Subsidiaries (w) for the quarter ending [   ] shall be $[   ], (x) for the quarter ending [   ] shall be $[   ] and (y) for the quarter ending [   ] shall be $[   ].

"<u>Consolidated Net Income</u>" means, with respect to any Person, for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period in accordance with GAAP; <u>provided</u>, <u>however</u>, that the following shall be excluded: (a) the net income of any other Person in which such Person or one of its Subsidiaries has a joint interest with a third-party, except to the extent of the amount of dividends or distributions paid in cash to such Person or Subsidiary, (b) the net income of any Subsidiary of such Person that is, on the last day of such period, subject to any restriction or limitation (by contract, organizational documentation, operation of law or otherwise) on the payment of dividends or the making of other distributions, to the extent of such restriction or limitation, and (c) the net income of any other Person arising prior to such other Person becoming a Subsidiary of such Person or merging or consolidating into such Person or its Subsidiaries.

"<u>Consolidated Net Interest Expense</u>" means, with respect to any Person for any period, without duplication, (a) gross interest expense (including, without limitation, interest expense paid to Affiliates of such Person), <u>less</u> (b) the sum of (i) interest income for such period and (ii) gains for such period on Hedging Agreements (to the extent not included in interest income above and to the extent not deducted in the calculation of gross interest expense), <u>plus</u> (c) the sum of (i) losses for such period on Hedging Agreements (to the extent not included in gross interest expense) and (ii) the upfront costs or fees for such period associated with Hedging Agreements (to the extent not included in gross interest expense), in each case, determined on a consolidated basis and in accordance with GAAP.

"<u>Contingent Indemnity Obligations</u>" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"<u>Contingent Obligation</u>" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not

14

contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract located in the United States, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, among the ABL Lender (so long as the ABL Loan Documents are still in effect), Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) is an Affiliate of such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.

"Credit Facilities" means, collectively, the credit facilities provided hereunder pursuant to (a) the Initial Term Loan Facility, (b) the Delayed Draw Facility, and (c) each Incremental Facility in effect from time to time (each of the foregoing, individually, a "Credit Facility").

"Curable Default" has the meaning specified therefor in Section 9.02.

"Cure Right" has the meaning specified therefor in Section 9.02.

"Current Value" has the meaning specified therefor in Section 7.01(m).

"Customer Trust Account" means any deposit account specifically required by a customer of a Loan Party to be maintained by such Loan Party as a trust account for the benefit of such customer, so long as such deposit account and all funds deposited therein are separately segregated from such Loan Party's general accounts and other cash.

"<u>Daily Simple SOFR</u>" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"<u>Debt Representative</u>" means, in respect of any Indebtedness, any administrative agent, collateral agent, trustee or other Person designated by the lenders or other holders of such Indebtedness to act as their representative in connection with, among other things, any intercreditor arrangements contemplated pursuant to the Intercreditor Agreements or otherwise applicable to the Obligations, as the case may be; <u>provided</u>, that the Administrative Agent shall be notified of the existence and identity of such Person.

"<u>Debtor Relief Law</u>" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"<u>Declined Amount</u>" has the meaning specified therefor in <u>Section 2.12(c)(iv)</u>.

"<u>Default</u>" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"<u>Defaulting Lender</u>" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within 2 Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Administrative Borrower in writing within 2 Business Days of the date such Loans were required to be funded hereunder that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within 2 Business Days of the date when due, (b) has notified the Administrative Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within 3 Business Days after written request by the Administrative Agent or the Administrative Borrower, to confirm in writing to the Administrative Agent and the Administrative Borrower that it will comply with its prospective funding obligations hereunder (<u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Administrative Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the

16

Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity. Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Administrative Borrower and each Lender.

"Delayed Draw Facility" refers to the Delayed Draw Facility Commitments and Delayed Draw Term Loans of the Lenders hereunder, together with all Obligations in respect thereof, which shall be deemed to constitute a single credit facility provided to the Borrowers on the terms set forth in this Agreement and the other Loan Documents.

"Delayed Draw Facility Commitment" means the commitment and obligation (if any) of any Lender to (if requested by the Administrative Borrower in accordance herewith) make Delayed Draw Term Loans during the Delayed Draw Facility Period; provided, that the maximum aggregate principal amount thereof shall not exceed, initially (the "Original Delayed Draw Facility Commitment"), the aggregate principal amount set forth on Schedule 1.01(A) hereto opposite such Lender's name under the heading "Delayed Draw Facility Commitment" (or, in the case of any Person that was not a Lender on the Effective Date, the aggregate principal amount (if any) committed to by such Person upon becoming a Lender, as set forth in the Assignment and Acceptance pursuant to which such Person became a Lender), in each case, as such Original Delayed Draw Facility Commitment may be adjusted from time to time in accordance herewith to reflect (on a dollar-for-dollar basis) the aggregate amount of all reductions, cancellations and terminations, and all increases (if any), to such Lender's Delayed Draw Facility Commitment (including pursuant to Sections 2.01, 2.05 and/or Section 9.01, and/or resulting from assignments of any Delayed Draw Facility Commitment by, or to, such Lender).

"Delayed Draw Facility Commitment Fee" means, with respect to each Delayed Draw Term Loan Lender (other than a Defaulting Lender), a quarterly 'unused line' fee in an amount equal to the following (in each case, calculated as of the last Business Day of each fiscal quarter that such fee is payable pursuant to Section 2.06 during the Delayed Draw Facility Commitment Period) (a) the unused amount of such Lender's Delayed Draw Facility Commitment (net of an amount equal to the greater of (x) such Lender's Pro Rata Share of the aggregate amount of Delayed Draw Term Loans requested to be borrowed if such date or any other date in the following calendar week constitutes a Borrowing Date and (y) the amount of Delayed Draw Term Loans actually funded by such Lender on such Borrowing Date) *multiplied* by (b) 0.50% per annum.

"Delayed Draw Facility Commitment Period" means the period commencing on the Effective Date and ending on the Delayed Draw Facility Commitment Period End Date.

"Delayed Draw Facility Commitment Period End Date" means, as used with respect to any Delayed Draw Term Loan Lender and/or its Delayed Draw Facility Commitments, the earlier of (a) the third (3rd) anniversary of the Effective Date and (b) the earliest date that (i) the Final Maturity Date occurs (whether pursuant to an acceleration under Section 9.01 hereof or otherwise) or (ii) (but without duplication of the foregoing) such Lender's Delayed Draw Facility Commitment is (or is deemed to be) permanently reduced to zero ($0.00), or cancelled, terminated or otherwise extinguished in full for any reason in accordance with the terms hereof (whether automatically, voluntarily or otherwise, and including as described in the definition of Delayed Draw Facility Commitment).

"Delayed Draw Term Loan Lender" means on any date of determination, each Lender that on such date has a Delayed Draw Facility Commitment and/or holds any Delayed Draw Term Loans; provided, that (a) each Person whose name is set forth on Schedule 1.01(A) hereof under the heading "Delayed Draw Term Loan Lender" shall be a Delayed Draw Term Loan Lender as of the Effective Date and at all times until such Person ceases to be a Delayed Draw Term Loan Lender pursuant to an Assignment and Acceptance or otherwise in accordance with the terms hereof, and (b) each Person that is an Assignee from any Person described in foregoing clause (a) (or from any prior Assignee thereof) shall be a Delayed Draw Term Loan Lender, in each case, as of such time as the assignment to such Person of any Delayed Draw Facility Commitment and/or Delayed Draw Term Loans from the then-existing Delayed Draw Term Loan Lender becomes effective in accordance with the terms hereof and of the applicable Assignment and Acceptance.

"Delayed Draw Term Loans" has the meaning assigned thereto in Section 2.01(e).

"DIP Claims" means, with respect to any Initial Term Loan Lender that is a Goldman Lender and a lender under the Term DIP Facility (as defined in the RSA), the amount of such Initial Term Loan Lender's DIP Obligations (as defined in the RSA) that are deemed exchanged for, and discharged upon the issuance to such Initial Term Loan Lender of, Initial Term Loans on the Effective Date pursuant to the Restructuring Transactions, in each case, as determined and calculated in accordance with the RSA and the other applicable Restructuring Documents.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired), including any Equity Interest in any Subsidiary, to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts or (b) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification).

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payment of dividends or distributions

18

in cash or assets, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is six months after the Final Maturity Date.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Early Opt-in Effective Date" means, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" means the occurrence of:

(a)    a notification by the Administrative Agent to (or the request by the Administrative Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five (or such other amount as reasonably determined by the Agent) currently outstanding U.S. dollar denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(b)    the joint election by the Administrative Agent and the Administrative Borrower to trigger a fallback from LIBOR Rate and the provision by the Administrative Agent of written notice of such election to the Lenders.

"Effective Date" has the meaning specified therefor in Section 5.01.

"Effective Date Committed Debt" means, collectively, the Initial Term Loans, the Initial Term Loan Commitments, the Delayed Draw Term Loans and the Delayed Draw Facility Commitments.  For the avoidance of doubt, (i) any reference to any Person's Effective Date Committed Debt (or any Effective Date Committed Debt held by any Person, as applicable) at any time of determination shall be a reference to the sum of the aggregate (x) then-outstanding principal of all such Loans and (y) then-remaining or unused amount of such Commitments, and (ii) Effective Date Committed Debt holdings of all Persons who are Affiliated Lenders of each other shall be aggregated where applicable or required by the context.

"Eligible Assignee" means each and any one of the following Persons (except any such Person that is a natural person, a Disqualified Lender or a Competitor): (a) a Permitted Holder, (b) a Lender, and (c) an Affiliate or a Related Fund of a Lender (except any portfolio company) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Eligible Lender" has the meaning specified therefor in Section 2.12(c).

"Eligible Lender Cap" means, in the case of any Person that is an Eligible Lender for purposes of any Incremental Facility, the amount specified in an Incremental Facility Notice delivered to such Eligible Lender pursuant to Section 2.12(c)(i) and determined by the Borrowers to represent the maximum principal amount of Incremental Facility Loans that such Eligible Lender would be entitled to subscribe for solely on the basis of its own Pro Rata Share of such Incremental Facility (determined in accordance with clause (c) of the definition of Pro Rata Share), which maximum amount shall be expressed both as (i) a percentage (%) of the aggregate principal amount of Incremental Facility Loans comprising such Incremental Facility (which shall be the same as the percentage representing such Eligible Lender's Pro Rata Share) and (ii) a Dollar principal amount of such Incremental Facility Loans (which shall be the product of (x) the total principal amount of all such Incremental Facility Loans *multiplied by* (y) the percentage described in clause (i)).

"Eligible Lender Group" means, with respect to any Incremental Facility, each of the following, individually, (a) in the case of any Eligible Lender thereunder that is a BSP Lender, such Eligible Lender and each Affiliated Lender thereof that is also an Eligible Lender under such Incremental Facility, and (b) in the case of any Eligible Lender thereunder that is a Goldman Lender, such Eligible Lender and each Affiliated Lender thereof that is also an Eligible Lender under such Incremental Facility.

"Eligible Lender Group Cap" means, in the case of any Eligible Lender Group, the maximum principal amount of Incremental Facility Loans constituting such Incremental Facility that such group of Affiliated Lenders, taken as a whole, may elect to subscribe for pursuant to Section 2.12(c), which maximum amount shall be equal to the sum of the Eligible Lender Caps of all Eligible Lenders in such group of Affiliated Lenders.

"Eligible Lender Subscription Amount" has the meaning specified therefor in Section 2.12(c)(ii).

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and sponsored or maintained (or that was sponsored or maintained at any time during the 6 years preceding the date of any Borrowing hereunder) for employees of any Loan Party or any of its ERISA Affiliates.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Loan Party or any of its Subsidiaries or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act

20

(42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other Requirement of Law, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (a) any property presently or formerly owned by any Loan Party or any of its Subsidiaries or (b) any facility which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by the Parent of any cash capital contributions, in each case, following the date hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Excess Cash Flow" means, with respect to any Person for any period, without duplication, (a) Consolidated EBITDA of such Person and its Subsidiaries for such period, less (b) the sum of,

without duplication, (i) all cash principal payments (excluding any principal payments made in accordance with Section 2.05(c)) on the Loans made during such period, and all cash principal payments on Indebtedness (other than Indebtedness incurred under this Agreement and Subordinated Indebtedness) of such Person or any of its Subsidiaries during such period to the extent such other Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (ii) all Consolidated Net Interest Expense to the extent paid or payable in cash during such period, (iii) the cash portion of Capital Expenditures made by such Person and its Subsidiaries during such period to the extent permitted to be made under this Agreement (excluding Capital Expenditures to the extent financed through the incurrence of Indebtedness or through an Equity Issuance), (iv) all scheduled loan servicing fees and other similar fees in respect of Indebtedness of such Person or any of its Subsidiaries paid in cash during such period, to the extent such Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (v) Tax Distributions and income, profits or gross margin taxes paid in cash by such Person and its Subsidiaries for such period, (vi) any dividends paid in cash in connection with the Parent Preferred Equity to the extent permitted to be paid in cash hereunder, and (vii) for any period, the excess, if any, of Working Capital at the end of such period over Working Capital at the beginning of such period (or minus the excess, if any, of Working Capital at the beginning of such period over Working Capital at the end of such period).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means (a) any deposit account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's employees, (b) any Customer Trust Account, (c) any License Trust Account, (d) Petty Cash Accounts, (e) any Barbados Account, (f) any Philippines Account, and (g) deposit accounts of any Loan Party or any of its Subsidiaries located outside of the United States, so long as, solely with respect to this clause (g), the aggregate amount of all cash and Cash Equivalents on deposit in such deposit accounts does not exceed $500,000 for any one deposit account and $1,000,000 in the aggregate for all such deposit accounts.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income, profits or gross margin (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.09(f)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.09(d) or 2.09(e), and (d) any U.S. federal withholding Taxes imposed under FATCA.

22

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Term Obligations" has the meaning set forth in the RSA.

"Extraordinary Receipts" means any cash received by any Loan Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(ii) or 2.05(c)2.05(c)(iii) hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than to the extent such consideration is (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person), (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received in connection with any purchase agreement (other than to the extent such payments in connection therewith are (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person).

"Facility" means the real property identified on Schedule 1.01(B) and any New Facility hereafter acquired by any Loan Party or any of its Subsidiaries, including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"Fair Share" has the meaning specified therefor in Section 11.06.

"Fair Share Contribution Amount" has the meaning specified therefor in Section 11.06.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning specified therefor in Section 6.01(aa)(i).

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means the fee letter, dated as of the date hereof, among the Borrowers and the Administrative Agent.

"Final Maturity Date" means, in the case of:

(a)     Initial Term Loans and the Delayed Draw Term Loans, the earlier of (i) the Initial/Delayed Draw Term Loan Maturity Date and (ii) the earliest date on or as of which any such Loan is declared (or otherwise becomes, or is deemed to become) due and payable pursuant to the terms of this Agreement (including as provided in Section 9.01); and

(b)     any Incremental Facility Loan, the earlier of (i) the Incremental Facility Loan Maturity Date applicable thereto and (ii) the earliest date on or as of which any such Incremental Facility Loan is declared (or otherwise becomes, or is deemed to become) due and payable pursuant to the terms of this Agreement (including as provided in Section 9.01) or as provided in accordance with the Incremental Facility Amendment applicable thereto.

"Financial Statements" means (a) the audited consolidated balance sheet of GCS and its Subsidiaries for the Fiscal Year ended December 31, 2020, and the related consolidated statement of operations, members' capital and cash flows for the Fiscal Year then ended, and (b) the unaudited consolidated balance sheet of Prepetition Administrative Borrower and its Subsidiaries for the 12 months ended [August 2021], and the related consolidated statement of operations and cash flows for the 12 months then ended.

"Fiscal Year" means the fiscal year of the Parent and its Subsidiaries ending on December 31 of each year.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to LIBOR Rate.

"Foreign Official" has the meaning specified therefor in Section 6.01(aa)(ii)(A).

"Funding Losses" has the meaning specified therefor in Section 2.08.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided that for the purpose of Section 7.03 hereof and the definitions used therein, "GAAP" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, that if there occurs after the date of this Agreement any change in

GAAP that affects in any respect the calculation of any covenant contained in Section 7.03 hereof, the Administrative Agent and the Administrative Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lenders and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 7.03 hereof shall be calculated as if no such change in GAAP has occurred.

"GC GP Buyer" has the meaning specified therefor in the preamble hereto.

"GC LP Buyer" has the meaning specified therefor in the preamble hereto.

"GCS" means GC Services Limited Partnership, a Delaware limited partnership.

"Goldman Group" means, at any time, Goldman Lenders who are not Defaulting Lenders, taken as a whole.

"Goldman Lenders" means, as of any time, the Goldman Persons that are Lenders at such time (each of them individually, a "Goldman Lender"); provided, that, upon any sale, assignment or other transfer (whether in a single or multiple transactions) by the Goldman Lenders of all Effective Date Committed Debt held collectively by them since the Effective Date through and including the date of such sale, assignment or transfer to a Goldman Successor, the term Goldman Lenders shall, as of such time, be construed to instead refer to such Goldman Successor.

"Goldman Person" means the following Persons, collectively, (a) Goldman Sachs Bank USA and Goldman Sachs BDC, Inc., (b) the Persons listed as a 'Goldman Lender' on Schedule 1.01(A) hereto, (c) each of the Affiliates of any of the foregoing, and their and such Affiliates' respective Related Funds, investment advisors, managing members, and partners (and, each such Person, individually, a "Goldman Person").

"Goldman Successor" means (a) any Person (together with its Affiliates and Related Funds) that has become a Lender pursuant to an assignment, together with all other Affiliates and Related Funds that has become a Lender pursuant to an assignment, of all Effective Date Committed Debt of the Goldman Lenders subject to the terms of this Agreement, and (b) each subsequent assignee of the foregoing, or of any prior assignee therefrom, as applicable (in each case, together with each of their respective Affiliates and Related Funds).

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

25

"Governmental Authority" means any nation or government, any foreign, Federal, state, territory, provincial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) the Parent, (b) each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, and (c) each other Person that guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in Article XI hereof and (b) each other guaranty, in form and substance satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"Hazardous Material" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non- usurious interest rate than applicable laws now allow.

26

"Holdco Borrower[2]" has the meaning specified therefor in the preamble hereto.

"Holdout Lender" has the meaning specified therefor in Section 12.02(b).

"Houston Facility" means the real property and improvements located at 6330 Gulfton Street, Houston, Texas 77081.

"IBA" has the meaning specified therefor in Section 2.13(a).

"Incremental Facility" has the meaning specified therefor in Section 2.12.

"Incremental Facility Amendment" has the meaning specified therefor in Section 2.12(d).

"Incremental Facility Commitment" has the meaning specified therefor in Section 2.12(a), as the same may be modified in an Incremental Facility Amendment for purposes of any Incremental Facility incurred after the date hereof pursuant to Section 2.12.

"Incremental Facility Commitment Election" has the meaning specified therefor in Section 2.12(c)(i)(B).

"Incremental Facility Commitment Election Deadline" has the meaning specified therefor in Section 2.12(c)(ii).

"Incremental Facility Effective Date" has the meaning specified therefor in Section 2.12(c)(i).

"Incremental Facility Lender" has the meaning specified therefor in Section 2.12(a).

"Incremental Facility Loan" has the meaning specified therefor in Section 2.12(a).

"Incremental Facility Loan Borrowing Date" has the meaning specified therefor in Section 2.12(c)(i)(a).

"Incremental Facility Loan Maturity Date" means, with respect to any Incremental Facility Loan, (a) the Initial/Delayed Draw Term Loan Maturity Date or (b) such other date as may be designated in the Incremental Facility Amendment applicable to such Incremental Facility Loan as the "Final Maturity Date" thereof, or as may be otherwise determined pursuant to the terms thereof to be the stated or scheduled final maturity or expiry date of such Incremental Facility Loan.

"Incremental Facility Notice" has the meaning specified therefor in Section 2.12(c)(i).

"Incremental Third Party Facility" has the meaning specified therefor in Section 2.12(d)(ii).

---

[2] To be the entity referred to as "New Holdco Sub".

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was due and any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person); (c) all obligations of such Person evidenced by bonds (excluding performance bonds, bid bonds, appeal bonds and surety bonds under which no claim has been made), debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include, without duplication, the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Matters" has the meaning specified therefor in Section 12.15(a).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified therefor in Section 12.15(a).

"Initial/Delayed Draw Term Loan Maturity Date" means [__][3], 2026.

"Initial Term Loan Commitment" means, with respect to any Lender the commitment or obligation (if any) of such Lender to make (or be deemed to make) an Initial Term Loan in the aggregate principal amount set forth on Schedule 1.01(A) hereto opposite such Lender's name under the heading "Initial Term Loan Commitment"; provided, that, for the avoidance of doubt, such Initial Term Loan Commitment shall be reduced to zero ($0) automatically and immediately upon such Lender being deemed to make an Initial Term Loan pursuant to Section 2.01.

---

[3] NTD:  To be the fifth (5th) anniversary of the Effective Date.

"Initial Term Loan Facility" refers to the Initial Term Loan Commitments and Initial Term Loans of the Lenders hereunder, together with all Obligations in respect thereof, which shall be deemed to constitute a single credit facility provided to the Borrowers on the terms set forth in this Agreement and the other Loan Documents.

"Initial Term Loan Lender" means (a) on the Effective Date, each Lender that has an Initial Term Loan Commitment, as set forth on Schedule 1.01(A) hereof under the heading "Initial Term Loan Lender", and (b) as of any time after the Initial Term Loans are deemed to be made on the Effective Date, each Person that, pursuant to the terms hereof, is Lender holding any Initial Term Loan at such time (including pursuant to, and upon effectiveness of, an assignment in accordance with Section 12.07 and the other terms hereof); provided, that, a Person shall cease to be an Initial Term Loan Lender immediately upon such time as such Person shall cease to be an Initial Term Loan Lender or a Lender (as applicable) in accordance with the terms hereof (including, without limitation, upon an assignment by such Person of all Initial Term Loans held by it pursuant to an effective Assignment and Acceptance, and otherwise in accordance with Section 12.07 and the other terms hereof).

"Initial Term Loans" has the meaning specified in Section 2.01(a).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" has the meaning specified therefor in the Security Agreement.

"Intellectual Property Contracts" means all agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"Intercompany Subordination Agreement" means the Intercompany Subordination Agreement, dated as of the date hereof, made by the Parent and its Subsidiaries in favor of the Collateral Agent for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent.

"Intercreditor Agreements" means, collectively, (a) the ABL/Term Intercreditor Agreement, (b) the Term Intercreditor Agreement, and (c) any intercreditor agreement or other agreement among lenders entered into from time to time in connection with any Incremental Facility by and among the Agents and any holder of such Indebtedness (or any Debt Representative thereof).

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Reference Rate Loan to a LIBOR Rate Loan) and, at the Borrowers' option, ending 1, 3 or 6 months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding,

the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another fiscal month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a fiscal month (or on a day for which there is no numerically corresponding day in the fiscal month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the fiscal month at the end of such Interest Period, (e) the Borrowers may not elect an Interest Period for any Loan which will end after the Final Maturity Date of such Loan, and (f) subject to clauses (a) and (c) above and Sections 2.02, 2.04 and 2.07, the Interest Period applicable as of the Effective Date to Initial Term Loans that are LIBOR Rate Loans may end on any day (not more than 3 months after the Effective Date) designated by the Administrative Borrower to the Administrative Agent.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account or cash.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"Joinder Agreement" means a Joinder Agreement, substantially in the form of Exhibit A, duly executed by a Subsidiary of a Loan Party made a party hereto pursuant to Section 7.01(b).

"Junior Lien Debt" means collectively, the principal of Second Lien Loans and any other funded Indebtedness permitted hereunder and, in each case, secured by a Lien on Collateral ranking junior to the Lien thereon that secures any Senior Lien Debt (but without regard to the ranking or priority of any Lien securing any such Junior Lien Debt relative to that of any Lien securing any other Junior Lien Debt). Unless expressly specified otherwise, references to any Junior Lien Debt as of any time of determination shall be construed as references to aggregate principal amount thereof outstanding as of such time.

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

30

"Lender" means (a) each Person whose name is set forth on Schedule 1.01(A) under the heading "Initial Term Loan Lender" or "Delayed Draw Term Loan Lender" and that signed this Agreement as a Lender and thereby became a party hereto on the Effective Date, and (b) each Person that becomes a Lender hereunder at any time after the Effective Date in accordance with the terms hereof (including pursuant to an assignment in accordance with Section 12.07 or an Incremental Facility Amendment in accordance with Section 2.12), in each case, for so long as such Person shall be (but only until such Person shall cease to be) a party to this Agreement as a Lender pursuant to the terms hereof; provided, that, unless the context otherwise requires, reference herein to "Lender" shall be deemed to be a reference to each Initial Term Loan Lender, each Delayed Draw Term Loan Lender and each Incremental Facility Lender (if any is a party hereto as of the time of determination).

"Lender Funding Account" has the meaning specified therefor in Section 2.02(c).

"LIBOR" means, with respect to any LIBOR Loan for any Interest Period, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on page LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided, that, if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time. "Interpolated Rate" means, at any time, the rate per annum determined in good faith by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"LIBOR Deadline" has the meaning specified therefor in Section 2.07(a).

"LIBOR Notice" means a written notice substantially in the form of Exhibit D.

"LIBOR Option" has the meaning specified therefor in Section 2.07(a).

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the greater of (a) the rate per annum determined by the Administrative Agent (rounded upwards if necessary, to the next 1/100%) by dividing (i) LIBOR for such Interest Period by (ii) 100% minus the Reserve Percentage and (b) 1.00%; provided, that, if the Administrative Agent is unable to determine LIBOR based on a Screen Rate for a period equal in length to the Interest Period applicable to the Initial Term Loans as of the Effective Date as provided in the definition of LIBOR, the LIBOR Rate applicable to Initial Term Loans during such Interest Period shall be 1.00%.

31

"LIBOR Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"License Trust Account" means any deposit account of a Loan Party specifically required by a State or other Governmental Authority to be maintained by such Loan Party as a trust account for the benefit of such State or Governmental Authority, pursuant to licensing and permitting requirements applicable to such Loan Party within such State's or Governmental Authority's jurisdiction, so long as such deposit account and all funds deposited therein are separately segregated from such Loan Party's general accounts and other cash.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Liquidity" means a Dollar amount equal to (determined at any time as of the last Business Day of the calendar week preceding the week in which the calculation of Liquidity is being made):

        (a)     the aggregate amount of unrestricted cash and Cash Equivalents maintained by the Borrowers in an account located in the United States subject to a Control Agreement; *plus*

        (b)     the aggregate amount available to be borrowed by any Borrower or any of its Subsidiaries under any ABL Facility in effect at such time (except to the extent that the Administrative Borrower determines that the pricing or terms thereof are unfavorable).

"Loan" means, generally, and unless the context requires otherwise, each loan or other credit extension (if any) made at any time to any Borrower pursuant this Agreement by any Person that is a Lender with an applicable Commitment at such time (all such loans and credit extensions, collectively, the "Loans"). As of the Effective Date, each Initial Term Loan and each Delayed Draw Term Loan is a Loan, and, upon such time (if any) that any Lender has an Incremental Facility Commitment, each Incremental Facility Loan extended pursuant to such Commitment will also be a Loan.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrowers, in which the Borrowers will be charged with all Loans made to, and all other Obligations incurred by, the Borrowers.

"Loan Document" means this Agreement, any Control Agreement, the Fee Letter, any Guaranty, the Intercompany Subordination Agreement, the Intercreditor Agreements, any Joinder Agreement, any Mortgage, any Security Agreement, any UCC Filing Authorization Letter, any landlord waiver, any collateral access agreement, any Perfection Certificate, and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"Loan Party" means any Borrower and any Guarantor.

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, financial condition of the Loan Parties taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on Collateral having individually or in the aggregate a fair market value in excess of $1,000,000.

"Material Contract" means, with respect to any Borrower, (a) the ABL Credit Agreement, (b) the Second Lien Financing Agreement and (c) all other contracts or agreements as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness in an aggregate principal amount of $2,000,000 or more.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to or had any liability at any time during the preceding 6 years.

"Net Cash Proceeds" means, with respect to, any issuance or incurrence of any Indebtedness, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (b) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (c) transfer taxes paid or payable to any taxing authorities by such Person or such Subsidiary in connection therewith, and (d) net income taxes paid or payable in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"New Facility" has the meaning specified therefor in Section 7.01(m).

"New Lending Office" has the meaning specified therefor in Section 2.09(e).

"Non-Funded Debt" has the meaning specified therefor in Section 1.04(b)(ii).

"Non-Funding Lender" has the meaning specified therefor in Section 2.12(c)(v).

"Non-Funding Lender Participation Date" has the meaning specified therefor in Section 2.12(c)(v).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.09(e).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees, premiums (including the Applicable Premium), attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"OFAC Sanctions Programs" means (a) the Requirements of Law and Executive Orders administered by OFAC, including, without limitation, Executive Order No. 13224, and (c) the list of Specially Designated Nationals and Blocked Persons administered by OFAC, in each case, as renewed, extended, amended, or replaced.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Other Rate" means, with respect to any Loan, the Rate (except the LIBOR Rate or Reference Rate) at which non-default interest is designated to accrue on such Loan pursuant to its terms, as specified (a) in the case of any Incremental Facility Loan, in the Incremental Facility

34

Amendment applicable thereto, and (b) in the case of any other Loan, in any agreement, document or instrument that constitutes a valid and enforceable amendment or other modification with respect to this Agreement in accordance with the terms hereof (including Section 12.02).

"Other Rate Loan" means each portion of any Loan that is permitted hereunder to bear interest at a rate determined by reference to any Other Rate.

"paid in kind", "payable in kind", and "payment in kind" (as applicable) means, (a) as used with respect to the payment of any interest, that such interest shall be paid in the form of PIK Interest instead of in cash, and (b) as used with respect to the payment of any fees or other amount hereunder, that such amount shall be paid in the form of additional Loan principal, capitalized on the applicable payment date in a manner implemented by the Administrative Agent in accordance with its customary practices or as contemplated pursuant to the definition of PIK Interest (with the provisions thereof being construed for this purpose to apply to fees or such other amount instead of to interest).

"Parent" has the meaning specified therefor in the preamble hereto.

"Parent Common Equity" means common equity interests issued by the Parent and constituting New Common Equity (as defined in the RSA).

"Parent Company Agreement" means the Limited Liability Company Agreement of Parent dated as of [___], 2021, as amended or modified from time to time in accordance with such agreement and this Agreement.

"Parent Junior Preferred Equity" means Series B junior preferred equity interests issued by the Parent as of the Effective Date to certain Goldman Persons and BSP Persons in accordance with the Restructuring Transactions and constituting [New Junior Preferred Equity (as defined in the RSA)].

"Parent Preferred Equity" means, collectively, Parent Senior Preferred Equity and Parent Junior Preferred Equity.

"Parent Senior Preferred Equity" means Series A senior preferred equity interests issued by the Parent as of the Effective Date to certain Goldman Persons in accordance with the Restructuring Transactions and constituting [New Senior Preferred Equity (as defined in the RSA).]

"Participant Register" has the meaning specified therefor in Section 12.07(i).

"Payment Office" means the office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Administrative Borrower.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Perfection Certificate" means a certificate in form and substance reasonably satisfactory to the Collateral Agent providing information with respect to the property of each Loan Party.

"Permitted Acquisition" means any acquisition (whether by means of a merger, consolidation or otherwise) of all or substantially all of the Equity Interests of any Person, or all or substantially all of the assets of (or any division or business line of) any Person by any Subsidiary of the Parent, to the extent that each of the following conditions shall have been satisfied:

(a)     such acquisition is permitted pursuant to the Parent Company Agreement or pursuant to any consent of the relevant holders of the equity interests therein in accordance with the terms thereof;

(b)     no Event of Default shall have occurred and be continuing or would result from the consummation of the proposed acquisition;

(c)     on a pro forma basis, the Total Secured Debt Leverage Ratio shall not exceed 5.50:1.00;

(d)     the assets being acquired (other than a *de minimis* amount of assets in relation to the Loan Parties' and their Subsidiaries' total assets) shall constitute Collateral, or the Person whose Equity Interests are being acquired shall become a Guarantor;

(e)     with respect to an acquisition in excess of $2,000,000, the Borrower shall have delivered to the Administrative Agent and the Lenders, at least ten Business Days prior to the date on which any such acquisition is to be consummated (or such shorter period as the Administrative Agent may agree) (1) a summary description of such acquisition, (2) to the extent prepared and available, a quality of earnings report from an accounting firm of recognized standing or another third party firm reasonably acceptable to the Administrative Agent, (3) to the extent prepared and available, a due diligence package, including all insurance policies (if applicable) and to the extent provided to the Borrower by the target, historical financial statements including audited financial statements of the target, for the two fiscal years most recently ended, consisting of balance sheets and the related aggregated statements of income, stockholders' equity and cash flows for such fiscal year, any environmental reports (if applicable) prepared by, or on behalf of, the target, (4) drafts of the acquisition documents, together with related disclosure schedules, and following consummation of the acquisition executed copies of all such acquisition documents and (c) all documentation and other information required under applicable "know your customer" and anti-terrorism and anti-money laundering Laws requested in writing to the Borrower by the Administrative Agent with respect to the target and its Subsidiaries; and

(f)     the Purchase Price payable in respect of such acquisition, along with all other Permitted Acquisitions, shall not exceed $10,000,000 in the aggregate.

"Permitted Capital Expenditures" means the following Capital Expenditures by the Borrowers and/or any of their Subsidiaries: (a) Capital Expenditures and other projects designated in the business plan delivered by the Borrowers to the Agents as of the Effective Date, as modified and supplemented pursuant to any supplement, amendment, restatement or replacement of such business plan from time to time with the consent of the Administrative Agent (acting at the direction of the Required Lenders), (b) Capital Expenditures and other projects consented to from time to time by the Administrative Agent (acting at the direction of the Required Lenders), (c)

Capital Expenditures and other projects approved by the board of the Parent upon recommendation of an independent financial advisor or consultant (reasonably satisfactory to the Required Lenders) and consented to by the Required Lenders, including to the extent necessary or desirable to preserve valuation in the business, and (d) incidental Capital Expenditures and other Capital Expenditures arising in the ordinary course of business (including telephone, computer and other types of IT and communications equipment and other electronics used by officers and employees) in an aggregate amount not to exceed $5 million in any twelve fiscal month period).

"Permitted Cure Equity" means Qualified Equity Interests of the Parent.

"Permitted Disposition" means:

    (a)    sale of Inventory in the ordinary course of business;

    (b)    licensing, on a non-exclusive basis, Intellectual Property rights in the ordinary course of business;

    (c)    leasing or subleasing assets for fair market value in the ordinary course of business;

    (d)    (i) the lapse of Registered Intellectual Property of the Parent or any of its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

    (e)    any involuntary loss, damage or destruction of property;

    (f)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

    (g)    so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets from the Parent or any of its Subsidiaries to a Loan Party (other than the Parent);

    (h)    Disposition for fair market value of obsolete or worn-out equipment in the ordinary course of business; and

    (i)    Disposition of property or assets not otherwise permitted in clauses (a) through (h) above for cash in an aggregate amount not less than the fair market value of such property or assets; provided, that the Net Cash Proceeds of such Dispositions pursuant to this clause (i) (including the proposed Disposition) (1) do not exceed $1,000,000 in the aggregate in any Fiscal Year and (2) in all cases, are paid to the Administrative Agent for the benefit of the Agents and the Lenders to the extent required pursuant to the terms of Section 2.05(c)(ii) or applied as provided in Section 2.05(c)(vi).

"Permitted Holder" means any BSP Person, any group (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of which any of the BSP Persons are members as of the Effective Date, and any other Person that is an equity holder of Parent as of the Effective Date, together with its Controlled Affiliates.

"Permitted Indebtedness" means:

      (a)    any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

      (b)    any other Indebtedness listed on Schedule 7.02(b), and any Permitted Refinancing Indebtedness in respect of such Indebtedness;

      (c)    Permitted Purchase Money Indebtedness, and any Permitted Refinancing Indebtedness in respect of such Indebtedness;

      (d)    Permitted Intercompany Investments;

      (e)    Indebtedness incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

      (f)    any Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

      (g)    the incurrence by any Loan Party of Indebtedness under Hedging Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes;

      (h)    Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business;

      (i)    ABL Indebtedness in an aggregate principal amount not exceeding the ["Maximum ABL Obligations"] as defined in the ABL/Term Intercreditor Agreement;

      (j)    Indebtedness of the Parent in respect of Parent Preferred Equity; provided that if the Parent Preferred Equity is converted into unsecured Indebtedness in accordance with the Parent Company Agreement, such Indebtedness shall be subordinated in right of payment pursuant to a subordination agreement on terms acceptable to the Required Lenders;

      (k)    Subordinated Indebtedness of the of the Loan Parties in an aggregate principal amount not exceeding $5,000,000 at any time outstanding;

(l)      other unsecured Indebtedness in an aggregate principal amount not exceeding $1,000,000 at any time outstanding (including any such Indebtedness owing to any Seller that is incurred in connection with the consummation of one or more Permitted Acquisitions (including, without limitation, obligations under earn-out agreements and similar deferred purchase arrangements));

(m)      Second Lien Indebtedness in an aggregate principal amount outstanding at any time not exceeding the amount of Second Lien Loans incurred on or about the Effective Date;

(n)      [reserved];

(o)      any Indebtedness of any of the Loan Parties or any of their Subsidiaries constituting Non-Funded Debt; and

(p)      all Non-Funded Debt arising in connection with each and any of the following: (i) the Obligations or the Loan Documents, and/or (ii) any obligations under the ABL Credit Facility, the Second Lien Credit Facility, any Parent Preferred Equity and/or any debt or equity incurred in accordance with this Agreement and the Parent Company Agreement (including pursuant to any consent thereunder by the requisite holders of the Parent Common Equity and Parent Preferred Equity).

"Permitted Intercompany Investments" means Investments made by (a) a Loan Party to or in another Loan Party (other than the Parent), (b) a Subsidiary that is not a Loan Party to or in another Subsidiary that is not a Loan Party, (c) a Subsidiary that is not a Loan Party to or in a Loan Party (other than the Parent), so long as, in the case of a loan or advance, the parties thereto are party to the Intercompany Subordination Agreement, and (d) a Loan Party to or in a Subsidiary that is not a Loan Party so long as (i) the aggregate amount of all such Investments made by the Loan Parties to or in Subsidiaries that are not Loan Parties does not exceed $2,500,000 at any time outstanding, (ii) no Default or Event of Default has occurred and is continuing either before or after giving effect to such Investment, and (iii) the Borrowers' Liquidity is not less than $5,000,000 after giving effect to such Investment.

"Permitted Investments" means:

(a)      Investments in cash and Cash Equivalents;

(b)      Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)      advances made in connection with purchases of goods or services in the ordinary course of business;

(d)      Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

39

(e)      Investments existing on the date hereof, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof;

(f)      Permitted Intercompany Investments;

(g)      loans or advances made to any officers or employees of Parent or its Subsidiaries not to exceed $100,000 individually and $200,000 in the aggregate at any time outstanding, so long as such loans are repaid by the applicable employee within one (1) year following the date of the making of such loan or advance or such other date as may be consented to by the Administrative Agent;

(h)      so long as no Default or Event of Default has occurred and is continuing or would result therefrom, any other Investments in an aggregate amount not to exceed $1,000,000 at any time outstanding; and

(i)      Permitted Acquisitions.

"Permitted Liens" means:

(a)      Liens securing the Obligations;

(b)      Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(c)(ii);

(c)      Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)      Liens described on Schedule 7.02(a), provided that any such Lien shall only secure the Indebtedness that it secures on the Effective Date and any Permitted Refinancing Indebtedness in respect thereof;

(e)      purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business to secure Permitted Purchase Money Indebtedness so long as such Lien only (i) attaches to such property and (ii) secures the Indebtedness that was incurred to acquire such property or any Permitted Refinancing Indebtedness in respect thereof;

(f)      deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)      with respect to any Facility, easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)      Liens of landlords and mortgagees of landlords (i) arising by statute or under any lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)      the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease), in each case extending only to such personal property;

(j)      non-exclusive licenses of Intellectual Property rights in the ordinary course of business;

(k)      judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(j);

(l)      rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(m)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(n)      Liens securing (i) ABL Indebtedness constituting Permitted Indebtedness, so long as such Liens are subject to the ABL/Term Intercreditor Agreement, and (ii) Second Lien Indebtedness constituting Permitted Indebtedness, so long as such Liens are subject to the Intercreditor Agreements;

(o)      Liens granted in the ordinary course of business to secure any Loan Party's contingent obligations in connection with any performance, surety, statutory or appeal bonds (which Liens shall not include any Liens on or pledges of the Equity Interests of any Loan Party or its Subsidiaries);

(p)      other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $1,000,000;

(q)      [reserved]; and

41

(r)      Liens securing Non-Funded Debt pursuant to clause (p) of the definition of "Permitted Indebtedness".

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations) incurred to finance the acquisition of any fixed assets secured by a Lien permitted under clause (e) of the definition of "Permitted Liens"; provided that (a) such Indebtedness is incurred within 270 days after such acquisition, (b) such Indebtedness when incurred shall not exceed the purchase price of the asset financed and (c) the aggregate principal amount of all such Indebtedness shall not exceed $5,000,000 at any time outstanding.

"Permitted Refinancing Indebtedness" means the extension of maturity, refinancing or modification of the terms of Indebtedness so long as:

(a)      after giving effect to such extension, refinancing or modification, the amount of such Indebtedness is not greater than the amount of Indebtedness outstanding immediately prior to such extension, refinancing or modification (other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto);

(b)      such extension, refinancing or modification has an average life to maturity that is greater than that of the Indebtedness so extended, refinanced or modified;

(c)      such extension, refinancing or modification is pursuant to terms that are not less favorable to the Loan Parties and the Lenders than the terms of the Indebtedness (including, without limitation, terms relating to the collateral (if any) and subordination (if any)) being extended, refinanced or modified; and

(d)      the Indebtedness that is extended, refinanced or modified is not recourse to any Loan Party or any of its Subsidiaries that is liable on account of the obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Permitted Restricted Payments" means any of the following Restricted Payments made by:

(a)      the Parent (and any Subsidiary of the Parent to the Parent to enable the Parent) to (i) pay customary expenses as and when due and owing by the Parent or any holding company thereof in the ordinary course of its business as a holding company (including salaries and related reasonable and customary expenses incurred by employees of the Parent or such holding company) in an aggregate amount not to exceed $[550,000] in any Fiscal Year and (ii) make Tax Distributions to its direct or indirect equityholders;

(b)      any Subsidiary of any Borrower to Borrower;

(c)      the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to make quarterly cash interest (or dividend) payments in respect of Parent Preferred Equity in

42

accordance with the terms of the Parent Company Agreement (as in effect as of the Effective Date unless Goldman Lenders (or an Affiliate or Related Fund thereof) own the applicable Parent Preferred Equity as of such date), so long as, both before and after giving effect to any such payment, no Default or Event of Default shall have occurred and be continuing;

(d)      the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to redeem or repurchase Parent Preferred Equity in accordance with the terms of the Parent Company Agreement;

(e)      the Parent to pay dividends in the form of common Equity Interests;

(f)      the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to pay (i) fees and expenses due and payable to (a) any Person pursuant to the BSP Management Consulting Agreement (including the BSP Management Fee) as in effect on the Effective Date (and with respect of any modifications of payment terms or amounts after the Effective Date, as otherwise consented to by the Required BSP Lenders and Required Goldman Lenders), in each case, in such amounts and on such terms as set forth in, or as determined in accordance with, the BSP Management Consulting Agreement, (b) [Jim Eckstaedt] pursuant to the [  ], as in effect on the Effective Date, and (c) [Riveron] pursuant to the [  ], as in effect on the Effective Date and (ii) fees and expenses payable to any Person pursuant to any other management, consultancy or similar agreement or arrangement in effect at any time; provided, that the aggregate amount of Restricted Payments permitted to be made in any fiscal quarter in reliance on this clause (ii) shall not exceed $[55,000]; provided, however, that, notwithstanding the foregoing, if the aggregate amount of Restricted Payments made in any fiscal quarter under this clause (ii) is less than $[55,000], the difference shall be permitted to be carried forward and may, at the Parent's election, be paid in any subsequent fiscal quarter(s) (in addition to any amounts permitted to be paid in such fiscal quarter directly in reliance on this clause (ii)); provided, further, that no Restricted Payments shall be paid in reliance on this clause (ii) in cash in any fiscal quarter unless, both before and after giving effect to any such payment, no Event of Default shall have occurred and be continuing (provided, that, to the extent that any such amount is not permitted to be paid in cash at any time as a result of the foregoing, such amount shall accrue notwithstanding the occurrence and continuance of any Event of Default, and all such accrued amounts shall be permitted to be paid in cash as of such time as such Event of Default is no longer continuing, or as of such time that the Required Lenders shall waive or consent to a forbearance with respect thereto, as the case may be);

(g)      the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to repurchase Parent Preferred Equity or Parent Common Equity from time to time, and on one or more occasions, in each case, from present or former directors, officers, employees and other related parties (or their respective spouses, ex-spouses or estates) of any Loan Party or Subsidiary thereof upon the death, disability, retirement, severance or termination of service of such director, officer or employee, so long as both before and after giving effect to any cash payment in respect thereof, no Event of Default shall have occurred and be continuing; provided, that, the aggregate amount of Restricted Payments permitted to be made in any Fiscal Year in reliance on this clause (g) shall not exceed $2,000,000 in such Fiscal Year; provided, further, that amounts referred to herein shall accrue during, and notwithstanding the occurrence and continuance of, any Event of Default, and all such accrued amounts shall be permitted to be paid in cash as of such time as such

43

Event of Default is no longer continuing, or as of such time that the Required Lenders shall waive or consent to a forbearance with respect thereto, as the case may; and

        (h)    the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to make any Restricted Payments authorized or permitted pursuant to or in accordance with the Parent Company Agreement as in effect as of the Effective Date (unless Goldman Lenders (or an Affiliate or Related Fund thereof) own the applicable Parent Preferred Equity as of such date) (subject to compliance with the conditions thereunder (if any) relating to consent rights (if any) of any BSP Person and/or any Goldman Person, if applicable).

Notwithstanding anything to the contrary herein, if any Parent Preferred Equity is converted to Indebtedness in accordance with the Parent Company Agreement, then any reference to Parent Preferred Equity in this definition shall include such Parent Preferred Equity as converted.

    "Permitted Specified Liens" means Permitted Liens described in clauses (a), (b), (c) and (n) of the definition of Permitted Liens, and, solely in the case of Section 7.01(b)(i), including clauses (g), (h) and (i) of the definition of Permitted Liens.

    "Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

    "Petty Cash Accounts" means Cash Management Accounts with deposits at any time in an aggregate amount not in excess of $50,000 for any one account and $250,000 in the aggregate for all such accounts.

    "Philippines Account" means any deposit account or other bank account maintained by GC Services International LLC that is located in the Philippines.

    "PIK Interest" means, when used with respect to any interest accruing on any unpaid principal of any Loan, which is due and payable pursuant hereto on a Regular Interest Payment Date in the amount accrued and unpaid as of such time, that, subject to a valid PIK Interest Election with respect thereto pursuant to Section 2.04(e), such interest in such amount shall not be required to be paid on such Regular Interest Payment Date in the form of cash, but, shall instead be permitted to be paid in the form of additional principal of such Loan, in an amount equal to the amount of the applicable interest payment due at such time, which payment shall be deemed made automatically (without any requirement for any Loan Party, Agent or any other Person to take any action or cause anything to occur) at 12:01 a.m. (New York City time) on the applicable Regular Interest Payment Date, it being agreed that such payment shall occur (and shall be deemed to occur) pursuant to the amount of such interest payment being deemed automatically capitalized and compounded onto, and treated as added to, the aggregate principal amount of such Loans outstanding immediately prior to such Regular Interest Payment Date and payment of such PIK Interest (and, accordingly, such payment shall also be deemed to be an automatic concurrent incurrence by the Borrowers of the applicable additional principal amount of such Loans and Obligations with respect thereto, but without any requirement to deliver any Notice of Borrowing with respect to such additional Loans, or to comply with any condition precedent that otherwise applies to the Borrowing of any Loans hereunder from the Lenders).  For the avoidance of doubt,

upon payment of any PIK Interest on any Loans, interest accruing on such Loans as of the time of such payment shall be calculated on the basis of the aggregate principal amount of such Loans outstanding as of such time, pro forma for the amount of principal resulting from such payment of PIK Interest (and the resulting capitalization of the corresponding PIK Interest amount onto the previously outstanding principal).

"PIK Interest Election" has the meaning specified therefor in Section 2.04(e).

"PIK Interest Election Notice" has the meaning specified therefor in Section 2.04(e).

"PIK Interest Election Period" has the meaning specified therefor in Section 2.04(e).

"PIK Interest Payment" has the meaning specified therefor in Section 2.04(e).

"Plan" means any Employee Plan or Multiemployer Plan.

["Plan of Reorganization" has the meaning specified therefor in RSA.]

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.00%.

"Pre-Default Payment Waterfall" means, with respect to any payment towards or on account of any Loan or other Obligation (including any optional or voluntary prepayment, any mandatory prepayment and otherwise), whether made by any Loan Party or any Agent or other Person on its behalf, and as relates to any Lender's right to receive the same, as applicable, pursuant to the terms set forth in Section 4.03(a) governing the right to make any such payment, and prescribing the order in which any such payment is to be applied (including with respect to application to the Loans based on their respective Classes, and application of such payments to respective Lenders), and the other provisions thereof governing the parties rights and obligations in connection with any such payments.

"Prepetition Administrative Borrower" means ORG GC Midco LLC, a Delaware limited liability company.

"Prepetition Group" means [  ].

"Prepetition Loan Parties" means, collectively, the Prepetition Parent, the Prepetition Administrative Borrower, and certain of the Prepetition Administrative Borrower's Subsidiaries party thereto as borrowers and guarantors, as applicable.

"Prepetition Parent" means ORG GC Holdings, LLC, a Delaware limited liability company.

"Prepetition Term Agent" means BSP Agency, as administrative agent and as collateral agent under the Prepetition Term Financing Agreement.

"<u>Prepetition Term Financing Agreement</u>" means that certain Financing Agreement, dated as of July 31, 2017 (as amended by that certain First Amendment to Financing Agreement, dated as of September 29, 2017, that certain Second Amendment to Financing Agreement, dated as of June 27, 2019, and as further amended, supplemented or otherwise modified through to, and as in effect on, the Petition Date), by and among the Prepetition Loan Parties, the Prepetition Term Lenders and the Prepetition Term Agent.

"<u>Prepetition Term Lenders</u>" means the Lenders and/or their respective affiliates who are party to the Prepetition Term Facility Credit Agreement as lenders thereunder.

"<u>Projections</u>" means the financial projections of the Parent and its Subsidiaries delivered pursuant to <u>Section 6.01(g)(ii)</u>.

"<u>Pro Rata Share</u>" means:

(a)  with respect to each of the following (in each case, as of the applicable time of determination thereof):

(i)  a Lender's obligation to make its Initial Term Loan, and its right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by <u>*dividing*</u> (x) such Lender's Initial Term Loan Commitment <u>*by*</u> (y) the Total Initial Term Loan Commitment; <u>provided</u>, that, if the Total Initial Term Loan Commitment is zero ($0.00), such percentage shall instead be obtained by dividing the aggregate then-outstanding unpaid principal amount of such Lender's Initial Term Loans by the aggregate then-outstanding unpaid principal amount of all Initial Term Loans;

(ii)  a Lender's obligation to make any Delayed Draw Term Loan(s), and its right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by <u>*dividing*</u>  (x) the aggregate amount of such Lender's Delayed Draw Facility Commitment remaining plus such Lender's outstanding Delayed Draw Term Loans <u>*by*</u> (y) the Total Delayed Draw Facility Commitment remaining plus the aggregate outstanding amount of all Delayed Draw Term Loans; <u>provided</u>, that, if the Total Delayed Draw Facility Commitment is zero ($0.00), such percentage shall instead be obtained by dividing the aggregate then-outstanding unpaid principal amount of such Lender's Delayed Draw Term Loans by the aggregate then-outstanding unpaid principal amount of all Delayed Draw Term Loans; and

(iii)  a Lender's obligation to make any Incremental Facility Loan(s) under any Incremental Facility for which it has an Incremental Facility Commitment pursuant to <u>Section 2.12</u>, and its right to receive payments of interest, fees, and principal with respect thereto, if and to the extent expressed to be payable to Lenders in such Incremental Facility in accordance with their respective Pro Rata Shares (except as may be otherwise provided pursuant to the Incremental Facility Amendment establishing such Incremental Facility, or separately agreed by the applicable parties in accordance therewith), the percentage obtained by <u>*dividing*</u> (x) such Lender's Incremental Facility Commitment, <u>*by*</u> (y) the Total Incremental Facility Commitment for such Incremental Facility; <u>provided</u>, that, if the Total Incremental Facility Commitment is zero ($0.00), such percentage shall instead be obtained by dividing the aggregate then-outstanding unpaid principal amount of Incremental Facility Loans of such Incremental Facility held by such

Lender by the aggregate then-outstanding unpaid principal amount of all such Incremental Facility Loans;

(b)     as to any Lender, and with respect to any matter other than matters set forth in clauses (a) and (c) (but including for purposes of calculating such Lender's indemnification obligations arising under Section 10.05, or determining whether Required Lenders have consented to, voted in favor of, or taken any other action expressed to any consent, vote or other action by Required Lenders), the percentage obtained as of the applicable time of determination by dividing (x) the sum of all unused Commitments of such Lender, and the aggregate then-outstanding unpaid principal amount of all such Lender's Loans, by (y) the sum of the unused Total Commitment then in effect and the aggregate then-outstanding unpaid principal amount of all Loans; and

(c)     as such term is used in connection with determining the amount or percentage (if any) of any Eligible Lender's rights with respect to any Incremental Facility pursuant to Section 2.12(c), the percentage obtained by *dividing* (x) such Eligible Lender's Effective Date Committed Debt, *by* (y) the sum of the aggregate amounts of Effective Date Committed Debt held by all Eligible Lenders;

provided, however, that (A) percentage calculations hereunder shall be carried out to the ninth (9th) decimal place, and (B) the outstanding or unpaid principal amount of Loans at any time shall include principal constituting all PIK Interest payments made thereon prior to such time, and shall be determined in accordance with Section 1.04(c).

"Purchase Price" means, with respect to any acquisition, an amount equal to the sum of (a) the aggregate consideration, whether cash, property or securities (including, without limitation, the fair market value of any Equity Interests of any Loan Party or any of its Subsidiaries issued in connection with such acquisition), paid or delivered by a Loan Party or any of its Subsidiaries (whether as initial consideration or through the payment or disposition of deferred consideration, including, without limitation, in the form of seller financing, royalty payments, payments allocated towards non-compete covenants, payments to principals for consulting services or other similar payments) in connection with such Acquisition, plus (b) the aggregate amount of liabilities of the acquired business (net of current assets of the acquired business) that would be reflected on a balance sheet (if such were to be prepared) of the Parent and its Subsidiaries after giving effect to such acquisition, plus (c) the aggregate amount of all transaction fees, costs and expenses incurred by the Parent or any of its Subsidiaries in connection with such acquisition.

"Qualified Cash" means, as of any date of determination, the aggregate amount of unrestricted cash on-hand of the Loan Parties maintained in deposit accounts in the name of a Loan Party in the United States as of such date, which deposit accounts are subject to Control Agreements.

"Qualified Equity Interests" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"Rate" refers to the 'form' or 'mechanism' of the interest rate applicable to any Indebtedness or other obligation, as the case may be.

"Real Property Deliverables" means each of the following agreements, instruments and other documents in respect of each Facility:

(a)      a Mortgage duly executed by the applicable Loan Party;

(b)      evidence of the recording of each Mortgage in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Collateral Agent and the Lenders thereunder;

(c)      a Title Insurance Policy with respect to each Mortgage, dated as of the Effective Date;

(d)      a current ALTA survey and a surveyor's certificate, in form and substance satisfactory to the Collateral Agent, certified to the Collateral Agent and to the issuer of the Title Insurance Policy with respect thereto by a professional surveyor licensed in the state in which such Facility is located and satisfactory to the Collateral Agent;

(e)      in the case of a leasehold interest, a copy of the lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest;

(f)      if available in the jurisdiction(s) in which any Facility is located, a copy of each letter issued by the applicable Governmental Authority, evidencing each Facility's compliance with all applicable building codes, fire codes, other health and safety rules and regulations, parking, density and height requirements and other building and zoning laws together with a copy of all certificates of occupancy issued with respect to each Facility;

(g)      [reserved];

(h)      if required by the Collateral Agent, a satisfactory ASTM 1527-00 Phase I Environmental Site Assessment ("Phase I ESA") provided by the Borrowers to the Collateral Agent (and, if requested by the Collateral Agent based upon the results of such Phase I ESA, an ASTM 1527-00 Phase II Environmental Site Assessment) of each Facility, in form and substance and by an independent firm satisfactory to the Collateral Agent; and

(i)      such other agreements, instruments and other documents (including guarantees and opinions of counsel) as the Collateral Agent may reasonably require.

"Recipient" means any Agent and any Lender, as applicable.

"Reference Rate" means, for any period, the greatest of (a) 2.00% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) the LIBOR Rate (which rate shall be calculated based upon an Interest Period of 1 month and shall be determined on a daily basis) plus 1.00% per annum, and (d) the rate last quoted by *The Wall Street Journal* as the "Prime Rate" in the United States or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release

by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Reference Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the Reference Rate.

"Reference Time" has the meaning specified therefor in Section 1.04(b)(i).

"Register" has the meaning specified therefor in Section 12.07(f).

"Registered Intellectual Property" means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

"Registered Loans" has the meaning specified therefor in Section 12.07(f).

"Regular Interest Payment Date" means (a) in the case of a Reference Rate Loan, the last Business Day of each March, June, September and December to occur while such Reference Rate Loan is outstanding (commencing with the closest such month to occur after such Loan is made or continued as a Reference Rate Loan, or converted from a LIBOR Rate Loan into a Reference Rate Loan, as the case may be), and (b) in the case of any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan; provided, that, if any Interest Period for a LIBOR Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be the Regular Interest Payment Dates for such LIBOR Rate Loan (or, if any such date is not a Business Day, the next succeeding Business Day).

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, any other Person (except a natural person) that is (a) an Affiliate of such Person, or (b) any partnership, fund or account managed or advised by such Person (or by an Affiliate of such Person).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or

49

outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Replacement Lender" has the meaning specified therefor in Section 12.02(b).

"Report" has the meaning specified therefor in Section 10.13(a).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section or for which such provision is waived).

"Required BSP/Goldman Lender Consent Expiry Date" refers to the date determined by the Administrative Agent pursuant to clauses (b) and (c) of the definition of Required Lenders to be the earliest or first date after the Effective Date as of which no Lender that is a party hereto at such time constitutes either a Required BSP Lender or a Required Goldman Lender; provided, that, for the avoidance of doubt, such date shall be deemed to be the same as the later of (i) the Required BSP Lender Consent Expiry Date and (ii) the Required Goldman Lender Consent Expiry Date.

"Required Lenders" means, as of any time of determination, Lenders whose Pro Rata Shares as of such time (calculated in accordance with clause (b) of the definition thereof) aggregate at least 50.1%; provided, however, that:

(a)    Solely to the extent the Suspension Date has not occurred, if the number of Unaffiliated Lenders holding Effective Date Committed Debt is two (2) or more, then the "Required Lenders" as of such time shall be required to include at least two (2) Lenders who are Unaffiliated Lenders at such time;

(b)    during the period commencing on the Effective Date and ending on (and as of) the first date (the "Required BSP Lender Consent Expiry Date") that the aggregate amount of Effective Date Committed Debt held by BSP Lenders who are not Defaulting Lenders represents less than 34% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders, "Required Lenders" shall be required to include, and consent of Required Lenders shall not be deemed to have been obtained without the consent of, BSP Lenders who are not Defaulting Lenders (such BSP Lenders, but only until the Required BSP Lender Consent Expiry Date, collectively, the "Required BSP Lenders", and, each individually, a "Required BSP Lender"); and

(c)    during the period commencing on the Effective Date and ending on (and as of) the first date (the "Required Goldman Lender Consent Expiry Date") that the aggregate amount of Effective Date Committed Debt held by Goldman Lenders who are not Defaulting Lenders represents less than 34% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders, "Required Lenders" shall be required to include, and consent of Required Lenders shall not be deemed to have been obtained without the consent of, Goldman

Lenders who are not Defaulting Lenders (such Goldman Lenders, but only until the Required Goldman Lender Consent Expiry Date, collectively, the "Required Goldman Lenders", and, each individually, a "Required Goldman Lender").

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning specified therefor in Section 10.07.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Restricted Payment" means (a) the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (b) the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party, any Subsidiary thereof or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (c) the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (d) the return of any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such or (e) the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party, but not including payments to employees in the ordinary course of business in accordance with the Loan Parties' regular payroll or employment practices or otherwise pursuant to employment agreements entered into with such employees.

"Restructuring Documents" means, collectively, the RSA, the Plan of Reorganization, the Chapter 11 Plan Confirmation Order, and any and all other agreements, orders, documents or instruments relating to the Restructuring Transactions.

"Restructuring Transactions" means any and all restructuring, recapitalization and other transactions relating to the Prepetition Group described in the Restructuring Documents, together with any and all other transactions consummated in connection therewith.

"RSA" means that certain Restructuring Support Agreement, dated as of [____], 2021 (together with all annexes, exhibits and other attachments thereto), by and among the Prepetition Group, certain of the Prepetition Administrative Borrower's Affiliates, the Prepetition Term Agent, the Prepetition Term Lenders and certain other persons.

"Sale and Leaseback Transaction" means, with respect to the Parent or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Parent or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Second Lien Agent" means BSP Agency, as the administrative agent and as the collateral agent under the Second Lien Term Loan Agreement, together with its successors and assigns in such capacities.

"Second Lien Credit Facility" means the term loan credit facility provided pursuant to the Second Lien Financing Agreement.

"Second Lien Financing Agreement" means that certain Second Lien Financing Agreement, dated as of the date hereof, by and among the Borrowers, as borrowers thereunder, the Parent and the other Guarantors, as guarantors thereunder, the Second Lien Agent, and the Second Lien Lenders, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreements.

"Second Lien Indebtedness" means Indebtedness of the Loan Parties owing to the lenders and other secured parties under the Second Lien Credit Facility.

"Second Lien Lender" means, at any time, any Person that is a lender under the Second Lien Financing Agreement as of such time.

"Second Lien Loan Documents" means, collectively, the Second Lien Financing Agreement and the other Loan Documents (as defined in the Second Lien Financing Agreement), in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreements.

"Secured Party" means any Agent and any Lender.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

52

"Securitization" has the meaning specified therefor in Section 12.07(l).

"Security Agreement" means a Pledge and Security Agreement, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"Senior Lien Debt" means, collectively, the principal of (a) all Initial Term Loans, Delayed Draw Term Loans and Incremental Facility Loans that are secured on a pari passu basis by a Lien on Collateral and (b) outstanding ABL Loans. Unless expressly specified otherwise, references to any Senior Lien Debt as of any time of determination shall be construed as references to aggregate principal amount thereof outstanding as of such time.

"SOFR" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is not less than the total amount of the liabilities of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its existing debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital.

"Specified Event of Default" means any Event of Default pursuant to Section 9.01(a), Section 9.01(f) or Section 9.01(g).

"Specified Financial Covenant" has the meaning specified therefor in Section 9.02.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate,

association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person. References to a Subsidiary shall mean a Subsidiary of the Parent unless the context expressly provides otherwise.

"Subordinated Indebtedness" means unsecured Indebtedness of any Loan Party the terms of which (including, without limitation, payment terms, interest rates, covenants, remedies, defaults and other material terms) are satisfactory to the Collateral Agent and the Required Lenders and which has been expressly subordinated in right of payment to all Indebtedness of such Loan Party under the Loan Documents (a) by the execution and delivery of a subordination agreement, in form and substance satisfactory to the Collateral Agent and Required Lenders, or (b) otherwise on terms and conditions satisfactory to the Collateral Agent and Required Lenders.

"Suspension Date" means, and shall be deemed to occur upon, the first date after the Effective Date that the aggregate amount of Effective Date Committed Debt held by Goldman Lenders who are not Defaulting Lenders represents less than 17% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders.

"Tax Distributions means, for any period that Parent is treated as a pass-through entity under the Code, distributions made to the holders of Parent's equity interests at such times and in such amounts as are permitted under Section 13.1 of the Parent Company Agreement, as in effect on the date hereof.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the first date on which all of the Obligations are paid in full in cash and the Commitments of the Lenders are terminated.

"Termination Event" means (a) a Reportable Event with respect to any Employee Plan, (b) any event with respect to an Employee Plan that causes any Loan Party or any of its ERISA Affiliates to incur material liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition that could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

"Term Intercreditor Agreement" means the 1L/2L Term Intercreditor Agreement, dated as of the date hereof, by and among the Collateral Agent and the Second Lien Agent, and acknowledged by the Loan Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Term Loan" means, collectively, (i) the Initial Term Loan and (ii) the Delayed Draw Term Loans.

"Term Loan Obligations" means any Obligations with respect to the Term Loan (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Priority Collateral" means "Term Priority Collateral" as defined in the ABL/Term Intercreditor Agreement.

"Term SOFR" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued to the Collateral Agent by or on behalf of a title insurance company selected by or otherwise satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"Total Commitment" means, as of any time, the aggregate amount of all Commitments of all Lenders in effect at such time.  For the avoidance of doubt, (a) on the Effective Date, the Total Commitment is the same as the Total Effective Date Commitment, and (b) whenever an Incremental Facility exists hereunder, the Total Commitment will include the Total Incremental Facility Commitment for such Incremental Facility.

"Total Delayed Draw Facility Commitment" refers to the sum of the amounts of the Delayed Draw Facility Commitments, taken as a whole, and means (a) as of the Effective Date, and at all times until any Delayed Draw Term Loan is made, $5,000,000 or (b) upon and as of the making of any Delayed Draw Term Loan(s), amount equal to the sum of Delayed Draw Facility Commitments as of such time.

"Total Effective Date Commitment" means an amount equal to sum of the amount of the Total Initial Term Loan Commitment and the Total Delayed Draw Facility Commitment in effect prior to the time that any Loan is made (calculated using the Dollar amounts referred to in clause (a) of the definitions of such terms).

"Total Incremental Facility Commitment" means, with respect to any Incremental Facility, the sum of all Lenders' Incremental Facility Commitments for such Incremental Facility.  As of the Effective Date, the Total Incremental Facility Commitment is zero ($0.00).

"Total Initial Term Loan Commitment" refers to the sum of the Initial Term Loan Commitments of all Lenders as of any time, taken as a whole, and means (a) $71,000,000 (until the time that Initial Term Loans are deemed made on the Effective Date in accordance herewith) or (b) $0.00 (as of, and at all times after, the Initial Term Loans are deemed to be made on the Effective Date in accordance herewith).

"Total Secured Debt Leverage Ratio" means, with respect to the Borrowers and their Subsidiaries, the ratio of: (a) (i) the sum of the aggregate amount of the Borrowers' and their Subsidiaries' Senior Lien Debt and Junior Lien Debt outstanding as of such time, *minus* (ii) the

aggregate amount of unrestricted cash and Cash Equivalents maintained by the Loan Parties in an account located in the United States subject to a Control Agreement not to exceed $5,000,000 (provided that proceeds of any borrowing on such date shall be excluded from unrestricted cash and Cash Equivalents) to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrowers for which financial statements have been furnished pursuant to Section 7.01(a).

"Total Senior Lien Leverage Ratio" means, with respect to the Borrowers and their Subsidiaries (if used in connection with (x) the determination of the Applicable ECF Percentage, for the 12 consecutive fiscal months ending on the applicable measurement date, and (y) any other matter, as of the last Business Day of the full fiscal quarter ending immediately prior to the applicable date of determination for which financial statements have been delivered) the ratio of (a) (i) the aggregate amount of the Borrowers' Senior Lien Debt of the Borrowers and their Subsidiaries outstanding as of such time, _minus_ (ii) the aggregate amount of unrestricted cash and Cash Equivalents maintained by the Loan Parties in an account located in the United States subject to a Control Agreement not to exceed $5,000,000 (provided that proceeds of any borrowing on such date shall be excluded from unrestricted cash and Cash Equivalents) to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrowers for which financial statements have been furnished pursuant to Section 7.01(a).

"tranche" means, with respect to any Class of Loans, a principal amount of Loans within such Class that are outstanding on identical terms, which principal amount constitutes a portion, but not the entire principal amount, of Loans comprised in such Class (and each separate portion representing Loans having other terms shall be a separate tranche); provided, that any Class of Loans comprised entirely of Loans having identical terms shall be deemed to be a Class with only one tranche of Loans; provided, further, that, whenever any provision of this Agreement or any other Loan Document identifies or is expressed to apply to any Loan(s) only by reference to Class, but without making any distinction between any Loans within such Class on the basis of their respective terms, such provision shall be deemed to apply to all Loans within such Class on the same basis, and each Loan in such Class shall be treated equally pursuant to such provision, notwithstanding that any such Loans belong to different tranches for any other purpose or in any other context.

"Transferee" has the meaning specified therefor in Section 2.09(a).

"Type", when used in respect of any Loan or Borrowing, shall refer to the specific type of fixed, floating/variable or other (if any is applicable in accordance with the terms hereof) reference interest rate applicable thereto, which shall be (a) the LIBOR Rate, (b) the Reference Rate, or (c) any Other Rate.  For the avoidance of doubt, all LIBOR Rate Loans comprising the same Borrowing shall be deemed to be Loans of the same Type, and all Reference Rate Loans comprising the same Borrowing shall be deemed to be Loans of the same Type (and such Type shall be deemed to be different to the Type of the foregoing LIBOR Rate Loans), and (iii) the Type of Other Rate Loans shall be designated in the definitive documents governing the applicable Borrowing thereof.

"UK Act" has the meaning specified therefor in Section 6.01(aa).

"Unaffiliated Lenders" means, as used with respect to a group of Lenders, Lenders in such group who are not Affiliates, Controlled Investment Affiliates or Related Funds of one another.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in Section 1.04(c).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001)) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"WARN" has the meaning specified therefor in Section 6.01(p).

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Working Capital" means, at any date of determination thereof, (a) the sum, for any Person and its Subsidiaries, of (i) the unpaid face amount of all Accounts of such Person and its Subsidiaries as at such date of determination, plus (ii) the aggregate amount of prepaid expenses and other current assets of such Person and its Subsidiaries as at such date of determination (other than cash, Cash Equivalents and any Indebtedness owing to such Person or any of its Subsidiaries by Affiliates of such Person), minus (b) the sum, for such Person and its Subsidiaries, of (i) the unpaid amount of all accounts payable of such Person and its Subsidiaries as at such date of determination, plus (ii) the aggregate amount of all accrued expenses of such Person and its Subsidiaries as at such date of determination (other than the current portion of long-term debt and all accrued interest and taxes).

Section 1.02  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03  Certain Matters of Construction.    References in this Agreement to "determination" or "calculation" by any Agent include good faith and commercially reasonable estimates by such Agent (in the case of quantitative determinations) and good faith and commercially reasonable beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders (or such other Lenders as required herein).  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders.  Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to the actual knowledge of a senior officer of any Loan Party.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04  Accounting and Other Terms.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted to the Administrative Agent or the Lenders pursuant to this Agreement shall be prepared in conformity with, GAAP (including the impact of "fresh start" accounting under Accounting Standards Codification 852), applied in a manner materially consistent with that used in preparing the Financial Statements, except as otherwise specifically prescribed herein.  For purposes of determining compliance with any incurrence or expenditure tests set forth in this Agreement (including Section 7.01, Section 7.02 and Section 7.03), any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the

aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time).  Unless expressly specified otherwise herein, each reference in this Agreement or in any other Loan Document to (x) any "cash", any "monies" or "money", or any "funds" (or to any amount thereof) shall be construed as a reference to Dollars (and such amount in Dollars), and such terms shall be deemed to be used interchangeably but with the same meaning in each case, and (y) any "payment" or "funding" to any Person (or any form or manner of any payment or funding, as the case may be) shall be construed as requiring a transfer or other delivery to such Person of Dollars of the applicable amount in cash, and (except in the case of PIK Interest, but solely to the limited extent expressly provided herein), nothing payable by any Loan Party or any of its Subsidiaries hereunder or on account of any Obligations shall be permitted to be paid "in kind", or in any other form or currency except in Dollars.  Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 840 or 842 on the definitions and covenants herein, GAAP as in effect on the Effective Date shall be applied and (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)     Subject to clause (ii) hereof, and unless expressly specified otherwise elsewhere in this Agreement:

(i)     All references in the Loan Documents to (A) the "amount", "principal amount" or "face amount" of any Loan or other Obligation, or any other Indebtedness referred to herein, shall be construed have the same meaning and effect, and shall be deemed to refer to the "outstanding" amount thereof as of the applicable time and/or date of determination (each, a "Reference Time"), and (B) the "outstanding" amount of any Indebtedness shall be (x) the amount thereof as of the applicable time of determination that has not been previously paid by the obligors thereof (which shall be the Loan Parties in the case of any Loan or other Obligation) to the creditors or other beneficiaries thereof or Persons entitled to the same pursuant to the terms of such Indebtedness (which shall be one or more Lenders, or other Secured Parties or Persons determined in accordance with the Loan Documents) and remains owing (or shall become payable), and (y) valued as the accreted value thereof (in the case of any Indebtedness issued with original issue discount), or the principal amount or liquidation preference thereof (in the case of any Indebtedness not issued with original issue discount); provided, that, without limiting clause (ii) below, whenever calculating the amount of any specific payment of any Obligation that any Loan Party is required to pay at any specified time, and whenever determining any Lender's Pro Rata Share, the "amount" of the relevant Loan and/or other Obligation shall be calculated pro forma for all PIK Interest paid at any time prior to such Reference Time.

(ii)     For purposes of calculating the amount of any Loans or other Indebtedness (including any Indebtedness referred to in the definition of Permitted Indebtedness, as applicable) as of any time for purposes of determining compliance with, and/or calculating the amount of additional Indebtedness and/or Liens permitted to be incurred at such time pursuant to any test governing incurrence of Indebtedness and/or Liens (including and any Incremental Facility or Second Lien Debt, or any other incurrence test set forth in <u>Section 2.12</u>, <u>Section 7.02</u> or any other provision of this Agreement, any Intercreditor Agreement or any other Loan Document (as applicable)), including any test or provision that limits such incurrence by express reference to a Dollar amount of Indebtedness (or any "outstanding" amount), or that indirectly limits the Dollar amount of any Indebtedness or Liens that may be incurred by conditioning the same on compliance with a specified level pursuant to a leverage ratio based test or any other ratio-based test that is affected by the amount of any Indebtedness, or any costs associated therewith (including any "fixed charge coverage ratio" or "interest coverage ratio" test), (A) the "amount" or "outstanding amount" of any Indebtedness for purposes of a provision pursuant to which Indebtedness is sought to be incurred or permitted shall include amounts actually outstanding resulting from accrual or payment of any interest thereon (including PIK Interest hereunder and any interest paid "in-kind" on any other Indebtedness), accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of any fees or other amounts "in-kind" thereunder in the form of additional principal of such Indebtedness, the payment of dividends in the form of additional shares of any preferred stock or other equity interests, or the reclassification of commitments or obligations not treated as Indebtedness due to a change in GAAP (the foregoing, collectively, "<u>Non-Funded Debt</u>"), and (B) following such initial incurrence, if any such Indebtedness accrues or arises under any Non-Funded Debt, the same shall not be deemed to be an "incurrence" of such Indebtedness for purposes of <u>Sections 2.12</u>, <u>7.02</u> or any other provision that limits the amount of such Indebtedness that may be incurred, or be permitted to exist or be outstanding at any time hereunder, and all Non-Funded Debt and Liens thereon shall be deemed to be permitted hereunder pursuant to <u>Section 7.02</u>, and clause (p) of the definition of Permitted Indebtedness (and, if secured, clause (r) of the definition of Permitted Liens).

(c)     All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "<u>Uniform Commercial Code</u>" or the "<u>UCC</u>") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine

(d)     The aggregate principal amount (if any) of any Loan that any Lender shall be required to fund on any specified Borrowing Date (to the extent requested by the Borrowers in accordance with the terms hereof) shall not exceed such Lender's Commitment relating to such Class of Loans, determined as of the requested Borrowing Date but after taking into account (and net of) the aggregate principal amount of all Loans previously funded by such Lender under such Commitment, and the corresponding reduction to the amount of such Commitment resulting therefrom, and, accordingly, any reference herein or in any other Loan Document to any Lender's "unfunded", "undrawn", "unutilized" or "remaining" Commitment at or as of any time shall be

construed in accordance with the foregoing, and such Lender shall not at any time be required to fund any amount of Loans exceeding its then-unfunded Commitment therefor.

Section 1.05  <u>Time References</u>.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, (i) the word "from" any specified date, time or other reference point, as applicable, means "from and including" such date, time or other reference point, as applicable (and the words "as of" any specified date, time or other reference point, as applicable, shall be construed have the same meaning and effect as the foregoing, and to require any determination to be made in the same manner), and (ii) the words "to", "through to", and "until" any specified date, time or other reference point, as applicable, each means "to but excluding" such date, time or other reference point; <u>provided</u>, <u>however</u>, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.

Section 1.06  <u>Classification of Loans and Borrowings</u>.

(a)  Loans may be classified and referred to by (i) Class (e.g., an "Initial Term Loan", a "Delayed Draw Term Loan", and "Incremental Facility Loan"), (ii) Type (e.g., a "LIBOR Rate Loan", a "Reference Rate Loan", an "Other Rate Loan") or (iii) Class and Type (e.g., a "LIBOR Rate Initial Term Loan", a "LIBOR Rate Delayed Draw Term Loan", a "LIBOR Rate Incremental Facility Loan", a "Reference Rate Loan Initial Term Loan", a "Reference Rate Delayed Draw Term Loan", a "Reference Rate Incremental Facility Loan", an "Other Rate Incremental Facility Loan").

(b)  Borrowings also may be classified and referred to by (i) Class (e.g., an "Initial Term Loan Borrowing", a "Delayed Draw Term Loan Borrowing", an "Incremental Facility Loan Borrowing"), (ii) Type (e.g., a "LIBOR Rate Borrowing", a "Reference Rate Borrowing", an "Other Rate Borrowing") or (iii) Class and Type (e.g., a "LIBOR Rate Initial Term Loan Borrowing", a "LIBOR Rate Delayed Draw Term Loan Borrowing", a "LIBOR Rate Incremental Facility Loan Borrowing", a "Reference Rate Initial Term Loan Borrowing", a "Reference Rate Delayed Draw Term Loan Borrowing", a "Reference Rate Incremental Facility Loan Borrowing", an "Other Rate Incremental Facility Loan Borrowing").

## ARTICLE II

## THE LOANS

Section 2.01  <u>Commitments</u>.

(a)  <u>Initial Term Loan Commitments</u>.  Subject to the terms and conditions, and relying upon the representations and warranties set forth herein, each Initial Term Loan Lender hereby agrees that, automatically and immediately upon the Effective Date occurring, it shall hereby be deemed to have made a term loan to the Borrowers pursuant to this <u>Section 2.01(a)</u> (an "<u>Initial Term Loan</u>") in an aggregate principal amount equal to such Initial Term Loan Lender's Initial Term Loan Commitment (such Initial Term Loan Lender's Initial Term Loan, together with

the Initial Term Loans of the other Initial Term Loan Lenders, collectively, the "Initial Term Loans").

(b)      Immediately and automatically upon the deemed making by each Lender of its Initial Term Loan on the Effective Date, (i) such Lender's Initial Term Loan Commitment shall permanently terminate, and shall be deemed extinguished, cancelled, and discharged in full, and (ii) to the extent required or applicable in connection with the Restructuring Transactions, such Lender's Existing Term Obligations and/or DIP Claims, or portion thereof (as applicable and determined in accordance with the Restructuring Documents) shall be (and shall be deemed to be) satisfied and discharged (or shall be deemed exchanged for, and refinanced with the proceeds deemed hereby to have been provided under, the Initial Term Loans, in each case, as determined pursuant to the Restructuring Documents).  The Total Initial Term Loan Commitment shall be automatically reduced to zero and terminated when the Initial Term Loans are deemed made hereunder.

(c)      Initial Term Loans shall be deemed to have been made and incurred as described herein automatically by operation of law and pursuant to the contract hereunder and under the Restructuring Documents, and pursuant to the Chapter 11 Plan, and the Bankruptcy Court orders in the Chapter 11 Cases, as applicable.  Initial Term Loans shall be made on a "cashless" basis, and no Initial Term Loan Lender shall be required to fund or transfer any cash in connection therewith, or as a condition to the incurrence by the Borrowers of Indebtedness and other Obligations in respect thereof.

(d)      The Initial Term Loans, and the Initial Term Loan Lenders' agreements and commitments hereunder, shall be deemed to satisfy and discharge certain obligations of the Lenders and/or their Affiliates under the Restructuring Documents, and shall constitute additional consideration for certain benefits received by them in connection with the Restructuring Transactions, as applicable.

(e)      Delayed Draw Facility Commitments.  Subject to the terms and conditions hereof, and relying upon the representations and warranties set forth herein, each Delayed Draw Term Loan Lender severally (and not jointly) agrees to, if requested by the Borrowers, make a term loan to the Borrowers during the Delayed Draw Facility Commitment Period in an aggregate principal amount not to exceed such Delayed Draw Term Loan Lender's Delayed Draw Facility Commitment (as in effect on the requested Borrowing Date, but calculated prior to the making by such Delayed Draw Term Loan Lender of any Delayed Draw Term Loan thereon) (a "Delayed Draw Term Loan" and, together with all term loans extended by the other Delayed Draw Term Loan Lenders pursuant to this Section 2.01(e), collectively, the "Delayed Draw Term Loans"), which Delayed Draw Term Loan shall be made by such Delayed Draw Term Loan Lender, at the Borrowers' request, in a single draw advanced on one Borrowing Date or in multiple draws, on one or more Borrowing Dates requested by the Borrowers; provided, that each draw shall be in a minimum amount equal to the lesser of (x) such Delayed Draw Term Loan Lender's Delayed Draw Facility Commitment and (y) $100,000, and in integral multiples of $10,000 (or such other amounts as agreed to by the Administrative Agent).

(f)      Immediately and automatically upon the making by such Delayed Draw Term Loan Lender of any Delayed Draw Term Loan on any Borrowing Date, such Delayed Draw

62

Term Loan Lender's Delayed Draw Facility Commitment shall be permanently reduced, on a dollar-for-dollar basis, by an amount equal to the aggregate principal amount of the Delayed Draw Term Loan made by such Delayed Draw Term Loan Lender thereon.  The Total Delayed Draw Facility Commitment shall be permanently reduced automatically upon the making of Delayed Draw Term Loans by the Delayed Draw Term Loan Lenders hereunder, on a dollar-for-dollar basis, by an amount equal to the aggregate principal amount of all Delayed Draw Term Loans made by the Delayed Draw Term Loan Lenders.  For the avoidance of doubt, each Delayed Draw Term Loan Lender's agreement to make any Delayed Draw Term Loan, as described above, shall automatically terminate and shall cease to be binding on, or enforceable against, such Delayed Draw Term Loan Lender automatically upon the occurrence of the Delayed Draw Facility Commitment Period End Date, and such Delayed Draw Term Loan Lender's Delayed Draw Facility Commitment shall also be (and shall be deemed to be) permanently reduced to zero ($0.00), and terminated, cancelled and extinguished in full, automatically and immediately as of such time.

(g)    Incremental Facility Commitments.    Any commitment, agreement or obligation of any Lender with an Incremental Facility Commitment to make any Incremental Facility Loan under any Incremental Facility established after the Effective Date in accordance with Section 2.12 and as otherwise permitted by this Agreement, shall be set forth in, and governed by, and shall be subject to the terms and conditions of, the Incremental Facility Amendment relating to such Incremental Facility, and the applicable provisions of this Agreement.  Accordingly, no Lender shall be (or shall be deemed to be) required to make any Incremental Facility Loan except if, and solely to the extent, required by, and made in accordance with, and subject to the terms and conditions of, and in reliance on the Loan Parties' agreements, representations, warranties and covenants set forth in, such Incremental Facility Amendment.

(h)    Re-borrowings.    Once repaid, prepaid or otherwise discharged in accordance with the terms hereof, no Loan (or any portion thereof) may be reborrowed.

Section 2.02  Making the Loans.  (a)  (i) The Administrative Borrower shall be deemed to have requested (on behalf of the Borrowers, taken as a whole) Initial Term Loans from the Initial Term Loan Lenders in an aggregate principal amount equal to the Total Initial Term Loan Commitment automatically pursuant to the deemed making of such Loans pursuant to Section 2.01(a), and delivery of a Notice of Borrowing shall not constitute a condition precedent to the effectiveness of the Borrowers' request (or deemed request) for such Initial Term Loans, or be required in connection with the making and Borrowing (or deemed making and Borrowing) of Initial Term Loans pursuant to Section 2.01(a); provided, that the Administrative Borrower may, at its sole option, elect to deliver a Notice of Borrowing for the Initial Term Loans notwithstanding the absence of a requirement to do so pursuant to the foregoing, and, so long as such Notice of Borrowing is delivered to the Administrative Agent not later than the Effective Date, the terms set forth therein shall be deemed to govern the Initial Term Loans, notwithstanding any conflict between the terms thereof and hereof (including Section 2.07) with respect to the election of Reference Rate Loans or LIBOR Rate Loans (or the Interest Period election).

(ii)    The Administrative Borrower shall give the Administrative Agent prior written notice (in substantially the form of Exhibit C hereto (a "Notice of Borrowing")), which

63

may be delivered via e-mail or as otherwise permitted hereunder) of its request for a Borrowing of any Loan available to be borrowed at any time hereunder (except the Initial Term Loans, which shall be governed by Section 2.02(a)(i)) not later than 12:00 noon (New York City time) on the date which is 3 Business Days prior to the proposed Borrowing Date for such Loan (or such shorter period as the Administrative Agent is willing to accommodate from time to time); provided, that the foregoing shall, in the case of any proposed Borrowing of Incremental Facility Loans at any time (if any Incremental Facility shall exist at such time), be subject to the terms of the Incremental Facility Amendment applicable thereto and any other provisions hereof relating thereto.  Such Notice of Borrowing shall be irrevocable and shall specify (i) the aggregate principal amount of the proposed Loan; provided, that no Notice of Borrowing shall be valid or effective with respect to any Borrowing unless the Total Commitment for the requested Class of Loans is equal to or greater than the aggregate principal amount of such Loan, (ii) whether the Loan is requested to be a Reference Rate Loan or a LIBOR Rate Loan and, in the case a LIBOR Rate Loans, the initial Interest Period with respect thereto (and, if the LIBOR Option is so elected, the Administrative Borrower shall also comply with the applicable provisions of Section 2.07), (iii) the proposed Borrowing Date, which must be a Business Day, and (iv) the wire instructions for the account to which funds in respect of the requested Loan should be transferred (or, if the Borrowers desire that more than one Person shall receive any portion of such funds, wire instructions for each such recipient's account and the amount to be transferred thereto).  The Administrative Agent and the Lenders may act without liability upon the basis of any written, e-mail, telecopied or telephonic notice (including any Notice of Borrowing and any LIBOR Notice delivered pursuant to Section 2.07) believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent).  The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Borrowers until the Administrative Agent receives written notice to the contrary.  The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any Notice of Borrowing or any other notice delivered hereunder.

(b)      Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrowers shall be bound to make a Borrowing in accordance therewith.

(c)      Each Loan shall be made as part of a single Borrowing consisting of Loans of the same Class and Type.  All Loans comprising the same Borrowing shall be made (or deemed made, as the case may be) by the Lenders on the requested Borrowing Date proportionately to their Pro Rata Shares of the Commitment for such Loans (or, in the case of any Incremental Facility Loans, as otherwise specified in the Incremental Facility Amendment applicable thereto), and each Lender shall make each Loan required to be made by it pursuant to this Agreement (except the Initial Term Loans, which shall be deemed made automatically as provided in Section 2.01(a)) by funding the Dollar amount thereof on the requested Borrowing Date to the account specified by the Administrative Agent to such Lender for purposes hereof (such account, the "Lender Funding Account") (and such Lender shall, for all purposes, be deemed to have made such Loan as of the time of such funding, notwithstanding that such funds shall not have been funded to any of the Loan Parties at such time), it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any

64

other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.  Subject to receipt by the Administrative Agent of Lender funds representing Loans requested to be made on such Borrowing Date, the Administrative Agent shall make the proceeds of such Loans available to the Borrowers by causing an amount, in immediately available funds, equal to the proceeds of such Loans received by the Administrative Agent, to be credited to the Loan Account (or such other account specified in the Notice of Borrowing for such purpose); provided, that, the Administrative Agent shall not be required to make available to the Borrowers any funds on the same Business Day as funds are received by the Administrative Agent into the Lender Funding Account if the Administrative Agent determines that it is operationally unable to do so, and such funds shall in such event be made available in accordance with the Administrative Agent's customary practices.

Section 2.03  Repayment of Loans; Evidence of Debt.

(a)     The outstanding or otherwise unpaid principal amount of each Loan, and all accrued and unpaid interest thereon, shall be due and payable, and shall be paid by the Borrowers, on the Final Maturity Date thereof; provided, that, notwithstanding the foregoing or anything to the contrary elsewhere:

(i)     no principal of any Delayed Draw Term Loans or any Initial Term Loans, or any interest, fees or other Obligations arising thereunder or relating thereto, shall be paid (or shall be deemed permitted to be paid) on the Final Maturity Date thereof, (x) unless and until all Incremental Facility Loans (including the principal thereof, and all accrued and unpaid interest and fees thereon, and all other Obligations relating thereto) have been paid in full in cash in accordance with, and as otherwise required pursuant to, the terms thereof (including any terms set forth in any Incremental Facility Amendment relating thereto) or (y) unless, but solely to the extent that, payment thereof is expressly permitted pursuant to, and made in accordance with, the terms of such Incremental Facility Loans, or any consent of the applicable the Incremental Facility Lenders holding such Loans granted in accordance with such terms, as the case may be;

(ii)     no principal of any Initial Term Loans, or any interest, fees or other Obligations arising thereunder or relating thereto, shall be paid (or shall be deemed permitted to be paid) on the Final Maturity Date thereof, (A) except upon, and subject to, compliance in full with the terms of Section 2.03(a)(i) and (B) subject to the foregoing, (x) unless and until all Delayed Draw Term Loans (including the principal thereof, and all accrued and unpaid interest and fees thereon, and all other Obligations relating thereto) have been paid in full in cash in accordance with, and as otherwise required pursuant to, the terms thereof or (y) unless, but solely to the extent that, payment thereof is expressly permitted pursuant to, and made in accordance with, the terms of such Delayed Draw Term Loans, or any consent of the applicable the Lenders holding such Loans granted in accordance with such terms, as the case may be; and

(iii)     all payments hereunder shall in any event be subject to the applicable requirements of Section 4.03 and, with respect to any Incremental Facility Loan, the applicable terms of any Incremental Facility Amendment relating thereto.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)      The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to Section 2.03(b) shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement.

(e)      Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent and reasonably acceptable to the Administrative Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04   Interest.

(a)      Loans.  Subject to Section 2.07 and the other terms of this Agreement (and, in the case of any Incremental Facility Loan, the Incremental Facility Amendment applicable thereto), at the option of the Administrative Borrower, any Loan or any portion thereof shall be either a Reference Rate Loan or a LIBOR Rate Loan; provided, that, the Administrative Borrower shall be permitted to elect that any Incremental Facility Loan (or portion thereof) shall instead be an Other Rate Loan, so long as the same is permitted pursuant to the Incremental Facility Amendment applicable thereto or otherwise consented to by the Lenders with Incremental Facility Commitments therefor.  Each portion of any Loan that is a Reference Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the Reference Rate, plus the Applicable Margin, and each portion of any Loan that is a LIBOR Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for such Loan (or such portion thereof), plus the Applicable Margin.  Each portion of any Incremental Facility Loan that is an Other Rate Loan permitted hereunder shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the Other Rate applicable thereto.

66

(b)     Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, (i) automatically upon the occurrence and during the continuance of any Specified Event of Default, and (ii) the Required Lenders may, by notice to the Administrative Agent and the Administrative Borrower, elect for all other Events of Default, in each case the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(c)     Interest Payments.  Interest on each Loan (except interest accruing at the Post-Default Rate) shall be payable in arrears on (i) each Regular Interest Payment Date, (ii) each date of any prepayment or repayment of such Loan (including the date such Loan is required to be repaid or prepaid in connection with any mandatory or optional prepayment) and (iii) the Final Maturity Date of such Loan.  Interest at the Post-Default Rate shall be payable on demand.  Except (i) in the case of any interest due on any Regular Interest Payment Date on any Loans with respect to which a PIK Interest Election has been made in accordance with Section 2.04(e), and (ii) in the case of any Incremental Facility Loans, to the extent specified otherwise pursuant to the Incremental Facility Amendment applicable thereto, interest on the Loans (including interest accruing at the Post-Default Rate) shall be payable at the times required hereunder in the form of cash.  Each Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account pursuant to Section 4.01 with the amount of any interest payment due hereunder.

(d)     General. All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

(e)     PIK Interest Election.

(i)     Subject to the terms and conditions hereof, the Administrative Borrower may, at its option, elect, pursuant to a PIK Interest Election Notice delivered in accordance herewith on one or more occasions during the period commencing on the Effective Date and ending on (but excluding) the second anniversary thereof (the "PIK Interest Election Period"), that any interest accruing on any Loan during the PIK Interest Election Period (or any portion of such interest), as designated in the applicable PIK Interest Election Notice, shall, if and to the extent due and payable on a Regular Interest Payment Date occurring during the PIK Interest Election Period, be permitted to be paid on such Regular Interest Payment Date in the form of PIK Interest notwithstanding that, in the absence hereof, this Agreement (including Section 2.04(c)) would otherwise require all such interest to be paid in cash (each election validly made in accordance with this Section 2.04(e), a "PIK Interest Election", and the amount of interest to be payable as PIK Interest pursuant thereto, to the extent accruing on Loans of the same Class and Type, and payable on the same Regular Interest Payment Date, each, a "PIK Interest Payment").

(ii)     A PIK Interest Election shall be deemed effective and validly made for purposes hereof with respect to any PIK Interest Payment if prior written notice thereof, signed by an Authorized Officer of the Administrative Borrower (a "PIK Interest Election Notice"), is delivered to the Administrative Agent; provided, that, each such PIK Interest Election Notice shall

identify each PIK Interest Payment subject to a PIK Interest Election thereunder by specifying (A) the Regular Interest Payment Date on which such PIK Interest Payment is due and payable, (B) the amount of such PIK Interest Payment and (C) the Class, Type and then-outstanding aggregate principal amount of the Loan in respect of which such PIK Interest Payment is being made, it being understood and agreed that interest amounts representing interest accruals on Loans of different Classes and/or Types, or amounts that are due and payable on different Regular Interest Payment Dates, shall constitute separate PIK Interest Payments and shall be clearly identified as such in the PIK Interest Election Notice (e.g. "*PIK Interest Amount 1: $[TBD] payable on March 31, 2022 pursuant to Reference Rate Initial Term Loan*"); provided, further, that (x) a PIK Interest Election shall not be valid with respect to any interest payable on a Regular Interest Payment Date occurring after the end of the PIK Interest Election Period, and (y) an interest payment shall not be permitted to be made as PIK Interest unless a PIK Interest Election Notice with respect thereto has been delivered to the Administrative Agent at least one (1) Business Day prior to such its scheduled Regular Interest Payment Date (and, if such PIK Interest Election Notice is not delivered by such time, Section 2.04(c) shall continue to apply to such interest without modification and, accordingly, the Borrowers shall be required to pay such interest in cash on such Regular Interest Payment Date).  For the avoidance of doubt, this Section 2.04(e) shall not permit a PIK Interest payment of any interest that is payable on the Final Maturity Date, or on the date of any repayment or prepayment of any Loan (whether pursuant to a voluntary or mandatory prepayment, acceleration or otherwise), or any other due date except a Regular Interest Payment Date during the PIK Interest Election Period, and only the amount of accrued interest representing a regular interest payment pursuant to Section 2.04(a) shall be permitted to be paid as PIK Interest.

Section 2.05   Termination or Reduction of Total Commitments; Prepayment of Loans.

(a)    Termination or Reduction of Total Commitments.  The Total Initial Term Loan Commitment shall permanently terminate in full (and shall be deemed permanently reduced to zero ($.00), and cancelled and extinguished in its entirety) automatically upon, and concurrently with, the deemed making of Initial Term Loans on the Effective Date pursuant to Section 2.01(a). The Total Delayed Draw Facility Commitment (to the extent of any amount thereof that has not been previously reduced, cancelled, terminated or extinguished pursuant to any other provisions of this Agreement, including Section 2.01 and Section 2.05(b)) shall permanently terminate in full (and shall be deemed permanently reduced to zero ($.00), and cancelled and extinguished in its entirety) automatically upon, and concurrently with, the occurrence of the Delayed Draw Facility Commitment Period End Date.  Each Incremental Facility Commitment (if any) shall terminate at the time and in the manner provided in, and otherwise in accordance with, and pursuant to, the Incremental Facility Amendment applicable thereto.

(b)    Optional Prepayment; Optional Termination of Commitments and/or Agreement.

(i)    Optional Prepayment of Loans.  The Borrowers may, at any time and from time to time, upon at least two (2) Business Days' prior written notice to the Administrative Agent, prepay the principal of outstanding Loans, in whole or in part, and each prepayment made pursuant to this clause (b)(i) shall be accompanied by the payment of (A) accrued interest on the amount of the applicable Loan being prepaid, calculated through the date of such payment and (B) the Applicable Premium, if any, payable in connection with such

prepayment of such Loan; _provided_, that, notwithstanding the foregoing, no Loans shall be prepaid (and no other payments shall be permitted to be made on account of any Loans) except to the extent in accordance with the requirements of the Pre-Default Payment Waterfall, subject to the terms of Section 4.03(b), as applicable.

        (ii)      Optional Termination of Commitments and Optional Termination of Agreement.  (A) The Borrowers may, at any time and from time to time, permanently reduce in part, and may, at any time, permanently reduce to zero ($0.00), and terminate, cancel and extinguish in full, the Total Delayed Draw Facility Commitment, in each case, upon at least two (2) Business Days' prior written notice to the Administrative Agent, and each permanent reduction pursuant to this clause (b)(ii) shall be accompanied by the payment of the Applicable Premium, if any, payable in connection with such permanent reduction.  Each reduction to the Total Delayed Draw Facility Commitment hereunder shall be allocated to the Delayed Draw Facility Commitment of each Lender in accordance with its Pro Rata Share of the Total Delayed Draw Facility Commitment.  (B) The Borrowers may, upon at least two (2) Business Days' prior written notice from the Administrative Borrower to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations in full, _plus_ the Applicable Premium, if any, payable in connection with such termination of this Agreement.   If the Administrative Borrower has sent a notice of termination of this Agreement pursuant to this Section 2.05(b)(ii)(B), then, unless such notice is expressed to be conditional and revocable (as set forth in the proviso below), the Borrowers shall be obligated to repay the Obligations in full, plus the Applicable Premium, if any is payable in connection with such termination of this Agreement on the date set forth as the date of termination of this Agreement in such notice; _provided_, that a notice of termination of this Agreement delivered by the Administrative Borrower hereunder may state that such notice (and the Borrowers' election to terminate this Agreement proposed thereunder) is conditioned upon the occurrence of any specified event (including the consummation of any sale, merger, financing or other specified transaction, the effectiveness of any other credit facilities, the incurrence of any other Indebtedness, issuance of any loans or securities, and/or the receipt of proceeds from any of the foregoing, as the case may be), in which case such notice (and the proposed termination of this Agreement to be effectuated thereunder) may be revoked by the Administrative Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

        (c)      Mandatory Prepayment.  Subject to Section 4.03:

        (i)      Unless the Suspension Date has occurred, on the date that audited annual financial statements are required to be delivered to the Agents and the Lenders pursuant to Section 7.01(a)(iii) (commencing with the date on which delivery to the Agents and the Lenders of the financial statements for the Fiscal Year ended December 31, 2023 is required thereunder), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to (I) the Applicable ECF Percentage of Excess Cash Flow of the Parent and its Subsidiaries for such Fiscal Year, _minus_ (II) the amount of any prepayments of the Loans made in cash during such period in accordance with Section 2.05(b).

        (ii)      Promptly after (and no later than five (5) Business Days after) any Disposition (excluding Dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), (d), (e), (f), (g) or (h) of the definition of Permitted Disposition) by any Loan Party or its

Subsidiaries, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries (and not paid to the Administrative Agent as a prepayment of the Loans) shall exceed for all such Dispositions $500,000 in any Fiscal Year. Nothing contained in this Section 2.05(c)(ii) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.01(c)(ii).

(iii)     Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith. The provisions of this Section 2.05(c)(iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)     Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries (and not paid to the Administrative Agent as a prepayment of the Loans) shall exceed for all such Extraordinary Receipts $2,500,000 in any Fiscal Year.

(v)     Upon receipt by the Borrowers of the proceeds of any Permitted Cure Equity in connection with the exercise of a Cure Right pursuant to Section 9.02, the Borrowers shall prepay the outstanding principal of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of such proceeds.

(vi)     Notwithstanding the foregoing, with respect to Net Cash Proceeds received by any Loan Party or any of its Subsidiaries in connection with a Disposition or the receipt of Extraordinary Receipts consisting of insurance proceeds or condemnation awards that are required to be used to prepay the Obligations pursuant to Section 2.05(c)(ii) or Section 2.05(c)(iv), the Net Cash Proceeds from all such Dispositions and Extraordinary Receipts shall not be required to be so used to prepay the Obligations to the extent that such Net Cash Proceeds are used to replace, repair or restore properties or assets (other than current assets) used in such Person's business, provided that, (A) no Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds, (B) the Administrative Borrower delivers a certificate to the Administrative Agent within 20 Business Days after such Disposition or loss, destruction or taking, as the case may be, stating that such Net Cash Proceeds shall be used to replace, repair or restore properties or assets used in such Person's business within a period specified in such certificate not to exceed 180 days after the date of receipt of such Net Cash Proceeds (which certificate shall set forth estimates of the Net Cash Proceeds to be so expended), (C) such Net Cash Proceeds are deposited in an account subject to a Control Agreement, and (D) upon the earlier of (1) the expiration of the period specified in the relevant certificate furnished to the Administrative Agent pursuant to clause (B) above or (2) the occurrence of an Event of Default,

such Net Cash Proceeds, if not theretofore so used, shall be used to prepay the Obligations in accordance with Section 2.05(c)(ii) or Section 2.05(c)(iv) as applicable.

(vii)    All payments under this Section 2.05(c) shall be accompanied with a written notice provided to the Administrative Agent by 12:00 p.m. (New York City time) at least 1 Business Day prior to the date of any such payment which shall include the sub-section of this Section 2.05(c) pursuant to which such payment is made.

(viii)    Notwithstanding anything in this Section 2.05 or elsewhere to the contrary, any Lender, at the sole and absolute discretion of the Borrowers, may elect, by notice to the Administrative Agent in writing by hand delivery, facsimile transmission or e-mail at least two Business Days prior to the required prepayment date, to decline all (or a portion) of any mandatory prepayment of its Loans, in which case the aggregate amount of the prepayment that would have been applied to prepay such Loans but was so declined will be offered to prepay the Loans of the other Lenders that have not declined such prepayment on a pro rata basis, and if any declined amounts remains such amounts shall be offered to prepay the Loans in the next tier of the Pre-Default Payment Waterfall, and if after all such tiers have been offered such prepayment any remaining declined amounts may be retained by the Borrowers and, to the extent not otherwise applied to prepay any other Loans, or any Second Lien Loans, or any other Indebtedness or obligations of the Loan Parties and their Subsidiaries in accordance with the terms thereof (as determined by the Borrowers in each case), may be used to finance any Restricted Payment or Investment not otherwise permitted hereunder at such time, or, if such amount is retained by any of the Borrowers or any of their Subsidiaries, the Borrowers shall get credit for such amount for purposes of any Liquidity or leverage ratio calculation hereunder.

(ix)    Subject to compliance with any order of payment priority set forth herein and applicable to any Loan on the basis of its Class or as otherwise provided herein, each prepayment will be applied first to Loans of the applicable Class that are Reference Rate Loans, to the full extent thereof, and before application to Loans of such Class that are LIBOR Rate Loans, in each case, in such a manner as determined by the Borrower to minimize the amount of any payments required to be made by the Borrower pursuant to Section 2.08.

(d)    Application of Payments. With respect to:

(i)    any mandatory prepayment required by subsection (c)(ii) or (c)(iv) above: (A) subject to clause (C) below, if the Net Cash Proceeds are from any Disposition of, or insurance or any condemnation, taking or other casualty with respect to, any ABL Priority Collateral, such Net Cash Proceeds shall be applied (1) first, to the ABL Loans, to the extent required by the ABL Credit Agreement and the ABL/Term Intercreditor Agreement (as in effect at such time), until paid in full and (2) second, to the principal amount of Loans hereunder in the order prescribed in the Pre-Default Payment Waterfall; (B) subject to clause (C) below, if the Net Cash Proceeds are from the Disposition of, or insurance or any condemnation, taking or other casualty with respect to Term Priority Collateral, such Net Cash Proceeds shall be applied to the principal amount of Loans hereunder (in the order prescribed in the Pre-Default Payment Waterfall), until paid in full and (C) if the Net Cash Proceeds are from a Disposition of, or insurance or any condemnation, taking or other casualty with respect to, the assets of any Person, which includes both (1) ABL Priority Collateral and (2) Term Priority Collateral, such Net Cash

71

Proceeds shall be applied, ratably, as between the ABL Priority Collateral and the Term Priority Collateral (based on the book value of such assets constituting ABL Priority Collateral and the Term Priority Collateral) and shall be applied in accordance with the preceding clauses (A) and (B); and

(ii)     any mandatory prepayment required by subsection (c)(i), (c)(iii) or (c)(v) above shall be applied to the Loans in the order prescribed in the Pre-Default Payment Waterfall; provided, that, notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and shall if directed by the Collateral Agent or the Required Lenders, apply payments in respect of any Obligations, including prepayments required under Section 2.05(c), in accordance with Section 4.03(b)

(e)     Interest and Fees. Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued and unpaid interest on the principal amount being prepaid to the date of prepayment, (ii) any Funding Losses payable pursuant to Section 2.08, (iii) the Applicable Premium, if any, payable in connection with such prepayment of the Loans to the extent required under Section 2.06 and (iv) if such prepayment would reduce the amount of the outstanding Loans to zero, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)     Cumulative Prepayments. Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05; provided that there shall be no duplication of mandatory prepayments due under more than one subsection of this Section 2.05.

Section 2.06  Fees.

(a)     Applicable Premium.

(i)     Upon the occurrence of an Applicable Premium Trigger Event, any amounts prepaid, repaid, accelerated or otherwise, or any Commitments voluntarily reduced or cancelled, as applicable, shall be accompanied by payment to the Administrative Agent, for the ratable account of each applicable Lender, of the Applicable Premium.

(ii)     Any Applicable Premium payable in accordance with this Section 2.06(a) shall be presumed to be equal to the liquidated damages sustained by the Lenders as the result of the occurrence of the Applicable Premium Trigger Event and the Loan Parties agree that it is reasonable under the circumstances currently existing. THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING APPLICABLE PREMIUM IN CONNECTION WITH ANY ACCELERATION.

(iii)     The Loan Parties expressly agree that: (A) the Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct

between the Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Applicable Premium; (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; (E) their agreement to pay the Applicable Premium is a material inducement to Lenders to provide the Commitments and make the Loans; and (F) the Applicable Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Agents and the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Agents and the Lenders or profits lost by the Agents and the Lenders as a result of such Applicable Premium Trigger Event.

(iv)    Nothing contained in this Section 2.06(a) shall permit any prepayment of the Loans or reduction of the Commitments not otherwise permitted by the terms of this Agreement or any other Loan Document.

(b)    Audit and Collateral Monitoring Fees. The Borrowers acknowledge that pursuant to Section 7.01(f), representatives of the Agents may visit any or all of the Loan Parties and/or conduct inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties at any time and from time to time during normal business hours and, so long as no Event of Default has occurred and is continuing, upon prior notice to the Borrowers. The Borrowers agree to pay (i) all out-of-pocket costs and reasonable expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations conducted by a third party on behalf of the Agents; provided, that so long as no Event of Default shall have occurred and be continuing, the Borrowers shall not be obligated to reimburse the Agents for more than one such visit, inspection, audit, physical count, valuation, appraisal, environmental site assessment and/or examination during any fiscal year.

(c)    Fee Letter. As and when due and payable under the terms of the Fee Letter, the Borrowers shall pay the fees set forth in the Fee Letter.

(d)    Delayed Draw Facility Commitment Fee. The Borrowers agree to pay to the Administrative Agent, for the account of each Delayed Draw Term Loan Lender (other than a Defaulting Lender), on the last Business Day of each fiscal quarter during the Delayed Draw Facility Commitment Period (commencing on the last Business Day of the second full fiscal quarter ending after the Effective Date) the Delayed Draw Facility Commitment Fee; provided, that such Delayed Draw Facility Commitment Fee shall, at the Borrower's option, accrue but shall not be payable in cash at any time prior to the sixth full fiscal quarter ending after the Effective Date (unless the Borrowers elect to make such payment).

Section 2.07  LIBOR Option.

(a)    The Borrowers may, at any time and from time to time, so long as no Specified Event of Default has occurred and is continuing, elect to have interest on all or a portion of the Loans be charged at a rate of interest based upon the LIBOR Rate (the "LIBOR Option") by notifying the Administrative Agent in writing prior to 11:00 a.m. (New York City time) at least 3 Business Days (or such later time as may be permitted by the Administrative Agent in its discretion) prior to (i) the proposed Borrowing Date of any Loan (as provided in Section 2.02)

other than any Initial Term Loan, (ii) in the case of the conversion of a Reference Rate Loan to a LIBOR Rate Loan, the commencement of the proposed Interest Period, or (iii) in the case of the continuation of a LIBOR Rate Loan as a LIBOR Rate Loan, the last day of the then current Interest Period (the "LIBOR Deadline"); provided if the Administrative Borrower fails to deliver a continuation notice thereafter by the LIBOR Deadline, the initial LIBOR Rate Loan shall be continued as a LIBOR Rate Loan with a one (1) month Interest Period.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, no LIBOR Option election, LIBOR Notice or other action or notice shall constitute a condition precedent to the interest on Initial Term Loans being charged at the LIBOR Rate as of the Effective Date, and the same shall hereby be deemed to be automatically in effect unless the Administrative Borrower expressly designates any Initial Term Loans as Reference Rate Loans as of the Effective Date pursuant to a written notice delivered to the Administrative Agent prior to the Effective Date (and the LIBOR Rate applicable to Initial Term Loans as of the Effective Date shall be the rate specified in clause (b) of the definition of "LIBOR Rate", and the initial Interest Period thereon shall end on the date that is one (1) month after the Effective Date (or such other date as may be notified by the Administrative Borrower to the Administrative Agent not later than the fifth (5th) Business Day after the Effective Date).  Notice of the Borrowers' election of the LIBOR Option for a permitted portion of any Loan and an Interest Period pursuant to this Section 2.07(a) shall be made by delivery to the Administrative Agent of (A) a Notice of Borrowing in accordance with Section 2.02 (in the case of the Borrowing of any Delayed Draw Term Loan or any other Loan, except the Initial Term Loans on the Effective Date, and any Incremental Facility Loan subject to any other requirements pursuant to the applicable Incremental Facility Amendment, as the case may be) or (B) a LIBOR Notice prior to the LIBOR Deadline (in the case of any LIBOR Option election relating to any Interest Period for any Loan except the first Interest Period).  Promptly upon its receipt of each such LIBOR Notice, the Administrative Agent shall provide a copy thereof to each of the Lenders, or shall otherwise notify each of the Lenders of the applicable Interest Period and other details thereof to the extent necessary to enable the Lenders to calculate the applicable interest thereon. Each LIBOR Notice shall be irrevocable and binding on the Borrowers.

(b)      Interest on LIBOR Rate Loans shall be payable in accordance with Section 2.04(c). On the last day of each applicable Interest Period, unless the Borrowers properly have exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loans automatically shall convert to the rate of interest then applicable to Reference Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, the Borrowers no longer shall have the option to request that any portion of the Loans bear interest at the LIBOR Rate and the Administrative Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans to the rate of interest then applicable to Reference Rate Loans of the same type hereunder on the last day of the then current Interest Period.

(c)      Notwithstanding anything to the contrary contained in this Agreement, the Borrowers (i) shall have not more than 10 LIBOR Rate Loans in effect at any given time, and (ii) only may exercise the LIBOR Option for LIBOR Rate Loans of at least $500,000 and integral multiples of $100,000 in excess thereof.

(d)      The Borrowers may prepay LIBOR Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are prepaid on any date that is not the last day

of the Interest Period applicable thereto, including as a result of any mandatory prepayment pursuant to Section 2.05(c) or any application of payments or proceeds of Collateral in accordance with Section 4.03 or Section 4.04 or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrowers shall indemnify, defend, and hold the Agents and the Lenders and their participants harmless against any and all Funding Losses in accordance with Section 2.08.

(e)     Anything to the contrary contained herein notwithstanding, neither any Agent nor any Lender, nor any of their participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of this Article II shall apply as if each Lender or its participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

Section 2.08  Funding Losses.  In connection with each LIBOR Rate Loan, the Borrowers shall indemnify, defend, and hold the Agents and the Lenders harmless against any loss, cost, or expense incurred by any Agent or any Lender as a result of (a) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or any mandatory prepayment required pursuant to Section 2.05(c)), (b) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), or (c) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any Notice of Borrowing or LIBOR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "Funding Losses"). Funding Losses shall, with respect to any Agent or any Lender, be deemed to equal the amount reasonably determined by such Agent or such Lender in good faith to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), minus (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Agent or such Lender would be offered were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market. A certificate of an Agent or a Lender delivered to the Administrative Borrower setting forth any amount or amounts that such Agent or such Lender is entitled to receive pursuant to this Section 2.08 shall be conclusive absent manifest error.

Section 2.09  Taxes.  (a)  Any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law. If any Loan Party (as determined in the good faith discretion of an applicable Withholding Agent) shall be required to deduct or withhold any Taxes from or in respect of any sum payable hereunder to any Secured Party (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")), (i) the applicable Withholding Agent shall make such deductions or withholding and (ii) the applicable Withholding Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and (iii) if

such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount (an "Additional Amount") necessary such that after making all required deductions (including deductions applicable to additions sums payable under this Section 2.09) such Secured Party (or such Transferee) receives the amount equal to the sum it would have received had no such deductions or withholding been made.

(b)     In addition, each Loan Party agrees to timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes. Each Loan Party shall deliver to each Secured Party official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)     The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes paid by such Person, whether or not such Indemnified Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 Business Days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes. A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Secured Party, shall be conclusive absent manifest error. As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section, the Loan Party shall deliver to the Secured Parties the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     Each Lender (or Transferee) that is a United States person under Section 7701(a)(30) of the Internal Revenue Code shall deliver to the Administrative Borrower or Administrative Agent a United States Internal Revenue Service Form W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender is exempt from United States backup withholding.

(e)     Each Lender (or Transferee) that is not a U.S. Person (a "Non-U.S. Lender") agrees that it shall, no later than the Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section 12.07 hereof after the Effective Date, promptly after the date upon which such Lender becomes a party hereto) deliver to the Agents (or, in the case of an assignee of a Lender which (x) is an Eligible Assignee and (y) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section 12.07(c)(ii) for recordation pursuant to Section 12.07(e), to the assigning Lender only, and in the case of a participant, to the Lender granting the participation only) one properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY (accompanied by the appropriate certification documents from each beneficial owner) or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments of interest hereunder. In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender hereby represents, and shall provide appropriate documentation providing, to the Agents and the Borrowers that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of

Section 864(d)(4) of the Internal Revenue Code), and such Non-U.S. Lender agrees that it shall promptly notify the Agents in the event any such representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, such Lender (or Transferee) or Agent shall deliver such forms within 20 days after receipt of a written request therefor from the Administrative Borrower or any Agent, the assigning Lender or the Lender granting a participation, as applicable.  Notwithstanding any other provision of this Section 2.09, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.09(e) that such Non-U.S. Lender is not legally able to deliver.  In addition to the foregoing, any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Agents (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agents), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Administrative Borrower or the Agents to determine the withholding or deduction required to be made.

(f)    Any Secured Party (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.09 or Section 2.10 shall (at the request of the Administrative Borrower) use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Administrative Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or Additional Amount that may thereafter accrue, would not require such Secured Party (or Transferee) to disclose any information such Secured Party (or Transferee) in good faith deems confidential and would not, in the sole determination of such Secured Party (or Transferee), be otherwise disadvantageous to such Secured Party (or Transferee).

(g)    If any Secured Party (or a Transferee) shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes with respect to which any Loan Party has made an indemnity payment or paid Additional Amount, pursuant to this Section 2.09, it shall promptly notify the Administrative Borrower of the availability of such refund claim and shall, within 10 days after receipt of a request by the Administrative Borrower, make a claim to such Governmental Authority for such refund at the Loan Parties' expense. If any Secured Party (or a Transferee) receives a refund (including pursuant to a claim for refund made pursuant to the preceding sentence) in respect of any Indemnified Taxes with respect to which any Loan Party has made an Indemnity payment or paid Additional Amount pursuant to this Section 2.09, it shall within 30 days from the date of such receipt pay over such refund to the Administrative Borrower, net of all out-of-pocket expenses of such Secured Party (or Transferee), provided that each Loan Party, upon the request of Administrative Agent or such Secured Party (or Transferee), agrees to repay the amount paid over to any Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or

such Secured Party (or Transferee) in the event Administrative Agent or any Secured Party (or Transferee) is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will an indemnified party be required to pay any amount to a Loan Party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or Additional Amount giving rise to such refund had never been paid. This subsection shall not be construed to require Administrative Agent, any Secured Party or Transferee to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     If a payment made to a Lender (or Transferee) or any Agent under any Loan Document would be subject to U.S. Federal withholding tax imposed by FATCA if such Lender (or Transferee) or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender (or Transferee) or Agent shall deliver to the Administrative Borrower and the Agents at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Agents such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Administrative Borrower or the Agents as may be necessary for the Administrative Borrower and the Agents to comply with their obligations under FATCA and to determine that such Lender (or Transferee) or Agent has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Any forms, certifications or other documentation under this clause (h) shall be delivered by each Lender (or Transferee) and each Agent. Each Lender (and Transferee) agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Borrower and the Agents in writing of its legal inability to do so.

(i)     If circumstances arise which entitle a Lender (or Transferee) to receive any payment under this Section 2.09 or Section 2.10, and, in each case, such Lender (or Transferee) has declined or is unable to designate a different lending office in accordance with Section 2.9(f), then that Lender (or Transferee) will (at the request and at the sole expense of the Borrower) take all reasonable steps to mitigate the effect of those circumstances (including but not limited to by transferring its rights and obligations under this Agreement to an Affiliate or changing its lending or transferring its rights and obligations under this Agreement in full and not in part for cash at par plus all accrued and unpaid interest and other amounts outstanding (if any) to another bank, financial institution or other person nominated for such purpose by the Loan Parties).

(j)     The obligations of the Loan Parties under this Section 2.09 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.10  Increased Costs and Reduced Return.  (a)  If any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any tax, duty or other

charge with respect to this Agreement or any Loan made by such Agent or such Lender, or change the basis of taxation of payments to such Secured Party or any Person controlling such Secured Party of any amounts payable hereunder (except for (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party such Additional Amount as will compensate such Secured Party for such increased costs or reductions in amount.

(b)       If any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained or any agreement to make Loans or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, within 30 days after demand by such Secured Party, the Borrowers shall pay to such Secured Party from time to time such Additional Amount as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c)       All amounts payable under this Section 2.10 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate. A certificate of such Secured Party claiming compensation under this Section 2.10, specifying in reasonable detail the event herein above described and the nature of such event shall be submitted by such Secured Party to the Administrative Borrower, setting forth the Additional Amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d)       Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.10 for any increased costs incurred or reductions suffered more than three months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law

giving rise to such increased costs or reductions is retroactive, then the three- month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    The obligations of the Loan Parties under this <u>Section 2.10</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.11   <u>Changes in Law; Impracticability or Illegality</u>.

(a)    The LIBOR Rate may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs due to any Change in Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding changes in Tax laws and the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give the Administrative Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Administrative Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Administrative Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (ii) repay the Loans with respect to which such adjustment is made (together with any amounts due under <u>Section 2.09</u>).

(b)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to the Administrative Borrower and the Administrative Agent, and the Administrative Agent promptly shall transmit the notice to each other Lender and (i) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Reference Rate Loans of the same type hereunder, and (ii) the Borrowers shall not be entitled to elect the LIBOR Option (including in any Borrowing, conversion or continuation then being requested) until such Lender determines that it would no longer be unlawful or impractical to do so.

(c)    The obligations of the Loan Parties under this <u>Section 2.11</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.12   <u>Incremental Facilities and Incremental Facility Loans</u>.

(a)    <u>Incremental Facilities</u>.  Following the Delayed Draw Facility Commitment Period End Date, the Borrowers shall, in reliance on this <u>Section 2.12</u>, be permitted to, at any time and from time to time and on one or more occasions, at their option, increase the size and scope of the Credit Facilities, and obtain additional loan commitments ("<u>Incremental Facility Commitments</u>"), and incur additional loans ("<u>Incremental Facility Loans</u>"), on such terms and from such Persons ("<u>Incremental Facility Lenders</u>"), subject to <u>Section 2.12(c)</u>, as determined by the Borrowers, and amend the Loan Documents in connection therewith, including by (A) increasing the total amount of one or more then-existing Classes of Commitments, and incurring an additional principal amount of any Loan comprised in such Class, whether under one or more then-existing tranches and/or new tranches of Loans within such Class, and/or (B) establishing one or more new Classes of Commitments and Loans, and incurring additional Loans under one or more tranches thereunder.  Each Class of Incremental Facility Commitments, and all Incremental Facility Loans and other Obligations incurred thereunder, shall constitute a new Credit Facility established pursuant to this <u>Section 2.12</u> (each, an "<u>Incremental Facility</u>").

(b)    <u>Incremental Facility Commitments and Lenders</u>.  Subject to <u>Section 2.12(c)</u>, the Borrowers shall be permitted to solicit and obtain Incremental Facility Commitments from such Person(s) as shall be satisfactory to them and reasonably acceptable to the Administrative Agent (to the extent that the Administrative Agent's consent is required under <u>Section 12.07</u>), and each such Person shall become an Incremental Facility Lender pursuant to such terms, conditions, and mechanics as determined by the Borrowers, subject to <u>Section 2.12(c)</u>.

(c)    <u>Initial Lender Participation Option</u>.  The parties to this Agreement hereby acknowledge and agree that, (x) the Loan Parties' agreements and obligations under this <u>Section 2.12(c)</u> shall not at any time be for the benefit of any Person, and shall not at any time be enforceable by any Person, unless, in each case, as of such time, such Person is (i) a BSP Lender, who is not a Defaulting Lender and holds, when combined with all other BSP Lenders that are not Defaulting Lenders, an aggregate amount of Effective Date Committed Debt that represents at least 17% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders or (ii) a Goldman Lender, who is not a Defaulting Lender and holds, when combined with all other Goldman Lenders that are not Defaulting Lenders, an aggregate amount of Effective Date Committed Debt that represents at least 17% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders, as the case may be (each such Person, an "<u>Eligible Lender</u>"), and (y) notwithstanding the continued effectiveness at any time of this Agreement, taken as a whole, or of any other provisions hereof, as the case may be, the Loan Parties' agreements and obligations under this <u>Section 2.12(c)</u> shall terminate and cease to be in force and effect immediately and automatically upon the occurrence of the Suspension Date. Subject to the foregoing, the Loan Parties hereby agree that:

(i)    Except to the extent separately consented to by Lenders who at the applicable time constitute Eligible Lenders (or, in the case of any such Eligible Lender individually, except to the extent that such Eligible Lender shall have waived any of its rights or benefits hereunder, or any noncompliance by the Loan Parties with any obligations owing to such Eligible Lender hereunder), the Borrowers shall not solicit Incremental Facility Commitments nor incur any Incremental Facility Loan at any time prior to the Suspension Date unless, not less than ten (10) Business Days prior to the effective date of such Incremental Facility (the "<u>Incremental</u>

Facility Effective Date"), a notice (an "Incremental Facility Notice") shall have been made available by or on behalf of the Borrowers to each Person that is an Eligible Lender, which Incremental Facility Notice shall:

                (A)    notify such Eligible Lender of (I) the aggregate principal amount of Incremental Facility Loans proposed to be incurred under such Incremental Facility, (II) the proposed Incremental Facility Effective Date and initial Borrowing Date thereunder (the "Incremental Facility Loan Borrowing Date"), (III) the Eligible Lender Cap and Eligible Lender Group Cap applicable to such Eligible Lender and its Eligible Lender Group, and (IV) any other terms determined by the Borrowers to be relevant to such Incremental Facility; and

                (B)    invite such Eligible Lender to elect (an "Incremental Facility Commitment Election") to become an Incremental Facility Lender in such Incremental Facility, and to subscribe for and provide Incremental Facility Commitments for Incremental Facility Loans thereunder, and to commit to fund the same as and when required pursuant to the Loan Documents, in each case, by delivering to the Administrative Agent an Incremental Facility Commitment Election Notice (an "Incremental Facility Commitment Election Notice") in compliance with the requirements of this Section 2.12(c) and taking such other actions as may be required pursuant to the terms thereof.

                (ii)    A Person that is an Eligible Lender in connection with any Incremental Facility shall be deemed to have properly exercised its rights under Section 2.12(c)(i)(B) and to have thereby made an effective Incremental Facility Commitment Election upon (but subject to) delivery to the Administrative Agent and the Administrative Borrower (in accordance with the instructions set forth in the applicable Incremental Facility Notice), not later than 11 a.m. (New York City time) on the Business Day prior to the Incremental Facility Effective Date applicable thereto (the "Incremental Facility Commitment Election Deadline") of a written notice, signed by an authorized officer of such Eligible Lender and substantially in the form attached to the Incremental Facility Notice relating to such Incremental Facility, and otherwise determined by the Administrative Agent to be sufficient to constitute, as of the date thereof, a fully effective and legally valid, binding, enforceable and irrevocable commitment by such Eligible Lender to provide the principal amount of such Incremental Facility Loans specified therein, which amount shall be permitted to exceed the Eligible Lender Cap applicable to such Lender to the extent that the excess amount shall become available as a result of any Declined Amount (the "Eligible Lender Subscription Amount").

                (iii)    Any Eligible Lender within any Eligible Lender Group shall be permitted to, at its option, make an Incremental Facility Commitment Election for Incremental Facility Loans in an amount equal to its Eligible Lender Cap, or in such higher or lower amount as may be agreed by it and one or more other Eligible Lenders in its Eligible Lender Group, and such Eligible Lenders shall be permitted to, at their discretion, re-allocate and apportion the amounts comprising their Eligible Lender Group Cap in such manner as agreed by them to facilitate the same; provided, that, after giving effect to any such allocation and apportionment within such Eligible Lender Group, the sum of the aggregate amounts of their Incremental Facility Commitment subscriptions (the amount of which shall be designated as the Eligible Lender Subscription Amount in the Incremental Facility Commitment Election Notices delivered by such

Eligible Lender Group by the Incremental Facility Commitment Election Deadline), shall not exceed the applicable Eligible Lender Group Cap.

(iv)    If any Eligible Lender Group does not make an effective Incremental Facility Commitment Election by the Incremental Facility Commitment Election Deadline for the full amount of its Eligible Lender Group Cap (the difference, the "Declined Amount"), the Borrowers may elect to (x) decrease the aggregate principal amount proposed for such Incremental Facility by an amount up to the Declined Amount and/or (y) offer an amount up to the Declined Amount to any other Eligible Lender Group, or any other Person(s) if such Eligible Lender Group shall decline to subscribe for all or any portion thereof (except to the extent that the excess amount shall become available as a result of any Declined Amount).

(v)    If any Eligible Lender makes an effective Incremental Facility Commitment Election by the Incremental Facility Commitment Election Deadline but, notwithstanding its good faith and best efforts, fails to secure final credit committee and other internal approvals necessary to enable it to fund the full amount of Incremental Facility Loans required to be funded by it on the applicable Incremental Facility Loan Borrowing Date (such Eligible Lender, a "Non-Funding Lender"), the Borrowers shall either (x) permit other Eligible Lenders to fund, in addition to the Incremental Facility Loans required to be funded by them on such Incremental Facility Loan Borrowing Date pursuant to their own Incremental Facility Commitment Election, Incremental Facility Loans in an amount corresponding to the amount that such Non-Funding Lender was required to fund on such Incremental Facility Loan Borrowing Date or (y) permit such Non-Funding Lender to fund such Incremental Facility Loans at any time prior to the 60th calendar day after the applicable Incremental Facility Notice shall have been received by it (the "Non-Funding Lender Participation Date"); provided, that, if such Incremental Facility Loans were funded by other Lenders pursuant to clause (x), such Non-Funding Lender shall be permitted to acquire (and such Eligible Lender that funded such Non-Funding Lender's commitment shall be required to sell) such Incremental Facility Loans pursuant to an assignment (which shall be at par, and subject to customary terms and conditions and documentation reasonably satisfactory to the parties; provided that if any funding Lender does not execute an assignment within ten (10) Business Days after receipt from such Non-Funding Lender, such Non-Funding Lender shall be entitled (but not obligated) to execute such assignment on behalf of such funding Lender, and any such assignment so executed shall be effective).  Incremental Facility Loans made or acquired by any Non-Funding Lender in accordance with the foregoing shall benefit from 'true-up' rights with respect to any fees paid on account of such Incremental Facility Loans as if such Non-Funding Lender had funded such Incremental Facility Loans on the applicable Incremental Facility Loan Borrowing Date.  Notwithstanding the foregoing, any Lender that exercises its rights hereunder to participate in such Incremental Facility at a later date and becomes a Non-Funding Lender as a result thereof, shall become a Defaulting Lender as of the Non-Funding Lender Participation Date if it fails to fund or acquire such Loans by such time.

(vi)    If, notwithstanding the Borrowers' compliance with their obligations under this Section 2.12, the amount of Incremental Facility Commitments validly provided by Eligible Lenders for any Incremental Facility is less than the aggregate principal amount of Incremental Facility Loans requested by the Borrowers thereunder, or if any Eligible Lender fails to fund the full amount of Incremental Facility Loans required to be funded by it

pursuant to its Incremental Facility Commitment (after giving effect to <u>Section 2.12(c)(v)</u>) in the case of any Non-Funding Lender), the Borrowers shall automatically cease to have any obligations under this <u>Section 2.12(c)</u> or otherwise to any such Eligible Lender or with respect to such Incremental Facility Commitments and Incremental Facility Loans, and shall be permitted to solicit and obtain the same from any other Person and on any terms determined by the Borrower.

(d)    <u>Incremental Facility Terms and Documentation</u>.

(i)    Incremental Facilities shall become effective, and Incremental Facility Loans shall be incurred, pursuant to this Agreement, and such other Loan Documents as determined to be applicable by the Agents, in each case, as supplemented, amended and/or otherwise modified in connection therewith pursuant to one or more agreements and other documents entered into by the Agents on behalf of itself and the Lenders in reliance on the direction and authorization deemed hereby to have been provided to it by each Lender automatically upon such Lender becoming a party hereto (each, an "<u>Incremental Facility Amendment</u>"), and each Person providing Incremental Facility Commitments shall become an Incremental Facility Lender and a Lender hereunder pursuant to the terms of the applicable Incremental Facility Amendment and/or any other agreement (including any joinder to this Agreement) in form and substance satisfactory to the Administrative Agent.  In furtherance of the foregoing, each Lender hereby agrees (and shall be deemed to agree, automatically upon and as a result of becoming a Lender hereunder) that (i) notwithstanding any provision to the contrary in <u>Section 12.02</u> of this Agreement, Incremental Facility Amendments may, without its consent, effect such amendments to this Agreement and the other Loan Documents as may be necessary or desirable, in the reasonable opinion of the Administrative Agent and the Administrative Borrower, to effect the provisions of, and implement the Incremental Facilities contemplated by, this <u>Section 2.12</u> (including to effectuate changes to the amortization schedule and amounts of any Class of existing Loans to allow for the Incremental Facility Loans to be treated as "fungible" with such Class of existing Loans, to extend any call protection and to provide for such other terms to apply to all such Loans in the manner required to give effect to the terms of the applicable Incremental Facility), and (ii) each Agent shall hereby be deemed irrevocably authorized by it to enter into any and all such Incremental Facility Amendments.

(ii)    Incremental Facilities shall have such pricing, economics, covenants, incurrence conditions, credit support and other terms and conditions as agreed by the Borrowers and the applicable Incremental Facility Lenders and set forth in the Incremental Facility Amendment applicable thereto, and, subject to the foregoing, all Incremental Facility Loans, and all other Indebtedness and obligations under the Incremental Facilities, shall constitute super-senior priming Indebtedness of the Loan Parties and their Subsidiaries, and shall rank senior in right of payment (but, for the avoidance of doubt, ratably in respect of security) to the Initial Term Loans and Delayed Draw Term Loans, and shall at all times have first-priority with respect to Loan prepayments, and any proceeds of Collateral; <u>provided</u>, subject to <u>Section 2.12(c)</u>, Incremental Facility Loans ranking senior in right of payment to Initial Term Loans and Delayed Draw Term Loans shall not be incurred prior to the occurrence of the Suspension Date under any Incremental Facility comprised of Incremental Facility Lenders that do not include one or more BSP Lenders and Goldman Lenders constituting Eligible Lenders (each, an "<u>Incremental Third Party Facility</u>") without the consent of such Eligible Lenders, unless (i) the amount of Liquidity shall not exceed

$2,500,000 as of the date of the Incremental Facility Notice relating to such Incremental Facility (as confirmed in such Incremental Facility Notice), (ii) the non-default interest rate applicable to such Incremental Facility Loans does not exceed the interest rate applicable to Parent Junior Preferred Equity held by Goldman Persons at such time, (iii) there shall be no call-protection applicable to such Incremental Facility, and (iv) the proceeds of such Incremental Facility Loans shall only be used (A) to repay, redeem, refinance, replace or otherwise restructure any ABL Indebtedness (or any portion thereof) upon an "Event of Default" thereunder that caused an acceleration of the maturity of such ABL Indebtedness, but only to the extent that, notwithstanding the use of commercially reasonable efforts, the Borrowers were unable to obtain from the capital markets alternative refinancing Indebtedness provided by a bank deemed by the Borrowers to be comparable to the bank providing the accelerated ABL Facility and on terms and pricing at least as favorable to the Borrowers as that in effect under the accelerated ABL Facility at the time of incurrence thereof, and to pay any fees, costs and expenses associated therewith, (B) to finance working capital and operations, and (C) for Permitted Capital Expenditures; provided, that (x) the aggregate amount of Permitted Capital Expenditures made after the Effective Date in any twelve-month period ending prior to the second (2nd) anniversary of the Effective Date shall not exceed $12,000,000, and (y) the aggregate amount of Permitted Capital Expenditures made at any time and from time to time after the Effective Date but prior to the third (3rd) anniversary of the Effective Date shall not exceed $30,000,000.  In addition, such Incremental Third Party Facilities shall be subject to the following:

(A)    (x) the final scheduled maturity date applicable to such Incremental Third Party Facility shall not be earlier than the then final scheduled maturity date of the Initial Term Loans and the Delayed Draw Term Loans with the latest Final Maturity Date then in effect and (y) the weighted average life to maturity of such Incremental Facility shall not be shorter than the remaining weighted average life to maturity of the Initial Term Loans and the Delayed Draw Term Loans with the latest Final Maturity Date then in effect;

(B)    such Incremental Third Party Facility shall not be secured by property other than the Collateral, nor shall such Incremental Facility be guaranteed by any Person other than a Loan Party;

(C)    the aggregate principal amount of all Incremental Facility Commitments and outstanding Incremental Facility Loans, solely with respect to Incremental Third Party Facilities, shall not exceed an amount equal to the sum of (x) $15,000,000 and (y) solely in the event that, on a pro forma basis, the Total Secured Debt Leverage Ratio does not exceed 5.00:1.00, 100% of Consolidated EBITDA for the most recent four-quarter period for which financial statements have been delivered to the Administrative Agent;

(D)    each of the representations and warranties of the Loan Parties in this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of such Incremental Third Party Facility is incurred as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on

85

and as of such earlier date in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification));

> (E)   at the time of, and immediately after giving effect to, such Borrowing of Incremental Facility Loans in respect of any Incremental Third Party Facility, no Default or Event of Default shall have occurred and be continuing or would result therefrom; and

> (F)   delivery of customary legal opinion, corporate authorizations, and secretary certificates as the Administrative Agent may reasonably request.

Section 2.13  <u>Benchmark Replacement Rate</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document:

> (a)   <u>Replacing LIBOR Rate</u>. On March 5, 2021 the Financial Conduct Authority ("FCA"), the regulatory supervisor of USD LIBOR's administrator ("IBA"), announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 2-month, 3-month, 6-month and 12- month LIBOR Rate tenor settings. On the earlier of (i) the date that all Available Tenors of LIBOR Rate have either permanently or indefinitely ceased to be provided by IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then current Benchmark is LIBOR Rate, the Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly or quarterly basis, at the Administrative Borrower's election.

> (b)   <u>Replacing Future Benchmarks</u>. Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, the Administrative Borrower may revoke any request for a Borrowing of, conversion to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Administrative Borrower's receipt of notice from the Administrative Agent that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Administrative Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Reference Rate Loans. During the

86

period referenced in the foregoing sentence, the component of Reference Rate based upon the Benchmark will not be used in any determination of Reference Rate.

(c)    Benchmark Replacement Conforming Changes. In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Administrative Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.

(e)    Unavailability of Tenor of Benchmark. At any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBOR Rate), then the Administrative Agent may remove any tenor of such Benchmark that is unavailable or non-representative for Benchmark (including Benchmark Replacement) settings and (ii) the Administrative Agent may reinstate any such previously removed tenor for Benchmark (including Benchmark Replacement) settings.

## ARTICLE III

## [INTENTIONALLY OMITTED]

## ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS

Section 4.01  Payments; Computations and Statements. (a) The Borrowers will make each payment under this Agreement not later than 2:00 pm (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Loan Account. All payments received by the Administrative Agent after 2:00 pm (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Borrowers without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders. Except as provided in Section 2.02 or Section 2.05, and except as otherwise provided pursuant to Section 4.02, Section 4.03 or in connection with any Incremental Facility Loan, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds

relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  The Lenders and the Borrowers hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account of the Borrowers with any amount due and payable by the Borrowers under any Loan Document.  Each of the Lenders and the Borrowers agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Article V have been satisfied.  Any amount charged to the Loan Account of the Borrowers shall be deemed to be Obligations.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be, but not be deemed to be a Default or Event of Default.  All computations of interest and fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)     The Administrative Agent shall provide the Administrative Borrower, reasonably promptly after the end of each fiscal month (or on such specified dates as may be mutually agreed by them), a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrowers during such month, the amounts and dates of all Loans made to the Borrowers during such month, the amounts and dates of all payments on account of the Loans to the Borrowers during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrowers during such month and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations.  All entries on any such statement shall be presumed to be correct and, 30 days after the same is sent, shall be final and conclusive absent manifest error.

Section 4.02 <u>Sharing of Payments</u>.  Except as otherwise provided herein (as of the Effective Date), or in <u>Section 2.02</u> or any other provisions hereof (in each case as of the Effective Date), if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its Pro Rata Share of payments on account of such obligations obtained by all other Lenders entitled thereto pursuant to the terms hereof (subject to <u>Section 4.03</u>), such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u>, <u>however</u>, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender,

and any payments made solely in connection with one Class of Loans, or pursuant to a payment waterfall or priority specifically applicable to Incremental Facility Loans), or (ii) any payment obtained by a Lender as consideration for any assignment or other transfer of, or any sale of a participation in, any of its Loans and/or Commitments.  The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 4.03  Apportionment of Payments.  Subject to Section 2.02 hereof and to any written agreement among the Agents and/or the applicable Lenders:

(a)  Prior to the occurrence of an Event of Default, all payments of principal and interest in respect of outstanding Loans (including optional and mandatory prepayments pursuant to Section 2.05, all payments of fees (other than (i) the fees set forth in Section 2.06 hereof, (ii) any fees or other consideration on account of any Lender consent or waiver, or any assignment, transfer or sale of participation in any Loan, each of which shall be due to such Lender in accordance with the terms thereof, and (iii) as provided by the applicable Incremental Facility Amendment with respect to any fees or other consideration payable in connection with any Incremental Facility Loans or otherwise to any Incremental Facility Lenders thereunder, as the case may be), and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent to such of the Lenders as are entitled thereto (in proportion to their respective Pro Rata Shares, or otherwise as provided herein, or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made); provided, that, no optional or mandatory prepayments (or other payments in connection therewith, including any accrued interest) shall be made by any Loan Party or any Person on its behalf (or applied by any Agent), or accepted by any Lender, in each case, on account of (x) any Delayed Draw Term Loan or any Initial Term Loan, (I) unless and until all Incremental Facility Loans (including the principal thereof, and all accrued and unpaid interest and fees thereon, and all other Obligations relating thereto) have been paid in full in cash in accordance with, and as otherwise required pursuant to, the terms thereof (including any terms set forth in any Incremental Facility Amendment relating thereto) or (II) unless, but solely to the extent that, payment thereof is expressly permitted pursuant to, and made in accordance with, the terms of such Incremental Facility Loans, or any consent of the applicable the Incremental Facility Lenders holding such Loans granted in accordance with such terms, as the case may be (including any payment of any Delayed Draw Term Loan or any Initial Term Loan made with any amounts declined by any Incremental Facility Lenders, if permitted by such Lenders); or (y) any Initial Term Loan, except upon compliance in full with the terms of clause (x) of this proviso, and, subject thereto, (I) unless and until all Delayed Draw Term Loans (including the principal thereof, and all accrued and unpaid interest and fees thereon, and all other Obligations relating thereto) have been paid in full in cash in accordance with, and as otherwise required pursuant to, the terms thereof or (II) unless, but solely to the extent that, payment thereof is expressly permitted pursuant to, and made in accordance with, the terms of such Delayed Draw Term Loans, or any consent of the applicable the Lenders holding such Loans granted in accordance with such terms, as the case may be.  For the avoidance of doubt, the terms of this proviso shall constitute part of the Pre-Default Waterfall.

(b)     After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) second, to pay interest then due and payable in respect of the Collateral Agent Advances until paid in full; (iii) third, to pay principal of the Collateral Agent Advances until paid in full; (iv) fourth, ratably to pay the Obligations owing to the Incremental Facility Lenders in respect of any fees (including any Applicable Premium), expense reimbursements, indemnities and other amounts then due and payable to Incremental Facility Lenders until paid in full; (v) fifth, ratably to pay interest then due and payable in respect of the Incremental Facility Loans until paid in full; (vi) sixth, ratably to pay principal of the Incremental Facility Loans until paid in full; (vii) seventh, to the ratable payment of all other Obligations then due and payable with respect to the Incremental Facility Loans; (viii) eighth (but only subject to the prior payment in full of all Obligations in respect of the Incremental Facility Loans and all other amounts described in foregoing clauses (i) through (vii)), ratably to pay the Obligations owing to the Delayed Draw Term Loan Lenders in respect of any fees (including any Applicable Premium), expense reimbursements, indemnities and other amounts then due and payable to the Delayed Draw Term Loan Lenders until paid in full; (ix) ninth, ratably to pay interest then due and payable in respect of the Delayed Draw Term Loans until paid in full; (x) tenth, ratably to pay principal of the Delayed Draw Term Loans until paid in full; (xi) eleventh, to the ratable payment of all other Obligations then due and payable with respect to the Delayed Draw Term Loans; (xii) twelfth (but only subject to the prior payment in full of all Obligations in respect of the Incremental Facility Loans, the Delayed Draw Term Loans, and all other amounts described in foregoing clauses (i) through (xi)), ratably to pay the Obligations owing to the Initial Term Loan Lenders in respect of any fees (including any Applicable Premium), expense reimbursements, indemnities and other amounts then due and payable to the Initial Term Loan Lenders until paid in full; (xiii) thirteenth, ratably to pay interest then due and payable in respect of the Initial Term Loans until paid in full; (xiv) fourteenth, ratably to pay principal of the Initial Term Loans until paid in full; (xv) fifteenth, to the ratable payment of all other Obligations then due and payable with respect to the Initial Term Loans until paid in full; and (xvi) sixteenth (but only subject to the prior payment in full of all Obligations in respect of the Incremental Facility Loans, the Delayed Draw Term Loans, the Initial Term Loans and all other amounts described in foregoing clauses (i) through (xv)), the remainder, if any, to the Borrowers or as otherwise required by applicable laws.

(c)     For purposes of Section 4.03(b), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d)     In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual,

irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 4.03</u> shall control and govern, except that payments to any Incremental Facility or any Lender thereunder shall be governed by the applicable Incremental Facility Amendment.

Section 4.04 <u>Defaulting Lenders</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 12.02</u>. The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by any Borrower to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Loans were funded by the other Lenders) or, if so directed by the Administrative Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrowers as if such Defaulting Lender had made such Loans to the Borrowers. Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.

(b)  Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers to replace the Defaulting Lender with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Defaulting Lender shall be made in accordance with the terms of <u>Section 12.07</u>.

(c)  The operation of this <u>Section 4.04</u> shall not be construed to increase or otherwise affect the Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(d)  This <u>Section 4.04</u> shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Borrowers

shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided that no adjustments will be made

(e)    retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 4.05    Administrative Borrower; Joint and Several Liability of the Borrowers.

(a)    Each Borrower hereby irrevocably appoints Holdco Borrower as the borrowing agent and attorney-in-fact for, and representative of, such Borrower and the Borrowers collectively (Holdco Borrower, in such capacities, the "Administrative Borrower"), which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to any Agent and to any or all of the Lenders (as applicable), and to receive, for and on its behalf, from any Agent and/or any of the Lenders, as the case may be, all notices with respect to any Loan or Obligations obtained for the benefit of any Borrower, and all other notices, agreements and other instruments and instructions under or with respect to this Agreement or any of the other Loan Documents, or any transactions hereunder, or any Obligations (it being agreed that any obligation or requirement providing for any Agent or Lender to deliver any notice, agreement, instrument or other document or any instruction to the Borrowers (or any one of them) shall be construed as requiring delivery thereof only to the Administrative Borrower, and shall be deemed satisfied accordingly) and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Agents nor the Lenders shall incur liability to the Borrowers as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

(b)    Each Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations. Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 4.05), it being the intention of the parties hereto that all of

the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them. If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 4.05 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(c)     The provisions of this Section 4.05 are made for the benefit of the Secured Parties and their successors and permitted  assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Secured Parties or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 4.05 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(d)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

**ARTICLE V**

**CONDITIONS TO EFFECTIVE DATE AND LOANS**

Section 5.01 Conditions Precedent to Effectiveness and Initial Term Loans.   This Agreement, and the obligation each Lender to make (or be deemed to make) the Initial Term Loans pursuant to Section 2.01(a) shall become effective as of the Business Day (the "Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to (or waived by) the Agents:

(a)     Payment of Fees, Etc. The Borrowers shall have paid on or before the Effective Date all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 12.04.

(b)     Representations and Warranties; No Event of Default.   The following statements shall be true and correct: (i) the representations and warranties of the Loan Parties

93

contained in Article VI and in each other Loan Document delivered on or prior to the Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)     Delivery of Documents.  The Collateral Agent (or its counsel) shall have received on or before the Effective Date the following, each in form and substance reasonably satisfactory to the Collateral Agent and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto:

(i)     a Security Agreement, together with the original stock certificates or certificated limited liability company interests (if any) representing all of the Equity Interests in the Borrowers and their Subsidiaries who are Guarantors, and all of the Equity Interests owned by the Borrowers and each Guarantor (including the Equity Interests in GC Services (Barbados) SRL) and all promissory notes required to be pledged thereunder, accompanied by undated stock powers executed in blank and other proper instruments of transfer;

(ii)     evidence of financing statements on Form UCC-1 in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by each Security Agreement;

(iii)     the results of searches for any effective UCC financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens acceptable to the Collateral Agent);

(iv)     a Perfection Certificate;

(v)     the Fee Letter;

(vi)     the Intercompany Subordination Agreement;

(vii)     the ABL/Term Intercreditor Agreement;

(viii)     the Term Intercreditor Agreement;

(ix)     a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments

94

thereto (including, without limitation, a true and complete copy of the charter, certificate of incorporation, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the Borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, the Notice of Borrowing, LIBOR Notices and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Authorized Officers and (D) as to the matters set forth in Section 5.01(b);

(x)     a certificate of an Authorized Officer of the Administrative Borrower (A) certifying that all tax returns required to be filed by the Loan Parties have been filed (except for any tax return for which extensions have been timely filed by appropriate procedures) and all taxes upon the Loan Parties or their properties, assets, and income (including real property taxes and payroll taxes) then due and payable have been paid, (B) attaching a copy of the Financial Statements and the Projections described in Section 6.01(g)(ii) hereof and certifying as to the compliance with the representations and warranties set forth in Section 6.01(g)(i) and Section 6.01(bb)(ii) and (C) certifying that after giving effect to all Indebtedness to be incurred on the Effective Date, and the payment of fees and expenses related to this Agreement and the ABL Credit Agreement, Consolidated EBITDA of the Parent and its Subsidiaries for the consecutive 12 fiscal month period most recently ended at least thirty days prior to the Effective Date will be greater than or equal to $[  ];

(xi)     a certificate of an Authorized Officer of each Loan Party, certifying as to the solvency of such Loan Party (after giving effect to the Indebtedness incurred on the Effective Date);

(xii)    [reserved];

(xiii)   a certificate of the appropriate official(s) of the jurisdiction of organization of each Loan Party certifying as of a recent date as to the subsistence in good standing of, and the payment of taxes prior to delinquency by (as applicable), such Loan Party in such jurisdiction;

(xiv)    an opinion of Weil, Gotshal & Manges LLP, as primary counsel to the Loan Parties, [and an opinion of [____], as local [__] counsel to the Loan Parties, in each case,] as to such matters as the Collateral Agent may reasonably request;

95

(xv)     Acord insurance certificates evidencing the insurance coverage of the Loan Parties required by <u>Section 7.01</u>;

(xvi)    all Existing Term Obligations and DIP Claims shall have been fully and finally discharged in accordance with the Restructuring Documents, and all Liens securing the same shall have been fully and finally terminated, discharged and released in a manner satisfactory to the Collateral Agent, and evidence thereof shall have been provided to the Collateral Agent, to the extent requested by the Collateral Agent; and

(xvii)   such other agreements, instruments, approvals, opinions and other documents, each satisfactory to the Agents in form and substance, as any Agent may reasonably request.

(d)      [Reserved].

(e)      <u>Chapter 11 Case and Restructuring Transactions</u>.

(i)      All conditions precedent to the confirmation and consummation of the Chapter 11 Plan, as set forth in the Chapter 11 Plan and the RSA and other Restructuring Documents (as applicable), shall have been satisfied or waived in accordance with the terms thereof, (ii) the Borrower shall have delivered to the Administrative Agent a docketed copy of the Chapter 11 Plan Confirmation Order, which shall be in form and substance acceptable to the Administrative Agent, and shall have been entered, and shall be in full force and effect, and shall not (A) have been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to adversely affect the interests of the Agents or the Required Lenders or (B) be the subject of an appeal, (iii) the Chapter 11 Plan shall have become effective (and all conditions precedent to the effective date of the Chapter 11 Plan as set forth therein shall have been satisfied or waived in accordance with the terms thereof), (iv) substantial consummation (as defined in Section 1101 of the Bankruptcy Code) under the Chapter 11 Plan shall have occurred and (v) no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which could reasonably be expected to adversely affect the Chapter 11 Plan, the consummation of the Chapter 11 Plan, the business or operations of the Loan Parties and their Subsidiaries or the transactions contemplated by this Agreement or the Chapter 11 Plan shall be pending.

(ii)     Any of the documents executed in connection with the implementation of the Chapter 11 Plan, to the extent they contain provisions differing in any material respect from, or not described in, the Chapter 11 Plan, that are adverse in any material respect to the rights or interest of any or all of the Agents and the Lenders, in their capacities as such, shall be in form and substance satisfactory to the Required Lenders.

(f)      <u>Approvals</u>. All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans, the ABL Loan Documents, the Second Lien Loan Documents, and the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect. There shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation), pending or

96

threatened in any court or before any arbitrator or Governmental Authority which (i) relates to the making of the Loans or (ii) could reasonably be expected to have a Material Adverse Effect.

(g)      [Reserved.]

(h)      ABL Credit Facility.  The ABL Credit Agreement and the other ABL Loan Documents shall be in full force and effect on the Effective Date, in each case, as required in connection with the Restructuring Transactions, and in accordance with the Restructuring Documents.

(i)      Second Lien Credit Facility.  The Second Lien Financing Agreement and the other Second Lien Loan Documents shall be in full force and effect on the Effective Date, and Second Lien Term Loans shall have been made (or deemed to have been made) thereunder on the Effective Date, in each case, as required in connection with the Restructuring Transactions, and in accordance with the Restructuring Documents.

Section 5.02  Conditions Subsequent to Effectiveness.  As an accommodation to the Loan Parties, the Agents and the Lenders have agreed to execute this Agreement and to make the Loans on the Effective Date notwithstanding the failure by the Loan Parties to satisfy the conditions set forth below on or before the Effective Date.  In consideration of such accommodation, the Loan Parties agree that, in addition to all other terms, conditions and provisions set forth in this Agreement and the other Loan Documents, including, without limitation, those conditions set forth in Section 5.01, the Loan Parties shall satisfy each of the conditions subsequent set forth below on or before the date applicable thereto (it being understood that (i) the failure by the Loan Parties to perform or cause to be performed any such condition subsequent on or before the date applicable thereto shall constitute an Event of Default and (ii) to the extent that the existence of any such condition subsequent would otherwise cause any representation, warranty or covenant in this Agreement or any other Loan Document to be breached, the Required Lenders hereby waive such breach for the period from the Effective Date until the date on which such condition subsequent is required to be fulfilled pursuant to this Section 5.02):

(a)      Not later than the date that is 60 days after the Effective Date (or such later date as the Collateral Agent may agree in its sole discretion), the Collateral Agent shall have received evidence of the insurance coverage of the Loan Parties required by Section 7.01(h) (other than Acord insurance certificates delivered pursuant to Section 5.01(d)), and the terms of each Security Agreement and each Mortgage and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent may reasonably request, in each case, with such endorsements as to the named insureds or loss payees thereunder as the Collateral Agent may reasonably request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' (10 days', in the case of non-payment) prior written notice to the Collateral Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof.

(b)      Not later than the date that is 90 days after the Effective Date (or such later date as the Collateral Agent may agree in its sole discretion), with respect to the Houston Facility, each of the Real Property Deliverables.

Section 5.03 <u>Conditions to Each Borrowing</u>. The agreement and obligation of each Lender to make the Loan(s) requested to be made on any Borrowing Date hereunder is subject to the satisfaction (or waiver by such Lender) of the following conditions precedent:

(a) Each of the representations and warranties of the Loan Parties in this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of such Borrowing Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)).

(b) At the time of, and immediately after giving effect to, such Borrowing, no Default or Event of Default shall have occurred and be continuing or would result therefrom.

(c) The aggregate principal amount of Loans of any Class requested to be made on such Borrowing Date shall not exceed the aggregate Commitment therefor of all Lenders (calculated as the unused amount thereof in effect immediately prior to the making of such Loans, and calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Pro Rata Share of all outstanding Borrowings of such Loans).

(d) If such Borrowing consists of any Delay Draw Term Loans, Liquidity shall not be greater than $2,500,000 as of such date on which the Notice of Borrowing is delivered in respect thereof.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01 <u>Representations and Warranties</u>. Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a) <u>Organization, Good Standing, Etc</u>. Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrowers, to make the Borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the

failure to be so qualified and in good standing would reasonably be expected to have a Material Adverse Effect.

(b)    Authorization, Etc.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable material Requirement of Law, or (C) any Material Contract, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to a material portion of the Collateral, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties, except, in each case, to the extent that the same would not reasonably be expected to have a Material Adverse Effect.

(c)    Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, on the Effective Date.

(d)    Enforceability of Loan Documents. This Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e)    Capitalization. On the Effective Date, after giving effect to the transactions contemplated hereby to occur on the Effective Date, the authorized Equity Interests of the Parent and each of its Subsidiaries and the issued and outstanding Equity Interests of the Parent and each of its Subsidiaries are as set forth on Schedule 6.01(e). All of the issued and outstanding shares of Equity Interests of the Parent and each of its Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights, except as set forth in the Parent Company Agreement. All Equity Interests of such Subsidiaries of the Parent are owned by the Parent free and clear of all Liens (other than Permitted Specified Liens). Except as described on Schedule 6.01(e), there are no outstanding debt or equity securities of the Parent or any of its Subsidiaries and no outstanding obligations of the Parent or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Parent or any of its Subsidiaries, or other obligations of the Parent or any of its Subsidiaries to issue, directly or indirectly, any shares of Equity Interests of the Parent or any of its Subsidiaries.

(f)    Litigation. There is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby.

99

(g)     Financial Statements.

(i)     The Financial Statements, copies of which have been delivered to each Agent and each Lender, have been prepared in accordance with GAAP applied on a consistent basis during the period covered by the Financial Statements, subject, in the case of the interim financial statements, to normal year-end audit adjustments and the absence of notes. The Financial Statements fairly present in all material respects the consolidated financial condition of GCS and its Subsidiaries at the dates therein indicated and the consolidated results of operations and cash flows of GCS and its Subsidiaries for the periods therein specified, in each case in accordance with GAAP, except that the interim financial statements do not contain footnotes and are subject to normal year-end audit adjustments. Since the Effective Date, no event or development has occurred, which could reasonably be expected to have a Material Adverse Effect.

(ii)     The Parent has heretofore furnished to each Agent and each Lender the Projections, which consist of (A) projected monthly balance sheets, income statements and statements of cash flows of the Prepetition Administrative Borrower and its Subsidiaries for the period from [August 2021] through and including [December 2025], and (B) projected annual balance sheets, income statements and statements of cash flows of the Prepetition Administrative Borrower and its Subsidiaries for the Fiscal Years ending in [2021] through and including [2025].

(h)     Compliance with Law, Etc. No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any material Requirement of Law or (iii) any material term of any Material Contract binding on or otherwise affecting it or a material portion of its properties, and no default or event of default has occurred and is continuing thereunder, except, in each case, to the extent such violation, default or event of default would not reasonably be likely to have a Material Adverse Effect.

(i)     ERISA. No Loan Party nor any of its ERISA Affiliates contributes to, sponsors, maintains or has an obligation to contribute to or maintain or has or could reasonably be expected to have any liability, whether actual or contingent (including as an ERISA Affiliate), in respect of any Multiemployer Plan or Employee Plan, and no Loan Party nor any of its ERISA Affiliates has at any time prior to the date hereof established, sponsored or maintained, been a party to, or has had at any time prior to the date hereof contributed or been obligated to contribute to or maintain, any Multiemployer Plan or Employee Plan. No Termination Event has occurred, and, except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or coverage after a participant's termination of employment. No Loan Party is an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA or a "plan" (as defined in Section 4975(e)(1) of the Code) subject to Section 4975 of the Code, and none of the assets of any Loan Party constitutes or will constitute "plan assets" of one or more such plans within the meaning of Section 3(42) of ERISA.  In addition, (a) no Loan Party is a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with any Loan Party or ERISA Affiliate are not subject to any law regulating investments of, or fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the

Code currently in effect, which prohibits or otherwise restricts the transactions contemplated by this Agreement or any of the other Loan Documents.

(j)       Taxes, Etc.  (i) All Federal and material provincial, state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been filed, or extensions have been obtained, and (ii) all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $250,000 and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k)       Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l)       Nature of Business.

(i)       No Loan Party is engaged in any business other than as set forth on Schedule 6.01(l).

(ii)      The Parent does not have any material liabilities (other than liabilities arising under the Loan Documents or the Parent Company Agreement), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(m)       Adverse Agreements, Etc. No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)       Permits, Etc. Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and there is no claim that any thereof is not in full force and effect where such claims, if

101

determined adversely to any Loan Party, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(o)     Properties. Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(p)     Employee and Labor Matters. There is (i) no material labor agreement, union contract or collective bargaining agreement respecting the employees of any Loan Party to which any Loan Party is a party or is bound, (ii) no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority, and no grievance or arbitration proceeding pending or threatened against any Loan Party, which, in each case, arises out of or under any collective bargaining agreement, (iii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or, to the knowledge of any Loan Party, threatened against any Loan Party or (iv) to the knowledge of each Loan Party, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party. As of the date hereof, no Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied.

(q)     Environmental Matters. Except as set forth on Schedule 6.01(q), (i) the operations of each Loan Party are in compliance with all Environmental Laws, except to the extent any noncompliance would not reasonably be expected to have a Material Adverse Effect; (ii) there has been no Release at any of the properties owned or operated by any Loan Party or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party or any predecessor in interest which would reasonably be expected to have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Loan Party nor does any Loan Party have knowledge or notice of any threatened or pending Environmental Action against any Loan Party which would reasonably be expected to have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Loan Party which would reasonably be expected to have a Material Adverse Effect; (v) no property now owned or operated by a Loan Party has been used as a treatment or disposal site for any Hazardous Material which would reasonably be expected to have a Material Adverse Effect; (vi) no Loan Party has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which would reasonably be expected to have a Material Adverse Effect; (vii) each Loan Party holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Loan Party's failure to maintain or comply with would not reasonably be expected to have a Material Adverse Effect; and (viii) no Loan Party has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to

limitations or conditions, revoked, withdrawn or terminated, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

(r)     Insurance. Each Loan Party maintains the insurance and required services and financial assurance as required by law and as required by Section 7.01(h). Schedule 6.01(r) sets forth a list of all insurance maintained by each Loan Party on the Effective Date.

(s)     [Reserved.]

(t)     Solvency. After giving effect to the transactions contemplated by this Agreement and before and after giving effect to each Loan, each Loan Party is, and the Loan Parties on a consolidated basis are, Solvent.

(u)     Intellectual Property. Except as set forth on Schedule 6.01(u), each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Set forth on Schedule 6.01(u) is a complete and accurate list as of the Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party; (ii) each material work of authorship owned by each Loan party and which is not Registered Intellectual Property; and (iii) each material Intellectual Property Contract to which each Loan Party is bound. No trademark or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)     Reserved.

(w)     Investment Company Act. None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)     Reserved.

(y)     Reserved.

(z)     Anti-Money Laundering and Anti-Terrorism Laws.

(i)      None of the Loan Parties, nor any Affiliate of any of the Loan Parties, has violated or is in violation of any of the Anti-Money Laundering and Anti-Terrorism Laws or has engaged in or conspired to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)      None of the Loan Parties, nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, is a Blocked Person.

(iii)      None of the Loan Parties, nor any of their agents acting in any capacity in connection with the Loans or other transactions hereunder, (A) conducts any business with or for the benefit of any Blocked Person or engages in making or receiving any contribution of funds, goods or services to, from or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to any OFAC Sanctions Programs.

(aa)      Anti-Bribery and Anti-Corruption Laws.

(i)      The Loan Parties are in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), the UK Bribery Act (the "UK Act") and the anti-bribery and anti-corruption laws of those jurisdictions in which they do business (collectively, the "Anti-Corruption Laws").

(ii)      None of the Loan Parties has at any time:

(A)      offered, promised, paid, given, or authorized the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any employee, official, representative, or other person acting on behalf of any foreign (i.e., non- U.S.) Governmental Authority thereof, or of any public international organization, or any foreign political party or official thereof, or candidate for foreign political office (collectively, "Foreign Official"), for the purpose of: (1) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (2) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official; or (3) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(B)      acted or attempted to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

(iii)      There are, and have been, no allegations, investigations or inquiries with regard to a potential violation of any Anti-Corruption Law by any of the Loan Parties or any of their respective current or former directors, officers, employees, stockholders or agents, or other persons acting or purporting to act on their behalf.

(iv)     The Loan Parties have adopted, implemented and maintain anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(bb)     <u>Full Disclosure</u>.

(i)     Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

(ii)     The Projections and the Budget have been prepared on a reasonable basis and in good faith based on assumptions, estimates, methods and tests that are believed by the Loan Parties to be reasonable at the time such Projections and the Budget were prepared and information believed by the Loan Parties to have been accurate based upon the information available to the Loan Parties at the time such Projections and Budget were furnished to the Lenders, and no Loan Party is aware of any facts or information that would lead it to believe that such Projections and Budget are incorrect or misleading in any material respect; it being understood that (A) the Projections and the Budget are by their nature subject to significant uncertainties and contingencies, many of which are beyond the Loan Parties' control, (B) actual results may differ materially from the Projections and the Budget and such variations may be material and (C) the Projections and the Budget are not guarantees of performance.

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES

Section 7.01  <u>Affirmative Covenants</u>.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)     <u>Reporting Requirements</u>.  Furnish to each Agent (for delivery to each Lender):

(i)     as soon as available, and in any event within 45 days after the end of each fiscal month of the Parent and its Subsidiaries, commencing with the fiscal month ending [   ][4], internally prepared consolidated balance sheets, statements of operations and retained earnings and statements of cash flows as at the end of such fiscal month, and for the period

---

[4] NTD: To be first fiscal month after Effective Date.

commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year (provided that for the first year following the Effective Date, such comparative figures shall be to the consolidated financial statements for the immediately preceding Fiscal Year of the Prepetition Administrative Borrower), and (B) the Budget, all in reasonable detail and certified by an Authorized Officer of the Administrative Borrower as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Parent and its Subsidiaries for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(ii)      as soon as available and in any event within 45 days after the end of each fiscal quarter of the Parent and its Subsidiaries, commencing with the fiscal quarter ending [   ]⁵, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of the Parent and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (1) the financial statements for the immediately preceding Fiscal Year (provided that for the first year following the Effective Date, such comparative figures shall be to the consolidated financial statements for the immediately preceding Fiscal Year of the Prepetition Administrative Borrower) and (2) the Budget, all in reasonable detail and certified by an Authorized Officer of the Administrative Borrower as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Parent and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Parent and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(iii)      as soon as available, and in any event within 120 days (or 180 days for the Fiscal Year ended December 31, 2021) after the end of each Fiscal Year of the Parent and its Subsidiaries, commencing with the Fiscal Year ending December 31, 2022, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of the Parent and its Subsidiaries as at the end of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year (provided that for the first year following the Effective Date, such comparative figures shall be to the consolidated financial statements for the immediately preceding Fiscal Year of the Prepetition Administrative Borrower) and (B) the Budget, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion with respect to such financial statements, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Parent and reasonably satisfactory to the Agents (initially, Ham, Langston

---

⁵ NTD: To be first fiscal quarter after Effective Date.

& Brezina, L.L.P.) (which opinion shall be without (1) a "going concern" or like qualification or exception or (2) any qualification or exception as to the scope of such audit;

(iv)     simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (ii) and (iii) of this Section 7.01(a), a certificate of an Authorized Officer of the Administrative Borrower (a "Compliance Certificate"):

(A)     stating that such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which the Parent and its Subsidiaries propose to take or have taken with respect thereto;

(B)     (1) in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i) and (iii) of this Section 7.01(a), including a business segment financial report and a key performance indicator report for the applicable period, in each case, in form and substance substantially similar to the form of the business segment financial report and a key performance indicator report delivered by the Borrowers to the Agents prior to the Effective Date; and (2) in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (ii) and (iii) of this Section 7.01(a), (i) attaching a schedule showing the calculation of the financial covenant specified in Section 7.03, (ii) including a discussion and analysis of the financial condition and results of operations of the Parent and its Subsidiaries for the portion of the Fiscal Year then elapsed and discussing the reasons for any significant variations from the Budget for such period and the figures for the corresponding period in the previous Fiscal Year, in each case, in the form of such discussion and analysis delivered by the Borrowers to the Agents prior to the Effective Date, and (iii) to the extent permitted by applicable Requirements of Law and subject to confidentiality requirements of Governmental Authorities and to the extent not subject to a legal privilege, including a summary of all documents and information submitted to any Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority during the applicable period;

(C)     in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clause (iii) of this Section 7.01(a), attaching (1) a summary of all material insurance coverage maintained as of the date thereof by any Loan Party and all material insurance coverage planned to be maintained by any Loan Party, together with such other related documents and information as the Administrative Agent may reasonably require, (2) the calculation of the Excess Cash Flow in accordance with the terms of Section 2.05(c)(i)(A) and (3) confirmation that there have been no changes to the information contained in each of the Perfection Certificates delivered on the Effective Date or the date of the most recently updated Perfection Certificate delivered pursuant to this clause (iv) and/or attaching an updated Perfection Certificate identifying any such changes to the information contained therein;

(v)     promptly after delivery or receipt thereof: (A) copies of all reports (including borrowing base certificates and all accounts receivable agings) and default notices delivered to or received from the ABL Lender under any ABL Loan Documents and (B) copies of any amendments, waivers, consents or other modifications to any ABL Loan Documents;

(vi)      [Reserved];

(vii)     as soon as available and in any event not later than 30 days after the start of each Fiscal Year commencing with the Fiscal Year ending [December 31, 2022], a certificate of an Authorized Officer of the Administrative Borrower (A) attaching a Budget for the Parent and its Subsidiaries, supplementing and superseding the Budget previously required to be delivered pursuant to this Agreement, prepared on a monthly basis and otherwise in form and substance satisfactory to the Agents, for the immediately succeeding Fiscal Year for the Parent and its Subsidiaries and (B) certifying that the representations and warranties set forth in Section 6.01(bb)(ii) are true and correct with respect to the Budget;

(viii)    as soon as possible, and in any event within 3 Business Days after the any Loan Party has knowledge of the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(ix)      promptly after the commencement thereof but in any event not later than 5 days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(x)       as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any notice or report with respect to an event or matter that is materially adverse to the Agents and the Lenders that any Loan Party executes or receives in connection with any Material Contract;

(xi)      as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

(xii)     promptly after (A) the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness the outstanding principal amount of which equals or exceeds $5,000,000 or its securities or files with the SEC or any national (domestic or foreign) securities exchange and (B) the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

(xiii)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xiv)   promptly upon request, any certification or other evidence reasonably requested from time to time by any Lender confirming the Borrowers' compliance with Section 7.02(s);

(xv)   simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i), (ii) and (iii) of this Section 7.01(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.02(q), the consolidated financial statements of the Parent and its Subsidiaries delivered pursuant to clauses (i), (ii) and (iii) of this Section 7.01(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Agents; and

(xvi)   promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time reasonably request.

(b)   Additional Guarantors and Collateral Security. Cause:

(i)   each Subsidiary of any Loan Party not in existence on the Effective Date, to execute and deliver to the Collateral Agent promptly and in any event within 5 Business Days (or such longer period agreed to by the Collateral Agent in its sole discretion) after the formation, acquisition or change in status thereof, (A) a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Guarantor, (B) a supplement to the Security Agreement, together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the Security Agreement, (2) undated stock powers for such Equity Interests executed in blank, and (3) such opinions of counsel as the Collateral Agent may reasonably request, (C) to the extent required under the terms of this Agreement, one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to Permitted Specified Liens) on such real property and such other Real Property Deliverables as may be required by the Collateral Agent with respect to each such real property, and (D) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)   each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within 5 Business Days (or such longer period agreed to by the Collateral Agent in its sole discretion) after the formation or acquisition of such Subsidiary a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment

for such Equity Interests executed in blank with signature guaranteed, (C) such opinions of counsel as the Collateral Agent may reasonably request and (D) such other agreements, instruments, approvals or other documents requested by the Collateral Agent.

(c)  <u>Compliance with Laws; Payment of Taxes</u>.

(i)  Comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable material Requirements of Law (including, without limitation, all Environmental Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), except where the failure to so comply could not reasonably be expected to result, individually or in the aggregate, in liabilities in excess of $3,000,000.

(ii)  Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all taxes, assessments and other governmental charges imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $500,000, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof to the extent required in accordance with GAAP.

(d)  <u>Preservation of Existence, Etc.</u> Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e)  <u>Keeping of Records and Books of Account</u>.  (i) Keep, and cause each of its Subsidiaries to keep, (a) adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP and (ii) all such records and books at the Houston Facility.

(f)  <u>Inspection Rights</u>. Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal business hours and, in the absence of an Event of Default, upon reasonable prior notice, at the expense of the Borrowers (subject to the limitations set forth in <u>Section 2.06(b)</u>), to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Collateral Agent based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives. In furtherance of the foregoing, the Parent hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or

110

together with representatives of such Person) with the agents and representatives of any Agent in accordance with this <u>Section 7.01(f)</u>.

(g)     <u>Maintenance of Properties, Etc.</u> Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect.

(h)     <u>Maintenance of Insurance</u>. Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, automobile, worker's compensation and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent. All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as their respective interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation.  Each Loan Party and each Subsidiary shall be responsible for timely compliance with the terms of all policies including but not limited to reporting occurrences and claims and filing claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, the Borrowers, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

111

(i)     <u>Obtaining of Permits, Etc.</u> Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, in each case, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect.

(j)     <u>Environmental</u>. (i) Keep any property either owned or operated by it or any of its Subsidiaries free of any Environmental Liens; (ii) comply, and cause each of its Subsidiaries to comply, with all Environmental Laws, to the extent any noncompliance would reasonably be expected to have a Material Adverse Effect, and provide to the Collateral Agent any documentation of such compliance which the Collateral Agent may reasonably request; (iii) provide the Agents written notice within 5 days of any knowledge by the Borrowers of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it or any of its Subsidiaries and take any Remedial Actions required to abate said Release; and (iv) provide the Agents with written notice within 10 days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Loan Party or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party or any of its Subsidiaries; and (C) notice of a violation, citation or other administrative order which could reasonably be expected to have a Material Adverse Effect.

(k)     <u>Fiscal Year</u>.  Cause the Fiscal Year of the Parent and its Subsidiaries to end on December 31 of each fiscal year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)     [Reserved].

(m)     <u>After Acquired Real Property</u>. Promptly and in any event, upon the acquisition by it or any of its Subsidiaries after the date hereof of any fee interest in any real property (wherever located) (each such interest being a "<u>New Facility</u>") with a Current Value (as defined below) in excess of $1,000,000 (provided, however, that the aggregate fair market value of all owned real property not subject to a Mortgage shall not exceed $2,000,000), immediately so notify the Collateral Agent, setting forth with specificity a description of the interest acquired, the location of the real property, any structures or improvements thereon and either an appraisal or such Loan Party's good-faith estimate of the current value of such real property (for purposes of this Section, the "<u>Current Value</u>"). The Collateral Agent shall notify such Loan Party whether it intends to require a Mortgage (and any other Real Property Deliverables) with respect to such New Facility. Upon receipt of such notice requesting a Mortgage (and any other Real Property Deliverables), the Person that has acquired such New Facility shall promptly furnish the same to the Collateral Agent. The Borrowers shall pay all fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Loan Party's obligations under this <u>Section 7.01(m)</u>.

(n)     <u>Anti-Bribery and Anti-Corruption Laws</u>. Maintain, and cause each of its Subsidiaries to maintain, anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

112

(o)     [Reserved].

(p)     Further Assurances. Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens (subject to the terms of the Intercreditor Agreements) any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Loan Party (A) authorizes each Agent to file such agreements, instruments or other documents in any appropriate filing office, (B) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

Section 7.02 Negative Covenants. So long as any principal of, or interest on, any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations), or any Lender shall have any Commitment hereunder, each Loan Party shall not, except as specified otherwise, or unless the Required Lenders shall otherwise consent in writing:

(a)     Liens, Etc. Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired other than Permitted Liens.

(b)     Indebtedness. Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)     Fundamental Changes; Dispositions.

(i)     Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any wholly-owned Subsidiary of any Loan Party (other than a Borrower) may be merged into such Loan Party or another wholly-owned Subsidiary of such Loan Party, or may consolidate or amalgamate with another wholly-owned Subsidiary of such Loan Party, so long as (A) no other provision of this Agreement would be violated thereby, (B) such Loan Party gives the Agents at least 10 Business Days' (or such shorter period agreed to by the Administrative Agent in its sole discretion) prior written notice of such merger, consolidation or amalgamation accompanied by true, correct and complete copies of all material agreements, documents and instruments relating to such merger, consolidation or amalgamation, including, but not limited to, the certificate or

113

certificates of merger or amalgamation to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing), (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Agents' and Lenders' rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger, consolidation or amalgamation and (E) the surviving Subsidiary, if any, if not already a Loan Party, is joined as a Loan Party hereunder pursuant to a Joinder Agreement and is a party to a Security Agreement and the Equity Interests of such Subsidiary is the subject of a Security Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger, consolidation or amalgamation; and

(ii)     Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(d)     Change in Nature of Business. Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 6.01(f).

(e)     Loans, Advances, Investments, Etc. Make, or permit any of its Subsidiaries to make, any Investment in any other Person except for Permitted Investments.

(f)     Sale and Leaseback Transactions.  Enter into, or permit any of its Subsidiaries to enter into, any Sale and Leaseback Transaction, except any Sale and Leaseback Transaction consented to by the Required Lenders.

(g)     [Intentionally Omitted].

(h)     Restricted Payments.  Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i)     Federal Reserve Regulations.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)     Transactions with Affiliates.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate of Parent or any of its Subsidiaries, except (i) transactions consummated in the ordinary course of business for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and if they involve one or more payments by the Parent or any of its Subsidiaries in excess of $250,000 for any single transaction or series of related transactions, that are fully disclosed to the Administrative Agent prior to the consummation thereof, (ii) transactions solely among two or more Loan Parties, (iii) transactions permitted by Section 7.02(e) or Section 7.02(h), (iv) sales of Qualified Equity Interests of the Parent to Affiliates of the Parent not otherwise prohibited by the

114

Loan Documents and the granting of registration and other customary rights in connection therewith, and (v) reasonable and customary outside director and officer compensation (including bonuses (including sale bonuses), deferred compensation and stock option programs), benefits and indemnification arrangements, in each case approved by the Board of Directors (or a committee thereof) of such Loan Party or such Subsidiary.

(k)     Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries.  Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 7.02(k) shall prohibit or restrict compliance with: (A) this Agreement, the other Loan Documents, the Second Lien Loan Documents, the ABL Loan Documents and the Parent Company Agreement; (B) any agreement in effect on the date of this Agreement and described on Schedule 7.02(k), or any extension, replacement or continuation of any such agreement; provided, that, any such encumbrance or restriction contained in such extended, replaced or continued agreement is no less favorable to the Agents and the Lenders than the encumbrance or restriction under or pursuant to the agreement so extended, replaced or continued; (C) any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances); (D) in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset sale agreement or similar contract for the conveyance of such property or asset and (2) instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto; (E) customary restrictions on dispositions of real property interests in reciprocal easement agreements; (F) customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets; or (G) customary restrictions in contracts that prohibit the assignment of such contract.

(l)     Limitations on Negative Pledges.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement, the other Loan Documents, the ABL Loan Documents and the Second Lien Loan Documents, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(b) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; provided that such restrictions and

115

conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, and (iv) customary provisions in leases restricting the assignment or sublet thereof.

(m)     Modifications and Payment of Indebtedness; Organizational Documents and Certain Other Agreements; Etc.

(i)     (A) Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness for borrowed money (other than Second Lien Indebtedness and ABL Indebtedness) or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would add any covenant or event of default, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any respect, (B) amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of the ABL Indebtedness other than in accordance with the terms of the ABL/Term Intercreditor Agreement or (C) amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of the Second Lien Loan Documents other than in accordance with the terms of the Term Intercreditor Agreement;

(ii)     except for the Obligations and the ABL Indebtedness (in accordance with the terms thereof) and the payment of dividends in connection with the Parent Preferred Equity and the redemption of Parent Preferred Equity, in each case in accordance with the Parent Company Agreement and this Agreement (Section 7.02(h) hereof), (A) make any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due), (B) refund, refinance, replace or exchange any other Indebtedness for any such Indebtedness (other than with respect to Permitted Refinancing Indebtedness), (C) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Subordinated Indebtedness in violation of the subordination provisions thereof or any subordination agreement with respect thereto, or (D) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing; provided that this clause (ii) shall not prohibit the payment of regularly scheduled payments of principal, interest, or mandatory prepayments of Second Lien Indebtedness in accordance with the Second Lien Financing Agreement; or

(iii)     amend, modify or otherwise change any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity

116

Interests, or enter into any new agreement with respect to any of its Equity Interests, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iii) that, either individually or in the aggregate, would not be adverse to the Agents and the Lenders in any material respect.

(n)     Investment Company Act of 1940. Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)     ERISA. (i) Engage, or permit or suffer to exist any ERISA Affiliate to engage, in any transaction described in Section 4069 or 4212(c) of ERISA; (ii) with respect to any Employee Plan, engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit or suffer to exist any ERISA Affiliate to adopt a Plan or any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to retirees after termination of employment other than as required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(p)     Environmental. Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it or any of its Subsidiaries, except in compliance in all material respects with Environmental Laws.

(q)     Accounting Methods. Modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r)     Anti-Money Laundering and Anti-Terrorism Laws.

(i)     None of the Loan Parties, nor any of their Affiliates or agents, shall:

(A)     conduct any business or engage in any transaction or dealing with or for the benefit of any Blocked Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Blocked Person;

(B)     deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to the OFAC Sanctions Programs;

(C)     use any of the proceeds of the transactions contemplated by this Agreement to finance, promote or otherwise support in any manner any illegal activity, including, without limitation, any violation of the Anti-Money Laundering and Anti-Terrorism Laws or any specified unlawful activity as that term is defined in the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956 and 1957; or

(D)     violate, attempt to violate, or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, shall be or shall become a Blocked Person.

(s)     Anti-Bribery and Anti-Corruption Laws. None of the Loan Parties shall:

(i)     offer, promise, pay, give, or authorize the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any Foreign Official for the purpose of: (A) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (B) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official; or (C) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(ii)     act or attempt to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

Section 7.03 Minimum EBITDA.   The Loan Parties shall not permit Consolidated EBITDA of the Parent and its Subsidiaries for the consecutive 12 fiscal month period, commencing with the fiscal quarter ending on December 31, 2022, and each subsequent consecutive 12 fiscal month period tested as of the last day of each fiscal quarter ending prior to the Suspension Date to be less than $[___] without the consent (not to be unreasonably withheld or delayed) of the Goldman Lenders (other than any Defaulting Lender).

# ARTICLE VIII

## CASH MANAGEMENT ARRANGEMENTS AND OTHER COLLATERAL MATTERS

Section 8.01 Cash Management Arrangements.   (a) On or prior to [___], 2022[6], the Loan Parties shall (i) establish and maintain cash management services of a type and on terms reasonably satisfactory to the Agents at one or more banks reasonably acceptable to the Agents (each a "Cash Management Bank") and (ii) except as otherwise provided under Section 8.01(b), deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral, all Collections (of a nature susceptible to

---

[6] NTD: To be 60 days post- Effective Date.

a deposit in a bank account) and all other amounts received by any Loan Party (including payments made by Account Debtors directly to any Loan Party) into a Cash Management Account.

(b)     On or prior to [___], 2022[7], the Loan Parties shall, with respect to each Cash Management Account (other than Excluded Accounts), deliver to the Collateral Agent a Control Agreement with respect to such Cash Management Account.  After [___], 2022[8] (or such later date as the Collateral Agent may agree in writing), the Loan Parties shall not maintain, and shall not permit any of their Subsidiaries to maintain, cash, Cash Equivalents or other amounts in any deposit account or securities account, unless the Collateral Agent shall have received a Control Agreement in respect of each such Cash Management Account (other than Excluded Accounts).

(c)     No Loan Party nor any of its Subsidiaries shall permit the maintenance of cash and Cash Equivalents (a) in the Barbados Accounts in excess of $250,000 in the aggregate, or (b) in the Philippines Accounts in excess of $500,000 in the aggregate, in the case of each of the preceding clauses (a) and (b), for any period of 5 consecutive days; it being understood that any amounts in excess of such threshold for such 5 day period shall be promptly repatriated to a Deposit Account held in the United States by a Loan Party and subject to a Control Agreement.

(d)     No Loan Party nor any of its Subsidiaries shall permit the maintenance of cash (a) in any Customer Trust Account, other than (i) cash owned by the applicable underlying customer (x) that was collected by such Loan Party from third parties in connection with its performance of services for such customer and (y) for payment of fees and expenses incurred by such Loan Party for the performance of such services, or (ii) funds advanced to such Customer Trust Account by a Loan Party to comply with client remittance requirements, and (b) in any License Trust Account, other than cash that such Loan Party is required to maintain in such account by the applicable underlying State or Governmental Authority; it being understood that any amounts in excess of such thresholds shall be promptly remitted to a Deposit Account subject to a Control Agreement.

(e)     So long as no Default or Event of Default has occurred and is continuing, the Borrowers may amend Schedule 8.01 to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, each Loan Party and such prospective Cash Management Bank shall have executed and delivered to the Collateral Agent a Control Agreement.  Subject to the conditions set forth in any Control Agreement with respect to any such Cash Management Account, each Loan Party shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from the Collateral Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment, or that the operating performance, funds transfer, or availability procedures or performance of such Cash Management Bank with respect to Cash Management Accounts or the Collateral Agent's liability under any Control Agreement

---

[7] NTD: To be 60 days post- Effective Date.
[8] NTD: To be 60 days post- Effective Date.

with such Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01  Events of Default.  Each of the following events shall constitute an event of default (each, an "Event of Default"):

(a)  any Borrower shall fail to pay (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) (i) within three (3) Business Days following the due date interest on any Loan, any Collateral Agent Advance, or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Loans) or any other Loan Document or (ii) all or any portion of the principal of the Loans when due;

(b)  any representation or warranty made or deemed made by or on behalf of any Loan Party or by any Authorized Officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)  any Loan Party shall fail to perform or comply with any covenant or agreement contained in Section 5.02, Section 7.01(a), Section 7.01(c), Section 7.01(d), Section 7.01(e), Section 7.01(h), Section 7.01(k), Section 7.01(n), Section 7.01(o), Section 7.02 or Section 7.03 or Article VIII;

(d)  any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for 30 days after the earlier of the date a senior officer of any Loan Party has knowledge of such failure and the date written notice of such default shall have been given by any Agent or the Required Lenders to any Loan Party;

(e)  any Loan Party or any of its Subsidiaries shall (i) fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of any Material Indebtedness (excluding (x) Indebtedness evidenced by this Agreement and (y) any failure to pay any applicable dividend on any Parent Preferred Equity in accordance with the Parent Company Agreement), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or (ii) fail to observe or perform any other agreement or condition under any agreement or instrument relating to any such Material Indebtedness and such failure or event shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such failure or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and

120

payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)     any Loan Party or any of its Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, administration, receivership, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, receivership or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g)     any proceeding shall be instituted against any Loan Party or any of its Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, administration, receivership, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)     any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason (except to the extent such failure results from the failure of the Collateral Agent to maintain possession of Collateral as to which the Liens thereon are perfected by possession or otherwise as a result of any action or failure to act by the Collateral Agent when provided with the information required by the Loan Documents) fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (subject to the terms of the Intercreditor Agreements) in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(j)     one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $1,000,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified

and has not denied coverage) shall be rendered against any Loan Party or any of its Subsidiaries and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of 30 consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;

(k)     one or more fines and/or penalties for the payment of money exceeding $10,000,000 in the aggregate shall be levied against any Loan Party or any of its Subsidiaries by the Consumer Fraud Protection Bureau or any other Governmental Authority;

(l)     [reserved];

(m)     any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 15 consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(n)     the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party, if such loss, suspension, revocation or failure to renew would reasonably be expected to have a Material Adverse Effect;

(o)     [reserved];

(p)     (i) there shall occur and be continuing any "Event of Default" (or any comparable term) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (ii) with respect to any Subordinated Indebtedness, any of the Obligations for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (iii) with respect to any Subordinated Indebtedness, any Indebtedness other than the Obligations shall constitute "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, the documents evidencing or governing any Subordinated Indebtedness, and (iv) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness;

(q)     a Change of Control shall have occurred; or

(r)     a Termination Event shall have occurred;

then, during the continuation of any such event, the Collateral Agent may, and shall, at the request of the Required Lenders, by notice to the Administrative Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall

become due and payable immediately, together with the payment of the Applicable Premium with respect to the Loans so repaid, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 9.01 with respect to any Loan Party, without any notice to any Loan Party or any other Person or any act by any Agent or any Lender, all Commitments shall automatically terminate and all Loans then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents, including, without limitation, the Applicable Premium, shall be accelerated and become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Loan Party.

Section 9.02 Cure Right.   In the event that the Borrowers fail to comply with the requirements of any financial covenant set forth in Section 7.03 (such financial covenant, a "Specified Financial Covenant" and such Event of Default, a "Curable Default"), from the last day of the applicable fiscal quarter until the expiration of the 10th day after the date on which financial statements are required to be delivered with respect to such fiscal quarter hereunder, the Parent shall have the right to issue Permitted Cure Equity for cash or otherwise receive cash contributions to the capital of the Parent and contribute such cash to the Borrower which such Permitted Cure Equity may be included in the calculation of Consolidated EBITDA solely for the purposes of determining compliance with the Specified Financial Covenant at the end of such fiscal quarter and any subsequent calculation period that includes such fiscal quarter (such right, the "Cure Right"); provided, that (a) such proceeds are actually received by the Borrowers no later than 10 days after the date on which financial statements are required to be delivered with respect to such fiscal quarter hereunder, and (b) such proceeds do not exceed the aggregate amount necessary to cure such Curable Default for such period.  If, after giving effect to the foregoing pro forma adjustment, the Borrowers are in compliance with the Specified Financial Covenant, the Borrowers shall be deemed to have satisfied the requirements of such Section as of the relevant date of determination with the same effect as though there had been no failure to comply on such date, and the applicable Curable Default shall be deemed cured for purposes of this Agreement.  From and after the receipt by the Administrative Agent of a written notice from Parent or the Administrative Borrower that the Parent or the Borrowers intend to exercise a Cure Right with respect to a particular fiscal quarter of Parent and its Subsidiaries and until the expiration of the 10th day after the date on which the Compliance Certificate is required to be delivered pursuant to Section 7.01(a)(iv) with respect to such fiscal quarter, neither the Administrative Agent nor the Required Lenders shall exercise any right under Section 9.01 solely on the basis of an Event of Default having occurred and being continuing in respect of a failure to comply with the requirements of the financial covenant set forth in Section 7.03(a); provided, that, during such period, an Event of Default in respect of such failure to comply shall continue to exist for all other purposes of this Agreement and the other Loan Documents.

# ARTICLE X

# AGENTS

Section 10.01  Appointment.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices, written reports, certificates and agreements received by such Agent, in its capacity as Agent, and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices, written reports, certificates or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Loans and Collateral Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) shall be binding upon all Lenders and all makers of Loans; provided, however, the Agents shall not be required to take any action which, in the reasonable opinion of any Agent,

124

exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 10.02  Nature of Duties; Delegation.  (a)  The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents. The duties of the Agents shall be mechanical and administrative in nature. The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender. Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) have instructed such Agent to act or refrain from acting pursuant hereto.

(b)  Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, sub-agent, co-agent, employee, attorney-in-fact and any other Person (including any Lender). Any such Person shall benefit from this Article X to the extent provided by the applicable Agent.

Section 10.03  Rights, Exculpation, Etc.  The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as

125

to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to <u>Section 4.03</u>, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents). The provisions of this <u>Section 10.03</u> shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.04  <u>Reliance</u>.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05  <u>Indemnification</u>.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five days of written demand by such Agent, reimburse such Agent for and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to <u>Section 10.08</u>; <u>provided</u>, <u>however</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-

appealable judicial determination that such liability resulted from such Agent's gross negligence or willful misconduct. The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Agreement.  This Section 10.05 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

Section 10.06  Agents Individually.  With respect to its Pro Rata Share of the Total Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07  Successor Agent.  (a) Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Administrative Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent with the consent of the Borrower so long as no Event of Default has occurred and is continuing. If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent. Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)      With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above. Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08  Collateral Matters.

(a)      The Collateral Agent may from time to time make such disbursements and advances ("Collateral Agent Advances") which the Collateral Agent, in its sole discretion, deems

127

necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrowers of the Loans and other Obligations or to pay any other amount chargeable to the Borrowers pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in <u>Section 12.04</u>; provided, however that the Collateral Agent shall not make Collateral Agent Advances under this <u>Section 10.08</u> of greater than $5.0 million in the aggregate at any time outstanding without the prior written consent of the Required Lenders. The Collateral Agent Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to the Term Loan. The Collateral Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with <u>Section 4.01</u>. The Collateral Agent shall notify each Lender and the Administrative Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such Collateral Agent Advance. Without limitation to its obligations pursuant to <u>Section 10.05</u>, each Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Collateral Agent Advance. If such funds are not made available to the Collateral Agent by such Lender, the Collateral Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for three Business Days and thereafter at a rate per annum equal to the Reference Rate <u>plus</u> the Applicable Margin.

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Loans and all other Obligations (other than Contingent Indemnification Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with <u>Section 12.02</u>. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 10.08(b)</u>.

(c)     Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in <u>Section 10.08(b)</u>), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under <u>Section 10.08(b)</u>. Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; <u>provided</u>, <u>however</u>, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and

(ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)     Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(e)     The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09  Agency for Perfection.  Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or

129

control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions. In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10  No Reliance on any Agent's Customer Identification Program.   Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act. Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11  No Third-Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12  No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13  Reports; Confidentiality; Disclaimers.   By becoming a party to this Agreement, each Lender:

(a)     is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Parent or any of its Subsidiaries (each, a "Report") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)     expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Parent and its Subsidiaries and will rely significantly upon the Parent's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)      agrees to keep all Reports and other material, non-public or proprietary information regarding the Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrowers, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorney's fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14  Collateral Custodian.  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests. Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral. All costs and expenses incurred by the Collateral Agent or its designee by reason of the employment of the custodian shall be the responsibility of the Borrowers and charged to the Loan Account.

Section 10.15  Intercreditor Agreements.  Each Lender hereby grants to the Collateral Agent all requisite authority to enter into or otherwise become bound by, and to perform its obligations and exercise its rights and remedies under and in accordance with the terms of, the Intercreditor Agreements, and to bind the Lenders thereto by the Collateral Agent's entering into or otherwise becoming bound thereby, and no further consent or approval on the part of any Lender is or will be required in connection with the performance by the Collateral Agent of the Intercreditor Agreements.

Section 10.16  Collateral Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Collateral Agent and, in the event that the Collateral Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent and its agents and counsel, and any other amounts due the Collateral Agent hereunder and under the other Loan Documents.

## ARTICLE XI

## GUARANTY

Section 11.01  Guaranty.  Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "Guaranteed Obligations"), and agrees to pay any and all expenses (including reasonable and documented out-of-pocket counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this Article XI and required to be paid hereunder. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower. In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02  Guaranty Absolute.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto. Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral. The obligations of each Guarantor under this Article XI are independent of the Guaranteed

132

Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following: (a) any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise; (c) any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations; (d) the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party; (e) any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or (f) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety. This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03  <u>Waiver</u>.  Each Guarantor hereby waives (a) promptness and diligence, (b) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (c) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (d) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (e) any other defense available to any Guarantor. Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this <u>Section 11.03</u> is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04  <u>Continuing Guaranty; Assignments</u>.   This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties

and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments and its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05  Subrogation.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising. If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06  Contribution.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed. "Fair Share Contribution Amount" means, with respect to any Guarantor

as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor. "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 11.06), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor. The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01   Notices, Etc.

(a)      Notices Generally. All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, telecopier or other electronic delivery. In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

[ ]

with copies to:

[ ]

and

[ ]
Attention: [ ]
Telephone: [ ]
Email: [ ]

if to the Agents, to it at the following address:

BSP Agency, LLC
9 West 57th Street, Suite 4920
New York, NY 10019
Attention: [____]
Fax: [(212) 588-670]
Email: [_____]

with a copy to:

Strook & Stroock & Lavan LLP
180 Maiden Lane
New York, NY, 10038
Attention: Jayme T. Goldstein / Marija Pecar
Telephone: (212) 806-5805 / 212 806-6535
Email: jgoldstein@stroock.com / mpecar@stroock.com
Fax: [____]

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by facsimile or other electronic delivery shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided, further that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

(b)      Electronic Communications.

(i)      Each Agent and the Administrative Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

(ii)      Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon receipt and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

136

Section 12.02 <u>Amendments, Etc.</u>  (a)  No amendment to or other modification of, or waiver of any provision of this Agreement or any other Loan Document (excluding the Fee Letter), and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, modification, consent or waiver to cure any ambiguity, omission, defect or inconsistency, or granting a new Lien for the benefit of the Agents and the Lenders, or extending an existing Lien over additional property, or to secure or extend any benefits hereof to any Obligations under any Incremental Facility incurred in accordance herewith, by the Agents and the Administrative Borrower, (y) in the case of any other amendment, modification, waiver or consent, subject to the proviso set forth below, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders), subject to the proviso set forth below, and the Administrative Borrower, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, modification, waiver or consent shall: (i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee or premium payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees or premiums on, the Loans payable to any Lender, in each case, without the written consent of such Lender and the Administrative Borrower; provided that an increase of any Lender's Commitment (other than pursuant to an Incremental Facility Commitment) shall require the consent of each such Lender; (ii) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender and the Administrative Borrower (except to the extent that any such change is in accordance with <u>Section 2.12</u> and is intended to reflect the existence and incurrence of Incremental Facility Loans permitted hereunder, and the inclusion thereof in the determination of the applicable matter); (iii) amend or otherwise modify, or be effective with respect to, the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender and the Administrative Borrower; (iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Agents and the Lenders, or release any Borrower or any Guarantor (except in connection with a Disposition of the Equity Interests thereof permitted by <u>Section 7.02(c)(ii)</u>), in each case, without the written consent of each Lender and the Administrative Borrower; (v) amend, modify or waive <u>Section 2.12(c)</u>, <u>Section 4.02</u>, <u>Section 4.03</u>, this <u>Section 12.02</u> of this Agreement or any provision in any Loan Document providing for the pro rata sharing of payments without the written consent of each affected Lender and the Administrative Borrower (except in connection with any Incremental Facility permitted hereunder); and (vi) extend the date of the PIK Interest Election Period or amend, modify or waive <u>Section 12.07(o)</u> without the consent of each affected Lender.

Notwithstanding the foregoing, (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents, (B) no amendment, waiver or consent shall, unless in writing and signed by (i) the BSP Lenders, affect the rights or duties of the BSP Lenders or any BSP Person, or Permitted Holders, under this Agreement or the other Loan Documents, and (ii) the Goldman Lenders, affect the rights or duties of the Goldman Lenders or

any Goldman Person under this Agreement or the other Loan Documents, (C) the consent of the Borrowers shall not be required to change any order of priority set forth in <u>Section 2.05(d)</u> and <u>Section 4.03</u>, and (D) only the consent of persons constituting Eligible Lenders at the applicable time shall be required for any waiver with respect to, or any consent to any departure by the Loan Parties from any of their obligations under, <u>Section 2.12(c)</u> (or any Default or Event of Default resulting from any failure to comply therewith), and each Eligible Lender shall be permitted to waive any of its individual rights pursuant thereto without the consent of any other Eligible Lender or any other Person.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents, and any Loans and Commitments (if applicable) held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender).

(b)     If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender other than the Collateral Agent and the Administrative Agent and their respective Affiliates and Related Funds (the "<u>Holdout Lender</u>") fails to give its consent, authorization, or agreement, then the Borrower, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "<u>Replacement Lender</u>"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations including the Applicable Premium. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Holdout Lender shall be made in accordance with the terms of <u>Section 12.07</u>. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

(c)     The Loan Parties and the Administrative Agent may, without the consent of any Lender, enter into Incremental Facility Amendments in accordance with <u>Section 2.12</u>, and any other amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to (i) to add one or more Incremental Facilities to this Agreement, and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders and other Persons holding any Incremental Facilities in any determination of the Required Lenders.  All amendments, modifications and other actions taken in reliance on this clause (c) shall be effective to supplement, amend and otherwise modify the terms of this Agreement and the other applicable Loan Documents, in each case, without any further action or consent of any other party to any Loan Document.

Section 12.03  No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04  Expenses; Taxes; Attorneys' Fees.  The Borrowers will pay within 30 days (except in connection with any amount due pursuant to Section 5.01(a)) of receipt of a written invoice, all reasonable and documented out-of-pocket costs and expenses incurred by or on behalf of each Agent (and, in the case of clauses (b) through (k) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable and documented out-of-pocket fees and expenses of counsel for each Agent (and, in the case of clauses (b) through (k) below, the BSP Lenders and the Goldman Lenders), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 7.01(b) or the review of any of the agreements, instruments and documents referred to in Section 7.01(f)), (b) any amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (e) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (f) any attempt to collect from any Loan Party, (g) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (h) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any Facility of any Loan Party, (i) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien or (k) the rating of the Loans by one or more rating agencies in connection with any Lender's Securitization; provided that, any legal fees and expenses in accordance with this Section 12.04 shall be limited to the reasonable and documented out-of-pocket fees and disbursements of (i) one outside counsel to each of (I) the Agents, (II) the BSP Lenders taken as a whole and (III) the Goldman Lenders taken as a whole and (ii) if reasonably necessary, one regulatory outside counsel and/or local counsel to each of (I) the Agents taken as a whole, (II) the BSP Lenders taken as a whole and (III) the Goldman Lenders taken as a whole. Without limitation of the foregoing or any other provision in the Loan Documents: (x) the

139

Borrowers agree to pay all Other Taxes payable in connection with this Agreement or any other Loan Document, and the Borrowers agree to save each Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such Other Taxes, (y) the Borrowers agree to pay all broker fees incurred by any Borrower that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (z) if, upon the occurrence and during the continuance of any Event of Default, the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself reasonably perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed by the Borrowers within 5 Business Days of demand by such Agent. The obligations of the Borrowers under this <u>Section 12.04</u> shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.05   <u>Right of Set-off</u>.   Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 4.04</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agents and the Lenders under this <u>Section 12.05</u> are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 12.06   <u>Severability</u>.   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07   <u>Assignments and Participations</u>.

(a)      This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent

140

of each Lender (and any such assignment without the Lenders' prior written consent shall be null and void), and the assignment of any Lender's Commitment or Loan (or any portion thereof) shall be subject to Section 12.07(b).

(b)     Subject to the conditions set forth in clause (c) below, each Lender may assign (including in connection with any open market or privately negotiated transaction) to one or more other lenders or other Persons all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitments and any Loan made by it with the written consent of the Administrative Agent and the Administrative Borrower (such consent of the Administrative Borrower not to be unreasonably withheld, delayed or conditioned); provided, however, that (x) no written consent of the Administrative Agent or the Administrative Borrower shall be required (1) in connection with any assignment by a Lender to any Eligible Assignee, or (2) if such assignment is to a Person that is not a Competitor and is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender, and (y) no written consent of the Administrative Borrower shall be required if a Specified Event of Default has occurred and is continuing at such time.

(c)     Assignments shall be subject to the following additional conditions:

(i)     Each such assignment shall be in an amount which is at least $1,000,000 or a multiple of $500,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A) any Eligible Assignee or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,000,000 or a multiple of $500,000 in excess thereof);

(ii)     Except as provided in the parenthetical below, the parties to each such assignment shall execute and deliver to the Administrative Agent (and, if applicable, to the Collateral Agent and/or the Administrative Borrower, as the case may be), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment, and such parties shall deliver to the Administrative Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to any other Lender), and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT; and

(iii)     Notwithstanding anything to the contrary in this Agreement, and whether or not any Default or Event of Default is continuing, in no event shall any Loan(s) or Commitment(s) (or any interest therein, or any claim or right with respect thereto, as applicable) be assigned or otherwise transferred (including pursuant to any participation, pledge, security interest or other indirect arrangement) to (x) any natural person, any Defaulting Lender or any Competitor (or any of their respective Affiliates or Related Funds), or (y) any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons, in each case, without the Administrative Borrower's prior written consent, and any assignment or other transfer in contravention of the foregoing shall be null and void ab initio (and any Loan, Commitment, interest, right or claim purported to be assigned or otherwise transferred pursuant thereto shall be

141

deemed to be held by the Lender or other Person that was the purported assignor or other transferor thereof).

(d)     Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)     By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty, and assumes no responsibility with respect to, the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender and (vii) such assignment complies with the terms of this Agreement.

(f)     The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain, or cause to be maintained, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent

manifest error, and the Borrowers, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Administrative Borrower and any Lender (but, in the case of any Lender, solely with respect to its own Loans and Commitments, unless consented to otherwise by the Administrative Borrower) at any reasonable time and from time to time upon reasonable prior written notice to the Administrative Agent.

(g)    Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Borrower, Administrative Agent or the Collateral Agent pursuant to Section 12.07(a) (which consent of the applicable Agent must be evidenced by such Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h)    A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(i)    In the event that any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrowers, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Loan Parties and the Agents at any reasonable time and from time to time upon reasonable prior notice; provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Loan Participant or any information relating to a Loan

Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person other than the Loan Parties and the Agents, except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury.

(j)     Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.09(e) and Section 2.09(h).

(k)     Each Lender may, subject to Section 12.07(c)(iii), sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations (including the making of any Loans), and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents, and such Lender shall remain the Lender of record in the Register and be deemed to be the legal owner and holder of the applicable Loans, Commitments and other Obligations; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document).  The Loan Parties agree that each participant shall be entitled to the benefits and be subject to the requirements of Section 2.09 and Section 2.10 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender, provided, that such Participant shall not be entitled to receive any greater payment under Section 2.09 or Section 2.10, with respect to any participation, than its participating Lender would have been entitled to receive except as otherwise required by a Change in Law that occurs after the Participant acquired the applicable participation or unless the Administrative Borrower has consented to such participation.

(l)     Any Lender may, subject to Section 12.07(c)(iii), at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such Lender pursuant to securitization or similar credit facility (a "Securitization"); provided, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(m)     For the avoidance of doubt, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, (x) Loans and Commitments may be sold, assigned, transferred and/or participated on a pro rata basis or a non-pro rata basis, whether via one or more auctions, open market purchases, privately negotiated transactions or otherwise pursuant, each of which shall be on terms and conditions, and for such consideration and/or at such

144

purchase price, in each case, as agreed to by the applicable seller or transferor, and the applicable purchaser or transferee, and (y) any payment made on account of any sale, assignment, transfer or participation pursuant to this Section 12.07, or any payment otherwise in respect of, pursuant to or in connection with this Section 12.07, in each case, shall not be subject to Sections 4.01 or 4.02 hereof, or any other provision of this Agreement or any other Loan Document that requires a payment to be made to Lenders in accordance with their Pro Rata Shares, or that otherwise provides for ratable payments or distributions to the Lenders.

(n)     [Reserved.]

(o)     BSP/Goldman Right of First Offer; BSP/Goldman Buyout Right & Consent Rights.

(i)     BSP Group and the Goldman Group shall each be permitted to exercise the BSP/Goldman Right of First Offer and the BSP/Goldman Buyout Right at such times as specified pursuant to the terms thereof.

(ii)     BSP Group (except if comprising any BSP Successor) shall be required to consent to any assignment or other transfer of any Loan, Commitment or other Obligations (or any portion thereof or interest therein) by any Goldman Lender to any Person (other than an Affiliate or Related Fund of such Goldman Lender that is an Eligible Assignee) at any time that the aggregate amount of Effective Date Committed Debt held by BSP Group represents not less than 17.0% of all Effective Date Committed Debt held at such time by all Lenders who are not Defaulting Lenders.

(iii)     Goldman Group (except if comprising any Goldman Successor) shall be required to consent to any assignment or other transfer of any Loan, Commitment or other Obligations (or any portion thereof or interest therein) by any BSP Lender to any Person (other than an Affiliate or Related Fund of such BSP Lender that is an Eligible Assignee) at any time that the aggregate amount of Effective Date Committed Debt held by Goldman Group represents not less than 17.0% of all Effective Date Committed Debt held at such time by all Lenders who are not Defaulting Lenders.

Section 12.08 Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09 GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE

145

OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 12.10  CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.

(a)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 12.11  WAIVER OF JURY TRIAL, ETC.   EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH

ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12   [Reserved].

Section 12.13   No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14   Reinstatement; Certain Payments.   If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to each other Agent and Lender and the Administrative Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.15   Indemnification; Limitation of Liability for Certain Damages.

(a)   In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrowers' use of the proceeds thereof, (iii) the Agents and the Lenders relying on any instructions of the Administrative Borrower or the handling of the Loan Account and Collateral of the Borrowers as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with

147

the transactions contemplated by this Agreement or the other Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter (x) caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non- appealable judgment of a court of competent jurisdiction or (y) result from any dispute solely among Indemnitees (or their Related Parties) and not involving any action or inaction by the Borrowers and their respective Affiliates (excluding as against the Agents in their capacity as such).

(b)   The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.15 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)   No party hereto shall assert, and each party hereto hereby waives, any claim against the Indemnitees or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)   The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.16   Records.   The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, including, without limitation, the Fees set forth in the Fee Letter and the Applicable Premium, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17   Binding Effect.   This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18  Highest Lawful Rate.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.18, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrowers). All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.18, and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this

149

Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19  Confidentiality.  Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public or proprietary information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents (and which at the time is not, and does not thereafter become, publicly available through no breach hereunder by an Agent or such Lender or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates (or prospective Affiliates, including limited partners) and to its and its Affiliates' (or such prospective Affiliates') respective equityholders (including, without limitation, partners), directors, officers, employees, agents, trustees, counsel, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19 and such Lender shall remain liable for any breach hereof by such Persons); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.19; (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority (in which case such Agent and/or such Lender shall notify the Administrative Borrower, in advance of any such disclosure, to the extent permitted by such law, process and/or request); (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency or otherwise to the extent consisting of general portfolio information that does not identify Loan Parties; (vi) in connection with any litigation to which any Agent or any Lender is a party (in which case such Agent and/or such Lender shall use commercially reasonable efforts to notify the Administrative Borrower, in advance of any such disclosure, to the extent permitted by such law, process and/or request); (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; or (viii) with the consent of the Administrative Borrower.

Section 12.20  Public Disclosure.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing

such press release or other public disclosure). Each Loan Party hereby authorizes each Agent and each Lender, after consultation with and prior written consent from the Borrowers, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.21 <u>Integration</u>.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.22 <u>USA PATRIOT Act</u>.  Each Lender or Agent that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrowers, which information includes the name and address of each such entity and other information that will allow such Lender or Agent to identify the entities composing the Borrowers in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender or Agent may reasonably require from time to time in order to enable such Lender or Agent to comply with the USA PATRIOT Act.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWERS:**

[NEW HOLDCO SUB], as a Borrower and as the Administrative Borrower

By: _____
    Name:   [  ]
    Title:   [  ]

ORG GC GP BUYER, LLC, as a Borrower

By: _____
    Name:   [  ]
    Title:   [  ]

ORG GC LP BUYER, LLC, as a Borrower

By: _____
    Name:   [  ]
    Title:   [  ]

**GUARANTORS:**

ORG GC GP BUYER, LLC

By: _____
    Name:   [  ]
    Title:   [  ]

**<u>GUARANTORS</u>:**

[NEW HOLDCO], as Parent and as a Guarantor

By: _____
      Name:  [ ]
      Title:  [ ]

[ORG GC GP BUYER, LLC, as a Guarantor]

By: _____
      Name:  [ ]
      Title:  [ ]

[ORG GC LP BUYER, LLC, as a Guarantor]

By: _____
      Name:  [ ]
      Title:  [ ]

GC SERVICES LIMITED PARTNERSHIP, as a Guarantor

By:   ORG GC GP Buyer, LLC,
        its general partner

By:   _____
        Name:   [  ]
        Title:   [  ]

GC SERVICES INTERNATIONAL, LLC, as a Guarantor

By:   _____
        Name:   [  ]
        Title:   [  ]

<u>ADMINISTRATIVE AGENT</u>:

BSP AGENCY, LLC

By: _____
     Name:
     Title:

<u>COLLATERAL AGENT</u>:

BSP AGENCY, LLC

By: _____
     Name:
     Title:

**SIGNATURE PAGE TO**
**GC SERVICES**
**FIRST LIEN FINANCING AGREEMENT**

LENDERS:

[   ]

**SIGNATURE PAGE TO**
**GC SERVICES**
**FIRST LIEN FINANCING AGREEMENT**

**<u>Exhibit E</u>**

**Form of New 2L Facility Agreement**

*SSL Draft 10/16/2021*

**SECOND LIEN FINANCING AGREEMENT**

**DATED AS OF [   ], 2021**

**BY AND AMONG**

**[NEW HOLDCO SUB], ORG GC GP BUYER, LLC, AND ORG GC LP BUYER, LLC,**
**as Borrowers,**

**[NEW HOLDCO],**
**as Parent**

**PARENT AND EACH SUBSIDIARY OF PARENT LISTED**
**AS A GUARANTOR ON THE SIGNATURE PAGES HERETO**
**AND FROM TIME TO TIME PARTY HERETO,**
**as Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as Lenders,**

**BSP AGENCY, LLC,**

**as Collateral Agent,**

**and**

**BSP AGENCY, LLC,**
**as Administrative Agent**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**ARTICLE I DEFINITIONS; CERTAIN TERMS** ...................................................1
   Section 1.01     Definitions ..............................................................2
   Section 1.02     Terms Generally. .................................................46
   Section 1.03     Certain Matters of Construction. ........................47
   Section 1.04     Accounting and Other Terms. .............................47
   Section 1.05     Time References .................................................50

**ARTICLE II THE LOANS** ...........................................................................50
   Section 2.01     Incurrence of Loans; Commitments. ..................50
   Section 2.01     Making the Loans ...............................................51
   Section 2.02     Repayment of Loans; Evidence of Debt...............53
   Section 2.03     Interest. ...............................................................53
   Section 2.04     Termination of Commitments; Prepayment of Loans. ...............54
   Section 2.05     Fees. ....................................................................58
   Section 2.06     LIBOR Option. .........................................**Error! Bookmark not defined.**
   Section 2.07     Funding Losses. ..................................................59
   Section 2.08     Taxes. ..................................................................60
   Section 2.09     Increased Costs and Reduced Return ..................63
   Section 2.10     Changes in Law; Impracticability or Illegality........... **Error! Bookmark not defined.**
   Section 2.11     Incremental Facilities. ..................................**Error! Bookmark not defined.**
   Section 2.12     Benchmark Replacement Rate. ...................**Error! Bookmark not defined.**

**ARTICLE III [INTENTIONALLY OMITTED]**......................................................64

**ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS** ..................64
   Section 4.01     Payments; Computations and Statements.....................64
   Section 4.02     Sharing of Payments ...........................................65
   Section 4.03     Apportionment of Payments ................................66
   Section 4.04     Defaulting Lenders .............................................67
   Section 4.05     Administrative Borrower; Joint and Several Liability of the Borrowers. ................68

**ARTICLE V CONDITIONS TO LOANS** .........................................................69
   Section 5.01     Conditions Precedent to Effectiveness ...............69
   Section 5.02     Conditions Subsequent to Effectiveness ............73
   Section 5.03     Conditions to Each Borrowing ...........................74

**ARTICLE VI REPRESENTATIONS AND WARRANTIES** ....................................74
   Section 6.01     Representations and Warranties ..........................74

**ARTICLE VII COVENANTS OF THE LOAN PARTIES** .................................................81
    Section 7.01     Affirmative Covenants ..................................................81
    Section 7.02     Negative Covenants .....................................................89
    Section 7.03     Financial Covenants ....................................................94

**ARTICLE VIII CASH MANAGEMENT ARRANGEMENTS AND OTHER
                COLLATERAL MATTERS** .........................**Error! Bookmark not defined.**
    Section 8.01     Cash Management Arrangements..................**Error! Bookmark not defined.**

**ARTICLE IX EVENTS OF DEFAULT** .................................................................96
    Section 9.01     Events of Default .........................................................96
    Section 9.02     Cure Right. ..................................................................99

**ARTICLE X AGENTS** ...........................................................................................99
    Section 10.01    Appointment. ...............................................................99
    Section 10.02    Nature of Duties; Delegation.....................................100
    Section 10.03    Rights, Exculpation, Etc..............................................101
    Section 10.04    Reliance. ....................................................................102
    Section 10.05    Indemnification...........................................................102
    Section 10.06    Agents Individually ...................................................103
    Section 10.07    Successor Agent .........................................................103
    Section 10.08    Collateral Matters.......................................................103
    Section 10.09    Agency for Perfection................................................105
    Section 10.10    No Reliance on any Agent's Customer Identification Program. ................106
    Section 10.11    No Third Party Beneficiaries.....................................106
    Section 10.12    No Fiduciary Relationship .........................................106
    Section 10.13    Reports; Confidentiality; Disclaimers .......................106
    Section 10.14    Collateral Custodian ..................................................107
    Section 10.15    Intercreditor Agreements...........................................107
    Section 10.16    Collateral Agent May File Proofs of Claim ...............107

**ARTICLE XI GUARANTY** ..................................................................................108
    Section 11.01    Guaranty. ...................................................................108
    Section 11.02    Guaranty Absolute......................................................108
    Section 11.03    Waiver. ......................................................................109
    Section 11.04    Continuing Guaranty; Assignments ..........................109
    Section 11.05    Subrogation. ...............................................................110
    Section 11.06    Contribution...............................................................110

**ARTICLE XII MISCELLANEOUS** ......................................................................111
    Section 12.01    Notices, Etc................................................................111
    Section 12.02    Amendments, Etc. ......................................................113
    Section 12.03    No Waiver; Remedies, Etc..........................................114
    Section 12.04    Expenses; Taxes; Attorneys' Fees .............................114
    Section 12.05    Right of Set-off ..........................................................115
    Section 12.06    Severability................................................................116
    Section 12.07    Assignments and Participations.................................116

Section 12.08    Counterparts. ................................................................................121
Section 12.09    GOVERNING LAW ......................................................................121
Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND
                 VENUE.........................................................................................121
Section 12.11    WAIVER OF JURY TRIAL, ETC..................................................122
Section 12.12    Consent by the Agents and Lenders ............................................122
Section 12.13    No Party Deemed Drafter .............................................................122
Section 12.14    Reinstatement; Certain Payments.................................................122
Section 12.15    Indemnification; Limitation of Liability for Certain Damages. ..................123
Section 12.16    Records. ........................................................................................124
Section 12.17    Binding Effect ..............................................................................124
Section 12.18    Highest Lawful Rate .....................................................................124
Section 12.19    Confidentiality ..............................................................................125
Section 12.20    Public Disclosure .........................................................................126
Section 12.21    Integration.....................................................................................126
Section 12.22    USA PATRIOT Act ......................................................................126

<u>SCHEDULE AND EXHIBITS</u>

Schedule 1.01(A)    Lenders and Lenders' Commitments
Schedule 1.01(B)    Facilities
Schedule 6.01(e)     Capitalization; Subsidiaries
Schedule 6.01(f)     Litigation
Schedule 6.01(l)     Nature of Business
Schedule 6.01(q)     Environmental Matters
Schedule 6.01(r)     Insurance
Schedule 6.01(u)     Intellectual Property
Schedule 7.02(a)     Existing Liens
Schedule 7.02(b)     Existing Indebtedness
Schedule 7.02(e)     Existing Investments
Schedule 7.02(k)     Limitations on Dividends and Other Payment Restrictions
Schedule 8.01        Cash Management Accounts

Exhibit A       Form of Joinder Agreement
Exhibit B       Form of Assignment and Acceptance
Exhibit C       Form of Notice of Borrowing
Exhibit D       Form of LIBOR Notice

## SECOND LIEN FINANCING AGREEMENT

This Second Lien Financing Agreement, dated as of [  ], 2021, is made by and among [New Holdco], a [  ] (the "Parent"), as a guarantor, [New Holdco Sub], a Delaware limited liability company (the "Holdco Borrower"), as a borrower, ORG GC GP Buyer, LLC, a Delaware limited liability company ("GC GP Buyer"), as a borrower, and ORG GC LP Buyer, LLC, a Delaware limited liability company ("GC LP Buyer"), as a borrower (GC LP Buyer, together with [Holdco Borrower] and GC GP Buyer, collectively, the "Borrowers", and each a "Borrower"), Holdco Borrower, as the Administrative Borrower, each subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, as a guarantor (together with the Parent and each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder or otherwise guaranties all or any part of the Obligations (as hereinafter defined), each a "Guarantor" and collectively, the "Guarantors"), the Lenders (as hereinafter defined) from time to time party hereto, BSP Agency, LLC (in its individual capacity, "BSP Agency"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent"), and BSP Agency, LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agent" or "Agents").

## RECITALS

**WHEREAS**, the Loan Parties and the Lenders (and/or one of more of their respective Affiliates) have agreed to consummate certain Restructuring Transactions, as further set forth in the related Restructuring Documents;

**WHEREAS**, in connection with implementing the Restructuring Transactions, the Lenders have agreed to provide a credit facility to the Borrowers hereunder, and shall be deemed to have extended certain term loans to the Borrowers on the Chapter 11 Plan Effective Date, in each case, on the terms set forth herein, and subject to the applicable provisions of the other Loan Documents and the Restructuring Documents;

**WHEREAS**, the Agents have agreed to act as administrative and collateral agents in respect of the credit facilities provided hereunder; and

**WHEREAS**, the parties hereto are entering into this Agreement in furtherance of, and to document their agreement with respect to, the foregoing.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01   <u>Definitions</u>.  As used in this Agreement, the following terms shall have the respective meanings indicated below:

"<u>ABL/Term Intercreditor Agreement</u>" means the [ABL/Term Intercreditor Agreement], dated as of the date hereof, by and among the Collateral Agent, the First Lien Collateral Agent and the ABL Agent and acknowledged by the Loan Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"<u>ABL Agent</u>" means [    ], in its capacities as the administrative agent and the collateral agent under the ABL Credit Agreement, together with its successors and assigns in such capacities.

"<u>ABL Credit Agreement</u>" means the Credit Agreement, dated as of [    ], among [GCS, as the borrower, Parent, GC Midco, GC GP Buyer, GC LP Buyer and GC Services International, LLC], as loan parties, the ABL Agent and the lenders from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreement.

"<u>ABL Credit Facility</u>" means (a) any credit facility established pursuant to, or governed by, and any loans provided under, the ABL Credit Agreement, and (b) any domestic secured or unsecured revolving, cash-flow or asset-backed credit facility, any letter of credit facility, any receivables financing, and any other form of liquidity or working capital financing provided to, or for the benefit of, the Borrowers.

"<u>ABL Indebtedness</u>" means Indebtedness of the Loan Parties owing to the ABL Lenders and other secured parties under the ABL Credit Facility.

"<u>ABL Lenders</u>" means, collectively, the lenders party to the ABL Credit Agreement from time to time.

"<u>ABL Loan Documents</u>" means, collectively, the ABL Credit Agreement and the other [Loan Documents] (as defined in the ABL Credit Agreement), in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreements.

"<u>ABL Loans</u>" means any revolving loans made pursuant to the ABL Credit Agreement.

"<u>ABL Priority Collateral</u>" means "ABL Priority Collateral" as defined in the ABL/Term Intercreditor Agreement.

"<u>Account Debtor</u>" means, with respect to any Person, each debtor, customer or obligor in any way obligated on or in connection with any Account of such Person.

"<u>Action</u>" has the meaning specified therefor in Section 12.12.

"<u>Additional Amount</u>" has the meaning specified therefor in Section 2.09(a).

2

"<u>Administrative Agent</u>" has the meaning specified therefor in the preamble hereto.

"<u>Administrative Agent's Account</u>" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"<u>Administrative Borrower</u>" has the meaning specified therefor in <u>Section 4.05(a)</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is in control of, is controlled by, or is under common control with, such Person (including such Person's Controlled Investment Affiliates). For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.  Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"<u>Affiliated Lenders</u>" means, as used with respect to any group of Lenders, any Lenders within such group who are Affiliates or Related Funds of one another and, accordingly, are not Unaffiliated Lenders.

"<u>Agent</u>" has the meaning specified therefor in the preamble hereto.

"<u>Agreement</u>" means this Second Lien Financing Agreement, including all amendments, restatements, amendments and restatements, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"<u>Anti-Corruption Laws</u>" has the meaning specified therefor in Section 6.01(aa)(i).

"<u>Anti-Money Laundering and Anti-Terrorism Laws</u>" means any Requirement of Law relating to terrorism, economic sanctions or money laundering, including, without limitation, (a) the Money Laundering Control Act of 1986 (*i.e.*, 18 U.S.C. §§ 1956 and 1957), (b) the Bank Secrecy Act of 1970 (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), and the implementing regulations promulgated thereunder, (c) the USA PATRIOT Act and the implementing regulations promulgated thereunder, (d) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("<u>OFAC</u>"), (e) any law prohibiting or directed against terrorist activities or the financing or support of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B), and (f) any similar laws enacted in the United States or any other jurisdictions in which the parties to this Agreement operate, as any of the foregoing laws have been, or shall hereafter be, amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"Applicable ECF Percentage" means, for any Fiscal Year of the Parent, (a) 50%, if the Total Senior Lien Leverage Ratio as of the last day of such Fiscal Year is greater than 4.50:1.00, (b) 25% if the Total Senior Lien Leverage Ratio as of the last day of such Fiscal Year is less than or equal to 4.50:1.00 and (c) 0%, as of, and at all times after, the Suspension Date.

"Applicable Premium" means as of the date of the occurrence of an Applicable Premium Trigger Event:

(a)     on or before the 12 month anniversary of the Effective Date, 103%;

(b)     during the period of time from and after the 12 month anniversary of the Effective Date up to and including the date that is the 24 month anniversary of the Effective Date, 102%; and

(c)     thereafter, zero.

"Applicable Premium Trigger Event" means, and shall be deemed to occur upon:

(a)     any payment by any Loan Party of all, or of any part, of the outstanding principal balance of any Loan for any reason (including, but not limited to, any optional prepayment, and any mandatory prepayment (other than any Excess Cash Flow mandatory prepayment required pursuant to Section 2.05(c)(i), or any Extraordinary Receipts mandatory prepayment required pursuant to Section 2.05(c)(iv))), and any voluntary permanent reduction or cancellation of all or any part of any undrawn Commitments effectuated at the option or request of the Borrowers, in each case, whether before or after (i) the occurrence of an Event of Default, (ii) the Final Maturity Date, or (iii) the commencement of any Insolvency Proceeding, and, in each case, notwithstanding any acceleration (for any reason) of any of the Loans or Obligations;

(b)     the acceleration of the Obligations for any reason, including, but not limited to, acceleration in accordance with Section 9.01, including as a result of the commencement of an Insolvency Proceeding;

(c)     the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to the Collateral Agent, for the account of the Lenders in full or partial satisfaction of the Obligations; or

(d)     the termination of this Agreement for any reason.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Administrative Agent (and the Collateral Agent, if applicable), in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Collateral Agent.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, chief administrative officer, treasurer or other

4

financial officer performing similar functions, president, vice president, general counsel or chief compliance officer of such Person.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, in its capacity as the court having jurisdiction over the Chapter 11 Case.

"Barbados Account" means any deposit account or other bank account maintained by GC Services (Barbados) SRL that is located in Barbados.

"Blocked Person" means any Person:

(a)     that (i) is identified on the list of "Specially Designated Nationals and Blocked Persons" published by OFAC; (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of an OFAC Sanctions Program; or (iii) a United States Person is prohibited from dealing or engaging in a transaction with under any of the Anti-Money Laundering and Anti-Terrorism Laws; and

(b)     that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in clause (a) above.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, manager or managers, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrowing" means Loans which are made, issued, converted or continued (as applicable) on the same Borrowing Date.

"Borrowing Date" means the date of any Borrowing hereunder (as set forth in the Notice of Borrowing delivered in connection with such Borrowing).  For the avoidance of doubt, the Effective Date shall be the Borrowing Date for the Term Loans.

"BSP/Goldman Buyout Right" has the meaning specified therefor in that certain Mutual Buyout Right and ROFO Agreement, dated as of the Effective Date, entered into by and among the BSP Lenders and the Goldman Lenders and acknowledged by the Agents.

"BSP/Goldman Right of First Offer" has the meaning specified therefor in that certain Mutual Buyout Right and ROFO Agreement, dated as of the Effective Date, entered into by and among the BSP Lenders and the Goldman Lenders and acknowledged by the Agents.

"BSP Agency" has the meaning specified therefor in the preamble hereto.

"BSP Group" means, at any time, BSP Lenders who are not Defaulting Lenders, taken as a whole.

"BSP Lenders" means, as of any time, the BSP Persons that are Lenders at such time (each of them individually, a "BSP Lender"); provided, that, upon any sale, assignment or other transfer (whether in a single or multiple transactions) by the BSP Lenders of all Effective Date Committed Debt held collectively by them since the Effective Date through and including the date of such sale, assignment or transfer to a BSP Successor, the term BSP Lenders shall, as of such time, be construed to instead refer to such BSP Successor.

"BSP Management Consulting Agreement" means that certain Management Consulting Agreement, dated as of [___], 2021, by and among [the Parent], and [the BSP Persons party thereto] as BSP Investors (as defined therein).

"BSP Management Fee" means that certain [___] (as defined in the BSP Management Consulting Agreement) owing and payable to BSP pursuant to the BSP Management Consulting Agreement in an amount and in accordance with the other terms set forth in the BSP Management Consulting Agreement.

"BSP Persons" means the following Persons, collectively, (a) Benefit Street Partners LLC, (b) the Persons listed as a '*BSP Lender*' on Schedule1.01(A) hereto, (c) each of the Affiliates of any of the foregoing, and their and such Affiliates' respective Related Funds, investment advisors, managing members, and partners (and, each such Person, individually, a "BSP Person").

"BSP Successor" means (a) any Person (together with its Affiliates and Related Funds) that has become a Lender pursuant to an assignment, together with all other Affiliates and Related Funds that has become a Lender pursuant to an assignment, of all Effective Date Committed Debt held by the BSP Lenders subject to the terms of this Agreement, and (b) each subsequent assignee of the foregoing, or of any prior assignee therefrom, as applicable (in each case, together with each of their respective Affiliates and Related Funds).

"Budget" means the financial projections of Parent and its Subsidiaries for the next succeeding fiscal year, delivered pursuant to Section 7.01(a)(vii).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"Capital Expenditures" means, with respect to any Person for any period, the result of the sum of (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment"

or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed, including all Capitalized Lease Obligations and all capitalized software development costs that are paid or due and payable during such period, plus, (b) to the extent not covered by clause (a) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person.  Notwithstanding the foregoing, for the avoidance of doubt, Capital Expenditures shall not include expenditures made with the Net Cash Proceeds of any Extraordinary Receipts solely to the extent such expenditures are used to purchase property that is the same as or substantially similar to any property the loss of which gave rise to a Loan Party's receipt of such Extraordinary Receipts.

"Capitalized Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within 270 days from the date of acquisition thereof.

"Cash Management Accounts" means the bank accounts of each Loan Party maintained at one or more Cash Management Banks.

"Cash Management Bank" has the meaning specified therefor in Section 8.01(a).

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the

making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means each occurrence of any of the following:

(a)    the Permitted Holders, taken as a whole, shall cease to beneficially and of record own and control, directly or indirectly, at least 50.1 % on a fully diluted basis of the Parent Common Equity (or the common equity of any successor to Parent);

(b)    the Parent shall cease to have "*beneficial ownership*" (as defined in Rule 13d-3 under the Exchange Act) of 100% of the aggregate voting or economic power of the Equity Interests of the Loan Parties (other than in connection with any transaction permitted pursuant to Section 7.02(c)(i)), free and clear of all Liens (other than Permitted Specified Liens);

(c)    a "Change of Control" (or any comparable term or provision) under or with respect to any documentation evidencing Subordinated Indebtedness if any Material Indebtedness is outstanding thereunder (but solely if the same shall cause the same to become, or to be declared, due and payable (or subject to any mandatory purchase or offer to purchase the same) prior to the scheduled maturity thereof; or

(d)    a "Change in Control" under, and as defined in, the ABL Credit Agreement or the First Lien Financing Agreement if any Material Indebtedness is outstanding thereunder (but solely if the same shall cause the same to become, or to be declared, due and payable (or subject to any mandatory purchase or offer to purchase the same) prior to the scheduled maturity thereof,

provided, that, notwithstanding the above, a Change of Control shall not be deemed to occur, and shall not be triggered, as a result of (i) any sale, merger, consolidation or other transaction permitted for purposes of (x) the Loan Documents (including pursuant to a consent of the Required Lenders in accordance herewith), or (y) the Parent Common Equity or the Parent Preferred Equity (or under the corporate governance and other arrangements governing the same, and including pursuant to a consent of the applicable holders of Parent Common Equity or Parent Preferred Equity, as applicable), (ii) any (x) sale, merger or consolidation of any Loan Party to or with, or (y) sale, assignment, conveyance, transfer or other disposition of all or substantially all of any Loan Party's assets to, an Affiliate incorporated or organized solely for the purpose of reincorporating or reorganizing such Loan Party in another jurisdiction and/or for the sole purpose of forming or collapsing a holding company structure, (iii) any change in the identity of any officer or member of (or any other matter relating to the governance of) the board of the Parent or any of its Subsidiaries, (iv) anything consented to at the applicable time by BSP Persons and/or other Permitted Holders, and by Goldman Persons, in each case, who at such time hold Parent Common Equity or Parent Preferred Equity, as applicable, (v) the Restructuring Transactions or any other

8

transactions relating thereto, or (vi) such other circumstances as shall be reasonably satisfactory to BSP Persons and/or other Permitted Holders and Goldman Persons.

"Chapter 11 Case" means the case under Chapter 11 of the Bankruptcy Code (Case No. [___]) arising from the voluntary petition filed with the Bankruptcy Court by the Prepetition Administrative Borrower, as a debtor and debtor-in-possession.

"Chapter 11 Case Documents" means the Chapter 11 Plan, the Chapter 11 Plan Confirmation Order, together with any and all other orders entered by the Bankruptcy Court in the Chapter 11 Case, and any and all agreements relating thereto.

"Chapter 11 Plan" means [_____].

"Chapter 11 Plan Confirmation Order" means [an order of the Bankruptcy Court in the Chapter 11 Case (in form and substance acceptable to the Required Lenders) confirming the Chapter 11 Plan].

"Chapter 11 Plan Effective Date" means [_____].

"Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 10.08(a).

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commitment" means, as of any time, any Term Loan Commitment.

"Compliance Certificate" has the meaning assigned to such term in Section 7.01(a)(iv).

"Consolidated EBITDA" means, with respect to any Person for any period:

(a)     the Consolidated Net Income of such Person for such period,

plus

(b)     without duplication, the sum of the following amounts for such period to the extent deducted in the calculation of Consolidated Net Income for such period:

(i)     any provision for United States federal income taxes or other taxes measured by net income, gross margin or profits,

(ii)      Consolidated Net Interest Expense,

(iii)     any loss from extraordinary, unusual or non-recurring items approved by the Administrative Agent in writing,

(iv)     any depreciation and amortization expense,

(v)      fees and expenses paid in cash or accrued pursuant to any agreement referred to in, and to the extent such payment is permitted to be paid or accrued under, Section 7.02(h),

(vi)     one-time, non-recurring, out-of-pocket fees and expenses incurred to consummate the transactions contemplated by the Loan Documents, the First Lien Loan Documents and the ABL Loan Documents prior to or within 90 days following the Effective Date,

(vii)    [reserved],

(viii)   any aggregate net loss on the Disposition of property (other than accounts and Inventory) outside the ordinary course of business,

(ix)     any non-cash expense related to employee compensation,

(x)      any severance, recruiting expenses or signing bonuses for employees up to $500,000 (or such greater amount as the Administrative Agent may agree (at the direction of the Required Lenders)) in such Fiscal Year,

(xi)     any dividends relating to the Parent Preferred Equity, to the extent permitted to be paid under Section 7.02(h),

(xii)    the negative effects of non-cash adjustments from the adoption of fresh start accounting in connection with the consummation of the Plan of Reorganization and the Restructuring Transactions; provided that positive effects, if any, of non-cash adjustments from the adoption of fresh start accounting in connection with the consummation of the Plan of Reorganization and the Restructuring Transactions shall be deducted from Consolidated EBITDA,

(xiii)   fees and expenses paid to members of the Board of Directors of the Loan Parties in an aggregate amount not to exceed $30,000 in any fiscal quarter,

(xiv)    (A) fees and expenses paid to the Agents, the Lenders, the ABL Agent, the ABL Lenders and the lenders and other secured parties under the First Lien Facility, in each case, pursuant to the terms of the Loan Documents, the ABL Loan Documents or the First Lien Loan Documents, respectively and (B) fees and expenses paid to the agents and lenders, pursuant to the terms of the Prepetition Term Financing Agreement (to the extent relating to amounts incurred through to the Effective Date or within 60 days thereafter), and

(xv)     any other non-cash expenditure, charge or loss for such period (other than any non-cash expenditure, charge or loss relating to write-offs, write-downs or reserves, in each case, with respect to accounts and Inventory),

minus

(c)     without duplication, the sum of the following amounts for such period to the extent included in the calculation of such Consolidated Net Income for such period:

(i)     any credit for United States federal income taxes or other taxes measured by net income, gross margin or profits,

(ii)     any gain from extraordinary, unusual or non-recurring items,

(iii)     [Reserved], and

(iv)     any aggregate net gain (or plus any aggregate net loss) from the Disposition of property (other than accounts and Inventory) outside the ordinary course of business, any other non-cash gain, including any reversal of a charge referred to in clause (b)(xv) above by reason of a decrease in the value of any Equity Interest;

in each case, determined on a consolidated basis in accordance with GAAP.

For purposes of the calculation of the covenants set forth in Section 7.03 of this Agreement, the Consolidated EBTIDA of Parent and its Subsidiaries (w) for the quarter ending [  ] shall be $[  ], (x) for the quarter ending [  ] shall be $[  ] and (y) for the quarter ending [  ] shall be $[  ].

"Consolidated Net Income" means, with respect to any Person, for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period in accordance with GAAP; provided, however, that the following shall be excluded: (a) the net income of any other Person in which such Person or one of its Subsidiaries has a joint interest with a third-party, except to the extent of the amount of dividends or distributions paid in cash to such Person or Subsidiary, (b) the net income of any Subsidiary of such Person that is, on the last day of such period, subject to any restriction or limitation (by contract, organizational documentation, operation of law or otherwise) on the payment of dividends or the making of other distributions, to the extent of such restriction or limitation, and (c) the net income of any other Person arising prior to such other Person becoming a Subsidiary of such Person or merging or consolidating into such Person or its Subsidiaries.

"Consolidated Net Interest Expense" means, with respect to any Person for any period, without duplication, (a) gross interest expense (including, without limitation, interest expense paid to Affiliates of such Person), less (b) the sum of (i) interest income for such period and (ii) gains for such period on Hedging Agreements (to the extent not included in interest income above and to the extent not deducted in the calculation of gross interest expense), plus (c) the sum of (i) losses for such period on Hedging Agreements (to the extent not included in gross interest expense) and (ii) the upfront costs or fees for such period associated with Hedging Agreements (to the extent not included in gross interest expense), in each case, determined on a consolidated basis and in accordance with GAAP.

"Contingent Indemnity Obligations" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent

11

(a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract located in the United States, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, among the ABL Lender (so long as the ABL Loan Documents are still in effect), Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) is an Affiliate of such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.

"Credit Facility" means the credit facility provided hereunder pursuant to the Term Loan Facility.

"Curable Default" has the meaning specified therefor in Section 9.02.

12

"Cure Right" has the meaning specified therefor in Section 9.02.

"Current Value" has the meaning specified therefor in Section 7.01(m).

"Customer Trust Account" means any deposit account specifically required by a customer of a Loan Party to be maintained by such Loan Party as a trust account for the benefit of such customer, so long as such deposit account and all funds deposited therein are separately segregated from such Loan Party's general accounts and other cash.

"Debt Representative" means, in respect of any Indebtedness, any administrative agent, collateral agent, trustee or other Person designated by the lenders or other holders of such Indebtedness to act as their representative in connection with, among other things, any intercreditor arrangements contemplated pursuant to the Intercreditor Agreements or otherwise applicable to the Obligations, as the case may be; provided, that the Administrative Agent shall be notified of the existence and identity of such Person.

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within 2 Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Administrative Borrower in writing within 2 Business Days of the date such Loans were required to be funded hereunder that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within 2 Business Days of the date when due, (b) has notified the Administrative Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within 3 Business Days after written request by the Administrative Agent or the Administrative Borrower, to confirm in writing to the Administrative Agent and the Administrative Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Administrative Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the

13

Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity. Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Administrative Borrower and each Lender.

"DIP Claims" means, with respect to any Term Loan Lender that is a Goldman Lender and a lender under the Term DIP Facility (as defined in the RSA), the amount of such Term Loan Lender's DIP Obligations (as defined in the RSA) that are deemed exchanged for, and discharged upon the issuance to such Term Loan Lender of, Term Loans on the Effective Date pursuant to the Restructuring Transactions, in each case, as determined and calculated in accordance with the RSA and the other applicable Restructuring Documents.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired), including any Equity Interest in any Subsidiary, to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts or (b) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification).

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payment of dividends or distributions in cash or assets, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is six months after the Final Maturity Date.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Effective Date" has the meaning specified therefor in Section 5.01.

"Effective Date Committed Debt" means the Term Loans and the Term Loan Commitments.  For the avoidance of doubt, (i) any reference to any Person's Effective Date

14

Committed Debt (or any Effective Date Committed Debt held by any Person, as applicable) at any time of determination shall be a reference to the sum of the aggregate (x) then-outstanding principal of all such Loans and (y) then-remaining or unused amount of such Commitments, and (ii) Effective Date Committed Debt holdings of all Persons who are Affiliated Lenders of each other shall be aggregated where applicable or required by the context.

"Eligible Assignee" means each and any one of the following Persons (except any such Person that is a natural person, a Disqualified Lender or a Competitor): (a) a Permitted Holder, (b) a Lender, and (c) an Affiliate or a Related Fund of a Lender (except any portfolio company) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and sponsored or maintained (or that was sponsored or maintained at any time during the 6 years preceding the date of any Borrowing hereunder) for employees of any Loan Party or any of its ERISA Affiliates.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Loan Party or any of its Subsidiaries or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other Requirement of Law, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (a) any property presently or formerly owned by any Loan Party or any of its Subsidiaries or (b) any facility which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries.

15

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by the Parent of any cash capital contributions, in each case, following the date hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Excess Cash Flow" means, with respect to any Person for any period, without duplication, (a) Consolidated EBITDA of such Person and its Subsidiaries for such period, less (b) the sum of, without duplication, (i) all cash principal payments (excluding any principal payments made in accordance with Section 2.05(c) on the Loans made during such period, and all cash principal payments on Indebtedness (other than Indebtedness incurred under this Agreement and Subordinated Indebtedness) of such Person or any of its Subsidiaries during such period to the extent such other Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (ii) all Consolidated Net Interest Expense to the extent paid or payable in cash during such period, (iii) the cash portion of Capital Expenditures made by such Person and its Subsidiaries during such period to the extent permitted to be made under this Agreement (excluding Capital Expenditures to the extent financed through the incurrence of Indebtedness or through an Equity Issuance), (iv) all scheduled loan servicing fees and other similar fees in respect of Indebtedness of such Person or any of its Subsidiaries paid in cash during such period, to the extent such Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (v) Tax Distributions and income, profits or gross margin taxes paid in cash by such Person and its Subsidiaries for such period, (vi) any dividends paid in cash in connection with the Parent Preferred Equity to the extent permitted to be paid in cash hereunder, and (vii) for any period, the excess, if any, of Working Capital at the end of such period over Working Capital at the beginning of such period (or minus the excess, if any, of Working Capital at the beginning of such period over Working Capital at the end of such period).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means (a) any deposit account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's employees, (b) any Customer Trust Account, (c) any License Trust Account, (d) Petty Cash Accounts, (e) any Barbados Account, (f) any Philippines Account, and (g) deposit accounts of any Loan Party or any of its Subsidiaries located outside of the United States, so long as, solely with respect to this clause (g), the aggregate amount of all cash and Cash Equivalents on deposit in such deposit accounts does not exceed $500,000 for any one deposit account and $1,000,000 in the aggregate for all such deposit accounts.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income, profits or gross margin (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.09(f)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.09(d) or 2.09(e), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Term Obligations" has the meaning set forth in the RSA.

"Extraordinary Receipts" means any cash received by any Loan Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(ii) or 2.05(c)(iii) hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than to the extent such consideration is (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person), (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received

17

in connection with any purchase agreement (other than to the extent such payments in connection therewith are (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person).

"Facility" means the real property identified on Schedule 1.01(B) and any New Facility hereafter acquired by any Loan Party or any of its Subsidiaries, including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"Fair Share" has the meaning specified therefor in Section 11.06.

"Fair Share Contribution Amount" has the meaning specified therefor in Section 11.06.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning specified therefor in Section 6.01(aa)(i).

"Fee Letter" means the fee letter, dated as of the date hereof, among the Borrowers and the Administrative Agent.

"Final Maturity Date" means, the earlier of (i) [__][1], 2027 and (ii) the earliest date on or as of which any such Loan is declared (or otherwise becomes, or is deemed to become) due and payable pursuant to the terms of this Agreement (including as provided in Section 9.01).

"Financial Statements" means (a) the audited consolidated balance sheet of GCS and its Subsidiaries for the Fiscal Year ended December 31, 2020, and the related consolidated statement of operations, members' capital and cash flows for the Fiscal Year then ended, and (b) the unaudited consolidated balance sheet of Prepetition Administrative Borrower and its Subsidiaries for the 12 months ended [August 2021], and the related consolidated statement of operations and cash flows for the 12 months then ended.

"First Lien Agent" means BSP Agency, as the administrative agent and as the collateral agent under the First Lien Financing Agreement, together with its successors and assigns in such capacities.

---

[1] NTD:  To be the sixth (6th) anniversary of the Effective Date.

18

"First Lien Credit Facility" means the term loan credit facilities provided pursuant to the First Lien Financing Agreement.

"First Lien Financing Agreement" means that certain First Lien Financing Agreement, dated as of the date hereof, by and among the Borrowers, as borrowers thereunder, the Parent and the other Guarantors, as guarantors thereunder, the First Lien Agent, and the First Lien Lenders, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreements.

"First Lien Indebtedness" means Indebtedness of the Loan Parties owing to the lenders and other secured parties under the First Lien Credit Facility.

"First Lien Lender" means, at any time, any Person that is a lender under the First Lien Financing Agreement as of such time.

"First Lien Loan Documents" means the Loan Documents (as defined in the First Lien Financing Agreement) as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the Intercreditor Agreements.

"Fiscal Year" means the fiscal year of the Parent and its Subsidiaries ending on December 31 of each year.

"Foreign Official" has the meaning specified therefor in Section 6.01(aa)(ii)(A).

"Funding Losses" has the meaning specified therefor in Section 2.08.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided that for the purpose of Section 7.03 hereof and the definitions used therein, "GAAP" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in Section 7.03 hereof, the Administrative Agent and the Administrative Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lenders and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 7.03 hereof shall be calculated as if no such change in GAAP has occurred.

"GC GP Buyer" has the meaning specified therefor in the preamble hereto.

"GC LP Buyer" has the meaning specified therefor in the preamble hereto.

"GCS" means GC Services Limited Partnership, a Delaware limited partnership.

"Goldman Group" means, at any time, Goldman Lenders who are not Defaulting Lenders, taken as a whole.

19

"Goldman Lenders" means, as of any time, the Goldman Persons that are Lenders at such time (each of them individually, a "Goldman Lender"); provided, that, upon any sale, assignment or other transfer (whether in a single or multiple transactions) by the Goldman Lenders of all Effective Date Committed Debt held collectively by them since the Effective Date through and including the date of such sale, assignment or transfer to a Goldman Successor, the term Goldman Lenders shall, as of such time, be construed to instead refer to such Goldman Successor.

"Goldman Person" means the following Persons, collectively, (a) Goldman Sachs Bank USA and Goldman Sachs BDC, Inc., (b) the Persons listed as a '*Goldman Lender*' on Schedule 1.01(A) hereto, (c) each of the Affiliates of any of the foregoing, and their and such Affiliates' respective Related Funds, investment advisors, managing members, and partners (and, each such Person, individually, a "Goldman Person").

"Goldman Successor" means (a) any Person (together with its Affiliates and Related Funds) that has become a Lender pursuant to an assignment, together with all other Affiliates and Related Funds that has become a Lender pursuant to an assignment, of all Effective Date Committed Debt of the Goldman Lenders subject to the terms of this Agreement, and (b) each subsequent assignee of the foregoing, or of any prior assignee therefrom, as applicable (in each case, together with each of their respective Affiliates and Related Funds).

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means any nation or government, any foreign, Federal, state, territory, provincial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) the Parent, (b) each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, and (c) each other Person that guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations; provided, that any Guarantor shall also be a guarantor of First Lien Indebtedness under the First Lien Credit Facility.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in Article XI hereof and (b) each other guaranty, in form and substance satisfactory to the Collateral

20

Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"Hazardous Material" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non- usurious interest rate than applicable laws now allow.

"Holdco Borrower"[2] has the meaning specified therefor in the preamble hereto.

"Holdout Lender" has the meaning specified therefor in Section 12.02(b).

"Houston Facility" means the real property and improvements located at 6330 Gulfton Street, Houston, Texas 77081.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was due and any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person); (c) all obligations of such Person evidenced by bonds (excluding performance bonds, bid

---

[2] To be the entity referred to as "New Holdco Sub".

bonds, appeal bonds and surety bonds under which no claim has been made), debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include, without duplication, the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Matters" has the meaning specified therefor in Section 12.15(a).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified therefor in Section 12.15(a).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" has the meaning specified therefor in the Security Agreement.

"Intellectual Property Contracts" means all agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"Intercompany Subordination Agreement" means the Intercompany Subordination Agreement, dated as of the date hereof, made by the Parent and its Subsidiaries in favor of the Collateral Agent for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent.

"Intercreditor Agreements" means, collectively, (a) the ABL/Term Intercreditor Agreement and (b) the Term Intercreditor Agreement.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account or cash.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"Joinder Agreement" means a Joinder Agreement, substantially in the form of Exhibit A, duly executed by a Subsidiary of a Loan Party made a party hereto pursuant to Section 7.01(b).

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"Lender" means (a) each Person whose name is set forth on Schedule 1.01(A) under the heading "Term Loan Lender" and that signed this Agreement as a Lender and thereby became a party hereto on the Effective Date, and (b) each Person that becomes a Lender hereunder at any time after the Effective Date in accordance with the terms hereof (including pursuant to an assignment in accordance with Section 12.07), for so long as such Person shall be (but only until such Person shall cease to be) a party to this Agreement as a Lender pursuant to the terms hereof.

"Lender Funding Account" has the meaning specified therefor in Section 2.02(c).

"License Trust Account" means any deposit account of a Loan Party specifically required by a State or other Governmental Authority to be maintained by such Loan Party as a trust account for the benefit of such State or Governmental Authority, pursuant to licensing and permitting requirements applicable to such Loan Party within such State's or Governmental Authority's jurisdiction, so long as such deposit account and all funds deposited therein are separately segregated from such Loan Party's general accounts and other cash.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any

23

Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"<u>Liquidity</u>" means a Dollar amount equal to (determined at any time as of the last Business Day of the calendar week preceding the week in which the calculation of Liquidity is being made):

(a)       the aggregate amount of unrestricted cash and Cash Equivalents maintained by the Borrowers in an account located in the United States subject to a Control Agreement;  *plus*

(b)       the aggregate amount available to be borrowed by any Borrower or any of its Subsidiaries under any ABL Facility in effect at such time (except to the extent that the Administrative Borrower determines that the pricing or terms thereof are unfavorable).

"<u>Loan</u>" means, generally, and unless the context requires otherwise, each loan or other credit extension (if any) made at any time to any Borrower pursuant this Agreement by any Person that is a Lender with an applicable Commitment at such time (all such loans and credit extensions, collectively, the "<u>Loans</u>").  As of the Effective Date, each Term Loan is a Loan.

"<u>Loan Account</u>" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrowers, in which the Borrowers will be charged with all Loans made to, and all other Obligations incurred by, the Borrowers.

"<u>Loan Document</u>" means this Agreement, any Control Agreement, the Fee Letter, any Guaranty, the Intercompany Subordination Agreement, the Intercreditor Agreements, any Joinder Agreement, any Mortgage, any Security Agreement, any UCC Filing Authorization Letter, any landlord waiver, any collateral access agreement, any Perfection Certificate, and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"<u>Loan Party</u>" means any Borrower and any Guarantor.

"<u>Material Adverse Effect</u>" means a material adverse effect on any of (a) the operations, assets, liabilities, financial condition of the Loan Parties taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on Collateral having individually or in the aggregate a fair market value in excess of $1,000,000.

"<u>Material Contract</u>" means, with respect to any Borrower, (a) the ABL Credit Agreement, (b) the First Lien Financing Agreement, and (c) all other contracts or agreements as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness in an aggregate principal amount of $2,000,000 or more.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to or had any liability at any time during the preceding 6 years.

"Net Cash Proceeds" means, with respect to, any issuance or incurrence of any Indebtedness, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (b) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (c) transfer taxes paid or payable to any taxing authorities by such Person or such Subsidiary in connection therewith, and (d) net income taxes paid or payable in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"New Facility" has the meaning specified therefor in Section 7.01(m).

"New Lending Office" has the meaning specified therefor in Section 2.09(e).

"Non-Funded Debt" has the meaning specified therefor in Section 1.04(b)(ii).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.09(e).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged,

stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees, premiums (including the Applicable Premium), attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"OFAC Sanctions Programs" means (a) the Requirements of Law and Executive Orders administered by OFAC, including, without limitation, Executive Order No. 13224, and (c) the list of Specially Designated Nationals and Blocked Persons administered by OFAC, in each case, as renewed, extended, amended, or replaced.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"paid in kind", "payable in kind", and "payment in kind" (as applicable) means, (a) as used with respect to the payment of any interest, that such interest shall be paid in the form of PIK Interest instead of in cash, and (b) as used with respect to the payment of any fees or other amount hereunder, that such amount shall be paid in the form of additional Loan principal, capitalized on the applicable payment date in a manner implemented by the Administrative Agent in accordance with its customary practices or as contemplated pursuant to the definition of PIK Interest (with the provisions thereof being construed for this purpose to apply to fees or such other amount instead of to interest).

"Parent" has the meaning specified therefor in the preamble hereto.

"Parent Common Equity" means common equity interests issued by the Parent and constituting New Common Equity (as defined in the RSA).

"Parent Company Agreement" means the Limited Liability Company Agreement of Parent dated as of [___], 2021, as amended or modified from time to time in accordance with such agreement and this Agreement.

"Parent Preferred Equity" means, collectively, Parent Senior Preferred Equity and Parent Junior Preferred Equity.

"<u>Parent Junior Preferred Equity</u>" means Series B junior preferred equity interests issued by the Parent as of the Effective Date to certain Goldman Persons and BSP Persons in accordance with the Restructuring Transactions and constituting [New Junior Preferred Equity (as defined in the RSA)].

"<u>Parent Senior Preferred Equity</u>" means Series A senior preferred equity interests issued by the Parent as of the Effective Date to certain Goldman Persons in accordance with the Restructuring Transactions and constituting [New Senior Preferred Equity (as defined in the RSA)].

"<u>Participant Register</u>" has the meaning specified therefor in Section 12.07(i).

"<u>Payment Office</u>" means the office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Administrative Borrower.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation or any successor thereto.

"<u>Perfection Certificate</u>" means a certificate in form and substance reasonably satisfactory to the Collateral Agent providing information with respect to the property of each Loan Party.

"<u>Permitted Acquisition</u>" means any acquisition (whether by means of a merger, consolidation or otherwise) of all or substantially all of the Equity Interests of any Person, or all or substantially all of the assets of (or any division or business line of) any Person by any Subsidiary of the Parent, to the extent that each of the following conditions shall have been satisfied:

(a)        such acquisition is permitted pursuant to the Parent Company Agreement or pursuant to any consent of the relevant holders of the equity interests therein in accordance with the terms thereof;

(b)        no Event of Default shall have occurred and be continuing or would result from the consummation of the proposed acquisition;

(c)        on a pro forma basis, the Total Secured Debt Leverage Ratio shall not exceed 5.50:1.00;

(d)        the assets being acquired (other than a *de minimis* amount of assets in relation to the Loan Parties' and their Subsidiaries' total assets) shall constitute Collateral, or the Person whose Equity Interests are being acquired shall become a Guarantor;

(e)        with respect to an acquisition in excess of $2,000,000, the Borrower shall have delivered to the Administrative Agent and the Lenders, at least ten Business Days prior to the date on which any such acquisition is to be consummated (or such shorter period as the Administrative Agent may agree) (1) a summary description of such acquisition, (2) to the extent prepared and available, a quality of earnings report from an accounting firm of recognized

27

standing or another third party firm reasonably acceptable to the Administrative Agent, (3) to the extent prepared and available, a due diligence package, including all insurance policies (if applicable) and to the extent provided to the Borrower by the target, historical financial statements including audited financial statements of the target, for the two fiscal years most recently ended, consisting of balance sheets and the related aggregated statements of income, stockholders' equity and cash flows for such fiscal year, any environmental reports (if applicable) prepared by, or on behalf of, the target, (4) drafts of the acquisition documents, together with related disclosure schedules, and following consummation of the acquisition executed copies of all such acquisition documents and (c) all documentation and other information required under applicable "know your customer" and anti-terrorism and anti-money laundering Laws requested in writing to the Borrower by the Administrative Agent with respect to the target and its Subsidiaries; and

(f)    the Purchase Price payable in respect of such acquisition, along with all other Permitted Acquisitions, shall not exceed $10,000,000 in the aggregate.

"Permitted Capital Expenditures" means the following Capital Expenditures by the Borrowers and/or any of their Subsidiaries: (a) Capital Expenditures and other projects designated in the business plan delivered by the Borrowers to the Agents as of the Effective Date, as modified and supplemented pursuant to any supplement, amendment, restatement or replacement of such business plan from time to time with the consent of the Administrative Agent (acting at the direction of Required BSP Lenders and Required Goldman Lenders (or, if no such Lenders exist, the Required Lenders)), (b) Capital Expenditures and other projects consented to from time to time by the Administrative Agent (acting at the direction of Required BSP Lenders and Required Goldman Lenders (or, if no such Lenders exist, the Required Lenders)), (c) Capital Expenditures and other projects approved by the board of the Parent upon recommendation of an independent financial advisor or consultant (reasonably satisfactory to the Required Lenders) and consented to by the Required Lenders, including to the extent necessary or desirable to preserve valuation in the business, and (d) incidental Capital Expenditures and other Capital Expenditures arising in the ordinary course of business (including telephone, computer and other types of IT and communications equipment and other electronics used by officers and employees) in an aggregate amount not to exceed $5 million in any twelve fiscal month period).

"Permitted Cure Equity" means Qualified Equity Interests of the Parent.

"Permitted Disposition" means:

(a)    sale of Inventory in the ordinary course of business;

(b)    licensing, on a non-exclusive basis, Intellectual Property rights in the ordinary course of business;

(c)    leasing or subleasing assets for fair market value in the ordinary course of business;

(d)    (i) the lapse of Registered Intellectual Property of the Parent or any of its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of business so long as (in each

28

case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

(e)    any involuntary loss, damage or destruction of property;

(f)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(g)    so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets from the Parent or any of its Subsidiaries to a Loan Party (other than the Parent);

(h)    Disposition for fair market value of obsolete or worn-out equipment in the ordinary course of business; and

(i)    Disposition of property or assets not otherwise permitted in clauses (a) through (h) above for cash in an aggregate amount not less than the fair market value of such property or assets; provided, that the Net Cash Proceeds of such Dispositions pursuant to this clause (i) (including the proposed Disposition) (1) do not exceed $1,000,000 in the aggregate in any Fiscal Year and (2) in all cases, are paid to the Administrative Agent for the benefit of the Agents and the Lenders to the extent required pursuant to the terms of Section 2.05(c)(ii) or applied as provided in Section 2.05(c)(vi).

"Permitted Holder" means any BSP Person, any group (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of which any of the BSP Persons are members as of the Effective Date and any other Person that is an equity holder of Parent as of the Effective Date, together with its Controlled Affiliates.

"Permitted Indebtedness" means:

(a)    any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)    any other Indebtedness listed on Schedule 7.02(b), and any Permitted Refinancing Indebtedness in respect of such Indebtedness;

(c)    Permitted Purchase Money Indebtedness, and any Permitted Refinancing Indebtedness in respect of such Indebtedness;

(d)    Permitted Intercompany Investments;

(e)    Indebtedness incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

(f)    any Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance

29

for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(g)     the incurrence by any Loan Party of Indebtedness under Hedging Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes;

(h)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business;

(i)     ABL Indebtedness in an aggregate principal amount not exceeding the ["Maximum ABL Obligations"] as defined in the ABL/Term Intercreditor Agreement;

(j)     Indebtedness of the Parent in respect of Parent Preferred Equity; provided that if the Parent Preferred Equity is converted into unsecured Indebtedness in accordance with the Parent Company Agreement, such Indebtedness shall be subordinated in right of payment pursuant to a subordination agreement on terms acceptable to the Required Lenders;

(k)     Subordinated Indebtedness of the of the Loan Parties in an aggregate principal amount not exceeding $5,000,000 at any time outstanding;

(l)     other unsecured Indebtedness in an aggregate principal amount not exceeding $1,000,000 at any time outstanding (including any such Indebtedness owing to any Seller that is incurred in connection with the consummation of one or more Permitted Acquisitions (including, without limitation, obligations under earn-out agreements and similar deferred purchase arrangements));

(m)     First Lien Indebtedness in an aggregate principal amount outstanding at any time not exceeding the amount permitted under the Term Intercreditor Agreement;

(n)     [reserved];

(o)     any Indebtedness of any of the Loan Parties or any of their Subsidiaries constituting Non-Funded Debt; and

(p)     all Non-Funded Debt arising in connection with each and any of the following: (i) the Obligations or the Loan Documents, and/or (ii) any obligations under the ABL Credit Facility, the First Lien Credit Facility, any Parent Preferred Equity and/or any debt or equity incurred in accordance with this Agreement and the Parent Company Agreement (including pursuant to any consent thereunder by the requisite holders of the Parent Common Equity and Parent Preferred Equity).

"Permitted Intercompany Investments" means Investments made by (a) a Loan Party to or in another Loan Party (other than the Parent), (b) a Subsidiary that is not a Loan Party to or in another Subsidiary that is not a Loan Party, (c) a Subsidiary that is not a Loan Party to or

in a Loan Party (other than the Parent), so long as, in the case of a loan or advance, the parties thereto are party to the Intercompany Subordination Agreement, and (d) a Loan Party to or in a Subsidiary that is not a Loan Party so long as (i) the aggregate amount of all such Investments made by the Loan Parties to or in Subsidiaries that are not Loan Parties does not exceed $2,500,000 at any time outstanding, (ii) no Default or Event of Default has occurred and is continuing either before or after giving effect to such Investment, and (iii) the Borrowers' Liquidity is not less than $5,000,000 after giving effect to such Investment.

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)    advances made in connection with purchases of goods or services in the ordinary course of business;

(d)    Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(e)    Investments existing on the date hereof, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof;

(f)    Permitted Intercompany Investments;

(g)    loans or advances made to any officers or employees of Parent or its Subsidiaries not to exceed $100,000 individually and $200,000 in the aggregate at any time outstanding, so long as such loans are repaid by the applicable employee within one (1) year following the date of the making of such loan or advance or such other date as may be consented to by the Administrative Agent;

(h)    so long as no Default or Event of Default has occurred and is continuing or would result therefrom, any other Investments in an aggregate amount not to exceed $1,000,000 at any time outstanding; and

(i)    Permitted Acquisitions.

"Permitted Liens" means:

(a)    Liens securing the Obligations;

(b)    Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(c)(ii);

(c)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)     Liens described on Schedule 7.02(a), provided that any such Lien shall only secure the Indebtedness that it secures on the Effective Date and any Permitted Refinancing Indebtedness in respect thereof;

(e)     purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business to secure Permitted Purchase Money Indebtedness so long as such Lien only (i) attaches to such property and (ii) secures the Indebtedness that was incurred to acquire such property or any Permitted Refinancing Indebtedness in respect thereof;

(f)     deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)     with respect to any Facility, easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)     Liens of landlords and mortgagees of landlords (i) arising by statute or under any lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)     the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease), in each case extending only to such personal property;

(j)     non-exclusive licenses of Intellectual Property rights in the ordinary course of business;

(k)     judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(j);

(l)        rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(m)        Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(n)        Liens securing (i) ABL Indebtedness constituting Permitted Indebtedness, so long as such Liens are subject to the ABL/Term Intercreditor Agreement, and (ii) First Lien Indebtedness constituting Permitted Indebtedness, so long as such Liens are subject to the Intercreditor Agreements;

(o)        Liens granted in the ordinary course of business to secure any Loan Party's contingent obligations in connection with any performance, surety, statutory or appeal bonds (which Liens shall not include any Liens on or pledges of the Equity Interests of any Loan Party or its Subsidiaries);

(p)        other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $1,000,000;

(q)        [reserved]; and

(r)        Liens securing Non-Funded Debt pursuant to clause (p) of the definition of "Permitted Indebtedness".

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations) incurred to finance the acquisition of any fixed assets secured by a Lien permitted under clause (e) of the definition of "Permitted Liens"; provided that (a) such Indebtedness is incurred within 270 days after such acquisition, (b) such Indebtedness when incurred shall not exceed the purchase price of the asset financed and (c) the aggregate principal amount of all such Indebtedness shall not exceed $5,000,000 at any time outstanding.

"Permitted Refinancing Indebtedness" means the extension of maturity, refinancing or modification of the terms of Indebtedness so long as:

(a)        after giving effect to such extension, refinancing or modification, the amount of such Indebtedness is not greater than the amount of Indebtedness outstanding immediately prior to such extension, refinancing or modification (other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto);

(b)        such extension, refinancing or modification has an average life to maturity that is greater than that of the Indebtedness so extended, refinanced or modified;

33

(c)     such extension, refinancing or modification is pursuant to terms that are not less favorable to the Loan Parties and the Lenders than the terms of the Indebtedness (including, without limitation, terms relating to the collateral (if any) and subordination (if any)) being extended, refinanced or modified; and

(d)     the Indebtedness that is extended, refinanced or modified is not recourse to any Loan Party or any of its Subsidiaries that is liable on account of the obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Permitted Restricted Payments" means any of the following Restricted Payments made by:

(a)     the Parent (and any Subsidiary of the Parent to the Parent to enable the Parent) to (i) pay customary expenses as and when due and owing by the Parent or any holding company thereof in the ordinary course of its business as a holding company (including salaries and related reasonable and customary expenses incurred by employees of the Parent or such holding company) in an aggregate amount not to exceed $[550,000] in any Fiscal Year and (ii) make Tax Distributions to its direct or indirect equityholders;

(b)     any Subsidiary of any Borrower to Borrower;

(c)     the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to make quarterly cash interest (or dividend) payments in respect of Parent Preferred Equity in accordance with the terms of the Parent Company Agreement (as in effect as of the Effective Date unless Goldman Lenders (or an Affiliate or Related Fund thereof) own the applicable Parent Preferred Equity as of such date), so long as, both before and after giving effect to any such payment, no Default or Event of Default shall have occurred and be continuing;

(d)     the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to redeem or repurchase Parent Preferred Equity in accordance with the terms of the Parent Company Agreement;

(e)     the Parent to pay dividends in the form of common Equity Interests;

(f)     the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to pay (i) fees and expenses due and payable to (a) any Person pursuant to the BSP Management Consulting Agreement (including the BSP Management Fee) as in effect on the Effective Date (and with respect of any modifications of payment terms or amounts after the Effective Date, as otherwise consented to by the Required BSP Lenders and Required Goldman Lenders), in each case, in such amounts and on such terms as set forth in, or as determined in accordance with, the BSP Management Consulting Agreement, (b) [Jim Eckstaedt] pursuant to the [  ], as in effect on the Effective Date, and (c) [Riveron] pursuant to the [  ], as in effect on the Effective Date and (ii) fees and expenses payable to any Person pursuant to any other management, consultancy or similar agreement or arrangement in effect at any time; provided, that the aggregate amount of Restricted Payments permitted to be made in any fiscal quarter in reliance on this clause (ii) shall not exceed $[55,000]; provided, however, that, notwithstanding the foregoing, if the aggregate amount of

34

Restricted Payments made in any fiscal quarter under this clause (ii) is less than $[55,000], the difference shall be permitted to be carried forward and may, at the Parent's election, be paid in any subsequent fiscal quarter(s)) (in addition to any amounts permitted to be paid in such fiscal quarter directly in reliance on this clause (ii)); provided, further, that no Restricted Payments shall be paid in reliance on this clause (ii) in cash in any fiscal quarter unless, both before and after giving effect to any such payment, no Event of Default shall have occurred and be continuing (provided, that, to the extent that any such amount is not permitted to be paid in cash at any time as a result of the foregoing, such amount shall accrue notwithstanding the occurrence and continuance of any Event of Default, and all such accrued amounts shall be permitted to be paid in cash as of such time as such Event of Default is no longer continuing, or as of such time that the Required Lenders shall waive or consent to a forbearance with respect thereto, as the case may be);

(g)  the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to repurchase Parent Preferred Equity or Parent Common Equity from time to time, and on one or more occasions, in each case, from present or former directors, officers, employees and other related parties (or their respective spouses, ex-spouses or estates) of any Loan Party or Subsidiary thereof upon the death, disability, retirement, severance or termination of service of such director, officer or employee, so long as both before and after giving effect to any cash payment in respect thereof, no Event of Default shall have occurred and be continuing; provided, that, the aggregate amount of Restricted Payments permitted to be made in any Fiscal Year in reliance on this clause (g) shall not exceed $2,000,000 in such Fiscal Year; provided, further, that amounts referred to herein shall accrue during, and notwithstanding the occurrence and continuance of, any Event of Default, and all such accrued amounts shall be permitted to be paid in cash as of such time as such Event of Default is no longer continuing, or as of such time that the Required Lenders shall waive or consent to a forbearance with respect thereto, as the case may; and

(h)  the Parent (and any Subsidiary of Parent to pay such amounts to the Parent) to make any Restricted Payments authorized or permitted pursuant to or in accordance with the Parent Company Agreement as in effect as of the Effective Date (unless Goldman Lenders (or an Affiliate or Related Fund thereof) own the applicable Parent Preferred Equity as of such date) (subject to compliance with the conditions thereunder (if any) relating to consent rights (if any) of any BSP Person and/or any Goldman Person, if applicable).

Notwithstanding anything to the contrary herein, if any Parent Preferred Equity is converted to Indebtedness in accordance with the Parent Company Agreement, then any reference to Parent Preferred Equity in this definition shall include such Parent Preferred Equity as converted.

"Permitted Specified Liens" means Permitted Liens described in clauses (a), (b), (c) and (n) of the definition of Permitted Liens, and, solely in the case of Section 7.01(b)(i), including clauses (g), (h) and (i) of the definition of Permitted Liens.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petty Cash Accounts" means Cash Management Accounts with deposits at any time in an aggregate amount not in excess of $50,000 for any one account and $250,000 in the aggregate for all such accounts.

"Philippines Account" means any deposit account or other bank account maintained by GC Services International LLC that is located in the Philippines.

 "PIK Interest" means, when used with respect to any interest accruing on any unpaid principal of any Loan, which is due and payable pursuant hereto on a Regular Interest Payment Date in the amount accrued and unpaid as of such time, that such interest in such amount shall not be required to be paid on such Regular Interest Payment Date in the form of cash, but, shall instead be permitted to be paid in the form of additional principal of such Loan, in an amount equal to the amount of the applicable interest payment due at such time, which payment shall be deemed made automatically (without any requirement for any Loan Party, Agent or any other Person to take any action or cause anything to occur) at 12:01 a.m. (New York City time) on the applicable Regular Interest Payment Date, it being agreed that such payment shall occur (and shall be deemed to occur) pursuant to the amount of such interest payment being deemed automatically capitalized and compounded onto, and treated as added to, the aggregate principal amount of such Loans outstanding immediately prior to such Regular Interest Payment Date and payment of such PIK Interest (and, accordingly, such payment shall also be deemed to be an automatic concurrent incurrence by the Borrowers of the applicable additional principal amount of such Loans and Obligations with respect thereto, but without any requirement to deliver any Notice of Borrowing with respect to such additional Loans, or to comply with any condition precedent that otherwise applies to the Borrowing of any Loans hereunder from the Lenders).  For the avoidance of doubt, upon payment of any PIK Interest on any Loans, interest accruing on such Loans as of the time of such payment shall be calculated on the basis of the aggregate principal amount of such Loans outstanding as of such time, pro forma for the amount of principal resulting from such payment of PIK Interest (and the resulting capitalization of the corresponding PIK Interest amount onto the previously outstanding principal).

"PIK Interest Payment" has the meaning specified therefor in Section 2.03.

"PIK Interest Rate" means 18.0% per annum.

 "Plan" means any Employee Plan or Multiemployer Plan.

["Plan of Reorganization" has the meaning specified therefor in the RSA.]

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.00%.

"Pre-Default Payment Waterfall" means, with respect to any payment towards or on account of any Loan or other Obligation (including any optional or voluntary prepayment, any mandatory prepayment and otherwise), whether made by any Loan Party or any Agent or other Person on its behalf, and as relates to any Lender's right to receive the same, as applicable, pursuant

to the terms set forth in Section 4.03(a) governing the right to make any such payment, and prescribing the order in which any such payment is to be applied (including with respect to application of such payments to respective Lenders), and the other provisions thereof governing the parties rights and obligations in connection with any such payments.

"Prepetition Administrative Borrower" means ORG GC Midco LLC, a Delaware limited liability company.

"Prepetition Group" means [ ].

"Prepetition Loan Parties" means, collectively, the Prepetition Parent, the Prepetition Administrative Borrower, and certain of the Prepetition Administrative Borrower's Subsidiaries party thereto as borrowers and guarantors, as applicable.

"Prepetition Parent" means ORG GC Holdings, LLC, a Delaware limited liability company.

"Prepetition Term Agent" means BSP Agency, as administrative agent and as collateral agent under the Prepetition Term Financing Agreement.

"Prepetition Term Financing Agreement" means that certain Financing Agreement, dated as of July 31, 2017 (as amended by that certain First Amendment to Financing Agreement, dated as of September 29, 2017, that certain Second Amendment to Financing Agreement, dated as of June 27, 2019, and as further amended, supplemented or otherwise modified through to, and as in effect on, the Petition Date), by and among the Prepetition Loan Parties, the Prepetition Term Lenders and the Prepetition Term Agent.

"Prepetition Term Lenders" means the Lenders and/or their respective affiliates who are party to the Prepetition Term Facility Credit Agreement as lenders thereunder.

"Projections" means the financial projections of the Parent and its Subsidiaries delivered pursuant to Section 6.01(g)(ii).

"Pro Rata Share" means a Lender's obligation to make its Term Loan, and its right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by _dividing_ (x) such Lender's Term Loan Commitment _by_ (y) the Total Term Loan Commitment; provided, that, if the Total Term Loan Commitment is zero ($0.00), such percentage shall instead be obtained by dividing the aggregate then-outstanding unpaid principal amount of such Lender's Term Loans by the aggregate then-outstanding unpaid principal amount of all Term Loans; provided, however, that (A) percentage calculations hereunder shall be carried out to the ninth (9th) decimal place, and (B) the outstanding or unpaid principal amount of Loans at any time shall include principal constituting all PIK Interest payments made thereon prior to such time, and shall be determined in accordance with Section 1.04(c).

"Purchase Price" means, with respect to any acquisition, an amount equal to the sum of (a) the aggregate consideration, whether cash, property or securities (including, without limitation, the fair market value of any Equity Interests of any Loan Party or any of its Subsidiaries

issued in connection with such acquisition), paid or delivered by a Loan Party or any of its Subsidiaries (whether as initial consideration or through the payment or disposition of deferred consideration, including, without limitation, in the form of seller financing, royalty payments, payments allocated towards non-compete covenants, payments to principals for consulting services or other similar payments) in connection with such Acquisition, plus (b) the aggregate amount of liabilities of the acquired business (net of current assets of the acquired business) that would be reflected on a balance sheet (if such were to be prepared) of the Parent and its Subsidiaries after giving effect to such acquisition, plus (c) the aggregate amount of all transaction fees, costs and expenses incurred by the Parent or any of its Subsidiaries in connection with such acquisition.

"Qualified Cash" means, as of any date of determination, the aggregate amount of unrestricted cash on-hand of the Loan Parties maintained in deposit accounts in the name of a Loan Party in the United States as of such date, which deposit accounts are subject to Control Agreements.

"Qualified Equity Interests" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"Rate" refers to the 'form' or 'mechanism' of the interest rate applicable to any Indebtedness or other obligation, as the case may be.

"Real Property Deliverables" means each of the following agreements, instruments and other documents in respect of each Facility:

(a)     a Mortgage duly executed by the applicable Loan Party;

(b)     evidence of the recording of each Mortgage in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Collateral Agent and the Lenders thereunder;

(c)     a Title Insurance Policy with respect to each Mortgage, dated as of the Effective Date;

(d)     a current ALTA survey and a surveyor's certificate, in form and substance satisfactory to the Collateral Agent, certified to the Collateral Agent and to the issuer of the Title Insurance Policy with respect thereto by a professional surveyor licensed in the state in which such Facility is located and satisfactory to the Collateral Agent;

(e)     in the case of a leasehold interest, a copy of the lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest;

(f)     if available in the jurisdiction(s) in which any Facility is located, a copy of each letter issued by the applicable Governmental Authority, evidencing each Facility's compliance with all applicable building codes, fire codes, other health and safety rules and

38

regulations, parking, density and height requirements and other building and zoning laws together with a copy of all certificates of occupancy issued with respect to each Facility;

(g)     [reserved];

(h)     if required by the Collateral Agent, a satisfactory ASTM 1527-00 Phase I Environmental Site Assessment ("Phase I ESA") provided by the Borrowers to the Collateral Agent (and, if requested by the Collateral Agent based upon the results of such Phase I ESA, an ASTM 1527-00 Phase II Environmental Site Assessment) of each Facility, in form and substance and by an independent firm satisfactory to the Collateral Agent; and

(i)     such other agreements, instruments and other documents (including guarantees and opinions of counsel) as the Collateral Agent may reasonably require.

"Recipient" means any Agent and any Lender, as applicable.

 "Register" has the meaning specified therefor in Section 12.07(f).

"Registered Intellectual Property" means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

"Registered Loans" has the meaning specified therefor in Section 12.07(f).

"Regular Interest Payment Date" means the last Business Day of each March, June, September and December .

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, any other Person (except a natural person) that is (a) an Affiliate of such Person, or (b) any partnership, fund or account managed or advised by such Person (or by an Affiliate of such Person).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the

39

indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Replacement Lender" has the meaning specified therefor in Section 12.02(b).

"Report" has the meaning specified therefor in Section 10.13(a).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section or for which such provision is waived).

"Required BSP/Goldman Lender Consent Expiry Date" refers to the date determined by the Administrative Agent pursuant to clauses (b) and (c) of the definition of Required Lenders to be the earliest or first date after the Effective Date as of which no Lender that is a party hereto at such time constitutes either a Required BSP Lender or a Required Goldman Lender; provided, that, for the avoidance of doubt, such date shall be deemed to be the same as the later of (i) the Required BSP Lender Consent Expiry Date and (ii) the Required Goldman Lender Consent Expiry Date.

"Required Lenders" means, as of any time of determination, Lenders whose Pro Rata Shares as of such time aggregate at least 50.1%; provided, however, that:

(a) Solely to the extent the Suspension Date has not occurred, if the number of Unaffiliated Lenders holding Effective Date Committed Debt is two (2) or more, then the "Required Lenders" as of such time shall be required to include at least two (2) Lenders who are Unaffiliated Lenders at such time;

(b) during the period commencing on the Effective Date and ending on (and as of) the first date (the "Required BSP Lender Consent Expiry Date") that the aggregate amount of Effective Date Committed Debt held by BSP Lenders who are not Defaulting Lenders represents less than 34% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders, "Required Lenders" shall be required to include, and consent of Required Lenders shall not be deemed to have been obtained without the consent of, BSP Lenders who are not Defaulting Lenders (such BSP Lenders, but only until the Required BSP Lender Consent Expiry Date, collectively, the "Required BSP Lenders", and, each individually, a "Required BSP Lender"); and

(c) during the period commencing on the Effective Date and ending on (and as of) the first date (the "Required Goldman Lender Consent Expiry Date") that the aggregate amount of Effective Date Committed Debt held by Goldman Lenders who are not Defaulting Lenders represents less than 34% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders, "Required Lenders" shall be required to include, and consent of Required Lenders shall not be deemed to have been obtained without the consent of, Goldman Lenders who are not Defaulting Lenders (such Goldman Lenders, but only until the Required

40

Goldman Lender Consent Expiry Date, collectively, the "Required Goldman Lenders", and, each individually, a "Required Goldman Lender").

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning specified therefor in Section 10.07.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Restricted Payment" means (a) the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (b) the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party, any Subsidiary thereof or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (c) the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (d) the return of any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such or (e) the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party, but not including payments to employees in the ordinary course of business in accordance with the Loan Parties' regular payroll or employment practices or otherwise pursuant to employment agreements entered into with such employees.

"Restructuring Documents" means, collectively, the RSA, the Plan of Reorganization, the Chapter 11 Plan Confirmation Order, and any and all other agreements, orders, documents or instruments relating to the Restructuring Transactions.

41

"Restructuring Transactions" means any and all restructuring, recapitalization and other transactions relating to the Prepetition Group described in the Restructuring Documents, together with any and all other transactions consummated in connection therewith.

"RSA" means that certain Restructuring Support Agreement, dated as of [_____], 2021 (together with all annexes, exhibits and other attachments thereto), by and among the Prepetition Group, certain of the Prepetition Administrative Borrower's Affiliates, the Prepetition Term Agent, the Prepetition Term Lenders and certain other persons.

"Sale and Leaseback Transaction" means, with respect to the Parent or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Parent or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Secured Party" means any Agent and any Lender.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 12.07(l).

"Security Agreement" means a Pledge and Security Agreement, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"Senior Lien Debt" means, collectively, the principal of (a) all First Lien Indebtedness, (b) [all Loans that are secured on a senior basis by a Lien on Collateral] and (c) outstanding ABL Loans. Unless expressly specified otherwise, references to any Senior Lien Debt as of any time of determination shall be construed as references to aggregate principal amount thereof outstanding as of such time.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is not less than the total amount of the liabilities of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its existing debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in

business or a transaction, for which such Person's property would constitute unreasonably small capital.

"Specified Event of Default" means any Event of Default pursuant to Section 9.01(a), Section 9.01(f) or Section 9.01(g).

"Specified Financial Covenant" has the meaning specified therefor in Section 9.02.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person. References to a Subsidiary shall mean a Subsidiary of the Parent unless the context expressly provides otherwise.

"Subordinated Indebtedness" means unsecured Indebtedness of any Loan Party the terms of which (including, without limitation, payment terms, interest rates, covenants, remedies, defaults and other material terms) are satisfactory to the Collateral Agent and the Required Lenders and which has been expressly subordinated in right of payment to all Indebtedness of such Loan Party under the Loan Documents (a) by the execution and delivery of a subordination agreement, in form and substance satisfactory to the Collateral Agent and Required Lenders, or (b) otherwise on terms and conditions satisfactory to the Collateral Agent and Required Lenders.

"Suspension Date" means, and shall be deemed to occur upon, the first date after the Effective Date that the aggregate amount of Effective Date Committed Debt held by Goldman Lenders who are not Defaulting Lenders represents less than 17% of all Effective Date Committed Debt held at such time by Lenders who are not Defaulting Lenders.

"Tax Distributions" means, for any period that Parent is treated as a pass-through entity under the Code, distributions made to the holders of Parent's equity interests at such times and in such amounts as are permitted under Section 13.1 of the Parent Company Agreement, as in effect on the date hereof.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Termination Date</u>" means the first date on which all of the Obligations are paid in full in cash and the Commitments of the Lenders are terminated.

"<u>Termination Event</u>" means (a) a Reportable Event with respect to any Employee Plan, (b) any event with respect to an Employee Plan that causes any Loan Party or any of its ERISA Affiliates to incur material liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition that could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

"<u>Term Intercreditor Agreement</u>" means the 1L/2L Term Intercreditor Agreement, dated as of the date hereof, by and among the Collateral Agent and the First Lien Agent, and acknowledged by the Loan Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"<u>Term Loan Commitment</u>" means, with respect to any Lender the commitment or obligation (if any) of such Lender to make (or be deemed to make) an Term Loan in the aggregate principal amount set forth on <u>Schedule 1.01(A)</u> hereto opposite such Lender's name under the heading "Term Loan Commitment"; <u>provided</u>, that, for the avoidance of doubt, such Term Loan Commitment shall be reduced to zero ($0) automatically and immediately upon such Lender being deemed to make an Term Loan pursuant to <u>Section 2.01</u>.

"<u>Term Loan Facility</u>" refers to the Term Loan Commitments and Term Loans of the Lenders hereunder, together with all Obligations in respect thereof, which shall be deemed to constitute a single credit facility provided to the Borrowers on the terms set forth in this Agreement and the other Loan Documents.

"<u>Term Loans</u>" means, collectively, the term loans made (or be deemed to be made) by the Term Loan Lenders to the Borrowers on the Effective Date pursuant to Section 2.01(a) (and, each such term loan, a "<u>Term Loan</u>").

"<u>Term Loan Lender</u>" means (a) on the Effective Date, each Lender that has an Term Loan Commitment, as set forth on <u>Schedule 1.01(A)</u> hereof under the heading "Term Loan Lender", and (b) as of any time after the Term Loans are made (or deemed made) on the Effective, each Person that, pursuant to the terms hereof, is Lender holding any Term Loan at such time (including pursuant to, and upon effectiveness of, an assignment in accordance with Section 12.07 and the other terms hereof); <u>provided</u>, that, a Person shall cease to be an Term Loan Lender immediately upon such time as such Person shall cease to be an Term Loan Lender or a Lender (as applicable) in accordance with the terms hereof (including, without limitation, upon an assignment by such Person of all Term Loans held by it pursuant to an effective Assignment and Acceptance, and otherwise in accordance with Section 12.07 and the other terms hereof).

"Term Loan Obligations" means any Obligations with respect to the Term Loan (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Priority Collateral" means "Term Priority Collateral" as defined in the ABL/Term Intercreditor Agreement.

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued to the Collateral Agent by or on behalf of a title insurance company selected by or otherwise satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"Total Commitment" means, as of any time, the aggregate amount of all Commitments of all Lenders in effect at such time. For the avoidance of doubt, on the Effective Date, the Total Commitment is the same as the Total Effective Date Commitment.

"Total Effective Date Commitment" means an amount equal to sum of the amount of the Total Term Loan Commitment in effect prior to the time that any Loan is made (calculated using the Dollar amounts referred to in clause (a) of the definitions of such terms).

"Total Term Loan Commitment" refers to the sum of the Term Loan Commitments of all Lenders as of any time, taken as a whole, and means (a) $29,000,000 (until the time that Term Loans are deemed made on the Effective Date in accordance herewith) or (b) $0.00 (as of, and at all times after, the Term Loans are made (or deemed to be made) on the Effective Date in accordance herewith).

"Total Secured Debt Leverage Ratio" means, with respect to the Borrowers and their Subsidiaries, the ratio of: (a) (i) the sum of the aggregate amount of the Borrowers' and their Subsidiaries' Senior Lien Debt and the Obligations outstanding as of such time, _minus_ (ii) the aggregate amount of unrestricted cash and Cash Equivalents maintained by the Loan Parties in an account located in the United States subject to a Control Agreement not to exceed $5,000,000 (provided that proceeds of any borrowing on such date shall be excluded from unrestricted cash and Cash Equivalents) to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrowers for which financial statements have been furnished pursuant to Section 7.01(a).

"Total Senior Lien Leverage Ratio" means, with respect to the Borrowers and their Subsidiaries (if used in connection with (x) the determination of the Applicable ECF Percentage, for the 12 consecutive fiscal months ending on the applicable measurement date, and (y) any other matter, as of the last Business Day of the full fiscal quarter ending immediately prior to the applicable date of determination for which financial statements have been delivered) the ratio of (a) (i) the aggregate amount of the Borrowers' Senior Lien Debt of the Borrowers and their Subsidiaries outstanding as of such time, _minus_ (ii) the aggregate amount of unrestricted cash and Cash Equivalents maintained by the Loan Parties in an account located in the United States subject to a Control Agreement not to exceed $5,000,000 (provided that proceeds of any borrowing on

such date shall be excluded from unrestricted cash and Cash Equivalents) to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrowers for which financial statements have been furnished pursuant to Section 7.01(a).

"Transferee" has the meaning specified therefor in Section 2.09(a).

"UK Act" has the meaning specified therefor in Section 6.01(aa).

"Unaffiliated Lenders" means, as used with respect to a group of Lenders, Lenders in such group who are not Affiliates, Controlled Investment Affiliates or Related Funds of one another.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in Section 1.04(c).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001)) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"WARN" has the meaning specified therefor in Section 6.01(p).

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Working Capital" means, at any date of determination thereof, (a) the sum, for any Person and its Subsidiaries, of (i) the unpaid face amount of all Accounts of such Person and its Subsidiaries as at such date of determination, plus (ii) the aggregate amount of prepaid expenses and other current assets of such Person and its Subsidiaries as at such date of determination (other than cash, Cash Equivalents and any Indebtedness owing to such Person or any of its Subsidiaries by Affiliates of such Person), minus (b) the sum, for such Person and its Subsidiaries, of (i) the unpaid amount of all accounts payable of such Person and its Subsidiaries as at such date of determination, plus (ii) the aggregate amount of all accrued expenses of such Person and its Subsidiaries as at such date of determination (other than the current portion of long-term debt and all accrued interest and taxes).

Section 1.02    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to

any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03   <u>Certain Matters of Construction</u>.  References in this Agreement to "determination" or "calculation" by any Agent include good faith and commercially reasonable estimates by such Agent (in the case of quantitative determinations) and good faith and commercially reasonable beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders (or such other Lenders as required herein).  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders.  Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to the actual knowledge of a senior officer of any Loan Party.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04   <u>Accounting and Other Terms</u>.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted to the Administrative Agent or the Lenders pursuant to this Agreement shall be prepared in conformity with, GAAP (including the impact of "fresh start" accounting under Accounting Standards Codification 852), applied in a manner materially consistent with that used in preparing the Financial Statements, except as otherwise specifically

prescribed herein. For purposes of determining compliance with any incurrence or expenditure tests set forth in this Agreement (including Section 7.01, Section 7.02 and Section 7.03), any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time).  Unless expressly specified otherwise herein, each reference in this Agreement or in any other Loan Document to (x) any "cash", any "monies" or "money", or any "funds" (or to any amount thereof) shall be construed as a reference to Dollars (and such amount in Dollars), and such terms shall be deemed to be used interchangeably but with the same meaning in each case, and (y) any "payment" or "funding" to any Person (or any form or manner of any payment or funding, as the case may be) shall be construed as requiring a transfer or other delivery to such Person of Dollars of the applicable amount in cash, and (except in the case of PIK Interest, but solely to the limited extent expressly provided herein), nothing payable by any Loan Party or any of its Subsidiaries hereunder or on account of any Obligations shall be permitted to be paid "in kind", or in any other form or currency except in Dollars.  Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 840 or 842 on the definitions and covenants herein, GAAP as in effect on the Effective Date shall be applied and (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)     Subject to clause (ii) hereof, and unless expressly specified otherwise elsewhere in this Agreement:

(i)     All references in the Loan Documents to (A) the "amount", "principal amount" or "face amount" of any Loan or other Obligation, or any other Indebtedness referred to herein, shall be construed have the same meaning and effect, and shall be deemed to refer to the "outstanding" amount thereof as of the applicable time and/or date of determination (each, a "Reference Time"), and (B) the "outstanding" amount of any Indebtedness shall be (x) the amount thereof as of the applicable time of determination that has not been previously paid by the obligors thereof (which shall be the Loan Parties in the case of any Loan or other Obligation) to

the creditors or other beneficiaries thereof or Persons entitled to the same pursuant to the terms of such Indebtedness (which shall be one or more Lenders, or other Secured Parties or Persons determined in accordance with the Loan Documents) and remains owing (or shall become payable), and (y) valued as the accreted value thereof (in the case of any Indebtedness issued with original issue discount), or the principal amount or liquidation preference thereof (in the case of any Indebtedness not issued with original issue discount); provided, that, without limiting clause (ii) below, whenever calculating the amount of any specific payment of any Obligation that any Loan Party is required to pay at any specified time, and whenever determining any Lender's Pro Rata Share, the "amount" of the relevant Loan and/or other Obligation shall be calculated pro forma for all PIK Interest paid at any time prior to such Reference Time.

(ii)     For purposes of calculating the amount of any Loans or other Indebtedness (including any Indebtedness referred to in the definition of Permitted Indebtedness, as applicable) as of any time for purposes of determining compliance with, and/or calculating the amount of additional Indebtedness and/or Liens permitted to be incurred at such time pursuant to any test governing incurrence of Indebtedness and/or Liens (including any First Lien Indebtedness, or any other incurrence test set forth in Section 2.12, Section 7.02 or any other provision of this Agreement, any Intercreditor Agreement or any other Loan Document (as applicable)), including any test or provision that limits such incurrence by express reference to a Dollar amount of Indebtedness (or any "outstanding" amount), or that indirectly limits the Dollar amount of any Indebtedness or Liens that may be incurred by conditioning the same on compliance with a specified level pursuant to a leverage ratio based test or any other ratio-based test that is affected by the amount of any Indebtedness, or any costs associated therewith (including any "fixed charge coverage ratio" or "interest coverage ratio" test), (A) the "amount" or "outstanding amount" of any Indebtedness for purposes of a provision pursuant to which Indebtedness is sought to be incurred or permitted shall include amounts actually outstanding resulting from accrual or payment of any interest thereon (including PIK Interest hereunder and any interest paid "in-kind" on any other Indebtedness), accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of any fees or other amounts "in-kind" thereunder in the form of additional principal of such Indebtedness, the payment of dividends in the form of additional shares of any preferred stock or other equity interests, or the reclassification of commitments or obligations not treated as Indebtedness due to a change in GAAP (the foregoing, collectively, "Non-Funded Debt"), and (B) following such initial incurrence, if any such Indebtedness accrues or arises under any Non-Funded Debt, the same shall not be deemed to be an "incurrence" of such Indebtedness for purposes of Sections 2.12, 7.02 or any other provision that limits the amount of such Indebtedness that may be incurred, or be permitted to exist or be outstanding at any time hereunder, and all Non-Funded Debt and Liens thereon shall be deemed to be permitted hereunder pursuant to Section 7.02, and clause (p) of the definition of Permitted Indebtedness (and, if secured, clause (r) of the definition of Permitted Liens).

(c)     All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code" or the "UCC") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof

shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine

(d)    The aggregate principal amount (if any) of any Loan that any Lender shall be required to fund on any specified Borrowing Date (to the extent requested by the Borrowers in accordance with the terms hereof) shall not exceed such Lender's Commitment, determined as of the requested Borrowing Date but after taking into account (and net of) the aggregate principal amount of all Loans previously funded by such Lender under such Commitment, and the corresponding reduction to the amount of such Commitment resulting therefrom, and, accordingly, any reference herein or in any other Loan Document to any Lender's "unfunded", "undrawn", "unutilized" or "remaining" Commitment at or as of any time shall be construed in accordance with the foregoing, and such Lender shall not at any time be required to fund any amount of Loans exceeding its then-unfunded Commitment therefor.

Section 1.05    Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, (i) the word "from" any specified date, time or other reference point, as applicable, means "from and including" such date, time or other reference point, as applicable (and the words "as of" any specified date, time or other reference point, as applicable, shall be construed have the same meaning and effect as the foregoing, and to require any determination to be made in the same manner), and (ii) the words "to", "through to", and "until" any specified date, time or other reference point, as applicable, each means "to but excluding" such date, time or other reference point; provided, however, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.

## ARTICLE II

## THE LOANS

Section 2.01    Commitments.

(a)    Term Loan Commitments.  Subject to the terms and conditions, and relying upon the representations and warranties set forth herein, each Term Loan Lender hereby agrees that, automatically and immediately upon the Effective Date occurring, it shall hereby be deemed to have made a term loan to the Borrowers pursuant to this Section 2.01(a) (a "Term Loan") in an aggregate principal amount equal to such Term Loan Lender's Term Loan Commitment (such Term Loan Lender's Term Loan, together with the Term Loans of the other Term Loan Lenders, collectively, the "Term Loans").

(b)    Immediately and automatically upon the deemed making by each Lender of its Term Loan on the Effective Date, (i) such Lender's Term Loan Commitment shall permanently terminate, and shall be deemed extinguished, cancelled, and discharged in full, and (ii) to the extent required or applicable in connection with the Restructuring Transactions, such Lender's Existing Term Obligations, or portion thereof (as applicable and determined in accordance with the Restructuring Documents) shall be (and shall be deemed to be) satisfied and discharged (or shall be deemed exchanged for, and refinanced with the proceeds deemed hereby to have been provided

under, the Term Loans, in each case, as determined pursuant to the Restructuring Documents). The Total Term Loan Commitment shall be automatically reduced to zero and terminated when the Term Loans are deemed made hereunder.

(c)     Term Loans shall be deemed to have been made and incurred as described herein automatically by operation of law and pursuant to the contract hereunder and under the Restructuring Documents, and pursuant to the Chapter 11 Plan, and the Bankruptcy Court orders in the Chapter 11 Cases, as applicable.  Term Loans shall be made on a "cashless" basis, and no Term Loan Lender shall be required to fund or transfer any cash in connection therewith, or as a condition to the incurrence by the Borrowers of Indebtedness and other Obligations in respect thereof.

(d)     The Term Loans, and the Term Loan Lenders' agreements and commitments hereunder, shall be deemed to satisfy and discharge certain obligations of the Lenders and/or their Affiliates under the Restructuring Documents, and shall constitute additional consideration for certain benefits received by them in connection with the Restructuring Transactions, as applicable.

(e)     [Reserved].

(f)     [Reserved].

(g)     [Reserved].

(h)     Re-borrowings.    Once repaid, prepaid or otherwise discharged in accordance with the terms hereof, no Loan (or any portion thereof) may be reborrowed.

Section 2.02   Making the Loans.  (a)  (i) The Administrative Borrower shall be deemed to have requested (on behalf of the Borrowers, taken as a whole) Term Loans from the Term Loan Lenders in an aggregate principal amount equal to the Total Term Loan Commitment automatically pursuant to the deemed making of such Loans pursuant to Section 2.01(a), and delivery of a Notice of Borrowing shall not constitute a condition precedent to the effectiveness of the Borrowers' request (or deemed request) for such Term Loans, or be required in connection with the making and Borrowing (or deemed making and Borrowing) of Term Loans pursuant to Section 2.01(a); provided, that the Administrative Borrower may, at its sole option, elect to deliver a Notice of Borrowing for the Term Loans notwithstanding the absence of a requirement to do so pursuant to the foregoing, and, so long as such Notice of Borrowing is delivered to the Administrative Agent not later than the Effective Date, the terms set forth therein shall be deemed to govern the Term Loans, notwithstanding any conflict between the terms thereof and hereof.

(ii)     The Administrative Borrower shall give the Administrative Agent prior written notice (in substantially the form of Exhibit C hereto (a "Notice of Borrowing"), which may be delivered via e-mail or as otherwise permitted hereunder) of its request for a Borrowing of any Loan available to be borrowed at any time hereunder (except the Term Loans, which shall be governed by Section 2.02(a)(ii)) not later than 12:00 noon (New York City time) on the date which is 3 Business Days prior to the proposed Borrowing Date for such Loan (or such shorter period as the Administrative Agent is willing to accommodate from time to time).  Such Notice of Borrowing

51

shall be irrevocable and shall specify (i) the aggregate principal amount of the proposed Loan; provided, that no Notice of Borrowing shall be valid or effective with respect to any Borrowing unless the Total Commitment for the requested Loans is equal to or greater than the aggregate principal amount of such Loan, (ii) the proposed Borrowing Date, which must be a Business Day, and (iii) the wire instructions for the account to which funds in respect of the requested Loan should be transferred (or, if the Borrowers desire that more than one Person shall receive any portion of such funds, wire instructions for each such recipient's account and the amount to be transferred thereto). The Administrative Agent and the Lenders may act without liability upon the basis of any written, e-mail, telecopied or telephonic notice (including any Notice of Borrowing) believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent). The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Borrowers until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any Notice of Borrowing or any other notice delivered hereunder.

(b)   Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrowers shall be bound to make a Borrowing in accordance therewith.

(c)   Each Loan shall be made as part of a single Borrowing consisting of Loans. All Loans comprising the same Borrowing shall be made (or deemed made, as the case may be) by the Lenders on the requested Borrowing Date proportionately to their Pro Rata Shares of the Commitment for such Loans , and each Lender shall make each Loan required to be made by it pursuant to this Agreement (except the Term Loans, which shall be deemed made automatically as provided in Section 2.01(a)) by funding the Dollar amount thereof on the requested Borrowing Date to the account specified by the Administrative Agent to such Lender for purposes hereof (such account, the "Lender Funding Account") (and such Lender shall, for all purposes, be deemed to have made such Loan as of the time of such funding, notwithstanding that such funds shall not have been funded to any of the Loan Parties at such time), it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender. Subject to receipt by the Administrative Agent of Lender funds representing Loans requested to be made on such Borrowing Date, the Administrative Agent shall make the proceeds of such Loans available to the Borrowers by causing an amount, in immediately available funds, equal to the proceeds of such Loans received by the Administrative Agent, to be credited to the Loan Account (or such other account specified in the Notice of Borrowing for such purpose); provided, that, the Administrative Agent shall not be required to make available to the Borrowers any funds on the same Business Day as funds are received by the Administrative Agent into the Lender Funding Account if the Administrative Agent determines that it is operationally unable to do so, and such funds shall in such event be made available in accordance with the Administrative Agent's customary practices.

Section 2.03    Repayment of Loans; Evidence of Debt.

(a)    Subject to the Term Intercreditor Agreement, the outstanding or otherwise unpaid principal amount of each Loan, and all accrued and unpaid interest thereon, shall be due and payable, and shall be paid by the Borrowers, on the Final Maturity Date.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to Section 2.03(b) shall be _prima facie_ evidence of the existence and amounts of the obligations recorded therein absent manifest error; _provided_ that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent and reasonably acceptable to the Administrative Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04    Interest.

(a)    Loans.  Each Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the PIK Interest Rate.

(b)    Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, (i) automatically upon the occurrence and during the continuance of any Specified Event of Default, and (ii) the Required Lenders may, by notice to the Administrative Agent and the Administrative Borrower, elect for all other Events of Default, in each case the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(c)  Interest Payments.  Interest on each Loan (except interest accruing at the Post-Default Rate) shall be payable in arrears on (i) each Regular Interest Payment Date. (ii) each date of any prepayment or repayment of such Loan (including the date such Loan is required to be repaid or prepaid in connection with any mandatory or optional prepayment) and (iii) the Final Maturity Date.  Interest at the Post-Default Rate shall be payable on demand.  Except  in the case of any interest due on any Regular Interest Payment Date on any Loans, which shall be paid in kind, interest on the Loans (including interest accruing at the Post-Default Rate) shall be payable at the times required hereunder in the form of cash.  Each Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account pursuant to Section 4.01 with the amount of any interest payment due hereunder.

(d)  General. All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

(e)  PIK Interest.  Subject to the terms and conditions hereof, any interest accruing on any Loan (except interest accruing at the Post-Default Rate), shall, if and to the extent due and payable on a Regular Interest Payment Date, be paid on such Regular Interest Payment Date in the form of PIK Interest (the amount of interest to be payable as PIK Interest pursuant hereto, to the extent accruing on Loans, and payable on the Regular Interest Payment Date, each, a "PIK Interest Payment"). For the avoidance of doubt, this Section 2.04(e) shall not permit a PIK Interest payment of any interest that is payable on the Final Maturity Date, or on the date of any repayment or prepayment of any Loan (whether pursuant to a voluntary or mandatory prepayment, acceleration or otherwise), or any other due date except a Regular Interest Payment Date, and only the amount of accrued interest representing a regular interest payment pursuant to Section 2.04(a) shall be permitted to be paid as PIK Interest.

Section 2.05   Termination or Reduction of Total Commitments; Prepayment of Loans.

(a)  Termination or Reduction of Total Commitments.  The Total Term Loan Commitment shall permanently terminate in full (and shall be deemed permanently reduced to zero ($.00), and cancelled and extinguished in its entirety) automatically upon, and concurrently with, the deemed making of Term Loans on the Effective Date pursuant to Section 2.01(a).

(b)  Optional Prepayment; Optional Termination of Commitments and/or Agreement.

(i)  Optional Prepayment of Loans.  Subject to the Term Intercreditor Agreement, the Borrowers may, at any time and from time to time, upon at least two (2) Business Days' prior written notice to the Administrative Agent, prepay the principal of outstanding Loans, in whole or in part, and each prepayment made pursuant to this clause (b)(i) shall be accompanied by the payment of (A) accrued interest on the amount of the applicable Loan being prepaid, calculated through the date of such payment and (B) the Applicable Premium, if any, payable in connection with such prepayment of such Loan; provided, that, notwithstanding the foregoing, no Loans shall be prepaid (and no other payments shall be permitted to be made on account of any Loans) except to the extent in accordance with the requirements of the Pre-Default Payment Waterfall, subject to the terms of Section 4.03(b), as applicable.

54

(ii)     Optional Termination of Commitments and Optional Termination of Agreement.  The Borrowers may, upon at least two (2) Business Days' prior written notice from the Administrative Borrower to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations in full, *plus* the Applicable Premium, if any, payable in connection with such termination of this Agreement.  If the Administrative Borrower has sent a notice of termination of this Agreement pursuant to this Section 2.05(b)(ii), then, unless such notice is expressed to be conditional and revocable (as set forth in the proviso below), the Borrowers shall be obligated to repay the Obligations in full, plus the Applicable Premium, if any is payable in connection with such termination of this Agreement on the date set forth as the date of termination of this Agreement in such notice; provided, that a notice of termination of this Agreement delivered by the Administrative Borrower hereunder may state that such notice (and the Borrowers' election to terminate this Agreement proposed thereunder) is conditioned upon the occurrence of any specified event (including the consummation of any sale, merger, financing or other specified transaction, the effectiveness of any other credit facilities, the incurrence of any other Indebtedness, issuance of any loans or securities, and/or the receipt of proceeds from any of the foregoing, as the case may be), in which case such notice (and the proposed termination of this Agreement to be effectuated thereunder) may be revoked by the Administrative Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(c)     Mandatory Prepayment.  Subject to Section 4.03 and the Term Intercreditor Agreement:

(i)     Unless the Suspension Date has occurred, on the date that audited annual financial statements are required to be delivered to the Agents and the Lenders pursuant to Section 7.01(a)(iii) (commencing with the date on which delivery to the Agents and the Lenders of the financial statements for the Fiscal Year ended December 31, 2023 is required thereunder), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to (I) the Applicable ECF Percentage of Excess Cash Flow of the Parent and its Subsidiaries for such Fiscal Year, minus (II) the amount of any prepayments of the Loans made in cash during such period in accordance with Section 2.05(b).

(ii)     Promptly after (and no later than five (5) Business Days after) any Disposition (excluding Dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), (d), (e), (f), (g) or (h) of the definition of Permitted Disposition) by any Loan Party or its Subsidiaries, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries (and not paid to the Administrative Agent as a prepayment of the Loans) shall exceed for all such Dispositions $500,000 in any Fiscal Year. Nothing contained in this Section 2.05(c)(ii) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.02(c)(ii).

(iii)     Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding amount of the Loans in accordance with Section 2.05(d) in an amount equal to

100% of the Net Cash Proceeds received by such Person in connection therewith. The provisions of this Section 2.05(c)(iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)     Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries (and not paid to the Administrative Agent as a prepayment of the Loans) shall exceed for all such Extraordinary Receipts $2,500,000 in any Fiscal Year.

(v)     Upon receipt by the Borrowers of the proceeds of any Permitted Cure Equity in connection with the exercise of a Cure Right pursuant to Section 9.02, the Borrowers shall prepay the outstanding principal of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of such proceeds.

(vi)     Notwithstanding the foregoing, with respect to Net Cash Proceeds received by any Loan Party or any of its Subsidiaries in connection with a Disposition or the receipt of Extraordinary Receipts consisting of insurance proceeds or condemnation awards that are required to be used to prepay the Obligations pursuant to Section 2.05(c)(ii) or Section 2.05(c)(iv), the Net Cash Proceeds from all such Dispositions and Extraordinary Receipts shall not be required to be so used to prepay the Obligations to the extent that such Net Cash Proceeds are used to replace, repair or restore properties or assets (other than current assets) used in such Person's business, provided that, (A) no Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds, (B) the Administrative Borrower delivers a certificate to the Administrative Agent within 20 Business Days after such Disposition or loss, destruction or taking, as the case may be, stating that such Net Cash Proceeds shall be used to replace, repair or restore properties or assets used in such Person's business within a period specified in such certificate not to exceed 180 days after the date of receipt of such Net Cash Proceeds (which certificate shall set forth estimates of the Net Cash Proceeds to be so expended), (C) such Net Cash Proceeds are deposited in an account subject to a Control Agreement, and (D) upon the earlier of (1) the expiration of the period specified in the relevant certificate furnished to the Administrative Agent pursuant to clause (B) above or (2) the occurrence of an Event of Default, such Net Cash Proceeds, if not theretofore so used, shall be used to prepay the Obligations in accordance with Section 2.05(c)(ii) or Section 2.05(c)(iv) as applicable.

(vii)     All payments under this Section 2.05(c) shall be accompanied with a written notice provided to the Administrative Agent by 12:00 p.m. (New York City time) at least 1 Business Day prior to the date of any such payment which shall include the sub-section of this Section 2.05(c) pursuant to which such payment is made.

(viii)     Notwithstanding anything in this Section 2.05 or elsewhere to the contrary, any Lender, at the sole and absolute discretion of the Borrowers, may elect, by notice to the Administrative Agent in writing by hand delivery, facsimile transmission or e-mail at least two Business Days prior to the required prepayment date, to decline all (or a portion) of any mandatory prepayment of its Loans, in which case the aggregate amount of the prepayment that would have

56

been applied to prepay such Loans but was so declined will be offered to prepay the Loans of the other Lenders that have not declined such prepayment on a pro rata basis, and if any declined amounts remains such amounts may be retained by the Borrowers and, to the extent not otherwise applied to prepay any other Loans, or any First Lien Loans, or any other Indebtedness or obligations of the Loan Parties and their Subsidiaries in accordance with the terms thereof (as determined by the Borrowers in each case), may be used to finance any Restricted Payment or Investment not otherwise permitted hereunder at such time, or, if such amount is retained by any of the Borrowers or any of their Subsidiaries, the Borrowers shall get credit for such amount for purposes of any Liquidity or leverage ratio calculation hereunder.

(ix)    In the case of any Loan, the Borrowers shall, prior to the close of the first "accrual period" (within the meaning of Section 163(i)(2) of the Code) ending after the fifth anniversary of the Effective Date and prior to the close of each subsequent accrual period, prepay a principal amount of any such Loan in an amount equal to the AHYDO Amount, without payment of any premium or penalty. For purposes of this Section 2.05(c)(ix), "AHYDO Amount" means the amount sufficient to ensure that any Loan will not be an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code. Each payment of the AHYDO Amount will be applied in full only against such Loan and there shall be an obligation, notwithstanding any other provision of this Agreement to the contrary, to prepay such Loans in accordance with this provision. Each payment of the AHYDO Amount shall be treated for tax purposes as a payment of original issue discount to the extent that the original issue discount has accrued as of the date such payment is due. Notwithstanding anything herein to the contrary, it is the intention of this Section 2.05(c)(ix) that no Loan pursuant to any Facility will be treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code, and the provisions of this Agreement shall be construed pursuant to this intent.

(x)    Notwithstanding anything in this Section 2.05(c) to the contrary, until the First Lien Obligations are paid in full, no mandatory prepayment of outstanding Loans that would otherwise be required to be made under this Section 2.05(c) shall be required to be made unless otherwise permitted by the Term Intercreditor Agreement.

(d)    Application of Payments. Subject to the Term Intercreditor Agreement, and with respect to:

(i)    any mandatory prepayment required by subsection (c)(ii) or (c)(iv) above: (A) subject to clause (C) below, if the Net Cash Proceeds are from any Disposition of, or insurance or any condemnation, taking or other casualty with respect to, any ABL Priority Collateral, such Net Cash Proceeds shall be applied (1) first, to the ABL Loans, to the extent required by the ABL Credit Agreement and the ABL/Term Intercreditor Agreement (as in effect at such time), until paid in full and (2) second, to the principal amount of Loans hereunder in the order prescribed in the Pre-Default Payment Waterfall; (B) subject to clause (C) below, if the Net Cash Proceeds are from the Disposition of, or insurance or any condemnation, taking or other casualty with respect to Term Priority Collateral, such Net Cash Proceeds shall be applied to the principal amount of Loans hereunder (in the order prescribed in the Pre-Default Payment Waterfall), until paid in full and (C) if the Net Cash Proceeds are from a Disposition of, or insurance or any condemnation, taking or other casualty with respect to, the assets of any Person, which includes both (1) ABL Priority Collateral and (2) Term Priority Collateral, such Net Cash

Proceeds shall be applied, ratably, as between the ABL Priority Collateral and the Term Priority Collateral (based on the book value of such assets constituting ABL Priority Collateral and the Term Priority Collateral) and shall be applied in accordance with the preceding clauses (A) and (B); and

(ii)     any mandatory prepayment required by subsection (c)(i), (c)(iii) or (c)(v) above shall be applied to the Loans in the order prescribed in the Pre-Default Payment Waterfall; provided, that, notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and shall if directed by the Collateral Agent or the Required Lenders, apply payments in respect of any Obligations, including prepayments required under Section 2.05(c), in accordance with Section 4.03(b).

(e)     Interest and Fees. Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued and unpaid interest on the principal amount being prepaid to the date of prepayment, (ii) [reserved], (iii) the Applicable Premium, if any, payable in connection with such prepayment of the Loans to the extent required under Section 2.06 and (iv) if such prepayment would reduce the amount of the outstanding Loans to zero, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)     Cumulative Prepayments. Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05; provided that there shall be no duplication of mandatory prepayments due under more than one subsection of this Section 2.05.

Section 2.06    Fees.

(a)     Applicable Premium.

(i)     Upon the occurrence of an Applicable Premium Trigger Event, any amounts prepaid, repaid, accelerated or otherwise, or any Commitments voluntarily reduced or cancelled, as applicable, shall be accompanied by payment to the Administrative Agent, for the ratable account of each applicable Lender, of the Applicable Premium.

(ii)     Any Applicable Premium payable in accordance with this Section 2.06(a) shall be presumed to be equal to the liquidated damages sustained by the Lenders as the result of the occurrence of the Applicable Premium Trigger Event and the Loan Parties agree that it is reasonable under the circumstances currently existing. THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING APPLICABLE PREMIUM IN CONNECTION WITH ANY ACCELERATION.

(iii)     The Loan Parties expressly agree that: (A) the Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Loan Parties giving specific consideration in this transaction for such

agreement to pay the Applicable Premium; (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; (E) their agreement to pay the Applicable Premium is a material inducement to Lenders to provide the Commitments and make the Loans and (F) the Applicable Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Agents and the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Agents and the Lenders or profits lost by the Agents and the Lenders as a result of such Applicable Premium Trigger Event.

(iv)    Nothing contained in this Section 2.06(a) shall permit any prepayment of the Loans or reduction of the Commitments not otherwise permitted by the terms of this Agreement or any other Loan Document.

(b)    Audit and Collateral Monitoring Fees. The Borrowers acknowledge that pursuant to Section 7.01(f), representatives of the Agents may visit any or all of the Loan Parties and/or conduct inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties at any time and from time to time during normal business hours and, so long as no Event of Default has occurred and is continuing, upon prior notice to the Borrowers. The Borrowers agree to pay (i) all out-of-pocket costs and reasonable expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations conducted by a third party on behalf of the Agents; provided, that so long as no Event of Default shall have occurred and be continuing, the Borrowers shall not be obligated to reimburse the Agents for more than one such visit, inspection, audit, physical count, valuation, appraisal, environmental site assessment and/or examination during any fiscal year.

(c)    Fee Letter. As and when due and payable under the terms of the Fee Letter, the Borrowers shall pay the fees set forth in the Fee Letter.

Section 2.07    [Prepayment Offer. So long as the Required Goldman Lender Consent Expiry Date has not occurred, if the outstanding amount of all Initial Term Loans (as defined in the First Lien Financing Agreement) and Delayed Draw Term Loans (as defined in the First Lien Financing Agreement) are each paid in full prior to their stated maturity date (including by acceleration upon an event of default) (the "Prepayment Trigger Event"), the Borrower shall be required to prepay the outstanding Obligations in full at par. Within three (3) Business Days of the occurrence of a Prepayment Trigger Event, the Borrower shall provide notice (a "Prepayment Offer Notice") to the Administrative Agent (to be distributed to the Lenders) of the occurrence of the Prepayment Trigger Event and the obligation to prepay all outstanding Obligations at par. Within ten (10) Business Days of receipt of the Prepayment Offer Notice (the "Acceptance Deadline"), each Lender may decline to receive its pro rata portion of the prepayment of the Obligations by providing written notice to the Administrative Agent (and any Lender that does not provide such notice to the Administrative Agent shall be deemed to have accepted such prepayment). The Borrower shall make the prepayment to all Lenders that have not declined to receive such prepayment within three (3) Business Days of the Acceptance Deadline. Any payment

made pursuant to this Section 2.07 shall constitute a voluntary prepayment pursuant to Section 2.05(b)(i).]

Section 2.08     [Reserved].

Section 2.09     Taxes.  (a)  Any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law. If any Loan Party (as determined in the good faith discretion of an applicable Withholding Agent) shall be required to deduct or withhold any Taxes from or in respect of any sum payable hereunder to any Secured Party (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")), (i) the applicable Withholding Agent shall make such deductions or withholding and (ii) the applicable Withholding Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount (an "Additional Amount") necessary such that after making all required deductions (including deductions applicable to additions sums payable under this Section **Error! Reference source not found.**) such Secured Party (or such Transferee) receives the amount equal to the sum it would have received had no such deductions or withholding been made.

(b)     In addition, each Loan Party agrees to timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes. Each Loan Party shall deliver to each Secured Party official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)     The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes paid by such Person, whether or not such Indemnified Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 Business Days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes.  A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Secured Party, shall be conclusive absent manifest error.  As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section, the Loan Party shall deliver to the Secured Parties the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     Each Lender (or Transferee) that is a United States person under Section 7701(a)(30) of the Internal Revenue Code shall deliver to the Administrative Borrower or Administrative Agent a United States Internal Revenue Service Form W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender is exempt from United States backup withholding.

(e)     Each Lender (or Transferee) that is not a U.S. Person (a "Non-U.S. Lender") agrees that it shall, no later than the Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section **Error! Reference source not found.** hereof after the Effective Date, promptly after the date upon which such Lender becomes a party hereto) deliver to the

60

Agents (or, in the case of an assignee of a Lender which (x) is an Eligible Assignee and (y) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section **Error! Reference source not found.** for recordation pursuant to Section **Error! Reference source not found.**, to the assigning Lender only, and in the case of a participant, to the Lender granting the participation only) one properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY (accompanied by the appropriate certification documents from each beneficial owner) or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments of interest hereunder. In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender hereby represents, and shall provide appropriate documentation providing, to the Agents and the Borrowers that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code), and such Non-U.S. Lender agrees that it shall promptly notify the Agents in the event any such representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, such Lender (or Transferee) or Agent shall deliver such forms within 20 days after receipt of a written request therefor from the Administrative Borrower or any Agent, the assigning Lender or the Lender granting a participation, as applicable. Notwithstanding any other provision of this Section **Error! Reference source not found.**, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section **Error! Reference source not found.**(e) that such Non-U.S. Lender is not legally able to deliver.  In addition to the foregoing, any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Agents (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agents), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Administrative Borrower or the Agents to determine the withholding or deduction required to be made.

(f)      Any Secured Party (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section **Error! Reference source not found.** or Section **Error! Reference source not found.** shall (at the request of the Administrative Borrower) use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Administrative Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or Additional Amount that may thereafter accrue, would not require such Secured Party (or Transferee) to disclose any information such Secured Party (or Transferee) in good faith deems confidential and

would not, in the sole determination of such Secured Party (or Transferee), be otherwise disadvantageous to such Secured Party (or Transferee).

(g)     If any Secured Party (or a Transferee) shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes with respect to which any Loan Party has made an indemnity payment or paid Additional Amount, pursuant to this Section **Error! Reference source not found.**, it shall promptly notify the Administrative Borrower of the availability of such refund claim and shall, within 10 days after receipt of a request by the Administrative Borrower, make a claim to such Governmental Authority for such refund at the Loan Parties' expense. If any Secured Party (or a Transferee) receives a refund (including pursuant to a claim for refund made pursuant to the preceding sentence) in respect of any Indemnified Taxes with respect to which any Loan Party has made an Indemnity payment or paid Additional Amount pursuant to this Section **Error! Reference source not found.**, it shall within 30 days from the date of such receipt pay over such refund to the Administrative Borrower, net of all out-of-pocket expenses of such Secured Party (or Transferee), provided that each Loan Party, upon the request of Administrative Agent or such Secured Party (or Transferee), agrees to repay the amount paid over to any Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Secured Party (or Transferee) in the event Administrative Agent or any Secured Party (or Transferee) is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will an indemnified party be required to pay any amount to a Loan Party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or Additional Amount giving rise to such refund had never been paid. This subsection shall not be construed to require Administrative Agent, any Secured Party or Transferee to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     If a payment made to a Lender (or Transferee) or any Agent under any Loan Document would be subject to U.S. Federal withholding tax imposed by FATCA if such Lender (or Transferee) or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender (or Transferee) or Agent shall deliver to the Administrative Borrower and the Agents at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Agents such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Administrative Borrower or the Agents as may be necessary for the Administrative Borrower and the Agents to comply with their obligations under FATCA and to determine that such Lender (or Transferee) or Agent has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Any forms, certifications or other documentation under this clause (h) shall be delivered by each Lender (or Transferee) and each Agent. Each Lender (and Transferee) agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification

or promptly notify the Administrative Borrower and the Agents in writing of its legal inability to do so.

(i)      If circumstances arise which entitle a Lender (or Transferee) to receive any payment under this <u>Section 2.09</u> or <u>Section 2.10</u>, and, in each case, such Lender (or Transferee) has declined or is unable to designate a different lending office in accordance with <u>Section 2.9(f)</u>, then that Lender (or Transferee) will (at the request and at the sole expense of the Borrower) take all reasonable steps to mitigate the effect of those circumstances (including but not limited to by transferring its rights and obligations under this Agreement to an Affiliate or changing its lending or transferring its rights and obligations under this Agreement in full and not in part for cash at par plus all accrued and unpaid interest and other amounts outstanding (if any) to another bank, financial institution or other person nominated for such purpose by the Loan Parties).

(j)      The obligations of the Loan Parties under this <u>Section **Error! Reference source not found.**</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.10      <u>Increased Costs and Reduced Return</u>.  (a)  If any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any tax, duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender, or change the basis of taxation of payments to such Secured Party or any Person controlling such Secured Party of any amounts payable hereunder (except for taxes on the overall net income of such Secured Party or any Person controlling such Secured Party), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party such Additional Amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b)      If any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained or any agreement to make Loans or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, within 30 days after demand by such Secured Party, the Borrowers shall pay to such Secured Party from time to time such Additional Amounts as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

63

(c)    All amounts payable under this Section 2.10 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate. A certificate of such Secured Party claiming compensation under this Section 2.10, specifying in reasonable detail the event herein above described and the nature of such event shall be submitted by such Secured Party to the Administrative Borrower, setting forth the Additional Amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.10 for any increased costs incurred or reductions suffered more than three months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the three- month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    The obligations of the Loan Parties under this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

## ARTICLE III

## [INTENTIONALLY OMITTED]

## ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS;

Section 4.01    Payments; Computations and Statements. (a)  The Borrowers will make each payment under this Agreement not later than 2:00 pm (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Loan Account.  All payments received by the Administrative Agent after 2:00 pm (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day.  All payments shall be made by the Borrowers without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02 or Section 2.05, and except as otherwise provided pursuant to Section 4.02 or Section 4.03, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement. The Lenders and the Borrowers hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account of the Borrowers with any amount due and payable by the Borrowers under any Loan Document.  Each of the Lenders and the Borrowers agrees that the Administrative Agent shall have the right to make such charges

64

whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Article V have been satisfied.  Any amount charged to the Loan Account of the Borrowers shall be deemed to be Obligations.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be, but not be deemed to be a Default or Event of Default.  All computations of interest and fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    The Administrative Agent shall provide the Administrative Borrower, reasonably promptly after the end of each fiscal month (or on such specified dates as may be mutually agreed by them), a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrowers during such month, the amounts and dates of all Loans made to the Borrowers during such month, the amounts and dates of all payments on account of the Loans to the Borrowers during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrowers during such month and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations.  All entries on any such statement shall be presumed to be correct and, 30 days after the same is sent, shall be final and conclusive absent manifest error.

Section 4.02    <u>Sharing of Payments</u>.  Except as otherwise provided herein (as of the Effective Date), or in Section 2.02 or any other provisions hereof (in each case as of the Effective Date), if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its Pro Rata Share of payments on account of such obligations obtained by all other Lenders entitled thereto pursuant to the terms hereof (subject to Section 4.03), such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u>, <u>however</u>, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (ii) any payment obtained by a Lender as consideration for any assignment or other transfer of, or any sale of a participation in, any of its Loans and/or Commitments.  The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off)

with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 4.03    Apportionment of Payments.  Subject to Section 2.02 hereof and to any written agreement among the Agents and/or the applicable Lenders:

(a)    Prior to the occurrence of an Event of Default, all payments of principal and interest in respect of outstanding Loans (including optional and mandatory prepayments pursuant to Section 2.05), all payments of fees (other than (i) the fees set forth in Section 2.06 hereof and (ii) any fees or other consideration on account of any Lender consent or waiver, or any assignment, transfer or sale of participation in any Loan, each of which shall be due to such Lender in accordance with the terms thereof), and all other payments in respect of any other Obligations, shall be, subject to the Term Intercreditor Agreement, allocated by the Administrative Agent to such of the Lenders as are entitled thereto (in proportion to their respective Pro Rata Shares, or otherwise as provided herein, or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made).

(b)    After the occurrence and during the continuance of an Event of Default, and subject to the Term Intercreditor Agreement, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) second, to pay interest then due and payable in respect of the Collateral Agent Advances until paid in full; (iii) third, to pay principal of the Collateral Agent Advances until paid in full; (iv) fourth, ratably to pay interest then due and payable in respect of the Term Loans until paid in full; (v) fifth, ratably to pay principal of the Term Loans until paid in full; (vi) sixth, to the ratable payment of all other Obligations then due and payable with respect to the Term Loans until paid in full; and (vii) seventh (but only subject to the prior payment in full of all Obligations in respect of the Term Loans and all other amounts described in foregoing clauses (i) through (vi)), the remainder, if any, to the Borrowers or as otherwise required by applicable laws.

(c)    For purposes of Section 4.03(b), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d)    In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.03 shall control and govern.

Section 4.04    Defaulting Lenders.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.02. The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by any Borrower to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Loans were funded by the other Lenders) or, if so directed by the Administrative Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrowers as if such Defaulting Lender had made such Loans to the Borrowers.  Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.

(b)    Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers to replace the Defaulting Lender with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 12.07.

(c)    The operation of this Section 4.04 shall not be construed to increase or otherwise affect the Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(d)    This Section 4.04  shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Borrowers shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided that no adjustments will be made

(e)     retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 4.05   Administrative Borrower; Joint and Several Liability of the Borrowers.

(a)     Each Borrower hereby irrevocably appoints Holdco Borrower as the borrowing agent and attorney-in-fact for, and representative of, such Borrower and the Borrowers collectively (Holdco Borrower, in such capacities, the "Administrative Borrower"), which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to any Agent and to any or all of the Lenders (as applicable), and to receive, for and on its behalf, from any Agent and/or any of the Lenders, as the case may be, all notices with respect to any Loan or Obligations obtained for the benefit of any Borrower, and all other notices, agreements and other instruments and instructions under or with respect to this Agreement or any of the other Loan Documents, or any transactions hereunder, or any Obligations (it being agreed that any obligation or requirement providing for any Agent or Lender to deliver any notice, agreement, instrument or other document or any instruction to the Borrowers (or any one of them) shall be construed as requiring delivery thereof only to the Administrative Borrower, and shall be deemed satisfied accordingly) and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Agents nor the Lenders shall incur liability to the Borrowers as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

(b)     Each Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations. Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 4.05), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them. If and to the extent that any of the Borrowers shall fail to

make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 4.05 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(c)     The provisions of this Section 4.05 are made for the benefit of the Secured Parties and their successors and permitted assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Secured Parties or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 4.05 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(d)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

## ARTICLE V

## CONDITIONS TO EFFECTIVE DATE AND LOANS

Section 5.01   Conditions Precedent to Effectiveness and Term Loans.   This Agreement, and the obligation each Lender to make (or be deemed to make) the Term Loans pursuant to Section 2.01(a) shall become effective as of the Business Day (the "Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to (or waived by) the Agents:

(a)     Payment of Fees, Etc. The Borrowers shall have paid on or before the Effective Date all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 12.04.

(b)     Representations and Warranties; No Event of Default.   The following statements shall be true and correct: (i) the representations and warranties of the Loan Parties contained in Article VI and in each other Loan Document delivered on or prior to the Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be

69

applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)     Delivery of Documents.  The Collateral Agent (or its counsel) shall have received on or before the Effective Date the following, each in form and substance reasonably satisfactory to the Collateral Agent and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto:

(i)     a Security Agreement, together with the original stock certificates or certificated limited liability company interests (if any) representing all of the Equity Interests in the Borrowers and their Subsidiaries who are Guarantors, and all of the Equity Interests owned by the Borrowers and each Guarantor (including the Equity Interests in GC Services (Barbados) SRL) and all promissory notes required to be pledged thereunder, accompanied by undated stock powers executed in blank and other proper instruments of transfer;

(ii)     evidence of financing statements on Form UCC-1 in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by each Security Agreement;

(iii)     the results of searches for any effective UCC financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens acceptable to the Collateral Agent);

(iv)     a Perfection Certificate;

(v)     the Fee Letter;

(vi)     the Intercompany Subordination Agreement;

(vii)     the ABL/Term Intercreditor Agreement;

(viii)     the Term Intercreditor Agreement;

(ix)     a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of incorporation, certificate of formation, certificate of limited partnership or other publicly filed

70

organizational document of each Loan Party certified as of a recent date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the Borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, the Notice of Borrowing and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Authorized Officers and (D) as to the matters set forth in Section 5.01(b);

        (x)    a certificate of an Authorized Officer of the Administrative Borrower (A) certifying that all tax returns required to be filed by the Loan Parties have been filed (except for any tax return for which extensions have been timely filed by appropriate procedures) and all taxes upon the Loan Parties or their properties, assets, and income (including real property taxes and payroll taxes) then due and payable have been paid, (B) attaching a copy of the Financial Statements and the Projections described in Section 6.01(g)(ii) hereof and certifying as to the compliance with the representations and warranties set forth in Section 6.01(g)(i) and Section 6.01(bb)(ii) and (C) certifying that after giving effect to all Indebtedness to be incurred on the Effective Date, and the payment of fees and expenses related to this Agreement and the ABL Credit Agreement and Consolidated EBITDA of the Parent and its Subsidiaries for the consecutive 12 fiscal month period most recently ended at least thirty days prior to the Effective Date will be greater than or equal to $[  ];

        (xi)    a certificate of an Authorized Officer of each Loan Party, certifying as to the solvency of such Loan Party (after giving effect to the Indebtedness incurred on the Effective Date);

        (xii)    [reserved];

        (xiii)    a certificate of the appropriate official(s) of the jurisdiction of organization of each Loan Party certifying as of a recent date as to the subsistence in good standing of, and the payment of taxes prior to delinquency by (as applicable), such Loan Party in such jurisdiction;

        (xiv)    an opinion of Weil, Gotshal & Manges LLP, as primary counsel to the Loan Parties, [and an opinion of [____], as local [__] counsel to the Loan Parties, in each case,] as to such matters as the Collateral Agent may reasonably request;

        (xv)    Acord insurance certificates evidencing the insurance coverage of the Loan Parties required by Section 7.01;

(xvi)    all Existing Term Obligations and DIP Claims shall have been fully and finally discharged in accordance with the Restructuring Documents, and all Liens securing the same shall have been fully and finally terminated, discharged and released in a manner satisfactory to the Collateral Agent, and evidence thereof shall have been provided to the Collateral Agent, to the extent requested by the Collateral Agent; and

(xvii)   such other agreements, instruments, approvals, opinions and other documents, each satisfactory to the Agents in form and substance, as any Agent may reasonably request.

(d)      [Reserved.]

(e)      Chapter 11 Case and Restructuring Transactions.

(i)      All conditions precedent to the confirmation and consummation of the Chapter 11 Plan, as set forth in the Chapter 11 Plan and the RSA and other Restructuring Documents (as applicable), shall have been satisfied or waived in accordance with the terms thereof, (ii) the Borrower shall have delivered to the Administrative Agent a docketed copy of the Chapter 11 Plan Confirmation Order, which shall be in form and substance acceptable to the Administrative Agent, and shall have been entered, and shall be in full force and effect, and shall not (A) have been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to adversely affect the interests of the Agents or the Required Lenders or (B) be the subject of an appeal, (iii) the Chapter 11 Plan shall have become effective (and all conditions precedent to the effective date of the Chapter 11 Plan as set forth therein shall have been satisfied or waived in accordance with the terms thereof), (iv) substantial consummation (as defined in Section 1101 of the Bankruptcy Code) under the Chapter 11 Plan shall have occurred and (v) no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which could reasonably be expected to adversely affect the Chapter 11 Plan, the consummation of the Chapter 11 Plan, the business or operations of the Loan Parties and their Subsidiaries or the transactions contemplated by this Agreement or the Chapter 11 Plan shall be pending.

(ii)     Any of the documents executed in connection with the implementation of the Chapter 11 Plan, to the extent they contain provisions differing in any material respect from, or not described in, the Chapter 11 Plan, that are adverse in any material respect to the rights or interest of any or all of the Agents and the Lenders, in their capacities as such, shall be in form and substance satisfactory to the Required Lenders.

(f)      Approvals.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans, the ABL Loan Documents, the First Lien Loan Documents, and the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect. There shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation), pending or threatened in any court or before any arbitrator or Governmental Authority which (i) relates to the making of the Loans or (ii) could reasonably be expected to have a Material Adverse Effect.

(g)    [Reserved.]

(h)    ABL Credit Facility.  The ABL Credit Agreement and the other ABL Loan Documents shall be in full force and effect on the Effective Date, in each case, as required in connection with the Restructuring Transactions, and in accordance with the Restructuring Documents.

(i)    First Lien Credit Facility.  The First Lien Financing Agreement and the other First Lien Loan Documents shall be in full force and effect on the Effective Date, and First Lien Term Loans shall have been made (or deemed to have been made) thereunder on the Effective Date, in each case, as required in connection with the Restructuring Transactions, and in accordance with the Restructuring Documents.

Section 5.02    Conditions Subsequent to Effectiveness. As an accommodation to the Loan Parties, the Agents and the Lenders have agreed to execute this Agreement and to make the Loans on the Effective Date notwithstanding the failure by the Loan Parties to satisfy the conditions set forth below on or before the Effective Date.  In consideration of such accommodation, the Loan Parties agree that, in addition to all other terms, conditions and provisions set forth in this Agreement and the other Loan Documents, including, without limitation, those conditions set forth in Section 5.01, the Loan Parties shall satisfy each of the conditions subsequent set forth below on or before the date applicable thereto (it being understood that (i) the failure by the Loan Parties to perform or cause to be performed any such condition subsequent on or before the date applicable thereto shall constitute an Event of Default and (ii) to the extent that the existence of any such condition subsequent would otherwise cause any representation, warranty or covenant in this Agreement or any other Loan Document to be breached, the Required Lenders hereby waive such breach for the period from the Effective Date until the date on which such condition subsequent is required to be fulfilled pursuant to this Section 5.02):

(a)    Not later than the date that is 60 days after the Effective Date (or such later date as the Collateral Agent may agree in its sole discretion), the Collateral Agent shall have received evidence of the insurance coverage of the Loan Parties required by Section 7.01(h) (other than Acord insurance certificates delivered pursuant to Section 5.01(c)), and the terms of each Security Agreement and each Mortgage and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent may reasonably request, in each case, with such endorsements as to the named insureds or loss payees thereunder as the Collateral Agent may reasonably request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' (10 days', in the case of non-payment) prior written notice to the Collateral Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof.

(b)    Not later than the date that is 90 days after the Effective Date (or such later date as the Collateral Agent may agree in its sole discretion), with respect to the Houston Facility, each of the Real Property Deliverables.

Section 5.03   Conditions to Each Borrowing.  The agreement and obligation of each Lender to make the Loan(s) requested to be made on any Borrowing Date hereunder is subject to the satisfaction (or waiver by such Lender) of the following conditions precedent:

(a)      Each of the representations and warranties of the Loan Parties in this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of such Borrowing Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)).

(b)      At the time of, and immediately after giving effect to, such Borrowing, no Default or Event of Default shall have occurred and be continuing or would result therefrom.

(c)      The aggregate principal amount of Loans requested to be made on such Borrowing Date shall not exceed the aggregate Commitment therefor of all Lenders (calculated as the unused amount thereof in effect immediately prior to the making of such Loans, and calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Pro Rata Share of all outstanding Borrowings of such Loans).

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01   Representations and Warranties.  Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a)      Organization, Good Standing, Etc.  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrowers, to make the Borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing would reasonably be expected to have a Material Adverse Effect.

(b)      Authorization, Etc.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all

necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable material Requirement of Law or (C) any Material Contract, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to a material portion of the Collateral, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties, except, in each case, to the extent that the same would not reasonably be expected to have a Material Adverse Effect.

(c)     Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, on the Effective Date.

(d)     Enforceability of Loan Documents. This Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e)     Capitalization. On the Effective Date, after giving effect to the transactions contemplated hereby to occur on the Effective Date, the authorized Equity Interests of the Parent and each of its Subsidiaries and the issued and outstanding Equity Interests of the Parent and each of its Subsidiaries are as set forth on Schedule 6.01(e). All of the issued and outstanding shares of Equity Interests of the Parent and each of its Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights, except as set forth in the Parent Company Agreement. All Equity Interests of such Subsidiaries of the Parent are owned by the Parent free and clear of all Liens (other than Permitted Specified Liens). Except as described on Schedule 6.01(e), there are no outstanding debt or equity securities of the Parent or any of its Subsidiaries and no outstanding obligations of the Parent or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Parent or any of its Subsidiaries, or other obligations of the Parent or any of its Subsidiaries to issue, directly or indirectly, any shares of Equity Interests of the Parent or any of its Subsidiaries.

(f)     Litigation. There is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby.

(g)     Financial Statements.

(i)     The Financial Statements, copies of which have been delivered to each Agent and each Lender, have been prepared in accordance with GAAP applied on a consistent

75

basis during the period covered by the Financial Statements, subject, in the case of the interim financial statements, to normal year-end audit adjustments and the absence of notes. The Financial Statements fairly present in all material respects the consolidated financial condition of GCS and its Subsidiaries at the dates therein indicated and the consolidated results of operations and cash flows of GCS and its Subsidiaries for the periods therein specified, in each case in accordance with GAAP, except that the interim financial statements do not contain footnotes and are subject to normal year-end audit adjustments. Since the Effective Date, no event or development has occurred, which could reasonably be expected to have a Material Adverse Effect.

(ii)     The Parent has heretofore furnished to each Agent and each Lender the Projections, which consist of (A) projected monthly balance sheets, income statements and statements of cash flows of the Prepetition Administrative Borrower and its Subsidiaries for the period from [August 2021] through and including [December 2025], and (B) projected annual balance sheets, income statements and statements of cash flows of the Prepetition Administrative Borrower and its Subsidiaries for the Fiscal Years ending in [2021] through and including [2025].

(h)     Compliance with Law, Etc. No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any material Requirement of Law or (iii) any material term of any Material Contract binding on or otherwise affecting it or a material portion of its properties, and no default or event of default has occurred and is continuing thereunder, except, in each case, to the extent such violation, default or event of default would not reasonably be likely to have a Material Adverse Effect.

(i)     ERISA. No Loan Party nor any of its ERISA Affiliates contributes to, sponsors, maintains or has an obligation to contribute to or maintain or has or could reasonably be expected to have any liability, whether actual or contingent (including as an ERISA Affiliate), in respect of any Multiemployer Plan or Employee Plan, and no Loan Party nor any of its ERISA Affiliates has at any time prior to the date hereof established, sponsored or maintained, been a party to, or has had at any time prior to the date hereof contributed or been obligated to contribute to or maintain, any Multiemployer Plan or Employee Plan. No Termination Event has occurred, and, except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or coverage after a participant's termination of employment.  No Loan Party is an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA or a "plan" (as defined in Section 4975(e)(1) of the Code) subject to Section 4975 of the Code, and none of the assets of any Loan Party constitutes or will constitute "plan assets" of one or more such plans within the meaning of Section 3(42) of ERISA.  In addition, (a) no Loan Party is a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with any Loan Party or ERISA Affiliate are not subject to any law regulating investments of, or fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibits or otherwise restricts the transactions contemplated by this Agreement or any of the other Loan Documents.

(j)     Taxes, Etc.  (i) All Federal and material provincial, state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party

have been filed, or extensions have been obtained, and (ii) all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $250,000 and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k)     <u>Regulations T, U and X</u>. No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l)     <u>Nature of Business</u>.

(i)     No Loan Party is engaged in any business other than as set forth on Schedule 6.01(l).

(ii)     The Parent does not have any material liabilities (other than liabilities arising under the Loan Documents or the Parent Company Agreement), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(m)     <u>Adverse Agreements, Etc</u>. No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)     <u>Permits, Etc</u>. Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and there is no claim that any thereof is not in full force and effect where such claims, if determined adversely to any Loan Party, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(o)     <u>Properties</u>. Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free

and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(p)     Employee and Labor Matters. There is (i) no material labor agreement, union contract or collective bargaining agreement respecting the employees of any Loan Party to which any Loan Party is a party or is bound, (ii) no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority, and no grievance or arbitration proceeding pending or threatened against any Loan Party, which, in each case, arises out of or under any collective bargaining agreement, (iii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or, to the knowledge of any Loan Party, threatened against any Loan Party or (iv) to the knowledge of each Loan Party, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party. As of the date hereof, no Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied.

(q)     Environmental Matters. Except as set forth on Schedule 6.01(q), (i) the operations of each Loan Party are in compliance with all Environmental Laws, except to the extent any noncompliance would not reasonably be expected to have a Material Adverse Effect; (ii) there has been no Release at any of the properties owned or operated by any Loan Party or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party or any predecessor in interest which would reasonably be expected to have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Loan Party nor does any Loan Party have knowledge or notice of any threatened or pending Environmental Action against any Loan Party which would reasonably be expected to have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Loan Party which would reasonably be expected to have a Material Adverse Effect; (v) no property now owned or operated by a Loan Party has been used as a treatment or disposal site for any Hazardous Material which would reasonably be expected to have a Material Adverse Effect; (vi) no Loan Party has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which would reasonably be expected to have a Material Adverse Effect; (vii) each Loan Party holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Loan Party's failure to maintain or comply with would not reasonably be expected to have a Material Adverse Effect; and (viii) no Loan Party has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

(r)     Insurance. Each Loan Party maintains the insurance and required services and financial assurance as required by law and as required by Section 7.01(h). Schedule 6.01(r) sets forth a list of all insurance maintained by each Loan Party on the Effective Date.

(s)     [Reserved.]

(t)     Solvency. After giving effect to the transactions contemplated by this Agreement and before and after giving effect to each Loan, each Loan Party is, and the Loan Parties on a consolidated basis are, Solvent.

(u)     Intellectual Property. Except as set forth on Schedule 6.01(u), each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Set forth on Schedule 6.01(u) is a complete and accurate list as of the Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party; (ii) each material work of authorship owned by each Loan party and which is not Registered Intellectual Property; and (iii) each material Intellectual Property Contract to which each Loan Party is bound. No trademark or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)     Reserved.

(w)     Investment Company Act. None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)     Reserved.

(y)     Reserved.

(z)     Anti-Money Laundering and Anti-Terrorism Laws.

(i)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, has violated or is in violation of any of the Anti-Money Laundering and Anti-Terrorism Laws or has engaged in or conspired to engage in any transaction that evades or avoids, or has the

purpose of evading or avoiding, or attempts to violate, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, is a Blocked Person.

(iii)     None of the Loan Parties, nor any of their agents acting in any capacity in connection with the Loans or other transactions hereunder, (A) conducts any business with or for the benefit of any Blocked Person or engages in making or receiving any contribution of funds, goods or services to, from or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to any OFAC Sanctions Programs.

(aa)     Anti-Bribery and Anti-Corruption Laws.

(i)     The Loan Parties are in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), the UK Bribery Act (the "UK Act") and the anti-bribery and anti-corruption laws of those jurisdictions in which they do business (collectively, the "Anti-Corruption Laws").

(ii)     None of the Loan Parties has at any time:

(A)     offered, promised, paid, given, or authorized the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any employee, official, representative, or other person acting on behalf of any foreign (i.e., non- U.S.) Governmental Authority thereof, or of any public international organization, or any foreign political party or official thereof, or candidate for foreign political office (collectively, "Foreign Official"), for the purpose of: (1) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (2) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official; or (3) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(B)     acted or attempted to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

(iii)     There are, and have been, no allegations, investigations or inquiries with regard to a potential violation of any Anti-Corruption Law by any of the Loan Parties or any of their respective current or former directors, officers, employees, stockholders or agents, or other persons acting or purporting to act on their behalf.

(iv)     The Loan Parties have adopted, implemented and maintain anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(bb)     Full Disclosure.

80

(i)        Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

(ii)        The Projections and the Budget have been prepared on a reasonable basis and in good faith based on assumptions, estimates, methods and tests that are believed by the Loan Parties to be reasonable at the time such Projections and the Budget were prepared and information believed by the Loan Parties to have been accurate based upon the information available to the Loan Parties at the time such Projections and Budget were furnished to the Lenders, and no Loan Party is aware of any facts or information that would lead it to believe that such Projections and Budget are incorrect or misleading in any material respect; it being understood that (A) the Projections and the Budget are by their nature subject to significant uncertainties and contingencies, many of which are beyond the Loan Parties' control, (B) actual results may differ materially from the Projections and the Budget and such variations may be material and (C) the Projections and the Budget are not guarantees of performance.

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES

Section 7.01    Affirmative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)        Reporting Requirements.  Furnish to each Agent (for delivery to each Lender):

(i)        as soon as available, and in any event within 45 days after the end of each fiscal month of the Parent and its Subsidiaries, commencing with the fiscal month ending [__][3], internally prepared consolidated balance sheets, statements of operations and retained earnings and statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year (provided that for the first year following the Effective Date, such comparative figures shall be to the consolidated financial statements for the immediately preceding Fiscal Year of the Prepetition Administrative Borrower), and (B) the Budget, all in reasonable detail and certified by an

_____

[3] NTD: To be first fiscal month after Effective Date.

Authorized Officer of the Administrative Borrower as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Parent and its Subsidiaries for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(ii)      as soon as available and in any event within 45 days after the end of each fiscal quarter of the Parent and its Subsidiaries, commencing with the fiscal quarter ending [__][4], consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of the Parent and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (1) the financial statements for the immediately preceding Fiscal Year (provided that for the first year following the Effective Date, such comparative figures shall be to the consolidated financial statements for the immediately preceding Fiscal Year of the Prepetition Administrative Borrower) and (2) the Budget, all in reasonable detail and certified by an Authorized Officer of the Administrative Borrower as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Parent and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Parent and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(iii)      as soon as available, and in any event within 120 days (or 180 days for the Fiscal Year ended December 31, 2021) after the end of each Fiscal Year of the Parent and its Subsidiaries, commencing with the Fiscal Year ending December 31, 2022, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of the Parent and its Subsidiaries as at the end of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year (provided that for the first year following the Effective Date, such comparative figures shall be to the consolidated financial statements for the immediately preceding Fiscal Year of the Prepetition Administrative Borrower), and (B) the Budget, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion with respect to such financial statements, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Parent and reasonably satisfactory to the Agents (initially, Ham, Langston & Brezina, L.L.P.) (which opinion shall be without (1) a "going concern" or like qualification or exception or (2) any qualification or exception as to the scope of such audit;

(iv)      simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (ii) and (iii) of this Section 7.01(a), a certificate of an Authorized Officer of the Administrative Borrower (a "Compliance Certificate"):

---

[4] NTD: To be first fiscal quarter after Effective Date.

(A)      stating that such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which the Parent and its Subsidiaries propose to take or have taken with respect thereto;

(B)      (1) in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i) and (iii) of this Section 7.01(a), including a business segment financial report and a key performance indicator report for the applicable period, in each case, in form and substance substantially similar to the form of the business segment financial report and a key performance indicator report delivered by the Borrowers to the Agents prior to the Effective Date; and (2) in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (ii) and (iii) of this Section 7.01(a), (i) attaching a schedule showing the calculation of the financial covenant specified in Section 7.03, (ii) including a discussion and analysis of the financial condition and results of operations of the Parent and its Subsidiaries for the portion of the Fiscal Year then elapsed and discussing the reasons for any significant variations from the Budget for such period and the figures for the corresponding period in the previous Fiscal Year, in each case, in the form of such discussion and analysis delivered by the Borrowers to the Agents prior to the Effective Date, and (iii) to the extent permitted by applicable Requirements of Law and subject to confidentiality requirements of Governmental Authorities and to the extent not subject to a legal privilege, including a summary of all documents and information submitted to any Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority during the applicable period;

(C)      in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clause (iii) of this Section 7.01(a), attaching (1) a summary of all material insurance coverage maintained as of the date thereof by any Loan Party and all material insurance coverage planned to be maintained by any Loan Party, together with such other related documents and information as the Administrative Agent may reasonably require, (2) the calculation of the Excess Cash Flow in accordance with the terms of Section 2.05(c)(i)(A) and (3) confirmation that there have been no changes to the information contained in each of the Perfection Certificates delivered on the Effective Date or the date of the most recently updated Perfection Certificate delivered pursuant to this clause (iv) and/or attaching an updated Perfection Certificate identifying any such changes to the information contained therein;

(v)      promptly after delivery or receipt thereof: (A) copies of all reports (including borrowing base certificates and all accounts receivable agings) and default notices delivered to or received from the ABL Lender under any ABL Loan Documents and (B) copies of any amendments, waivers, consents or other modifications to any ABL Loan Documents;

(vi)      [Reserved];

(vii)      as soon as available and in any event not later than 30 days after the start of each Fiscal Year commencing with the Fiscal Year ending [December 31, 2022], a certificate of an Authorized Officer of the Administrative Borrower (A) attaching a Budget for the Parent and its Subsidiaries, supplementing and superseding the Budget previously required to be

83

delivered pursuant to this Agreement, prepared on a monthly basis and otherwise in form and substance satisfactory to the Agents, for the immediately succeeding Fiscal Year for the Parent and its Subsidiaries and (B) certifying that the representations and warranties set forth in Section 6.01(bb)(ii) are true and correct with respect to the Budget;

(viii)    as soon as possible, and in any event within 3 Business Days after the any Loan Party has knowledge of the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(ix)    promptly after the commencement thereof but in any event not later than 5 days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(x)    as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any notice or report with respect to an event or matter that is materially adverse to the Agents and the Lenders that any Loan Party executes or receives in connection with any Material Contract;

(xi)    as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

(xii)    promptly after (A) the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness the outstanding principal amount of which equals or exceeds $5,000,000 or its securities or files with the SEC or any national (domestic or foreign) securities exchange and (B) the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

(xiii)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xiv)    promptly upon request, any certification or other evidence reasonably requested from time to time by any Lender confirming the Borrowers' compliance with Section 7.02(s);

(xv)    simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i), (ii) and (iii) of this Section 7.01(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.02(q), the consolidated financial statements of

84

the Parent and its Subsidiaries delivered pursuant to clauses (i), (ii) and (iii) of this Section 7.01(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Agents; and

(xvi)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time reasonably request.

(b)    <u>Additional Guarantors and Collateral Security</u>. Cause:

(i)    each Subsidiary of any Loan Party not in existence on the Effective Date, to execute and deliver to the Collateral Agent promptly and in any event within 5 Business Days (or such longer period agreed to by the Collateral Agent in its sole discretion) after the formation, acquisition or change in status thereof, (A) a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Guarantor, (B) a supplement to the Security Agreement, together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the Security Agreement, (2) undated stock powers for such Equity Interests executed in blank, and (3) such opinions of counsel as the Collateral Agent may reasonably request, (C) to the extent required under the terms of this Agreement, one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to Permitted Specified Liens) on such real property and such other Real Property Deliverables as may be required by the Collateral Agent with respect to each such real property, and (D) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)    each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within 5 Business Days (or such longer period agreed to by the Collateral Agent in its sole discretion) after the formation or acquisition of such Subsidiary a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such Equity Interests executed in blank with signature guaranteed, (C) such opinions of counsel as the Collateral Agent may reasonably request and (D) such other agreements, instruments, approvals or other documents requested by the Collateral Agent.

(c)    <u>Compliance with Laws; Payment of Taxes</u>.

(i)    Comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable material Requirements of Law (including, without limitation, all

85

Environmental Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), except where the failure to so comply could not reasonably be expected to result, individually or in the aggregate, in liabilities in excess of $3,000,000.

(ii)     Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all taxes, assessments and other governmental charges imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $500,000, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof to the extent required in accordance with GAAP.

(d)     Preservation of Existence, Etc. Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e)     Keeping of Records and Books of Account. (i) Keep, and cause each of its Subsidiaries to keep, (a) adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP and (ii) all such records and books at the Houston Facility.

(f)     Inspection Rights. Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal business hours and, in the absence of an Event of Default, upon reasonable prior notice, at the expense of the Borrowers (subject to the limitations set forth in Section 2.06(b)), to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Collateral Agent based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives. In furtherance of the foregoing, the Parent hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this Section 7.01(f).

(g)     Maintenance of Properties, Etc. Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent

86

any loss or forfeiture thereof or thereunder, except to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect.

(h)     Maintenance of Insurance. Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, automobile, worker's compensation and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent. All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as their respective interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation.  Each Loan Party and each Subsidiary shall be responsible for timely compliance with the terms of all policies including but not limited to reporting occurrences and claims and filing claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, the Borrowers, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)     Obtaining of Permits, Etc. Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, in each case, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect.

(j)     Environmental. (i) Keep any property either owned or operated by it or any of its Subsidiaries free of any Environmental Liens; (ii) comply, and cause each of its Subsidiaries

87

to comply, with all Environmental Laws, to the extent any noncompliance would reasonably be expected to have a Material Adverse Effect, and provide to the Collateral Agent any documentation of such compliance which the Collateral Agent may reasonably request; (iii) provide the Agents written notice within 5 days of any knowledge by the Borrowers of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it or any of its Subsidiaries and take any Remedial Actions required to abate said Release; and (iv) provide the Agents with written notice within 10 days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Loan Party or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party or any of its Subsidiaries; and (C) notice of a violation, citation or other administrative order which could reasonably be expected to have a Material Adverse Effect.

(k)    <u>Fiscal Year</u>.  Cause the Fiscal Year of the Parent and its Subsidiaries to end on December 31 of each fiscal year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)    [Reserved].

(m)    <u>After Acquired Real Property</u>. Promptly and in any event, upon the acquisition by it or any of its Subsidiaries after the date hereof of any fee interest in any real property (wherever located) (each such interest being a "<u>New Facility</u>") with a Current Value (as defined below) in excess of $1,000,000 (provided, however, that the aggregate fair market value of all owned real property not subject to a Mortgage shall not exceed $2,000,000), immediately so notify the Collateral Agent, setting forth with specificity a description of the interest acquired, the location of the real property, any structures or improvements thereon and either an appraisal or such Loan Party's good-faith estimate of the current value of such real property (for purposes of this Section, the "<u>Current Value</u>"). The Collateral Agent shall notify such Loan Party whether it intends to require a Mortgage (and any other Real Property Deliverables) with respect to such New Facility. Upon receipt of such notice requesting a Mortgage (and any other Real Property Deliverables), the Person that has acquired such New Facility shall promptly furnish the same to the Collateral Agent. The Borrowers shall pay all fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Loan Party's obligations under this Section 7.01(m).

(n)    <u>Anti-Bribery and Anti-Corruption Laws</u>. Maintain, and cause each of its Subsidiaries to maintain, anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(o)    [Reserved].

(p)    <u>Further Assurances</u>. Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens (subject to the terms of the Intercreditor Agreements) any of the Collateral or any other

88

property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Loan Party (A) authorizes each Agent to file such agreements, instruments or other documents in any appropriate filing office, (B) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

Section 7.02   Negative Covenants.  So long as any principal of, or interest on, any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations), or any Lender shall have any Commitment hereunder, each Loan Party shall not, except as specified otherwise, or unless the Required Lenders shall otherwise consent in writing:

(a)   Liens, Etc.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired other than Permitted Liens.

(b)   Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)   Fundamental Changes; Dispositions.

(i)   Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any wholly-owned Subsidiary of any Loan Party (other than a Borrower) may be merged into such Loan Party or another wholly-owned Subsidiary of such Loan Party, or may consolidate or amalgamate with another wholly-owned Subsidiary of such Loan Party, so long as (A) no other provision of this Agreement would be violated thereby, (B) such Loan Party gives the Agents at least 10 Business Days' (or such shorter period agreed to by the Administrative Agent in its sole discretion) prior written notice of such merger, consolidation or amalgamation accompanied by true, correct and complete copies of all material agreements, documents and instruments relating to such merger, consolidation or amalgamation, including, but not limited to, the certificate or certificates of merger or amalgamation to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing), (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Agents' and Lenders' rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger, consolidation or amalgamation and (E) the surviving Subsidiary, if any, if not already a Loan Party, is joined as a Loan Party hereunder pursuant to a Joinder Agreement and is a party to a Security Agreement and

89

the Equity Interests of such Subsidiary is the subject of a Security Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger, consolidation or amalgamation; and

(ii)     Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(d)     Change in Nature of Business. Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 6.01(l).

(e)     Loans, Advances, Investments, Etc.  Make, or permit any of its Subsidiaries to make, any Investment in any other Person except for Permitted Investments.

(f)     Sale and Leaseback Transactions.   Enter into, or permit any of its Subsidiaries to enter into, any Sale and Leaseback Transaction, except any Sale and Leaseback Transaction consented to by the Required Lenders.

(g)     [Intentionally Omitted].

(h)     Restricted Payments.  Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i)     Federal Reserve Regulations.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)     Transactions with Affiliates.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate of Parent or any of its Subsidiaries, except (i) transactions consummated in the ordinary course of business for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and if they involve one or more payments by the Parent or any of its Subsidiaries in excess of $250,000 for any single transaction or series of related transactions, that are fully disclosed to the Administrative Agent prior to the consummation thereof, (ii) transactions solely among two or more Loan Parties, (iii) transactions permitted by Section 7.02(e) or Section 7.02(h), (iv) sales of Qualified Equity Interests of the Parent to Affiliates of the Parent not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith, and (v) reasonable and customary outside director and officer compensation (including bonuses (including sale bonuses), deferred compensation and stock option programs), benefits and indemnification arrangements, in each case approved by the Board of Directors (or a committee thereof) of such Loan Party or such Subsidiary.

(k)     Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries.  Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 7.02(k) shall prohibit or restrict compliance with: (A) this Agreement, the other Loan Documents, the First Lien Loan Documents, the ABL Loan Documents and the Parent Company Agreement; (B) any agreement in effect on the date of this Agreement and described on Schedule 7.02(k), or any extension, replacement or continuation of any such agreement; provided, that, any such encumbrance or restriction contained in such extended, replaced or continued agreement is no less favorable to the Agents and the Lenders than the encumbrance or restriction under or pursuant to the agreement so extended, replaced or continued; (C) any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances); (D) in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset sale agreement or similar contract for the conveyance of such property or asset and (2) instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto; (E) customary restrictions on dispositions of real property interests in reciprocal easement agreements; (F) customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets; or (G) customary restrictions in contracts that prohibit the assignment of such contract.

(l)     Limitations on Negative Pledges.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement, the other Loan Documents, the ABL Loan Documents and the First Lien Loan Documents, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(b) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; provided that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, and (iv) customary provisions in leases restricting the assignment or sublet thereof.

(m)     Modifications and Payment of Indebtedness; Organizational Documents and Certain Other Agreements; Etc.

(i)       (A) Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness for borrowed money (other than the First Lien Loan Documents or ABL Indebtedness) or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would add any covenant or event of default, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any respect, (B) amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of the ABL Indebtedness other than in accordance with the terms of the ABL/Term Intercreditor Agreement or (C) amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of the Second Lien Loan Documents other than in accordance with the terms of the Term Intercreditor Agreement;

(ii)      except for the First Lien Indebtedness and the ABL Indebtedness (in accordance with the terms thereof) and the payment of dividends in connection with the Parent Preferred Equity and the redemption of Parent Preferred Equity, in each case in accordance with the Parent Company Agreement and this Agreement (including Section 7.02(h) hereof), (A) make any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due), (B) refund, refinance, replace or exchange any other Indebtedness for any such Indebtedness (other than with respect to Permitted Refinancing Indebtedness), (C) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Subordinated Indebtedness in violation of the subordination provisions thereof or any subordination agreement with respect thereto, or (D) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing; provided that this clause (ii) shall not prohibit (a) payments in kind permitted hereunder and (b) other payments of principal, interest, or mandatory prepayments of the Obligations hereunder in accordance with this Agreement and the Term Intercreditor Agreement; or

(iii)     amend, modify or otherwise change any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity Interests, or enter into any new agreement with respect to any of its Equity Interests, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iii) that, either individually or in the aggregate, would not be adverse to the Agents and the Lenders in any material respect.

(n)     Investment Company Act of 1940. Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)     ERISA. (i) Engage, or permit or suffer to exist any ERISA Affiliate to engage, in any transaction described in Section 4069 or 4212(c) of ERISA; (ii) with respect to any Employee Plan, engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit or suffer to exist any ERISA Affiliate to adopt a Plan or any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to retirees after termination of employment other than as required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(p)     Environmental. Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it or any of its Subsidiaries, except in compliance in all material respects with Environmental Laws.

(q)     Accounting Methods. Modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r)     Anti-Money Laundering and Anti-Terrorism Laws.

(i)     None of the Loan Parties, nor any of their Affiliates or agents, shall:

(A)     conduct any business or engage in any transaction or dealing with or for the benefit of any Blocked Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Blocked Person;

(B)     deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to the OFAC Sanctions Programs;

(C)     use any of the proceeds of the transactions contemplated by this Agreement to finance, promote or otherwise support in any manner any illegal activity, including, without limitation, any violation of the Anti-Money Laundering and Anti-Terrorism Laws or any specified unlawful activity as that term is defined in the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956 and 1957; or

93

(D)     violate, attempt to violate, or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, shall be or shall become a Blocked Person.

(s)     Anti-Bribery and Anti-Corruption Laws. None of the Loan Parties shall:

(i)     offer, promise, pay, give, or authorize the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any Foreign Official for the purpose of: (A) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (B) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official; or (C) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(ii)     act or attempt to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

Section 7.03     Minimum EBITDA.  The Loan Parties shall not permit Consolidated EBITDA of the Parent and its Subsidiaries for the consecutive 12 fiscal month period, commencing with the fiscal quarter ending on December 31, 2022, and each subsequent consecutive 12 fiscal month period tested as of the last day of each fiscal quarter ending prior to the Suspension Date to be less than $[___] without the consent (not to be unreasonably withheld or delayed) of the Goldman Lenders (other than any Defaulting Lender).

### ARTICLE VIII

Cash Management Arrangements and Other Collateral Matters

Section 8.01     Cash Management Arrangements.  (a)  On or prior to [___], 2022[5], the Loan Parties shall (i) establish and maintain cash management services of a type and on terms reasonably satisfactory to the Agents at one or more banks reasonably acceptable to the Agents (each a "Cash Management Bank") and (ii) except as otherwise provided under Section 8.01(b), deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral, all Collections (of a nature susceptible to a deposit in a bank account) and all other amounts received by any Loan Party (including payments made by Account Debtors directly to any Loan Party) into a Cash Management Account.

(b)     On or prior to [___], 2022[6], the Loan Parties shall, with respect to each Cash Management Account (other than Excluded Accounts), deliver to the Collateral Agent a Control

---

[5] NTD: To be 60 days post- Effective Date.
[6] NTD: To be 60 days post- Effective Date.

Agreement with respect to such Cash Management Account.  After [___], 2022[7] (or such later date as the Collateral Agent may agree in writing), the Loan Parties shall not maintain, and shall not permit any of their Subsidiaries to maintain, cash, Cash Equivalents or other amounts in any deposit account or securities account, unless the Collateral Agent shall have received a Control Agreement in respect of each such Cash Management Account (other than Excluded Accounts).

(c)     No Loan Party nor any of its Subsidiaries shall permit the maintenance of cash and Cash Equivalents (a) in the Barbados Accounts in excess of $250,000 in the aggregate, or (b) in the Philippines Accounts in excess of $500,000 in the aggregate, in the case of each of the preceding clauses (a) and (b), for any period of 5 consecutive days; it being understood that any amounts in excess of such threshold for such 5 day period shall be promptly repatriated to a Deposit Account held in the United States by a Loan Party and subject to a Control Agreement.

(d)     No Loan Party nor any of its Subsidiaries shall permit the maintenance of cash (a) in any Customer Trust Account, other than (i) cash owned by the applicable underlying customer (x) that was collected by such Loan Party from third parties in connection with its performance of services for such customer and (y) for payment of fees and expenses incurred by such Loan Party for the performance of such services, or (ii) funds advanced to such Customer Trust Account by a Loan Party to comply with client remittance requirements, and (b) in any License Trust Account, other than cash that such Loan Party is required to maintain in such account by the applicable underlying State or Governmental Authority; it being understood that any amounts in excess of such thresholds shall be promptly remitted to a Deposit Account subject to a Control Agreement.

(e)     So long as no Default or Event of Default has occurred and is continuing, the Borrowers may amend Schedule 8.01 to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, each Loan Party and such prospective Cash Management Bank shall have executed and delivered to the Collateral Agent a Control Agreement.  Subject to the conditions set forth in any Control Agreement with respect to any such Cash Management Account, each Loan Party shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from the Collateral Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment, or that the operating performance, funds transfer, or availability procedures or performance of such Cash Management Bank with respect to Cash Management Accounts or the Collateral Agent's liability under any Control Agreement with such Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment.

---

[7] NTD: To be 60 days post- Effective Date.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01   <u>Events of Default</u>.  Each of the following events shall constitute an event of default (each, an "<u>Event of Default</u>"):

(a)      any Borrower shall fail to pay (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) (i) within three (3) Business Days following the due date interest on any Loan, any Collateral Agent Advance, or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Loans) or any other Loan Document or (ii) all or any portion of the principal of the Loans when due;

(b)      any representation or warranty made or deemed made by or on behalf of any Loan Party or by any Authorized Officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)      any Loan Party shall fail to perform or comply with any covenant or agreement contained in Section 5.02, Section 7.01(a), Section 7.01(c), Section 7.01(d), Section 7.01(f), Section 7.01(h), Section 7.01(k), Section 7.01(n), Section 7.01(o), Section 7.02 or Section 7.03 or Article VIII;

(d)      any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for 30 days after the earlier of the date a senior officer of any Loan Party has knowledge of such failure and the date written notice of such default shall have been given by any Agent or the Required Lenders to any Loan Party;

(e)      any Loan Party or any of its Subsidiaries shall (i) fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of any Material Indebtedness (excluding (x) Indebtedness evidenced by this Agreement and (y) any failure to pay any applicable dividend on any Parent Preferred Equity in accordance with the Parent Company Agreement), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or (ii) fail to observe or perform any other agreement or condition under any agreement or instrument relating to any such Material Indebtedness and such failure or event shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such failure or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

96

(f)     any Loan Party or any of its Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, administration, receivership, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, receivership or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g)     any proceeding shall be instituted against any Loan Party or any of its Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, administration, receivership, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)     any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason (except to the extent such failure results from the failure of the Collateral Agent to maintain possession of Collateral as to which the Liens thereon are perfected by possession or otherwise as a result of any action or failure to act by the Collateral Agent when provided with the information required by the Loan Documents) fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (subject to the terms of the Intercreditor Agreements) in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(j)     one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $1,000,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against any Loan Party or any of its Subsidiaries and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of 30

consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;

        (k)    one or more fines and/or penalties for the payment of money exceeding $10,000,000 in the aggregate shall be levied against any Loan Party or any of its Subsidiaries by the Consumer Fraud Protection Bureau or any other Governmental Authority;

        (l)    [reserved];

        (m)    any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 15 consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

        (n)    the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party, if such loss, suspension, revocation or failure to renew would reasonably be expected to have a Material Adverse Effect;

        (o)    [reserved];

        (p)    (i) there shall occur and be continuing any "Event of Default" (or any comparable term) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (ii) with respect to any Subordinated Indebtedness, any of the Obligations for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (iii) with respect to any Subordinated Indebtedness, any Indebtedness other than the Obligations shall constitute "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, the documents evidencing or governing any Subordinated Indebtedness, and (iv) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness;

        (q)    a Change of Control shall have occurred; or

        (r)    a Termination Event shall have occurred;

then, during the continuation of any such event, the Collateral Agent may, and shall, at the request of the Required Lenders, by notice to the Administrative Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, together with the payment of the Applicable Premium with respect to the Loans so repaid, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its

other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 9.01 with respect to any Loan Party, without any notice to any Loan Party or any other Person or any act by any Agent or any Lender, all Commitments shall automatically terminate and all Loans then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents, including, without limitation, the Applicable Premium, shall be accelerated and become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Loan Party.

Section 9.02   Cure Right.  In the event that the Borrowers fail to comply with the requirements of any financial covenant set forth in Section 7.03 (such financial covenant, a "Specified Financial Covenant" and such Event of Default, a "Curable Default"), from the last day of the applicable fiscal quarter until the expiration of the 10th day after the date on which financial statements are required to be delivered with respect to such fiscal quarter hereunder, the Parent shall have the right to issue Permitted Cure Equity for cash or otherwise receive cash contributions to the capital of the Parent and contribute such cash to the Borrower which such Permitted Cure Equity may be included in the calculation of Consolidated EBITDA solely for the purposes of determining compliance with the Specified Financial Covenant at the end of such fiscal quarter and any subsequent calculation period that includes such fiscal quarter (such right, the "Cure Right"); provided, that (a) such proceeds are actually received by the Borrowers no later than 10 days after the date on which financial statements are required to be delivered with respect to such fiscal quarter hereunder, and (b) such proceeds do not exceed the aggregate amount necessary to cure such Curable Default for such period.  If, after giving effect to the foregoing pro forma adjustment, the Borrowers are in compliance with the Specified Financial Covenant, the Borrowers shall be deemed to have satisfied the requirements of such Section as of the relevant date of determination with the same effect as though there had been no failure to comply on such date, and the applicable Curable Default shall be deemed cured for purposes of this Agreement.  From and after the receipt by the Administrative Agent of a written notice from Parent or the Administrative Borrower that the Parent or the Borrowers intend to exercise a Cure Right with respect to a particular fiscal quarter of Parent and its Subsidiaries and until the expiration of the 10th day after the date on which the Compliance Certificate is required to be delivered pursuant to Section 7.01(a)(iv) with respect to such fiscal quarter, neither the Administrative Agent nor the Required Lenders shall exercise any right under Section 9.01 solely on the basis of an Event of Default having occurred and being continuing in respect of a failure to comply with the requirements of the financial covenant set forth in Section 7.03(a); provided, that, during such period, an Event of Default in respect of such failure to comply shall continue to exist for all other purposes of this Agreement and the other Loan Documents.

## ARTICLE X

## AGENTS

Section 10.01   Appointment.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set

forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices, written reports, certificates and agreements received by such Agent, in its capacity as Agent, and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices, written reports, certificates or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Loans and Collateral Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) shall be binding upon all Lenders and all makers of Loans; provided, however, the Agents shall not be required to take any action which, in the reasonable opinion of any Agent, exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

        Section 10.02 <u>Nature of Duties; Delegation</u>. (a)  The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents. The duties of the Agents shall be mechanical and administrative in nature. The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship

in respect of any Lender. Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender. Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) have instructed such Agent to act or refrain from acting pursuant hereto.

(b)     Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, sub-agent, co-agent, employee, attorney-in-fact and any other Person (including any Lender). Any such Person shall benefit from this Article X to the extent provided by the applicable Agent.

Section 10.03  <u>Rights, Exculpation, Etc.</u>  The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty

regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents). The provisions of this Section 10.03 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.04  Reliance.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05  Indemnification.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five days of written demand by such Agent, reimburse such Agent for and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted from such Agent's gross negligence or willful misconduct. The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Agreement.  This Section 10.05 shall not

apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

Section 10.06  <u>Agents Individually</u>.  With respect to its Pro Rata Share of the Total Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07  <u>Successor Agent</u>.  (a)  Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Administrative Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent with the consent of the Borrower so long as no Event of Default has occurred and is continuing . If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "<u>Resignation Effective Date</u>"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent. Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above. Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08  <u>Collateral Matters</u>.

(a)    The Collateral Agent may from time to time make such disbursements and advances ("<u>Collateral Agent Advances</u>") which the Collateral Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrowers of the Loans and other Obligations or to pay any other amount chargeable to the

Borrowers pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 12.04; provided, however that the Collateral Agent shall not make Collateral Agent Advances under this Section 10.08 of greater than $5.0 million in the aggregate at any time outstanding without the prior written consent of the Required Lenders. The Collateral Agent Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to the Term Loan. The Collateral Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.01. The Collateral Agent shall notify each Lender and the Administrative Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such Collateral Agent Advance. Without limitation to its obligations pursuant to Section 10.05, each Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Collateral Agent Advance. If such funds are not made available to the Collateral Agent by such Lender, the Collateral Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for three Business Days and thereafter at a rate per annum equal to the Reference Rate plus the Applicable Margin.

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Loans and all other Obligations (other than Contingent Indemnification Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section 12.02. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(b).

(c)     Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(b). Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)      Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(e)      The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09 Agency for Perfection.   Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions. In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such

other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10  No Reliance on any Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act. Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11  No Third-Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12  No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13  Reports; Confidentiality; Disclaimers.  By becoming a party to this Agreement, each Lender:

(a)     is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Parent or any of its Subsidiaries (each, a "Report") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)     expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Parent and its Subsidiaries and will rely

106

significantly upon the Parent's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)     agrees to keep all Reports and other material, non-public or proprietary information regarding the Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)     without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrowers, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorney's fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14 <u>Collateral Custodian</u>.   Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests. Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral. All costs and expenses incurred by the Collateral Agent or its designee by reason of the employment of the custodian shall be the responsibility of the Borrowers and charged to the Loan Account.

Section 10.15 <u>Intercreditor Agreements</u>.   Each Lender hereby grants to the Collateral Agent all requisite authority to enter into or otherwise become bound by, and to perform its obligations and exercise its rights and remedies under and in accordance with the terms of, the Intercreditor Agreements, and to bind the Lenders thereto by the Collateral Agent's entering into or otherwise becoming bound thereby, and no further consent or approval on the part of any Lender is or will be required in connection with the performance by the Collateral Agent of the Intercreditor Agreements.

Section 10.16 <u>Collateral Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the

Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Collateral Agent and, in the event that the Collateral Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent and its agents and counsel, and any other amounts due the Collateral Agent hereunder and under the other Loan Documents.

## ARTICLE XI

## GUARANTY

Section 11.01 <u>Guaranty</u>.   Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable and documented out-of-pocket counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this Article XI and required to be paid hereunder. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower. In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02 <u>Guaranty Absolute</u>.   Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto. Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral. The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of

each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following: (a) any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise; (c) any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations; (d) the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party; (e) any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or (f) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety. This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03 <u>Waiver</u>.   Each Guarantor hereby waives (a) promptness and diligence, (b) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (c) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (d) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (e) any other defense available to any Guarantor. Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04 <u>Continuing Guaranty; Assignments</u>.  This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its

rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments and its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05  Subrogation.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising. If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06  Contribution.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed. "Fair Share Contribution Amount" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance

as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor. "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 11.06), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor. The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01  Notices, Etc.

(a)      Notices Generally. All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, telecopier or other electronic delivery. In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

[  ]

with copies to:

[  ]

and

[  ]
Attention: [  ]
Telephone: [  ]
Email: [  ]

if to the Agents, to it at the following address:

BSP Agency, LLC
9 West 57th Street, Suite 4920
New York, NY 10019
Attention: [      ]
Fax: [      ]
Email: [      ]

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY, 10038
Attention: Jayme T. Goldstein / Marija Pecar
Telephone: (212) 806-5805 / 212 806-6535
Email: jgoldstein@stroock.com / mpecar@stroock.com

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by facsimile or other electronic delivery shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided, further that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

        (b)      <u>Electronic Communications</u>.

        (i)      Each Agent and the Administrative Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

        (ii)      Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon receipt and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

Section 12.02  <u>Amendments, Etc.</u>  (a)  No amendment to or other modification of, or waiver of any provision of this Agreement or any other Loan Document (excluding the Fee Letter), and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, modification, consent or waiver to cure any ambiguity, omission, defect or inconsistency, or granting a new Lien for the benefit of the Agents and the Lenders, or extending an existing Lien over additional property, by the Agents and the Administrative Borrower, (y) in the case of any other amendment, modification, waiver or consent, subject to the proviso set forth below, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders), subject to the proviso set forth below, and the Administrative Borrower, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, modification, waiver or consent shall: (i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee or premium payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees or premiums on, the Loans payable to any Lender, in each case, without the written consent of such Lender and the Administrative Borrower; provided that an increase of any Lender's Commitment  shall require the consent of each Lender; (ii) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender and the Administrative Borrower; (iii) amend or otherwise modify, or be effective with respect to, the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender and the Administrative Borrower; (iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Agents and the Lenders, or release any Borrower or any Guarantor (except in connection with a Disposition of the Equity Interests thereof permitted by Section 7.02(c)(ii)), in each case, without the written consent of each Lender and the Administrative Borrower; (v) amend, modify or waive Section 2.07, 2.12(c), Section 4.02, Section 4.03, this Section 12.02 of this Agreement or any provision in any Loan Document providing for the pro rata sharing of payments without the written consent of each affected Lender and the Administrative Borrower; and (vi) amend, modify or waive Section 12.07(o) without the consent of each affected Lender.

Notwithstanding the foregoing, (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents, (B) no amendment, waiver or consent shall, unless in writing and signed by (i) the BSP Lenders, affect the rights or duties of the BSP Lenders or any BSP Person, or Permitted Holders, under this Agreement or the other Loan Documents, and (ii) the Goldman Lenders, affect the rights or duties of the Goldman Lenders or any Goldman Person under this Agreement or the other Loan Documents, (C) the consent of the Borrowers shall not be required to change any order of priority set forth in Section 2.05(d) and Section 4.03, and (D) only the consent of persons constituting Eligible Lenders at the applicable time shall be required for any waiver with respect to, or any consent to any departure by the Loan Parties from any of their obligations under, Section 2.12(c) (or any Default or Event of Default resulting from any failure to comply therewith), and each Eligible Lender shall be permitted to

113

waive any of its individual rights pursuant thereto without the consent of any other Eligible Lender or any other Person. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents, and any Loans and Commitments (if applicable) held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender).

(b)     If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender other than the Collateral Agent and the Administrative Agent and their respective Affiliates and Related Funds (the "Holdout Lender") fails to give its consent, authorization, or agreement, then the Borrower, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations including the Applicable Premium. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 12.07. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

(c)     [Reserved].

Section 12.03  No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04  Expenses; Taxes; Attorneys' Fees.  The Borrowers will pay within 30 days (except in connection with any amount due pursuant to Section 5.01(a)) of receipt of a written invoice, all reasonable and documented out-of-pocket costs and expenses incurred by or on behalf of each Agent (and, in the case of clauses (b) through (k) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable and documented out-of-pocket fees and expenses of counsel for each Agent (and, in the case of clauses (b) through (k) below, the BSP Lenders and the Goldman Lenders), accounting,

due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section **Error! Reference source not found.** or the review of any of the agreements, instruments and documents referred to in Section **Error! Reference source not found.**), (b) any amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (e) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (f) any attempt to collect from any Loan Party, (g) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (h) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any Facility of any Loan Party, (i) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien or (k) the rating of the Loans by one or more rating agencies in connection with any Lender's Securitization; provided that, any legal fees and expenses in accordance with this Section 12.04 shall be limited to the reasonable and documented out-of-pocket fees and disbursements of (i) one outside counsel to each of (I) the Agents, (II) the BSP Lenders taken as a whole and (III) the Goldman Lenders taken as a whole and (ii) if reasonably necessary, one regulatory outside counsel and/or local counsel to each of (I) the Agents taken as a whole, (II) the BSP Lenders taken as a whole and (III) the Goldman Lenders taken as a whole. Without limitation of the foregoing or any other provision in the Loan Documents: (x) the Borrowers agree to pay all Other Taxes payable in connection with this Agreement or any other Loan Document, and the Borrowers agree to save each Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such Other Taxes, (y) the Borrowers agree to pay all broker fees incurred by any Borrower that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (z) if, upon the occurrence and during the continuance of any Event of Default, the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself reasonably perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed by the Borrowers within 5 Business Days of demand by such Agent. The obligations of the Borrowers under this Section **Error! Reference source not found.** shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.05   Right of Set-off.   Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits

(general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agents and the Lenders under this Section 12.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 12.06  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07  Assignments and Participations.

(a)     This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender (and any such assignment without the Lenders' prior written consent shall be null and void), and the assignment of any Lender's Commitment or Loan (or any portion thereof) made by it shall be subject to Section 12.07(b).

(b)     Subject to the conditions set forth in clause (c) below, each Lender may assign (including in connection with any open market or privately negotiated transaction) to one or more other lenders or other Persons all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitments and any Loan made by it with the written consent of the Administrative Agent and the Administrative Borrower (such consent of the Administrative Borrower not to be unreasonably withheld, delayed or conditioned); provided, however, that (x) no written consent of the Administrative Agent or the Administrative Borrower shall be required (1) in connection with any assignment by a Lender to any Eligible Assignee, or (2) if such assignment is to a Person that is not a Competitor and is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender, and (y) no written consent of the Administrative Borrower shall be required if a Specified Event of Default has occurred and is continuing at such time.

(c)    Assignments shall be subject to the following additional conditions:

(i)    Each such assignment shall be in an amount which is at least $1,000,000 or a multiple of $500,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A) any Eligible Assignee or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,000,000 or a multiple of $500,000 in excess thereof);

(ii)    Except as provided in the parenthetical below, the parties to each such assignment shall execute and deliver to the Administrative Agent (and, if applicable, to the Collateral Agent and/or the Administrative Borrower, as the case may be), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment, and such parties shall deliver to the Administrative Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to any other Lender), and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT; and

(iii)    Notwithstanding anything to the contrary in this Agreement, and whether or not any Default or Event of Default is continuing, in no event shall any Loan(s) or Commitment(s) (or any interest therein, or any claim or right with respect thereto, as applicable) be assigned or otherwise transferred (including pursuant to any participation, pledge, security interest or other indirect arrangement) to (x) any natural person, any Defaulting Lender or any Competitor (or any of their respective Affiliates or Related Funds), or (y) any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons, in each case, without the Administrative Borrower's prior written consent, and any assignment or other transfer in contravention of the foregoing shall be null and void ab initio (and any Loan, Commitment, interest, right or claim purported to be assigned or otherwise transferred pursuant thereto shall be deemed to be held by the Lender or other Person that was the purported assignor or other transferor thereof).

(d)    Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)      By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty, and assumes no responsibility with respect to, the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender and (vii) such assignment complies with the terms of this Agreement.

(f)      The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain, or cause to be maintained, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Administrative Borrower and any Lender (but, in the case of any Lender, solely with respect to its own Loans and Commitments, unless consented to otherwise by the Administrative Borrower) at any reasonable time and from time to time upon reasonable prior written notice to the Administrative Agent.

(g)      Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Borrower, Administrative Agent or the Collateral Agent pursuant to Section 12.07(b) (which consent of the applicable Agent must be evidenced by such Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment

to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(i)     In the event that any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrowers, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Loan Parties and the Agents at any reasonable time and from time to time upon reasonable prior notice; provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Loan Participant or any information relating to a Loan Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person other than the Loan Parties and the Agents, except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury.

(j)     Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.09(e) and Section 2.09(h).

(k)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations (including the making of any Loans), and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents, and such

Lender shall remain the Lender of record in the Register and be deemed to be the legal owner and holder of the applicable Loans, Commitments and other Obligations;; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document).  The Loan Parties agree that each participant shall be entitled to the benefits and be subject to the requirements of Section 2.09 and Section 2.10 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender, provided, that such Participant shall not be entitled to receive any greater payment under Section 2.09 or Section 2.10, with respect to any participation, than its participating Lender would have been entitled to receive except as otherwise required by a Change in Law that occurs after the Participant acquired the applicable participation or unless the Administrative Borrower has consented to such participation.

(l)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such Lender pursuant to securitization or similar credit facility (a "Securitization"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(m)     For the avoidance of doubt, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, (x) Loans and Commitments may be sold, assigned, transferred and/or participated on a pro rata basis or a non-pro rata basis, whether via one or more auctions, open market purchases, privately negotiated transactions or otherwise pursuant, each of which shall be on terms and conditions, and for such consideration and/or at such purchase price, in each case, as agreed to by the applicable seller or transferor, and the applicable purchaser or transferee, and (y) any payment made on account of any sale, assignment, transfer or participation pursuant to this Section 12.07, or any payment otherwise in respect of, pursuant to or in connection with this Section 12.07, in each case, shall not be subject to Sections 4.01 or 4.02 hereof, or any other provision of this Agreement or any other Loan Document that requires a payment to be made to Lenders in accordance with their Pro Rata Shares, or that otherwise provides for ratable payments or distributions to the Lenders.

(n)     [Reserved.]

(o)     BSP/Goldman Right of First Offer; BSP/Goldman Buyout Right & Consent Rights.

(i)     BSP Group and the Goldman Group shall each be permitted to exercise the BSP/Goldman Right of First Offer and the BSP/Goldman Buyout Right at such times as specified pursuant to the terms thereof.

(ii)     BSP Group (except if comprising any BSP Successor) shall be required to consent to any assignment or other transfer of any Loan, Commitment or other

120

Obligations (or any portion thereof or interest therein) by any Goldman Lender to any Person (other than an Affiliate or Related Fund of such Goldman Lender that is an Eligible Assignee) at any time that the aggregate amount of Effective Date Committed Debt held by BSP Group represents not less than 17.0% of all Effective Date Committed Debt held at such time by all Lenders who are not Defaulting Lenders.

(iii)     Goldman Group (except if comprising any Goldman Successor) shall be required to consent to any assignment or other transfer of any Loan, Commitment or other Obligations (or any portion thereof or interest therein) by any BSP Lender to any Person (other than an Affiliate or Related Fund of such BSP Lender that is an Eligible Assignee) at any time that the aggregate amount of Effective Date Committed Debt held by Goldman Group represents not less than 17.0% of all Effective Date Committed Debt held at such time by all Lenders who are not Defaulting Lenders.

Section 12.08  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09  <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 12.10  <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>.

(a)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01, SUCH SERVICE TO

BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 12.11  WAIVER OF JURY TRIAL, ETC.  EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12  [Reserved].

Section 12.13  No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14  Reinstatement; Certain Payments.  If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to each other Agent and Lender and the Administrative Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of

any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.15   Indemnification; Limitation of Liability for Certain Damages.

(a)      In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrowers' use of the proceeds thereof, (iii) the Agents and the Lenders relying on any instructions of the Administrative Borrower or the handling of the Loan Account and Collateral of the Borrowers as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter (x) caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction or (y) result from any dispute solely among Indemnitees (or their Related Parties) and not involving any action or inaction by the Borrowers and their respective Affiliates (excluding as against the Agents in their capacity as such).

(b)      The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.15 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)      No party hereto shall assert, and each party hereto hereby waives, any claim against the Indemnitees or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)      The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.16  <u>Records</u>.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, including, without limitation, the Fees set forth in the Fee Letter and the Applicable Premium, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17  <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18  <u>Highest Lawful Rate</u>.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this

124

Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.18, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrowers). All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19  <u>Confidentiality</u>.  Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public or proprietary information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents (and which at the time is not, and does not thereafter become, publicly available through no breach hereunder by an Agent or such Lender or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), <u>provided</u> that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates (or prospective Affiliates, including limited partners) and to its and its Affiliates' (or

such prospective Affiliates') respective equityholders (including, without limitation, partners), directors, officers, employees, agents, trustees, counsel, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19 and such Lender shall remain liable for any breach hereof by such Persons); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.19; (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority (in which case such Agent and/or such Lender shall notify the Administrative Borrower, in advance of any such disclosure, to the extent permitted by such law, process and/or request); (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency or otherwise to the extent consisting of general portfolio information that does not identify Loan Parties; (vi) in connection with any litigation to which any Agent or any Lender is a party (in which case such Agent and/or such Lender shall use commercially reasonable efforts to notify the Administrative Borrower, in advance of any such disclosure, to the extent permitted by such law, process and/or request); (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; or (viii) with the consent of the Administrative Borrower.

Section 12.20  <u>Public Disclosure</u>.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure). Each Loan Party hereby authorizes each Agent and each Lender, after consultation with and prior written consent from the Borrowers, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.21  <u>Integration</u>.   This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.22  <u>USA PATRIOT Act</u>.  Each Lender or Agent that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrowers that pursuant to the

requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrowers, which information includes the name and address of each such entity and other information that will allow such Lender or Agent to identify the entities composing the Borrowers in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender or Agent may reasonably require from time to time in order to enable such Lender or Agent to comply with the USA PATRIOT Act.

Section 12.23  Intercreditor Agreement. In the event of any conflict between the terms of this Agreement and the Term Intercreditor Agreement, the parties hereto hereby agree that the terms of the Term Intercreditor Agreement shall prevail.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWERS:**

[NEW HOLDCO SUB], as a Borrower and as the Administrative Borrower

By: _____
  Name:  [  ]
  Title:  [  ]

ORG GC GP BUYER, LLC, as a Borrower

By: _____
  Name:  [  ]
  Title:  [  ]

ORG GC LP BUYER, LLC, as a Borrower

By: _____
  Name:  [  ]

**GC SERVICES**
**SECOND LIEN FINANCING AGREEMENT**

Title:    [ ]

**GUARANTORS:**

ORG GC GP BUYER, LLC

By:
    Name:   [ ]
    Title:    [ ]

**GUARANTORS:**

[NEW HOLDCO], as Parent and as a Guarantor

By: _____
    Name:   [ ]
    Title:    [ ]

[ORG GC GP BUYER, LLC, as a Guarantor]

By: _____
    Name:   [ ]
    Title:    [ ]

[ORG GC LP BUYER, LLC, as a Guarantor]

By:
    Name:   [ ]
    Title:    [ ]

GC SERVICES LIMITED PARTNERSHIP, as a
Guarantor

**GC SERVICES
SECOND LIEN FINANCING AGREEMENT**

By:   ORG GC GP Buyer, LLC,
      its general partner

By: _____
    Name:   [  ]
    Title:  [  ]

GC SERVICES INTERNATIONAL, LLC, as a
Guarantor

By: _____
    Name:   [  ]
    Title:  [  ]

**GC SERVICES**
**SECOND LIEN FINANCING AGREEMENT**

<u>ADMINISTRATIVE AGENT</u>:

BSP AGENCY, LLC

By: _____
       Name:  Bryan Martoken
       Title:   CFO

<u>COLLATERAL AGENT</u>:

BSP AGENCY, LLC

By: _____
       Name:  Bryan Martoken
       Title:   CFO

**GC SERVICES**
**SECOND LIEN FINANCING AGREEMENT**

<u>LENDERS</u>:

[   ]

**GC SERVICES**
**SECOND LIEN FINANCING AGREEMENT**

## Exhibit F

**Form of Term DIP Facility Agreement**

*K&S COMMENTS*
*10/11/21*

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

**DATED AS OF [__], 2021**

**BY AND AMONG**

**ORG GC MIDCO, LLC,**
**as Borrower,**

**EACH SUBSIDIARY OF BORROWER LISTED**
**AS A GUARANTOR ON THE SIGNATURE PAGES HERETO**
**AND FROM TIME TO TIME PARTY HERETO,**
**as Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as Lenders,**

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,**
**as Collateral Agent, and**

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,**
**as Administrative Agent**

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS; CERTAIN TERMS.................................................................2
   Section 1.01        Definitions......................................................................................2
   Section 1.02        Terms Generally............................................................................28
   Section 1.03        Certain Matters of Construction....................................................28
   Section 1.04        Accounting and Other Terms.........................................................28
   Section 1.05        Time References.............................................................................29

ARTICLE II        THE LOANS......................................................................................30
   Section 2.01        DIP Loan Commitments; Disbursement of Loans..........................30
   Section 2.02        Making the Loans...........................................................................30
   Section 2.03        Repayment of Loans; Evidence of Debt.........................................30
   Section 2.04        Interest............................................................................................31
   Section 2.05        Termination of DIP Loan Commitment; Prepayment of Loans......32
   Section 2.06        Fees.................................................................................................33
   Section 2.07        [Reserved].......................................................................................33
   Section 2.08        [Reserved].......................................................................................33
   Section 2.09        Taxes...............................................................................................33
   Section 2.10        Increased Costs and Reduced Return.............................................35
   Section 2.11        [Reserved].......................................................................................36
   Section 2.12        Super Priority Nature of Obligations and Lenders' Liens...............36
   Section 2.13        No Discharge; Survival of Claims.  Except as otherwise contemplated in the RSA, until indefeasible payment in full (other than contingent obligations not yet due and payable) in cash of the Loans and all other Obligations (which includes a conversion thereof into any exit financing of the Debtor pursuant to the terms of the Bankruptcy Plan and in accordance with the RSA), each of the Borrower and the Guarantors agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority DIP Claims and the Liens granted to the Collateral Agent pursuant to the Order and the Loan Documents and described in this Section 2.13 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in the Chapter 11 Case.....................................................................36
   Section 2.14        Release.  [The Borrower and the Guarantors hereby acknowledges effective upon entry of the Order, and subject to the terms thereof, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or any Subsidiaries' liability to repay any Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Agent or any Lender.  Upon entry of the Order, the Borrower and the Guarantors, each in their own right (and in respect of the Borrower,  on behalf of its bankruptcy estate), and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge each Agent and the Lenders and all of the Agents' and the Lenders' respective officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or

i

on behalf of any of them of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Order, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other Professional Costs, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to this Agreement, the Order and the transactions (including, for avoidance of doubt, the Transactions) contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  Notwithstanding anything herein to the contrary, the Borrower and Guarantors shall not have any obligation to indemnify or hold harmless any Agent or any Lender hereunder with respect to liabilities to the extent they result from the actual fraud (other than in the case of the Agents), gross negligence or willful misconduct of such Agent or Lender, as applicable, as finally determined by a court of competent jurisdiction.] ............... 37

Section 2.15    Waiver of Certain Rights ........................................................................ 37

ARTICLE III    [INTENTIONALLY OMITTED] ................................................ 38

ARTICLE IV    APPLICATION OF PAYMENT ................................................ 38
Section 4.01    Payments; Computations and Statements ................................ 38
Section 4.02    Sharing of Payments .................................................................. 38
Section 4.03    Apportionment of Payments ...................................................... 39

ARTICLE V    CONDITIONS TO LOANS ...................................................... 39
Section 5.01    Conditions Precedent to Effectiveness .................................... 39

ARTICLE VI    REPRESENTATIONS AND WARRANTIES .......................... 42
Section 6.01    Representations and Warranties ................................................ 42

ARTICLE VII    ARTICLE VII COVENANTS OF THE LOAN PARTIES........... 49
Section 7.01    Affirmative Covenants .............................................................. 49
Section 7.02    Negative Covenants .................................................................. 57

ARTICLE VIII    CASH MANAGEMENT ARRANGEMENTS  AND OTHER COLLATERAL MATTERS........................................................................ 62
Section 8.01    Cash Management Arrangements .............................................. 62

ARTICLE IX    EVENTS OF DEFAULT ........................................................ 63
Section 9.01    Events of Default....................................................................... 63
Section 9.02    Remedies upon an Event of Default.......................................... 68

ARTICLE X    AGENTS .................................................................................. 69
Section 10.01    Appointment.............................................................................. 69
Section 10.02    Nature of Duties; Delegation..................................................... 69
Section 10.03    Rights, Exculpation, Etc............................................................ 70
Section 10.04    Reliance..................................................................................... 71
Section 10.05    Indemnification ......................................................................... 71

Section 10.06    Agents Individually ................................................................................ 71
Section 10.07    Successor Agent .................................................................................... 71
Section 10.08    Collateral Matters ................................................................................. 72
Section 10.09    Agency for Perfection ........................................................................... 73
Section 10.10    No Reliance on any Agent's Customer Identification Program ............ 73
Section 10.11    No Third Party Beneficiaries ................................................................ 74
Section 10.12    No Fiduciary Relationship .................................................................... 74
Section 10.13    Reports; Confidentiality; Disclaimers ................................................. 74
Section 10.14    Collateral Custodian ............................................................................ 74
Section 10.15    Intercreditor Agreement ...................................................................... 75
Section 10.16    Collateral Agent May File Proofs of Claim ......................................... 75
Section 10.17    Chapter 11 Case; Bankruptcy .............................................................. 75
Section 10.18    Erroneous Payments ............................................................................. 76

ARTICLE XI      GUARANTY ......................................................................................... 79
Section 11.01    Guaranty ............................................................................................... 79
Section 11.02    Guaranty Absolute ............................................................................... 79
Section 11.03    Waiver .................................................................................................. 79
Section 11.04    Continuing Guaranty; Assignments ..................................................... 80
Section 11.05    Subrogation .......................................................................................... 80
Section 11.06    Contribution ......................................................................................... 81

ARTICLE XII     MISCELLANEOUS ............................................................................. 81
Section 12.01    Notices, Etc. ........................................................................................ 81
Section 12.02    Amendments, Etc .................................................................................. 83
Section 12.03    No Waiver; Remedies, Etc .................................................................... 83
Section 12.04    Expenses; Taxes; Attorneys' Fees ........................................................ 83
Section 12.05    Right of Set-off .................................................................................... 84
Section 12.06    Severability .......................................................................................... 85
Section 12.07    Assignments and Participations. .......................................................... 85
Section 12.08    Counterparts ......................................................................................... 88
Section 12.09    GOVERNING LAW .............................................................................. 88
Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE. ........ 88
Section 12.11    WAIVER OF JURY TRIAL, ETC ......................................................... 89
Section 12.12    [Reserved] ............................................................................................ 89
Section 12.13    No Party Deemed Drafter ..................................................................... 89
Section 12.14    Reinstatement; Certain Payments ......................................................... 89
Section 12.15    Indemnification; Limitation of Liability for Certain Damages. .......... 90
Section 12.16    Records ................................................................................................. 90
Section 12.17    Binding Effect ...................................................................................... 91
Section 12.18    Highest Lawful Rate ............................................................................. 91
Section 12.19    Confidentiality ..................................................................................... 92
Section 12.20    Public Disclosure ................................................................................. 92
Section 12.21    Integration ............................................................................................ 92
Section 12.22    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and

iii

agrees to be bound by:.................................................................................. 93

Section 12.23      Bankruptcy Matters.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Debtor, the estate of the Debtor, and any trustee, other estate representative or any successor in interest of the Debtor in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of each Agent and the Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law.  No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and the Lenders.  Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Administrative Agent and the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, the Administrative Agent and the Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents. ............................................................. 93

Section 12.24      USA PATRIOT Act ................................................................................. 93

SCHEDULE AND EXHIBITS

Schedule 1.01(A)         Lenders and Lenders' Commitments
Schedule 1.01(B)         Facilities
Schedule 6.01(e)         Capitalization; Subsidiaries
Schedule 6.01(l)         Nature of Business
Schedule 6.01(q)         Environmental Matters
Schedule 6.01(r)         Insurance
Schedule 6.01(u)         Intellectual Property Schedule
Schedule 6.01(v)         Material Contracts
Schedule 7.02(a)         Existing Liens
Schedule 7.02(e)         Existing Investments
Schedule 7.02(k)         Limitations on Dividends and Other Payment Restrictions


Exhibit A        Form of Joinder Agreement
Exhibit B        Form of Assignment and Acceptance
Exhibit C        Form of Notice of Borrowing
Exhibit D        Form of Order

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

This Superpriority Secured Debtor-in-Possession Financing Agreement, dated as of [__], 2021, is made by and among ORG GC Midco, LLC, a Delaware limited liability company ("GC Midco"), as borrower (the "Borrower"), ORG GC GP Buyer, LLC, a Delaware limited liability company ("GC GP Buyer"), ORG GC LP Buyer, LLC, a Delaware limited liability company ("GC LP Buyer"), GC Services Limited Partnership, a Delaware limited partnership ("GCLP"), GC Services International LLC, a Delaware limited liability company ("GCSI", together with GC GP Buyer, GC LP Buyer, GCLP and each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder or otherwise guaranties all or any part of the Obligations (as hereinafter defined), each a "Guarantor" and collectively, the "Guarantors"), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders"), Goldman Sachs Specialty Lending Group, L.P., as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent"), and Goldman Sachs Specialty Lending Group, L.P., as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agents").

RECITALS[1]

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Article I;

WHEREAS, on [__], 2021 (the "Petition Date"), the Borrower (in such capacity, the "Debtor") commenced a chapter 11 case, assigned Case No. [____] (the "Chapter 11 Case"), by filing a voluntary petition for reorganization under the Bankruptcy Code, with the United States Bankruptcy Court for the Southern District of Texas (together with any other court having jurisdiction over the Chapter 11 Case or any proceeding therein from time to time, the "Bankruptcy Court"). The Debtor continues to operate its businesses and manage its properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain of the Lenders and/or certain of their affiliates or controlled funds provided financing to the Borrower and the Guarantors pursuant to that certain Financing Agreement, dated as of July 31, 2017, among the Borrower and the other borrowers party thereto, ORG GC Holdings, LLC, a Delaware limited liability company ("Parent"), the guarantors party thereto from time to time, the lenders party thereto from time to time, and BSP Agency, LLC, as the administrative agent and collateral agent thereunder (as amended by that certain First Amendment to Financing Agreement, dated as of September 29, 2017, that certain Second Amendment to Financing Agreement, dated as of June 27, 2019, and as may be further amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Term Financing Agreement");

WHEREAS, the Borrower has requested that the Lenders provide a senior secured, superpriority debtor-in-possession term loan facility to the Borrower in the maximum aggregate principal amount of $[6,000,000] (the "DIP Facility") to be used during the Chapter 11 Case as further set forth herein. The Loans will be made for purposes set forth in Section 7.01(m);

WHEREAS, the Borrower has requested that the Prepetition ABL Lenders continue to make available Prepetition ABL Loans and the other financial accommodations under the Prepetition ABL Loan Documents;

---

[1] NTD: To be updated as applicable.

WHEREAS, all of the Guarantors will guaranty all of the Obligations under the Loan Documents;

WHEREAS, in order to secure the Obligations of the Borrower and the Guarantors under the Loan Documents, the Borrower and the Guarantors will grant to the Collateral Agent, for the benefit of Collateral Agent and all other Secured Parties, a security interest in and Lien upon substantially all of the now existing and hereafter acquired personal and real property of the Borrower and the Guarantors pursuant to the Order;

WHEREAS, the relative priority of the Liens and security interests granted to secure the Obligations in relation to the Liens and security interests securing the Prepetition Term Obligations, the Prepetition ABL Obligations and certain other obligations will be set forth in the Order, the Intercreditor Agreement and the RSA, as applicable;

WHEREAS, the Borrower will provide to the prepetition lenders and other prepetition secured parties under the Prepetition Term Financing Agreement and the other Prepetition Term Loan Documents, adequate protection in accordance with the Order; and

WHEREAS, the Lenders are severally, and not jointly, willing to extend such credit to the Borrower on the terms and subject to the terms and conditions set forth herein and the Order.

NOW, THEREFORE, in consideration of the premises, provisions, covenants and mutual agreements contained herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Lenders are willing to extend such credit to the Borrower on the terms and express conditions set forth herein, and accordingly the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01    Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below:

"ABL Priority Collateral" means "ABL Priority Collateral" as defined in the Intercreditor Agreement.

"Account Debtor" means, with respect to any Person, each debtor, customer or obligor in any way obligated on or in connection with any Account of such Person.

"Additional Amount" has the meaning specified therefor in Section 2.09(a).

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

2

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"Agents" has the meaning specified therefor in the preamble hereto.

"Agreement" means this Superpriority Secured Debtor-in-Possession Financing Agreement, including all amendments, restatements, amendments and restatements, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"Anti-Corruption Laws" has the meaning specified therefor in Section 6.01(aa)(i).

"Anti-Money Laundering and Anti-Terrorism Laws" means any Requirement of Law relating to terrorism, economic sanctions or money laundering, including, without limitation, (a) the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957), (b) the Bank Secrecy Act of 1970 (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), and the implementing regulations promulgated thereunder, (c) the USA PATRIOT Act and the implementing regulations promulgated thereunder, (d) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (e) any law prohibiting or directed against terrorist activities or the financing or support of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B), and (f) any similar laws enacted in the United States or any other jurisdictions in which the parties to this Agreement operate, as any of the foregoing laws have been, or shall hereafter be, amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"Applicable Margin" means, for any day with respect to the Loans, 6.00% per annum.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Administrative Agent (and the Collateral Agent, if applicable), in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Collateral Agent.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, chief administrative officer, treasurer or other financial officer performing similar functions, president, vice president, general counsel or chief compliance officer of such Person.

"Automatic Stay" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union,

the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

"Bankruptcy Plan" means a plan of reorganization filed by the Debtor in form and substance consistent with the RSA and otherwise reasonably acceptable to the Required Lenders and, solely with respect to terms and provisions affecting the rights, protections, duties or obligations of the Agents or the Prepetition Term Agents, reasonably acceptable to the Agents or the Prepetition Term Agents.

"Bankruptcy Plan Effective Date" has the meaning specified therefor in Section 7.01(q).

"Barbados Account" means any deposit account or other bank account maintained by GC Services (Barbados) SRL that is located in Barbados.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation in form and substance reasonably acceptable to the Administrative Agent.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Blocked Person" means any Person:

(a)     that (i) is identified on the list of "Specially Designated Nationals and Blocked Persons" published by OFAC; (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of an OFAC Sanctions Program; or (iii) a United States Person is prohibited from dealing or engaging in a transaction with under any of the Anti-Money Laundering and Anti-Terrorism Laws; and

(b)     that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in clause (a) above.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, manager or managers, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

4

"Business Day" means for all purposes, any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Capital Expenditures" means, with respect to any Person for any period, the result of the sum of (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed, including all Capitalized Lease Obligations and all capitalized software development costs that are paid or due and payable during such period, plus, (b) to the extent not covered by clause (a) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person.

"Capitalized Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning specified therefor in the then applicable Order.

["Carve-Out Reserves" has the meaning specified therefor in the then applicable Order.]

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within 270 days from the date of acquisition thereof.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means each occurrence of any of the following:

(a)       the Permitted Holders cease to beneficially and of record own and control, directly or indirectly, the Equity Interests of the Borrower held by the Permitted Holders on the Petition Date; or

(b)       the Parent shall cease to have beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of 100% of the aggregate voting and economic power of the Equity Interests of each other Loan Party and each of its Subsidiaries, free and clear of all Liens (other than the Liens granted to the Prepetition ABL Agent to secure the Prepetition ABL Obligations and the Liens granted to the Prepetition Collateral Agent to secure the Prepetition Term Obligations);

provided, that in each case of the foregoing, the commencing of the Chapter 11 Case shall not constitute a Change of Control.

"Chapter 11 Case" has the meaning specified therefor in the recitals hereto.

"Closing Date" shall have the meaning assigned to such term in Section 5.01.

"Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Committee" shall mean the official committee of unsecured creditors, if any, appointed in the Chapter 11 Case.

"Company Advisors" means (a) Conway MacKenzie, in its role as financial advisor to the Debtor and the other Loan Parties, (b) Weil, Gotshal & Manges LLP, in its role as legal advisor to the Debtor and the other Loan Parties, (c) Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its role as claims, noticing and solicitation agent for the Debtor and the other Loan Parties, and (d) with the consent of the Required Lenders, any other professionals retained by the Loan Parties in connection with the Chapter 11 Case.

"Compliance Certificate" has the meaning assigned to such term in Section 7.01(a)(iv).

"Confirmation Order" means an order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders and, solely with respect to terms and provisions affecting the rights, protections, duties or obligations of the Agents or the Prepetition Term Agents, as applicable, the Agents and the Prepetition Term Agents, confirming the Bankruptcy Plan.

"Contingent Indemnity Obligations" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"<u>Contingent Obligation</u>" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Control Agreement</u>" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract located in the United States, an agreement, in form and substance reasonably satisfactory to the Collateral Agent (it being agreed that the Control Agreements in effect as of the Petition Date are reasonably satisfactory to the Collateral Agent), among the Prepetition ABL Agent (so long as the Prepetition ABL Loan Documents are still in effect), the Collateral Agent (except with respect to Control Agreements in effect as of the Petition Date so long as the RSA has not been terminated), the Prepetition Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"<u>Controlled Investment Affiliate</u>" means, as to any Person, any other Person that directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person whether by contract or otherwise.

"<u>Customer Trust Account</u>" means any deposit account specifically required by a customer of a Loan Party to be maintained by such Loan Party as a trust account for the benefit of such customer, so long as such deposit account and all funds deposited therein are separately segregated from such Loan Party's general accounts and other cash.

"<u>Debtor</u>" has the meaning specified therefor in the recitals hereto.

"<u>Debtor Relief Law</u>" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"<u>Default</u>" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"<u>DIP Facility</u>" has the meaning specified therefor in the recitals hereto.

"<u>DIP Loan Commitment</u>" means on the Closing Date, with respect to each Lender holding a DIP Loan Commitment, the commitment of such Lender to make a Loan, which commitment is in the amount set forth opposite such Lender's name on Schedule 1.01(A) under the caption "DIP Loan Commitment", as amended to reflect assignments by or to such Lender pursuant to an Assignment and Acceptance.  The aggregate amount of the DIP Loan Commitments on the Closing Date shall be the lesser of (a) the DIP Loan Commitment set forth on Schedule 1.01(A) and (b) such amount as approved by the Bankruptcy Court for funding on the Closing Date pursuant to the Order.

"<u>DIP Proceeds</u>" shall mean the proceeds received by the Borrower from the Loans.

"<u>DIP Termination Date</u>" shall mean the date that all Obligations will be due and payable in full in cash (except, in the case of clause (v) below, as otherwise expressly provided herein), which such date shall be the earliest of (i) the Final Maturity Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtor pursuant to section 363 of the Bankruptcy Code, (iii) if the Order has not been entered, the date that is thirty-two (32) calendar days after the Petition Date, (iv) the acceleration of the Loans and the termination of the DIP Loan Commitments during the continuance of an Event of Default, (v) the Bankruptcy Plan Effective Date, (vi) the date the Bankruptcy Court converts the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and (vii) the date the Bankruptcy Court dismisses the Chapter 11 Case.

"<u>Disposition</u>" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired), including any Equity Interest in any Subsidiary, to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.  For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts or (b) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification).

"<u>Disqualified Equity Interests</u>" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payment of dividends or distributions in cash or assets, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is six months after the Final Maturity Date.

"<u>Dollar</u>," "<u>Dollars</u>" and the symbol "<u>$</u>" each means lawful money of the United States of America.

8

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the 6 calendar years preceding the date of any borrowing hereunder) for employees of any Loan Party or any of its ERISA Affiliates.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Loan Party or any of its Subsidiaries or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other Requirement of Law, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (a) any property presently or formerly owned by any Loan Party or any of its Subsidiaries or (b) any facility which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Erroneous Payment" has the meaning specified therefor in Section 10.18(a).

"Erroneous Payment Deficiency Assignment" has the meaning specified therefor in Section 10.18(d).

"Erroneous Payment Impacted Class" has the meaning specified therefor in Section 10.18(d).

"Erroneous Payment Return Deficiency" has the meaning specified therefor in Section 10.18(d).

"Erroneous Payment Subrogation Rights" has the meaning specified therefor in Section 10.18(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income, profits or gross margin (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or DIP Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or DIP Loan Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its

lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.09(d) or 2.09(e), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Extraordinary Receipts" means any cash received by any Loan Party or any of its Subsidiaries not in the ordinary course of business, including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than to the extent such consideration is (i) immediately payable to a Person that is not an Affiliate of the Borrower or any of its Subsidiaries or (ii) received by the Borrower or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person), (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of the Borrower or any of its Subsidiaries or (ii) received by the Borrower or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received in connection with any purchase agreement (other than to the extent such payments in connection therewith are (i) immediately payable to a Person that is not an Affiliate of the Borrower or any of its Subsidiaries or (ii) received by the Borrower or any of its Subsidiaries as reimbursement for any costs or actual losses previously incurred or any payment previously made by such Person).

"Facility" means the real property identified on Schedule 1.01(B), including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"FCPA" has the meaning specified therefor in Section 6.01(aa)(i).

"Final Maturity Date" means the date that is 120 days following the Petition Date.

"Fiscal Year" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each year.

"Foreign Official" has the meaning specified therefor in Section 6.01(aa)(ii)(A).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

11

"<u>GC GP Buyer</u>" has the meaning specified therefor in the preamble hereto.

"<u>GC LP Buyer</u>" has the meaning specified therefor in the preamble hereto.

"<u>GC Midco</u>" has the meaning specified therefor in the preamble hereto.

"<u>GCLP</u>" has the meaning specified therefor in the preamble hereto.

"<u>GCS</u>" means GC Services Limited Partnership, a Delaware limited partnership.

"<u>GCSI</u>" has the meaning specified therefor in the preamble hereto.

"<u>Governing Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"<u>Governmental Authority</u>" means any nation or government, any foreign, Federal, state, territory, provincial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guaranteed Obligations</u>" has the meaning specified therefor in Section 11.01.

"<u>Guarantor</u>" means (a) each Subsidiary of the Borrower listed as a "Guarantor" on the signature pages hereto, and (b) each other Person that guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations.

"<u>Guaranty</u>" means (a) the guaranty of each Guarantor party hereto contained in Article XI hereof and (b) each other guaranty, in form and substance satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or any part of the Obligations.

"<u>Hazardous Material</u>" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and

12

manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non- usurious interest rate than applicable laws now allow.

"Houston Facility" means the real property and improvements located at 6330 Gulfton Street, Houston, Texas 77081.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was due and any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person); (c) all obligations of such Person evidenced by bonds (excluding performance bonds, bid bonds, appeal bonds and surety bonds under which no claim has been made), debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include, without duplication, the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Matters" has the meaning specified therefor in Section 12.15(a).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified therefor in Section 12.15(a).

13

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" has the meaning specified therefor in the Security Agreement.

"Intellectual Property Contracts" means all agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of July 31, 2017, by and among the Prepetition Collateral Agent and the Prepetition ABL Lender and following the execution of the Intercreditor Agreement Amendment No. 1, the Collateral Agent, and acknowledged by the Loan Parties, [as amended pursuant to that First Amendment to Intercreditor Agreement, dated as of the date hereof, in form and substance reasonably satisfactory to the Required Lenders (the "Intercreditor Agreement Amendment No. 1") and][2] as amended or modified from time to time in accordance with the terms thereof.

"Intercreditor Agreement Amendment No. 1" has the meaning ascribed to such term in the definition of "Intercreditor Agreement."

"Interest Payment Date" means the first Business Day of each calendar month.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account or cash.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"Joinder Agreement" means a Joinder Agreement, substantially in the form of Exhibit A, duly executed by a Subsidiary of a Loan Party made a party hereto pursuant to Section 7.01(b).

"K&S" has the meaning assigned to such term in Section 5.01(e).

"Known Events" means (a) the commencement and continuation of the Chapter 11 Case and (b) any "Events of Default" as defined under, and occurring under, each of the Prepetition ABL Loan

---

[2] NTD: To be updated as necessary.

Documents and the Prepetition Term Loan Documents as disclosed in writing to the Administrative Agent and the Lenders prior to the Petition Date.

"<u>Lease</u>" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"<u>Lender</u>" has the meaning specified therefor in the preamble hereto.

"<u>Lender Advisors</u>" shall have the meaning assigned to such term in Section 5.01(d).

"<u>License Trust Account</u>" means any deposit account of a Loan Party specifically required by a State or other Governmental Authority to be maintained by such Loan Party as a trust account for the benefit of such State or Governmental Authority, pursuant to licensing and permitting requirements applicable to such Loan Party within such State's or Governmental Authority's jurisdiction, so long as such deposit account and all funds deposited therein are separately segregated from such Loan Party's general accounts and other cash.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"<u>Loans</u>" means the term loans to be made on the Closing Date in an aggregate amount not to exceed the DIP Loan Commitments.

"<u>Loan Documents</u>" means this Agreement, the Order, the Intercreditor Agreement, any Guaranty, any Joinder Agreement, any Security Agreement, any Perfection Certificate and any other document executed and delivered pursuant hereto or thereto.

"<u>Loan Party</u>" means any Borrower and any Guarantor.

"<u>Material Adverse Effect</u>" means other than with respect to any Known Events (or any event, circumstance or condition reasonably expected to result from a Known Event), any event, circumstance or condition that materially adversely affects (a) the operations, assets, liabilities or financial condition of the Loan Parties taken as a whole, (b) the legality, validity or enforceability of any Loan Documents or the Order, (c) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of the Liens granted pursuant to the Order and the other Loan Documents.

"<u>Material Contract</u>" means, with respect to any Person, (a) the ABL Credit Agreement, and (b) all other contracts or agreements as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.[3]

"<u>Milestone</u>" has the meaning assigned to such term in Section 7.01(q).

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgage</u>" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance reasonably satisfactory to the Collateral Agent, made

---

[3] NTD:  Company to confirm there are no Material Contracts as of closing.

by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to at any time during the preceding 6 years.

"Net Cash Proceeds" means, with respect to, any issuance or incurrence of any Indebtedness, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any Indebtedness secured by any Permitted Lien on a senior basis to the Liens securing the Obligations on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (b) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (c) transfer taxes paid or payable to any taxing authorities by such Person or such Subsidiary in connection therewith, and (d) net income taxes paid or payable in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"New Lending Office" has the meaning specified therefor in Section 2.09(e).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.09(e)

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees, premiums, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"OFAC Sanctions Programs" means (a) the Requirements of Law and Executive Orders administered by OFAC, including, without limitation, Executive Order No. 13224, and (b) the list of Specially Designated Nationals and Blocked Persons administered by OFAC, in each case, as renewed, extended, amended, or replaced.

"Order" means an order entered by the Bankruptcy Court in the Chapter 11 Case (as the same may be amended, supplemented, or modified form time to time after entry thereof in a manner satisfactory to the Required Lenders in their sole discretion) substantially in the form of Exhibit D authorizing and approving, among other things, the DIP Facility and the Transactions, which order is in

16

form and substance satisfactory to the Administrative Agent (with respect to matters relevant to or affecting the Administrative Agent and the Collateral Agent) and the Required Lenders in their sole discretion.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

["ORG Management Agreement" means that certain Amended and Restated Consulting Agreement dated as of July 31, 2017 by and between GCLP and Owner Resource Group, LLC, as further amended or modified from time to time in accordance with such agreement and, solely to the extent applicable, this Agreement.]

"Parent" has the meaning specified therefor in the recitals hereto.

"Parent Company Agreement" means the Amended and Restated Limited Liability Company Agreement of Parent dated as of December 31, 2015, as amended or modified from time to time in accordance with such agreement and this Prepetition Term Financing Agreement.

"Participant Register" has the meaning specified therefor in Section 12.07(i).

"Payment Office" means the office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Borrower.

"Payment Recipient" has the meaning specified therefor in Section 10.18(a).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Perfection Certificate" means a certificate in form and substance satisfactory to the Collateral Agent providing information with respect to the property of each Loan Party.

"Permitted Disposition" means:

(a)     sale of Inventory in the ordinary course of business;

(b)     licensing, on a non-exclusive basis, Intellectual Property rights in the ordinary course of business and consistent with past practice;

(c)     leasing or subleasing assets for fair market value in the ordinary course of business;

(d)     [reserved];

(e)     any involuntary loss, damage or destruction of property;

17

(f)      any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(g)      so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets from any Loan Party (other than the Borrower) or any of their Subsidiaries to a Loan Party (other than the Borrower) in the ordinary course of business; and

(h)      Disposition for fair market value of obsolete or worn-out equipment in the ordinary course of business.

"Permitted Holder" means Owner Resource Group, LLC, a Delaware limited liability company, or any of its Controlled Investment Affiliates.

"Permitted Indebtedness" means:

(a)      any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)      Indebtedness outstanding on the Petition Date (including Permitted Purchase Money Indebtedness);

(c)      [reserved];

(d)      Permitted Intercompany Investments;

(e)      Indebtedness of the Loan Parties incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

(f)      any Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(g)      [reserved];

(h)      Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business; and

(i)      Prepetition ABL Indebtedness in an aggregate principal amount not exceeding the "Maximum ABL Obligations" as defined in the Intercreditor Agreement.

"Permitted Intercompany Investments" means Investments made by a Loan Party to or in another Loan Party in the ordinary course of business.

"Permitted Investments" means:

(a)      Investments in cash and Cash Equivalents;

(b)      Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

18

(c)       advances made in connection with purchases of goods or services in the ordinary course of business and consistent with past practices;

(d)       Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(e)       Investments existing on the Closing Date, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof; and

(f)       Permitted Intercompany Investments.

"Permitted Liens" means:

(a)       Liens created under the Loan Documents or the Order;

(b)       Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(c)(ii);

(c)       Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are (i) incident to the construction, operation, maintenance, repair, restoration or improvement of any property or asset and (ii) (A) not overdue by more than 30 days or (B) are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)       Liens described on Schedule 7.02(a), provided that any such Lien shall only secure the Indebtedness that it secures as of the Closing Date;

(e)       purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business to secure Permitted Purchase Money Indebtedness so long as such Lien only secures the Indebtedness existing on the Petition Date and that was incurred to acquire such property;

(f)       deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)       with respect to any Facility, easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)       Liens of landlords and mortgagees of landlords (i) arising by statute or under any lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for

19

amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)      the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease), in each case extending only to such personal property;

(j)      non-exclusive licenses of Intellectual Property rights in the ordinary course of business and consistent with past practices;

(k)      judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(j);

(l)      rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(m)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(n)      (i) Liens of the Prepetition ABL Agent to secure Indebtedness under the Prepetition ABL Loan Documents and (ii) Liens of the Prepetition Term Agent to secure Indebtedness under the Prepetition Term Loan Documents, in each case to the extent such Liens are subject to the terms and conditions of the Intercreditor Agreement;

(o)      Liens granted in the ordinary course of business to secure any Loan Party's contingent obligations in connection with any performance, surety, statutory or appeal bonds (which Liens shall not include any Liens on or pledges of the Equity Interests of any Loan Party or its Subsidiaries); and

(p)      Permitted Priority Liens.

"Permitted Priority Lien" shall mean any of those existing Liens that under applicable law, are senior to, and have not been subordinated to, the Liens granted in favor of the Collateral Agent under the Loan Documents, but only to the extent that such Liens are valid, perfected, enforceable and non-avoidable Liens as of the Petition Date; provided that the Carve-Out shall be deemed to be a Permitted Priority Lien for all purposes hereunder.

"Permitted Purchase Money Indebtedness" means Indebtedness incurred prior to the Petition Date that is outstanding as of the Petition Date to finance the acquisition of any fixed assets secured by a Lien permitted under clause (e) of the definition of "Permitted Liens"; provided that (a) such Indebtedness was incurred within 90 days after such acquisition, and (b) such Indebtedness does not exceed the purchase price of the asset financed.

"Permitted Restricted Payments" means any of the following Restricted Payments made by:

(a)      Subject to the Bankruptcy Plan, the Borrower (and any Loan Party to pay such amounts to the Borrower) to make Tax Distributions to its direct or indirect equityholders of the Parent; and

(b)        any Subsidiary of the Borrower to Borrower.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" has the meaning specified therefor in the preamble hereto.

"Plan" means any Employee Plan or Multiemployer Plan.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.00%.

"Prepayment Event" means:

(a)        any (i) Disposition of Collateral (other than ABL Priority Collateral) that is not permitted by Section 7.02(c) and (ii) Disposition of ABL Priority Collateral or assets not constituting Collateral that is not permitted by Section 7.02(c), in each case so long as provided for in the Order and/or the Intercreditor Agreement and to the extent not otherwise required to be applied to the Prepetition ABL Obligations (excluding ordinary course sales of ABL Priority Collateral);

(b)        any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any Collateral (other than ABL Priority Collateral (other than as provided for in the Order and/or the Intercreditor Agreement)) of Borrower or any Subsidiary;

(c)        the incurrence by Borrower or any Subsidiary of Indebtedness or the receipt of Net Cash Proceeds from the issuance of Equity Interests, in each case other than as permitted under Section 7.02(b); or

(d)        the receipt of any Extraordinary Receipts.

"Prepetition ABL Agent" means JPMorgan Chase Bank, N.A., together with its capacity as administrative agent under the Prepetition ABL Loan Documents, or any successor administrative agent under the Prepetition ABL Loan Documents.

"Prepetition ABL Credit Agreement" means the Credit Agreement, dated as July 31, 2017, among GCS, as the borrower, Parent, GC Midco, GC GP Buyer, GC LP Buyer and GC Services International, LLC, as loan parties, the Prepetition ABL Agent and the lenders from time to time party thereto, [as amended pursuant to that [Ninth] Amendment to Credit Agreement, dated as of the date hereof in form and substance reasonably satisfactory to the Required Lenders (the "Prepetition ABL Credit Agreement Amendment",][4] and as amended or modified from time to time in accordance with this Agreement and the Intercreditor Agreement.

"Prepetition ABL Credit Agreement Amendment" has the meaning ascribed to such term in the definition of "Prepetition ABL Credit Agreement."

---

[4] NTD: To be updated as necessary.

"<u>Prepetition ABL Indebtedness</u>" means Indebtedness of the Loan Parties owing to the Prepetition ABL Lenders in respect of the Prepetition ABL Obligations.

"<u>Prepetition ABL Lenders</u>" means, collectively, the lenders party to the Prepetition ABL Credit Agreement from time to time.

"<u>Prepetition ABL Letters of Credit</u>" means any letter of credit issued pursuant to the Prepetition ABL Credit Agreement.

"<u>Prepetition ABL Loan Documents</u>" means the "Loan Documents" as defined in the Prepetition ABL Credit Agreement.

"<u>Prepetition ABL Loans</u>" means the "Loans" as defined in the Prepetition ABL Credit Agreement

"<u>Prepetition ABL Obligations</u>" means the ["Obligations"] as defined in the Prepetition ABL Credit Agreement.

"<u>Prepetition Collateral Agent</u>" means the "Collateral Agent" as defined in the Prepetition Term Financing Agreement.

"<u>Prepetition Payment</u>" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness, trade payables or other pre-petition claims against any Debtor.

"<u>Prepetition Term Agents</u>" means the "Agents" as defined in the Prepetition Term Financing Agreement.

"<u>Prepetition Term Collateral</u>" means the "Collateral" as defined in the Prepetition Term Financing Agreement.

"<u>Prepetition Term Financing Agreement</u>" has the meaning specified therefor in the preamble hereto.

"<u>Prepetition Term Indebtedness</u>" means Indebtedness of the Loan Parties owing to the Prepetition Term Lenders in respect of the Prepetition Term Obligations.

"<u>Prepetition Term Lenders</u>" shall means the "Lenders" as defined in the Prepetition Term Financing Agreement.

"<u>Prepetition Term Liens</u>" the meaning assigned to such term in Section 7.01(m).

"<u>Prepetition Term Loan Documents</u>" means the "Loan Documents" as defined in the Prepetition Term Financing Agreement as of the Closing Date.

"<u>Prepetition Term Obligations</u>" means the "Obligations" as defined in the Prepetition Term Financing Agreement as of the Closing Date.

"<u>Prepetition Term Secured Parties</u>" shall have the meaning assigned to such term in Section 2.15(b).

22

"Professional Costs" shall mean any payment or the obligation to make payment on account of reasonable and documented out-of-pocket fees and expenses incurred by professional advisors to the Loan Parties, the Lenders, the Agents, the Prepetition Term Lenders, the Prepetition ABL Agent, or any other party's professional advisors, the fees and expenses of which are obligated to be paid by the Loan Parties (including, but not limited to, the fees and expenses of professional advisors to any committee appointed in the Chapter 11 Case), the Lenders or the Agents in connection with the Chapter 11 Case and/or the Loan Documents including for the avoidance of doubt, the reasonable and documented fees and expenses of (i) the Company Advisors; (ii) Stroock & Stroock & Lavan LLP, counsel to certain Prepetition Term Lenders affiliated with Benefit Street Partners, LLC and the Prepetition Term Agents; (iii) V&E, corporate counsel to certain Prepetition Term Lenders affiliated with the Lenders, (iv) David Zwick, consultant to the Prepetition Term Agents; (v) Garry Herdler, consultant to the Prepetition Term Agents; (vi) K&S, counsel to the Agent and the Lenders; (vii) Mayer Brown LLP, regulatory counsel to the Prepetition Term Lenders; and (viii) Winstead PC, counsel to the Prepetition ABL Agent.

"Pro Rata Share" means, with respect to:

(a)    a Lender's obligation to make the Loans and the right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) the sum of the aggregate outstanding principal amount of the Loans of such Lender at such time and its unused DIP Loan Commitments at such time, by (ii) the sum of the aggregate outstanding principal amount of the Loans of all Lenders at such time and the aggregate unused DIP Loan Commitments of all Lenders at such time; and

(b)    all other matters (including, without limitation, the indemnification obligations arising under Section 10.05), the percentage obtained by dividing (i) the sum of the aggregate outstanding principal amount of the Loans of such Lender at such time and its unused DIP Loan Commitments at such time, by (ii) the sum of the aggregate unpaid principal amount of the Loan.

"Real Property Deliverables" means each of the following agreements, instruments and other documents in respect of each Facility:

(a)    a Mortgage duly executed by the applicable Loan Party,

(b)    evidence of the recording of each Mortgage in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Collateral Agent and the Lenders thereunder;

(c)    a Title Insurance Policy with respect to each Mortgage, dated as of a recent date;

(d)    a current ALTA survey and a surveyor's certificate, in form and substance satisfactory to the Collateral Agent, certified to the Collateral Agent and to the issuer of the Title Insurance Policy with respect thereto by a professional surveyor licensed in the state in which such Facility is located and satisfactory to the Collateral Agent;

(e)    in the case of a leasehold interest, a copy of the lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest;

(f)    if available in the jurisdiction(s) in which any Facility is located, a copy of each letter issued by the applicable Governmental Authority, evidencing each Facility's compliance with all applicable building codes, fire codes, other health and safety rules and regulations, parking, density and height requirements and other building and zoning laws together with a copy of all certificates of occupancy issued with respect to each Facility;

(g)       if required by the Collateral Agent, a satisfactory ASTM 1527-00 Phase I Environmental Site Assessment ("Phase I ESA") provided by the Borrower to the Collateral Agent (and, if requested by the Collateral Agent based upon the results of such Phase I ESA, an ASTM 1527-00 Phase II Environmental Site Assessment) of each Facility, in form and substance and by an independent firm satisfactory to the Collateral Agent; and

(h)       such other agreements, instruments and other documents (including guarantees and opinions of counsel) as the Collateral Agent may reasonably require.

"Recipient" means any Agent and any Lender, as applicable.

"Register" has the meaning specified therefor in Section 12.07(f).

"Registered Intellectual Property" means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

"Registered Loans" has the meaning specified therefor in Section 12.07(f).

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Released Parties" has the meaning specified therefor in Section 7.01(m).

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Remedies Notice Period" has the meaning specified therefor in Section 9.02(a).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Required Lenders" means Lenders whose Pro Rata Shares (calculated in accordance with clause (b) of the definition thereof) aggregate at least 50.1%.

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees

24

(including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Payment" means (a) the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (b) the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (c) the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (d) the return of any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such or (e) the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party, but not including payments to employees in the ordinary course of business in accordance with the Loan Parties' regular payroll or employment practices or otherwise pursuant to employment agreements entered into with such employees (other than any officers or directors).

"Restructuring Expenses" means the Professional Costs and U.S. Trustee costs and expenses, filing fees, and other expenses related to the Chapter 11 Case, collectively.

"RSA" shall have the meaning assigned to such term in Section 5.01(i).

"Sale and Leaseback Transaction" means, with respect to the Borrower or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Borrower or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Secured Party" means any Agent and any Lender.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 12.07(l).

"Security Agreement" means a Pledge and Security Agreement, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.  References to a Subsidiary shall mean a Subsidiary of the Borrower unless the context expressly provides otherwise.

"Superpriority DIP Claim" means all Obligations of the Borrower shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all unsecured claims and all administrative expenses, including administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out to the extent set forth in the Order.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Distributions" means, for any period that Parent is treated as a pass-through entity under the Code, distributions made to the holders of Parent's equity interests not to exceed the amount necessary to provide such holders (or their direct or indirect owners) with funds to pay, at the highest applicable marginal tax rate for any holder (or such holder's direct or indirect owners), any federal, state or local income taxes for the current period (including estimated taxes) as a result of the items of income, gain, loss and deduction of Parent allocated to such holders (net of all taxable losses allocated to such holders and not previously taken into account pursuant to this sentence, assuming the deductibility of state and local income taxes for federal income tax purposes, and taking into account any additional deductions available to a holder (or such holder's direct or indirect owners) as a result of any basis adjustment to the assets of Parent or its Subsidiaries, including pursuant to Sections 734 or 743 of the Code) (the "Applicable Tax"); provided that if the amount distributed to a holder during the applicable taxable year exceeds such holder's (or such holder's direct or indirect owner's) Applicable Tax for such taxable year (which, for the avoidance of doubt, shall be calculated at the highest applicable marginal tax rate for any holder), then such excess shall be credited against and reduce the next Tax Distribution permitted to be made with respect to such holder for subsequent taxable years.

"Termination Event" means (a) a Reportable Event with respect to any Employee Plan, (b) any event with respect to an Employee Plan that causes any Loan Party or any of its ERISA Affiliates to incur material liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition that could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

26

"Term Priority Collateral" means "Term Priority Collateral" as defined in the Intercreditor Agreement.

"Termination Notice" shall have the meaning assigned to such term in Section 9.02(a).

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance reasonably satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued to the Collateral Agent by or on behalf of a title insurance company selected by or otherwise reasonably satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"Transactions" means, collectively (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, the borrowings hereunder and the use of the proceeds thereof, and the grant of the Liens by the Loan Parties on the Collateral pursuant to this Agreement, the Order and the other Loan Documents, (b) the commencement and filing of the Chapter 11 Case and (c) the payment of all fees, costs and expenses incurred in connection with the foregoing.

"Transferee" has the meaning specified therefor in Section 2.09(a).

"UK Act" has the meaning specified therefor in Section 6.01(aa).

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in Section 1.04(b).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001)) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"V&E" means Vinson & Elkins LLP.

"WARN" has the meaning specified therefor in Section 6.01(p).

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion

27

powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03    Certain Matters of Construction.  References in this Agreement to "determination" by any Agent include good faith and commercially reasonable estimates by such Agent (in the case of quantitative determinations) and good faith and commercially reasonable beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders.  Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to the actual knowledge of a senior officer of any Loan Party.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04    Accounting and Other Terms.

28

(a)      Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.  For purposes of determining compliance with any incurrence or expenditure tests set forth in Section 7.01 and Section 7.02, any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time).  Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 840 or 842 on the definitions and covenants herein, GAAP as in effect on the Closing Date shall be applied[5] and (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)      All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code" or the "UCC") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine.

Section 1.05      Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.

Section 1.06.      Divisions.      Any reference herein to a merger, consolidation, amalgamation, liquidation, winding up, dissolution, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, limited partnership or trust, or an allocation of assets to a series of limited liability company, limited partnership or trust (or the unwinding of such a division or allocation), as if it were a merger, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company, limited partnership or trust shall constitute a separate Person

---

[5] NTD: For exit facility, GCS to opt into new lease accounting early 2022.  Discuss carving out the effects.

hereunder (and each division of any limited liability company, limited partnership or trust that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

# ARTICLE II

## THE LOANS

Section 2.01    DIP Loan Commitments; Disbursement of Loans.

(a)    Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Loan Parties contained herein, on the Closing Date, each Lender, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make a Loan to and for the account of the Borrower as provided herein, in the amount of such Lender's DIP Loan Commitment (subject to any limitations contained within the Order). The Loans shall be made in one draw on the Closing Date, and the DIP Loan Commitments shall be immediately terminated after the funding of the Loans. Once repaid, no part of the Loans may be reborrowed.

(b)    The DIP Proceeds shall be deposited into an account of the Borrower and invested at all times by the Borrower in cash and Cash Equivalents. Any such DIP Proceeds may only be used by the Borrower in accordance with the terms hereof and the Bankruptcy Plan.

Section 2.02    Making the Loans. (a) The Borrower shall give the Administrative Agent prior written notice (in substantially the form of Exhibit C hereto (a "Notice of Borrowing") not later than 12:00 noon (New York City time) on the date which is 3 Business Days prior to the date of the proposed Loan (or such shorter time as agreed by the Administrative Agent). Such Notice of Borrowing shall be irrevocable and shall specify (i) the aggregate principal amount of the proposed Loan, (ii) the proposed borrowing date, which must be a Business Day, and (iii) the wire instructions for the Borrower's account to which funds are to be disbursed. The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any Notice of Borrowing.

(b)    Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrower shall be bound to make a borrowing in accordance therewith.

(c)    All Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the DIP Loan Commitment, as applicable, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the DIP Loan Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

Section 2.03    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promise to pay to the Administrative Agent for the ratable account of each Lender the then unpaid principal amount of, and unpaid accrued interest on, each Loan of such Lender made to the Borrower, along with all other Obligations owing under any Loan Document, on the DIP Termination Date in cash without further application to or order of the Bankruptcy Court. Notwithstanding the foregoing sentence, in lieu of any applicable portion of the cash payments

otherwise owed to the Lenders with respect to the Loans, the Lenders may receive non-cash consideration in the form of senior secured debt as contemplated by the RSA and Bankruptcy Plan on the Bankruptcy Plan Effective Date if the Bankruptcy Plan is confirmed pursuant to the Confirmation Order.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to paragraph (b) of this Section and the accounts maintained pursuant to paragraph (c) of this Section, the accounts maintained pursuant to paragraph (c) of this Section shall govern and control.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent and reasonably acceptable to the Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04     Interest.

(a)     Loans.  The Loans shall bear interest at the Applicable Margin.

(b)     Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(c)     Interest Payment.  Accrued interest on each Loan shall be payable in cash in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable promptly upon written demand by the Administrative Agent, and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)      General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05      Termination of DIP Loan Commitment; Prepayment of Loans.

(a)      Termination of DIP Loan Commitments.  The DIP Loan Commitments shall terminate in accordance with Section 2.01 hereof.

(b)      Optional Prepayment.

(i)      The Borrower shall have the right at any time and from time to time, without premium or penalty, to prepay the Loans in whole or in part, as selected and designated by the Borrower, subject to the requirements of this Section.

(c)      Mandatory Prepayments.

(i)      Unless the Required Lenders otherwise agree, in the event and on each occasion that any Net Cash Proceeds are received by or on behalf of the Borrower or any Subsidiary in respect of any Prepayment Event, the Borrower shall, within five (5) Business Days after such Net Cash Proceeds are received, prepay in strict accordance with Section 2.05(d) the outstanding Loans in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds; provided, that, with the consent of the Administrative Agent (in its sole discretion), the Borrower may use such Net Cash Proceeds in lieu of any prepayment requirements under this Agreement to reinvest in the business of the Borrower and the other Loan Parties.

(ii)      The Borrower shall notify the Administrative Agent in writing of any prepayment hereunder not later than 10:00 a.m., New York City time, two (2) Business Days before the date of the proposed prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Loan or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided, however, that any notice of prepayment may be expressly made contingent on the occurrence of a refinancing or the consummation of a sale, transfer, lease or other disposition of assets and if so designated may be revoked or the termination date deferred if the refinancing or sale, transfer, lease or other disposition of assets does not occur. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each prepayment of the Loans shall be applied ratably. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.04(e).

(d)      Application of Payments.  With respect to any voluntary prepayments pursuant to Section 2.05(b) and any mandatory prepayments of the Loans pursuant to Section 2.05(c), such prepayments shall be applied on a pro rata basis to the then outstanding Loans.

(e)      Interest and Fees.  Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued and unpaid interest on the principal amount being prepaid to the date of prepayment, (ii) [reserved], (iii) [reserved] and (iv) if such prepayment would reduce the amount of the outstanding Loans to zero, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)      Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made

or required to be made under any other subsection of this Section 2.05; provided that there shall be no duplication of mandatory prepayments due under more than one subsection of this Section 2.05.

Section 2.06    Fees.

(a)    The Borrower agrees to pay to each Lender in accordance with their Pro Rata Shares a closing fee (the "Closing Fee") in the amount of one percent (1.00%) of the aggregate principal amount of the DIP Loan Commitments held by such Lender on the Closing Date, payable on the Closing Date; *provided*, that such Closing Fee can be taken in the form of an equivalent amount of original issue discount of the aggregate principal amount of Loans made on the Closing Date at the discretion of the applicable Lender.

(b)    All fees shall be paid on the dates due, in cash (unless elected to be taken as original issue discount as set forth in Section 2.06(a)) and in Dollars, immediately available funds to the Administrative Agent for the ratable account of the applicable Lenders.  Once paid, none of the fees shall be refundable under any circumstances.

Section 2.07    [Reserved].

Section 2.08    [Reserved].

Section 2.09    Taxes.  (a) Any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any and all Taxes, except as required by applicable law.  If any Loan Party shall be required to deduct any Taxes from or in respect of any sum payable hereunder to any Secured Party (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")), (i) the applicable Withholding Agent shall make such deductions and (ii) the applicable Withholding Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount (an "Additional Amount") necessary such that after making all required deductions (including deductions applicable to additions sums payable under this Section 2.09) such Secured Party (or such Transferee receives the amount equal to the sum it would have received had no such deductions been made.

(b)    In addition, each Loan Party agrees to pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes.  Each Loan Party shall deliver to each Secured Party official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)    The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes paid by such Person, whether or not such Indemnified Taxes were correctly or legally asserted.  Such indemnification shall be paid within ten (10) Business Days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes.

(d)    Each Lender (or Transferee) that is a United States person under Section 7701(a)(30) of the IRC shall deliver to the Borrower or Administrative Agent a United States Internal Revenue Service Form W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender is exempt from United States backup withholding.

(e)    Each Lender (or Transferee) that is not a U.S. Person (a "Non-U.S. Lender") agrees that it shall, no later than the Closing Date (or, in the case of a Lender which becomes a party hereto pursuant

to Section 12.07 hereof after the Closing Date, promptly after the date upon which such Lender becomes a party hereto) deliver to the Agents (or, in the case of an assignee of a Lender which (x) is an Affiliate of such Lender or a Related Fund of such Lender and (y) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section 12.07(c)(ii) for recordation pursuant to Section 12.07(e), to the assigning Lender only, and in the case of a participant, to the Lender granting the participation only) one properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments of interest hereunder.  In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender hereby represents to the Agents and the Borrower that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code), and such Non-U.S. Lender agrees that it shall promptly notify the Agents in the event any such representation is no longer accurate.  Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office").  In addition, such Lender (or Transferee) or Agent shall deliver such forms within 20 days after receipt of a written request therefor from the Borrower or any Agent, the assigning Lender or the Lender granting a participation, as applicable.  Notwithstanding any other provision of this Section 2.09, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.09(e) that such Non-U.S. Lender is not legally able to deliver.

(f)     Any Secured Party (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.09 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such Secured Party (or Transferee) to disclose any information such Secured Party (or Transferee) in good faith deems confidential and would not, in the sole determination of such Secured Party (or Transferee), be otherwise disadvantageous to such Secured Party (or Transferee).

(g)     If any Secured Party (or a Transferee) shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes with respect to which any Loan Party has made an indemnity payment or paid additional amounts, pursuant to this Section 2.09, it shall promptly notify the Borrower of the availability of such refund claim and shall, within ten (10) days after receipt of a request by the Borrower, make a claim to such Governmental Authority for such refund at the Loan Parties' expense.  If any Secured Party (or a Transferee) receives a refund (including pursuant to a claim for refund made pursuant to the preceding sentence) in respect of any Indemnified Taxes with respect to which any Loan Party has made an Indemnity payment or paid additional amounts pursuant to this Section 2.09, it shall within 30 days from the date of such receipt pay over such refund to the Borrower, net of all out-of-pocket expenses of such Secured Party (or Transferee), provided that each Loan Party, upon the request of Administrative Agent or such Secured Party (or Transferee), agrees to repay the amount paid over to any Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Secured Party (or Transferee) in the event Administrative Agent or any Secured Party (or Transferee) is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will an indemnified party be required to pay any amount to a Loan Party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have

34

been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This subsection shall not be construed to require Administrative Agent, any Secured Party or Transferee to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     If a payment made to a Lender (or Transferee) or any Agent under any Loan Document would be subject to U.S. Federal withholding tax imposed by FATCA if such Lender (or Transferee) or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender (or Transferee) or Agent shall deliver to the Borrower and the Agents at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agents such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Agents as may be necessary for the Borrower and the Agents to comply with their obligations under FATCA and to determine that such Lender (or Transferee) or Agent has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Any forms, certifications or other documentation under this clause (h) shall be delivered by each Lender (or Transferee) and each Agent.

(i)     The obligations of the Loan Parties under this Section 2.09 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.10     <u>Increased Costs and Reduced Return</u>.  (a) If any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any tax, duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender, or change the basis of taxation of payments to such Secured Party or any Person controlling such Secured Party of any amounts payable hereunder (except for taxes on the overall net income of such Secured Party or any Person controlling such Secured Party), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrower shall pay to such Secured Party such additional amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b)     If any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained or any agreement to make Loans or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, within 30 days after demand by such Secured Party, the Borrower shall pay to such Secured Party from time to time such additional amounts

as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c)     All amounts payable under this Section 2.10 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at a rate equal to the Applicable Margin.  A certificate of such Secured Party claiming compensation under this Section 2.10, specifying in reasonable detail the event herein above described and the nature of such event shall be submitted by such Secured Party to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.10 for any increased costs incurred or reductions suffered more than three months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the three-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     The obligations of the Loan Parties under this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.11     [Reserved].

Section 2.12     Super Priority Nature of Obligations and Lenders' Liens.

(a)     The priority of the Secured Parties' Liens on the Collateral owned by the Borrower shall be set forth in the Order.

(b)     All Obligations (i) of the Borrower shall constitute Superpriority DIP Claims and (ii) shall be senior to the Prepetition Term Obligations and any adequate protection claims provided to the Prepetition Term Secured Parties under any Order.

(c)     Upon entry of the applicable Order, the Liens granted to the Collateral Agent for the benefit of the Lenders on the Collateral shall be valid and automatically perfected on the basis with the priority set forth herein and in the Order.

(d)     Except as set forth herein or in the Order and subject to the Carve-Out and with respect to Debtor Professional Fees, the Debtor shall not seek approval of any other claim having a priority superior or pari passu to that granted to the Collateral Agent and Lenders by the Order while any Obligations remain outstanding.

Section 2.13     No Discharge; Survival of Claims.  Except as otherwise contemplated by the RSA, until indefeasible payment in full (other than contingent obligations not yet due and payable) in cash of the Loans and all other Obligations (which includes a conversion thereof into any exit financing of the Debtor pursuant to the terms of the Bankruptcy Plan and in accordance with the RSA), each of the Borrower and the Guarantors agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority DIP Claims and the Liens granted to the Collateral Agent pursuant

36

to the Order and the Loan Documents and described in this Section 2.13 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in the Chapter 11 Case.

Section 2.14    Release.    [The Borrower and the Guarantors hereby acknowledges effective upon entry of the Order, and subject to the terms thereof, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or any Subsidiaries' liability to repay any Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Agent or any Lender.  Upon entry of the Order, the Borrower and the Guarantors, each in their own right (and in respect of the Borrower,  on behalf of its bankruptcy estate), and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge each Agent and the Lenders and all of the Agents' and the Lenders' respective officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Order, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other Professional Costs, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to this Agreement, the Order and the transactions (including, for avoidance of doubt, the Transactions) contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  Notwithstanding anything herein to the contrary, the Borrower and Guarantors shall not have any obligation to indemnify or hold harmless any Agent or any Lender hereunder with respect to liabilities to the extent they result from the actual fraud (other than in the case of the Agents), gross negligence or willful misconduct of such Agent or Lender, as applicable, as finally determined by a court of competent jurisdiction.][6]

Section 2.15    Waiver of Certain Rights.

(a)    On and after the Closing Date, and on behalf of themselves (and in respect of the Borrower, its bankruptcy estate), and for so long as any Obligations shall be outstanding, the Borrower and the other Loan Parties hereby irrevocably waive any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

(b)    The Order shall provide that in no event shall the Agents, the Lenders, the Prepetition Term Agents or the Prepetition Term Lenders under the Prepetition Term Financing Agreement (the "Prepetition Term Secured Parties") be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral or the Prepetition Term Collateral, as applicable, and all proceeds shall be received and applied pursuant to the Order and the Loan Documents notwithstanding any other agreement or provision to the contrary.

(c)    Subject to the Carve-Out, and only upon entry of the Order, the Debtor (on behalf of itself and its bankruptcy estate) shall irrevocably waive, and shall be prohibited from asserting in the Chapter 11 Case or any successor cases, (i) any surcharge claim under sections 105(a) or 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Agents, the Lenders, or the Prepetition Term Secured Parties upon

---

[6] NTD: To be discussed in connection with Plan discussions.

the Collateral or the Prepetition Term Collateral, and (ii) the Agents, the Lenders, and the Prepetition Term Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Agents, the Lenders, and the Prepetition Term Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Term Collateral or Collateral.

# ARTICLE III

## [INTENTIONALLY OMITTED]

# ARTICLE IV

## APPLICATION OF PAYMENT

Section 4.01    Payments; Computations and Statements.  (a) The Borrower will make each payment under this Agreement not later than 2:00 pm (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account.  All payments shall be made by the Borrower without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be, but not be deemed to be a Default or Event of Default.  All computations of interest and fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

Section 4.02    Sharing of Payments.  Except as provided in Section 2.02 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply).  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

38

Section 4.03    Apportionment of Payments.  Subject to Section 2.02 hereof and to any written agreement among the Agents and/or the Lenders:

(a)    All payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof to the extent set forth in any written agreement among the Agents and the Lenders) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b)    After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, (i) first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to each Agent in its capacity as such; (ii) second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them; (iii) third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them; (iv) fourth, to payment of that portion of the Obligations constituting unpaid principal, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them; (v) fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and (vi) sixth, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by law.

(c)    For purposes of Section 4.03(b), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d)    In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.03 shall control and govern.

## ARTICLE V

### CONDITIONS TO LOANS

Section 5.01    Conditions Precedent to Effectiveness.  This Agreement shall become effective as of the Business Day (the "Closing Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents and the Required Lenders:

(a)    Payment of Fees, Etc.  The Borrower shall have paid on or before the Closing Date all fees, costs, expenses and taxes then due and payable pursuant to Section 2.06 and Section 12.04.

39

(b)      Representations and Warranties; No Event of Default.  The following statements shall be true and correct: (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the Closing Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Closing Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)) and (ii) no Default or Event of Default shall have occurred and be continuing on the Closing Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)      Delivery of Documents.[7]  The Administrative Agent (or its counsel) shall have received on or before the Closing Date the following, each in form and substance satisfactory to the Administrative Agent and, unless indicated otherwise, dated the Closing Date and, if applicable, duly executed by the Persons party thereto:

(i)      from the Borrower and the Guarantors, a counterpart of this Agreement signed on behalf of such party;

(ii)      from the Loan Parties, executed counterparts of the Security Agreement to be entered into on the Closing Date;

(iii)      evidence of financing statements on Form UCC-1 in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by each Security Agreement;

(iv)      a Perfection Certificate;

(v)      the Notice of Borrowing relating to the Loan in accordance with Section 2.02(a);

(vi)      [the Prepetition ABL Credit Agreement Amendment];[8]

(vii)      [the Intercreditor Agreement Amendment No. 1];[9]

(viii)      a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of incorporation, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 30 days prior to the Closing Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational

---

[7] NTD:  Requirement of copyright security agreement and flow of funds TBD.

[8] NTD:  Confirm no bankruptcy order is contemplated with the ABL amendment.

[9] NTD:  Subordination of the Prepetition Term Obligations and related Liens shall be set forth in RSA.

number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, the Notice of Borrowing and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Authorized Officers and (D) as to the matters set forth in Sections 5.01(b);

(ix)    a certificate of the appropriate official(s) of the jurisdiction of organization of each Loan Party certifying as of a recent date as to the good standing of such Loan Party in such jurisdiction;

(x)    the results of searches for any effective UCC financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens acceptable to the Collateral Agent);

(xi)    [a customary opinion of counsel to the Loan Parties in form and substance reasonably acceptable to the Administrative Agent][10]; and

(xii)    such other agreements, instruments, approvals and other documents, each satisfactory to the Agents in form and substance, as any Agent may reasonably request.

(d)    All reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of (i) the Administrative Agent and the Lenders (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of King & Spalding LLP ("K&S"), Haynes and Boone LLP ("H&B"), as local counsel, Mayer Brown LLP ("MB"), as regulatory counsel, and any successor counsels), and (ii) any other professional advisors retained by the Administrative Agent at the direction of the Required Lenders in their reasonable discretion, including, but not limited to, Ernst & Young Global Limited, as tax advisor ("E&Y"; together with K&S, H&B, MB, V&E and any other professional advisor engaged by the Administrative Agent and/or the Lenders from time to time, the "Lender Advisors"), shall have been paid in full in cash (which payment may be made from DIP Proceeds), in each case to the extent invoices for any such accrued and unpaid amounts are provided to the Debtor no later than three (3) Business Day prior to the Closing Date.

(e)    [The Administrative Agent shall have received at least five (5) Business Days prior to the Closing Date, all documentation and other information required by the Administrative Agent and the Lenders under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.  For all such documentation and information, the Administrative Agent shall make a request reasonably prior to the deadline to deliver such documentation or information.

---

[10] NTD: Subject to ongoing discussion based on timing of DIP facility.

(f)      At least five days prior to the Closing Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Loan Party.][11]

(g)      Subject to entry of the Order, the Collateral Agent, for the benefit of the Lenders, shall have a valid and perfected Lien on and security interest in the Collateral of the Debtor and the other Loan Parties on the basis and with the priority set forth herein.

(h)      The Bankruptcy Court shall have entered the Order within thirty-two (32) calendar days after the Petition Date, which Order shall include, without limitation, copies of the DIP Facility as exhibits thereto, entered on notice to such parties as may be satisfactory to the Required Lenders, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein and therein; (ii) authorizing the lifting or modification of the Automatic Stay to permit the Borrower to perform its obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Term Lenders, as and to the extent provided herein and therein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Required Lenders and the Debtor, in their respective discretion in each case, which Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent at the direction of the Required Lenders, which consent shall not be unreasonably withheld, delayed or conditioned.

(i)      The Loan Parties shall have entered into the restructuring support agreement, which shall be in form and substance acceptable to the Required Lenders (the "RSA") with the requisite Prepetition Term Lenders in accordance with its terms and the RSA shall otherwise become effective as to such parties, and the RSA shall continue to be in full force and effect according to its terms.

(j)      On the Closing Date, the Prepetition ABL Loan Documents shall remain in full force and effect [and the entities identified as "Borrowers" thereunder are entitled to continue to borrow thereunder.]

(k)      The Administrative Agent shall have received a Notice of Borrowing relating to the Loan in accordance with Section 2.02.

(l)      The Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Required Lenders, confirming the Bankruptcy Plan, and such order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01      <u>Representations and Warranties</u>.  Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a)      <u>Organization, Good Standing, Etc</u>.  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the

---

[11] NTD: Confirm satisfied based on existing credit facility.

laws of the state or jurisdiction of its organization, (ii) subject to the entry by the Bankruptcy Court of the applicable Order in respect of the Borrower, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrower, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing would reasonably be expected to have a Material Adverse Effect.

(b)    Authorization, Etc.  Subject to the entry by the Bankruptcy Court of the applicable Order in respect of the Borrower and other than the Known Events, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable material Requirement of Law or (C) any material Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document or any restrictions arising on account of the Borrower's status as a "debtor" under the Bankruptcy Code) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties.

(c)    Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than (i) filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, to perfect the Liens or (ii) the Order.

(d)    Enforceability of Loan Documents.  Subject to the entry by the Bankruptcy Court of the applicable Order in respect of the Borrower, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e)    Capitalization.  On the Closing Date, after giving effect to the transactions contemplated hereby to occur on the Closing Date, the authorized Equity Interests of the Borrower and each of its Subsidiaries and the issued and outstanding Equity Interests of the Borrower and each of its Subsidiaries are as set forth on Schedule 6.01(e). All of the issued and outstanding shares of Equity Interests of the Borrower and each of its Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  All Equity Interests of such Subsidiaries of the Borrower are owned by the Borrower free and clear of all Liens (other than Permitted Liens). Except as described on Schedule 6.01(e), there are no outstanding debt or equity securities of the Borrower or any of its Subsidiaries and no outstanding obligations of the Borrower or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Borrower or any of its Subsidiaries, or other obligations of the Borrower or any of its Subsidiaries to issue, directly or indirectly, any shares of Equity Interests of the Borrower or any of its Subsidiaries.

(f)    Litigation.  Other than the Known Events, there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely

43

determined, could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby.

(g)     Financial Condition.

(i)     The financial statements for (x) the Fiscal Year ending December 31, 2020 and (y) for the fiscal quarter ending March 31, 2021, copies of which have been delivered to each Agent and each Lender, have been prepared in accordance with GAAP applied on a consistent basis during the period covered by such financial statements, subject, in the case of the interim financial statements, to normal year-end audit adjustments and the absence of notes, and fairly present in all material respects the consolidated financial condition of Borrower and its Subsidiaries at the dates therein indicated and the consolidated results of operations and cash flows of Borrower and its Subsidiaries for the periods therein specified, in each case in accordance with GAAP, except that the interim financial statements do not contain footnotes and are subject to normal year-end audit adjustments.

(ii)     Since the Petition Date (other than the Known Events), no event, change, development or condition has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(iii)     On the Closing Date, to the knowledge of the Borrower, the information included in the Beneficial Ownership Certification is true and correct in all respects.

(h)     Compliance with Law, Etc.  Subject to the entry of the Order in respect of the Borrower, as applicable, no Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any material Requirement of Law or (iii) any material term of any Material Contract binding on or otherwise affecting it or any of its properties, and no default or event of default has occurred and is continuing thereunder, except, in each case, to the extent such violation, default or event of default would not reasonably be likely to have a Material Adverse Effect.

(i)     ERISA.  No Loan Party nor any of its ERISA Affiliates contributes to, sponsors, maintains or has an obligation to contribute to or maintain any Multiemployer Plan or Employee Plan and has not at any time prior to the date hereof established, sponsored or maintained, been a party to and has not at any time prior to the date hereof contributed or been obligated to contribute to or maintain any Multiemployer Plan or Employee Plan.  No Termination Event has occurred, except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or coverage after a participant's termination of employment.

(j)     Taxes, Etc.  (i) All Federal and material provincial, state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been filed, or extensions have been obtained, and (ii) all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $250,000 and which have become due and payable on or prior to the date hereof have been paid, except to the extent excused by the Bankruptcy Court or as a result of the Chapter 11 Case contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k)     Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l)     Nature of Business.

(i)     No Loan Party is engaged in any business other than as set forth on Schedule 6.01(l).

(ii)     The Borrower does not have any material liabilities (other than liabilities arising under the Loan Documents, the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents or the Parent Company Agreement), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(iii)     GC Midco does not have any material liabilities (other than liabilities arising under the Loan Documents, the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents and other Contingent Indemnity Obligations made in the ordinary course of business), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(m)     Adverse Agreements, Etc.  No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)     Permits, Etc.  Other than as a result of the Chapter 11 Case and subject to any necessary orders or authorization of the Bankruptcy Court, each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect.  Other than as a result of the Chapter 11 Case and subject to any necessary orders or authorization of the Bankruptcy Court, no condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and there is no claim that any thereof is not in full force and effect where such claims, if determined adversely to any Loan Party, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(o)     Properties.  Other than as a result of the Chapter 11 Case and subject to any necessary orders or authorization of the Bankruptcy Court, each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(p)     Employee and Labor Matters.  There is (i) no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party before any

45

Governmental Authority, and no grievance or arbitration proceeding pending or threatened against any Loan Party, which, in each case, arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or, to the knowledge of any Loan Party, threatened against any Loan Party or (iii) to the knowledge of each Loan Party, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party.  As of the date hereof, no Loan Party or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied.

(q)     Environmental Matters.  Except for those items as set forth on Schedule 6.01(q), (i) the operations of each Loan Party are in compliance with all Environmental Laws, except to the extent any noncompliance would not reasonably be expected to have a Material Adverse Effect; (ii) there has been no Release at any of the properties owned or operated by any Loan Party or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party or any predecessor in interest which would reasonably be expected to have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Loan Party nor does any Loan Party have knowledge or notice of any threatened or pending Environmental Action against any Loan Party which would reasonably be expected to have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Loan Party which would reasonably be expected to have a Material Adverse Effect; (v) no property now owned or operated by a Loan Party has been used as a treatment or disposal site for any Hazardous Material which would reasonably be expected to have a Material Adverse Effect; (vi) no Loan Party has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which would reasonably be expected to have a Material Adverse Effect; (vii) each Loan Party holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Loan Party's failure to maintain or comply with would not reasonably be expected to have a Material Adverse Effect; and (viii) no Loan Party has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued  pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

(r)     Insurance.  Each Loan Party maintains the insurance and required services and financial assurance as required by law and as required by Section 7.01(h).  Schedule 6.01(r) sets forth a list of all insurance maintained by each Loan Party on the Closing Date.

(s)     Use of Proceeds.  The proceeds of the Loans shall be used in accordance with Section 7.01(m).

(t)     Chapter 11 Case.  The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and the Bankruptcy Court has determined that proper or sufficient notice has been or will be given of the motion seeking approval of the Loan Documents, the Order, and the hearing for the entry of the Order, to the extent notice is required to be given under the Bankruptcy Code or applicable law.

(u)     Intellectual Property.  Except as set forth on Schedule 6.01(u), other than as a result of the Chapter 11 Case and subject to any necessary orders or authorization of the Bankruptcy Court, each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are

46

necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 6.01(u) is a complete and accurate list as of the Closing Date of each item of Registered Intellectual Property owned by each Loan Party; (ii) each material work of authorship owned by each Loan party and which is not Registered Intellectual Property, and (iii) each material Intellectual Property Contract to which each Loan Party is bound.  No trademark or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)     Material Contracts.  Set forth on Schedule 6.01(v) is a complete and accurate list as of the Closing Date of all Material Contracts of each Loan Party, showing the parties and subject matter thereof and amendments and modifications thereto.  Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Loan Party that is a party thereto and, to the best knowledge of such Loan Party, all other parties thereto in accordance with its terms, (ii) has not been otherwise amended or modified, and (iii) except as set forth on Schedule 6.01(v), other than as a result of the Chapter 11 Case and subject to any necessary orders or authorization of the Bankruptcy Court, is not in default due to the action of any Loan Party or, to the knowledge of any Loan Party, any other party thereto, to the extent that the non-Loan Party counterparty thereto has the right to terminate its obligations under such Material Contract (other than a right to terminate for convenience) as a result of such default.

(w)     Investment Company Act.  None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)     Security Interest.  This Agreement, the Order and the other Loan Documents, subject to entry of the Order in respect of the Borrower, are effective to create in favor of the Collateral Agent, subject to the Carve-Out for the benefit of the Secured Parties legal, valid and enforceable Collateral and continuing first-priority Liens on, and security interests in, the Collateral pledged hereunder or thereunder, in each case, with respect to priority, subject to no Liens other than Permitted Priority Liens with the relative priorities granted pursuant to the terms of the Order and the other Loan Documents.  Pursuant to the terms of the Order, no filing or other action will be necessary to perfect or protect such Liens and security interests in respect of the Borrower's Obligations.  Pursuant to and to the extent provided in the Order, the Indebtedness of the Debtor under this Agreement will constitute part of the Superpriority DIP Claim.

(y)     [Reserved].

(z)     Anti-Money Laundering and Anti-Terrorism Laws.

(i)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, has violated or is in violation of any of the Anti-Money Laundering and Anti-Terrorism Laws or has engaged in or conspired to engage in any transaction that evades or avoids, or has the purpose of

47

evading or avoiding, or attempts to violate, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, is a Blocked Person.

(iii)     None of the Loan Parties, nor any of their agents acting in any capacity in connection with the Loans or other transactions hereunder, (A) conducts any business with or for the benefit of any Blocked Person or engages in making or receiving any contribution of funds, goods or services to, from or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to any OFAC Sanctions Programs.

(aa)     <u>Anti-Bribery and Anti-Corruption Laws</u>.

(i)     The Loan Parties are in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>"), the UK Bribery Act (the "<u>UK Act</u>") and the anti-bribery and anti-corruption laws of those jurisdictions in which they do business (collectively, the "<u>Anti-Corruption Laws</u>").

(ii)     None of the Loan Parties has at any time:

(A)     offered, promised, paid, given, or authorized the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any employee, official, representative, or other person acting on behalf of any foreign (i.e., non- U.S.) Governmental Authority thereof, or of any public international organization, or any foreign political party or official thereof, or candidate for foreign political office (collectively, "<u>Foreign Official</u>"), for the purpose of: (1) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (2) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official, or (3) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(B)     acted or attempted to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

(iii)     There are, and have been, no allegations, investigations or inquiries with regard to a potential violation of any Anti-Corruption Law by any of the Loan Parties or any of their respective current or former directors, officers, employees, stockholders or agents, or other persons acting or purporting to act on their behalf.

(iv)     The Loan Parties have adopted, implemented and maintain anti- bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(bb)     <u>Full Disclosure</u>.  Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan

48

Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrower's industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

(cc)     <u>Order</u>.  As of the date of the Closing Date, the Debtor is in compliance in all material respects with the terms and conditions of the Order.  The Order is in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, and solely with respect to terms and provisions affecting the rights, protections, duties or obligations of the Agents, the Administrative Agent in its sole and absolute discretion, in each case, except for any such modification, stay, vacation, reversal, rescindment or amendment that is reversed within three (3) Business Days.

(dd)     <u>No Default</u>.  No Loan Party nor any of their Subsidiaries are in default under any of the Loan Documents and no Event of Default exist and is continuing.

# ARTICLE VII

## ARTICLE VII COVENANTS OF THE LOAN PARTIES

Section 7.01     <u>Affirmative Covenants</u>.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any DIP Loan Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)     <u>Reporting Requirements</u>.  Furnish to each Agent:[12]

(i)     as soon as available, and in any event within 45 days after the end of each fiscal month of the Borrower and its Subsidiaries, commencing with the fiscal month ending [●], internally prepared consolidated and consolidating balance sheets, statements of operations and retained earnings and statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Borrower and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Borrower and its Subsidiaries for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(ii)     as soon as available and in any event within 45 days after the end of each fiscal quarter of the Borrower and its Subsidiaries, commencing with the fiscal quarter ending [●], consolidated and consolidating balance sheets, statements of operations and retained earnings and statements of cash flows of the Borrower and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the

---

[12] NTD: To be updated based on timing of filing and closing.

end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Borrower and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Borrower and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Parent and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(iii)    simultaneously with the delivery of the financial statements of the Borrower and its Subsidiaries required by clauses (i) and (ii) of this Section 7.01(a), a certificate of an Authorized Officer of the Borrower (a "Compliance Certificate"):

(A)    stating that such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which the Borrower and its Subsidiaries propose to take or have taken with respect thereto; and

(B)    in the case of the delivery of the financial statements of the Borrower and its Subsidiaries required by clauses (i) and (ii) of this Section 7.01(a), including a business segment financial report and a key performance indicator report for the applicable period, in each case, in form and substance substantially similar to the form of the business segment financial report and a key performance indicator report delivered by the Borrower to the Agents prior to the Closing Date;

(iv)    promptly (v) after delivery or receipt thereof: (A) copies of all reports (including borrowing base certificates and all accounts receivable agings) and default notices delivered to or received from the Prepetition ABL Agent under any Prepetition ABL Loan Documents and (B) copies of any amendments, waivers, consents or other modifications to any Prepetition ABL Loan Documents.

(v)    [Reserved];

(vi)    [Reserved];

(vii)    as soon as possible, and in any event within 3 Business Days after the any Loan Party has knowledge of the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(viii)    promptly after the commencement thereof but in any event not later than 5 days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, or any litigation, investigation or proceeding with respect to the DIP Facility;

(ix)     as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any notice or report with respect to an event or matter that is materially adverse to the Agents and the Lenders that any Loan Party executes or receives in connection with any Material Contract;

(x)     as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

(xi)     promptly after (A) the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness the outstanding principal amount of which equals or exceeds $5,000,000 or its securities or files with the SEC or any national (domestic or foreign) securities exchange and (B) the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

(xii)     promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xiii)     promptly upon request, any certification or other evidence reasonably requested from time to time by any Lender confirming the Borrower's compliance with Section 7.02(s);

(xiv)     simultaneously with the delivery of the financial statements of the Borrower and its Subsidiaries required by clauses (i) and (ii) of this Section 7.01(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.02(q), the consolidated financial statements of the Borrower and its Subsidiaries delivered pursuant to clauses (i) and (ii) of this Section 7.01(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Agents; and

(xv)     promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time reasonably request.

(b)     Additional Guarantors and Collateral Security.  Cause:

(i)     each Subsidiary of any Loan Party not in existence on the Closing Date, to execute and deliver to the Collateral Agent promptly and in any event within 5 Business Days (or such longer period agreed to by the Agent in its sole discretion) after the formation, acquisition or change in status thereof, (A) a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Guarantor, (B) a supplement to the Security Agreement, together with, to the extent requested by the Collateral Agent, (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the Security Agreement and (2) undated stock powers for such Equity Interests executed in blank, (C) to the extent requested by the Collateral Agent, one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to

Permitted Priority Liens) on such real property and such other Real Property Deliverables as may be required by the Collateral Agent with respect to each such real property, (D) to the extent requested by the Collateral Agent, insurance certificates evidencing the insurance coverage of the Loan Parties required by Section 7.01(h) and endorsements naming the Collateral Agent as an additional insured or loss payee, and (E) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

        (ii)     to the extent requested by the Collateral Agent, each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within 5 Business Days (or such longer period agreed to by the Agent in its sole discretion) after the formation or acquisition of such Subsidiary a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such Equity Interests executed in blank with signature guaranteed, and (C) such other agreements, instruments, approvals or other documents requested by the Collateral Agent.

        (c)     <u>Compliance with Laws; Payment of Taxes</u>.

        (i)     Subject to any necessary Bankruptcy Court approval, comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable material Requirements of Law (including, without limitation, all Environmental Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), except where the failure to so comply could not reasonably be expected to result, individually or in the aggregate, in liabilities in excess of $100,000 or excused by, or otherwise prohibited by, the provision of the Bankruptcy Code or as a result of the Chapter 11 cases.

        (ii)     Subject to any approval by the Bankruptcy Court, pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all taxes, assessments and other governmental charges imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $500,000, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof to the extent required in accordance with GAAP or excused by, or otherwise prohibited by, the provision of the Bankruptcy Code or as a result of the Chapter 11 cases.

        (d)     <u>Preservation of Existence, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

        (e)     <u>Keeping of Records and Books of Account</u>.  Keep, and cause each of its Subsidiaries to keep, (a) adequate records and books of account, with complete entries made to permit the

preparation of financial statements in accordance with GAAP and (b) all such records and books at the Houston Facility.

(f)        Inspection Rights.  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal business hours and, in the absence of an Event of Default, upon reasonable prior notice, at the expense of the Borrower, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Collateral Agent based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, the Borrower hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this Section 7.01(f).

(g)        Maintenance of Properties, Etc.  Subject to any necessary order or authorization from the Bankruptcy Court, maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and, comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect or for the rejection of any contract in connection with the pendency of the Chapter 11 case that is permitted pursuant to the Bankruptcy Plan.

(h)        Maintenance of Insurance.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, worker's compensation and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent (at the direction of the Required Lenders).  All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as its interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  If requested by the Collateral Agent pursuant to Section 7.01(b)(i)(D), all certificates of insurance delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent (at the direction of the Required Lenders) may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all

53

endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)  <u>Obtaining of Permits, Etc.</u>  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, in each case, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect or other than as a result of the Chapter 11 case and subject to any necessary orders of authorization of the Bankruptcy Court.

(j)  <u>Environmental</u>.  Other than as a result of the Chapter 11 case and subject to any necessary orders of authorization of the Bankruptcy Court (i) keep any property either owned or operated by it or any of its Subsidiaries free of any Environmental Liens; (ii) comply, and cause each of its Subsidiaries to comply, with all Environmental Laws, to the extent any noncompliance would reasonably be expected to have a Material Adverse Effect, and provide to the Collateral Agent any documentation of such compliance which the Collateral Agent may reasonably request; (iii) provide the Agents written notice within 5 days of any knowledge by the Borrower of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it or any of its Subsidiaries and take any Remedial Actions required to abate said Release; and (iv) provide the Agents with written notice within 10 days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Loan Party or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party or any of its Subsidiaries; and (C) notice of a violation, citation or other administrative order which could reasonably be expected to have a Material Adverse Effect.

(k)  <u>Fiscal Year</u>.  Cause the Fiscal Year of the Borrower and its Subsidiaries to end on December 31 of each calendar year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)  [<u>Intentionally Omitted</u>].

(m)  <u>Use of Proceeds</u>.  The proceeds of the Loans shall be used to pay (or reimbursement the payment) (i) interest, fees, costs and expenses under the Loan Documents and (ii) certain Professional Costs, U.S. Trustee fees and expenses, and such other expenses related to and/or necessary to be paid in connection with, or during, the Chapter 11 Case as determined by the Borrower in consultation with the Required Lenders, in each case subject to the terms and conditions of this Agreement, the Order and the Bankruptcy Plan. [Without in any way limiting the foregoing, no Collateral, DIP Proceeds, or any portion of the Carve-Out may be used directly or indirectly by any of the Debtor, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to or *pari passu* with the Liens securing the Obligations or the Liens in existence on the Petition Date securing the Prepetition Term Obligations (the "<u>Prepetition Term Liens</u>"); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any of the Agents, the Lenders, or the Prepetition Term Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "<u>Released Parties</u>"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising

54

under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority DIP Claims, the Liens securing the Obligations, the Loan Documents, the Prepetition Term Liens, the Prepetition Term Loan Documents, or the Prepetition Term Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Term Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Agents or the Lenders hereunder or under any of the Loan Documents, or (B) the Prepetition Term Agents or the Prepetition Term Lenders under any of the Prepetition Term Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or any of the Agents' or the Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the Order); or (vi) objecting to, contesting, or interfering with, in any way, the Agents' and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; provided, however, that no more than $[50,000][13] in the aggregate of the Collateral, DIP Proceeds, or the Carve-Out, may be used by the Committee, if any, to investigate claims and/or liens.][14]

(n)     Anti-Bribery and Anti-Corruption Laws.   Maintain, and cause each of its Subsidiaries to maintain, anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(o)     Board Materials.  The Loan Parties shall deliver, or cause to be delivered, to the Administrative Agent (or its counsel), concurrently with the delivery thereof to the members of the Board of Directors of each Loan Party, copies of all formal written communications delivered to such board as a whole to report performance and other metrics or in connection with, or in preparation or anticipation of, a meeting of the Board of Directors of such Loan Party, minutes and other similar materials distributed to such members and presentations made to the Board of Directors (including all such materials distributed and presentations made with respect to any committee or subcommittee of such Board of Directors (or comparable management body)); provided, however, that to the extent any such materials are attorney-client privileged or relate to strategic discussions regarding any Loan Party, such materials may be excluded.

(p)     Further Assurances.

(i)     Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent (at the direction of the Required Lenders) may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens (subject to the terms of the Intercreditor Agreement and any Permitted Priority Liens) any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Loan Party (A) authorizes each Agent to file such agreements, instruments or other documents in any appropriate filing office, (B) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with

---

[13] NTD:  Investigation budget TBD.
[14] NTD:  Subject to discussion of the Order.

respect thereto, in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

(ii)     By its signature hereto, each Loan Party hereby authorizes the Collateral Agent to, in connection with, and to the extent contemplated by, this Agreement, and subject to the Order, file against such Loan Party, one or more financing, continuation or amendment statements pursuant to the UCC in form and substance satisfactory to the Required Lenders (which statements may have a description of Collateral which is broader than that set forth herein, including without limitation a description of Collateral as "all assets' and/or "all personal property" of such Loan Party).

(q)     Milestone.  The Borrower and the Guarantors covenant and agree that, the effective date (the "Bankruptcy Plan Effective Date") of the Bankruptcy Plan shall occur no later than [forty-six (46)] calendar days following the Petition Date (the "Milestone").

(r)     Bankruptcy Covenants.  Notwithstanding anything in the Loan Documents to the contrary, the Debtor shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Order in all material respects.

(s)     Chapter 11 Case.

(i)     The Debtor shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and in any event at least three (3) Business Days (or as soon thereafter as is reasonably practicable under the circumstance) prior to filing, upon request, all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtor with the Bankruptcy Court to K&S and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrower shall provide copies to the Administrative Agent (for distribution to the Lenders) of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtor with the Bankruptcy Court, distributed by or on behalf of the Debtor to any Committee, filed with respect to the Chapter 11 Case or filed with respect to any Loan Document.  In connection with the Chapter 11 Case, the Debtor shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Order and (y) the hearings for the approval of the Order.

(ii)     Starting in the first week following the Closing Date, and thereafter every week until the payment in full in cash of the Obligations (other than contingent obligations not yet due and payable), the Loan Parties and the Company Advisors will participate in a conference call with the Agents and the Lenders and their representatives, consultants, and agents, at such mutually convenient dates and times to be proposed by the Agents upon reasonable advance notice, and will use commercially reasonable efforts to cause available senior members of management and any investment bankers and other advisors of the Borrower and its Subsidiaries, as applicable or as requested by the Agents or such Lenders, to participate in such calls for the purpose of discussing the status of the financial, collateral, and operational condition, businesses, liabilities, assets, and prospects of the Borrower and its Subsidiaries and any sale, refinance or other strategic transaction efforts; provided, that any materials may be redacted to the extent information contained therein would adversely affect any attorney-client privilege or accountant-client privilege.

(iii)     Each Loan Party shall deliver or cause to be delivered to the Administrative Agent and the Lenders, as soon as commercially reasonable upon receipt of same, copies of any term sheets, proposals, presentations or other material documents, from any Person, related to (i) the restructuring of the Debtor or any other Loan Party or their Subsidiaries, or (ii) the sale of any material asset of one or all of the Loan Parties or their Subsidiaries (for the avoidance of doubt, excluding ordinary course asset sales).

(iv)     Except to the extent permitted (or required) hereunder or under the Order, the Borrower shall not, without the express prior written consent of the Required Lenders or pursuant to an order of the Bankruptcy Court after notice and a hearing, use the DIP Proceeds or cash Collateral to make any Prepetition Payment.

(v)     All Professional Costs at any time paid by the Borrower shall be paid in accordance with the limitation and procedures set forth in the Loan Documents.

(t)     <u>Retention of Consultants; Communications with Accountants and other Financial Advisors</u>.

(i)     There shall be no material modifications to the compensation (excluding any decreases in compensation but including any other modification in compensation) for the engagement of the Company Advisors or the appointment and/or replacement of any Company Advisor without the consent of the Required Lenders.

(ii)     The Borrower shall provide the Agents, the Lenders, and their respective representatives reasonable access to their independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Company Advisors) through regular meetings or conference calls at times and locations to be mutually agreed, which have been engaged from time to time by the Loan Parties, and authorizes and agrees to instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Agents, the Lenders and their respective representatives' information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party.  The Borrower acknowledge and agree that the Loan Parties and their representatives will reasonably cooperate with the Company Advisors and any Lender Advisor.  Each Loan Party acknowledges that the Agents and Lenders have engaged the Lender Advisors for the sole benefit thereof, as applicable, as the Agents or the Lenders each may determine to be necessary or appropriate, in their respective reasonable discretion.  Each Loan Party covenants and agrees that (i) such Loan Party shall provide its reasonable cooperation with any Lender Advisor (including, without limitation, providing reasonable access to such Loan Party's business, books and records and senior management at times and locations to be mutually agreed); (ii) all costs and expenses of any such Lender Advisor shall be expenses (subject to limitations regarding legal expenses provided in Section 12.04) required to be paid by the Loan Parties under Section 12.04 hereof; and (iii) all reports, determinations and other written and verbal information provided by any Lender Advisor shall be confidential and no Loan Party shall be entitled to have access to same.

(u)     <u>Mortgages</u>.  Within thirty (30) days of written request by the Administrative Agent, the Loan Parties shall deliver executed Real Property Deliverables in respect of the Facility.

Section 7.02     <u>Negative Covenants</u>.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any DIP Loan Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)    <u>Liens, Etc.</u>  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; other than, as to all of the above, Permitted Liens.

(b)    <u>Indebtedness</u>.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)    <u>Fundamental Changes; Dispositions</u>.

(i)    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or permit any of its Subsidiaries to do (or agree to do) any of the foregoing except to the extent agreed to by the Required Lenders.

(ii)    Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; <u>provided</u>, <u>however</u>, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(d)    <u>Change in Nature of Business</u>.

(i)    Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 6.01(l).

(ii)    Permit the Borrower to have any material liabilities (other than liabilities arising under the Loan Documents, the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents or the Parent Company Agreement), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(iii)    Create, form or acquire, or permit any of its Subsidiaries to create, form or acquire, any new Subsidiary on and after the Petition Date.

(iv)    Acquire, or permit any of its Subsidiaries to acquire, any new real property on and after the Petition Date.

(e)    <u>Loans, Advances, Investments, Etc.</u>  Make or commit or agree to make, or permit any of its Subsidiaries to make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f)    <u>Sale and Leaseback Transactions</u>.  Enter into, or permit any of its Subsidiaries to enter into, any Sale and Leaseback Transaction.

(g)    [<u>Intentionally Omitted</u>].

(h)    <u>Restricted Payments</u>.  Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i)      Federal Reserve Regulations.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)      Transactions with Affiliates.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate of Borrower or any of its Subsidiaries, except the following transactions:  (i) transactions consummated in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and if they involve one or more payments by the Borrower or any of its Subsidiaries in excess of $100,000 for any single transaction or series of related transactions, that are fully disclosed to the Administrative Agent prior to the consummation thereof,[15] (ii) transactions solely among two or more Loan Parties not involving the Borrower and (iii) transactions permitted by Section 7.02(e) or Section 7.02(h).

(k)      Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries. Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, to make loans or advances to any Loan Party or any of its Subsidiaries or (iii) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iii) of this Section 7.02(k) shall prohibit or restrict compliance with: (A) this Agreement, the other Loan Documents, the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents; (B) any agreement in effect on the date of this Agreement and described on Schedule 7.02(k), or any extension, replacement or continuation of any such agreement; provided, that, any such encumbrance or restriction contained in such extended, replaced or continued agreement is no less favorable to the Agents and the Lenders than the encumbrance or restriction under or pursuant to the agreement so extended, replaced or continued; (C) any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances); (D) in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset sale agreement or similar contract for the conveyance of such property or asset and (2) instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto; (E) customary restrictions on dispositions of real property interests in reciprocal easement agreements; (F) customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets; or (G) customary restrictions in contracts that prohibit the assignment of such contract.

(l)      Limitations on Negative Pledges.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement, the other Loan Documents, the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents,

---

[15] NTD: Discuss payments to GCSIL.

(ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(b) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; provided that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, and (iv) customary provisions in leases restricting the assignment or sublet thereof.

    (m)    Modifications and Payment of Indebtedness; Organizational Documents and Certain Other Agreements; Etc.

        (i)    (A)    Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of by any Subsidiary) any of the provisions of any of its or its Subsidiaries' Indebtedness (other than Prepetition ABL Indebtedness and the Prepetition Term Indebtedness) or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness or (B) amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of by any Subsidiary) any of the provisions of the Prepetition ABL Indebtedness other than in accordance with the terms of the Intercreditor Agreement;

        (ii)    except for the Obligations, (A) make, or permit any Subsidiary to make, any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due), (B) refund, refinance, replace or exchange, or permit any Subsidiary to refund, refinance, replace or exchange, any other Indebtedness for any such Indebtedness, (C) [reserved], or (D) make, or permit any Subsidiary to make, any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing; provided that the foregoing shall not prohibit paying the Prepetition ABL Obligations in accordance with the Order and the Prepetition ABL Credit Agreement Amendment; or

        (iii)    amend, modify or otherwise change, or permit any Subsidiary to amend, modify or otherwise change, any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it); or

        (iv)    [agree, or permit any Subsidiary to agree, to any amendment, modification or other change to or waiver of any of its rights under the ORG Management Agreement.]

    (n)    Investment Company Act of 1940.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)      ERISA.  (i) Engage, or permit any ERISA Affiliate to engage, in any transaction described in Section 4069 of ERISA; (ii) with respect to any Employee Plan, engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit any ERISA Affiliate to adopt a Plan or any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to retirees after termination of employment other than as required by Section 601 of ERISA or applicable law; fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(p)      Environmental.  Permit, or permit any Subsidiary to permit, the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it or any of its Subsidiaries, except in compliance in all material respects with Environmental Laws.

(q)      Accounting Methods.  Modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r)      Anti-Money Laundering and Anti-Terrorism Laws.

(i)      (A)      conduct any business or engage in any transaction or dealing with or for the benefit of any Blocked Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Blocked Person;

(B)      deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to the OFAC Sanctions Programs;

(C)      use any of the proceeds of the transactions contemplated by this Agreement to finance, promote or otherwise support in any manner any illegal activity, including, without limitation, any violation of the Anti-Money Laundering and Anti-Terrorism Laws or any specified unlawful activity as that term is defined in the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956 and 1957; or

(D)      violate, attempt to violate, or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)      nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, shall be or shall become a Blocked Person.

(s)      Anti-Bribery and Anti-Corruption Laws.

(i)      Offer, promise, pay, give, or authorize the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any Foreign Official for the purpose of: (A) influencing any act or decision of such Foreign Official in his, her, or its

61

official capacity; or (B) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official, or (C) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

        (ii)     Act or attempt to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

        (t)     <u>Chapter 11 Claims</u>.  Except for the Carve-Out and Permitted Priority Liens and as provided in the Order, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien that is *pari passu* with or senior to the claims or Liens granted under the Loan Documents, as the case may be, of the Agents and the Lenders against the Debtor hereunder or under the Order, or apply to the Bankruptcy Court for authority to do so.[16]

        (u)     <u>Revision of Order; Applications to Bankruptcy Court; Superpriority Claims</u>. Directly or indirectly, or permit any Subsidiary to directly or indirectly, (a) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of any Order or any other order of the Bankruptcy Court except for (i) any such modification, stay, vacation or amendment that is stayed or reversed within three (3) Business Days, (ii) modifications and amendments that do not affect the interests of the Lenders and (iii) any modifications and amendments agreed to in writing by the Required Lenders, in their sole discretion, (b) apply to the Bankruptcy Court for authority to take any action prohibited by this Article 7 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Administrative Agent (or Collateral Agent, as applicable) and the Required Lenders, in their sole discretion) or (c) seek authorization for, or permit the existence of, any claims other than that of the Secured Parties entitled to superpriority status under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the Secured Parties' claim under section 364(c)(1) of the Bankruptcy Code, except for the Carve-Out.

# ARTICLE VIII

## CASH MANAGEMENT ARRANGEMENTS
## AND OTHER COLLATERAL MATTERS

        Section 8.01     <u>Cash Management Arrangements</u>.

        (a)     The Loan Parties shall maintain, and cause each Subsidiary to maintain, a cash management system as in effect on the Petition Date and as required by the Order and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties.  Subject to Section 8.01(b), the Loan Parties shall deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral, all Collections (of a nature susceptible to a deposit in a bank account) and all other amounts received by any Loan Party (including payments made by Account Debtors) directly to any Loan Party into an account subject to a Control Agreement.

        (b)     The Borrower shall cause all DIP Proceeds to be maintained in an account of the Borrower until used in accordance with the terms hereof, the Order and the Bankruptcy Plan.

        (c)     No Loan Party nor any of its Subsidiaries shall permit the maintenance of cash and Cash Equivalents (a) in the Barbados Accounts in excess of $250,000 in the aggregate, or (b) in the Philippines Accounts in excess of $500,000 in the aggregate, in the case of each of the preceding clauses

---

[16] NTD: Subject to discussion of the Order.

(a) and (b), for any period of 5 consecutive days; it being understood that any amounts in excess of such threshold for such 5 day period shall be promptly repatriated to a deposit account held in the United States by a Loan Party and subject to a Control Agreement.

(d)     No Loan Party nor any of its Subsidiaries shall permit the maintenance of cash (a) in any Customer Trust Account, other than (i) cash owned by the applicable underlying customer (x) that was collected by such Loan Party from third parties in connection with its performance of services for such customer and (y) for payment of fees and expenses incurred by such Loan Party for the performance of such services, or (ii) funds advanced to such Customer Trust Account by a Loan Party to comply with client remittance requirements, and (b) in any License Trust Account, other than cash that such Loan Party is required to maintain in such account by the applicable underlying State or Governmental Authority; it being understood that any amounts in excess of such thresholds shall be promptly remitted to a deposit account subject to a Control Agreement.

(e)     No Loan Party may open or otherwise create any deposit account, security account, or commodity account that was not in existence as of the Petition Date without the consent of the Administrative Agent.

# ARTICLE IX

# EVENTS OF DEFAULT

Section 9.01     Events of Default. Each of the following events shall constitute an event of default (each, an "Event of Default"):

(a)     any Borrower shall fail to pay (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) (i) within three (3) Business Days following the due date interest on any Loan, or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Loans) or any other Loan Document or (ii) all or any portion of the principal of the Loans when due;

(b)     any representation or warranty made or deemed made by or on behalf of any Loan Party or by any Authorized Officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)     (i) any Loan Party shall fail to perform or comply with any covenant or agreement contained in Section 7.01(a), Section 7.01(c), Section 7.01(d), Section 7.01(f), Section 7.01(h), Section 7.01(k), Section 7.01(m), Section 7.01(n), Section 7.01(o), Section 7.01(q), Section 7.01(r), Section 7.01(s), Section 7.01(t), Section 7.02, or Section 8.01(b), or (ii) any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party subject to any grace period therein;

(d)     any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for fifteen (15) days after the earlier of the date a senior officer of any Loan Party has

knowledge of such failure and the date written notice of such default shall have been given by any Agent or the Required Lenders to the Borrower;

(e)　　(i) the Borrower shall (x) fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of post-petition Indebtedness (including, for the avoidance of doubt, Indebtedness under the Prepetition ABL Loan Documents) in an aggregate principal amount of $500,000 or more (excluding Indebtedness evidenced by this Agreement), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or (y) fail to observe or perform any other agreement or condition under any agreement or instrument relating to any such post-petition Indebtedness in an aggregate principal amount of $500,000 or more and such failure or event shall continue after the applicable grace period, if any, specified in such agreement or instrument or (ii) any Loan Party (other than the Borrower) or any of its Subsidiaries shall (x) fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of Indebtedness in an aggregate principal amount of $500,000 or more (excluding Indebtedness evidenced by this Agreement and the Prepetition Term Loan Documents), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or (ii) fail to observe or perform any other agreement or condition under any agreement or instrument relating to any such Indebtedness in an aggregate principal amount of $500,000 or more and such failure or event shall continue after the applicable grace period, if any, specified in such agreement or instrument, in each case if the effect of such failure or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof; provided that this clause (e) shall not apply to any Indebtedness outstanding hereunder or any Indebtedness of any Loan Party that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Loan Party) unless the enforcement of remedies against the applicable Loan Party (or its property) with respect to such Indebtedness is not stayed by Section 362 of the Bankruptcy Code.

(f)　　Other than with respect to the Chapter 11 Case, any Loan Party or any of its Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, administration, receivership, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, receivership or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g)　　Other than with respect to the Chapter 11 Case, any proceeding shall be instituted against any Loan Party or any of its Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, administration, receivership, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of thirty (30) days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)     any of the Loan Documents shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     any Security Agreement or any other security document, after delivery thereof pursuant hereto, shall for any reason (except to the extent such failure results from the failure of the Collateral Agent to maintain possession of Collateral as to which the Liens thereon are perfected by possession or otherwise as a result of any action or failure to act by the Collateral Agent when provided with the information required by the Loan Documents) fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (subject to the terms of the Intercreditor Agreement and Permitted Priority Liens) in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(j)     [reserved];

(k)     one or more fines and/or penalties for the payment of money exceeding $500,000 in the aggregate shall be levied against any Loan Party or any of its Subsidiaries by the Consumer Fraud Protection Bureau or any other Governmental Authority;

(l)     one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $500,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against any Loan Party or any of its Subsidiaries and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of thirty (30) consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;

(m)     any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(n)     the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party, if such loss, suspension, revocation or failure to renew would reasonably be expected to have a Material Adverse Effect;

(o)     [reserved];

(p)     [reserved];

(q)     [reserved];

(r)     a Change of Control shall have occurred; or

(s)     a Termination Event shall have occurred;

65

(t)        the occurrence of any of the following in the Chapter 11 Case:

(i)        (x) termination of the RSA or (y) any material breach of, or default by, any party to the RSA other than any Lender that is also party thereto;

(ii)        filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtor (other than the Bankruptcy Plan) that has not been consented to by the Required Lenders;

(iii)        filing of a plan of reorganization by the Debtor (other than the Bankruptcy Plan) that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the Administrative Agent and the Required Lenders;

(iv)        the Debtor or any Loan Party or any of their Subsidiaries shall file a pleading seeking to vacate or modify any of the Order over the objection of the Administrative Agent or the Administrative Agent at the direction of the Required Lenders;

(v)        entry of an order without the prior written consent of the Required Lenders amending, supplementing or otherwise modifying the Order;

(vi)        reversal, vacatur or stay of the effectiveness of the Order except to the extent stayed or reversed within three (3) Business;

(vii)        a failure by the Debtor to comply with any material provision of the Order (except where such failure would not materially and adversely affect the Lenders or the Agents);

(viii)        dismissal of the Chapter 11 Case of the Debtor to a case under Chapter 7 of the Bankruptcy Code;

(ix)        appointment of a Chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrower;

(x)        any sale of all or substantially all assets of the Debtor pursuant to section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale are applied to indefeasibly satisfy the Obligations in full in cash or (ii) such sale is supported by the Administrative Agent at the direction of the Required Lenders;

(xi)        failure to meet the Milestone, unless extended or waived pursuant by the prior written consent of the Administrative Agent at the direction of the Required Lenders;

(xii)        granting of relief from the Automatic Stay in the Chapter 11 Case to permit foreclosure or enforcement on assets of the Borrower or any other Loan Party, in each case, with a fair market value in excess of $500,000;

(xiii)        the Debtor filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the Lenders' claims under the DIP Facility;

(xiv)        the Debtor filing of (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or

66

comparable plan, except as provided in the Bankruptcy Plan (if any), without the prior written consent of the Required Lenders;

(xv)     the Debtor or any other Loan Party or any Subsidiary thereof shall seek, or shall support any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading with the Bankruptcy Court, or any other writing to another party in interest by Debtor) to challenge the extent, validity, perfection, priority, or enforceability of any of the Lien or obligations of the parties under the Prepetition Term Loan Documents;

(xvi)     payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the Order or consented to by the Administrative Agent at the direction of the Required Lenders;

(xvii)     expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan, with respect to the Debtor;

(xviii)     cessation of the Liens securing the Obligations or the Superpriority DIP Claims to be valid, perfected and enforceable in all respects;

(xix)     [reserved];

(xx)     any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any the Debtor or any of its respective affiliates in a combined aggregate amount in excess of $500,000 unless stayed;

(xxi)     other than in the ordinary course and consistent with past practice, any Loan Party asserting any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are paid in full in cash (or converted to non-cash consideration in the form of senior secured debt as contemplated by the RSA and Bankruptcy Plan on the Bankruptcy Plan Effective Date if the Bankruptcy Plan is confirmed pursuant to the Confirmation Order) and the commitments are terminated;

(xxii)     an order shall be entered in the Chapter 11 Case, without the prior written consent of the Administrative Agent and the Required Lenders (i) to permit any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal or superior to the Superpriority DIP Claim (other than the Carve-Out) or (ii) granting or permitted grant of a Lien that is equal in priority or senior to the Liens securing the Obligations (other than the Carve-Out pursuant to the Order);

(xxiii)     other than the Confirmation Order confirming the Bankruptcy Plan in accordance with the RSA, an order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in the Chapter 11 Case which does unimpair or not indefeasibly pay in full in cash the Obligations upon the effective date of such plan; and

(xxiv)     the payment of any prepetition claim other than (i) as consented to by the Required Lenders, (ii) permitted under the terms of this Agreement or (iii) as authorized by the Bankruptcy Court pursuant to the "first day" or "second day" orders or the Order;

then, during the continuation of any such event, the Collateral Agent may, and shall at the request of the Required Lenders, by notice to the Borrower, its counsel, the United States Trustee and counsel for any

67

statutory committee, terminate the DIP Facility, declare the Obligations in respect thereof to be immediately due and payable and, subject to <u>Section 9.02</u>, exercise all rights and remedies under the Loan Documents and the Order.

Section 9.02 <u>Remedies upon an Event of Default</u>.

 (a) If any Event of Default occurs and is continuing, then, subject to the terms of the Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Administrative Agent and/or Collateral Agent, as applicable, and the Lenders to exercise all rights and remedies provided for in the Loan Documents and: (i) upon the occurrence and during the continuance of any Event of Default under the Loan Documents, to (A) cease making any Loans under the DIP Facility to the Loan Parties and (B) declare all Obligations to be immediately due and payable; and (ii) unless the Bankruptcy Court orders otherwise during such period, upon the occurrence of an Event of Default and the giving by the Administrative Agent at the direction of the Required Lenders of five (5) Business Days prior written notice (the "<u>Termination Notice</u>"; and such notice period, the "<u>Remedies Notice Period</u>" provided that such period may be extended by written agreement by the Debtor and the Administrative Agent (acting at the direction of the Required Lenders), in their respective discretion), delivered to counsel to the Debtor, with copies to the United States Trustee and counsel to the Committee (if any), in each case subject in all respects to the Carve-Out and the proviso below, including without limitation the Debtor's rights to fund the Carve-Out Reserves, to (A) immediately terminate the Debtor's use of any cash collateral, (B) freeze monies or balances in the Debtor's account; (C) set-off any and all amounts in accounts maintained by the Debtor with the Administrative Agent or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the applicable Lenders, including, without limitation, disposition of the Collateral solely for application towards the Obligations; and (D) take any other actions or exercise any other rights or remedies permitted under the Order, the Loan Documents or applicable law to effect the repayment of the Obligations; <u>provided</u>, <u>however</u>, that during the Remedies Notice Period, the Debtor shall be permitted to continue to use proceeds of the DIP Facility and cash collateral to fund the Carve-Out Reserves; <u>provided</u>, <u>further</u>, that the only basis on which the Debtor, the Committee or any other party-in-interest shall have the right to contest a Termination Notice shall be with respect to the validity of the Event of Default giving rise to such Termination Notice (i.e., whether or not such Event of Default has occurred or not, or whether or not it has been cured within the cure periods expressly set forth in the applicable Loan Documents). Subject to the preceding sentence, upon the occurrence and during the continuation of any Event of Default, the Debtor shall not be permitted to withdrawal any DIP Proceeds from its accounts other than in accordance with the Order. Upon and after the delivery of the Termination Notice, the Debtor and the Administrative Agent at the direction of the Required Lenders consent to a hearing on an expedited basis to consider whether the Automatic Stay may be lifted so that the Agents and the Lenders may exercise all of their respective rights and remedies in respect of the Collateral in accordance with the Order and the Loan Documents, or to consider any other appropriate relief (including the Debtor's use of cash collateral on a nonconsensual basis). For the avoidance of doubt, notwithstanding any of the foregoing, upon the occurrence of and during the continuation of any Event of Default, the Agents and Lenders may exercise any and all rights and remedies provided under the Loan Documents against any non-Debtor Loan Party and/or Collateral not constituting property of the Debtor's bankruptcy estate.

 (b) Except as expressly provided above in this Section 7.02, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

68

## ARTICLE X

## AGENTS

Section 10.01 <u>Appointment</u>. Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices, written reports, certificates and agreements received by such Agent, in its capacity as Agent, and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices, written reports, certificates or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement, any other Loan Document or the Order; (v) to make the Loans, for such Agent or on behalf of the applicable Lenders as provided in this Agreement, any other Loan Document or the Order; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement, any other Loan Document or the Order; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement, any other Loan Document or the Order; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof, the other Loan Documents or the Order (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents or the Order, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations.  As to any matters not expressly provided for by this Agreement, the other Loan Documents or the Order (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein, in the other Loan Documents or in the Order), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein, in the other Loan Documents or in the Order, as applicable) shall be binding upon all Lenders and all makers of Loans; <u>provided</u>, <u>however</u>, the Agents shall not be required to take any action which, in the reasonable opinion of any Agent, exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 10.02 <u>Nature of Duties; Delegation</u>.  (a) The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement, in the other Loan Documents or in the Order.  The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement, any other Loan Document or the Order a fiduciary relationship in respect of any Lender.  Nothing in this Agreement, any other Loan Document or the Order, express or implied, is

69

intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement, any other Loan Document or the Order. If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender. Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein, in the other Loan Documents or in the Order) have instructed such Agent to act or refrain from acting pursuant hereto.

(b)       Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, sub-agent, co- agent, employee, attorney-in-fact and any other Person (including any Lender). Any such Person shall benefit from this Article X to the extent provided by the applicable Agent.

Section 10.03    Rights, Exculpation, Etc.  The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agents may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the

other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).  The provisions of this Section 10.03 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.04    Reliance.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05    Indemnification.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five (5) days of written demand by such Agent, reimburse such Agent for and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted from such Agent's gross negligence or willful misconduct.  The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.06    Agents Individually.  With respect to its Pro Rata Share of the DIP Loan Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07    Successor Agent.  (a)  Any Agent may at any time give at least thirty (30) days prior written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent in consultation with the Borrower.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

71

(b)    With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.    Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.    After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08    Collateral Matters.

(a)    [Reserved].

(b)    The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by such Agent upon any Collateral upon (i) indefeasible payment in full in cash of the Obligations (which includes a conversion thereof into any exit financing of the Debtor pursuant to the terms of the Bankruptcy Plan and in accordance with the RSA); (ii) constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement, the other Loan Documents and the Order; (iii) constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or (iv) if approved, authorized or ratified in writing by the Lenders in accordance with Section 12.02.    Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(b).

(c)    Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(b).    Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser of any

or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(e)     The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09     Agency for Perfection.  Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party.  Should the Administrative Agent or any Lender obtain  possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions.  In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents.  Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10     No Reliance on any Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act.  Each Lender,

Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11    No Third Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12    No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13    Reports; Confidentiality; Disclaimers.   By becoming a party to this Agreement, each Lender:

(a)      is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Borrower or any of its Subsidiaries (each, a "Report") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)      expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Borrower and its Subsidiaries and will rely significantly upon the Borrower's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)      agrees to keep all Reports and other material, non-public or proprietary information regarding the Borrower and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrower, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorney's fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14    Collateral Custodian.  Upon the occurrence and during the continuance of any Default or Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests.  Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such

74

custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral.

Section 10.15   Intercreditor Agreement.  Each Lender hereby grants to the Collateral Agent all requisite authority to enter into or otherwise become bound by, and to perform its obligations and exercise its rights and remedies under and in accordance with the terms of, the Intercreditor Agreement and to bind the Lenders thereto by the Collateral Agent's entering into or otherwise becoming bound thereby, and no further consent or approval on the part of any Lender is or will be required in connection with the performance by the Collateral Agent of the Intercreditor Agreement.

Section 10.16   Collateral Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent and/or the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Collateral Agent and the Administrative Agent and, in the event that the Collateral Agent or Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent or the Administrative Agent, as applicable, any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent or the Administrative Agent, and their respective agents and counsel, and any other amounts due the Collateral Agent or the Administrative Agent hereunder and under the other Loan Documents.

Section 10.17   Chapter 11 Case; Bankruptcy.

(a)      Nothing contained herein shall be deemed to (x) require any Agent to file or prove any claim in the Chapter 11 Case, or (y) authorize any Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

(b)      The Lenders hereby irrevocably authorize the Agents, based upon the instruction of the Required Lenders, to (a) consent to, credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code and any similar laws in any other jurisdictions in which a Loan Party is subject, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Uniform Commercial Code, including pursuant to Sections 9-610 or 9-620 of

the Uniform Commercial Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by the Collateral Agent (at the direction of the Required Lenders) in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of the Agents to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of the Agents to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) the Agents, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith the Agents may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.  Except as provided above, the Agents will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders.  Upon request by the Agents or the Borrower at any time, the Lenders will confirm in writing the Agents' authority to release any such Liens on particular types or items of Collateral pursuant to this Article X; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, the Agents shall not be required to execute any document or take any action necessary to evidence such release on terms that, in the Agents' reasonable opinion, could expose either Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of the Borrower in respect of) any and all interests retained by the Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

Section 10.18    Erroneous Payments.

(a)    If the Administrative Agent notifies a Lender, Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from any Agent or any of their Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof) (provided, that without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this sentence with respect to an Erroneous Payment unless such demand is made within ten (10) Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly,

but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received). A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)　　Without limiting immediately preceding clause (a), each Lender and Secured Party hereby further agrees that if it (or any Payment Recipient who on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from any Agent (or any of their Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by such Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by such Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)　　(A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)　　such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 10.18(b).

(c)　　Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)　　In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its DIP Loan Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not DIP Loan Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Acceptance with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its

77

obligations under the indemnification provisions of this Agreement and its applicable DIP Loan Commitments which shall survive as to such assigning Lender, and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the DIP Loan Commitments of any Lender and such DIP Loan Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)     The parties hereto agree that (1) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party and (2) to the extent an Erroneous Payment was in any way or at any time credited as a payment or satisfaction of any of the Obligations, the Obligations or part thereof that were so credited, and all rights of the applicable Lender, other Secured Party or Administrative Agent, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.  Further, each party hereto agrees that, in the event a Secured Party is the recipient of an Erroneous Payment and such Secured Party fails to return such Erroneous Payment in accordance with Section 10.18(a), then the Administrative Agent shall be entitled to (x) collect from the Borrower or any other Loan Party any Obligations owed by the Borrower or any other Loan Party to such Secured Party up to and including the amount of the Erroneous Payment, plus any other amounts owed by such Secured Party under the indemnification provisions of this Agreement, and (y) exercise its rights and remedies under Section 10.18(c) until the Administrative Agent has received all amounts owed by the Secured Party to the Administrative Agent pursuant to Section 10.18(a).

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this Section 10.18 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the DIP Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

# ARTICLE XI

## GUARANTY

Section 11.01    <u>Guaranty</u>.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this <u>Article XI</u>.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02    <u>Guaranty Absolute</u>.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto.  Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral.  The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following: (a) any lack of validity or enforceability of any Loan Document, the Order or any agreement or instrument relating thereto; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise; (c) any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations; (d) the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party; (e) any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or (f) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.  This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03    <u>Waiver</u>.  Each Guarantor hereby waives (a) promptness and diligence, (b) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this

Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (c) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (d) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (e) any other defense available to any Guarantor.  Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits.  Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04   Continuing Guaranty; Assignments.   This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI, (b) be binding  upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its DIP Loan Commitments and its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05   Subrogation.   No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the DIP Termination Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the DIP Termination Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the DIP Termination Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06   Contribution. All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed. "Fair Share Contribution Amount" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor. "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 11.06), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor. The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01   Notices, Etc.

(a)      Notices Generally. All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, telecopier or other electronic delivery. In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

GC Services Limited Partnership
6330 Gulfton Street
Houston, Texas 77081
Attention: Chief Financial Officer
Telephone: 713-776-6874
Email: michael.jones@gcserv.com

and

Weil, Gotshal & Manges LLP

200 Crescent Court, Suite 300
Dallas, TX 75201-6950
Attention: Vynessa M. Nemunaitis, Sunny Singh
Telephone: 214-746-7851
Fax: (214) 746-7777
Email: vynessa.nemunaitis@weil.com; sunny.singh@weil.com

if to the Agents, to it at the following address:

Goldman Sachs Specialty Lending Group, L.P.
2001 Ross Avenue, Suite 2800
Dallas, TX 75201
Attention: GCS Account Manager
Phone: 770-663-6182
Email:           Alex.harris@gs.com,              lee.king@gs.com,
Hannah.olmstead@gs.com, gs-slg-notices@gs.com

with a copy to:

King & Spalding LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, GA 30309-3521
Attention: Carolyn Z. Alford, W. Austin Jowers
Telephone: (404) 572-2776
Facsimile: (404) 572 5100
Email: calford@kslaw.com; ajowers@kslaw.com

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by facsimile or other electronic delivery shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided, further that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

(b)       Electronic Communications.

(i)       Each Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

(ii)       Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon receipt and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing

82

clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

Section 12.02    Amendments, Etc.  (a) No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Agents and the Lenders or extending an existing Lien over additional property, by the Agents (at the direction of the Required Lenders) and the Borrower, (y) in the case of any other waiver or consent, by the Required Lenders (or by the Collateral Agent and/or the Administrative Agent, as applicable, with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent and/or the Administrative Agent, as applicable, with the consent of the Required Lenders) and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall: (i) increase the DIP Loan Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee or premium payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees or premiums on, the Loans payable to any Lender, in each case, without the written consent of such Lender; (ii) change the percentage of the DIP Loan Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender; (iii) amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender; (iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent and/or the Administrative Agent, as applicable, for the benefit of the Agents and the Lenders, or release any Borrower or any Guarantor (except as permitted by this Agreement), in each case, without the written consent of each Lender; or (v) amend, modify or waive Section 4.02, Section 4.03 or this Section 12.02 of this Agreement without the written consent of each Lender;

(b)    Notwithstanding the foregoing, (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents, and (B) the consent of the Borrower shall not be required to change any order of priority set forth in Section 2.05(d) and Section 4.03.

(c)    [Reserved].

Section 12.03    No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of  any other right.  The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04    Expenses; Taxes; Attorneys' Fees.  The Borrower will pay on demand, all costs and expenses incurred by or on behalf of each Agent and each Lender, including, without limitation,

reasonable fees, reasonable and documented out-of-pocket costs, client charges and expenses of the Lender Advisors, accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents, (b) any amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any Facility of any Loan Party, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien, (m) the rating of the Loans by one or more rating agencies in connection with any Lender's Securitization, or (n) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing.  Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrower agrees to pay all Other Taxes payable in connection with this Agreement or any other Loan Document, and the Borrower agrees to save each Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay  or delay in paying any such Other Taxes, (y) the Borrower agrees to pay all broker fees incurred by any Borrower that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (z) if, upon the occurrence and during the continuance of any Event of Default, the Borrower fails to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself reasonably perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed by the Borrowers within five (5) Business Days of demand by such Agent.  The obligations of the Borrower under this Section 12.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.05    Right of Set-off.  Subject to the Order, upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured.  The rights of the Agents and the Lenders under this Section 12.05 are in addition to the other rights and remedies (including

other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise

Section 12.06   <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07   <u>Assignments and Participations</u>.

(a)   This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; <u>provided</u>, <u>however</u>, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void, and the assignment of any Lender's DIP Loan Commitment and any Loan made by it shall be subject to Section 12.07(b).

(b)   Subject to the conditions set forth in clause (c) below, each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its DIP Loan Commitment and any Loan made by it with the written consent of the Agents and the Borrower (such consent of the Borrower not to be unreasonably withheld, delayed or conditioned); <u>provided</u>, <u>however</u>, that (x) no written consent of Agents or the Borrower shall be required (1) in connection with any assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (2) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender and (y) no written consent of Borrower shall be required if an Event of Default has occurred and is continuing.

(c)   Assignments shall be subject to the following additional conditions:

(i)   Each such assignment shall be in an amount which is at least $1,000,000 or a multiple of $500,000 in excess thereof (or the remainder of such Lender's DIP Loan Commitment) (except such minimum amount shall not apply to an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,000,000 or a multiple of $500,000 in excess thereof);

(ii)   Except as provided in the parenthetical below, the parties to each such assignment shall execute and deliver to the Administrative Agent (and the Collateral Agent, if applicable), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Administrative Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $3,500 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender) and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT; and

(iii)   No such assignment shall be made to any Loan Party, any Permitted Holder or any of their respective Affiliates.

85

(d)      Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least three (3) Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)      By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(f)      The Administrative Agent shall, acting solely for this purpose as a non- fiduciary agent of the Borrower, maintain, or cause to be maintained, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the DIP Loan Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g)      Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Agent or the Collateral Agent pursuant to Section 12.07(b) (which consent of the applicable Agent must be evidenced by such Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or DIP

Loan Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(i)     In the event that any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(j)     Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.09(d).

(k)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its DIP Loan Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its DIP Loan Commitments hereunder) and the other Loan Documents shall remain unchanged; such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document). The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.09 and Section 2.10 of this Agreement with respect to its participation in any portion of the DIP Loan Commitments and the Loans as if it was a Lender, provided that such Participant shall not be entitled to receive any greater payment under Section 2.09 or Section 2.10, with respect to any

participation, than its participating Lender would have been entitled to receive except as otherwise required by a change in law after participation or unless Borrower has consented to such participation.

(l)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such Lender pursuant to securitization or similar credit facility (a "Securitization"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  The Loan Parties shall cooperate with such Lender and its Affiliates to effect the Securitization including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its Loans or the Securitization.

Section 12.08   Counterparts.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09   GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 12.10   CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.

(a)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING JURISDICTION, THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING.   EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL

AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION.  EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 12.10, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS IN RESPECT OF THE DEBTOR AND COLLATERAL CONSTITUTING PROPERTY OF THE DEBTOR'S BANKRUPTCY ESTATE.

Section 12.11    WAIVER OF JURY TRIAL, ETC.  EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12    [Reserved].

Section 12.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14    Reinstatement; Certain Payments.  If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to each other Agent and Lender and the Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the

termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.15    Indemnification; Limitation of Liability for Certain Damages.

(a)    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Closing Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrower under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrower's use of the proceeds thereof, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non- appealable judgment of a court of competent jurisdiction.

(b)    To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)    No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)    The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.16    Records.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the DIP Loan Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17    Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each  Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18    Highest Lawful Rate.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrower); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.18, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrower).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18. For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19    Confidentiality.  Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public or proprietary information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents (and which at the time is not, and does not thereafter become, publicly available through no breach hereunder by an Agent or such Lender or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates (or prospective Affiliates, including limited partners) and to its and its Affiliates' (or such prospective Affiliates') respective equityholders (including, without limitation, partners), directors, officers, employees, agents, trustees, counsel, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19 and such Lender shall remain liable for any breach hereof by such Persons); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.19; (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority (in which case such Agent and/or such Lender shall notify the Borrower, in advance of any such disclosure, to the extent permitted by such law, process and/or request); (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency or otherwise to the extent consisting of general portfolio information that does not identify Loan Parties; (vi) in connection with any litigation to which any Agent or any Lender is a party (in which case such Agent and/or such Lender shall use commercially reasonable efforts to notify the Borrower, in advance of any such disclosure, to the extent permitted by such law, process and/or request); (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; or (viii) with the consent of the Borrower.

Section 12.20    Public Disclosure.  Other than in connection with the Chapter 11 case, each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure).  Each Loan Party hereby authorizes each Agent and each Lender, after consultation with and prior written consent from the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.21    Integration.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.  To

the extent there are any inconsistencies between the terms of this Agreement or any Loan Document and the Order, the provisions of the Order shall govern.

Section 12.22   <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 12.23   <u>Bankruptcy Matters</u>.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Debtor, the estate of the Debtor, and any trustee, other estate representative or any successor in interest of the Debtor in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of each Agent and the Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law.  No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and the Lenders.  Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Administrative Agent and the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, the Administrative Agent and the Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Section 12.24   <u>USA PATRIOT Act</u>.  Each Lender or Agent that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower,

which information includes the name and address of each such entity and other information that will allow such Lender or Agent to identify the entities composing the Borrower in accordance with the USA PATRIOT Act.  Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender or Agent may reasonably require from time to time in order to enable such Lender or Agent to comply with the USA PATRIOT Act.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**<u>BORROWER</u>**:

ORG GC MIDCO, LLC

By:_____
Name:
Title:

**<u>GUARANTORS</u>**:

ORG GC GP BUYER, LLC
ORG GC LP BUYER, LLC

By:_____
    Name:
    Title:

ORG SERVICES LIMITED PARTNERSHIP

By:     ORG GC GP Buyer, LLC,
        its General Partner

By:_____
    Name:
    Title:

ORG SERVICES INTERNATIONAL, LLC

By:_____
    Name:
    Title:

ADMINISTRATIVE AGENT:

[GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.]

By:_____
    Name:    [●]
    Title:    [●]

COLLATERAL AGENT:

[GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.]

By:_____
    Name:    [●]
    Title:    [●]

LENDERS:

[____]
By:   [____]
By:   [____]


By:_____
Name:  [____]
Title: [____]


[____]
By:   [____]
By:   [____]


By:_____
Name:  [____]
Title: [____]


[____]
By:   [____]
By:   [____]


By:_____
Name:  [____]
Title: [____]

SCHEDULE 1.01(A)

Lenders and Lenders' Commitments[17]

| Lenders | DIP Loan Commitment |
|---|---|
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| **Total**: | $[●] |

---

[17] NTD:  To be updated.

## Exhibit G

## FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Restructuring Support Agreement, dated as of [_____] [●], 2021 (as amended, supplemented or otherwise modified from time to time, the "**Agreement**"), by and among the GCS Parties and the Consenting Lenders (each, as defined in the Agreement) is executed and delivered by _____ (the "**Joining_Party**") as of _____, 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "**Consenting Lender**" and a "**Party**" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

2.  Representations and Warranties.  With respect to the aggregate principal amount of Loans under the Existing Term Loan Credit Agreement, as applicable, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Lenders set forth in Section 10 of the Agreement to each other Party to the Agreement.

3.  Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

[CONSENTING LENDER]

By: _____
Name: _____
Title: _____


Principal Amount of Loans:  $_____

Notice Address:

_____
_____
_____
Fax: _____
Attention: _____
Email: _____

[Restructuring Support Agreement Signature Page]

**<u>Schedule A to RSA</u>**

**Specified Defaults**

**Specified Defaults**

1.  Events of Default under Section 9.01(a) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to pay interest, as required by Section 2.04(c) of the Existing Term Loan Credit Agreement.

2.  Events of Default under Section 9.01(a) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to pay principal payments, as required by Section 2.03(a) of the Existing Term Loan Credit Agreement.

3.  Events of Default under Section 9.01(a) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to repay the Loans with the proceeds of any DIP Loans, as required by Section 2.05(c) of the Existing Term Loan Credit Agreement.

4.  Events of Default under Section 9.01(a) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to pay certain administrative agent fees, as required by Section 2.06(c) of the Existing Term Loan Credit Agreement.

5.  Events of Default under Section 9.01(c) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to deliver audited financial statements of Parent pursuant with Section 7.01(a)(iii) of the Existing Term Loan Credit Agreement for the fiscal year ending December 31, 2020.

6.  Events of Default under Section 9.01(c) of the Existing Term Loan Credit Agreement as a result of the Borrowers' delivery of audited financial statements pursuant with Section 7.01(a)(iii) of the Existing Term Loan Credit Agreement for the fiscal years ending December 31, 2019 and December 31, 2020 with a going concern or like qualification or exception.

7.  Events of Default under Sections 9.01(c) and 9.01(d) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to comply with any affirmative covenant set forth in Article VII as a result of the Chapter 11 Cases or excused by, or otherwise prohibited by, the provisions of the Bankruptcy Code.

8.  Events of Default under Sections 9.01(c) and 9.01(d) of the Existing Term Loan Credit Agreement as a result of the incurrence of the DIP Loans.

9.  Events of Default under Section 9.01(c) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to comply with the maximum Leverage Ratio for the twelve month periods ending September 30, 2019 and each fiscal quarter ending thereafter set forth in Section 7.03(a) of the Existing Term Loan Credit Agreement.

10. Events of Default under Section 9.01(c) of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to comply with the minimum Fixed Charge Coverage Ratio for the twelve month periods ending December 31, 2019 and each fiscal quarter ending thereafter set forth in Section 7.03(b) of the Existing Term Loan Credit Agreement.

11. Events of Default under <u>Sections 9.01(f)</u>, <u>9.01(g)</u>, <u>9.01(h)</u> or <u>9.01(i)</u> of the Existing Term Loan Credit Agreement as a result of or in connection with the Chapter 11 Case, the effectiveness of this Agreement or the incurrence of the DIP Loans.

12. Events of Default under <u>Section 9.01(e)</u> of the Existing Term Loan Credit Agreement as a result of the occurrence and continuation of a Default or an Event of Default as defined in the Existing ABL Facility Agreement.

13. Events of Default under <u>Section 9.01(c)</u> of the Existing Term Loan Credit Agreement as a result of the Borrowers' failure to comply with <u>Section 7.01(a)(viii)</u> of the Existing Term Loan Credit Agreement as it relates to any of the foregoing Specified Defaults or the Chapter 11 Case.

14. Events of Default under <u>Section 9.01(b)</u> of the Existing Term Loan Credit Agreement as it relates to any of the foregoing Specified Defaults.

## Exhibit B

**(Settlement and Release Agreement)**

## SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (including all exhibits, annexes, and schedules attached hereto, this "**Agreement**") is made and entered into as of November 8, 2021, by and among the following parties:

i.  ORG GC Midco, LLC ("**Midco**"), ORG GC GP Buyer, LLC, ORG GC LP Buyer, LLC, GC Services International, LLC, GC Services Limited Partnership ("**GCS LP**"), and GC Services (Barbados) SRL (the foregoing, collectively, the "**Company**" or the "**GCS Parties**");

ii.  ORG GC Holdings, LLC ("**Holdings**");

iii.  Owner Resource Group, LLC ("**ORG**"), ORG Opportunity Fund II, LP, ORG Side Car Fund II, LP, ORG GC Coinvestment, LP, and ORG GC Coinvestment II, LP (the foregoing, collectively, the "**ORG Parties**" and, together with Holdings, the "**Sponsors**");

iv.  DLS Enterprises Holdings, LLC, DLS Enterprises, Inc., and GC Financial Corp (the foregoing, collectively, the "**Katz Parties**"); and

v.  the Existing Term Loan Facility Agent (as defined herein) and each of the undersigned lenders (the "**Existing Term Loan Lenders**" and, collectively with the Existing Term Loan Facility Agent, the "**Existing Term Loan Parties**") that, as of the date hereof, beneficially own (or otherwise have voting discretion with respect to) 100% of the obligations outstanding under that certain Financing Agreement, dated July 31, 2017, by and among certain of the GCS Parties, variously, as a borrower and/or as a guarantor thereunder (the "**Borrowers**" and "**Guarantors**," as applicable), BSP Agency, LLC, as administrative agent and collateral agent (the "**Existing Term Loan Facility Agent**"), and the lenders party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Existing Term Loan Credit Agreement**").

Each of the GCS Parties, the Sponsors, the Katz Parties, and the Existing Term Loan Parties shall be referred to herein as a "**Party**" and, collectively, as the "**Parties**".  Capitalized terms used

but not otherwise defined herein shall have the meanings attributed to them in the Plan (as defined herein).

**RECITALS**

**WHEREAS**, the ORG Parties are collectively the majority owners of the Series B and Series C units of Holdings;

**WHEREAS**, the Katz Parties collectively own 100% of the Series A-2, 0% of the Series B and 12% of the Series C Units of Holdings;

**WHEREAS**, Holdings owns 100% of the membership interests in Midco;

**WHEREAS**, Midco directly or indirectly owns 100% of the interests in the GCS Parties other than Midco;

**WHEREAS**, in connection with the Existing Term Loan Credit Agreement, the Existing Term Loan Facility Agent, Holdings, the Borrowers and the Guarantors entered into that certain Pledge and Security Agreement dated July 31, 2017 (the "**Pledge and Security Agreement**"), pursuant to which 100% of the equity interests in the Borrowers and each Guarantor (each a "**Pledged Company**" and, collectively, the "**Pledged Companies**" and such equity interests, the "**Pledged Equity**") was pledged by the holders of such Pledged Equity party to the Pledge and Security Agreement (the "**Pledgors**") in favor of the Existing Term Loan Facility Agent, in its capacity as collateral agent for the Existing Term Loan Lenders, to secure the obligations of the Borrowers under the Existing Term Loan Credit Agreement;

**WHEREAS**, pursuant to Section 6.3 of the Pledge and Security Agreement, the Pledgors (including Holdings) irrevocably constituted and appointed the Existing Term Loan Facility Agent as their proxy and attorney in fact with respect to the Pledged Equity of such Pledgor (including with respect to the equity interests in Midco), including, after the occurrence and during the continuation of an Event of Default (as defined in the Existing Term Loan Credit Agreement), the right to vote the Pledged Equity and the right to exercise certain other rights, powers, privileges and remedies to which a Pledgor would be entitled as set forth in the Pledge and Security Agreement (the "**Proxy and Power of Attorney**");

**WHEREAS**, at any time after the occurrence and during the continuance of an Event of Default, (i) pursuant to Section 9.01 of the Existing Term Loan Credit Agreement, the Existing Term Loan Facility Agent may, and shall at the request of the Required Lenders (as defined in the Existing Term Loan Credit Agreement), by notice to the Administrative Borrower (as defined in the Existing Term Loan Credit Agreement), exercise any and all of its rights and remedies under applicable law, the Existing Term Loan Credit Agreement and any other Loan Document (as defined in the Existing Term Loan Credit Agreement) (including the Pledge and Security Agreement), and (ii) pursuant to Section 4.6(d)(ii) and Section 5.2(a)(v) of the Pledge and Security Agreement, the Existing Term Loan Facility Agent, with one (1) Business Days' prior written notice to the Pledgors, is permitted to exercise all voting rights or other rights relating to the Pledged Collateral (as defined in the Pledge and Security Agreement), including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any

2

Equity Interest or Investment Property (each as defined in the Pledge and Security Agreement) constituting such Pledged Collateral as if it were the absolute owner thereof;

**WHEREAS**, on September 16, 2020, the Existing Term Loan Facility Agent delivered to Midco, as the Administrative Borrower (as defined in the Existing Term Loan Credit Agreement), and each of the other Borrowers, Holdings, and each of the Pledged Companies, that certain *Notice of Exercise of Rights and Remedies After Default*, which, among other things, notified Midco of the Existing Term Loan Facility Agent's decision to exercise rights under the Proxy and Power of Attorney (the "**Exercise of Remedies**");

**WHEREAS**, on September 18, 2020, the Existing Term Loan Facility Agent executed and delivered an Action by Written Consent of the Sole Member of ORG GC Midco, LLC (the "**September 18 Written Consent**"), in the name of and on behalf of Holdings, pursuant to the Proxy and Power of Attorney and the Existing Term Loan Facility Agent's exercise of rights thereunder;

**WHEREAS**, pursuant to (x) the September 18 Written Consent, (y) Section 3.9 of the Limited Liability Company Agreement of ORG GC Midco, LLC dated December 2, 2015 (the "**Former ORG GC Midco Operating Agreement**"), and (z) Section 18-302(d) of the Delaware Limited Liability Company Act, the Existing Term Loan Facility Agent, on behalf of Holdings, among other things, (i) removed each person that was formerly serving as a manager of Midco and appointed new managers to serve as the managers of Midco; and (ii) amended and restated in its entirety the Former ORG GC Midco Operating Agreement and adopted the Amended and Restated Limited Liability Company Agreement of ORG GC Midco, LLC, effective as of September 18, 2020 (the "**A&R ORG GC Midco Operating Agreement**");

**WHEREAS**, ORG and GCS LP are party to that certain Amended and Restated Consulting Agreement, dated as of July 31, 2017 (as may be amended, restated, amended and restated, supplemented, or modified from time to time in accordance with the terms thereof, the "**Consulting Agreement**");

**WHEREAS**, the GCS Parties and the Existing Term Loan Parties have negotiated in good faith at arm's length and agreed to enter into certain transactions in furtherance of a restructuring of the Company's capital structure and financial obligations (the "**Restructuring**"), which is anticipated to be implemented pursuant to the terms of (i) a restructuring support agreement by and among the GCS Parties and the Existing Term Loan Parties (the "**RSA**") and (ii) a prepackaged plan of reorganization (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Plan**"), the substantially final form of which is annexed hereto as **Exhibit A**, and which will be implemented by Midco commencing a voluntary case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United

States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"); and

      **WHEREAS**, the Sponsors and the Katz Parties have agreed, subject to the terms and conditions herein, to, among other things, support and not object to the Restructuring;

      **NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

**AGREEMENT**

**Section 1.**    **Interpretation**.  In this Agreement, unless the context otherwise requires:

      (a)    words importing the singular also include the plural;

      (b)    the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

      (c)    the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation;" the word "or" is not exclusive; and

      (d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and this Agreement.

**Section 2.**    **Effectiveness**.  This Agreement shall become effective and binding upon each of the GCS Parties, the Sponsors, the Katz Parties, and the Existing Term Loan Parties on the first date upon which this Agreement has been executed and delivered by each of the Parties (such date, the "**Agreement Effective Date**").

**Section 3.**    **Commitments of the Sponsors and the Katz Parties**.  From and after the Agreement Effective Date, each of the Sponsors and the Katz Parties shall, severally and not jointly:

      (a)    support and take all actions reasonably requested in writing by the GCS Parties to support and facilitate the implementation and consummation of the Plan and the Restructuring in a timely manner so long as such request does not result in the incurrence of out-of-pocket fees and/or expenses to the Sponsors or the Katz Parties without their express written consent and does not result in the assumption of any liability by the Sponsors or the Katz Parties;

      (b)    not, directly or indirectly, object to, oppose, interfere with, impede, or otherwise attempt to frustrate the Restructuring, the RSA, the Plan, or the Chapter 11 Case or take any  other action that is inconsistent with the Restructuring, the RSA, the Plan, and the Chapter 11 Case;

      (c)    not prepare or commence any action, suit or other proceeding that challenges (i) the

4

amount, validity, allowance, character, enforceability or priority of any Claims against or Interests in the GCS Parties owned or held by any of the Existing Term Loan Parties or any of their respective affiliates or related funds, (ii) the validity, enforceability or perfection of any lien or other encumbrance securing any Claims against or Interests in the GCS Parties owned or held by any of the Existing Term Loan Parties or any of their respective affiliates or related funds, or (iii) support any third party in connection with any of the acts described in this clause (e); provided however that nothing in this paragraph shall prohibit Sponsors or Katz Parties from testifying truthfully in any court or administrative proceeding or responding to discovery in connection with any court proceeding or the Chapter 11 Case to the extent such testimony or discovery is promulgated by a non-Party to this Agreement.

(d)     not, directly or indirectly, pledge, encumber, assign, sell, transfer, loan, grant, hypothecate, participate, donate or otherwise encumber or dispose of, including by the declaration of a worthless stock deduction for any tax year of the applicable Sponsor or Katz Party ending prior to the earlier to occur of (i) date on which the Plan becomes effective in accordance with its terms (such date, the "**Plan Effective Date**") and (ii) the nine (9)-month anniversary of the Agreement Effective Date (such earlier date, the "**Tax Election Covenant Expiration Date**"), offer, or contract to pledge, encumber, assign, sell, transfer, loan, grant, hypothecate, participate, donate or otherwise encumber or dispose of, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other Claims against or Interests in any of the GCS Parties (the "**Sponsor/Katz Claims and Interests**"), or direct or permit any such act directly, indirectly or otherwise (including through derivatives, options, swaps, pledges, forward sales or other transactions, or granting any proxies, depositing into any voting trust, or entering into a voting agreement) and shall not purchase or otherwise acquire any Claims against or Interests in any of the GCS Parties; and

(e)     negotiate in good faith and use commercially reasonable efforts to execute any amendments to the GCS Parties' corporate organizational documents, including the A&R ORG GC Midco Operating Agreement (collectively, the "**Organizational Documents**"), the current forms of which are annexed hereto as **Exhibits B, C, D, E, F, and G**, to facilitate implementation of the Restructuring through the Chapter 11 Case.

**Section 4.**     **Commitments of the GCS Parties**.  From and after the Agreement Effective Date, the GCS Parties shall:

(a)     not seek to reject or modify this Agreement in the Chapter 11 Case and shall assume the obligations herein; and

(b)     not amend, modify, supplement or otherwise alter the Plan or RSA in a manner that is inconsistent with this Agreement without the prior written consent of each of the Sponsors and the Katz Parties.

**Section 5.**     **Termination of the Consulting Agreement**.  Upon the Plan Effective Date, and without further action of any Party, the Consulting Agreement shall be deemed terminated and any amounts due thereunder at any time shall be deemed forever waived and released by ORG in consideration of the full and complete release of any claims against the Sponsors in accordance with the terms of this Agreement.

**Section 6.**     **Payment of Sponsor Professional Fees**.  On the Plan Effective Date, or as soon as practicable thereafter, the GCS Parties shall pay or reimburse to the Sponsors the reasonable and documented out-of-pocket professional fees and expenses of the Sponsors incurred through and including the Plan Effective Date (the "**Sponsor Fees**"); *provided that* the Sponsor Fees shall not exceed $100,000.  The foregoing obligation shall be incorporated into the Plan.

**Section 7.**     **Mutual Representations, Warranties, and Covenants**.  Each of the Parties severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement, that on the Agreement Effective Date:

(a)     it is duly organized, validly existing and in good standing under the laws of the state of its organization, has (or will have, at the relevant time) all necessary power and authority to execute and deliver this Agreement and to consummate all of the transactions and/or obligations contemplated hereby, has duly and validly authorized the execution and delivery of this Agreement and the consummation of all of the transactions and/or obligations contemplated hereby and has duly and validly executed and delivered this Agreement;

(b)     this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c)     except as expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for it to execute, deliver and perform its respective obligations under this Agreement except for consents or approvals that have been obtained as of the Agreement Effective Date;

(d)     in the case of the Sponsors and the Katz Parties, it is the beneficial or record owner of the Sponsor/Katz Claims and Interests, it has the full power and authority to act on behalf of, vote and consent to matters concerning the Sponsor/Katz Claims and Interests, and it has not transferred any of its rights or interests with respect to the foregoing to any Person that is not party to this Agreement;

(e)     with respect to a Sponsor and a Katz Party, it has not made a declaration of a worthless stock deduction with respect to its Interests in any of the GCS Parties for any tax year of the applicable Sponsor or Katz Party, as applicable, ending prior to the Agreement Effective Date or knowingly taken any steps that are likely to have impaired any of the GCS Parties' tax attributes;

(f)     neither the execution and delivery by it of this Agreement nor the consummation by it of any of the transactions contemplated hereby, conflicts with, results in a breach or violation of, constitutes a default under, or results in the termination, cancellation, modification, suspension, revocation or acceleration (whether after the filing of notice or the lapse of time or both) of any rights or obligations of it under, or results in the creation of any security interest, lien, charge, pledge or other encumbrance upon any assets or properties of it pursuant to the terms of: (i) any law, statute, rule, code, ordinance, regulation, restriction or guideline of any governmental or regulatory authority to which it is subject or bound, or any judgment, order, writ, decree, permit,

authorization or license of any governmental or regulatory authority to which it is subject or bound, (ii) any contract, agreement, commitment, instrument, document or arrangement (written or oral) to which it is a party or by which it or any of its assets, businesses or properties is subject or bound or (iii) any of the organizational documents of it; and

(g)     it shall instruct the Related Parties (as defined herein) over which it has control to abide by the Releases set forth in <u>Section 8</u>.

**Section 8.     <u>Releases</u>.** Subject to the occurrence of, and immediately upon the Plan Effective Date, and without further action of any Party, except for the right to enforce this Agreement or any right or obligation arising under this Agreement that remains in effect or becomes effective after the Plan Effective Date, for good and valuable consideration, the Parties shall grant the following mutual releases (collectively, the "**Releases**") to the persons or entities indicated below (each a "**Released Party**"):

8.01.     <u>**Releases by GCS Parties**</u>.  Subject to the occurrence of, and immediately upon the Plan Effective Date, and without further action of any Party, except for the right to enforce this Agreement or any right or obligation arising under this Agreement that remains in effect or becomes effective after the Plan Effective Date , for good and valuable consideration, each of the Sponsors and the Katz Parties and each of their respective current (a) affiliates, (b) subsidiaries, (c) partners, (d) members, (e) managers, (f) managed entities, (g) investment managers, (h) employees, (i) professionals, (j) consultants, (k) directors and (l) officers (the foregoing (a) through (l) in each case together with their respective successors and assigns and in their respective capacities as such, the "**Related Parties**") shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each GCS Party, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of any of the GCS Parties, from any and all Claims or Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the GCS Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that any of the GCS Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, any of the GCS Parties (including the capital structure, management, ownership or operation thereof, including the management and operation of the GCS Parties prior to or following the Exercise of Remedies), the Consulting Agreement, the Organizational Documents, any of the Loan Documents (as defined in the Existing Term Loan Agreement), the Exercise of Remedies, the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements by and among any GCS Party, any of the Existing Term Loan Parties, the Sponsors, and/or the Katz Parties, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of this Agreement or the Plan, the pursuit of confirmation and consummation of the Plan, the negotiations regarding or concerning any of the foregoing or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time to and including the Plan Effective Date.

7

8.02.  **Releases by Existing Term Loan Parties.**  Subject to the occurrence of, and immediately upon the Plan Effective Date, and without further action of any Party, except for the right to enforce this Agreement or any right or obligation arising under this Agreement that remains in effect or becomes effective after the Plan Effective Date, for good and valuable consideration, each of the Sponsors and the Katz Parties and each of their respective Related Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each of the Existing Term Loan Parties, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of any of the Existing Term Loan Parties, from any and all Claims or Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Existing Term Loan Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that any of the Existing Term Loan Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, any of the GCS Parties (including the capital structure, management, ownership or operation thereof, including the management and operation of the GCS Parties prior to or following the Exercise of Remedies), the Consulting Agreement, the Organizational Documents, any of the Loan Documents (as defined in the Existing Term Loan Agreement), the Exercise of Remedies, the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements by and among any GCS Party, any of the Existing Term Loan Parties, the Sponsors, and/or the Katz Parties, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of this Agreement or the Plan, the pursuit of confirmation and consummation of the Plan, the negotiations regarding or concerning any of the foregoing or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time to and including the Plan Effective Date.

8.03.  **Releases by Sponsors.**  Subject to the occurrence of, and immediately upon the Plan Effective Date, and without further action of any Party, except for the right to enforce this Agreement or any right or obligation arising under this Agreement that remains in effect or becomes effective after the Plan Effective Date, for good and valuable consideration, each of the GCS Parties, each of the Existing Term Loan Parties, and each of their respective Related Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each Sponsor, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of any of the Sponsors, from any and all Claims or Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Sponsors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that any of the Sponsors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, any of the GCS Parties (including the capital structure, management, ownership or operation thereof, including the management and operation of the GCS Parties prior to or following the Exercise of Remedies), the Consulting Agreement, the Organizational

Documents, any of the Loan Documents (as defined in the Existing Term Loan Agreement), the Exercise of Remedies, the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between by and among, any GCS Party, any of the Existing Term Loan Parties, the Sponsors, and/or the Katz Parties, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of this Agreement or the Plan, the pursuit of confirmation and consummation of the Plan, the negotiations regarding or concerning any of the foregoing or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time to and including the Plan Effective Date.

8.04.   **Releases by Katz Parties.**  Subject to the occurrence of, and immediately upon the Plan Effective Date, and without further action of any Party, except for the right to enforce this Agreement or any right or obligation arising under this Agreement that remains in effect or becomes effective after the Plan Effective Date , for good and valuable consideration, each of the GCS Parties and the Existing Term Loan Parties and each of their respective Related Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each Katz Party, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Persons who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of any of the GCS Parties, from any and all Claims or Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the GCS Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, contingent or noncontingent, in law, equity or otherwise, that any of the GCS Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person based on or relating to, or in any manner arising from, in whole or in part, any of the GCS Parties (including the capital structure, management, ownership or operation thereof, including the management and operation of the GCS Parties prior to or following the Exercise of Remedies), the Consulting Agreement, the Organizational Documents, any of the Loan Documents (as defined in the Existing Term Loan Agreement), the Exercise of Remedies, the Chapter 11 Case, the filing of the Chapter 11 Case, the Restructuring, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements by and among any GCS Party, any of the Existing Term Loan Parties, the Sponsors, and/or the Katz Parties, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, filing or consummation of this Agreement or the Plan, the pursuit of confirmation and consummation of the Plan, the negotiations regarding or concerning any of the foregoing or any related act or omission, transaction, agreement, event or other occurrence related or relating to the foregoing, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time to and including the Plan Effective Date.

8.05.   **Exceptions to Releases.**

(a)    Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be construed to constitute a release or discharge of, Claims or Causes of Action

against any Released Party arising from conduct of any Released Party determined by a court of competent jurisdiction, or admitted in a formal writing, a formal pleading, or in a plea agreement, to have been caused by, or the result of, intentional fraud, knowing willful misconduct or a criminal act by such Released Party.

(b)    Notwithstanding anything to the contrary in this Agreement, the Released Parties shall not include Frank Taylor in his capacity as the Company's former Chief Executive Officer whose employment with the Company was terminated effective as of November 29, 2020.

(c)    In the event a Related Party brings a Claim or Cause of Action that has been released pursuant to Section 8.01, Section 8.02, Section 8.03, or Section 8.04 of this Agreement against any Released Party, such Related Party shall automatically be deemed not to be a Released Party.

**Section 9.    Termination**

(a)    This Agreement and the obligations of the Parties hereunder may be terminated by mutual written agreement of all of the Parties hereto.

(b)    At any time prior to the Plan Effective Date, any Party may terminate this Agreement as to itself only in the event of a material breach by any other Party of any representation, warranty, covenant, commitment, or other provision of this Agreement that is not cured within five (5) business days of receipt of notice thereof.

(c)    Upon termination of this Agreement in accordance with this Section 9, except as otherwise explicitly provided for herein, all obligations of the Parties under this Agreement shall terminate and shall be of no further force and effect; *provided that* any claim for breach of this Agreement prior to the termination of this Agreement shall survive termination and all rights and remedies with respect to such claim shall be neither waived nor prejudiced in any way by termination of this Agreement.

**Section 10.    Amendments and Waivers**.

(a)    This Agreement may be amended only upon written consent of each of the Parties. Any waiver of any condition, term or provision of this Agreement must be in writing signed by each of the Parties entitled to waive such condition, term or provision.  In determining whether any consent or approval has been given or obtained by the applicable Parties, any then existing Party that is in material breach of its covenants, obligations or representations under this Agreement shall be excluded from such determination.

(b)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 10 shall be ineffective and void *ab initio*.

(c)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of

such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by law.

**Section 11.**     **Notices**.  All notices, requests, and demands to or upon the Parties shall be in writing (including by email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered, addressed as follows:

(a)     If to a GCS Party:

ORG GC Midco, LLC
6330 Gulfton Street
Houston, Texas 77081
Attention:  Mark Schordock, Chief Executive Officer, Michael Jones, Chief Financial Officer, and Brad Batig, Chief Compliance Officer and General Counsel
Email:  mark.schordock@gcserv.com, michael.jones@gcserv.com, and brad.batig@gcserv.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Sunny Singh, Esq. and Katherine T. Lewis, Esq.
Email: sunny.singh@weil.com and katherine.lewis@weil.com

(b)     If to Holdings:

c/o Owner Resource Group, LLC
221 West Sixth Street, Suite 2000
Austin, Texas 78701
Attention: Brad Esson and Tapan Modi
 Email: besson@orgroup.com and tmodi@orgroup.com


(c)     If to the ORG Parties:

c/o Owner Resource Group, LLC
221 West Sixth Street, Suite 2000
Austin, Texas 78701
Attention: Brad Esson and Tapan Modi
 Email: besson@orgroup.com and tmodi@orgroup.com

With a copy (which shall not constitute notice) to:

Waller Lansden Dortch & Davis, LLP
100 Congress Ave., Suite 1800
Austin, TX 78701

Attention: Eric Taube, Esq.
Email: eric.taube@wallerlaw.com

and

Queen Saenz + Schutz PLLC
327 Congress Ave., Suite 220
Austin, Texas 78701
Attention: Thomas I. Queen, Jr. and Andrea Schutz
Email: tqueen@qsps-law.com and aschutz@qsps-law.com

(d)     If to the Katz Parties:

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Attention: George W. Shuster Jr.
Email: george.shuster@wilmerhale.com

(e)     If to BSP:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
Attention: Jayme T. Goldstein, Esq., Daniel P. Ginsberg, Esq., and Joanne Lau, Esq.
Email:  jgoldstein@stroock.com, dginsberg@stroock.com, and jlau@stroock.com

(f)     If to GS:

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Attention: W. Austin Jowers, Esq. and Michael R. Handler, Esq.
Email:  ajowers@kslaw.com and mhandler@kslaw.com

**Section 12.**     **Entire Agreement**.  This Agreement sets forth the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof.

**Section 13.**     **No Admission of Liability**.  Each Party enters into this Agreement without admitting any liability or conceding any allegations.  This Agreement and its provisions shall not be offered or received in evidence in any action or proceeding as an admission or concession of liability or wrongdoing of any nature on the part of any Party except that it may be offered and received in evidence solely to enforce this Agreement.

**Section 14.**     **Settlement Discussions**.  This Agreement and the transactions contemplated herein

are part of a settlement among the Parties.  Nothing herein shall be deemed an admission of any kind.  Each Party acknowledges that it has had a reasonable opportunity to consult with counsel of its own choosing regarding this Agreement, whether or not it has elected to do so.  The Parties have negotiated and executed this Agreement knowingly and voluntarily, without duress or coercion, and with full knowledge of its significance, effects, and consequences.  Each Party has had the opportunity to consider and comment on all provisions of this Agreement and to obtain whatever professional assistance it has considered necessary.

**Section 15.** <u>**Successors and Assigns**</u>.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  The rights and obligations of any party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.  The Parties acknowledge and agree that, for purposes of this Agreement, New Holdco shall be a successor of Midco.

**Section 16.** <u>**Third-Party Beneficiaries**</u>.  This Agreement shall be solely for the benefit of the Parties hereto and no other person shall be a third-party beneficiary hereof; *provided however* the Related Parties shall be entitled to the benefit of the Releases set forth in <u>Section 8</u> hereof and shall be entitled, to the fullest extent permitted by law, to enforce this Agreement to the extent necessary to enforce the Releases herein.

**Section 17.** <u>**Counterparts**</u>.  This Agreement may be executed (including electronically) in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 18.** <u>**Mutual Drafting**</u>.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Agreement is to be interpreted in a neutral manner and in accordance with section 102 of the Bankruptcy Code; and any presumption with regard to interpretation for or against any Party by reason of that Party (or its counsel) having drafted or caused to be drafted this Agreement or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.

**Section 19.** <u>**Choice of Law and Venue; WAIVER OF JURY TRIAL**</u>.  This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York without giving effect to the conflict of laws principles thereof.  Each of the Parties irrevocably agrees that any legal action, suit or proceeding (each, a "**Proceeding**") arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the City of New York (the "**New York Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Proceeding arising out of or relating to this Agreement and the Restructuring.  Each of the Parties agrees not to commence any Proceeding relating hereto or thereto except in the New York Courts, other than Proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court.  Each of the Parties further agrees that notice as provided in <u>Section 11</u> hereof shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.

Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that a Proceeding in any New York Court is brought in an inconvenient forum, the venue of such Proceeding is improper, or the Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Case, all Proceedings related to this Agreement shall be brought in the Bankruptcy Court.  **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**

**Section 20.** **Remedies.**  The Parties understand and agree that irreparable damage may occur in the event that any provision of this Agreement were not performed in accordance with its terms and further agree that, although monetary damages may be available for the breach of such covenants and undertakings, monetary damages alone may not be an adequate remedy therefor. Accordingly, each Party hereto agrees, on behalf of itself and its Affiliates, that in the event of any breach or threatened breach of this Agreement by another Party, each Party shall be entitled to seek an injunction or injunctions and specific performance (which shall include the right to seek to unwind the making of a declaration of a worthless stock deduction by any Sponsor for any tax year that is prior to the Tax Election Covenant Expiration Date), as a remedy of any such breach or to prevent or restrain breaches or threatened breaches of this Agreement, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the terms and provisions of this Agreement.  Any Party seeking an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security or to object to such relief based on a lack of bond or other security.  In the event that any action, claim, suit or proceeding should be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereto hereby waives the defense, that there is an adequate remedy at law.

**Section 21.** **Further Assurances.**  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate this Agreement.

**Section 22.** **Severability and Construction.**  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

**Section 23.** **Headings.**  Headings in this Agreement are for the convenience of the Parties and are not to be construed as limiting the scope of or used in construing the Agreement.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**SIGNATURE PAGES ON FILE WITH THE DEBTOR**

**<u>Exhibit A</u>**

Plan

[Omitted]

## **<u>Exhibit B</u>**

**ORG GC MIDCO, LLC A&R LLCA**

[Omitted]

## Exhibit C

**ORG GC GP BUYER, LLC A&R LLCA**

[Omitted]

## Exhibit D

**ORG GC LP BUYER, LLC A&R LLCA**

[Omitted]

**<u>Exhibit E</u>**

**GC SERVICES LIMITED PARTNERSHIP A&R PARTNERSHIP AGREEMENT**

[Omitted]

## **Exhibit F**

**GC SERVICES INTERNATIONAL, LLC A&R LLCA**

[Omitted]